## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:07CV00399 (ES) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MOTION TO AMEND ANSWER AND FILE COUNTERCLAIMS

Pursuant to Federal Rules Civil Procedure 13 and 15, Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") respectfully requests that this Court grant it leave to amend its previously filed Answer to the Complaint filed by Donald Gross, to include counterclaims for his breach of duty of loyalty while employed at Akin Gump and tortious interference with Akin Gump's economic advantage, and to include an "after-acquired evidence" affirmative defense, based upon the same improper conduct. The amendments are supported by information discovered by Akin Gump while responding to Mr. Gross's First Request for Production of Documents. Amendment at this time would in no way prejudice Mr. Gross as no depositions have taken place and the close of discovery is over two months away. Pursuant to Local Rule 15.1, the proposed First Amended Answer and Counterclaim is attached hereto as Exhibit A.

## I.    STATUS OF THE CASE

On February 26, 2007, Mr. Gross filed a Complaint alleging age discrimination in connection with the termination of his employment. Akin Gump filed its Answer to Mr. Gross's Complaint on March 19, 2007, denying those allegations. Mr. Gross served Akin Gump with his

First Request for Production of Documents, dated April 12, 2007. Pursuant to the Scheduling

Order, dated April 13, 2007, the discovery deadline is August 31, 2007. No depositions have

been taken in this case.

## II.    FACTS TO BE PLED IN COUNTERCLAIM

1.  In June 2003, Mr. Gross was offered a Senior Counsel position at Akin Gump, working

for the firm's Korean clients. In this role, Mr. Gross reported to, Sukhan Kim, a Partner at Akin

Gump. Due to concerns raised by several Akin Gump attorneys during his interview process

regarding Mr. Gross's qualifications for that position, Mr. Gross's offer letter clearly explained

that it was the firm's "intention to review [his] employment situation at [his] one year

anniversary and reassess our needs and the terms of [his] employment."

2.  Mr. Gross began working for Akin Gump, and the firm quickly discovered that the

concerns identified in the interview process were valid. Mr. Gross's writing lacked organization

and the clear analytical skills necessary for attorneys at a major international law firm. Much of

Mr. Gross's written material needed substantial revision and editing, and other attorneys at the

firm, including Michael Quigley and David Park, were tasked with substantially rewriting these

materials—in some instances virtually from scratch.

3.  As a result, Mr. Gross could not be given the task of drafting analytical policy

memorandums, and rather, was assigned to work primarily on business development projects for

Akin Gump's  Korea Practice.

4.  Akin Gump decided that it could not employ Mr. Gross in a primarily business

development capacity.

5.  Accordingly, just after Mr. Gross's one year anniversary, on or shortly before July 25, 2004, Mr. Gross was informed that his employment would be terminated.  Mr. Kim told Mr. Gross that he would try to extend Mr. Gross's employment with the firm as long as possible to allow Mr. Gross the opportunity to find another position.

6.  Prior to being informed that he would be asked to leave the firm, Mr. Gross had worked with others at the firm to persuade a particular prospective client (the "Prospective Client") to hire Akin Gump and to sign a proposed engagement letter which Mr. Gross had drafted and negotiated with input from others.  He, along with several Akin Gump partners, had performed significant preliminary work with an understanding that the firm would receive certain exclusive rights thereafter to perform services.

7.  On July 25, 2004, Mr. Gross, for the first time, conveyed to the Prospective Client alleged reservations about the Prospective Client retaining Akin Gump.  Specifically, he wrote to the Prospective Client:  "Before you commit yourself to a partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind your project."

8.  Then, on July 29, 2004, Mr. Gross encouraged the Prospective Client not to sign the final version of a previously negotiated engagement letter with Akin Gump.  Specifically, he wrote to the Prospective Client:

> "For the moment, I think you should delay signing the engagement letter.  *The law firm will be unhappy with this recommendation*, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words."

(emphasis added).

9.  The Prospective Client did not sign an engagement letter with Akin Gump.

10. Mr. Gross's misconduct did not stop there. On July 29, 2004, Mr. Kim received an email from the Chief Executive Officer ("CEO") of Company X, a business partner of the Prospective Client, asking to meet with him about an issue related to Company Y.

11. On August 3, 2004, Mr. Gross sent Mr. Kim a memorandum preparing Mr. Kim for a meeting with the CEO of Company X, outlining, among other things, various ways in which Akin Gump and Mr. Kim could advise and assist Company X. Mr. Gross raised no concerns whatsoever to Mr. Kim about Akin Gump's or Mr. Kim's ability to effectively represent/advise Company X. In particular, with respect to a contemplated deal between Company X and Company Y, Mr. Gross wrote "from [CEO of Company X's ] standpoint, your assistance on this alone would give tremendous 'added value.'"

12. On August 5, 2004, Mr. Kim informed Mr. Gross that Akin Gump had decided that Mr. Gross would be required to leave the firm within 60 days, unless he found work elsewhere in the firm.

13. On August 6, 2004, Mr. Gross wrote to Mr. Kim, noting that it was "quite upsetting" that he was being asked to leave the firm within 60 days, stating his desire to stay at Akin Gump, and asking for Mr. Kim's support of a position in which he would spend part of his time in the International Section of the firm (working on business development), with the remainder of his time spent on Korea-matters. Mr. Gross also stated that he "[hope[d] that [the CEO of Company X] will decide to retain Akin Gump as his international counsel" and asked Mr. Kim to inform him if there was "anything further [he could] do to help." Mr. Gross did not mention any alleged age discrimination.

14. On August 12, 2004, Mr. Gross asked Mr. Kim, via email, to recommend him for a position to the CEO of Company X, during his upcoming meeting with the CEO, because Mr. Kim had encouraged him to look for opportunities outside of Akin Gump.  Mr. Kim told Mr. Gross he would do his best to help Mr. Gross obtain a position at Company X.

15. On August 14, 2004, in response to additional job opportunities forwarded by Mr. Kim, Mr. Gross stated that he felt that it was best at that point to focus his efforts on obtaining a position at Company X, thanked Mr. Kim for his assistance in this regard, and noted that he would "be quite helpful to [Mr. Kim] if [he] served as a kind of ambassador for [Company X]."

16. In contrast to the representations he was making to Mr. Kim about serving as "a kind of ambassador," beginning August 24, 2004, while still an Akin Gump employee and on its payroll, Mr. Gross made the following statements in emails to the Prospective Client, an advisor to Company X:

- "They [Akin Gump] have also ignored me and treated me very badly, though they know I am your friend and have strived to advance your interests.  If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm."

- "Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.]  This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X] could not possibly trust him to serve as an 'honest broker.'  Sukhan has never represented an American company doing business in Korea, so far as I know, and is a highly specialized trade lawyer whose practice consists of representing Korean companies in the United States."

- "Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X]."

- "I didn't know Jaemin [Park] [a then Partner at Akin Gump] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul.  Her help is even more questionable. . . .  She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence."

5

- "If [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."

17.  Mr. Gross thereafter lobbied the Prospective Client in writing for a position with the Prospective Client and/or at Company X.

18.  Company X did not retain the services of Akin Gump at that time.

19.  Mr. Gross's employment at Akin Gump terminated on October 31, 2004.

20.  Had Akin Gump known of Mr. Gross's efforts to disturb its relationships with the Prospective Client or Company X, including his statements about its attorneys, Akin Gump would have terminated him immediately and would not have allowed him to remain on the payroll through the end of October.

21.  Akin Gump did not discover the email communications referenced in Paragraphs 7, 8 and 16 until they reviewed Mr. Gross's Akin Gump email account for documents responsive to Mr. Gross's First Request for Production of Documents, in May and June 2007.  Akin Gump would have no reason to suspect and/or investigate this wrongdoing on the part of Mr. Gross prior to this discovery.[1]

## III.    ARGUMENT

### A.    Standards For Leave To Amend.

Pursuant to Rule 13 of the Federal Rules of Civil Procedure:

> A claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading. . . .  When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or

---

[1]  All of these emails were produced by Akin Gump to Mr. Gross on June 19, 2007, as part of its response to his request for documents.

> when justice requires, the pleader may be leave of court set up the counter-claim by amendment.

Id.

Pursuant to Rule 15 of the Federal Rule of Civil Procedure, after 20 days have run from service of a pleading: "a party may amend the party's pleading only by leave of court. . . and leave shall be freely given when justice so requires." See Boyd v. District of Columbia, 465 F. Supp. 2d 1 (D.D.C. 2006) (granting motion for leave to amend, and noting that the court must "heed Rule 15's mandate that leave is to be 'freely given when justice so requires.'").

**B.     Akin Gump Should Be Granted Leave to File Counterclaims of Breach of Duty of Loyalty and Tortious Interference with Prospective Business.**

**1.     Mr. Gross Violated his Duty of Loyalty to Akin Gump**

This Court has repeatedly applied the common law principles and limitations of agency law in the employment context. Under such common law principles, Mr. Gross owed an "undivided and unselfish loyalty" to Akin Gump while employed there. See Government Relations Inc., v. Howe, No. 05-1081, 207 U.S. Dist. LEXIS 4952 (D.D.C. Jan. 24, 2007). He violated that duty.

In PM Services Co. v. Odoi Associates, Inc., No. 03-1810 (CKK), 2006 U.S. Dist. LEXIS 655 (D.D.C. Jan. 4, 2006), this Court found that if the employer could prove that its former employee attempted to divert a potential contract away from the employer, then it could establish a breach of the fiduciary duty of loyalty by the employee. This Court noted that employees owe an "'undivided and unselfish loyalty to the corporation' such that there 'shall be no conflict between duty and self interest," relying on Restatement (Second) of Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the

principal in all matters concerned with his agency."). <u>See</u> <u>also</u> <u>George A. Hormel and</u> <u>Co., v.</u> <u>Nat'l Labor Relations Board</u>, 962 F.2d 1061 (D.C. Cir. 1992) (finding that an employee's participation in a boycott parade and rally against his employer violated his duty of loyalty to his employer because it would appear to any reasonably observer that he was acting in furtherance of the boycott which worked against his employer's interest).

Here, Akin Gump has ample evidence (before even taking the deposition of Mr. Gross) that Mr. Gross repeatedly and systematically worked against its interests, and thus violated his duty of loyalty to Akin Gump. Mr. Gross admits as much to the Prospective Client, when he states that "[t]he law firm will be unhappy with [his] recommendation" that the Prospective Client not sign the previously negotiated engagement letter.

In addition, Mr. Gross's advice to the Prospective Client, in the Prospective Client's capacity as advisor to Company X, that if "[Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm" is the polar opposite of the "unselfish" and undivided loyalty that Mr. Gross was duty-bound to with respect to Akin Gump. Moreover, Mr. Gross's subsequent negative statements regarding Akin Gump's potential representation of Company X, including, but not limited to his statement that Mr. Kim was close to retirement (Mr. Kim is still a Partner at Akin Gump three (3) years after this statement was made), are further potent evidence of Mr. Gross's clear breaches of his duty of loyalty with respect to Akin Gump.

Finally, the timing of these disloyal acts and statements, combined with copious contemporaneous documentation of Mr. Gross's efforts to obtain a position with either the Prospective Client and/or Company X, clearly indicate that Mr. Gross was attempting to curry

favor with said entities, and put himself (either individually, or with a new firm) in the position of serving the needs that they were looking to Akin Gump to service.  For example, after advising the Prospective Client that Company X should not retain Akin Gump; stating that Mr. Kim could not be trusted, had no relevant experience and was about to retire; and that Ms. Park allegedly exaggerates her influence in Korea, Mr. Gross helpfully offers that "[i]f [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."  Mr. Gross's behavior is the very definition of a breach of the duty of loyalty, made even worse by the well-documented fact that many individuals at Akin Gump, including the very individuals that he was disparaging, including Mr. Kim and Ms. Park, were doing everything in their power to assist Mr. Gross secure a new position outside of a large U.S.-based law firm.

Given this strong evidence of Mr. Gross's wrongdoing discovered by Akin Gump during the preliminary stages of discovery in this matter, Akin Gump should be granted leave to file a breach of duty of loyalty counterclaim in this matter.  Such a counterclaim would in no way prejudice the Plaintiff as no depositions have taken place and discovery is ongoing and the cut-off is over two months away.

### 2.    Mr. Gross Tortiously Interfered With Akin Gump's Economic Advantage.

To establish a claim for tortious interference with economic advantage under District of Columbia law, a plaintiff must show:  (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damages.  PM Services Co. v. Odoi Associates, Inc., No. 03-1810 (CKK), 2006 U.S. Dist. LEXIS 655 (D.D.C. Jan. 4, 2006).

In <u>PM Services Co.</u>, this Court held that the employee could be liable for intentional interference if he breached his duty of loyalty to the employer by knowingly and intentionally diverting business opportunities away from his employer. <u>Id.</u> at 113. Here, it is well-documented that Akin Gump had a valid business expectancy with the Prospective Client. The Prospective Client had already expressed his commitment to working with Akin Gump and an engagement letter had been negotiated (by Mr. Gross) and nearly signed by the Prospective Client. In addition, Akin Gump had a valid business expectancy with Company X. The CEO of Company X had requested a meeting with Mr. Kim. Mr. Gross himself drafted a memorandum for Mr. Kim in preparation for that meeting advising him of the various ways that Akin Gump could provide valuable assistance to Company X. Because of Mr. Gross's extensive involvement in these matters, his knowledge of these expectancies cannot seriously be disputed. As outlined above, Mr. Gross wrongly interfered with these expectancies by breaching his duty of loyalty to Akin Gump. Mr. Gross's misconduct was effective. Akin Gump has been damaged by Mr. Gross's wrongful interference, by losing the engagement with the Prospective Client and by not being retained by Company X at that time.

Accordingly, this Court should grant Akin Gump leave to file a counter-claim for tortious interference with economic advantage.

### C.	Akin Gump Should Be Granted Leave to Amend its Answer to Include an "After-Acquired Evidence" Affirmative Defense.

Akin Gump's post-termination discovery of Mr. Gross's tortious actions entitle Akin Gump to raise the "after-acquired evidence" affirmative defense to his claim that he is entitled to reinstatement and/or front pay in this matter. The United States Supreme Court has held that after-acquired evidence of wrongdoing, serves as a bar to reinstatement or front pay as a remedy

in an age discrimination case.  McKennon v. Nashville Banner Publishing Co., 513 U.S. 352,

362 (1995).  Specifically, in McKennon, the court held that:

> Once an employer learns about employee wrongdoing that would lead to
> legitimate discharge, we cannot require the employer to ignore the
> information, even if it is acquired during the course of discovery in a suit
> against the employer and even if it might have gone undiscovered absent
> the suit.

Id. at 362.

This Court has repeatedly followed McKennon to bar the recovery of front pay in

discrimination suits involving wrongdoing on the part of the employee alleging discrimination.

See Webb v. The District of Columbia, 146 F.3d 964 (D.C. Cir. July 7, 1998) (vacating default

judgment in favor of employer and remanding for further proceedings, holding that the district

court had improperly rejected evidence relevant to the propriety of reinstatement).  In Webb, The

Court noted, citing McKennon, that if evidence acquired after an unlawful termination showed

wrongdoing "of such severity that the employee in fact would have been terminated on those

grounds alone if the employer had known of it at the time of discharge" reinstatement generally

would be an inappropriate remedy.  See also Castle v. Rubin, 78 F.3d 654, 657 (D.C. Cir. 1996)

(granting summary affirmance of the district court's denial of reinstatement and front pay in a

discrimination matter based on after-acquired evidence that the plaintiff had plagiarized various

materials while preparing training materials, and that the employer would have terminated the

employee had it discovered her plagiarism while she was still employed); Gipson v. Wells Fargo

Bank N.A., 460 F. Supp. 2d 12 (D.D.C. 2006) (denying plaintiff's motion in limine, and finding

that after-acquired evidence of the employees misconduct relating to material omissions on her

employment application could be admitted at trial); Fogg v. Gonzales, 407 F. Supp. 2d 79

(D.D.C. 2005) (noting that while the after-acquired evidence rule generally applies to situations

in which the plaintiff's misconduct occurred before dismissal and would have resulted in the

plaintiff's termination if the employer had known of the misconduct, the Supreme Court in

McKennon has suggested that the district court may also apply the rule in situations beyond that

standard after-acquired evidence case, such as those where the plaintiff's misconduct occurs after

dismissal); Ekandem v. District of Columbia, No. 91-1060-LFO, 1997 U.S. Dist. LEXIS 8906

(D. D.C. June 23, 1997) (holding that after-required evidence of falsification of information on

an employment application barred recovery for reinstatement and front pay).

　　　Here, Akin Gump will be able to establish that Mr. Gross's active discouragement of the

Prospective Client, and Company X, would have been grounds for the immediate termination of

Mr. Gross's employment at Akin Gump.  See George A. Hormel and Company v. Nat'l Labor

Relations Board, 962 F.2d 1061 (D.D.C. 1992) (noting that employer committed no unfair labor

practice by discharging employee who violated his duty of loyalty to the employer by

participating in a boycott parade and rally).

　　　Akin Gump should be granted leave to amend its Answer to include an "after-acquired

evidence" affirmative defense that will bar any possible reinstatement or front-pay award in this

case.  There is no reason that Akin Gump would have had looked for or uncovered Mr. Gross's

tortious actions prior to its recent discovery of the emails referenced herein.  Therefore, as was

the case in McKennon, Akin Gump was not aware that it had such an affirmative defense to Mr.

Gross's claims until it uncovered his misconduct during discovery.  Thus, the interests of justice

require that Akin Gump be allowed to amend its Answer to include this recently discovered

"after-acquired evidence" affirmative defense.  Finally, as stated above, such an amendment

would in no way prejudice the Plaintiff as no depositions have taken place and discovery is

ongoing.

## IV.     CONCLUSION

For the foregoing reasons,  Defendant respectfully requests that this Court grant it leave to amend its previously filed Answer in this case to include counterclaims of breach of duty of loyalty and tortious interference with economic advantage as well as an "after-acquired evidence" affirmative defense.

### <u>LOCAL RULE 7 MEET AND CONFER CERTIFICATION</u>

I, the undersigned counsel of record for Akin Gump Strauss Hauer & Feld, LLP, certify that this motion has been discussed with opposing counsel via telephone on Friday, June 22, 2007.  Opposing counsel opposes this motion.  A good faith effort was made to narrow the areas of disagreement.

Dated:  June 25, 2007                    Respectfully Submitted,


                                             /s/
                              _____
                              Christine N. Kearns (D.C. Bar # 416339)
                              Karen-Faye McTavish (D.C. Bar # 477588)
                              PILLSBURY WINTHROP SHAW PITTMAN LLP
                              2300 N Street, N.W.
                              Washington, D.C.  20037-1128
                              (202) 663-8000

                              Counsel for Akin Gump Strauss Hauer & Feld LLP

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 25th day of June, 2007, I electronically filed the foregoing

document with the clerk of the court by using the ECF system, which will send a notice of

electronic filing to the following counsel of record:

        Jonathan C. Puth
        Webster, Fredrickson & Brackshaw
        1775 K Street, N.W.
        Suite 600
        Washington, D.C. 20006


                /s/
                Christine N. Kearns

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) Case No. 1:07CV00399 (ES) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

## FIRST AMENDED ANSWER AND COUNTERCLAIMS

Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") respectfully submits its first amended response and answer to the Complaint and its counterclaims. Any allegation that is not expressly admitted is denied.

1.      Defendant lacks sufficient information to admit or deny the allegations of the first sentence of paragraph 1 relating to Plaintiff's place of residence and allegations of the last sentence of paragraph 1 relating to Plaintiff's date of birth, and demands strict proof thereof. Defendant neither admits nor denies the remaining allegations of paragraph 1, because they are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

2.      Defendant denies that it is a limited liability partnership organized under the laws of the District of Columbia, and admits that it maintains its principal office in the District of Columbia. Defendant neither admits nor denies the remaining allegations of paragraph 2,

because they are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

3.     Defendant admits that the Complaint purports to state claims that would support this Court's jurisdiction, but denies the factual and legal sufficiency of those claims.

4.     Defendant admits that the Complaint purports to state claims that support venue in this district and division, but denies the factual and legal sufficiency of those claims.

5.     Defendant admits that Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on April 29, 2005, in which he alleges age discrimination, but denies the factual and legal sufficiency of those claims. Defendant neither admits nor denies the remaining allegations of paragraph 5, because they are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

6.     Defendant admits the allegations of paragraph 6.

7.     Defendant neither admits nor denies the allegations of paragraph 7, because they are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied.

8.     Defendant admits that in June 2003, it extended an offer to Plaintiff as Senior Counsel in its Washington, D.C. office.  Defendant also admits the second sentence of paragraph 8. Defendant denies the remaining allegations of paragraph 8.

9.     Defendant denies the allegations of paragraph 9.

10.     Defendant admits that Michael Quigley was present during Plaintiff's pre-employment interview.  Defendant denies the remaining allegations of paragraph 10.

400591335v1

11.     Defendant admits that during that meeting Mr. Gross made a statement to the effect that he hoped that his prior experience would not disqualify him for the position. Defendant denies the remaining allegations of paragraph 11.

12.     Defendant admits that in or around March 2004, Plaintiff was absent for surgery. Defendant lacks sufficient information to admit or deny the allegation that the surgery was "minimally-invasive heart-valve" surgery.  Defendant denies the remaining allegations of paragraph 12.

13.     Defendant denies the allegations of paragraph 13.

14.     Defendant denies the allegations of paragraph 14.

15.     Defendant admits that Mr. Park redrafted "sections of major memoranda" prepared by Mr. Gross.  Defendant denies the remaining allegations of paragraph 15.

16.     Defendant denies the allegations of paragraph 16.

17.     Defendant admits that Mr. Kim spoke with Plaintiff about the fact that Mr. Kim took baby aspirin for his heart but denies the remaining allegations of paragraph 17.

18.     Defendant admits that Mr. Kim made a statement to the effect that he (Mr. Kim) hoped to retire soon.  Defendant denies the remaining allegations of paragraph 18.

19.     Defendant denies the allegations of paragraph 19.

20.     Defendant denies the allegations of paragraph 20.

21.     Defendant admits that Mr. Kim suggested that Mr. Gross investigate the possibility of working with the firm's public law and policy practice group.  Defendant  denies the remaining allegations of paragraph 21.

22.     Defendant denies the allegations of paragraph 22.

23.     Defendant admits that Mr. Quigley observed that Plaintiff's experience might make him a good fit for a job with a policy think tank or similar non-legal arena.  Defendant denies the remaining allegations of paragraph 23.

24.     Defendant admits that on or about August 5, 2004, Mr. Kim informed Plaintiff that the firm was terminating his employment.  Defendant further admits that Mr. Quigley discussed Plaintiff with R. Bruce McLean, Akin Gump's Chairman, who decided that Mr. Gross's employment should be terminated, and that Mr. Kim relayed this to Plaintiff.  Defendant denies the remaining allegations of paragraph 24.

25.     Defendant admits that on or about September 1, 2004, Plaintiff met with Rick Burdick, partner-in-charge of the Washington office, and that Mr. Burdick told Mr. Gross that he knew nothing about his termination, and said he would speak with Mr. McLean and Mr. Quigley. Defendant denies the remaining allegations of paragraph 25.

26.     Defendant admits the allegations of paragraph 26.

27.     Defendant admits that that it terminated Plaintiff's employment effective October 31, 2004, and that it had granted Plaintiff a one-month extension of his original termination date. Defendant denies the remaining allegations of paragraph 27.

28.     Defendant denies the allegations of paragraph 28.

29.     Defendant denies the allegations of paragraph 29.

30.     Defendant admits that Mr. Kim told Plaintiff that his termination was not based on economic reasons.  Defendant denies the remaining allegations of paragraph 30.

31.     Defendant denies the allegations of paragraph 31.

32.     Defendant admits the allegations of paragraph 32.

## COUNT I

33.     Defendant incorporates the responses to paragraphs 1- 32 as if fully set forth herein.

34.     Defendant denies the allegations of paragraph 34.

35.     Defendant denies the allegations of paragraph 35.

36.     Defendant denies the allegations of paragraph 36.

## COUNT II

37.     Defendant incorporates the responses to paragraphs 1- 36 as if fully set forth herein.

38.     Defendant denies the allegations of paragraph 38.

39.     Defendant denies the allegations of paragraph 39.

40.     Defendant denies the allegations of paragraph 40.

Defendant denies that Plaintiff is entitled to any of the remedies sought in his prayer for relief.

Any allegations not specifically admitted are denied.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Plaintiff fails to state a claim for which relief may be granted.

### SECOND DEFENSE

Plaintiff failed to avail himself of remedial measures provided by his employer.

### THIRD DEFENSE

Plaintiff has failed to mitigate his damages, if any.

### FOURTH DEFENSE

Plaintiff has failed to exhaust his administrative requirements.

<u>FIFTH DEFENSE</u>

Plaintiff's claims are time-barred.

<u>SIXTH DEFENSE</u>

The relief sought by Plaintiff is limited by the "after-acquired evidence" rule.

**<u>COUNTERCLAIMS</u>**

For its Counterclaims against Plaintiff, Donald G. Gross, Akin Gump states as follows:

**<u>PARTIES</u>**

1.      Counterclaim Plaintiff Akin Gump Strauss Hauer & Feld LLP ("Akin Gump" or

"firm") is a limited liability partnership, with an office in the District of Columbia.

2.      Upon information an belief, Counterclaim Defendant Donald G. Gross is an adult

male citizen of the District of Columbia.

**<u>JURISDICTION</u>**

3.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367.

4.      Venue is proper as all acts complained of herein occurred in the District of

Columbia.

**<u>FACTS GIVING RISE TO RELIEF</u>**

5.      In June 2003, Mr. Gross was offered a Senior Counsel position at Akin Gump,

working for the firm's Korea clients.  In this role, Mr. Gross reported to Sukhan Kim, a Partner

at Akin Gump.   Due to concerns raised by several Akin Gump attorneys during his interview

process regarding Mr. Gross's qualifications for that position, Mr. Gross's offer letter clearly

explained that it was the firm's "intention to review [his] employment situation at [his] one year

anniversary and reassess our needs and the terms of [his] employment."

6

6.      Mr. Gross began working for Akin Gump, and the firm quickly discovered that the concerns identified in the interview process were valid.  Mr. Gross's writing lacked organization and the clear analytical skills necessary for attorneys at a major international law firm.  Much of Mr. Gross's written material needed substantial revision and editing, and other attorneys at the firm, including Michael Quigley and David Park, were tasked with substantially rewriting these materials—in some instances virtually from scratch.

7.      As a result, Mr. Gross could not be given the task of drafting analytical policy memorandum, and rather, was assigned to work solely on business development projects for Akin Gump's  Korea Practice.

8.      Akin Gump decided that it could not employ Mr. Gross in a primarily business development capacity.

9.      Accordingly, just after Mr. Gross's one year anniversary, on or shortly before July 25, 2004, Mr. Gross was informed that his employment would be terminated.  Mr. Kim told Mr. Gross that he would try to extend Mr. Gross's employment with the firm as long as possible to allow Mr. Gross the opportunity to find another position.

10.      Prior to being informed that he would be asked to leave the firm, Mr. Gross had worked with others at the firm to persuade a particular prospective client (the "Prospective Client") to hire Akin Gump and to sign a proposed engagement letter which Mr. Gross had drafted and negotiated with input from others.  He, along with several Akin Gump partners, had performed significant preliminary work with an understanding that the firm would receive certain exclusive rights thereafter to perform services.

11.      On July 25, 2004, Mr. Gross, for the first time, conveyed to the Prospective Client alleged reservations about the Prospective Client retaining Akin Gump.  Specifically, he wrote to

the Prospective Client: "Before you commit yourself to a partnership with Akin Gump, I want to

make sure that the law firm is a hundred percent behind your project."

12.    Then, on July 29, 2004, Mr. Gross encouraged the Prospective Client not to sign

the final version of a previously negotiated engagement letter with Akin Gump.  Specifically, he

wrote to the Prospective Client:

> "For the moment, I think you should delay signing the engagement letter.  *The law firm
> will be unhappy with this recommendation*, but I can't in good conscience ask you to rely
> exclusively on Akin Gump until I see actions matching words."

(emphasis added).

13.    The Prospective Client did not sign an engagement letter with Akin Gump.

14.    Mr. Gross's misconduct did not stop there.  On July 29, 2004, Mr. Kim received

an email from the Chief Executive Officer ("CEO") of Company X, a business partner of the

Prospective Client, asking to meet with him about an issue related to Company Y.

15.    On August 3, 2004, Mr. Gross sent Mr. Kim a memorandum preparing Mr. Kim

for a meeting with the CEO of Company X, outlining, among other things, various ways in

which Akin Gump and Mr. Kim could advise and assist Company X.  Mr. Gross raised no

concerns whatsoever to Mr. Kim about Akin Gump's or Mr. Kim's ability to effectively

represent/advise Company X.  In particular, with respect to a contemplated deal between

Company X and Company Y, Mr. Gross wrote "from [CEO of Company X's ] standpoint, your

assistance on this alone would give tremendous 'added value.'"

16.    On August 5, 2004, Mr. Kim informed Mr. Gross that Akin Gump had decided

that Mr. Gross would be required to leave the firm within 60 days, unless he found work

elsewhere in the firm.

17.    On August 6, 2004, Mr. Gross wrote to Mr. Kim, noting that it was "quite

upsetting" that he was being asked to leave the firm within 60 days, stating his desire to stay at

Akin Gump, and asking for Mr. Kim's support of a position in which he would spend part of his time in the International Section of the firm (working on business development), with the remainder of his time spent on Korea-matters.  Mr. Gross also stated that he "[hope[d] that [the CEO of Company X] will decide to retain Akin Gump as his international counsel" and asked Mr. Kim to inform him if there was "anything further [he could] do to help."  Mr. Gross did not mention any alleged age discrimination.

18.    On August 12, 2004, Mr. Gross asked Mr. Kim, via email, to recommend him for a position to the CEO of Company X, during his upcoming meeting with the CEO, because Mr. Kim had encouraged him to look for opportunities outside of Akin Gump.  Mr. Kim told Mr. Gross he would do his best to help Mr. Gross obtain a position at Company X.

19.    On August 14, 2004, in response to additional job opportunities forwarded by Mr. Kim, Mr. Gross stated that he felt that it was best at that point to focus his efforts on obtaining a position at Company X, thanked Mr. Kim for his assistance in this regard, and noted that he would "be quite helpful to [Mr. Kim] if [he] served as a kind of ambassador for [Company X]."

20.    In contrast to the representations he was making to Mr. Kim about serving as "a kind of ambassador," beginning August 24, 2004, while still an Akin Gump employee and on its payroll, Mr. Gross made the following statements in emails to the Prospective Client, an advisor to Company X:

- "They [Akin Gump] have also ignored me and treated me very badly, though they know I am your friend and have strived to advance your interests.  If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm."

- "Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.]  This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X]  could not possibly trust him to serve as an 'honest broker.'  Sukhan has never represented an American company doing

business in Korea, so far as I know, and is a highly specialized trade lawyer whose practice consists of representing Korean companies in the United States."

- "Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X]."

- "I didn't know Jaemin [Park] [a then Partner at Akin Gump] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul.  Her help is even more questionable. . . .  She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence."

- "If [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."

21.    Mr. Gross thereafter lobbied the Prospective Client in writing for a position with the Prospective Client and/or at Company X.

22.    Company X did not retain the services of Akin Gump at that time.

23.    Mr. Gross's employment at Akin Gump terminated on October 31, 2004.

24.    Had Akin Gump known of Mr. Gross's efforts to disturb its relationships with the Prospective Client or Company X, including his statements about its attorneys, Akin Gump would have terminated him immediately and would not have allowed him to remain on the payroll through the end of October.

25.    Akin Gump did not discover the email communications referenced in Paragraphs 11, 12 and 20 until they reviewed Mr. Gross's Akin Gump email account for documents responsive to Mr. Gross's First Request for Production of Documents, in May and June 2007.  Akin Gump would have no reason to suspect and/or investigate this wrongdoing on the part of Mr. Gross prior to this discovery.

## COUNT I
### (Breach of Fiduciary Duty of Loyalty)

26.     Counterclaim Plaintiff Akin Gross incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-25 of this Counterclaim with the same force and vigor as if set out here in full.

27.     While employed by Akin Gump, Mr. Gross owed Akin Gump an unselfish and undivided duty of loyalty.

28.     While employed by Akin Gump, Mr. Gross discouraged the Prospective Client from signing an exclusive engagement letter for services with Akin Gump, in violation of his duty of loyalty to Akin Gump.

29.     While employed by Akin Gump, Mr. Gross made negative statements about Akin Gump, and its attorneys, including Sukhan Kim and Jaemin Park to Prospective Client, and advisor to Company X, in violation of his duty of loyalty to Akin Gump.

30.     While employed by Akin Gump, Mr. Gross told an advisor of Company X that Company X should not to retain the services of Akin Gump, in violation of his duty of loyalty to Akin Gump.

31.     The acts committed by Mr. Gross were intentional, knowing, willful and in reckless disregard of his duty of loyalty.

32.     As a direct and proximate results of the tortious acts of Mr. Gross, Akin Gump suffered damages.

## COUNT II
### (Tortious Interference with Economic Advantage)

33.    Counterclaim Plaintiff Akin Gump incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-32 of this Counterclaim with the same force and vigor as if set out here in full.

34.    Akin Gump had a valid business expectancy with the Prospective Client and with Company X.

35.    Mr. Gross had knowledge of Akin Gump's valid business expectancy with the Prospective Client and with Company X.

36.    Mr. Gross willfully and wrongfully interfered with Akin Gump's valid business expectancy with the Prospective Client and with Company X by breaching his duty of loyalty.

37.    As a direct and proximate results of the tortious acts of Mr. Gross, Akin Gump suffered damages.

\*            \*            \*

Wherefore, the premises considered, Counterclaim Plaintiff respectfully prays that this Honorable Court:

1.    Enter judgment on behalf of Counterclaim Plaintiff Akin Gump;

2.    Award Counterclaim Plaintiff Akin Gump compensatory damages;

3.    Award Counterclaim Plaintiff Akin Gump prejudgment and post-judgment interest;

400591335v1

4.    Grant such other relief as this Court deems just and proper.


Dated: June 25, 2007                    Respectfully submitted,


                                        _____/s/_____
                                        Christine N. Kearns (D.C. Bar # 416339)
                                        Karen-Faye McTavish (D.C. Bar # 477588)
                                        Pillsbury Winthrop Shaw Pittman LLP
                                        2300 N Street, N.W.
                                        Washington, DC  20037
                                        (202) 663-8000

                                        Counsel for Akin Gump Strauss Hauer & Feld, LLP

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:07CV00399 (ES) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>ORDER</u>

UPON CONSIDERATION of the Defendant's Motion to Amend Answer and File Counterclaims, Plaintiff's opposition thereto, and the entire record in this case, it is this ___ day of _____, 2007, by the United States District Court for the District of Columbia,

ORDERED, that Defendant's Motion is granted, and Defendant may amend its Answer and file its counterclaims.

_____
The Honorable Emmet G. Sullivan

Copies to:

Christine N. Kearns, Esq.
Karen-Faye McTavish, Esq.
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037

Jonathan C. Puth
WEBSTER, FREDRICKSON & BRACKSHAW
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006