**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 07-399 (EGS/JMF) |
| v. ) | |
| ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP ) | |
| ) | |
| Defendant. ) | |

**COUNTERCLAIM DEFENDANT DONALD GROSS' MOTION FOR SUMMARY JUDGMENT DISMISSING COUNTERCLAIMS, AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING AFTER-ACQUIRED EVIDENCE DEFENSE**

COMES NOW the Plaintiff and counterclaim defendant Donald G. Gross, by and through his attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves this Court for an order granting summary judgment in favor of Mr. Gross as to the counterclaims of Akin Gump Strauss Hauer & Feld LLP ("counterclaimant" or "Akin Gump"). Plaintiff Gross also moves for partial summary judgment dismissing the after-acquired evidence defense that was asserted by Akin Gump in Plaintiff's age discrimination case. The grounds for the Motion are that 1) there are no genuine issues of material fact in dispute, and 2) Mr. Gross is entitled to judgment as a matter of law.

This Motion is supported by good and substantial authority in the attached Memorandum of Points and Authorities.

Respectfully Submitted,

WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.

       */s/   Jonathan C. Puth*
Jonathan C. Puth  #439241
Kataryna L. Baldwin  #494439
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
Attorneys for Plaintiff Gross

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS             ) | |
|            ) | |
|        Plaintiff,       ) | Civil Action No. 07-399 (EGS/JMF) |
|            ) | |
|        v.           ) | |
|            ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP   ) | |
|            ) | |
|        Defendant.       ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
DISMISSING COUNTERCLAIMS, AND PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT DISMISSING AFTER-ACQUIRED EVIDENCE DEFENSE**

Akin Gump cannot make out the elements of the two counterclaims brought against

counterclaim defendant Donald G. Gross ("Mr. Gross") for tortious interference with economic

advantage and breach of fiduciary duty of loyalty, nor can it meet its burden to prove an "after-

acquired evidence" affirmative defense.  Summary judgment should be entered for Mr. Gross on all

three claims.

At issue are three emails sent by Mr. Gross to "Prospective Client."[1]  The first two emails

concern Prospective Client's possible retention of Akin Gump to establish an Asian private equity

fund, while the third email to Prospective Client concerns Akin Gump's representation of another

potential client, "Company X," with which Prospective Client was related.  As set forth below with

full citation to the record, the undisputed facts establish that Akin Gump cannot possibly make out

---

[1]Defendant Akin Gump has sought to maintain the confidentiality of the client entities at
issue, and has designated as "confidential" exhibits referred to herein.  Consistent with the Protective
Order in this case (Docket Entry No. 12), the exhibits cited herein are filed under seal pursuant to
Local Rule 5.1(j).  A glossary containing the identities of "Prospective Client," "Company X," and
"Company Y" is located at Exhibit 1 attached to the Motion to File Under Seal.

a claim for either counterclaim because it cannot establish the requisite level of intent, causation, or damages. As well, Akin Gump's "after acquired evidence" affirmative defense must fail because the undisputed facts demonstrate that it cannot prove that it would have terminated Donald Gross had the e-mails come to light prior to his unlawful termination.

## STATEMENT OF FACTS

On February 26, 2007, Plaintiff Gross filed his age discrimination complaint against Akin Gump. (*See* Docket Entry No. 1.) On June 25, 2007, at its first opportunity and in retaliation for Mr. Gross' protected activity, Akin Gump moved to countersue Mr. Gross for tortious interference and breach of fiduciary duty, alleging wrongdoing by Mr. Gross. (Defendant's Motion to Amend Answer and File Counterclaims, June 25, 2007 (Docket Entry No. 9).)

In 2003 and 2004, Donald Gross "worked to persuade a particular prospective client ("Prospective Client") to hire Akin Gump and to sign a proposed engagement letter which Mr. Gross had drafted and negotiated with input from others." (Defendant's First Amended Answer & Counterclaims, September 10, 2007, at 8, ¶ 10 (Docket Entry No. 26).) Prospective Client was forming an Asian real estate investment fund, and had spoken with Don Gross over a series of months in order to establish a possible engagement with Akin Gump. (Ex. 2; Ex. 3.)

Prospective Client sought Akin Gump's representation to obtain Akin Gump's help "in screening and setting up appointments with potential investors," believing that Akin Gump's experience in the field would enable it to effectively launch its private equity fund. (Ex. 3 at AK001850.) According to Prakash Mehta, Akin Gump's lead Washington partner on private equity funds formation, "the client was looking to us in part to help them get the fund raising process started, and to make contacts" in order to raise money for the fund. (Ex. 4, Mehta Dep. at 18, 26-27.)

2

Early drafts of a prospective retainer letter between Prospective Client and Akin Gump reflected the client's expectation that Akin Gump's services would "include exerting our reasonable efforts in introducing you and the Fund to the equity funds, financial institutions and other investors that Akin Gump represents." (Ex. 5 at AK001737.)[2]  Prospective Client had hoped that Akin Gump could schedule meetings with potential investors to his new private equity fund beginning in mid to late June 2004. (Ex. 3 at AK001850.)

Contrary to Prospective Client's expectations, however, the Funds Group expected only to do the legal work for Prospective Client, and not to take part in investor fundraising:  "Assuming responsibility for setting up meetings with potential investors is not something I perceived to be our responsibility." (Ex. 4, Mehta Dep. at 45.) Despite Prospective Client's hopes, no investor meetings were held in June 2004.

During June and July, Prospective Client persisted in its expressed desire that Akin Gump would lead an effort to raise funds for its private equity fund.  Prospective Client reiterated that the terms of any engagement between Prospective Client and Akin Gump were "subject to" the obligation that Akin Gump

> will introduce [Prospective Client] to [Akin Gump] clients that are likely to have an interest in investing in [Prospective Client's] Asia Fund.  These USA meetings should take place on or about 19-23 July, at your direction.

(Ex. 7, at AK001938.)  Writing to Donald Gross in June 2004, Prospective Client made clear that the central basis for the representation was that Akin Gump would be in a position to generate interest from potential investors:

---

[2]Akin Gump later removed any reference to investors meetings in its proposed retainer agreement.  (See Ex. 6 at AK001913.)

3

> Don, it is clear to me, and certainly to [Prospective Client's principal], that the idea underlying our working together with [Akin Gump] . . . is that [Akin Gump] likely has clients that would have interest in the Asia Fund. . . .

(Ex. 7 at AK001938.)  In communicating its key aims, Prospective Client wanted "to make sure that we all have the same understanding" regarding the scope of representation. (*Id.*)    From this and other communications, Mr. Mehta felt that Prospective Client was "putting pressure on [the firm] to make these [investor] contacts happen quickly."  (Ex. 4, Mehta Dep. at 27.)   Contrary to Prospective Client's expectations, however, raising money from specific investors was not typically a role that Akin Gump took on.  (Ex. 4, Mehta Dep. at 25.)  In the case of a possible engagement between Akin Gump and Prospective Client,

> there was an issue with respect to our role in the fund raising, so to speak, what we typically leave to the investment bankers or the business people.
>
> I think I wanted to be careful to make sure that [Prospective Client] and his team understood what I thought our role to be and what I thought our role not to be.
>
> *       *       *
>
> I believed our role to be essentially structuring, negotiating, documenting, and closing the fund transaction.
>
> Not to be a role focused on taking the . . . lead[3] in respect of raising money from specific investors.

(Ex. 4, Mehta Dep. at 24.)

Although Prospective Client expected Akin Gump to establish the investor meetings, (*see, e.g.* Ex. 7 at AK001938), Akin Gump cancelled any hoped-for investor meetings for July 2004.  (Ex. 8, Gross Dep. at 251-52.)  As the primary contact person with a relationship with Prospective Client,

---

[3]The transcript mistakenly indicates the witness stated "taking the *care* lead," but a review of the videotaped testimony reveals that the witness simply stated, "taking the lead."

4

(Ex. 4, Mehta Dep. at 62), Don Gross was left to "climb down" from Akin Gump's previous position that it would establish investor meetings, and to instead communicate to the client that the planned meetings could not take place. (Ex. 8, Gross Dep. at 251-53; Ex. 9, 02 July 2004 00:42 email, at AK003435.) Prospective Client found the news "rather disappointing" given Akin Gump's prior representations. (Ex. 9, July 1 19:39:15 2004 email, at AK003435.) Given its keen interest in having Akin Gump attract investor interest, Prospective Client expressed frustration over "why it has taken [Akin Gump] this long to receive the suggestion to send information to [its] clients," and that further delay by the firm was "not appealing." (*Id.*)

Speaking for Akin Gump's Funds Group, Prakash Mehta sought to temper the client's expectations that Akin Gump could guarantee investors. (Ex. 4, Mehta Dep. at 50.) To that end, Mehta wrote Prospective Client: "I don't want to get anyone's hopes up yet. . . . [W]e have been seeing reluctance on the part of many in the [private equity] community to 'first time funds' especially of late." (Ex. 9 at AK003434.) The point was apparently not lost on Prospective Client, who wrote back, in full: "I note a considerable amount of hedging here. . . . . . . . ." (*Id.* at AK003434 (ellipses in original).)

Resigned to a later schedule, Prospective Client then suggested moving forward with the representation, but made it more clear than ever the critical importance that Akin Gump "take the lead" on fundraising efforts for its Asian equity fund. (Ex. 10, at AK003438.) In fact, Prospective Client wrote a lengthy e-mail concerning the scope of the representation, none of which concerned any legal work on the fund; rather, it focused entirely on the central role Akin Gump would take to lead the fundraising effort. (*Id.* at AK003438-39.)

In particular, Prospective Client asserted that the representation could go forward "based

upon the following criteria" including the attraction of "significant interest by capital with the right

presentation strategy" and the utilization of "Akin's platform to maximum effect" to attract capital.

(Ex. 10 at AK003438.)  Accepting a delayed schedule, Prospective Client observed that delaying

investor meetings would at least enable Akin Gump to have "sufficient time to fully inform potential

investors of what makes [the fund] not just a 'start up' fund." (*Id.* at AK003438.) Prospective Client

expressed confidence of success "if we let Akin take the lead, get the right materials to them, . . .

and, finally, give the Akin team the time needed to fully inform their clients and contacts about [the

fund]." (*Id.*)  As a predicate to its e-mail, Prospective Client emphasized:

> If we, [the Fund], are not convinced that Akin is the right choice to lead this effort,
> then we should reassess the situation now.  I'm not interested in blowing $15,000 if
> we're not confident this effort will be of benefit to all parties.

(*Id.* at AK003438.)

Mr. Mehta expressed concern to his Akin Gump colleagues about the extent of Prospective

Client's expectations:

> as Don and I discussed for [Prospective Client] to think we can attract interest is in
> my judgment overly optimistic.  If he is hiring us on this basis at the end of the day
> I personally am afraid he may be disappointed.  Of course we will try but I can't even
> guarantee him one investor meeting at this point.  So when he says Akin is taking the
> lead if he's referring to investors and meetings it worries me.  I appreciate this needs
> to be handled correctly.

(Ex. 11 at AK002009.)

"I hope they are not relying on us to raise money," Mr. Mehta observed; "I don't know if we

can attract any interest."  (Ex. 4, Mehta Dep. at 57.)  In fact, Akin Gump "could not promise

anything in terms of timing" or "in terms of delivery."  (*Id.* at 31.)  Consequently, Mr. Mehta

"wanted to be very careful that [Prospective Client] not think it was our job to attract significant

6

interest in capital * * * [W]here he says that Akin Gump will lead this effort and then he goes on to talk about the fund raising sort of reinforces my concern that he thinks or let's make sure that he doesn't think that by leading this effort we are responsible for fundraising."  (*Id*. at 59-60.)

Prospective Client's hesitations about whether "Akin is the right choice to lead this effort" are apparent in the record.  (Ex. 10, 7/5/04 email at AK 3437-3439; *see also* Ex. 9.)  In fact, at the time of Prospective Client's concerns about Akin Gump's unwillingness to attract investors, Prospective Client had spoken to a firm with an extensive Asian practice, and communicated its interest in this prospective competitor to Akin Gump.  (Ex. 10 at AK003439.)

Although Mr. Mehta was the lead Funds Group attorney on the matter, Mr. Gross was the individual with the relationship with Prospective Client and was expected to communicate Akin Gump's unwillingness to attract investors.  (*See* Ex. 4, Mehta Dep. at 33, 61-62.) After discussing the matter with Jay Cohen, a key partner in the Korea Practice Group, Mr. Gross advised Prospective Client to delay signing the engagement letter because Akin Gump had made clear that it could not deliver the services that Prospective Client hoped to attain.  (Ex. 8, Gross Dep. at 263-64.) Specifically, on July 25, 2004, Mr. Gross wrote:

> Before you commit yourself to a partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind your project. I am thinking specifically of the Funds Group, based mainly in New York, on whom we're now relying to line up potential investors.  In the next several days, I'll talk to everyone involved and give you my honest assessment.

(Ex. 12, 7/25/04 email, at AK002035.)  A few days later, Mr. Gross again wrote to Prospective Client regarding Akin Gump's willingness to take on fundraising:

> Everyone tells me they want to be supportive and they should start reporting client feedback soon.  But I'm not satisfied with the out-reach efforts of the funds group so far, though there's no question the law firm would do an excellent job on the legal

7

> work. For the moment, I think you should delay signing the engagement letter. The
> law firm will be unhappy with this recommendation, but I can't in good conscience
> ask you to rely exclusively on Akin Gump until I see actions matching words.

(Ex. 13 at AK002065-66.) Importantly, Mr. Gross had reinforced that "there's no question that the

law firm would do an excellent job on the legal work" but that the "out-reach efforts of the funds

group" to potential investors was in question. (*Id.* at AK002065.) Mr. Gross wrote the emails to

communicate the unwillingness of the firm to set up investor meetings, "which was the reason . . .

that [Prospective Client] wanted to enter into the engagement in the first place." (Ex. 8, Gross Dep.

at 256.)

                    *          *          *

        The chairman of Prospective Client was also a managing partner and financial advisor to

Korea-based "Company X". (Ex. 8, Gross Dep. at 276.) Company X was exploring retaining Akin

Gump to negotiate a deal with Company Y. (Ex. 14, 8/25/04 10:50:33 AM email.) Akin Gump's

client Company Y had been putting pressure on Akin Gump's potential client Company X regarding

a Korean real estate development. (Ex. 15 at AK002080.) Company Y, a large Korean

conglomerate, is the largest and most important client of Sukhan Kim, the head of the Korea Practice

Group. (Ex. 8, Gross Dep. at 297; Ex. 16, Kim Dep. at 18-19, 45.) Notwithstanding an apparent

conflict of interest between his largest client and Company X, Mr. Kim wished to land Company X

as a client in order to negotiate the deal between the two companies. (Ex. 8, Gross Dep. at 297.)

After Don Gross was informed he was to leave the Korea Practice Group, he wrote a memorandum

to Mr. Kim providing advice as to how to secure Company X as a client. (Ex. 15 at AK002078-

2081.) In the memo, Mr. Gross advised Mr. Kim regarding the possibility of Company X's concern

about this conflict of interest. (*Id.* at AK002080 ("He may want to know whether your position as

8

outside counsel to [Company Y] would prevent you from assisting [Company X] in a subsequent negotiation with [Company Y.]").)

Akin Gump has no evidence of any proposed retainer agreement with Company X in 2004 (see Ex. 16, Kim Dep. at 102, 106), and the record is devoid of any evidence of a draft retainer agreement until the time that Company X hired Akin Gump in 2005.  Indeed, when Korea Practice Group partner Jaemin Park suggested in August 2004 that she hold off doing further work for Company X until a client matter number could be established, Sukhan Kim demurred, directing instead that rather than establish a retainer at that time, "our current goal is to demonstrate our capabilities and impress him . . ."  (Ex. 17, August 12, 2004 10:00 AM email, at AK003483.)  Mr. Kim, the attorney directly involved in communicating with Company X's CEO, did not set up a new client matter number for Company X.  (Ex. 16, Kim Dep. at 101.)

On August 25, 2004, believing that Mr. Kim could not ethically represent both entities, and aware that Company X was interested in retaining Akin Gump to help make a deal with [Company Y], Mr. Gross communicated this conflict of interest to his friend and colleague, the chairman of Prospective Client. (Ex. 18.)  Specifically, Mr. Gross relayed that Mr. Kim was "so close to [Company Y] and a couple of other Korean business groups that [Company X] could not possibly trust him to serve as an 'honest broker.'" (*Id.* at AK002125.) Mr. Gross also wrote: "[Jaemin Park's] help is even more questionable since she is a bankruptcy lawyer whose practice consists of representing Korean companies on corporate restructuring issues."  (*Id.*)  "If [Company X] wants to get in touch with some Korean business groups, there are other ways to do it."  (*Id.*)  Mr. Gross explained that he "had a fiduciary duty" and "a duty of candor" to Prospective Client "in order to -- to keep his trust," (Ex. 8, Gross Dep. at 295-96), and that by writing the August 25, 2004 email, he

9

was trying to "salvage the relationship with [Company X] going forward," "uphold[] [his] ethical duty of -- of being honest," and "protect[] the fiduciary duty and . . . interest of the client." (*Id*. at 298, 301.)

Mr. Gross never communicated his hesitations to the CEO of Company X, who had been dealing directly with Mr. Kim.  In fact, the record is clear that Mr. Gross did not have any direct interactions with the CEO of Company X regarding its retainer with Akin Gump.  However, in October 2004, Akin Gump *itself* rejected representing Company X due to a disagreement of the retainer amount for representation.  (Ex. 16, Kim Dep. at 83; Ex. 19.)  Mr. Kim testified that Akin Gump rejected the representation of Company X because the firm expected to be paid "handsomely," and the fixed fee amount offered by Company X was much lower than what the firm anticipated.  (Ex. 16, Kim Dep. at 106, 83.)  There is no evidence in the record as to what actually motivated Company X to offer a lower number.

Notwithstanding Mr. Kim's rejection, Akin Gump nonetheless engaged Company X as a client shortly thereafter.  (Ex. 16, Kim Dep. at 79.)  Before he left Akin Gump in late October 2004, Mr. Gross briefed Thomas Hubbard, former U.S. ambassador to Korea and a newly hired Akin Gump Senior Advisor, to assist Akin Gump in securing representation of Company X.  (Ex. 8, Gross Dep. at 298.)  Akin Gump then secured Company X as a client "in large measure" because of Mr. Hubbard.  (Ex. 20; *see also* Kim Dep. at 79.)

10

## ARGUMENT

**I.     Legal Standards for Summary Judgment.**

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that may affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment may be granted, despite the presence of some factual disputes, if their resolution could not change the final result. *See Anderson*, 477 U.S. at 248. "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**II.     Akin Gump Fails to Demonstrate the Requisite Intent Necessary To Make Out A Claim for Tortious Interference with Prospective Economic Advantage.**

In the District of Columbia, to make out a claim of tortious interference with prospective economic advantage, a party bears the burden to prove (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage. *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986); *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995); *Mercer Management Consulting, Inc. v. Wilde*, 920 F.Supp. 219, 239 (D.D.C. 1996). The District of Columbia Court of Appeals has held time and again that to establish a prima facie case of tortious interference, a plaintiff must show that the interference was intentional and that there was resulting damage.

11

*Kreuzer v. George Washington Univ.*, 896 A.2d 238, 247 (D.C. 2006)(quoting *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986)).  Conclusory allegations "do not meet the demanding test for liability under this cause of action."  *Id.* at 248.  Here, Akin Gump cannot meet the "demanding test" for liability under this tort.  In particular, even assuming the existence of a valid business expectancy with either entity, Akin Gump cannot establish the requisite intent to interfere, causation, or damages.[4]

The three email communications by Mr. Gross that are alleged to constitute supposed misconduct fall far short of the malicious intent required for an intentional interference claim, plainly warranting summary judgment here.  In fact, District of Columbia law emphasizes an exceedingly high standard for proving the intent element for a tortious interference with prospective economic advantage claim.

An alleged interferer's motive or purpose in disrupting an ongoing or prospective business relationship is of "central concern" in a tortious interference case.  *PM Services v. Odoi Assoc.*, No. 03-1810, 2006 WL 20382, at *35 (D.D.C. 2006).  "A general intent to interfere or knowledge that the conduct will injure the plaintiff's business dealings is insufficient to impose liability."  *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F.Supp.2d 27, 34 (D.D.C. 1999).  The requisite level of intent is met only if the conduct "involves egregious conduct such as libel, slander, physical coercion, and fraud."  *Id.*  "Even if some element of ill will [is] shown," a claim for intentional interference will fail if the actor's conduct was not motivated by malice.  *Sullivan v. Heritage Foundation,* 399 A.2d 856, 861 (D.C. 1979); *see also Mercer Management Consulting v. Wilde*, 920

---

[4]The absence of proof of causation or damages also compels summary judgment on Akin Gump's breach of duty of loyalty claims as well.  (*See* Parts III and IV, *infra*.)

F.Supp. 219, 239 (D.D.C. 1996) (improper actions, including mailing tape diskettes containing history of plaintiff's work to plaintiff's major clients, which later joined defendants' competing business, did not rise to the level of wrongful intent to constitute tortious interference).

Here, Akin Gump has presented nowhere near the evidence of malice required in this jurisdiction to make out the intent element of this tort. Indeed, in its Amended Answer and Counterclaims, Akin Gump does not even (and could not) allege that Mr. Gross acted with malicious intent. (*See* Amended Answer at 12-13.) With respect to Prospective Client, Akin Gump has selectively quoted from two emails by Mr. Gross dated July 25, 2004 and July 29, 2004, attempting to highlight what it considers the most damaging language. (*See* Amended Answer at ¶ 11, 12.)

These isolated quotations evince no malice, and even less so when considering the context of the remarks. In short, Mr. Gross was merely stating the obvious. Having held no investor meetings in June, and having cancelled investor meetings in July 2004, Akin Gump then persisted in its stance that "setting up meetings with potential investors" and "taking the . . . lead in respect of raising money" was not Akin Gump's role in any representation of Prospective Client. (Ex. 9 at AK003435; Ex. 4, Mehta Dep. at 45, 24.) At the same time, Prospective Client was steadfast in conditioning any representation on Akin Gump's attracting "significant interest" of capital by "tak[ing] the lead" in fundraising efforts. (Ex. 10 at AK003438.) While expressing "no question the law firm would do an excellent job on the legal work," Mr. Gross truthfully represented that Akin Gump could not be "rel[ied] on exclusively" to take the lead on Prospective Client's fundraising effort. (Ex. 13 at AK003065-66.) Mr. Gross' communications reflect no ill will whatsoever, which itself would be insufficient to make out this tort, *see Sullivan*, 399 A.2d at 861, and certainly not the malicious intent required by law. *See id*. In fact, the emails illustrate no more

13

than a candid assessment to Prospective Client that Akin Gump could do the legal work but could not be relied upon "exclusively" because of the client's stated desire that the firm take the lead on fundraising. (*See id.*) In sum, as the attorney with the client relationship, Mr. Gross merely carried out instructions to communicate the full scope of Akin Gump's proposed representation. (Ex. 4, Mehta Dep. at 61-62.)

In the District of Columbia, a lawyer has a duty to provide a client with information sufficient to permit the client to make informed decisions about the matter on which legal representation is being provided. *See* District of Columbia Rules of Professional Conduct 1.1, 1.2 and 1.4.[5] Moreover, a lawyer has a duty to "abide by a client's decisions concerning the objectives of representation." Rule 1.2(a); *see also* Comment 1 to Rule 1.4 ("The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued . . .") Here, not only was there no malice, as required by law, but Don Gross was truthfully communicating the fact that Akin Gump would not undertake the fundraising aspect of the representation, as he was bound to do by governing ethical obligations. *See Sullivan v. Heritage Foundation*, 399 A.2d 856 (D.C. 1979) (affirming summary judgment on tortious interference claim for lack of showing that defendant's acts were motivated by malice or an intent to harm plaintiff).

Akin Gump's allegations regarding Mr. Gross' intent to interfere with a prospective business relationship between Company X and the firm fare no better. Besides imposing a duty of candor, the Rules of Professional Conduct also require every attorney to avoid potential conflicts of interest

---

[5]"Recognized standards of business ethics and business customs and practices are pertinent" in the determination of whether an actor's conduct in intentionally interfering with a prospective contractual relation of another is improper. *See* Restatement 2d of Torts § 767, comment (j).

between current and prospective clients. *See* Rule 1.7. Indeed, Rick Burdick, partner in charge of Akin Gump's Washington, D.C. office, admitted that each Akin Gump attorney has an independent obligation to ensure that representation of any potential client does not conflict with the interest of any current client of the firm. (Ex. 21, Burdick Dep. at 44.) Mr. Gross' intent is apparent in the record:

> I felt at that time, when I thought about it more deeply, that Akin Gump, and -- and specifically Sukhan Kim, had a huge conflict of interest. There was no way that he could represent both [Company X] and [Company Y], [Company Y] being his most important client. I felt I had a duty to point that out to [Prospective Client].

(Ex. 8, Gross Dep. at 297.) Likewise, the emails from Mr. Gross to Prospective Client, pointing out conflicts of interest between Company X and Company Y, show a good faith intention by Mr. Gross to take actions he viewed as fulfilling his duty to Prospective Client, Company X and Akin Gump. (*Id*. at 297, 301.)[6] Mr. Gross acted on his "fiduciary duty" and "duty of candor" to Company X regarding that potential representation. (Ex. 8, Gross Dep. at 295-96.) Even if he did so inartfully, "[e]verything said [by Mr. Gross] in that e-mail is the God's honest truth." (*Id.* at 297.) Mr. Gross' ethical motivations regarding a duty of candor and avoiding a conflict of interest demonstrate an absence of malice.

Moreover, Don Gross' subsequent actions to secure Company X as a client overcome any suggestion of malice. First, Mr. Gross worked to regain the trust of Prospective Client, with whom he had a long-standing relationship, in hopes of salvaging a relationship with Prospective Client and

---

[6]Mr. Gross had earlier advised Mr. Kim regarding Company X's potential concern about this conflict of interest in a memorandum he prepared for Mr. Kim. (*See* Ex. 15 at AK002080 ("He may want to know whether your position as outside counsel to [Company Y] would prevent you from assisting [Company X] in a subsequent negotiation with [Company Y.]").)

Company X after an Akin Gump partner alienated Prospective Client.[7]  Second, Mr. Gross then met

with and briefed Akin Gump Senior Advisor Thomas Hubbard "to put him in a position so that he

could go in and . . . obtain [Company X] as a client."  (*Id*. at 298-99.)  These efforts proved

successful when Akin Gump secured Company X as a client.  (*Id*. at 299; Ex. 16, Kim Dep. at 72,

79.)

> Under District of Columbia law, such conduct cannot possibly rise to the level of malice

necessary to establish the intent element for a claim of tortious interference.  *See Paul v. Howard

University*, 754 A.2d 297, 309 (D.C. 2000) (summary judgment appropriate where plaintiff could

not show malice or pecuniary harm from any alleged misconduct); *see also Vinas v. Chubb Corp.,*

449 F.Supp.2d 427, 434-45 (S.D.N.Y. 2007) (interference with prospective business advantage claim

failed for lack of necessary malice).

> In sum, Akin Gump fails to establish that Mr. Gross' alleged misconduct can meet the high

level of intent required to prove intentional interference with prospective economic advantage in the

District of Columbia.  Where no evidence of malice exists, summary judgment should be granted

for Mr. Gross on Akin Gump's counterclaim for intentional interference with prospective economic

advantage.

---

[7]Prospective client had become "furious" regarding actions of Akin Gump partner Jaemin Park, and Don Gross sent the email at issue in an attempt to "stabilize the relationship."  (Ex. 8, Gross Dep. at 293-98.)

16

III.    **Akin Gump Cannot Prove that Mr. Gross Proximately Caused the Loss of Any Business with Prospective Client or Company X, Warranting Summary Judgment for Mr. Gross on the Breach of Fiduciary Duty and Tortious Interference with Prospective Economic Advantage Counterclaims.**

Akin Gump cannot prevail on either of its counterclaims for failure to demonstrate causation. As with any tort action, to prevail on an intentional interference or a breach of duty of loyalty claim, Akin Gump must prove that Mr. Gross' conduct proximately caused the client not to retain the firm. *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 24, 47, 51 (D.C. 1991) (in tortious interference case, defendant's misrepresentations were not substantial, contributing or concurring cause of clients to leave law firm).   Proximate cause exists only if there is a "substantial and direct causal link" between the misconduct and the injury sustained by the plaintiff.  *Id.* (citing *Dalo v. Kivitz*, 596 A.2d 35, 42 (D.C. 1991).); *see also R.M. Newell Co. Inc. v. Rice,* 236 A.D.2d 843, 844 (N.Y. App. Div. 4th Dept. 1997).  Here, Akin Gump cannot demonstrate a "substantial and direct causal link" between Mr. Gross' July 25, July 29, and August 25, 2004 email correspondence with Prospective Client and supposed loss of business.

Defendant cannot possibly demonstrate causation with respect to a possible engagement of Prospective Client because the undisputed facts demonstrate that the most likely cause of any representation decisions was Akin Gump's decision regarding the scope of the representation. Prospective Clients' expectations had raised "an issue with respect to our role in the fund raising." (Ex. 4, Mehta Dep. at 24.)  In particular, Prospective Client had made clear that its retention of Akin Gump was "subject to" the firm "introduc[ing] [Prospective Client] to [Akin Gump] clients that are likely to have an interest in investing in the [] Asia Fund," (Ex. 7 at AK001938), and that Akin Gump would undertake a central role in fundraising for the fund.  (*See, e.g.* Ex. 3 at AK001850; Ex.

17

10; Ex. 7 at AK001938.)  Prospective Client made perfectly clear that it had other firms interested in the work and that if Akin Gump is not "the right choice to lead this effort, then we should reassess the situation now."  (Ex. 10 at AK003438.)    Nonetheless, Akin Gump determined that any representation would focus on "structuring, negotiating, documenting and closing" the fund's transactions, and not on "taking the . . . lead in respect of raising money." (Ex. 4, Mehta Dep. at 24.)  Prakash Mehta expected Don Gross to communicate to Prospective Client the limited scope of Akin Gump's proposed representation of Prospective Client, and Mr. Gross did so.  (*Id*. at 61-62; Ex. 12; Ex. 13.)  In short, Akin Gump seeks to hold Mr. Gross liable for a decision that the firm itself made.  There is no causation here.

Causation aside and more broadly, Akin Gump cannot demonstrate any disloyalty or wrongful conduct by Don Gross with respect to the two emails it identifies concerning the potential representation of Prospective Client.  Given the obvious divergence in Prospective Client's and Akin Gump's expectations regarding the scope of the representation, Prakash Mehta "wanted to be careful to make sure that [Prospective Client] and his team understood what I thought our role to be and what I thought our role not to be." (Ex. 4, Mehta Dep. at 24.)  Mehta, an equity partner at Akin Gump, relied on his employee Don Gross to communicate the scope of the representation to Prospective Client.  (*Id*. at 61-62.)  Carrying out that direction, Don Gross expressed his confidence to Prospective Client that Akin Gump could ably undertake the legal work for the fund, but also communicated that the client would not be able to "rely exclusively" on Akin Gump because of a lack of commitment to undertake the fundraising imperative repeatedly expressed by Prospective Client as central to the representation.  (Ex. 13 at AK003065-66.)  On this record, the undisputed facts demonstrate that Akin Gump cannot meet its burden to prove disloyalty or tortious interference

18

for carrying out his employer's instructions.[8]  Where there was no wrongful conduct, summary

judgment should be entered in Mr. Gross' favor on both torts.[9]  *Brown,* 503 A.2d at 1247; *Vinas ,*

499 F.Supp.2d at 435; *Mercer*, 920 F.Supp. at 233.

      Akin Gump's counterclaims for tortious interference and breach of duty of loyalty are even

more attenuated with respect to Company X.   Although Company X hired Akin Gump for

representation, (Ex. 16, Kim Dep. at 79), which itself undermines claim of injury, Akin Gump

appears to suggest that Company X did not hire Akin Gump "at that time" in August 2004 because

of an email Donald Gross sent to Prospective Client that month.  (*See* Defendant's Motion to Amend

Answer and File Counterclaims at 5-6.)  In fact, in August 2004 (the time of the Akin Gump's

claimed injury) Korea Practice Group head Sukhan Kim instructed is partner Jaemin Park to continue

to do work for Company X without a client matter number, since his goal at that time was to merely

"demonstrate our capabilities," (*see* Ex. 17 at AK003483), rather than seek a retainer.

      Even more critically, Akin Gump cannot possibly meet its burden because it has no evidence

as to what caused Company X to make its representation decisions in the manner that it did.  Because

---

[8]Under District of Columbia law, intentional interference may only be found if the
employee's acts were improper.  *Curaflex Health Services, Inc. v. Bruni*, 899 F. Supp. 689, 694
(D.D.C. 1995)(citing *Sorrells v. Garfinckel's, Brooks Bothers, Miller & Rhoads, Inc.*, 565 A.2d 285,
290 (D.C. 1989).  *See also id*. at 695 ("The restatement's reference to 'improper' conduct is simply
another way of saying that [to avoid liability,] the alleged tortfeasor's conduct must be legally
justified.")(quoting *Sorrells*, 565 A.2d at 290)(alterations in original).  An employee's acts are
legally justified or privileged where, as here, the employee acts in furtherance of the employer's
interest and not for personal gain.  *Id*. at 695-96.

[9]Akin Gump also cannot demonstrate causation because there is no indication that
Prospective Client would have retained Akin Gump following the termination of Don Gross, with
whom he had a longstanding  personal relationship.  *See Connors, Fiscina, Swarts & Zimmerly v.
Rees*, 599 A.2d 47 (D.C. 1991) (causal chain broken because clients' flight from law firm was due
to departure of attorney).

there is no evidence, let alone a "substantial and direct causal link" between any supposed misconduct and alleged injury, both of Defendant's counterclaims must fail as matter of law. *Connors*, 599 A.2d at 51. Akin Gump simply has no means of proving on this record that any action by Mr. Gross had any effect on Company X's or Akin Gump's representation decisions. While in this posture, Akin Gump is entitled to all *reasonable* inferences, it is not entitled to turn pure speculation into fact. There is absolutely *no* record evidence demonstrating a direct causal link between Mr. Gross' e-mail to Prospective Client and Company X's representation decisions.

Moreover, the undisputed facts reveal that Akin Gump *itself* decided it would reject representing Company X because Company X's retainer proposal was far too low. (Ex. 16, Kim Dep. at 83, 85; *see also* Ex. 19.) Mr. Kim testified that it was Akin Gump that turned down the opportunity of taking Company X on as a client in September 2004. (Ex. 16, Kim Dep. at 85 ("Gale Company wanted to hire me, right? And I turned it down.").) These facts alone negate any finding of proximate cause.[10] However, here, Company X *did* hire Akin Gump just months later. (Ex. 16, Kim Dep. at 85.) Therefore, Akin Gump cannot establish the necessary causal connection with respect to Company X.

Without record evidence, Akin Gump is not entitled as a matter of law to an inference that Mr. Gross was the cause of any decision by Company X. *See Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289-90 (D.C. 1977) (in tortious interference case, while architect's letters

---

[10]The record does not reveal whether the CEO of Company X made a low retainer offer to Akin Gump because he was careful with money, drives a hard bargain, had a poor night's sleep, or had any other particular reason. In any event, no fair inference could be drawn that the CEO of Company X made a low offer because Don Gross sent an e-mail to Prospective Client, as Akin Gump would presumably wish to argue. That would be pure speculation, and is far from the direct and substantial causal link required under the law for Akin Gump to be able to sustain its burden here.

to surety blaming contractor for construction delays may have been a factor in later refusal by companies to do business with contractor, evidence was insufficient that letters were the actual cause for any lost business). Where no record evidence attributes the representation decisions by the CEO of Company X to Mr. Gross' e-mail to Prospective Client, both counterclaims must fail.

Other case law governing causation is instructive. In *Connors*, for instance, the District of Columbia Court of Appeals affirmed a finding of no causation where a former managing partner[11] who took away several clients engaged in far more egregious behavior than that alleged here, including meeting with each client personally, providing them with his new firm's brochure, and lying to one of his clients by representing that the law firm lacked the financial resources to proceed with its case and planned on selling the case to another law firm for $50,000. *Connors*, 599 A.2d at 49-50. Even where the partner had unequivocally misrepresented his future employment and lied about his former law firm's intentions, a tortious interference claim could not be sustained where the law firm had not proven the partner's conduct was actually responsible for the clients' departure. *Id*. at 50-51.

Similarly, in *R.M. Newell*, the court found no causation as a matter of law in a breach of duty of loyalty case, where, as here, the plaintiff could not provide that it lost a contract due to the actions of its former employee. *R.M. Newell*, 236 A.D.2d at 844. Terming proof of causation an "essential element" of a breach of duty of loyalty claim, the court dismissed the claim on summary judgment in the absence of proof of a causal link between the former employee's actions and the supposed

_____

[11]Presumably, whatever duty Mr. Gross owed to Akin Gump here was less than any duty owed by a manager, corporate officer, or director. *See PM Services*, 2006 WL 20382 at *27 ("employees – especially managers, corporate officers, and directors - owe an undivided and unselfish loyalty to the corporation..."); *accord Mercer Management*, 920 F.Supp. at 223.

21

harm sustained. *Id*.

Here, both of Akin Gump's counterclaims for tortious interference and breach of duty of loyalty must fail as a matter of law because there is no causation. With respect to Prospective Client, not only is there no wrongdoing by Mr. Gross, but any loss of a business expectancy was merely the result of Akin Gump's own decisions regarding the scope of representation. Prospective Client sought Akin Gump's services to undertake work that Akin Gump would not do, and Akin Gump expected Mr. Gross to inform the client of Akin Gump's limitations on the representation, which Mr. Gross then communicated. Akin Gump's attempt to "shoot the messenger" must be rejected for an absence of causation. As well, Akin Gump's counterclaims must fail with respect to representation of Company X in the complete absence of evidence of causation and where Akin Gump retained Company X as a client in any event. Rank speculation simply cannot serve to meet Akin Gump's significant burden to demonstrate a "substantial and direct causal link" between supposed misconduct and injury. *Connors*, 599 A.2d at 51.

## IV.    Akin Gump Has Suffered No Injury.

Even assuming for the sake of argument that Akin Gump could establish the elements of tortious interference or breach of duty of loyalty, this Court should grant summary judgment in favor of Mr. Gross on both counterclaims, because Akin Gump has failed to demonstrate damages flowing from either tort. Akin Gump does not place a dollar value on the damages it may or may not have suffered after Mr. Gross' July 25, July 29, and August 25, 2004 email communications to Prospective Client. Rather, Akin Gump simply claims that as a result of these communications, it suffered damages. (*See* Def. Amended Answer at 11-12, ¶¶ 32, 37.) Akin Gump's conclusory claims cannot sustain a cause of action under either tort.

22

With respect to Prospective Client, Akin Gump can show no more than speculative damages, because it cannot demonstrate any loss from Prospective Client. Prospective Client unequivocally conditioned any engagement on Akin Gump's attraction of potential investors, (Ex. 7 at AK001938), a representation Akin Gump was unwilling to undertake. (Ex. 4, Mehta Dep. at 31 (Akin Gump "could not promise anything" to Prospective Client "in terms of timing" or "in terms of delivery.").) In light of this disconnect between what the client saw as the firm's role and Akin Gump's differing vision of its duties, whether Akin Gump could secure Prospective Client's representation is entirely speculative.

Similarly, Akin Gump has no proof that it would have been retained by Company X prior to its ultimate retention a few months later. The record is devoid of any evidence of a retainer agreement or any other formalization of Company X's relationship with Akin Gump in the fall of 2004. (Ex. 16, Kim Dep. at 106 ("Q. [] Do you recall any time before September 20th, 2004, specifically, requesting of [Company X] that a specific retainer be proposed for Akin Gump's representation? A. No. The only comment made by [Company X] was that he's going to treat us very properly, meaning the right compensation.").) Moreover, it is undisputed that Company X retained Akin Gump after Mr. Hubbard joined the practice and paid Akin Gump's fees for that representation. (*Id.* at 78-79.)

A plaintiff cannot prevail on either a tortious interference or a breach of duty claim where it cannot demonstrate damages stemming from the alleged interference or breach. *See Mercer Management Consulting v. Wilde*, 920 F.Supp. 219 (D.D.C. 1996) (plaintiff could show no damages resulting in breach of fiduciary duty and tortious interference case); *Curtis v. Radio Representatives, Inc.,* 696 F.Supp. 729, 734 (D.D.C. 1988) (defendant precluded from recovering damages for alleged

misconduct for failure to show it was injured by the acts); *Day v. Avery*, 548 F.2d 1018, 1029 n.56 (D.C. Cir. 1976) (claim for breach of fiduciary duty failed where no injury could be shown); *Financial General Bankshares v. Mertzger*, 680 F.2d 768, 772 (D.C. Cir. 1982) (no recovery for breach of fiduciary duty in absence of proven pecuniary loss to plaintiff or proven financial gain to defendant); *Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977) (evidence of damages insufficient to create factual issue for jury on intentional interference with prospective advantage).

Proof must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of the defendant's wrongful conduct. *Connors*, 599 A.2d at 51. Once the causal connection has been demonstrated, although the impossibility of calculation with mathematical certainty will not defeat recovery, the amount of damages must be capable of proof to a reasonable certainty and not left to speculation or conjecture. *Mercer*, 920 F.Supp. at 238; *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C. 1982) (jury could not speculate regarding damages where no evidence was introduced to form basis to reasonably calculate or infer harm).

Here, there is both an absence of pecuniary loss to Akin Gump and any financial gain by Mr. Gross. Consequently, any damages calculation is not only incapable of proof with reasonable certainty, but is either nonexistent or left to complete speculation. Therefore, even assuming that Akin Gump could establish the other elements for a breach of fiduciary duty or tortious interference, which it cannot, Akin Gump's counterclaims fail for want of damages.

24

**V.    Defendant's After-Acquired Evidence Affirmative Defense Must Be Dismissed For Lack of Causation.**

Defendant claims that it can produce evidence that it would have fired Plaintiff Gross if it had discovered the e-mails during Mr. Gross' employment, and thus seeks to limit the relief available to Plaintiff Gross under the so-called "after-acquired evidence" doctrine of *McKennon v. v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995).  (Motion to Amend Answer and File Counterclaims, June 25, 2007 (Docket Entry No. 9), at 12.)  Even assuming the truth of the allegations in its Amended Complaint, however, Akin Gump cannot meet its burden here.  Defendant simply lacks sufficient evidence to prove that Plaintiff actually would have been terminated for the supposed misconduct alone had the e-mails come to light at some earlier time.

As the Supreme Court explained,

> Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.

*McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362-63 (1995).

In order to meet this burden, a defendant must do more than show that a termination is justified by the conduct; rather, the defendant must demonstrate by pointing to similarly situated employees that in practice it has actually terminated employees for the conduct at issue.  *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047-48 (7th Cir. 1999).  In affirming the decision of the trial court that the employer's affirmative defense must fail as a matter of law, the Seventh Circuit noted:

> The trial court reasoned . . . that there was no causation, since it was not disputed that no one in the history of Donlen had ever been fired for falsification of a resume.  If Donlen cannot show by a preponderance of the evidence that the after-acquired evidence would have led to her termination, it has not made out the defense.  *See McKennon*, 513 U.S. at 362-63, 115 S. Ct. 879.  As the Ninth Circuit has said,

25

"the inquiry focuses on the employer's actual employment practices, not just on the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not." *O'Day v. McDonnel Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996). "Proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252, 109 S. Ct. 1775 (1989). In the absence of further evidence that the policy would have been applied, Donlen's aversion to its stated policy is insufficient to carry its burden of persuasion on the after-acquired evidence defense.

*Id*.

As in *Donlen*, Defendant's affirmative defense must fail as a matter of law because even assuming for the sake of argument that all of its allegations are true, at best it can only suggest that it might have generated some possible justification for termination, and not that it actually would have done so. Simply put, in all its history, Defendant cannot point to any similarly situated individual who has been fired solely for a breach of duty of loyalty or tortious interference with economic advantage, as alleged by Defendant here.

Specifically, in response to an interrogatory seeking the identity of "all attorneys at Akin Gump who have been terminated for a breach of fiduciary duty or tortious interference with economic advantage," Defendant admitted it could identify no individuals in all of Akin Gump's history who had been terminated for either. (Ex. 22, Defendant's Objections and Responses to Plaintiff's Third Set of Interrogatories, August 16, 2007, at 4.) Without such evidence, Akin Gump cannot carry its burden.

While Akin Gump contends that it would have terminated Mr. Gross for the conduct (*see, e.g.,* Amended Answer at 11, ¶ 24), "a party's 'self serving remarks standing alone are insufficient'" to carry its burden under *McKennon* to demonstrate that the employee would have been terminated

26

for the misconduct. *Jones v. Board of Trustees of Communcy College District No. 508*, 75 F. Supp. 2d 885, 888 (N.D. Il. 1999). As noted by the D.C. Circuit in affirming a reinstatement order of the National Labor Relations Board, under *McKennon* an employer has "the burden of showing that it *would have* discharged the employee because of the misconduct, not simply that it *could have* done so." *Frazier Industrial Co., Inc. v. National Labor Relations Board*, 213 F. 3d 750, 760 (D.C. Cir. 2000)(original emphasis); *see also id.* at 760-61 ("bare assertion" by employer that employee would have been discharged is insufficient under NLRB practice where "the company offered no evidence that it has routinely dismissed employees for similar" misconduct.)

On this record, Akin Gump cannot demonstrate that "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time." *McKennon*, 513 U.S. at 362-63. Because Akin Gump's self serving statements are insufficient to carry its burden, Plaintiff Gross respectfully requests that this Court grant his motion for partial summary judgment on the so-called "after-acquired evidence" affirmative defense.

## CONCLUSION

For the foregoing reasons, and for any other reasons this Court may find proper, Donald G. Gross respectfully requests that this Honorable Court grant his Motion and enter summary judgment in his favor, dismissing Akin Gump's counterclaims for breach of fiduciary duty of loyalty and tortious interference with economic advantage. Additionally, Plaintiff respectfully requests that this Court enter partial summary judgment against Akin Gump on its after-acquired evidence affirmative defense to Plaintiff Gross' age discrimination claim. On this record, the undisputed facts demonstrate that Akin Gump cannot meet its burden to prove its alleged torts or its affirmative

defense.

Respectfully Submitted,

WEBSTER,   FREDRICKSON,   HENRICHSEN,
CORREIA & PUTH, P.L.L.C.


    */s/  Jonathan C. Puth*       
Jonathan C. Puth  #439241
Kataryna L. Baldwin  #494439
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorneys for Plaintiff

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this **2nd** day of November, 2007, a copy of the forgoing Motion for Summary Judgment Dismissing Counterclaims, and Motion for Partial Summary Judgment Dismissing After-Acquired Evidence Defense, the Memorandum of Points and Authorities in Support thereof, and proposed order was transmitted electronically and sent by first-class mail, postage prepaid, to:

Christine Nicolaides Kearns
Karen Faye McTavish
Pillsbury Winthrop Shaw Pittman, LLP
2300 N St., N.W.
Washington, DC  20037

Counsel for Defendant

_____/s/  **Kataryna L. Baldwin**_____
Kataryna L. Baldwin
Webster, Fredrickson & Brackshaw
1775 K Street, N.W.
Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No. 07-399 (EGS/JMF)

**ORDER**

Upon consideration of Donald G. Gross' Motion for Summary Judgment Dismissing Counterclaims, and Motion for Partial Summary Judgment Dismissing After-Acquired Evidence Defense, Akin Gump's Opposition thereto, and the entire record herein, it is this _____ day of _____, 2007,

ORDERED that Mr. Gross' Motion shall be, and the same hereby is, GRANTED in its entirety; and it is further

ORDERED that counterclaimant Akin Gump's counterclaims for breach of fiduciary duty of loyalty and tortious interference with economic advantage are hereby dismissed; and it is further

ORDERED that Defendant Akin Gump's "after-acquired evidence" affirmative defense is hereby dismissed.

Dated: _____        _____
                                    Judge Emmet G. Sullivan
                                    United States District Court for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS<br><br>Plaintiff,<br><br>v.<br><br>AKIN GUMP STRAUSS HAUER & FELD LLP<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 07-399 (EGS/JMF) |

**PLAINTIFF AND COUNTERCLAIM DEFENDANT GROSS' STATEMENT OF**
**MATERIAL FACTS NOT IN DISPUTE**

Plaintiff and counterclaim defendant Donald G. Gross hereby submits the following statement of material facts as to which there is no genuine issue in support of his Motion for Summary Judgment Dismissing Counterclaims, and Motion for partial Summary Judgment Dismissing After-Acquired Evidence Defense pursuant to Rule 56.

1.      On February 26, 2007, Plaintiff Gross filed his age discrimination complaint against Akin Gump.  (Docket Entry No. 1.)  On June 25, 2007, Akin Gump moved to countersue Mr. Gross for tortious interference and breach of fiduciary duty, alleging wrongdoing by Mr. Gross.  (Defendant's Motion to Amend Answer and File Counterclaims, June 25, 2007 (Docket Entry No. 9).)

2.      In 2003 and 2004, during his tenure at Akin Gump, Mr. Gross "worked to persuade a particular prospective client ("Prospective Client") to hire Akin Gump and to sign a proposed engagement letter which Mr. Gross had drafted and negotiated with input from others." (Defendant's First Amended Answer & Counterclaims, September 10, 2007, at 8, ¶ 10 (Docket Entry No. 26).)

3.      Prospective Client was forming an Asian real estate investment fund, and had spoken with

Don Gross over a series of months in order to establish a possible engagement with Akin Gump. (Ex. 2, Ex. 3.)

4.    Prospective Client sought Akin Gump's representation to obtain Akin Gump's help "in screening and setting up appointments with potential investors," believing that Akin Gump's experience in the field would enable it to effectively launch the private equity fund.  (Ex. 3 at AK001850.)

5.    According to Prakash Mehta, Akin Gump's lead Washington partner on private equity funds formation, "the client was looking to us in part to help them get the fund raising process started, and to make contacts" in order to raise money for the potential fund.  (Ex. 4, Mehta Dep. at 18, 26-27.)

6.    Early drafts of a prospective retainer letter between Prospective Client and Akin Gump reflected the client's expectation that Akin Gump's services would "include exerting our reasonable efforts in introducing you and the Fund to the equity funds, financial institutions and other investors that Akin Gump represents."  (Ex. 5 at AK001737.)  Akin Gump later removed any reference to investors meetings in its proposed retainer agreement.  (See Ex. 6 at AK001913.)

7.    Prospective Client had hoped that Akin Gump could schedule meetings with potential investors to his new private equity fund beginning in mid to late June 2004.  (Ex. 3 at AK001850.)

8.    Contrary to Prospective Client's expectations, the Funds Group expected only to do the legal work for Prospective Client, and not to take part in investor fundraising.  (Ex. 4, Mehta Dep. at 45 ("Assuming responsibility for setting up meetings with potential investors is not something I perceived to be our responsibility.").)

9.    Despite Prospective Client's hopes, no investor meetings were held in June 2004.

10.    During June and July, Prospective Client persisted in its expressed desire that Akin Gump

would lead an effort to raise funds for its private equity fund.  (Ex. 7 at AK001938.)  Prospective

Client reiterated that the terms of any engagement between Prospective Client and Akin Gump were

"subject to" the obligation that Akin Gump "will introduce [Prospective Client] to [Akin Gump]

clients that are likely to have an interest in investing in [Prospective Client's] Asia Fund.  These

USA meetings should take place on or about 19-23 July, at your direction." (Ex. 7 at AK001938.)

11.     Writing to Donald Gross in June 2004, Prospective Client made clear that the central basis

for the representation was that Akin Gump would be in a position to generate interest from potential

investors. (Ex. 7 at AK001938.)  In communicating its key aims, Prospective Client wanted "to

make sure that we all have the same understanding" regarding the representation. (*Id.*)

12.     Contrary to Prospective Client's expectations, however, raising money from specific

investors was not typically a role that Akin Gump took on.  (Ex. 4, Mehta Dep. at 25.)  Akin Gump

viewed its role as "structuring, negotiating, documenting, and closing the fund transaction," and not

taking the lead in fundraising from specific investors, a role Akin Gump typically left to investment

bankers.  (Ex. 4, Mehta Dep. at 24.)

13.     Although Prospective Client expected Akin Gump to establish the investor meetings, (*see,*

*e.g.* Ex. 7 at AK001938), Akin Gump cancelled any hoped-for investor meetings that had been

scheduled for July 2004.  (Ex. 8, Gross Dep. at 251-52.)

14.     As the primary contact person with a relationship with Prospective Client, (Ex. 4, Mehta Dep.

at 62), Don Gross was left to "climb down" from Akin Gump's previous position that it would

establish investor meetings, and to instead communicate to the client that the planned meetings could

not take place.  (Ex. 8, Gross Dep. at 251-53; Ex. 9, 02 July 2004 00:42 email, at AK003435.)

15.     Prospective Client found the news "rather disappointing" given Akin Gump's prior

representations. (Ex. 9, July 1 19:39:15 2004 email, at AK003435.) Given its keen interest in having Akin Gump attract investor interest, Prospective Client expressed frustration over "why it has taken [Akin Gump] this long to receive the suggestion to send information to [its] clients," and that further delay by the firm was "not appealing." (*Id.*)

16.    Speaking for Akin Gump's Funds Group, Prakash Mehta sought to temper the client's expectations that Akin Gump could guarantee investors. (Ex. 4, Mehta Dep. at 50.) To that end, Mr. Mehta wrote Prospective Client: "I don't want to get anyone's hopes up yet. . . . [W]e have been seeing reluctance on the part of many in the [private equity] community to 'first time funds' especially of late." (Ex. 9 at AK003434.) The point was apparently not lost on Prospective Client, who wrote back, in full: "I note a considerable amount of hedging here. . . . . . . . . ." (*Id.* (ellipses in original).)

17.    Resigned to a later schedule, Prospective Client then suggested moving forward with the representation, but made it more clear than ever the critical importance that Akin Gump "take the lead" on fundraising efforts for its Asian equity fund. (Ex. 10 at AK003438.)

18.    Prospective Client wrote a lengthy e-mail concerning the representation, none of which had to do with any legal work on the fund; rather, it focused entirely on the central role Akin Gump would take to lead the fundraising effort. (Ex. 10 at AK003438-39.)

19.    Prospective Client asserted that the representation could go forward "based upon the following criteria" including the attraction of "significant interest by capital with the right presentation strategy" and the utilization of "Akin's platform to maximum effect" to attract capital. (Ex. 10 at AK003438.)

20.    Accepting a delayed schedule, Prospective Client observed that delaying investor meetings

4

would at least enable Akin Gump to have "sufficient time to fully inform potential investors of what makes [the fund] not just a 'start up' fund." (Ex. 10 at AK003438.)  Prospective Client expressed confidence of success "if we let Akin take the lead, get the right materials to them, . . . and, finally, give the Akin team the time needed to fully inform their clients and contacts about [the fund]." (*Id*.)

21.    Prospective Client emphasized that it was not convinced that Akin Gump was the right choice to lead the representation, and that it was not interested in losing $15,000 if it was not confident that the fundraising would be performed.  (Ex. 10 at AK003438.)

22.    Mr. Mehta expressed concern to his Akin Gump colleagues about the extent of Prospective Client's expectations, noting that if Prospective Client was hiring Akin Gump to attract investor interest to the fund, Prospective Client may be disappointed.  (Ex. 11 at AK002009 ("I can't even guarantee him one investor meeting at this point.").)

23.    Akin Gump "could not promise anything in terms of timing" or "in terms of delivery" to Prospective Client.  (Ex. 4, Mehta Dep. at 31.)

24.    Mr. Mehta "wanted to be very careful that [Prospective Client] not think it was our job to attract significant interest in capital * * * [W]here he says that Akin Gump will lead this effort and then goes on to talk about the fund raising sort of reinforces my concern that he thinks or let's make sure that he doesn't think that by leading this effort we are responsible for fundraising." (Ex. 4, Mehta Dep. at 59-60.)

25.    At the time of Prospective Client's concerns about Akin Gump's unwillingness to attract investors, Prospective Client had spoken to a firm with an extensive Asian practice, and communicated its interest in this prospective competitor to Akin Gump.  (Ex. 10 at AK003439.)

26.    Although Mr. Mehta was the lead Funds Group attorney on the matter, Mr. Gross was the

5

individual with the relationship with Prospective Client and was expected to communicate Akin

Gump's unwillingness to attract investors. (*See* Ex. 4, Mehta Dep. at 33, 61-62.)

27.    After discussing the matter with Jay Cohen, a key partner in the Korea Practice Group, Mr.

Gross advised Prospective Client to delay signing the engagement letter because Akin Gump had

made clear that it could not deliver the services that Prospective Client hoped to attain. (Ex. 8, Gross

Dep. at 263-64.)

28.  On July 25, 2004, Mr. Gross wrote:

> Before you commit yourself to a partnership with Akin Gump, I want to make sure
> that the law firm is a hundred percent behind your project. I am thinking specifically
> of the Funds Group, based mainly in New York, on whom we're now relying to line
> up potential investors.  In the next several days, I'll talk to everyone involved and
> give you my honest assessment.

(Ex. 12 at AK002035.)

29.    On July 29, 2004, Mr. Gross again wrote to Prospective Client regarding Akin Gump's

willingness to take on fundraising:

> Everyone tells me they want to be supportive and they should start reporting client
> feedback soon.  But I'm not satisfied with the out-reach efforts of the funds group so
> far, though there's no question the law firm would do an excellent job on the legal
> work.  For the moment, I think you should delay signing the engagement letter.  The
> law firm will be unhappy with this recommendation, but I can't in good conscience
> ask you to rely exclusively on Akin Gump until I see actions matching words.

(Ex. 13 at AK002065-66.)

30.    Mr. Gross had reinforced that "there's no question that the law firm would do an excellent

job on the legal work" but that the "out-reach efforts of the funds group" to potential investors was

in question. (Ex. 13 at AK002065.)

31.    Mr. Gross wrote these emails to communicate the unwillingness of the firm to set up investor

meetings, "which was the reason . . . that [Prospective Client] wanted to enter into the engagement in the first place." (Ex. 8, Gross Dep. at 256.)

32.     The chairman of Prospective Client was also a managing partner and financial advisor to Korea-based "Company X". (Ex. 8, Gross Dep. at 276.)

33.     Company X was exploring retaining Akin Gump to negotiate a deal with Company Y. (Ex. 14, 8/25/04 10:50:33 AM email.)

34.     Akin Gump's client Company Y had been putting pressure on Akin Gump's potential client Company X regarding a Korean real estate development. (Ex. 15 at AK002080.)

35.     Company Y, a large Korean conglomerate, is the largest and most important client of Sukhan Kim, the head of the Korea Practice Group. (Ex. 8, Gross Dep. at 297; Ex. 4, Kim Dep. at 18-19, 45.)

36.     Notwithstanding an apparent conflict of interest between his largest client and Company X, Mr. Kim wished to land Company X as a client in order to negotiate the deal between the two companies. (Ex. 8, Gross Dep. at 297.)

37.     After Don Gross was informed he was to leave the Korea Practice Group, he wrote a memorandum to Mr. Kim providing advice as to how to secure Company X as a client. (Ex. 15 at AK002078-2081.) In the memo, Mr. Gross advised Mr. Kim regarding the possibility of Company X's concern about this conflict of interest. (*Id.* at AK002080 ("He may want to know whether your position as outside counsel to [Company Y] would prevent you from assisting [Company X] in a subsequent negotiation with [Company Y.]").)

38.     Akin Gump did not prepare an engagement letter or retainer agreement with Company X during its 2004 discussions with the company. (*See* Ex. 16, Kim Dep. at 102, 106.)

39.     When Korea Practice Group partner Jaemin Park suggested in August 2004 that she hold off

doing further work for Company X until a client matter number could be established, Sukhan Kim demurred, directing instead that rather than establish a retainer at that time, "our current goal is to demonstrate our capabilities and impress him . . ." (Ex. 17, August 12, 2004 10:00 AM email, at AK003483.)

40.     Akin Gump has no evidence of any proposed retainer agreement with Company X in 2004 (*see* Ex. 16, Kim Dep. at 102, 106), and the record is devoid of any evidence of a draft retainer agreement until the time that Company X hired Akin Gump in 2005.

41.     On August 25, 2004, believing that Mr. Kim could not ethically represent both entities, and aware that Company X was interested in retaining Akin Gump to help make a deal with [Company Y], Mr. Gross communicated this conflict of interest to his friend and colleague, the chairman of Prospective Client. (Ex. 18.)   Specifically, Mr. Gross relayed that Mr. Kim was "so close to [Company Y] and a couple of other Korean business groups that [Company X] could not possibly trust him to serve as an 'honest broker.'" (*Id.* at AK002125.) Mr. Gross also wrote: "[Jaemin Park's] help is even more questionable since she is a bankruptcy lawyer whose practice consists of representing Korean companies on corporate restructuring issues." (*Id.*)  "If [Company X] wants to get in touch with some Korean business groups, there are other ways to do it."  (*Id.*)

42.     Mr. Gross explained that he "had a fiduciary duty" and "a duty of candor" to Prospective Client "in order to -- to keep his trust," (Ex. 8, Gross Dep. at 295-96), and that by writing the August 25, 2004 email, he was trying to "salvage the relationship with [Company X] going forward," "uphold[] [his] ethical duty of -- of being honest," and "protect[] the fiduciary duty and . . . interest of the client."  (*Id*. at 298, 301.)

43.     Mr. Gross never communicated his hesitations to the CEO of Company X, who had been

8

dealing directly with Mr. Kim.  In fact, Mr. Gross did not have any direct interactions with the CEO of Company X regarding its retainer with Akin Gump.

44.    In October 2004, Akin Gump itself rejected representing Company X due to a disagreement of the retainer amount for representation.  (Ex. 16, Kim Dep. at 83; Ex. 19.)  Mr. Kim testified that Akin Gump rejected the representation of Company X because the firm expected to be paid "handsomely," and the fixed fee amount offered by Company X was much lower than what the firm anticipated.  (Ex. 16, Kim Dep. at 106, 83.)

45.    Notwithstanding Mr. Kim's rejection, Akin Gump nonetheless engaged Company X as a client shortly thereafter.  (Ex. 16, Kim Dep. at 79.)

46.    Before he left Akin Gump in late October 2004, Mr. Gross briefed Thomas Hubbard, former U.S. ambassador to Korea and a newly hired Akin Gump Senior Advisor, to assist Akin Gump in securing representation of Company X.  (Ex. 8, Gross Dep. at 298.)

47.    Akin Gump then secured Company X as a client "in large measure" because of Mr. Hubbard. (Ex. 20; *see also* Ex. 16, Kim Dep. at 79.)

48.     In all of Akin Gump's history, no person has ever been terminated for breach of fiduciary duty of loyalty or tortious interference with economic advantage. (Ex. 22, Defendant's Objections and Responses to Plaintiff's Third Set of Interrogatories, August 16, 2007, at 4.)

Respectfully Submitted,

WEBSTER,    FREDRICKSON,    HENRICHSEN, CORREIA & PUTH, P.L.L.C.


___*/s/  Jonathan C. Puth*_____
Jonathan C. Puth  #439241
Kataryna L. Baldwin  #494439
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorneys for Plaintiff Gross

EXHIBIT 1

(Filed Under Seal)

EXHIBIT 2


(Filed Under Seal)

# EXHIBIT 3

# (Filed Under Seal)

EXHIBIT 4

(Filed Under Seal)

EXHIBIT 5

(Filed Under Seal)

EXHIBIT 6

(Filed Under Seal)

EXHIBIT 7


(Filed Under Seal)

EXHIBIT 8


(Filed Under Seal)

EXHIBIT 9

(Filed Under Seal)

EXHIBIT 10

(Filed Under Seal)

EXHIBIT 11


(Filed Under Seal)

EXHIBIT 12


(Filed Under Seal)

EXHIBIT 13


(Filed Under Seal)

EXHIBIT 14

(Filed Under Seal)

EXHIBIT 15


(Filed Under Seal)

EXHIBIT 16


(Filed Under Seal)

EXHIBIT 17

(Filed Under Seal)

EXHIBIT 18


(Filed Under Seal)

EXHIBIT 19


(Filed Under Seal)

EXHIBIT 20


(Filed Under Seal)

EXHIBIT 21


(Filed Under Seal)

EXHIBIT 22

(Filed Under Seal)