# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:07CV00399 (EGS) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Christine N. Kearns (Bar No. 416339)
Karen-Faye McTavish (Bar No. 477588)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

Counsel for Defendant Akin Gump Strauss Hauer & Feld LLP

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   PROCEDURAL HISTORY.....................................................................................3

III.  FACTUAL BACKGROUND ...................................................................................3

IV.   ARGUMENT...........................................................................................................4

    A.    Mr. Gross's Claims That He Was Terminated Based on His Age Fail
    (Counts I and II)...........................................................................................5

        1.    Mr. Gross's Claim of "Direct Evidence" Does Not Save His
        Case.................................................................................................5

        2.    Mr. Gross Has No Circumstantial Evidence of Age
        Discrimination...............................................................................13

            a.    He Can Not Establish a Prima Facie Case of
            Discrimination....................................................................13

            b.    Mr. McLean Had Legitimate Reasons For Terminating
            Mr. Gross and There is No Evidence That Those Reasons
            are Pretextual. ....................................................................17

            c.    There Is A Strong Inference Against Age Discrimination.............20

    B.    There Is No Evidence To Support Mr. Gross's Claim of Retaliation
    (Counts III and IV).......................................................................................22

        1.    The Filing of a Counterclaim Is Not An Adverse Employment
        Action.............................................................................................22

        2.    There Is No Evidence of Causation. ............................................25

        3.    Akin Gump Had a Legitimate, Nondiscriminatory Reason For
        Filing Its Affirmative Defense and Counterclaims...................................28

V.    CONCLUSION......................................................................................................30

400662879v1

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page**

Alexander v. Tomlinson, No. 05-0767 (ESH), 2007 U.S. Dist. LEXIS 59641
    (D.D.C. Aug. 15, 2007)................................................................................15

Beeck v. Fed. Express Corp., 81 F. Supp. 2d 48 (D.D.C. 2000)........................................10

Beltran v. Brentwood N. Healthcare Ctr., LLC, 426 F. Supp. 2d 827
    (N.D. Ill. 2006)..........................................................................24-25, 27-28

Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731 (1983)................................28

Blackman v. Visiting Nurses Ass'n, 694 A.2d 865 (D.C. 1997) .........................................11

Blount v. Nat'l Ctr. for Tobacco-Free Kids, 775 A.2d 1110 (D.C. 2001) ..........................21

Broderick v. Donaldson, 437 F.3d 1226 (D.C. Cir. 2006) ................................................29

Brown v. CSC Logic, Inc., 82 F.3d 651 (5th Cir. 1996)......................................................20

Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006) ................................23

Chamberlain v. Student Loan Mktg. Ass'n, No. 96-CV-1710, 1999 D.C. App. LEXIS 220
    (D.C. June 22, 1999) .............................................................................21

Chambliss v. Nat'l R.R. Passenger Corp., No. 05-2490 (CKK), 2007 U.S. Dist. LEXIS
    11522 (D.D.C. Feb. 20, 2007).....................................................................4, 10

Cheek v. Chertoff, No. 04-251 (RMC), 2006 U.S. Dist. LEXIS 14341
    (D.D.C. Mar. 17, 2006) .............................................................................27

Clark County Sch. Dist. v. Breeden, 532 U.S. 268 (2001)..................................................27

Clifton v. Fed. Nat'l Mortgage Ass'n, 36 F. Supp. 2d 20 (D.D.C. 1999) ..........................20

Dockins v. Benchmark Commc'ns, 176 F.3d 745 (4th Cir. 1999).......................................20

Duncan v. Harvey, 479 F. Supp. 2d 125 (D.D.C. 2007) ..............................................15, 29

Earl v. Electro-Coatings of Iowa, Inc., No. C02-0042, 2002 U.S. Dist. LEXIS 20937
    (N.D. Iowa Oct. 29, 2002)...................................................................22-23

Ergo v. Int'l Merchant Servs., Inc., No. 04 C 6789, 2007 U.S. Dist. LEXIS 67699
    (N.D. Ill. Sept. 13, 2007)..................................................................27, 28

Evans v. Davis Mem. Goodwill Indus., 133 F. Supp. 2d 24 (D.D.C. 2000), aff'd,
    1 Fed. Appx. 3 (D.C. Cir. 2001)............................................................... 16, 17-18

Fox v. Giaccia, 424 F. Supp. 2d 1 (D.D.C. 2006) ...............................................16

Garrett v. Lujan, 799 F. Supp. 198 (D.D.C. 1992)...............................................10

Ginger v. District of Columbia, 477 F. Supp. 2d 41 (D.D.C. 2007) ........................... 4-5, 17

Griffin v. Washington Convention Ctr., 142 F.3d 1308 (D.C. Cir. 1998) ..........................10

Gustave-Schmidt v. Chao, 360 F. Supp. 2d 105 (D.D.C. 2004), aff'd,
    2004 U.S. Dist. LEXIS 21817 (D.C. Cir. Oct. 19, 2004).....................................4, 12, 27

Hall v. Giant Food, Inc., 175 F.3d 1074 (D.C. Cir. 1999) .................................. 9-10, 11, 19

Harmar v. United Airlines, Inc., No. 95 C 7665, 1996 U.S. Dist. LEXIS 5346
    (N.D. Ill. Apr. 23, 1996).........................................................................28

Holbrook v. Reno, 196 F.3d 255 (D.C. Cir. 1999)...............................................11

Hussain v. Prinicipi, 344 F. Supp. 2d 86 (D.D.C. 2004).......................................10

Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173 (8th Cir. 1992).................................21-22

Mastro v. Potomac Elec. Power Co., 447 F.3d 843 (D.C. Cir. 2006), cert. denied,
    127 S. Ct. 1140 (2007) .....................................................................13, 15, 17

Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364 (D.C. Cir. 2001) ....27

McManus v. Williams, No. 05-1621 (EGS), 2007 U.S. Dist. LEXIS 15592
    (D.D.C. Feb. 22, 2007)..........................................................................25

Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647 (D.C. Cir. 2003) ..................10

Proud v. Stone, 945 F.2d 796 (4th Cir. 1991) ...................................................21

Rand v. CF Indus., Inc., 42 F.3d 1139 (7th Cir. 1994)........................................22

Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997) ...............................................20

Royall v. Nat'l Ass'n of Letter Carriers, No. 05-1711 (RBW), 2007 U.S. Dist LEXIS
    63655 (D.D.C. Aug. 29, 2007)............................................................. 18-19

Siragy v. Georgetown Univ., No. 97-2557 (RMU), 1999 U.S. Dist. LEXIS 21021
    (D.D.C. Aug. 20, 1999)..........................................................................10

Sullivan-Obst v. Powell, 300 F. Supp. 2d 85 (D.D.C. 2004) ...................................27

Sylve v. HSPV, LLC, 2 F. Supp. 2d 837 (E.D. La. 1998).....................................20

Tao v. Freeh, 27 F.3d 635 (D.C. Cir. 1994) ...........................................................4

Taylor v. Small, 350 F.3d 1286 (D.C. Cir. 2003) ................................................22

Timmerman v. U.S. Bank, N.A., No. 04-cv-01903-REB-MJW, 2006 U.S. Dist. LEXIS
    19356 (D. Colo. Mar. 31, 2006), aff'd on other grounds, 483 F.3d 1106
    (10th Cir. 2007).......................................................................................... 23-24

Udoh v. Trade Ctr. Mgmt. Assocs., 479 F. Supp. 2d 60 (D.D.C. 2007) ....................... 14-15

Valles-Hall v. Ctr. For Nonprofit Advancement, 481 F. Supp. 2d 118
    (D.D.C. 2007)..........................................................................................10, 19

Vickers v. Powell, 493 F.3d 186 (D.C. Cir. 2007)............................................... 8-9

Williams v. Chertoff, 495 F. Supp. 2d 17 (D.D.C. 2007) ....................................15

Williams v. Washington Convention Ctr. Auth., 407 F. Supp. 2d 4 (D.D.C. 2005).....15, 29

Willingham v. Gonzales, 391 F. Supp. 2d 52 (D.D.C. 2005) .............................................27

**Statutes and Rules**

Fed. R. Civ. P. 56(c)...........................................................................................4

**Other Authorities**

Barbara Lindeman & Paul Grossman, Employment Discrimination Law 466
    (3d ed. 2002 Supp.) ..........................................................................................21

I.    **INTRODUCTION**

Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") submits this motion

for summary judgment on all of the claims presented in the Amended Complaint filed by

Plaintiff Donald G. Gross.

Mr. Gross originally sued Akin Gump for age discrimination under the Age

Discrimination in Employment Act ("ADEA") (Count I), and the District of Columbia Human

Rights Act ("DCHRA") (Count II), claiming that his termination after one year of employment

was based on his age. He was hired at age 51 and fired at age 52. His discrimination claims

rests entirely upon alleged age-related comments by his <u>older</u> supervisor, Akin Gump partner

Sukhan Kim,[1] who had been among those who recommended that the firm hire Mr. Gross in the

first place. The alleged comments are sharply disputed. They are, however, entirely irrelevant.

The undisputed facts of this case show that the decision to terminate Mr. Gross at the conclusion

of one year (a possibility expressly anticipated in his offer letter) was made by Bruce McLean,

Chairman of Akin Gump, based on his independent assessment of Mr. Gross's lack of

contribution to the firm. Mr. Gross's work product was poor and his billable hours abysmal.

Significantly, Mr. McLean is also older than Mr. Gross.

The facts here are straightforward: despite significant, documented reservations about

Mr. Gross's qualifications for the position that it was trying to fill, Akin Gump gave Mr. Gross

an opportunity to prove that he could do the work. Recognizing the uncertainty of Mr. Gross's

success at the firm, Akin Gump was careful to take the unusual step of putting a provision in

Mr. Gross's offer letter clearly stating, "[l]ike other employees of the firm, you will be

considered an employee at will; <u>however, it is our intention to review your employment situation</u>

<u>at your one year anniversary and reassess our needs and the terms of your employment.</u>"

---

[1] Mr. Gross's allegations are accepted as true solely for purposes of this motion.

(Emphasis added). Unfortunately, but not entirely unexpectedly, Mr. Gross was unable to deliver.

It is undisputed that many attorneys at the firm found Mr. Gross's substantive writing on billable client assignments to be poor. In addition, he was unable to even come close to achieving his billable hours requirement. Val Slater, who serves as Head of the International Trade Practice Group to which Mr. Gross was assigned,[2] brought her concern about Mr. Gross's hours directly to the attention of Mr. McLean. Mr. Kim had no involvement at all. Ms. Slater is also older than Mr. Gross. As a result, Mr. McLean undertook an independent assessment of Mr. Gross's productivity and performance, and made the decision to terminate Mr. Gross's employment at Akin Gump, without any prior input from Mr. Kim.

Mr. Gross never mentioned or complained once about any alleged age discrimination at Akin Gump until almost six months after he left the firm, when he filed a Charge with the U.S. Equal Employment Opportunity Commission (the "EEOC") in April 2005. Rather, his July 2004 written response to Mr. Kim, who had delivered the news that his employment would terminate, was entirely inconsistent with so called discrimination by Mr. Kim:

> I have a great deal of respect for you and I know that what you have told me is best for both Akin Gump and for the development of my own career. I sincerely appreciate your support. Thanks and best wishes, Don.

In addition, Mr. Gross alleges that Akin Gump's decision to file Counterclaims in this matter is retaliation in violation of the ADEA (Count III) and the DCHRA (Count IV). It is undisputed, however, that Akin Gump filed an affirmative defense and two Counterclaims two years after Mr. Gross filed a Charge with the EEOC alleging age discrimination. It is also

---

[2] Akin Gump is comprised of formal practice groups, including the International Trade Practice Group. The Korea Practice Group at Akin Gump is an informal group of attorneys (who are all assigned to various formal practice groups), but who work on Korean matters.

undisputed that Akin Gump filed its Counterclaims only after uncovering, during discovery in this matter, that while an Akin Gump employee, and on Akin Gump's payroll, Mr. Gross actively encouraged prospective clients of Akin Gump not to retain the services of Akin Gump, including making negative statements about the motivation, experience and level of influence of those Akin Gump partners, including Mr. Kim. Mr. Gross did so while Mr. Kim and others were assisting (at Mr. Gross's request) in his search for another position both inside and outside of the firm. Mr. Gross admits to making these statements. There is no evidence in the record to suggest that Akin Gump's decision to file its affirmative defense or Counterclaims based on Mr. Gross's admitted disloyalty, was in any way retaliatory.

Accordingly, Mr. Gross's Amended Complaint should be dismissed in its entirety.

## II.    PROCEDURAL HISTORY

On April 29, 2005, Mr. Gross filed a Charge of Discrimination with the EEOC alleging age discrimination under the ADEA and the DCHRA. On February 26, 2007, Mr. Gross filed a Complaint in which he repeated the allegations in the EEOC Charge. Akin Gump filed its Answer denying the allegations, and discovery commenced. On June 25, 2007, Akin Gump filed a motion to amend its Answer to add an affirmative defense of "after acquired evidence" based upon e-mails it discovered in responding to Mr. Gross's document requests. It also included in the Amended Answer counterclaims for breach of fiduciary duty and tortious interference with economic relations based upon the same newly discovered evidence. Mr. Gross then moved to amend his Complaint to add a retaliation claim based upon the Amended Answer and Counterclaims. On September 10, 2007, this Court granted both motions to amend.

## III.    FACTUAL BACKGROUND

The relevant facts are set forth in the accompanying Statement of Undisputed Material Facts (the "Statement") and will be referenced throughout this motion.

## IV.    ARGUMENT

The standards for summary judgment are well settled.  A party is entitled to summary judgment "if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and the moving party is entitled to summary judgment as a matter of law."  <u>Chambliss v. Nat'l R.R. Passenger Corp.</u>, No. 05-2490 (CKK), 2007 U.S. Dist. LEXIS 11522, at *47 (D.D.C. Feb. 20, 2007) (granting employer's motion for summary judgment on race and retaliation claims) <u>citing</u> Fed. R. Civ. P. 56(c) and <u>Tao v. Freeh</u>, 27 F.3d 635, 638 (D.C. Cir. 1994).  The moving party "bears the 'initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact.'"  <u>Chambliss</u>, 2007 U.S. Dist. LEXIS 11522, at *47 (citations omitted).

In response, a plaintiff must "'go beyond the pleadings and by his own affidavits, or depositions, answers to interrogatories, and admissions on file "designate" specific facts showing that there is a genuine issue for trial.'"  <u>Id.</u> at *48 (citations omitted).  In addition, "[w]hile it is understood that when considering a motion for summary judgment a court must 'draw all justifiable inferences in the non-moving party's favor and accept the non-moving party's evidence as true,' the non-moving party must establish more than 'the mere existence of a scintilla of evidence in support of the plaintiff's position.'"  <u>Gustave-Schmidt v. Chao</u>, 360 F. Supp. 2d 105, 112 (D.D.C. 2004) (granting motion for summary judgment on Title VII and ADEA claims), <u>aff'd</u>, 2004 U.S. Dist. LEXIS 21817 (D.C. Cir. Oct. 19, 2004) (citation omitted).  "'Even when material facts are in dispute, however, summary adjudication may be appropriate if, with all factual inferences drawn in favor of the non-movant, the movant would nonetheless be entitled to judgment as a matter of law.'"  <u>Id.</u> (citation omitted).  Finally, "DCHRA and federal

discrimination claims are analyzed under the same legal standard." <u>Ginger v. District of Columbia</u>, 477 F. Supp. 2d 41, 56 (D.D.C. 2007) (citation omitted). The undisputed record in this case confirms that Akin Gump is entitled to summary judgment on all claims.

**A.    Mr. Gross's Claims That He Was Terminated Based on His Age Fail (Counts I and II).**

As a preliminary matter, despite Akin Gump's clear policy prohibiting discrimination on the basis of age, or any other protected characteristic, and reporting procedures, it is undisputed that Mr. Gross never complained about age discrimination to anyone at Akin Gump. Statement at 73-74. To the contrary, in addition to writing to Mr. Kim, "I know what you have told me is best for both Akin Gump and the development of my career," (Statement at 62), Mr. Gross repeatedly characterized his termination, both inside Akin Gump and externally, as follows:

> Over the summer, Akin Gump's management put considerable pressure on the Korea practice group here to reduce its costs due to insufficient profitability. As a consequence, I and a partner in the practice group from our L.A. office were asked to leave the firm.

Statement at 72. Mr. Gross did not mention age discrimination until filing his EEOC Charge almost six months after he left the firm.

**1.    Mr. Gross's Claim of "Direct Evidence" Does Not Save His Case.**

Mr. Gross bases his age discrimination claims entirely on his testimony regarding alleged ageist comments made by Mr. Kim.[3] Specifically, Mr. Gross bases his claims on his testimony that (1) Mr. Kim asked him his age during his interview and stated during the interview that he

---

[3] This testimony comes from Mr. Gross's deposition and is accepted as true only for purposes of this motion. Mr. Gross has notes that he alleges he took at the time of, or shortly thereafter, alleged conversations between he and Mr. Kim, and others at Akin Gump. These notes, however, are inadmissible hearsay. Moreover, the authenticity of the notes cannot be verified, and, in fact, in questionable given the content of the notes. For example, the notes that Mr. Gross maintains that he took of his July 13, 2006 conversation with Mr. Kim note that Mr. Kim "[e]mphasized age issue: SK is 55 and I am 52." It is undisputed, however, that Mr. Gross was 51, not 52, at the time he claims he drafted the notes. Statement at 8.

"thought it was – that [Mr. Gross] was very old to be starting out in a major law firm;" (2) a statement allegedly made by Akin Gump attorney David Park that "the fact that [Mr. Gross's] age and Mr. Kim's age were very close . . . made [Mr. Kim] feel very uncomfortable" and that Mr. Gross's surgery had "reinforced in Mr. Kim's mind how old Mr. Gross was" and "created a question of whether "Mr. Gross would] be able to do work that [he] was supposed to do because of. . . [his] heart condition;[4] (3) Mr. Kim's alleged statement in a hallway in which he expressed concern for Mr. Gross's health following his surgery and said "we're both getting older;" 4) Mr. Kim's alleged comment to Mr. Gross that he took baby aspirin for his heart; 5) the fact that Mr. Kim allegedly "brought up the subject of retirement" and asked Mr. Gross when he planned to retire; 6) alleged comments by Mr. Kim when advising Mr. Gross that the firm was terminating him that Mr. Gross "was doing associate level work at [his] age, [he] needed to – either to move outside the firm or to find another niche within the firm" and that Mr. Kim asked Mr. Gross his age and discussed the closeness of age between them, as well as with respect to former Akin Gump partner Michael Quigley; and 7) alleged comments by Mr. Kim at a lunch following Mr. McLean's decision to terminate Mr. Gross where Mr. Kim allegedly told Mr. Gross that "[h]e felt that [Mr. Gross] was too old to do the kind of work I was doing, what he called research or junior level work" and that normally he could assist him in finding another job, but that Mr. Gross "was too senior in terms of age" for Mr. Kim to help him.[5]  None of these comments are direct evidence of discrimination.

It is undisputed that Mr. McLean--not Mr. Kim--made the decision to terminate Mr. Gross after completing an independent assessment of Mr. Gross's productivity and performance prompted by a "communication from Ms. Slater about [Mr. Gross's] lack of

---

[4] It is undisputed, however, that Mr. Kim was aware of Mr. Gross's upcoming heart surgery when he recommended that the firm hire him.  Statement at 15.

[5] In addition, Mr. Gross alleges that Mr. Quigley allegedly agreed with Mr. Kim's alleged critique that "the disparity between [Mr. Gross's] age and the work that [he] was doing" was a problem.

productivity measured by billable hours." Statement at 38, 50-59. Mr. McLean followed up on these concerns raised by Ms. Slater by asking Mr. Quigley about Mr. Gross's lack of productivity, and Mr. Quigley explained that Mr. Gross "had not worked out." Statement at 38, 50-59. The record is replete with similar testimony from Akin Gump attorneys (other than Mr. Kim) who found Mr. Gross's work product unsatisfactory. Statement at 28-37, 42-44, 46. For example, Mr. Park worked closely with Mr. Gross and quickly concluded "We had an issue. [Mr. Gross] did not do well." Statement at 33. Former Akin Gump partner Michael Kaye found his work "poorly done" and, in one instance wrote him an email stating he was "pull[ing] the plug" on an unusable memorandum. Statement at 29-30, 34, 46. Akin Gump attorney Lisa Ross assisted in revising Mr. Gross's work product and wrote to Mr. Park in May 2004,

> I think it may have been totally impossible to get rid of that "type of writing" that we discussed last night – but I tried to make progress. . . .    Again, literally full sentences and ideas were repeated in the paragraph below them, making the message get lost in the words.    So, I added entire paragraphs and deleted entire paragraphs and switched the order of sections, so I really hope Don won't be offended.

Statement at 43-44.

There is more. In April 2004, a Senior Advisor to the Center for Strategic and International Studies ("USIP") commented on a paper Mr. Gross submitted for publication as follows: "Don[] I have had a chance to look at your paper.  I have an obligation to USIP to make sure these papers are the best they can be.  Honestly, I still think yours falls short of the mark." Statement at 47.

Mr. McLean also knew that Akin Gump had hired Mr. Gross on a one year "trial basis." Statement at 53.  He decided that Mr. Gross's one year term with Akin Gump should not be extended.  Id.  It is undisputed that Mr. McLean did not consult Mr. Kim prior to making his decision to terminate Mr. Gross's employment.  Statement at 55-57.  However, Rick Burdick,

Partner in Charge of Akin Gump's Washington D.C. office (and also older than Mr. Gross) raised Mr. Gross's "idleness" with Mr. McLean in an e-mail in early July 2004 as an issue that the firm needed to address. Statement at 54.

Mr. McLean also contemporaneously decided that another attorney in the Korea Practice group, an income partner in Akin Gump's Los Angeles office (then under 40), should be asked to leave the firm as well. Statement at 58-59. In an August 11, 2004 e-mail to Mr. Kim and Mr. Quigley, Mr. McLean wrote "at least two personnel actions that needed to be addressed immediately. Gross ought to be resolved by October 31 and [Income Partner (under 40)] by year end." Statement at 59.

The United States Court of Appeals for the District of Columbia, this Court and other courts applying District of Columbia law, have repeatedly granted summary judgment on employment discrimination and retaliation claims where, as here, the decisionmaker completed an assessment of the relevant facts independent of the alleged discriminator and decided to take adverse action with respect to a plaintiff. Just recently, in Vickers v. Powell, 493 F.3d 186 (D.C. Cir. 2007), the United States Court of Appeals for the District of Columbia affirmed summary judgment of discrimination and retaliation claims under such circumstances. In Vickers, the Court found that the plaintiff had:

> failed to provide any evidence indicating why Holland, who ultimately made the decision to terminate Vickers, might have wanted to see her removed. He was not involved in any of the events that preceded Vickers' termination, nor did he participate in any of the alleged incidents that make up Vickers' hostile work environment claim. Instead, as Assistant Inspector General for Investigations, Holland had been given the authority to review the allegations against Vickers and make the ultimate decision to keep her or fire her. Without more than what Vickers has offered as evidence, we cannot see how a reasonable jury might find a retaliatory motive at work in Holland's decision. Vickers' retaliation claim is further undermined by the fact that even though it was Holland who fired her, Bedwell was the focus of her

> discrimination claims. Vickers failed to put on any evidence to show that Holland's decision was in any way influenced by Bedwell, who had retired before Vickers' refusal to sign the releases in April 2001 that triggered her firing.

Vickers, 493 F.3d at 195-96. Like in Vickers, Mr. Gross has failed to provide any evidence that

Mr. McLean (or Ms. Slater or Mr. Burdick) had any discriminatory animus towards him.

Likewise, as was true in Vickers, Mr. Gross has no evidence that Mr. Kim, "the focus of [his]

discrimination claims," in any way influenced Mr. McLean's decision. In fact, it is undisputed

that Mr. McLean had no communication with Mr. Kim on the subject prior to making the

termination decision. Statement at 56. Accordingly, like in Vickers, Mr. Gross's discrimination

claims should be dismissed.

In Hall v. Giant Food, Inc., 175 F.3d 1074 (D.C. Cir. 1999), the Court affirmed summary

judgment for the defendant employer, noting that the decisionmaker, like Mr. McLean, had made

an independent assessment of the facts and had determined that the plaintiff's employment

should be terminated. The Hall court found that the plaintiff's evidence of discrimination,

alleged ageist remarks made by a non-decisionmaker, was "insufficient to survive Giant's

motion for summary judgment, whether it is advanced as direct evidence of discriminatory intent

or indirect evidence of pretext." Id. at 1079. The court explained that:

> First, the record is clear that Balodemas, not Sanford, made the decision to terminate Hall. Sanford did not have the authority to fire Hall; indeed, Hall offered no evidence to establish that Sanford was even involved in the decisionmaking process. To be sure, Sanford conveyed to Balodemas the information in connection with Hall's August 4, 1995 suspension. Sanford, however, merely communicated the facts as relayed to her by Turnblacer. Hall offers no evidence that Sanford recommended to Balodemas that Hall be discharged, that Sanford was sufficiently involved to be aware of Balodemas's reason for terminating Hall, or that Sanford had the ability to influence Balodemas's decision. It appears from the record that Balodemas made an independent assessment of Hall's conduct and concluded that Hall's violations of multiple

-9-

> Giant employment policies warranted his termination. Hall offers
> nothing to refute this version of events, and thus, his reliance on
> Sanford's remark proves at most that Sanford herself harbored a
> bias completely unrelated to Giant's decision to terminate Hall.

Id. at 1079-80 (internal citations and quotations omitted). See also Siragy v. Georgetown Univ.,

No. 97-2557 (RMU), 1999 U.S. Dist. LEXIS 21021, at *20 (D.D.C. Aug. 20, 1999) (finding that

the fact that an employee's supervisor at one point called him an "old fart" was not direct

evidence of discrimination because that supervisor had "little to no role in the decision to

terminate" the plaintiff).[6]

---

[6] See also Chambliss v. Nat'l R.R. Passenger Corp., No. 05-2490 (CKK), 2007 U.S. Dist. LEXIS 11522 (D.D.C. Feb. 20, 2007) (granting defendant employer's motion for summary judgment, holding that evidence of a discriminatory animus on the part of a supervisor, including a history of taking inappropriate actions and making demeaning statements to minorities under his supervision, would not constitute evidence of discrimination on the part of the defendant employer where there was no evidence that that supervisor played any role in the decision to terminate the plaintiff); Valles-Hall v. Ctr. For Nonprofit Advancement, 481 F. Supp. 2d 118, 149 (D.D.C. 2007) (granting defendant employer's motion for summary judgment, and stating that "evidence of a discriminatory animus on Kost's part, alone, would not constitute evidence of discrimination on the part of CAN because Kost did not play a role in evaluating Plaintiff"); Hussain v. Prinicipi, 344 F. Supp. 2d 86, 100 (D.D.C. 2004) (granting defendant employer's motion for summary judgment, and explaining that although "Plaintiff . . . repeatedly makes reference to the discriminatory behavior of Dr. Patel . . . . Plaintiff does not contend . . . that Dr. Patel had anything to do with the hiring or promotion decisions of hospital administrators. Thus, whether Dr. Patel was prejudiced against Muslims is irrelevant to plaintiff's claims of discriminatory nonselection"); Garrett v. Lujan, 799 F. Supp. 198 (D.D.C. 1992) (finding that stray remarks by persons not involved in the employment decisionmaking process are not material to a finding of discrimination unless those remarks are made to the decisionmakers and have some impact on the selection process); Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 655 (D.C. Cir. 2003) (affirming summary judgment for employer defendant where plaintiff "[did] not allege that the offending employee had any role whatsoever in deciding whether to hire him"); Beeck v. Fed. Express Corp., 81 F. Supp. 2d 48, 54 (D.D.C. 2000) (granting summary judgment in ADEA case because "alleged remarks at social dinners and random meetings have no evident connection to [the employment action at issue]"); cf Griffin v. Washington Convention Ctr., 142 F.3d 1308 (D.C. Cir. 1998), provides a useful contrast. In Griffin, the alleged discriminating supervisor "repeatedly urged" the decisionmaker to terminate the plaintiff, was "in contact with [the decisionmaker] at every significant step in the decisionmaking process," and "was [the decisionmakers's] chief source of information regarding Griffin's job performance." Id. at 1311. Mr. McLean's decision to terminate Mr. Gross's employment was clearly based on his individual assessment of Mr. Gross's productivity. This is simply not a case where Mr. Kim actively pushed Mr. McLean to do his illicitly motivated bidding. "When the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and legally permissive [sic] basis, the bias of the subordinate is not relevant." Id. at 1313.

In Holbrook v. Reno, 196 F.3d 255 (D.C. Cir. 1999), the Court, following Hall, granted summary judgment for a defendant employer on a discrimination claim based on comments allegedly made by the employee's supervisor, where the adverse employment decision was made by someone other than the supervisor who had made an independent assessment of the plaintiff's conduct. The Court explained that:

> This case is controlled by Hall v. Giant Food, 175 F.3d 1074 (D.C. Cir. 1999). Hall held that a supervisor's discriminatory remarks could not be considered evidence of discrimination because the decision to dismiss the employee was made not by the supervisor, but by the company's Director of Transportation. Although the supervisor had reported the employee's misconduct to the Director, the Director "made an independent assessment of Hall's conduct." The same happened here. Clow "made an independent assessment" of Holbrook's conduct and determined that she was unsuitable to become an FBI Agent. Nothing in the record indicates either that Crawford had input into Clow's decision or that Crawford discussed Holbrook's suitability with Clow or Higginbotham.

Holbrook, 196 F.3d at 260-61 (citations omitted).

Similarly, in Blackman v. Visiting Nurses Ass'n, 694 A.2d 865 (D.C. 1997), the Court affirmed summary judgment for the defendant employer, stating that it was "persuaded by the reasoning of several other federal cases which hold that the discriminatory animus of an employee's supervisor, who is not involved in the decision to terminate, can not, as a matter of law, be imputed to the ultimate decision maker." Id. at 870. The Court found that:

> Supervisor Barnes, the alleged discriminator, did not participate in the decision to terminate Blackman, and Blackman has offered no evidence showing that decision maker Maurano was predisposed to bias based on national origin. Therefore, the fact that Barnes reported Blackman's job-related misconduct to Maurano, is insufficient, without more, to infer a casual relation between Barnes's alleged animus and Maurano's decision to terminate Blackman for gross misconduct.

Id.

- 11 -

Here, it is also undisputed that Mr. McLean did not discuss Mr. Gross's termination in any way with Mr. Kim prior to making the termination decision. Statement at 56. There is no evidence that either Mr. Kim or Mr. Quigley recommended to Mr. McLean that Mr. Gross's employment be terminated. Statement at 55-56. To the contrary, despite clear performance deficiencies, it is undisputed that Mr. Kim asked those who worked with Mr. Gross not to say anything to others about those deficiencies, and instead, worked to help Mr. Gross succeed. Statement at 37. In fact, once he learned of Mr. McLean's decision, Mr. Kim went to Mr. McLean and negotiated more time at Akin Gump for Mr. Gross and attempted to assist him in finding a new position. Statement at 65-67.

Even if Mr. Kim or Mr. Quigley had recommended that Mr. Gross's employment at Akin Gump be terminated, (which they undisputedly did not do), that fact would not overcome a summary judgment motion in the face of an independent assessment by Mr. McLean. In Chao, the Court granted defendant employer's motion for summary judgment noting that:

> Furthermore, of particular significance to the Court is that while the recommendation to terminate the plaintiff was initially made by Schoepfle, whom plaintiff alleges made discriminatory and derogatory remarks against her, the termination was supported after an independent review of the documents in question by Perez-Lopez, who has not been shown to have engaged in any discriminatory behavior . . . . Perez-Lopez independently reviewed the papers and arrived at the same conclusion as Schoepfle . . . . Absent any evidence illustrating a discriminatory motive on Perez-Lopez's part, or collusion by Perez-Lopez and Schoepfle to reach the same conclusion about the plaintiff's termination, the plaintiff's denial of the misrepresentation charge is insufficient to prove that the reason offered by the defendant was a pretext for discrimination.

Chao, 360 F. Supp. 2d at 119. Here, Mr. McLean conducted an independent review of Mr. Gross's performance, which included a review of Mr. Gross's objectively low billable hours, his sub-par performance and the firm's express notice to Mr. Gross that it would review its need

for him after one year. There is absolutely no evidence of a discriminatory motive on the part of Mr. McLean. Therefore, even if Mr. Kim or Mr. Quigley had recommended Mr. Gross's termination to Mr. McLean (which they did not), Mr. McLean's independent review of the firm's "need" supported his decision to terminate the Mr. Gross's employment. Therefore, Mr. Gross's age discrimination claim based on direct evidence of comments allegedly made by Mr. Kim fails as a matter of law.

> 2.     **Mr. Gross Has No Circumstantial Evidence of Age Discrimination.**
>
> > a.     **He Can Not Establish a Prima Facie Case of Discrimination.**

To the extent that Mr. Gross now tries to introduce a theory of circumstantial evidence under the McDonnell-Douglas framework, he also fails. To establish a prima facie case of age discrimination in connection with his termination, Mr. Gross must demonstrate that he (1) is a member of a protected class; (2) suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006), cert. denied, 127 S. Ct. 1140 (2007) (citations omitted). A plaintiff may satisfy the third prong of this test by "demonstrating that []he was treated differently from similarly situated employees who are not part of the protected class, or, in the specific context of a discharge claim, showing that []he was not terminated for 'the two . . . common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." Id. at 850-51 (citations omitted). Here, Mr. Gross has failed to demonstrate the third element.

Mr. Gross does not even allege, much less present evidence in support of an assertion, that he was treated differently from a similarly situated employee who is not a part of the protected class of those 40 and over, nor could he. First, there is simply no evidence of a

similarly situated employee at Akin Gump. No one at Akin Gump other than Mr. Gross was

hired to work in the Korea Practice Group as a Senior Counsel without large U.S. law firm

experience or training, with no substantive area of legal expertise, and with no obvious perceived

ability to attract significant new clients. Statement at 10-14, 17, 20. No one else received an

offer with the express provision that "like other employees of the firm, you will be considered an

employee at will, <u>however, it is our intention to review your employment situation at your one</u>

<u>year anniversary and reassess our needs and the terms of your employment.</u>" Statement at 20

(emphasis added).[7] In fact, the individual closest to a similarly situated employee at Akin Gump

(although certainly not "similarly situated" to Mr. Gross) was Income Partner (under 40) in Akin

Gump's Los Angeles office, who Akin Gump asked to leave at close to the same time that he

made the decision to terminate Mr. Gross's employment, based, in part, on the same reason--lack

of contribution to the firm. Statement at 58. On the other hand, it is undisputed that on Akin

Gump hired Thomas Hubbard (date of birth January 30, 1943), to join the Korea Practice Group

on October 11, 2004, shortly before Mr. Gross left the firm. Statement at 60, 72.

A plaintiff fails to establish a prima facie case of discrimination where, as here, he cannot

demonstrate that any similarly situated employee outside the protected class who was treated

differently from the plaintiff, or to provide any other evidence that would give rise to an

inference of discrimination as the motive for his termination. See <u>Udoh v. Trade Ctr. Mgmt.</u>

<u>Assocs.</u>, 479 F. Supp. 2d 60 (D.D.C. 2007) (granting summary judgment for employer on Title

VII and ADEA discrimination claims where plaintiff failed to demonstrate that any similarly

situated employee, not in the protected class of the plaintiff, was treated any differently from the

---

[7] Mr. Gross's implication during the discovery process that Mr. Park could somehow be a comparator is patently absurd. Mr. Park was a Counsel, who by the time Mr. Gross arrived at Akin Gump, had 7 years of training working as an attorney at Akin Gump. Moreover, Mr. Park has a strong substantive expertise in trade law and could handle client billable trade policy work. Finally, Mr. Park's work and performance was highly regarded and he was recognized by his Section leader, Ms. Slater, as a "star." Statement at 38. Mr. Park and Mr. Gross are not "similarly situated."

plaintiff, or to provide any other evidence that would give rise to an inference of discrimination as the motive for his termination).[8] This failure of evidence is all the more fatal where Akin Gump has offered uncontroverted evidence that Mr. McLean decided to terminate the employment of another Korea Practice Group attorney who was under 40 for essentially the same reason. See Udoh, 479 F. Supp. 2d at 65 (finding that plaintiff failed to make out a prima facie case of discrimination because he failed to provide any evidence that would give rise to an inference of discrimination as the motive for his termination and taking into account the fact that defendant had offered "uncontroverted evidence" that others outside of plaintiff's protected class were terminated after violating defendant's policy prohibiting physical threats and confrontation).

Mr. Gross has also not established that he was <u>not</u> terminated for "performance below the employer's legitimate expectations." Mastro, 447 F.3d at 851. First, after interviewing Mr. Gross, numerous Akin Gump attorneys including Mr. Kim, Mr. Kaye, Mr. Park and Mr. Quigley, doubted Mr. Gross's qualifications for the position given his lack of law firm training or substantive legal expertise. Statement at 10-14. Indeed, that was the reason his offer letter included the unusual condition that the firm would reassess its need for him in a year. Statement at 20. Nevertheless, it is undisputed that Mr. Kim recommended that the firm hire Mr. Gross

---

[8] See also Alexander v. Tomlinson, No. 05-0767 (ESH), 2007 U.S. Dist. LEXIS 59641 (D.D.C. Aug. 15, 2007) (granting summary judgment for defendant employer on ADEA claim where plaintiff failed to establish that he was treated differently from similarly situated employees who were not a part of the protected class); Williams v. Chertoff, 495 F. Supp. 2d 17 (D.D.C. 2007) (granting summary judgment for defendant employer on ADEA claim where plaintiff failed to establish that he was treated differently from similarly situated employees who were not a part of the protected class and because inconsistency in witness testimony was insufficient to infer "mendacity"); Duncan v. Harvey, 479 F. Supp. 2d 125 (D.D.C. 2007) (granting summary judgment for defendant employer on Title VII claim where plaintiff failed to establish that he was treated differently from similarly situated employees who were not a part of the protected class); Williams v. Washington Convention Ctr. Auth., 407 F. Supp. 2d 4 (D.D.C. 2005) (granting summary judgment to defendant employer where plaintiff had not demonstrated that the defendant's conduct gave rise to an inference of discrimination, noting that the plaintiff had not demonstrated that his annual performance ratings were based upon age rather than merit, or that younger employees had been treated differently).

because, among other reasons, he liked him. Statement at 15. Unfortunately, Mr. Gross did not

work out. As set forth above, the record is replete with examples of Mr. Gross failing to meet

the legitimate performance expectations of other Akin Gump attorneys. Statement at 28-38, 42-

44, 46, 49-52, 54. Specifically, Mr. Gross was expected to take the lead in writing analytical,

structured, legal advice memorandums to clients. Id. at 28. Unfortunately, he was not

effectively able to do so. Id. For this reason alone, he cannot make a prima facie case. See Fox

v. Giaccia, 424 F. Supp. 2d 1, 8-9 (D.D.C. 2006) (granting defendant employer's motion for

summary judgment, and holding that the inference of discrimination prong of the plaintiff's

prima facie case was not satisfied where the record revealed poor job performance, citing Evans

v. Davis Mem. Goodwill Indus., 133 F. Supp. 2d 24, 29-30 (D.D.C. 2000), aff'd 1 Fed. Appx. 3

(D.C. Cir. 2001), where the court granted summary judgment to an employer where evidence

demonstrated "that Goodwill officials were unhappy with plaintiff's writing efforts , had in fact

received complaints about letters he wrote, [and] management was frustrated with errors").

    In addition, the undisputed evidence in the record is that Mr. McLean terminated

Mr. Gross's employment for another reason. He received a complaint from Ms. Slater (also over

40) who served as the Head of the International Trade Practice Group that Mr. Gross's hours

were extremely low. Statement at 38 ("We originally parked him in our section on the express

understanding (which Warren correctly insisted upon) that he would be kept fully billable, which

he was for a while. Since last fall, however, he is down to next to nothing"). See also 50-59. In

2003-2004, Senior Counsel at Akin Gump had an annual billing requirement of 2,100 client

billable hours. Statement at 22, 24, 50. Mr. Gross was hired by Akin Gump, only after Warren

Connelly (then Head of the International Trade Practice Group and also over 40) and  Mr.

McLean were assured that Mr. Gross would meet this requirement. Statement at 16, 19. Mr.

Gross was well aware of that requirement. Statement at 22-25, 48. Mr. Gross knew he was

falling short of the mark as early as January 2004 when he wrote to himself, "I have to increase billable hours as much as possible," and "try by whatever means to increase my billable hours." Statement at 48. Mr. Gross admittedly billed nowhere near that amount of client billable hours during his first year at Akin Gump, lodging only approximately 1,300 client billable hours. Statement at 49.[9]

> **b.  Mr. McLean Had Legitimate Reasons For Terminating Mr. Gross and There is No Evidence That Those Reasons are Pretextual.**

Even if Mr. Gross was able to establish a prima facie case of age discrimination (which he is not), his age discrimination claims still fail as a matter of law because Akin Gump has offered a legitimate, nondiscriminatory reason for Mr. McLean's decision to terminate Mr. Gross's termination—Mr. Gross's lack of contribution to the firm. Mr. Gross has no evidence that this legitimate reason is pretextual. Under the applicable McDonnell Douglas burden-shifting framework, if the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant employer "to articulate some legitimate, non-discriminatory reason" for the employment action. Ginger, 477 F. Supp. 2d at 47 (internal citations and quotation marks omitted). If the employer meets its burden, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the employer's proffered reasons are a pretext for discrimination." Id., citing Mastro, 447 F.3d at 850.

The absence of any evidence of pretext also dooms Mr. Gross's discrimination claims. In Evans, this Court granted summary judgment for the defendant employer on a discrimination

---

[9] Mr. Gross cannot identify any alleged ageist remarks made about him by anyone at Akin Gump between his interview in June 2003, which Mr. Gross believed "went well" and during which Mr. Kim commented positively about Mr. Gross's background (and after which it is undisputed that Mr. Kim recommended hiring Mr. Gross), and April 2004. Statement at 21. Mr. Gross himself noted his low billable hours in January 2004-- well in advance of Mr. Kim's alleged ageist comments. Statement at 48. Similarly, Ms. Slater reported her concerns regarding Mr. Gross's low hours in February 2004. Statement at 38.

claim because "plaintiff ha[d] not cast sufficient doubt on defendant's assertion that it fired
[plaintiff] because of his inadequate writing skills." <u>Evans</u>, 133 F. Supp. 2d at 29. The same is
true here. As the <u>Evans</u> court explained:

> As this Circuit has noted in the Title VII context, once an employer
> has asserted a non-discriminatory reason for an adverse job action,
> "the issue is not 'the correctness or desirability of the reasons
> offered . . . but whether the employer honestly believes in the
> reason it offers.'" Here, the defendant has offered ample,
> uncontroverted evidence that Goodwill officials were unhappy
> with plaintiff's writing efforts and had in fact received complaints
> about letters he wrote.

<u>Id.</u> (internal citation omitted). Here, like in <u>Evans</u>, Akin Gump has offered uncontroverted
evidence that Akin Gump attorneys Mr. Kim, Mr. Quigley, Mr. Kaye, Mr. Park and Ms. Ross
(not to mention a third party who said Mr. Gross's writing "falls short of the mark") were
unhappy with Mr. Gross's substantive writing and that Ms. Slater, Ms. McLean and Mr. Burdick
were not satisfied with his low billable hours (or "idleness" as described by Mr. Burdick in his
email to Mr. McLean). Statement at 28-38, 42-44, 46, 49-52, 54. The issue is not the
"correctness" of those reasons, but rather, whether Mr. McLean "honestly believed" that
Mr. Gross's performance was deficient. Mr. McLean has testified, under oath, that he decided to
terminate Mr. Gross's employment, "because there were serious performance issues." Statement
at 50-58. There is absolutely no evidence in the record to suggest that he did not honestly
believe this.

In <u>Royall v. Nat'l Ass'n of Letter Carriers</u>, No. 05-1711 (RBW), 2007 U.S. Dist. LEXIS
63655 (D.D.C. Aug. 29, 2007), this Court recently granted defendant employer's motion for
summary judgment on the plaintiff's discrimination claim, finding that the plaintiff failed to
establish pretext where the defendant had proffered sworn testimony from two individuals who
recounted, in detail, their reasons for believing that the plaintiff's performance merited
termination. <u>Id.</u> at *40. The <u>Royall</u> court expressly rejected the plaintiff's argument that the

employer's legitimate reason for his termination (poor performance) was pretextual where the plaintiff's argument was based on evidence that he completed some assigned tasks and was praised for his good performance. Id. at **49-50. The court held:

> The plaintiff cannot create a genuine issue of material fact as to whether the NALC "honestly believes in the reasons it offers" for his termination simply by contesting some portion of the defendant's account of his performance or citing certain instances in which he correctly performed the duties of his job. It is nonsensical to suppose that a plaintiff should be able to demonstrate that an employer's stated reason for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance. Rather, because it is not the role of the federal courts to review the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination, employers are surely entitled to determine that the deficiencies in an employee's performance outweighed his accomplishments.

Id. (internal citations and quotation marks omitted). Here too, numerous individuals have given sworn testimony "recounting in detail their reasons for believing that [Mr. Gross's] performance merited termination." It is true that Mr. Gross did a "decent job" on some assignments. Statement at 31. As in Royall, however, "[i]t is nonsensical to suppose that a plaintiff should be able to demonstrate that an employer's stated reason for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance." Id. at *49.

Finally, Mr. Gross's allegations of ageist remarks in his Amended Complaint (none of which are attributed to Mr. McLean) are insufficient to establish pretext. See Hall, 175 F.3d at 1079 (holding that the plaintiff's evidence of discrimination, alleged ageist remarks made by a non-decisionmaker, was "insufficient to survive Giant's motion for summary judgment, whether it is advanced as direct evidence of discriminatory intent or indirect evidence of pretext"); Valles-Hall, 481 F. Supp. 2d at 148-49 (granting summary judgment for defendant employer,

finding that a showing of pretext could not be made on evidence of discriminatory animus on the part of a non-decisionmaker and finding that "Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (internal citations and quotation marks omitted).[10] Accordingly, Mr. Gross cannot establish that Akin Gump's legitimate reasons for his termination were pretextual, and his discrimination claims should be dismissed as a matter of law.

### c.    There Is A Strong Inference Against Age Discrimination.

Given Mr. McLean's age, an inference must be drawn that he would not terminate Mr. Gross because of his age. He, like Mr. Gross, was over 40. Notably, Mr. Quigley, Mr. Kim, Ms. Slater, Mr. Kaye and Mr. Burdick are also all over 40 as well. See Clifton v. Fed. Nat'l Mortgage Ass'n, 36 F. Supp. 2d 20, 26 n.6 (D.D.C. 1999) (granting summary judgment for the employer on an age discrimination claim where "[t]he Court also notes that [plaintiff's] direct supervisors . . . were all over 40 at the time of her termination"); Sylve v. HSPV, LLC, 2 F. Supp. 2d 837, 840 (E.D. La. 1998) ("The fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference' that the employer had no discriminatory animus.") (quoting Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir. 1996)).

---

[10] As other courts have recognized, statements about age, even in an employment interview, may not support an inference of discrimination. In Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997), a company president allegedly said to an employee during an interview for a promotion that "he presumed that [the employee] didn't want to be the office manager so late in [his] career", which led to a discussion of the employee's retirement plans. The Court found that the statements did not convey discriminatory animus. Id. at 62-63. ("The ADEA does not make all discussion of age taboo."). See also Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999) ("[S]tatements about age, unlike statements about race or gender, do not rest on a we/they dichotomy and therefore do not create the same inference of animus.").

Also, this Court, and numerous other courts, have recognized that discrimination is less likely to have occurred where, as here, the same individual hired and terminated an employee. Chamberlain v. Student Loan Mktg. Ass'n, No. 96-CV-1710, 1999 D.C. App. LEXIS 220, at *6 n.2 (D.C. June 22, 1999) ("[A]n inference of discrimination is less likely, since the same person who recommended [appellant's] hiring just a short time before, recommended the termination based upon inadequate performance.") (citing Proud v. Stone, 945 F.2d 796 (4th Cir. 1991)). See also Blount v. Nat'l Ctr. for Tobacco-Free Kids, 775 A.2d 1110, 11 16 (D.C. 2001) (noting that plaintiffs proof of race discrimination "may not be an easy task, since . . . 'employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing'") (quoting Proud, 945 F.2d at 798)).[11]  The court in Proud stated:

> '[C]laims that employer animus exists in termination but not in hiring seem irrational.'. . . Therefore, in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.

Id. at 797. See also Barbara Lindeman & Paul Grossman, Employment Discrimination Law 466 (3d ed. 2002 Supp.) ("With the exception of the Third Circuit, every federal court that has decided the issue has found that an inference of non-discriminatory intent can be drawn where the same decisionmaker both hired and fired the plaintiff.").

Finally, the fact that Mr. Gross was 51 when hired and 52 when fired cuts against any age discrimination.  In Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 174-75 (8th Cir. 1992), the court found:

---

[11] The plaintiffs theory in Blount, on which she was permitted to proceed, appeared to the court to be that she was hired "in the hope that she would give [her employer] the 'cover' of having a black director, but then they decided to fire her because she proved to be an assertive proponent of black participation. . . ." Blount, 775 A.2d at 1116-17.  Mr. Gross puts forth no equally, or even minimally, logical theory here.

> The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him…It is simply incredible, in light of the weakness of plaintiffs evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.

See also, Rand v. CF Indus., Inc., 42 F.3d 1139 (7th Cir. 1994) (affirming grant of summary judgment in age discrimination case, reasoning in part that such discrimination was unlikely where the same people who hired the plaintiff at age 47 fired him at age 49).

**B.    There Is No Evidence To Support Mr. Gross's Claim
of Retaliation (Counts III and IV).**

To prove a prima facie case for retaliation under the ADEA or the DCHRA, the plaintiff must demonstrate that: (1) he engaged in protected activity, (2) the employer subjected him to adverse action or conduct that had an adverse impact on him, and (3) there is a causal link between the protected activity and the adverse action. Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir. 2003). Here, Mr. Gross fails to establish the second and third elements of a prima facie case of discrimination.

**1.    The Filing of a Counterclaim Is Not
An Adverse Employment Action.**

As a preliminary matter, this Court has never found the filing of counterclaims to be an adverse employment action. Moreover, many federal courts have held that the filing of counterclaims (especially in a situation, where, as here, counterclaims are filed after the discovery of plaintiff wrongdoing during the discovery process) cannot, as a matter of law, be an adverse employment action.

For example, under circumstances similar to those in this case, the court in Earl v. Electro-Coatings of Iowa, Inc., No. C02-0042, 2002 U.S. Dist. LEXIS 20937 (N.D. Iowa Oct.

- 22 -

29, 2002), denied a plaintiff's motion to amend his complaint to add a retaliation claim based on

his former employer's filing of a counterclaim:

> Although many different post-termination actions may constitute retaliation, this court holds that, ordinarily, a counterclaim may not. Initially, the court notes that a counterclaim is not to be considered an employment-related action. Only in the rare case will conduct that occurs within the scope of litigation amount to retaliation. . . . Defendants in discrimination suits must have some leeway to investigate possible defenses without undue fear of being subjected to additional liability in retaliation suits.

Id. at **6-8 (internal citations and quotation marks omitted).

Similarly, In Timmerman v. U.S. Bank, N.A., No. 04-cv-01903-REB-MJW, 2006 U.S.

Dist. LEXIS 19356 (D. Colo. Mar. 31, 2006), aff'd on other grounds, 483 F.3d 1106 (10th Cir.

2007),[12] the court held that:

> [P]laintiff has failed to state actionable claims for retaliation based on defendant's assertion of counterclaims against her in this litigation. To state an actionable claim for retaliation, plaintiff must establish, *inter alia*, that she suffered an adverse employment action. Post-termination conduct can constitute an adverse employment action, and in particular, the filing of a retaliatory lawsuit may be thus construed. However, I perceive a crucial distinction in this regard between an employer *initiating* its own retaliatory lawsuit against the employee, on the one hand, and filing a counterclaim once it has been made a defendant by the employee. One of the primary justifications for permitting retaliation claims based on the filing of a lawsuit against the employee is the potential chilling effect that action may have on the employee's pursuit of her discrimination claim. The same concern is not implicated when the employee has already instituted litigation.

---

[12] The Tenth Circuit, citing Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2409 (2006), also stated that the applicable standard for whether an adverse employment action has occurred is whether the employer's actions "would have been materially adverse to a reasonable employee or job applicant," and noted that "[w]hile it is certainly an interesting question whether the filing of counterclaims in response to discrimination claims brought by a former employee constitutes an adverse employment action," that question did not need to be decided in that case. See Timmerman, 483 F.3d at 1123.

Timmerman, 2006 U.S. Dist. LEXIS 19356, at **15-17 (internal citations omitted).  Moreover,

the Timmerman court based its dismissal of a matter of law on the fact that, like here:

> Defendant instituted its counterclaims only after it was revealed in discovery that plaintiff had taken money that ostensibly belonged to defendant.  It is clear that its decision to do so was based on that information, not on plaintiff's protected activity of instituting this lawsuit.

Id. at *17 (internal citations omitted).

In Beltran v. Brentwood N. Healthcare Ctr., LLC, 426 F. Supp. 2d 827 (N.D. Ill. 2006),

the court granted the defendant employer's motion to dismiss a former employee's retaliation

claim.  The court found that:

> As the Seventh Circuit has explained, except in rare cases, conduct occurring within the scope of litigation does not provide grounds for a retaliation claim.  This is not one of the rare cases.  The purpose of statutory anti-retaliation provisions is to prevent employers from intimidating employees and discouraging them from enforcing their legal rights.  We recognize that an employer's lawsuit filed with a retaliatory motive rather than in good faith may constitute an adverse action and provide a basis for a retaliation claim.  But if the mere filing of a counterclaim were sufficient to give rise to a retaliation claim, then every defendant in an FLSA, Title VII or ADA lawsuit who asserts a counterclaim would be subject to a retaliation claim.  Because filing a counterclaim is different from initiating a lawsuit, courts in this district repeatedly have ruled that filing a counterclaim, without more, is not an adverse action and thus cannot support a retaliation claim. . . . [U]nlike initiating litigation against an employee, filing a counterclaim will not chill plaintiffs from exercising and enforcing their statutory rights because by the time the employer files its counterclaim, plaintiffs have already made their charges and initiated a lawsuit.  Additionally, asserting a counterclaim generally will not cause a plaintiff to incur the expense of hiring a lawyer to respond to the claim because the plaintiff likely will already have legal representation.  Moreover, as [defendant] points out, its counterclaim was compulsory – under Rule 13 of the Federal Rules of Civil Procedure [defendant] had to file any claims against plaintiffs arising out of the same transaction or waive them.  Because counterclaims are supposed to be brought in response to a complaint, there is nothing suspicious about the timing of [defendant's] counterclaim.

Id. at 833-34 (internal citations omitted).

These holdings make sense. It simply cannot be the case that defendants in discrimination suits cannot add affirmative defenses and counterclaims in suits raised against them without being subjected to retaliation suits, especially where, as here, the employer discovers evidence of disloyalty during the discovery process.

In addition, as discussed in Beltran, Akin Gump's Counterclaims are compulsory under Rule 13 of the Federal Rules of Civil Procedure. Akin Gump had to file its claims, once it discovered that it had claims against Mr. Gross during the discovery process, in connection with this suit, or it would have waived them. There is nothing suspect about the timing of the filing of the Counterclaims, which were filed almost two years after Akin Gump first had knowledge of Mr. Gross's age discrimination claims.

### 2.   There Is No Evidence of Causation.

Mr. Gross's retaliation claim also cannot survive summary judgment because he has no evidence of any causal connection between his filing of an EEOC charge in April 2005 or his filing of this lawsuit in February 2006 and Akin Gump's filing of its Motion for Leave to Amend its Answer to include Counterclaims in June 2007. See McManus v. Williams, No. 05-1621 (EGS), 2007 U.S. Dist. LEXIS 15592, at *13 n.4 (D.D.C. Feb. 22, 2007) (granting summary judgment for defendant employer on retaliation claim, noting that there was "a paucity of evidence to suggest a causal link between plaintiff's 1999 EEOC complaint and the actions taken by DOC in 2002").

First, it is undisputed that Akin Gump made the decision to file its Counterclaims against Mr. Gross only after learning through the discovery process that while an Akin Gump employee, and on Akin Gump's payroll, Mr. Gross actively encouraged prospective clients of Akin Gump

not to retain the services of Akin Gump, including making negative statements about the

motivation, experience and level of influence of those Akin Gump partners, including Mr. Kim,

who were assisting (at Mr. Gross's request) in his search for another position both inside and

outside of the firm.  Specifically, Mr. Gross stated:

- "For the moment, I think you should delay signing the engagement letter. *The law firm will be unhappy with this recommendation,* but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words." (emphasis added).

- "If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm."

- "Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.]  This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X] could not possibly trust him to serve as an 'honest broker.'  Sukhan has never represented an American company doing business in Korea, so far as I know, and is a highly specialized trade lawyer whose practice consists of representing Korean companies in the United States."

- "Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X]."

- "I didn't know Jaemin [Park] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul.  Her help is even more questionable. . . .  She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence."

- "If [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."

Statement at 75-76.  What is more, Mr. Gross <u>admits</u> to this behavior.  <u>Id.</u> at 76.[13]

Second, Mr. Gross cannot establish causation here through temporal proximity.  Akin

Gump filed its motion with this Court seeking leave to amend its Answer to include an "after-

acquired evidence" affirmative defense and tortious interference and breach of duty of loyalty

Counterclaims on June 25, 2007, more than <u>two years</u> after Mr. Gross filed his EEOC charge and

---

[13] It is also undisputed that Mr. McLean would have fired him at the time, had he known of the disloyal conduct.  Statement at 78.

four months after Mr. Gross filed his Complaint. This Court, in addition to the District of

Columbia Court of Appeals, has repeatedly found that a lapse of this duration between protected

activity and an alleged adverse employment action is insufficient to establish causation on the

basis of temporal proximity as a matter of law. See Mayers v. Laborers' Health & Safety Fund

of N. Am., 478 F.3d 364, 369 (D.C. Cir. 2007) (finding that the eight-or nine-month gap between

the protected activity and the alleged retaliatory act was "far too long", citing Clark County Sch.

Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) and circuit cases rejecting temporal proximity of

three and four months as evidence of causation).[14] The significant amount of time that elapsed

between Mr. Gross's protected activity and Akin Gump's filing of its Motion for Leave to

Amend prevents Mr. Gross from proving causation via temporal proximity. There is no evidence

in the record to support any other causal connection between Mr. Gross's filing of this suit and

Akin Gump's filing its Counterclaims.

Finally, there is no logic to a theory of causation here. Akin Gump derives no benefit

from the Counterclaims – they do not stop the lawsuit or otherwise provide a strategic advantage.

These are merely compulsory counterclaims based on evidence uncovered in the discovery

process. "[T]he only circumstance in which the filing of a compulsory counterclaim might

constitute retaliation is where the counterclaim is totally baseless." Ergo v. Int'l Merchant

Servs., Inc., No. 04 C 6789, 2007 U.S. Dist. LEXIS 67699, at *39 (N.D. Ill. Sept. 13, 2007). A

---

[14] See also Cheek v. Chertoff, No. 04-251 (RMC), 2006 U.S. Dist. LEXIS 14341, at *33 (D.D.C. Mar. 17, 2006) (noting that this Court has followed a three-month rule to establish causation on the basis of temporal proximity and finding that the Court could not infer a causal connection to employment actions taken two years after the filing of an EEOC charge, stating that "[t]he long period of time between the two events destroys any inference that they were causally connected"); Willingham v. Gonzales, 391 F. Supp. 2d 52, 61-62 (D.D.C. 2005) (noting that this Court has followed a three-month rule to establish causation on the basis of temporal proximity and finding that where more than six moths has elapsed between the alleged protective activity and retaliatory act, plaintiff could not, as a matter of law, demonstrate causation); Chao, 360 F. Supp. 2d at 118-19 (referring to the end of a three-month window as the "outer limit" of the "temporal requirement in a retaliation case"); Sullivan-Obst v. Powell, 300 F. Supp. 2d 85 (D.D.C. 2004) (finding that the over 15-month gap between the protected activity and the purported retaliatory action failed to establish the necessary causal link).

claim is baseless if, for example, "clear state law makes the [claim] frivolous." Beltran, 426 F.

Supp. 2d at 834 (internal citations and quotation marks omitted). In Beltran, the Court dismissed

a counterclaim for failure to state a claim, but found that the claim was not baseless. Id.

Similarly, in Ergo, the Court granted summary judgment to Defendants based on the filing of

counterclaims. Specifically, the Court explained that is was:

> unwilling to conclude that Defendants' counterclaim is baseless.
> Although the Court has concluded that summary dismissal of the filed
> counterclaim is appropriate, that is not equivalent to stating that it is
> baseless, which is to say frivolous (and therefore sanctionable). Especially
> since an employer that fails to assert legitimate claims against an
> employee arising from the same transaction. . . would waive those claims,
> the threshold for concluding that a compulsory counterclaim is retaliatory
> should be high.

Ergo, 2007 U.S. Dist. LEXIS 67699, at **39-40.

Moreover, "[e]ven if motivated by retaliation, filing a lawsuit [and presumably a

counterclaim] will not support a retaliation claim if the claims in the lawsuit are substantial."

Harmar v. United Airlines, Inc., No. 95 C 7665, 1996 U.S. Dist. LEXIS 5346 (N.D. Ill. Apr. 23,

1996) (citing Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 743-44 (1983) and dismissing

retaliation claim based on assertion of after-acquired evidence defense). See also Ergo, 2007

U.S. Dist. LEXIS 67699, at **41-42 (granting summary judgment on retaliation claim based on

filing of a lawsuit because plaintiff had failed to put forth evidence establishing a genuine issue

of material fact that the defendant's suit was both retaliatory and baseless, citing Bill Johnson's,

and noting the employer's First Amendment rights to access to the courts). Here, given Mr.

Gross's undisputed comments to Akin Gump's prospective clients, and the lack of any evidence

of a discriminatory motive on the part of Mr. McLean, there is no way that Akin Gump's claims

can be held "baseless."

      **3.**    **Akin Gump Had a Legitimate, Nondiscriminatory Reason
For Filing Its Affirmative Defense and Counterclaims.**

- 28 -

Finally, even if Mr. Gross could make a prima facie case of retaliation, which he cannot, Akin Gump is entitled to judgment as a matter of law on his retaliation claims because it has articulated a legitimate, nondiscriminatory reason for filing its Counterclaims—Mr. Gross's admitted disloyal activity.  The <u>McDonnell</u> <u>Douglas</u> burden-shifting framework applies to retaliation claims.  <u>See</u> <u>Broderick v. Donaldson</u>, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006).  In order to survive summary judgment, plaintiff must show by a preponderance of the evidence that defendant's asserted legitimate reason is "pretext" for discrimination.  <u>Duncan</u> , 479 F. Supp. 2d at 136(citation omitted) (granting defendant employer's motion for summary judgment on retaliation claim "[b]ecause plaintiff failed to put forth any evidence from which a jury could conclude that defendant's reasons for dismissal were pretext for retaliation").  <u>See also</u> <u>Williams</u>, 407 F. Supp. 2d at 8 (granting summary judgment to the defendant employer on the plaintiff's retaliation claims where the defendant "has articulated legitimate, nondiscriminatory reasons for its conduct, and . . . there is no evidence that these reasons were pretexts for retaliatory motives").  Here, there is no evidence of pretext.

As set forth above, Akin Gump has multiple legitimate, non-discriminatory reasons for bringing Counterclaims against Mr. Gross.  There is absolutely no evidence in the record whatsoever to establish that the filing of Counterclaims in this matter was (or could be) in any way retaliatory, or that Akin Gump's legitimate reason for asserting its Counterclaims is pretextual.  Accordingly, Mr. Gross's retaliation claims should be dismissed as a matter of law.

## V.     CONCLUSION

For these reasons, the Defendant requests that the Court grant summary judgment on all

Counts of the Amended Complaint and award them all costs of this proceeding.

DATED:  November 2, 2007                    Respectfully submitted,


                                    _____/s/_____
                                    Christine N. Kearns  (Bar # 416339)
                                    Karen-Faye McTavish (Bar # 477588)
                                    PILLSBURY WINTHROP SHAW PITTMAN LLP
                                    2300 N Street, N.W.
                                    Washington, D.C.  20037-1128
                                    (202) 663-8000

                                    *Counsel for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD G. GROSS,<br><br>               Plaintiff,<br><br>      v.<br><br>AKIN GUMP STRAUSS HAUER & FELD LLP,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. 1:07CV00399 (EGS)<br>)<br>)<br>)<br>)<br>)<br>) |

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## PURSUANT TO LOCAL RULE OF CIVIL PROCEDURE 56.1

Christine N. Kearns (Bar No. 416339)
Karen-Faye McTavish (Bar No. 477588)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C.  20037-1128
(202) 663-8000

Counsel for Defendant Akin Gump Strauss Hauer & Feld LLP

**Akin Gump's Organizational Structure.[1]**

1.      Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") is a large international law firm.  It has fifteen offices, including an office in Washington, D.C.  Declaration of Julie Stumpe Dressing ("Dressing Dec."), attached hereto as Exhibit 1, at ¶2.

2.      Bruce McLean is the Chairman of Akin Gump.  Deposition of R. Bruce McLean ("McLean Dep."), attached hereto as Exhibit 2, at 6:17-19.  Mr. McLean's date of birth is November 15, 1946.  Dressing Dec. at ¶6.

3.      Akin Gump is comprised of formal practice groups, including the International Trade Practice Group.  Dressing Dec. at ¶3.  The Korea Practice Group at Akin Gump is an informal group of attorneys (who are all assigned to various formal practice groups) who work on Korean matters.  Id.

4.      Sukhan Kim, Akin Gump partner, is the most senior lawyer in the Korea Practice Group.  Dressing Dec. at ¶7.  Mr. Kim's date of birth is November 20, 1949.  Id.  At all times relevant to this matter, Michael Quigley (former Akin Gump partner) was designated by the firm as the head of the Korea Practice Group.  Deposition of Sukhan Kim Transcript ("Kim Dep."), attached hereto as Exhibit 3, at 56:4-20.  Mr. Quigley's date of birth is September 11, 1957.  Dressing Dec. at ¶12.

**Akin Gump Looks To Hire A Lawyer To Support Its Korean Practice.**

5.      In the first half of 2003 Akin Gump was looking to hire an attorney for the Korea Practice Group who "could help us with managing the practice, managing existing workload that we already had, perform analytical and legal advisory services, particularly in respect of one

---

[1]  Pursuant to ¶ 6 of the Stipulated Protective Order in place in this matter, Defendant has redacted certain confidential information from various exhibits attached to this Statement of Undisputed Facts.

large project that we had."  Deposition of Michael Quigley Transcript, ("Quigley Dep."),

attached hereto as Exhibit 4, at 32:6-17.

6.     Akin Gump wanted "to bring in somebody that could help us with substantive

writing," "who could really devote substantive time and had substantive knowledge of issues to

be able to write well."  Deposition of David Park Transcript ("Park Dep."), attached hereto as

Exhibit 5, at 27:13-28:13; Kim Dep. at 21:3-25:10.  Mr. Park was a counsel at Akin Gump at that

time and a member of the International Trade Practice Group.  His date of birth is November 28,

1971.  Dressing Dec. at ¶15.

**Mr. Gross Is Considered For The Position.**

7.     Dan Spiegel (date of birth September 5, 1945), an Akin Gump partner,

recommended that the firm consider hiring Donald G. Gross for the position.  Deposition of

Donald Gross Transcript ("Gross Dep."), attached hereto as Exhibit 6, at 30:13-31:8; Dressing

Dec. at ¶8.

8.     Mr. Gross's date of birth is November 29, 1952.  Gross Dep. at 12:19-21.

9.     In June 2003 Mr. Gross interviewed with a number of Akin Gump attorneys for

the position, including Mr. Kim.  Gross Dep. at 33:18-34:3.  Mr. Gross thought that his interview

with Mr. Kim "went well."  Id. at 48:20-49:6.  Mr. Kim said "nothing negative" during the

interview, "commented positively on [Mr. Gross's] background" and "ended up the interview in

an upbeat way."  Id.

10.     Mr. Quigley interviewed Mr. Gross.  Mr. Quigley was concerned that Mr. Gross

"had not spent significant time in a major, at least U.S., law firm, and I was wondering whether

or not the absence of that would be a barrier to succeeding at Akin Gump."  Quigley Dep. at

64:1-11. In addition, Mr. Quigley was concerned that Mr. Gross's "experience and the length of his experience, which was considerable with the Republic of Korea, was more that what was required or appropriate for the job we were looking to fill." <u>Id.</u> at 66:18-67:11. Finally, Mr. Quigley was also concerned about that fact that Mr. Gross "had not developed a specialty area or expertise within the practice of law." <u>Id.</u> at 76:10-77:6.

11.    Mr. Park also interviewed Mr. Gross. Park Dep. at 32:5-34:22. He doubted that Mr. Gross had the legal substantive background to work on the trade policy matters that the position would require. <u>Id.</u> Park Dep. at 32:5-34:22. Mr. Park was concerned because Mr. Gross "wasn't coming in with a specific area of expertise, and in a law firm you need that specific area of expertise to continue to bill." <u>Id.</u> at 60:18-61:8. In addition, Mr. Park was concerned because he "knew the type of substantive writer that we were looking for, and we also knew that an issue that has consistently come up is analytical skills with legal training," and Mr. Gross lacked "experience in a U.S. law firm or training." <u>Id.</u>

12.    Michael Kaye (date of birth January 8, 1960), former Akin Gump partner, also interviewed Mr. Gross. Declaration of D. Michael Kaye, ("Kaye Dec."), attached hereto as Exhibit 7, at ¶3. Mr. Kaye understood that the firm was "looking for a lawyer with 5-6 years experience to support Sukhan Kim's practice advising Korean clients on international policy issues." <u>Id.</u> Mr. Kaye had serious misgivings about Mr. Gross's ability to perform the work required of the position. <u>Id.</u> at 4. Specifically, Mr. Kaye was concerned about what he perceived to be Mr. Gross's lack of knowledge about law firms and Mr. Gross's lack of substantial large firm experience, which he believed was important to the position Akin Gump wanted to fill because "it provides training for dealing with sophisticated clients and in preparation of legal memos." <u>Id.</u> Finally, Mr. Kaye observed that Mr. Gross did not appear to be a "roll up your

3

sleeves" type of attorney.  Id.  Mr. Kaye prepared and sent an email on June 13, 2003, to

Mr. Kim, Mr. Quigley and Mr. Park, describing his thoughts regarding Mr. Gross's interview.

Id. at 6.  Specifically, Mr. Kaye wrote:

> Personally, I liked him.  He seemed like a really nice guy.
> However:  (1) He struck me as being somewhat na[i]ve about what
> law firms are all about. . . .  For instance, I'm not sure he has an
> appreciation for the intensity of big U.S. law firms. . . .  He seemed
> much more interested in trying to "generate business" from his
> Korea contacts than he was in rolling up his sleeves to help us in
> the Korea practice. . . .  Truthfully, I don't think he has a finder
> personality, and honestly we don't need somebody to bring in
> more business, we need someone to service what we already have.

Exhibit A to Kaye Dec.

13.    Mr. Kim had reservations about Akin Gump hiring Mr. Gross "because

[Mr. Gross] didn't have major training – training at a major law firm, I wasn't positive that he

would do – be up to the task."  Kim Dep. at 21:3-23:13.  In fact, Mr. Kim told Mr. Quigley "that

based on my experience, that the odds of [Mr. Gross] making it I think are probably below 25

percent. . . .  But I said, let's give it a try, let's make it work because we need someone to do the

policy work."  Id. at 36:8-22.

14.    Mr. Kim also had a concern that Mr. Gross was "too senior to take on the kind of

assignment I had in mind" and talked directly about that with Mr. Gross during his interview.

Kim Dep. at 36:8-22.  By "too senior," Mr. Kim was referring to the number of years Mr. Gross

had been working after law school.  Id. at 24:15-25:10.  Mr. Kim knew that Mr. Gross had at

least 20 years of experience and Akin Gump had been contemplating hiring someone with

between 5 to 10 years of experience after law school.  Id.  Mr. Kim liked Mr. Gross's response to

his question about his fit for the position given his level of seniority, which was "I hope you

don't use my age and my experience against me." <u>Id.</u>  This was one of the reasons Mr. Kim

ended up recommending that Akin Gump hire Mr. Gross.  <u>Id.</u>

15.    Mr. Kim also decided to recommend that the firm hire Mr. Gross because he

"liked" Mr. Gross and "came away feeling good about him," and in part, because Mr. Gross had

been candid during his interview that he needed to have major surgery, did not have health

insurance and would have to pay for the $70,000-$80,000 surgery out of his own pocket.  Kim

Dep. at 21:3-23:13.

16.    Prior to recommending to the firm that it hire Mr. Gross, Mr. Kim consulted with

Warren Connelly (date of birth November 18, 1946), then Head of the International Trade

Practice Group at Akin Gump.  Kim Dep. at 43:12-44:4; Dressing Dec. at ¶13.  Mr. Kim

consulted with Mr. Connelly because Mr. Gross would need to be placed in a formal practice

group and Mr. Kim thought that the International Trade Practice Group would be the right one.

<u>Id.</u>  Mr. Connelly told Mr. Kim that Mr. Gross could be placed in the International Trade

Practice Group, but only if he could meet the firm's 2,100 annual hourly billing requirement.  <u>Id.</u>

Mr. Connelly made clear, and Mr. Kim understood, that Mr. Gross could only have a place in the

International Trade Practice Group if he met his billing requirement.  <u>Id.</u> at 43:12-44:8.  As

Mr. Kim explained in a June 16, 2003 email to Mr. Connelly, Mr. Kaye, Mr. Spiegel and

Mr. Park:

> i spoke to warren about don gross.  Warren was more than willing
> to accommodate us and has agreed to invite don to his international
> section.  I think this is just great.  I have assured warren though
> that he would bill no less than 2,100 hours, as required of all
> counsels.  Dan, can you pls tell don about this billing requirement
> and get his reaction, as I must honor my commitment to warren?
> Warren, thanks so much for your support and cooperation.  I really
> appreciate it.

5

Exhibit A to Dressing Dec.

17.    Mr. Park wrote in response to Mr. Kim that, given Mr. Gross's lack of substantive

legal expertise, he thought "Don will have a very hard team billing anywhere close to 2100

hours." Exhibit A to Dressing Dec.

**Mr. Gross Is Hired For A One Year Term.**

18.    Mr. Kim recommended to Mr. Quigley that Akin Gump hire Mr. Gross.  Kim

Dep. at 42:16-43:9.  Mr. Quigley took Mr. Kim's recommendation to Mr. McLean, Chairman of

Akin Gump, and Dennis Race (date of birth March 13, 1947), hiring partner at Akin Gump.

Quigley Dep. at 74:1-76:4; Dressing Dec. at ¶9.

19.    Mr. McLean approved the hiring of Mr. Gross with the assurance "that Mr. Gross

would be a fully productive practicing lawyer at a senior counsel level given the amount of the

salary." McLean Dep. at 16:3-9.

20.    In addition, as a result of the reservations expressed about hiring Mr. Gross,

Mr. Quigley asked Mr. Race to add a provision to Mr. Gross's offer letter stating "[l]ike other

employees of the firm, you will be considered an employee at will; however, it is our intention to

review your employment situation at your one year anniversary and reassess our needs and the

terms of your employment." Gross Dep. at Gross Dep. at 69:10-22; Gross Dep. Exhibit 4;

Quigley Dep. at 74:1-76:4.  He did so.  Id.  Such language is not a customary part of Akin

Gump's offer letters.  Quigley Dep. at 74:1-76:4.

21.    In July 2003, Mr. Gross commenced employment with Akin Gump as an Senior

Counsel.  Gross Dep. at 26:18-22.  Mr. Gross cannot identify any alleged ageist remarks made

about him by anyone at Akin Gump between his first interview with Mr. Kim in June 2003 and

April 2004.  Gross Dep. at 33:9-37:16.

**Mr. Gross Is Well Aware Of His Billing Requirement.**

22.     According to Mr. Gross's own handwritten notes, when Mr. Gross began work at Akin Gump he was informed by Mr. Kim that he was required to bill 2,100 hours of billable client work annually.  <u>See</u> Gross Dep. at 79:16- 81:22; Gross Dep. Ex. 6.

23.     Also, as reflected in Mr. Gross's handwritten notes of a July 7, 2003 meeting with Mr. Kim, Mr. Kim told Mr. Gross to "Bill as much as possible," and to only do non-billable management work with respect to the Korea Practice if he did not have enough real billable work.  Gross Dep. at 82:16-83:8; Gross Dep. Ex. 6.  <u>See</u> <u>also</u> Kim Dep. at 55:14-19.

24.     Additionally, according to Mr. Gross's handwritten notes, Mr. Kim also told him on July 7, 2003 that he wanted "someone who can take control over some cases for [him]," and "wants [Mr. Gross] to be point person for Korea projects generally" and "wants [Mr. Gross] to be the focal point of the Korean practice."  Gross Dep. Ex. 6.

25.     In addition, as reflected in Mr. Gross's notes, during a separate July 2003 meeting with Mr. Park, Mr. Park also informed Mr. Gross of the 2,100 billable requirement.  Gross Dep. at 97:5-17; Gross Dep. Ex. 6.

26.     According to Mr. Gross's notes of his July 2003 meeting with Mr. Park, Mr. Park told him during that meeting that "Sukhan would like someone to write or at least revise the memos needed by the client. . . .  Sukhan will view me [Mr. Gross] as a godsend if I am someone he can turn to write a memo, based on input from others, rather than someone who simply revises what others have written."  Gross Dep. Ex. 6.

27.     Mr. Kim tried to help Mr. Gross meet his 2,100 hour billing requirement by, for a period of time, permitting Mr. Gross to bill time worked on non-billable Korea Practice Group

7

matters to a particular billable retainer when Mr. Gross was short of his target.  Kim Dep. at 140:22-141:15.

**Mr. Gross Has Immediate Performance Problems At Akin Gump.**

28.     As early as late September 2003, Mr. Kim and Mr. Park discussed Mr. Gross's contributions on a major client memorandum.  Park Dep. at 79:9-82:12.  They had hoped that Mr. Gross "would be able to provide us with strategic input into the memo, and [] be[] able to write strategically, where we're giving advice, and we were coming to the realization that that was not the case at that time."  Id.  Mr. Kim and Mr. Park discussed their "hope" that Mr. Gross would be able to "come in and really be able to contribute in that way, to be one of the primary people on [the project], since we were all in different sections doing other work.  And the conclusion was that that was likely not going to work out."  Id.

29.     Mr. Kaye also worked on critical sections of the project with Mr. Gross.  Kaye Dec. at ¶8.  In Mr. Kaye's view, the work was poorly done.  Mr. Kaye recommended that Mr. Gross rewrite several sections more than once.  Id.

30.     In addition, in Fall 2003, Mr. Kim gave Mr. Gross an assignment to write a relatively short Op-Ed piece for a Korean periodical.  Kaye Dec. at ¶7.  Mr. Kim was unhappy with Mr. Gross's draft, and brought it to Mr. Kaye.  Id.  Mr. Kaye, in essence, rewrote it.  Id.

31.     Mr. Gross did a "decent job" on some of the non-legal writing projects that he was assigned.  Kim Dep. at 66:22-68:14.  Mr. Gross, along with other attorneys received emails praising his work on non-billable projects from Mr. Kim and others.  Park Dep. at 108:18-110:3; 124:9-126:2.

8

32.     Mr. Gross, and other attorneys, including Mr. Park, received emails from Mr. Kim and others praising their efforts.  Mr. Kim would "typically send e-mails that are very friendly, and thank you very much for the memos, but . . . that's not really his sentiments" "[r]egardless of whether a memo was edited once or three time, he will send the same email at the end, saying great job."  Park Dep. at 108:18-110:3; 124:9-126:2.

33.     Mr. Gross "didn't fare well" when asked to write sophisticated policy memoranda, which required organized analysis with logical connections and delivering advice to client in a succinct manner.  Kim Dep. at 66:22-68:14.  With respect to the international trade policy memorandums that Mr. Gross was assigned to write in Fall 2003, "We had an issue. [Mr. Gross] did not do well."  Park Dep. at 40:21-41-16.

34.     For example, in November 2003, Mr. Kaye learned that Mr. Gross was working on a client memorandum for another client that Mr. Kaye supervised.  Kaye Affidavit at ¶9. Mr. Kaye believes that Mr. Gross's handling of the assignment lacked communication, cooperation, and coordination.  Id.  On November 11, 2003, Mr. Kaye wrote an email to Mr. Kim raising his concerns about the handling and quality of the assignment.  Id.  On November 14, 2003, Mr. Kaye wrote an email to Mr. Gross and a junior associate with whom he was working instructing them to "pull the plug" on the assignment.  Id.  That same day Mr. Kaye also sent an email to Mr. Gross providing corrective suggestions on future staffing and efficiency.  Id.

35.     Mr. Gross organized meetings of the Korea Practice Group.  Mr. Kim viewed the meetings overall as "not productive because our goal was to expand business, but nothing really transpired."  Kim Dep. at 61:19-62:1.  Although Mr. Gross "was very good at setting up regular meetings. . . [Mr. Gross] didn't realize that in a law firm you have to – you can't just have

9

meetings every two weeks for the sake of having meetings."  Park Dep. at 144:3-145:6.  During

the meetings "we would have agenda items that we were supposed to – that [Mr. Gross] was

primarily in charge of trying to take care of.  And we would have another meeting and [Mr. Kim]

would ask if they were done, and [Mr. Gross] would say no, and [Mr. Kim] in some of the

meetings at that time got visibly upset.  And [Mr. Kim] approached Jaemin [Park (date of birth

November 9, 1964) then Partner at Akin Gump] and I and said he would prefer that we work

with Don or push off the meetings."  Id.; Dressing Dec. at ¶11.

36.     In January 2004, Akin Gump was notified by its client that it might be given the

opportunity to do additional work on the major project.  Park Dep. at 82:22-84:1.  Even though

Mr. Gross's work on the initial draft of a major memorandum for that project was poor,

"[Mr. Kim] wanted [Mr. Gross] to continue to bill, we wanted him to try to succeed."  Id.  He did

not want to directly revise Mr. Gross's work, but wanted Mr. Park to review it first and revise it

before it got to him.  Id.  Because of the importance of the project, Mr. Kim also asked

Mr. Quigley to oversee the drafting of the second memorandum.  Id.

37.     Although "early on" Mr. Kim and others felt that Mr. Gross "didn't have to

requisite skill, with respect to . . . policy areas," Mr. Kim "want[ed] Mr. Gross to succeed, so he

told Mr. Quigley, Mr. Park and Ms. Park "not to really tell other people" about Mr. Gross's

deficiencies.  Kim Dep. at 143:19-144-12.

38.     On February 25, 2004, Val Slater (date of birth October 13, 1952), who had

replaced Mr. Connelly as Head of Akin Gump's International Trade Practice Group, sent an

email to Mr. McLean in which she raised concerns about Mr. Gross's billable hours.

Specifically, Ms. Slater told Mr. McLean:

> Bruce:  Sorry to bother you with this, but one topic I meant to
> mention to you yesterday, (but forgot!) is the status of Korea
> practice development personnel.  I am carrying on my section
> "books" Don Gross, who is working full time at Korea practice
> development and who is billing only about 20-30 hours a month.
> We originally parked him in our section on the express
> understanding (which Warren correctly insisted upon) that he
> would be kept fully billable, which he was for a while.  Since last
> fall, however, he is down to next to nothing.  Also, one of our star
> counsels, David Park, has been assigned now to spend a substantial
> portion of his time on nonbillable Korea Practice development,
> which is a very reasonable use of his considerable talents.  These
> two changes have a dramatic impact on our performance indicia,
> and make it difficult for me to see what is really happening.
> Ideally, Don should be moved out of our group entirely, as he is
> not doing our work, and I have no control over (or knowledge of)
> how he spends his time.  David, who is eligible for partnership
> next year, is a superstar, and I would like to keep him in our group,
> principally so I can keep an eye on his professional development. .
> . .  I know Rick [Burdick (date of birth) Partner in Charge of Akin
> Gump's Washington D.C. office] mentioned this to you last week,
> and that you would be looking at the situation this week, so I just
> wanted to mention what the current state of affairs means for our
> group.

McLean Dep. Ex. 48; Dressing Dec. at ¶14.

**Mr. Gross Goes Out For Less Than Two Weeks For Surgery**

39.     In March 2004, Mr. Gross went out on leave (less than two weeks), for what he

referred to as "non-invasive heart surgery."  Gross Dep. at 144:21-149:16; 150:20-151:3.

40.     While out for his surgery, Mr. Gross sent an email to Mr. Quigley, Mr. Kim and

other in the Korea Practice Group in which he stated "I greatly appreciate your flowers and kind

thoughts for me."  Gross Dep. Ex. 10.  In addition, several weeks after he returned to the office,

Mr. Gross sent a second email to Mr. Kim in which he stated "I greatly appreciate your

friendship and support during the last few weeks, which were difficult for me and my family."

Gross Dep. Ex. 12.

**Mr. Gross Returns To Work And Resumes Work On A Key Project.**

41.     When he returned from his medical leave, Mr. Gross was assigned to work on a new version of the memorandum.  Park Dep. at 92:13-93:2.

42.     Mr. Kim, Mr. Quigley and Mr. Park found Mr. Gross's first draft of the revised memorandum "unusable."  Park Dep. 169:17-170:14.  Mr. Park and Mr. Kim met to discuss Mr. Gross's "unusable" draft.  According to Mr. Park, Mr. Kim and Mr. Quigley "were upset about that."  Id.  On May 19, 2004, Mr. Quigley sent Mr. Park an email asking whether Mr. Gross should join in the discussion about the project because he was uncertain about Mr. Gross's continued involvement.  Id.  Mr. Kim asked Mr. Park to edit Mr. Gross's "unusable" draft, allowing him to extend the deadline "as long as we got a better product out."  Id. at 171:7:17.

43.     Mr. Park asked Lisa Ross (date of birth September 1, 1977), an associate with Akin Gump, to assist him, Mr. Quigley and Mr. Gross revise the draft memorandum prepared by Mr. Gross.  Declaration of Lisa Ross ("Ross Dec."), attached hereto as Exhibit 8, at ¶5; Dressing Dec. at ¶16.  Ms. Ross reviewed the memorandum and thought that it was severely lacking in both substance and clarity.  Id.  Ms. Ross found the writing in the memorandum to be "redundant, wordy and poorly structured."  Id.  Moreover, Ms. Ross felt that the memo was simply not written as if it were written by an attorney providing advice and recommendations to a client.  Id.  Ms. Ross was surprised by the poor quality of the work.  Id. at ¶6.

44.     Ms. Ross assisted Mr. Park with the rewriting and restructuring of the memo.  Ross Dec. at ¶8.  She found this to be particularly difficult because the structure of the memorandum was so disjointed.  Id.  As Ms. Ross explained to Mr. Park in an email on May 22, 2004:

> I think it may have been totally impossible to get rid of that "type of writing" that we discussed last night – but I tried to make progress. . . . Again, literally full sentences and ideas were repeated in the paragraph below them, making the message get lost in the words. So, I added entire paragraphs and deleted entire paragraphs and switched the order of sections, so I really hope Don won't be offended. I also reworked the tech policy section and tried to make it more concise and convey why we are recommending this --. . . .

Id.

45.     At the conclusion of the project, Mr. Gross, along with Mr. Park, Ms. Ross and others who had worked on the second memorandum, received emails from Mr. Kim and others praising their hard work. Park Dep. Ex. 38.

46.     In Spring 2004, Mr. Kim asked Mr. Kaye to work on a different project with Mr. Gross to assist him in improving his written work product. Kaye Dec. at ¶10. Mr. Kaye gave Mr. Gross a precise research assignment and asked him to provide him with a short memo later that day. Id. The purpose of the exercise was to help Mr. Gross learn how Akin Gump expected these kinds of memos to be written and presented to clients. Id. Mr. Kaye was "dismayed when [Mr. Gross's] reaction was, 'Who can I get to work with me on this?'" Id. Mr. Kaye explained to Mr. Gross that he should be able to handle the entire assignment on his own. Id. Mr. Gross did not, as requested, provide Mr. Kaye with a draft memo that day, but did so three or four days later. Id. Mr. Kaye found the memo to be poorly researched and written. Id. Mr. Gross asked him to rewrite the assignment. Id.

47.     In April 2004, a Senior Advisor to the Center for Strategic and International Studies commented on a paper Mr. Gross submitted for publication as follows: "Don[] I have had a chance to look at your paper. I have an obligation to USIP to make sure these papers are the best they can be. Honestly, I still think yours falls short of the mark." Gross Dep. Ex. 17.

13

**Mr. Gross Fails To Meet His Billing Requirement.**

48.     In January 2004 Mr. Gross noted to himself in writing that "I have to increase billable hours as much as possible." Gross Dep. at 136:9-16; Gross Dep. Ex. 8. He further noted that "[i]f I put myself in the front edge of all actual marketing activity and try by whatever means to increase my billable hours, it should be okay." Id. at 136:9-137:5; Gross Dep. Ex. 8.

49.     Mr. Gross failed to meet his 2,100 hour annual billing requirement—billing only approximately 1,300 to client billable work during his first year of employment with Akin Gump. Gross Dep. at 140:3-7.

50.     Mr. McLean recalls that "Mr. Gross, like all of our senior counsel, was expected to perform at a level where they would have, you know, roughly 2,100 chargeable client hours and that that was one of the factors that – that was addressed when Mr. Gross was hired, and my recollection was that Ms. Slater – Ms. Slater had – after she became the practice manager, had indicated to me that the performance was substantially below that." McLean Dep. 23:1-6.

51.     As a result of Ms. Slater's expressed concerns, Mr. McLean approached Mr. Quigley and asked him "why Mr. Gross's performance was so far below what we had expected." McLean Dep. at 28:2-11. Mr. Quigley explained: "He hasn't worked out." Id.

52.     Mr. McLean decided to terminate Mr. Gross's employment "because there were serious performance issues," "[f]irst of all, there was a very substantial lack of productivity. Secondly, even with respect to the tasks that he was asked to accomplish there were performance issues with respect to – to his ability to carry out those tasks." McLean Dep. at 6:20-7:9.

53.     Mr. McLean decided that Mr. Gross's initial one year term of employment should not be extended. McLean Dep. at 25:7-9. Mr. McLean was "aware at the time that Mr. Gross

14

was working under a one-year contract and my decision was we were not going to extend that, that we needed to communicate to Mr. Gross that we were not going to extend the relationship beyond the one year that was in his agreement and that – and that that ought to be communicated to Mr. Gross immediately."  McLean Dep. at 25:6-26:7.

54.     On July 9, 2004, Mr. Burdick wrote to Mr. McLean and addressed the need to "deal with some of the idle resources, like don gross."  McLean Dep. Exhibit 49.

55.     Mr. Kim did recommend that Akin Gump terminate Mr. Gross's employment. Kim Dep. at 129:13-19; McLean Dep. at 26:8-28:11.

56.     Mr. McLean did not discuss Mr. Gross's termination with Mr. Kim before making the decision to terminate Mr. Gross.  McLean Dep. at 26:17-27:5; Kim Dep. at 130:7-13.

57.     Mr. Kim did not discuss the termination of Mr. Gross's employment with Mr. Quigley prior to Mr. McLean making the termination decision.  Kim Dep. at 130:14-131:12.

58.     During the summer 2004, Mr. McLean also decided to require the withdrawal from the partnership of an income partner (date of birth October 31, 1963) (the "Income Partner (under 40)") in the Korea Practice Group.  McLean 34:4-12; 50:20-53:3; McLean Dep. Exhibit 43.  The decision to terminate the Income Partner (under 40), like the decision to terminate Mr. Gross's employment, was based, in part on low productivity.  Kim Dep. at 111:19-112:2.

59.     On August 11, 2004, Mr. McLean sent an email to Mr. Kim and Mr. Quigley summarizing Mr. McLean's previous decision regarding "at least two personnel actions that need to be addressed immediately.  Gross ought to be resolved by October 31 and [Income Partner (under 40)] by year end."  McLean Dep. Exhibit 43.

15

60.     On October 11, 2004, Akin Gump hired Thomas C. Hubbard (date of birth January 30, 1943) as a member of the Korea Practice Group.  Dressing Dec. at ¶17.

**Mr. Kim Informs Mr. Gross Of Mr. McLean's Decision.**

61.     On or about July 13, 2004, Mr. Kim delivered news of Mr. McLean's decision to terminate Mr. Gross's employment to Mr. Gross.  Gross Dep. Ex. 8; Quigley Dep. at 170:19-171:11.  According to Mr. Gross's notes, Mr. Kim told Mr. Gross that "[t]hinks that they're not utilizing my talents and capabilities well."  Gross Dep. Ex. 8.  Mr. Gross's notes also reflect that Mr. Kim stated that he

> [t]hought I have to find the right niche either outside the firm – think-tank, PR firm, etcetera – or within the firm.  Thought that PLP [Public Law and Policy Group] would be a good place for me, although he heard they might be down-sizing.  Stressed that a person's skills might be under-utilized in one area but could be more fully utilized when he finds the right position, inside or outside of the firm.  Right now, there's not a goof fit between me and the firm.

Id.  According to Mr. Gross's notes, Mr. Kim also "offered to talk with Spiegel about possibility of my joining PLP," and "[s]aid that if asked, he would say that the Korea section could use me one-third of time; and he would give me projects when something came up that was appropriate.  Id.

62.     On July 26, 2004, Mr. Gross wrote Mr. Kim an email in which he states:

> Frankly, our recent discussion came as a big surprise to me so I am still sorting through my options.  I have a great deal of respect for you and I know that what you have told me is best both for Akin Gump and for the development of my own career.  I sincerely appreciate your support.  Thanks and best wishes, Don.

Gross Dep. Ex. 21.

63.     Upon learning of Mr. McLean's decision to terminate Mr. Gross, Mr. Kim was still hopeful that Mr. Gross could stay with the firm in some capacity.  Kim Dep. at 130:14-131:12.

64.     Mr. Kim tried to help Mr. Gross find another position within Akin Gump. Specifically, he told Mr. Gross that he might be able to work for the Public Law and Policy Section and offered to talk to a few people in that Section on Mr. Gross's behalf.  Kim Dep. at 134:10-135:15.

65.     Mr. Kim "tried to extend [Mr. Gross's] stay as long as [he] could" and "was trying to keep him there as long as [he could] at Akin Gump."  Kim Dep. at 130:14-131:12.

66.     On August 5, 2004, according to Mr. Gross's notes, Mr. Kim told Mr. Gross that "McLean wants to put in place a 60-day "exit strategy" for me," and "SK says he hasn't talked with McLean directly but received all the information about me from MQ."  Gross Dep. Ex. 8. On August 11, 2004, according to Mr. Gross's notes, "SK said I should plan to leave the law firm by October 1.  Could possibly seek a short extension based on fact that SK has not talked directly to McLean about me."  Id.

67.     Mr. Kim asked Mr. McLean to extend Mr. Gross's original termination date in order to provide more time for Mr. Gross to find suitable employment.  Gross Dep. Ex. 8.  As a result, Mr. Gross's termination date was extended to October 31, 2004.  McLean Dep. Ex. 43.

**Mr. Kim Assists Mr. Gross In Finding Employment Outside of the Firm.**

68.     Mr. Kim suggested the Korea Economy Institute ("KEI") and Stan Gale as potential employers to Mr. Gross.  Kim Dep. at 135:16-136:9.  In fact, Mr. Kim forwarded job opportunity notices at KEI to Mr. Gross.  Gross Dep. Ex. 21

17

69.     Mr. Gross was not interested in a position suggested to him by Mr. Kim at the

Korean Economic Institute, because "it was a more junior level position than I – than I – I was

far more – I was much more qualified for a senior position than that."  Gross Dep. at 278:14-

279:4.  Mr. Gross felt this, and another position that Mr. Kim suggested were "too junior."  Id. at

335:14-337:3.  By "too junior," Mr. Gross meant that "both of those positions were junior level

positions and were not appropriate for someone with my background and expertise."  Id.

70.     Mr. Kim took Mr. Gross out to lunch on October 27, 2007 (Mr. Gross's last week

at Akin Gump).  Gross Dep. at 333:22-334-19.  Mr. Gross wrote an email to Mr. Kim after that

lunch in which Mr. Gross states "I very much enjoyed our lunch today.  As I mentioned, I would

very much appreciate it if you would recommend me to Vernon Jordan for a position at Lazard."

Id. at Gross Dep. Ex. 32.  Once again, Mr. Gross did not mention age discrimination.

**Mr. Gross Admits That The Characterization of Being**
**"Too Senior" For Various Positions Is Not Discriminatory.**

71.     In December 2004, Mr. Gross sent an email inquiring about a position at the

Center for American Progress to Bob Boorstin.  Mr. Boorstin replied that "[w]e are in the midst

of a search for a new analyst but I'm looking for someone with about 3-5 years experience, much

younger. . . ."  Gross Dep. Ex. 33.  Similarly, Mr. Gross sent an email to Paul Stares inquiring

about a position with USIP, to which Mr. Stares responded "[m]y initial reaction is that you are

too senior for this position."  Gross Dep. Ex. 34.  Mr. Gross does not believe that Mr. Boorstin or

Mr. Stares hold his age against him or have negative feelings about him because of his age.

Gross Dep. at 332:14-333:21.

**Mr. Gross Admits That His Employment At Akin Gump
Was Terminated Because of His Lack of Productivity.**

72.    In the Fall 2004,  Mr. Gross explained the circumstances of the termination of his

employment at Akin Gump to at least five (5) individuals inside and outside of Akin Gump as

follows:

> Over the summer, Akin Gump's management put considerable
> pressure on the Korea practice group here to reduce its costs due to
> insufficient profitability.  As a consequence, I and a partner in the
> practice group from our L.A. office were asked to leave the firm.
> Though this decision seems very unfair and short-sighted because I
> have only been at Akin Gump about one year (and have done quite
> well), it is the reality I am facing.

Gross Dep. Exhibit 27.

**Mr. Gross Never Complains About Alleged Age Discrimination.**

73.    Akin Gump has a Firm Manual that contained the following policy regarding the

prohibition of discrimination or harassment on the basis of age and other protected

characteristics, as well as procedures for reporting any such discrimination, which was in effect

during Mr. Gross's tenure at Akin Gump:

> As part of its equal employment opportunity policy, Akin Gump
> Strauss Hauer & Feld LLP is committed to the principle that all of
> its personal should be able to enjoy a work environment free from
> all forms of discrimination and harassment, including, but not
> limited to, sexual harassment and harassment based on race, color,
> national origin, religion, gender, sexual orientation, age, disability
> and any other basis of discrimination prohibited by law. . . .
>
> Any employee who believes that he or she has been a victim of
> harassment in any form by an attorney, manager, supervisor, co-
> worker, client, vendor or other visitor should report the incident to
> the Partner-in-Charge, Director of Administration or Human
> Resources Manager of the employee's office.  If the employee is
> uncomfortable for any reason with discussing the incident with any
> of these persons, or, in the alternative, if the employee is not
> satisfied after bring this matter to the attention of such person(s),
> the employee should report the incident to <u>Julie Dressing</u>, the
> Firm's Chief Human Resources Officer and Human Resources

Counsel (202.887.4165, ext. 24165); <u>Kerry Berchem</u>, Partner in the New York office (212.872.1095, ext. 31095); <u>Catherine Conway</u>, Partner in the Los Angeles Office (310.552.6435, ext. 46435) or <u>Laura Franze</u>, Partner in the Dallas Office (214.969.2779, ext. 12779).

The firm will investigate all allegations of discrimination and harassment in as prompt and confidential manner as possible and will take appropriate corrective action when warranted. Any person who is determined by the firm, as a result of such an investigation, to have engaged in discrimination or harassment in violation of this policy may be subject to appropriate disciplinary action, up to an including termination of employment or severance from the partnership. Further, retaliation in any form against an employee or applicant who complains of discrimination or harassment is strictly prohibited, and may itself be cause for appropriate disciplinary action.

Dressing Dec. at 4.

74.    Mr. Gross never complained about any alleged comments made by Mr. Kim to

Mr. Kim or to anyone else at Akin Gump. Gross Dep. at 243:7-14; 272:19-22; 339:2-7.

**Mr. Gross Encourages Prospective Clients of
Akin Gump's Not To Retain The Firm's Services.**

75.    While still an Akin Gump employee, and still on Akin Gump's payroll, Mr. Gross

made the following statements in emails to prospective clients of Akin Gump:

- "For the moment, I think you should delay signing the engagement letter. *The law firm will be unhappy with this recommendation*, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words." (emphasis added).

- "If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm."

- "Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.] This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X] could not possibly trust him to serve as an 'honest broker.' Sukhan has never represented an American company doing business in Korea, so far as I know, and is a highly

specialized trade lawyer whose practice consists of representing Korean companies in the United States."

- "Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X]."

- "I didn't know Jaemin [Park] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul.  Her help is even more questionable. . . .  She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence."

- "If [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."

76.     Mr. Gross admits to making these statements.  Gross Dep. at 288:13- 290:22; 327:10- 329:22; Gross Dep. Exhibits 23, 24, and 31.  He also admitted that he did not advise Mr. Kim that he was doing so, and that he does not recall advising anyone else at Akin Gump of his comments.  Gross Dep. at 291:5:-293:14.  Finally, he admitted that he was simultaneously seeking employment with one of the prospective clients.  Id. at 295:13-296:11.

**Akin Gump Discovers Mr. Gross's Wrongdoing.**

77.     Akin Gump filed an affirmative defense and counterclaims against Mr. Gross in this matter after discovering during discovery in this case that "on several occasions Mr. Gross communicated with clients of the firm and affirmatively disparaged or otherwise criticized the performance of Akin Gump attorneys in an attempt to dissuade those clients from giving the firm work."  McLean Dep. at 66:6-67:12.

78.     Mr. McLean would have "terminated [Mr. Gross] immediately" had he known about Mr. Gross's "disparaging comments about the firm or its attorneys to a client."  McLean Dep. at 67:13-68:2.

DATED:  November 2, 2007          Respectfully submitted,


                                                     /s/
                         Christine N. Kearns  (Bar # 416339)
                         Karen-Faye McTavish (Bar # 477588)
                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                         2300 N Street, N.W.
                         Washington, D.C.  20037-1128
                         (202) 663-8000

                         *Counsel for Defendant*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS, | ) |
| Plaintiff, | ) |
| v. | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) Case No. 1:07CV00399 (EGS) |
| Defendant. | ) |

## DECLARATION OF JULIE STUMPE DRESSING

I, Julie Stumpe Dressing, a member in good standing of the bar of the District of Columbia, state as follows:

1.      I am the Chief Human Resources Officer and Human Resources Counsel for Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), the Defendant in this matter. I make this Declaration based on my personal knowledge and, where stated, my review of Akin Gump's business records kept in the ordinary course of business.

2.      Akin Gump is a large international law firm. It has fifteen offices, including an office in Washington D.C.

3.      Akin Gump is comprised of formal practice groups, including the International Trade Practice Group. The Korea Practice Group at Akin Gump is an informal group comprised of attorneys who are each assigned to various formal practice groups, but who work on Korean matters.

4.    Akin Gump has a Firm Manual that contained the following policy regarding the

prohibition of discrimination or harassment on the basis of age and other protected

characteristics, as well as procedures for reporting any such discrimination, which was in effect

during Mr. Gross's tenure at Akin Gump:

> As part of its equal employment opportunity policy, Akin Gump
> Strauss Hauer & Feld LLP is committed to the principle that all of
> its personal should be able to enjoy a work environment free from
> all forms of discrimination and harassment, including, but not
> limited to, sexual harassment and harassment based on race, color,
> national origin, religion, gender, sexual orientation, age, disability
> and any other basis of discrimination prohibited by law. . . .
>
> Any employee who believes that he or she has been a victim of
> harassment in any form by an attorney, manager, supervisor, co-
> worker, client, vendor or other visitor should report the incident to
> the Partner-in-Charge, Director of Administration or Human
> Resources Manager of the employee's office.  If the employee is
> uncomfortable for any reason with discussing the incident with any
> of these persons, or, in the alternative, if the employee is not
> satisfied after bring this matter to the attention of such person(s),
> the employee should report the incident to Julie Dressing, the
> Firm's Chief Human Resources Officer and Human Resources
> Counsel (202.887.4165, ext. 24165); Kerry Berchem, Partner in
> the New York office (212.872.1095, ext. 31095); Catherine
> Conway, Partner in the Los Angeles Office (310.552.6435, ext.
> 46435) or Laura Franze, Partner in the Dallas Office
> (214.969.2779, ext. 12779).
>
> The firm will investigate all allegations of discrimination and
> harassment in as prompt and confidential manner as possible and
> will take appropriate corrective action when warranted.  Any
> person who is determined by the firm, as a result of such an
> investigation, to have engaged in discrimination or harassment in
> violation of this policy may be subject to appropriate disciplinary
> action, up to an including termination of employment or severance
> from the partnership.  Further, retaliation in any form against an
> employee or applicant who complains of discrimination or
> harassment is strictly prohibited, and may itself be cause for
> appropriate disciplinary action.

- 2 -

5.     In my capacity as Chief Human Resources Officer and Human Resources Counsel for Akin Gump Strauss Hauer & Feld LLP, I have access to the firm's personnel records which include birth date and start date information for former and current employers and partners of Akin Gump. My statements with respect to dates of birth and start dates of employees and partners in ¶¶6-17 of this Declaration are based on my review of those records.

6.     Bruce McLean is the Chairman of Akin Gump. Mr. McLean's date of birth is November 15, 1946.

7.     Sukhan Kim is a Partner at Akin Gump and is the senior lawyer in the Korea Practice Group. Mr. Kim's date of birth is November 20, 1949.

8.     Daniel Spiegel is a Partner at Akin Gump. Mr. Spiegel's date of birth is September 5, 1945.

9.     Dennis Race is a Partner at Akin Gump. Mr. Race's date of birth is March 13, 1947.

10.     Michael Kaye is a former Partner of, and current consultant to, Akin Gump. Mr. Kaye's date of birth is January 8, 1960.

11.     Jaemin Park is a former Partner of Akin Gump. Ms. Park's date of birth is November 9, 1964.

12.     Michael Quigley is a former Partner of Akin Gump. Mr. Quigley's date of birth is September 11, 1957.

13.     Warren Connelly is a partner at Akin Gump and is the former head of the International Trade Practice Group. Mr. Connelly's date of birth is November 18, 1946.

14.     Val Slater is a Partner at Akin Gump and is the current head of the International Trade Practice Group. Ms. Slater's date of birth is October 13, 1952.

400662373v1

15.     David Park is a Partner at Akin Gump.  He was Counsel at the firm during the time that Donald G. Gross was employed by the firm.  Mr. Park's date of birth is November 28, 1971.

16.     Lisa Ross is an Associate at Akin Gump.  Ms. Ross's date of birth is September 1, 1977.

17.     On October 11, 2004, Akin Gump hired Thomas C. Hubbard (date of birth January 30, 1943) as a member of the Korea Practice Group.

18.     The document that is attached hereto as Exhibit A (Bates labeled AK002634), is a hard copy of two electronic messages that were produced in this case from Akin Gump's computer systems.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2007.

Julie Stumpe Dressing

- 4 -

From: Park, David
Sent: 6/16/2003 7:13:40 PM (Eastern Time)
To: Kim, Sukhan; Kaye, Michael
Subject: RE:

I would be careful.  I think Don will have a very hard team billing anywhere
close to 2100 hours.

   -----Original Message-----
From:  Kim, Sukhan
Sent: Monday, June 16, 2003 3:52 PM
To: Spiegel, Dan; Quigley,  Mike
Cc: Connelly, Warren; Kaye, Michael; Park, David
Subject:

 i spoke to warren about don gross. warren was more than willing to accommodate
us and has agreed to invite don to his international section. I think this is
just great. i have assured warren though that he would bill no less than 2,100
hours, as required of all of counsels. Dan,  can you pls tell don about this
billing requirement and get his reaction, as i must  honor my commitment to
warren? Warren, thanks so much for your support and cooperation. I really
appreciate it.

CONFIDENTIAL                                                                          AK002634

# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - x
                          :
DONALD G. GROSS,          :
                          :
          Plaintiff,      :
                          :
                          : Civil Action No.
v.                        : 07-399 (EGS)
                          :
AKIN, GUMP, STRAUSS,      :
HAUER & FELD, LLP         :
                          :
          Defendant.      :
                          :
- - - - - - - - - - - - - x
```

Videotaped Deposition of

ROBERT BRUCE McLEAN

Washington, DC

Thursday, August 30, 2007

9:03 a.m.

Job No.:  1-109380

Pages 1 through 90

Reported by:  Rebecca L. Stonerock, RPR

VIDEOTAPED DEPOSITION OF ROBERT BRUCE MCLEAN
CONDUCTED ON THURSDAY, AUGUST 30, 2007

Page 6

1    THE VIDEOGRAPHER: Thank you. The
2  court reporter today is Rebecca Stonerock of
3  LAD Reporting. I will now swear in the
4  witness.
5        ROBERT BRUCE McLEAN
6  having been duly sworn, testified as
7  follows:
8      THE VIDEOGRAPHER: Please begin, sir.
9    EXAMINATION OF ROBERT BRUCE McLEAN
10 BY MR. PUTH:
11   Q   Good morning, Mr. McLean.
12   A   Good morning.
13   Q   Will you state your name for the
14 record?
15   A   My name is Robert Bruce McLean,
16 M-c-L-E-A-N.
17   Q   And what is your position at Akin
18 Gump?
19   A   I'm the firm's chairman.
20   Q   Why was Donald Gross terminated from
21 Akin Gump?
22   A   Donald Gross terminated from Akin Gump

Page 7

1  because there were serious performance issues.
2    Q   And what were those?
3    A   The -- as I became aware of those
4  situations, they were severalfold. First of all,
5  there was a very substantial lack of
6  productivity. Secondly, even with respect to the
7  tasks that he was asked to accomplish there were
8  performance issues with respect to -- to his
9  ability to carry out those tasks.
10   Q   And when did you begin at Akin Gump?
11   A   I began at Akin Gump in November of
12 1973.
13   Q   What was your educational background
14 starting with college?
15   A   I got a bachelor of science in
16 business economics from Indiana University and a
17 JD in 1971 from Indiana University.
18   Q   I'm sorry, what year was that?
19   A   1971.
20   Q   And where did you go to work after?
21   A   I went to work for the National Labor
22 Relations Board.

Page 8

1    Q   What was your position at the NLRB?
2    A   I was an attorney in the appellate
3  division.
4    Q   And you argued appeals on behalf of
5  the NLRB?
6    A   I did.
7    Q   So you defended the decisions of the
8  NLRB before Courts across the United States?
9    A   That's correct.
10   Q   And how long were you at the NLRB?
11   A   I was at the NLRB from the summer of
12 1971 until the fall of 1973.
13   Q   And so your work at the NLRB
14 essentially involved labor issues along with
15 administrative law?
16   A   Yes.
17   Q   Would that sum it up generally?
18   A   That sums it up.
19   Q   And following NLRB you went to Akin
20 Gump?
21   A   That's correct.
22   Q   What position did you have when you

Page 9

1  joined?
2    A   I was an associate.
3    Q   Was that here in DC?
4    A   It was.
5    Q   When did you become a partner of Akin
6  Gump?
7    A   I became a partner effective January
8  1, 1976.
9    Q   And when you began as an associate at
10 Akin Gump what was your specialty?
11   A   I was hired by Akin Gump to do labor
12 and employment work, but in fact I did a variety
13 of different things, including some antitrust
14 work, some environmental work, and then
15 ultimately work in the oil and gas area.
16   Q   And so did you also do labor and
17 employment?
18   A   I did.
19   Q   Did you defend employers in civil
20 rights cases?
21   A   Well, by "civil rights cases" do you
22 mean did I defend employers in actions brought by

3 (Pages 6 to 9)

VIDEOTAPED DEPOSITION OF ROBERT BRUCE MCLEAN
CONDUCTED ON THURSDAY, AUGUST 30, 2007

Page 14

1  panel for some level of damages that were not --
2  that were substantially short of what she had
3  asked for, but were nonetheless substantial. I
4  believe it was in the neighborhood of 150 to
5  $200,000, but my memory on that's vague.
6      Q  Why was Don Gross hired?
7      A  Don Gross was hired to be a senior
8  counsel in our international practice and to work
9  with our Korea practice.
10      Q  And who do you think was primarily
11  responsible for the decision to hire Don Gross?
12      A  Well, as best I know, the person
13  responsible for the decision to hire Don Gross
14  was Mike Quigley.
15      Q  And what's the basis of that
16  knowledge?
17      A  Well, Mike Quigley was generally the
18  person with the responsibility in the Korea
19  practice for things like personnel issues, who
20  was going to be hired, what assignments they had,
21  and generally the administrative oversight of the
22  practice.

Page 15

1      Q  And do you know what duties Don Gross
2  was hired to fill?
3      A  Specifically?
4      Q  Yes.
5      A  I don't. I don't know that he was
6  hired to practice in the group, and my
7  recollection is that the expectation was he was
8  going to be a fully occupied practicing lawyer in
9  the Korea group.
10      Q  Did you have any involvement in the
11  hiring process?
12      A  I would have approved it because I
13  approve -- basically everybody that's hired at
14  this level, senior counsels with compensation in
15  the range of Mr. Gross, would have come to me for
16  my approval.
17      Q  And what materials would you have
18  reviewed in --
19      A  I generally -- generally speaking,
20  would have had a conversation with either the
21  practice manager or the sponsor of the -- of the
22  proposed employment. Sometimes those are

Page 16

1  relatively brief, sometimes they're more
2  extensive.
3      Q  Do you have any specific recollection
4  in the -- in this case, the hire of Don Gross, of
5  any of those conversations?
6      A  No. My only recollection is that --
7  that we had been assured that Mr. Gross would be
8  a fully productive practicing lawyer at a senior
9  counsel level given the amount of the salary.
10      Q  Do you know who provided those
11  assurances?
12      A  I believe they were provided by
13  Mr. Quigley to Mr. Connelly and that I would have
14  either gotten that directly from Mr. Quigley or
15  would have gotten it from Mr. Connelly or
16  Mr. Race or both.
17      Q  Now, "Mr. Connelly," you're referring
18  to Warren Connelly?
19      A  Warren Connelly, that's correct.
20      Q  And Warren Connelly at that time was
21  heading the international group?
22      A  That's correct.

Page 17

1      Q  And although I gather Mr. Gross was
2  being dedicated primarily to Korea practice group
3  matters, he would be officially in the
4  international practice group. Is that right?
5      A  Yes, that's correct. He was in the
6  international group.
7      Q  And do I understand correctly that the
8  Korea practice group was not a formal practice
9  group?
10      A  That's correct.
11      Q  Did you understand that Mr. Gross had
12  duties to develop and manage the Korea practice
13  group?
14      A  No.
15      Q  Did you ever have any discussions with
16  Sukhan Kim about Don Gross's role in the Korea
17  practice group?
18      A  Not that I remember.
19      MS. KEARNS:  I just want to say just
20  for clarification, you're talking -- we're
21  still at the time of hiring or at any time?
22      MR. PUTH:  That's a good

5 (Pages 14 to 17)

VIDEOTAPED DEPOSITION OF ROBERT BRUCE MCLEAN
CONDUCTED ON THURSDAY, AUGUST 30, 2007

Page 22

1    or departments of Akin Gump that would help
2    provide those services?
3        A  Other than the marketing department
4    and the accounting department?  Not that I --
5        Q  Individuals.
6        A  Not that I remember.  I don't recall
7    that there was an individual person in the
8    marketing department exclusively devoted to the
9    Korea practice.  I'm sure there was a person in
10   the marketing department who the practice group
11   would have relied on, would have been sort of the
12   go-to person in the marketing department.  And
13   I'm also quite confident that there was somebody
14   in the accounting department that specialized in
15   the -- in the financial relationship with our
16   Korean clients, but I don't know who those
17   individuals were or don't recall them at this
18   point.
19       Q  Do you recall any discussions with
20   Warren Connelly regarding Don Gross's work in the
21   international group?
22       A  No.

Page 23

1        Q  Do you recall any communications with
2    Val Slater regarding Don Gross's work in the --
3    in the international group?
4        A  Yes.
5        Q  What do you recall?
6        A  My recollection was that -- that
7    relatively shortly after Val took over the
8    management responsibilities of the group that she
9    raised with me the gap in Don's performance
10   and -- and what we had expected, and my
11   recollection is that -- that she urged some kind
12   of a resolution of that situation.
13       Q  And when you talk about a gap in
14   performance, what are you referring to?
15       A  Well, my recollection is that -- that
16   Mr. Gross, like all of our senior counsel, was
17   expected to perform at a level where they would
18   have, you know, roughly 2,100 chargeable client
19   hours and that that was one of the factors
20   that -- that was addressed when Mr. Gross was
21   hired, and my recollection was that Ms. Slater --
22   Ms. Slater had -- after she became the practice

Page 24

1    manager, had indicated to me that the performance
2    was substantially below that.
3        Q  And so when you refer to performance
4    you're referring to billable hours as opposed to
5    nonbillable hours?
6        A  Correct.
7        Q  You're not referring to the quality of
8    the work?
9        A  Not with respect to my discussion with
10   Ms. Slater.  With respect to my discussion with
11   Mr. Quigley that was quite different.
12       Q  With respect to your discussions with
13   Ms. Slater it was confined to Don Gross's
14   billable work and not to the quality of his work?
15       A  Correct.
16       Q  Do you recall when Val Slater became
17   the head of the international group?
18       A  No.
19       Q  Mr. McLean, how much of your career
20   professionally has been involved with litigation?
21       A  Most of it.
22       Q  Most of it.  How many -- have you

Page 25

1    taken depositions?
2        A  I have.
3        Q  How many depositions would you
4    estimate that you've taken?
5        A  A hundred.
6        Q  A hundred.  And -- strike that.
7           What was your involvement in the
8    decision to terminate Don Gross?
9        A  I made it.
10       Q  And what were your reasons?
11       A  Well, I had had the communication from
12   Ms. Slater about the lack of productivity
13   measured by billable hours, had a subsequent
14   discussion with Mr. Quigley that was in direct
15   response to Ms. Slater's inquiry, and my
16   recollection is I asked Mr. Quigley what the
17   situation was with Mr. Gross because his
18   productivity was substantially below what we had
19   expected and he told me that Mr. Gross had not
20   worked out, and I made the decision that he ought
21   to be terminated.
22          I was also aware at the time that

7 (Pages 22 to 25)

VIDEOTAPED DEPOSITION OF ROBERT BRUCE MCLEAN
CONDUCTED ON THURSDAY, AUGUST 30, 2007

Page 26

1    Mr. Gross was working under a one-year contract
2    and my decision was we were not going to extend
3    that, that we needed to communicate to Mr. Gross
4    that we were not going to extend the relationship
5    beyond the one year that was in his agreement and
6    that -- and that that ought to be communicated to
7    Mr. Gross immediately.
8        Q   So do I understand correctly that you
9    brought up the decision to terminate Donald Gross
10   with Mike Quigley?
11       A   That's correct.  That's my
12   recollection.
13       Q   And that was prompted by your
14   communications with Val Slater regarding her
15   concerns about billable hours?
16       A   Correct.
17       Q   Did you have any discussions with
18   Sukhan Kim about the decision to terminate Donald
19   Gross?
20       A   I may have had a discussion with
21   Mr. Kim at some point in time.  In fact, it's
22   likely that I would have had a conversation with

Page 27

1    Mr. Kim at some point in time, but I did not have
2    a discussion with Mr. Kim prior to making the
3    decision to terminate Mr. Gross or at the same
4    time that I made the decision to terminate
5    Mr. Gross.
6        Q   All right.  Now, I believe you had
7    testified, and correct me if I'm wrong, that you
8    made the decision to terminate Don Gross in
9    response to Val Slater's concerns about his
10   billable hours in the international group.  Is
11   that right?
12       A   Well, I think what I testified was it
13   was two things.  It was -- it was Ms. Slater's
14   concern about his billable hours, and then
15   subsequently in the discussion with Mr. Quigley
16   one of -- I think a very important part of this
17   was that Mr. Quigley's assessment was that
18   Mr. Gross was not performing either.  That was
19   one of the reasons that his billable hours were
20   low.
21       Q   And that was a discussion that you had
22   after your communications with Val Slater?

Page 28

1        A   Correct.
2        Q   Okay.  And what do you recall about
3    your discussion with Mr. Quigley regarding Don
4    Gross's performance?
5        A   Well, I asked him why Mr. Gross's
6    performance was so far below what we had expected
7    and Mr. Quigley said, "He hasn't worked out," and
8    then I said, "You need to terminate Mr. Gross."
9        Q   That's the full substance of what you
10   recall?
11       A   That's what I recall.
12       Q   Now, do you understand that Val Slater
13   had any managerial responsibilities over Donald
14   Gross?
15       A   Val Slater was the practice manager in
16   the practice that we're -- Mr. Gross was
17   resident, and she would have had both the
18   responsibility and accountability to me for the
19   performance of the group, including Mr. Gross's
20   performance.
21       Q   Did you also have a discussion with
22   Mr. Quigley about the -- strike that.

Page 29

1        MR. PUTH:  Let's have these marked as
2    Deposition Exhibits 46 and 47, please.
3        (Exhibit Nos. 46 and 47 were marked
4    for identification and attached to the
5    deposition transcript.)
6    BY MR. PUTH:
7        Q   Mr. McLean, the court reporter is
8    handing you what has been marked as Deposition
9    Exhibits 46 and 47.  I'll ask you to review those
10   for identification.
11       A   (Complying.)
12       Q   Have you had a chance to review
13   Deposition Exhibits 46 and 47?
14       A   I have.
15       Q   What is Deposition Exhibit 46?
16       A   Forty-six is a letter of resignation
17   by            :o David Allen.
18       Q   And who is David Allen?
19       A   David Allen is the partner in charge
20   of our Los Angeles office.
21       Q   And Deposition Exhibit 47, can you
22   identify that, please?

REDACTED

8 (Pages 26 to 29)

VIDEOTAPED DEPOSITION OF ROBERT BRUCE MCLEAN
CONDUCTED ON THURSDAY, AUGUST 30, 2007

Page 66

1    A   To the best of my knowledge, there was
2  no attempt to retroactively reclassify the
3  nonbillable time which had been logged to the
4  retainer as billable time to the correct
5  categorization of nonbillable time.
6    Q   Are you aware that Akin Gump has filed
7  counterclaims in this case?
8    A   Yes.
9    Q   Are you familiar with those
10 counterclaims?
11   A   Generally.
12   Q   Who made the decision to file the
13 counterclaims?
14   A   The ultimate decision was made by me.
15   Q   And why were the counterclaims filed?
16   A   It's my understanding --
17      MS. KEARNS: I just want to object to
18 the extent that your answer calls fork any
19 privileged communication.  But you can answer
20 his question.
21   Q   Without revealing the substance of any
22 attorney-client privileged communications, will

Page 67

1  you tell me why the counterclaims were filed?
2    A   Right.  In the -- in -- as I
3  understand it, in the discovery in this case we
4  became aware of the fact that on, I believe,
5  several occasions Mr. Gross communicated with
6  clients of the firm and affirmatively disparaged
7  or otherwise criticized the performance of Akin
8  Gump attorneys in an attempt to dissuade those
9  clients from giving the firm work, and that that
10 conduct, you know, was relevant to a -- to a
11 counterclaim regarding the matters at issue in
12 this litigation.
13   Q   All right.  Are you aware of any
14 attorneys being terminated for seeking to
15 dissuade clients from retaining the services of
16 Akin Gump?
17   A   I've been with the firm for 34 years,
18 I've been the chairman of the firm for 15.  This
19 is the first instance that I'm aware of where any
20 attorney of the firm actually made these kinds of
21 disparaging comments about the firm or its
22 attorneys to a client.  And had I known about

Page 68

1  this at the time, I would have asked that
2  Mr. Gross be terminated immediately.
3    Q   You do run into situations where
4  attorneys are planning to leave the firm?
5    A   Correct.
6    Q   All right.  And you do have
7  circumstances where attorneys at times may seek
8  to take clients with them, correct?
9    A   I would say this:  I'm aware that that
10 occurs with partners of the firm, in my view, if
11 that occurs before they have notified the firm
12 that they intend to leave, it's a breach of
13 fiduciary duty to the firm as a partner.  I'm not
14 specifically aware that partners have done it.
15 I've got a general awareness that this occurs.
16   Q   And at times you as Akin Gump's
17 chairman make decisions to bring in as partners
18 lateral hires, correct?
19   A   Correct.
20   Q   And including -- included in your
21 decision over that is the possibility that they
22 would bring with them a book of business,

Page 69

1  correct?
2    A   Well, if "book of business" means that
3  they have client relationships that they think
4  are transportable to Akin Gump from whatever firm
5  they're with, that's correct.
6    Q   And -- and have you had circumstances
7  on the other end of that where you have partners
8  that are leaving that sometimes take
9  transportable business with them to other firms?
10   A   Yes.
11   Q   Have you had any circumstances where
12 you've discovered that they have communicated
13 their interest in leaving the firm and taking
14 business with them prior to them notifying Akin
15 Gump?
16   A   Other than Mr.      I don't have any
17 recollection of knowing that about any partner
18 that has left the firm in advance of them
19 leaving.
20   Q   With respect to Mr.      , was any
21 sanction taken against Mr.
22   A   Well, Mr. Lee, you know, was

18 (Pages 66 to 69)



From: McLean, Bruce
Sent: 8/11/2004 4:03:22 PM (Eastern Time)
To: Kim, Sukhan; Quigley, Mike
Subject: Korea Practice

I have had very productive and informative meetings with each of you. As I
think is always the case, we have benefited from a frank and candid
conversation where each of us has gotten the benefit of the other's views. I
can certainly tell you that I have learned much in our discussions and I now
feel that I know a great deal more about the performance of the Korea practice
and the challenges that we face in building the practice from here. I thought
it would be useful to set forth the financial goals and objectives that we
discussed, particularly in my meeting with Mike. Before doing so, I wanted to
express my appreciation for your cooperation in discussing what needs to be
done. I am more optimistic than ever in the future of our Korea practice and I
want to give you full support in achieving that potential.

1. Rates-The goal for 2004 is to have our net rates for the Korea practice at
or above regional rates. It is my understanding that as a result of the rate
increases put into place earlier this year, that goal is reasonable and will be
achieved for this year. Going forward, I would like to see the net rates for
next year be 5% over regional rates, which should equate to about 1/3 of the
work being done at net standard rates. This should put the Korea practice
slightly ahead of firm metrics.

2. Realization-Historically, the realization rate for the Korea practice has
been substantially below the firm metrics when measured against either agreed
rates or regional rates. In large measure that is because the agreed upon
discount of 10% to           has been applied against regional rates after the
draft bills are rendered by accounting. In other words the agreed rate in the
system has been the regional rate and the discount is applied after the fact
and therefore shows up as a realization issue when it is actually a rate issue.
Going forward, the goal is to achieve a realization of 94% on regional rates on
the work that is billed by the hour (excluding the retainers which are covered
in paragraph 3). This is completely consistent with firm metrics and should be
possible in light of the rate increases implemented earlier this year so long
as there are no billing and collection issues. The goal for 2005 will be
adjusted to reflect the ongoing rate increases set forth in paragraph.

3. Retainers-The time logged to the retainers should be limited to the work
that we were retained to do and nothing else. The practice of using the
retainers to cover business development and write off of other matters should
be discontinued. There is a wealth of management information included in write
offs and business development that is lost when aggregated or transferred to
the retainers. In addition, all the work which is appropriately logged to the
retains should be so logged. It is expected that the retainers, in the
aggregate, would produce a premium of at least 300,000 in 2004 which is a fair
reflection of the value of the services that we are providing under the
retainer.

4. Billing and Collections-I am now aware of some of the complexities of the
billing process with our Korean clients, particularly           Rather than set
targets separately for billing and collections, the target  that we discussed
and agreed to is  to be paid in full for all services billed by the hour within
75 days after the close of the month on time logged through September 30 and to
be paid in full for all time logged through October 31 by the end of the year

CONFIDENTIAL

AK003250

(60 days). Once again, this performance is consistent with firm metrics and would greatly assist in our cash flow management. The retainers, which are fixed fee amounts should be paid within 30 days of the end of the month. Most of our retainers are actually paid in advance. I know that this is not the normal procedure with our Korean retainers, so I am not asking to change the relationships. However, 30 days ought to be sufficient since  there is no bill for us to prepare or for them to review. It is simply a matter of how long payment will be delayed for processing.

5. Personnel actions- We have discussed at least two personnel actions that need to be addressed immediately. Gross ought to be resolved by October 31 and by year end.

6. Projections-We hope to have an aggregate of 20 million in revenue in 2004 for our entire Korean practice which would represent a 30% increase over 2003. This would be a terrific result.

As discussed we will regularly meet to evaluate the practice performance and I would expect full cooperation with the billings and collections committee consistent with the goals set forth herein. One item that we did not discuss previously is separate accounting for the Korea practice a working attorney and billing attorney basis. I think that this will assist us greatly in managing the practice effectively and profitably. Let's get together to discuss all of this when I return from vacation at the end of the month.

REDACTED

CONFIDENTIAL                                                                    AK003251

From: Slater, Val
Sent: 2/26/2004 10:19:40 AM (Eastern Time)
To: McLean, Bruce
Subject: RE: Korea Issues

Thanks, Bruce. I agree completely, but I am not (of course) in a position to
argue with Sukhan about how the Korea Practice gets structured. Let me know if
there's anything I can do to help with this. I would like to keep at least half
of David's time in our group, if possible. He's a gem--a very rare gem-- and I
don't want to have him or his career get lost in the shuffle.

    -----Original Message-----
From:  McLean, Bruce
Sent: Thursday, February 26, 2004 9:07 AM
To: Slater, Val
Subject: RE: Korea Issues

This presents a real dilemma. I do not want to carry either of them at a
reduced FTE. Their productivity is what it is-a cost of doing our business. The
accounting data, which everyone seems to put too much stock in, reflects
reality. The difficulty is as you suggest. If the data is a management tool, it
is corrupted if it includes costs and productivity you cannot manage. Inclusion
of Don and David in your reporting masks the performance of your group and
intrudes on your ability to manage effectively. The data should be reported to
those who do have the ability to manage David and Don. I, for one, think that
we ought to report the Korean practice group separately. I would consider
"informal" reporting with Sukhan, David and Don also carried in general, James
Lee also carried in lit, Mike a carried in tax and Jay and Jaemin also carried
in corporate. Without the aid of separate reporting, the Korea practice is far
more difficult to manage. We simply don t know whether we are using our people
and resources effectively.

    -----Original Message-----
From:  Slater, Val
Sent: Wednesday, February 25, 2004 7:36 PM
To: McLean, Bruce
Subject: Korea Issues
Importance: High


Bruce: Sorry to bother you with this, but one topic I meant to mention to you
yesterday, (but forgot!) is the status of Korea practice development personnel.
I am carrying on my section "books" Don Gross, who is working full time at
Korea practice development and who is billing only about 20-30 hours a month.
We originally parked him in our section on the express understanding (which
Warren correctly insisted upon) that he would be kept fully billable, which he
was for a while. Since last fall, however, he is down to next to nothing. Also,
one of our star counsels, David Park, has been assigned now to spend a
substantial portion of his time on nonbillable Korea Practice development,
which is a very reasonable use of his considerable talents. These two changes
have a dramatic impact on our performance indicia, and make it difficult for me
to see what is really happening. Ideally, Don should be moved out of our group
entirely, as he is not doing our work, and I have no control over (or knowledge
of) how he spends his time. David, who is eligible for partnership next year,
is a superstar, and I would like to keep him in our group, principally so  I



can keep an eye on his professional development.  Ideally, we would make him a 40 or 50% FTE. Sukhan does not want to move either one of them (he tells me that he does NOT want a separate Korea practice group created) and wants to leave them where they are, but would be happy to have Don Gross carried as a 0% FTE and David reduced to a 40 or 50% FTE.  For my part, I have been trying to have this issue addressed for months, and would like to get it resolved. The current state of affairs may be fine for Sukhan, and we certainly want to support his efforts, but the current arrangement leaves our small group with two apparently "Nonproductive" members.   I know Rick mentioned this to you last week, and that you would be looking at the situation this week, so I just wanted to mention what the current state of affairs means for our group.

Please let me know if I can provide any information that would be useful in getting this addressed.

CONFIDENTIAL

From: McLean, Bruce
Sent: 7/9/2004 2:18:36 PM (Eastern Time)
To: Burdick, Rick
Subject: RE:

I agree and will insist on it.

-----Original Message-----
From: Burdick, Rick
Sent: Friday, July 09, 2004 2:19 PM
To: McLean, Bruce
Subject: Re:

Ok. After this I am unplugging again (but for craig).  One thought is to use
this as an opportunity to set up a sep practice group to get the numbers more
transparent and force dealing with some of the idle resources, like don gross.



PLAINTIFF'S
EXHIBIT 49
McLEAN
8-30-07    RLS

CONFIDENTIAL

AK002614

# EXHIBIT 3

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

1 (Pages 1 to 4)

---

**1**

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF COLUMBIA
3
4    DONALD G. GROSS,
5         Plaintiff,      Civil No.
6    vs.                  07-399 (EGS)
7    AKIN GUMP STRAUSS HAUER & FELD LLP,
8         Defendant.
9            - - - - -
10    VIDEOTAPED DEPOSITION OF SUKHAN KIM
11            Washington, D.C.
12            September 7, 2007
13    The videotaped deposition of Sukhan Kim was
14    convened on Friday, September 7, 2007,
15    commencing at 10:07 a.m., at the offices of
16    Webster Fredrickson Henrichsen Correia & Puth,
17    1775 K St., N.W., Suite 600, Washington,
18    D.C., before Paula G. Satkin, Registered
19    Professional Reporter and Notary Public.
20    Job No. 1-109382
21    Pages 1 - 168
22            - - - - -

---

**2**

1         A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4    JONATHAN C. PUTH, ATTORNEY AT LAW
5    KATARYNA L. BALDWIN, ATTORNEY AT LAW
6    WEBSTER FREDRICKSON HENRICHSEN
7    CORREIA & PUTH, PLLC
8    1775 K Street, N.W., Suite 600
9    Washington, D.C. 20006
10    (202) 659-8510
11
12    ON BEHALF OF THE DEFENDANT:
13    CHRISTINE NICOLAIDES KEARNS, ATTORNEY AT LAW
14    PILLSBURY WINTHROP SHAW PITTMAN, LLP
15    2300 N Street, N.W.
16    Washington, D.C. 20037
17    (202) 663-8000
18
19
20    and
21
22

---

**3**

1         A P P E A R A N C E S (Cont'd)
2
3    JULIE STUMPE DRESSING, CHIEF HUMAN RESOURCES
4    OFFICER and HUMAN RESOURCES COUNSEL
5    AKIN GUMP STRAUSS HAUER & FELD LLP
6    Robert S. Strauss Building
7    1333 New Hampshire Avenue, N.W.
8    Washington, D.C. 20036-1564
9    (202) 887-4000
10
11    ALSO PRESENT:
12    DAVID BAYLES, VIDEOGRAPHER
13
14
15
16
17
18
19
20
21
22

---

**4**

1            C O N T E N T S
2
3    SUKHAN KIM            EXAMINATION
4
5    BY MR. PUTH.........................6
6
7    AFTERNOON SESSION...................98
8
9         E X H I B I T S
10
11    EXHIBIT NO:          PAGE NO:
12
13    51 - E-mail, 10/13/04................76
14    52 - E-mail, 10/15/04................81
15    53 - E-mail, 9/24/04................93
16    54 - E-mail, 8/12/04................99
17    55 - E-mail, 9/20/04................103
18    56 - E-mail, 9/27/04................108
19    57 - Dept of Commerce article.......120
20
21    ** Exhibit retained by counsel.
22

---

Case 1:07-cv-00399-EGS    Document 31-5    Filed 11/02/2007    Page 3 of 14
VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

14 (Pages 53 to 56)

53

1  project?
2      A.  No.  As I mentioned earlier, it is
3  a fixed fee amount, so if you exceed it then we
4  lose.
5      Q.  Okay.  What other types of work
6  for that major client were billed apart from the
7  retainer to the client?
8      MS. KEARNS:  I object to the form
9  of the question to the extent you're asking him
10  to reveal what kind of work that client asked
11  the firm to do.
12      MR. PUTH:  Well, I think -- I
13  think we can get around any concerns based upon
14  even publicly available information.
15      For instance, you represent this
16  major client on International Trade matters;
17  don't you?
18      MS. KEARNS:  Okay.  That might
19  help.  Because your -- the form -- or the
20  content of your prior question called for
21  instructions from the client.  If your question
22  is what disciplines of law did we handle for

54

1  that type of client, that might be helpful.  For
2  example, litigation or International Trade, real
3  estate.  Is that what you're asking?
4      MR. PUTH:  I'm asking -- I'm not
5  confining it to disciplines of law, because
6  there may have been work that was not within a
7  particular discipline of law that was done for
8  the client.  I'm asking for what types of work
9  was done for the client that -- without getting
10  into client confidences.
11      THE WITNESS:  I understand.
12  BY MR. PUTH:
13      Q.  That is billed separately from the
14  retainer?
15      MS. KEARNS:  Okay.  And I would
16  just caution the witness to the extent you can
17  answer that question without revealing any
18  client confidences, you can.  But your client
19  has not waived their privilege, so any types of
20  work the client has asked you to do, that is
21  anything, but what I would think is quite
22  generic you would be prohibited from revealing.

55

1      THE WITNESS:  I'm a lawyer, so,
2  yeah, I'm not going to divulge my client.
3      MS. KEARNS:  I'm obviously not
4  lecturing you.  I'm making a record to make it
5  clear.
6      MR. PUTH:  And I think that goes
7  for the whole deposition, as well.  I think
8  that's --
9      THE WITNESS:  Yes.  In response to
10  your question, tax.  One is tax area, and the
11  other one is litigation and International Trade.
12  BY MR. PUTH:
13      Q.  Okay.  All right.
14      And do I understand correctly that
15  for matters that Don Gross was not working on
16  billable client matters that you instructed
17  Mr. Gross to log his time against the retainer?
18      A.  If and only if he has to meet the
19  billing requirement.
20      Q.  Okay.  And that included work
21  developing and managing the Korea Practice
22  Group; is that right?

56

1      A.  Developing and managing?
2      Q.  Yes.
3      A.  Who is developing and managing?
4      Q.  You said assisting Mike Quigley.
5      What did you mean by that?
6      A.  Well, Mike Quigley is the head of
7  -- was functioning as head of this group but, as
8  I mentioned, it's really loosely, I mean really
9  informal group.  So when Don came on board I
10  said, why don't you try to have regular
11  meetings.  And so basically we asked Don to set
12  up meetings and prepare agenda for the meetings.
13  And after the meeting, write minutes of the
14  meeting and then also discuss action items that
15  we agreed to do.  So basically we also asked him
16  to lead the discussion at the meeting.  But Mike
17  Quigley under really his leadership and
18  guidance, so basically he was in terms of
19  administering the group at meetings, also Korea
20  website.
21      Q.  Right.
22      A.  So basically, we want to do

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

6 (Pages 21 to 24)

21

1    A.   Yes. I don't deal with hiring and
2    firing, at all.
3       Q.   I understand.  Why did you
4    recommend -- did you recommend the hiring of Don
5    Gross?
6       A.   Yes. I did.  Yes.
7       Q.   And why was that?
8       A.   There was several reasons.  First,
9    I liked him.  I think -- I came away feeling
10   good about him.
11           It sounds really nonprofessional,
12   but second reason is that he told me about his
13   upcoming surgery in the interview.  And
14   basically he told me that he left Korea because
15   he need some medical treatment in the United
16   States.  And so I asked him, when, and he said,
17   I don't know exactly, but he said, sometime
18   like -- I don't -- I thought the time frame, but
19   he said six, seven, eight months, or whatever.
20   And in the interview people normally do not,
21   based on my experience, divulge the fact that he
22   or she has to have a major surgery.  So that, I

22

1    liked it, and then I said, do you have
2    insurance?  He said, no.  I said who is going to
3    pay for it?  He said, I will pay for it.  And I
4    should have stopped there, but I said, how much
5    will it cost?  And my recollection is he said
6    $70 to $80,000.  And, that's a lot of money
7    and you have to pay out of your pocket.  He
8    said, yes.  I said, do you have a job now?  He
9    said, no.  So that was one of the reasons I
10   decide to recommend him.
11           And then, third, I told -- I asked
12   him whether he felt that he was too senior to
13   take on the kind of assignment I had in mind,
14   and so we talked about it.  And then he came
15   back and he said, I hope you don't use my age
16   and my experience against me.  I thought that
17   was a really quick, good come back, and quick on
18   his feet.  So after that I stopped, and so those
19   three reasons, but I have to add one more.
20           I was hoping -- I was trying to
21   hire a person or have the firm hire a person to
22   do really sophisticated policy work, which I do

23

1    all the time.  And I went through a number of
2    interviews, and nothing really panned out.  And
3    Don came to my attention, and given his
4    background, which was very impressive, White
5    House, State Department, and given his
6    experience, I thought there might be a chance
7    that he could perform.  But because he didn't
8    have major training -- training at a major law
9    firm, I wasn't positive that he would do -- be
10   up to the task.  Nonetheless, I was hopeful that
11   he would be able to do that.  So these are the
12   reasons why I decide to recommend that the firm
13   hire him.
14       Q.   All right.  Now, you -- maybe we
15   can break that down, because I did want to ask
16   you specifically about the interview, which I
17   know you covered to some extent in your answer
18   there.
19           I think you mentioned first that
20   he had told you about some upcoming surgery; is
21   that right?
22       A.   Yes.

24

1       Q.   And that it was sometime off into
2    the future?
3       A.   Yes.  He told me.  He referred to
4    months, but I forgot.
5       Q.   Months into the future?
6       A.   Yeah, yeah, of course.
7       Q.   And then -- that he did not have
8    insurance?
9       A.   Yes.
10      Q.   And that it would cost many tens
11   of thousands of dollars.  I think you mentioned
12   $80,000?
13      A.   The number I remember is $70 to
14   $80,000.  That's the number I recall.
15      Q.   Okay.  And I think you mentioned
16   another thing that you recall from the
17   interview, that you asked him if he was too
18   senior for the work?
19      A.   Right.
20      Q.   And what did you mean by that?
21      A.   When I say senior?
22      Q.   Yes.

Case 1:07-cv-00399-EGS     Document 31-5     Filed 11/02/2007     Page 5 of 14
VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

7 (Pages 25 to 28)

**Page 25**

1  A.  Well, as you -- as you know, I'm
2  sure, at a law firm you look at the year of
3  graduation. That's how we are trained, and so I
4  knew because I reviewed his resume. I knew he
5  had been out of law school for at least 20 some
6  years and then, so that's really why I thought
7  senior, because I was thinking about I was
8  trying to hire a lawyer who was about coming out
9  of law school for five to maybe 10 years. And
10  so that's what I meant.
11      Q.  Okay. And you mentioned, I
12  believe, the need to do policy work?
13      A.  Uh-huh. Yes.
14      Q.  What do you mean by that?
15      A.  Policy work, I mean there's two
16  types of really writing, in my view, my personal
17  view, one is monetary and reporting.
18          Policy memo is really try to
19  monitor developments and find out what's going
20  on and synthesize it, and analyze it, and
21  discuss trend. And in light of a particular
22  trend, what would the implications. For

**Page 26**

1  example, my client and the implications and
2  therefore, what kind of steps my client ought to
3  take to address the certain issues and so,
4  therefore, making recommendations. So it's
5  really sophisticated analysis and giving our
6  advice. And so that's what I meant when I say
7  policy work.
8      Q.  What aspects of Don Gross's
9  background would you think would serve your
10  interest in having effective policy work done?
11      A.  First of all, his experience,
12  White House and State Department.
13          And another point that was good as
14  far as I was concerned, good for him, was that
15  he was in Korea at Kim & Chang, a great law
16  firm. I believe he was there for about
17  two years. And so I felt that he knew something
18  about Korea and then also he spoke Korean, which
19  is very rare in my view. He doesn't speak
20  fluent Korean, but pretty decent.
21          Then also, based on my interview,
22  we talked about policy work and he said he can

**Page 27**

1  do that. So that's the reason.
2      Q.  Now, the work that you do for your
3  client, I imagine there is strictly legal work,
4  like International Trade disputes; correct?
5      A.  No.
6      Q.  You don't do International Trade
7  disputes?
8      A.  I used to.
9      Q.  Used to?
10     A.  Right, but not anymore.
11     Q.  That's work that David Park has
12  done; correct?
13     A.  And also the entire Trade section.
14  Yes.
15     Q.  Okay. And you spoke of trends and
16  the need to recognize trends?
17     A.  Right.
18     Q.  And to be able to write
19  effectively about those. What do you mean by
20  trends?
21         Are those political trends,
22  social?

**Page 28**

1          What sort of trends would you --
2  were you looking for Don Gross to identify to
3  best serve your clients?
4      A.  Well, you know, vis-a-vis Don, I
5  was not thinking of a particular topic or
6  particular memo, just someone who can handle
7  sophisticated trade policy memos. And in my
8  case, often it relates to trade, U.S./Korea
9  trade policy and also U.S. political trend.
10         For example, in terms of upcoming
11  election, we believe, for example, Mr. Bush will
12  be elected. If that's the case, there are
13  certain trends why we believe he will be
14  elected. But mostly it was trade and also
15  business issues.
16     Q.  Okay. So would that involve
17  treaties?
18     A.  What kind of -- what do you mean
19  by treaties?
20     Q.  Trends with respect to trade,
21  would that involve treaties that might be struck
22  between, for instance, Korea and the United

33
1  we do and why we are interviewing him. And so
2  then he said that he can do the type of policy
3  work that we had in mind.
4      I asked him when he could start
5  and then we -- oh, yes, we briefly touched on
6  his compensation because I had to make a
7  recommendation to the firm. His compensation.
8      Q.  And you recommended $250,000?
9      A.  Yes. And then also his term. We
10  talked about his term, one year term.
11      Q.  And what did you discuss about his
12  term?
13      A.  This is my recollection. I told
14  him that based on my experience it would be a
15  daunting task for anyone to come into a major
16  law firm and do the kind of policy work that we
17  had in mind, because he didn't have training in
18  a major law firm.
19      I told him that I hired someone
20  like him, almost same background, from the U.S.
21  Government and it didn't work out. And also we
22  hire people from Commerce and often they don't

34
1  work out.
2      So I told him, it's really a
3  matter of training, not matter of intelligence.
4  And because of that, we had a lot of concerns.
5  And so why don't we do it for a one year deal
6  and then, based on your performance, if you do
7  well then, of course, we'll ask you to stay.
8  But if not, it will be a one year deal. So that
9  we addressed.
10      Q.  Okay. Was there anything else?
11      A.  I don't recall.
12      Q.  And so you described your
13  interview with Mr. Gross and Mr. Quigley and
14  you; is that right?
15      A.  Yes.
16      Q.  Was there any other interview that
17  you had with Mr. Gross?
18      A.  No.
19      Q.  Did you have any discussions --
20  well, who else did you have discussions with
21  regarding the prospect of hiring Don Gross?
22      A.  Well, Mike Quigley was functioning

35
1  as the head of the section -- not the section,
2  this Korea Practice Group. So I talked to
3  Quigley and I asked him to talk to Quigley, and
4  I asked him to talk to Dennis Race, the
5  hiring -- he's the Chairman of the Hiring
6  Committee. I asked Mike Quigley to talk to
7  Dennis Race and then also Bruce McLean and
8  then --
9      Q.  I'm sorry, did you instruct Mike
10  Quigley to speak with Bruce McLean; is that what
11  you're saying?
12      A.  No. Mike Quigley was the head of
13  the -- was running it because we met with him.
14  Basically, I was really hands off. I was hands
15  off because I had other plans. And so Quigley
16  was running it as the head. But to be sure, I
17  built that practice, and it deals with Korea so
18  Quigley comes to me very often. We discuss and
19  he defers to me also on many issues pertaining
20  to Korea.
21      So I asked Mike Quigley because he
22  handles other things on my behalf and on behalf

36
1  of the group. I raised one issue about the
2  billing requirement. So for that, according to
3  my recollection, I told Quigley I will deal on
4  the billing issue with somebody else. But
5  basically it was Mike Quigley who talked to
6  other people. I don't know really who he talked
7  to.
8      Q.  Okay. Did you and Mr. Quigley
9  discuss any concerns you had about Mr. Gross's
10  performance, about his job, being able to do the
11  job?
12      A.  Yes.
13      Q.  And what was that discussion
14  about?
15      A.  Well, I really feel bad saying
16  this in front of him. I told Mike Quigley that,
17  based on my experience, that the odds of his
18  making it I think are probably below 25 percent
19  and Mike agreed. But I said, let's give it a
20  try, let's make it work because we need someone
21  to do the policy work. So in that regard we
22  shared our concerns.

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

11 (Pages 41 to 44)

41

1  Korean practice and the new addition, of course
2  that would come up, but it was Mike Quigley.
3      Q.  But I'm speaking of the decision
4  to hire Don Gross?
5      A.  No.  It was Bruce McLean
6      Q.  Did you speak personally with
7  Bruce McLean prior to Don Gross being hired?
8      A.  Prior to Don Gross being hired?  I
9  have to guess.
10     MS. KEARNS:  No.  You can't guess.
11  He just wants to know do you remember speaking
12  to Bruce McLean or not.  No guessing, no
13  supposing, no reconstructing.  Do you remember
14  talking to Bruce McLean before Mr. Gross was
15  hired?  If it helps, counsel can give you the
16  date of that.  If you don't know, you don't
17  know, it's okay.
18     THE WITNESS:  The reason why I'm
19  asking is that, I mean, I discussed it with him,
20  but I don't recall.  That's why I'm asking.
21  Something that -- he's a new addition and Bruce
22  is my chairman and when I meet with Bruce, I'll

42

1  talk about him, that's my natural inclination,
2  but in terms of timing.  So of course I did, but
3  in terms of timing, I'm not sure.  That's what
4  I'm saying.
5  BY MR. PUTH:
6      Q.  I understand.  I understand that
7  after Mr. Gross was hired you certainly
8  mentioned Mr. Gross and discussed Mr. Gross from
9  time to time with Bruce McLean; is that right?
10     MS. KEARNS:  Object to the form of
11  the question.
12     THE WITNESS:  No.  I have no
13  reason to discuss Don Gross really with Bruce
14  McLean because --
15  BY MR. PUTH:
16     Q.  Fair enough.  I guess what I was
17  getting at before is whether you discussed
18  whether or not Don Gross should be hired with
19  Bruce McLean?
20     A.  I just, as I mentioned to Quigley,
21  I met, and we want to give it a try.  So, as I
22  also mentioned I really was trying to phase out.

43

1      Q.  You were taking a hands off
2  approach?
3      A.  Yes.  Very much.
4      Q.  As far as the decision to hire Don
5  Gross, you -- do you recall speaking with
6  anybody aside from Mike Quigley as to whether or
7  not to hire Don Gross?
8      A.  No.  Not on that one, but
9  different setting I did, with Warren Connelly.
10     Q.  With Warren Connelly?
11     A.  Yes.
12     Q.  And what did you discuss with
13  Warren Connelly?
14     A.  Again, I don't know the timing,
15  but I -- he needed to belong to a section
16  because of his background, and so basically we
17  need to find him a home.  And I thought the
18  International section would be the only one.  So
19  I talked to Warren Connelly.  Basically, I told
20  Warren about him and Warren says, but we have
21  this billing requirement, so I gave him my word.
22  I said I'll make sure he bills, I don't know,

44

1  2000 -- 2000 -- I don't have the exact number,
2  but I told him he got to do that.  So I promised
3  Warren that I will do so.  So in that context I
4  discussed Donald Gross.
5      Q.  I see.  And Mr. Connelly agreed
6  that Don Gross could have a place in the
7  International Trade Group?
8      A.  If I fulfill my commitment.
9      Q.  I understand.  Did you ever have
10  any further discussions with Warren Connelly
11  about Don Gross's billable hours?
12     A.  I don't recall.
13     Q.  You don't remember any?
14     A.  I'm not saying I didn't, but I
15  don't remember.
16     Q.  Okay.  I understand.
17         Now, did you yourself have a
18  discussion with Don Gross after he began about
19  how he should bill his time?
20     A.  Yes.
21     Q.  What was that discussion?
22     A.  About billing in general?

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

16 (Pages 61 to 64)

61

1    history, how it started.
2        Q.   All right.  So I want to get back
3    to business development or Korea Practice Group
4    development.  We talked about holding meetings
5    with the Korean Practice Group; is that right?
6        A.   Yes.  Trying to meet a couple
7    times a month, at least.
8        Q.   And how did that go?
9        MS. KEARNS:  Object to the form of
10   the question.  If you can answer it, you can.
11       THE WITNESS:  Not well.
12   BY MR. PUTH:
13       Q.   And why not?
14       A.   Why not?  Well, basically I didn't
15   find it to be very productive, so that -- in
16   summary, yes, that's the reason.
17       Q.   Were there aspects to the meetings
18   that were productive?
19       A.   When we meet and exchange
20   information, some aspects would be productive,
21   but overall it was not productive because our
22   goal was to expand business, but nothing really

62

1    transpired.
2        Q.   I see.
3        And what did you observe that was
4    not productive?
5        A.   As I mentioned, we would meet but
6    in terms of new business, nothing really
7    developed and so our time is our money and so
8    that is one reason.
9        And, secondly, the meeting was not
10   really being run effectively because we didn't
11   find it to be productive, so it was basically --
12   I don't know when it stopped, but it stopped
13   more or less or we began to meet much, much
14   less.
15       Q.   And was that -- did you suggest
16   that you meet less?
17       A.   I think -- as I said, Quigley
18   really was running it.  And Quigley and I
19   discussed it and we both thought that the
20   meetings were not productive at all.  Then after
21   that I don't know, really.  Just tail it off.
22   Yeah.  Just tail it off.

63

1        Q.   Do you understand that Don Gross
2    was informed that meetings should not take place
3    with as much frequency?
4        A.   I don't know.
5        Q.   You don't know?
6        Did you have discussions with Don
7    Gross about developing clients and the process
8    of developing clients?
9        A.   Yes.
10       Q.   I gather he did not come with
11   client's portable business with him when he came
12   to Akin Gump; right?
13       A.   No.
14       Q.   He had largely a Government
15   background; right?
16       A.   Right.
17       Q.   Did you have any discussions with
18   him about that process and how it should be
19   undertaken?
20       A.   About business development?
21       Q.   Yes.
22       A.   I don't recall the detail, but we

64

1    talked about the need to develop business.
2        Q.   All right.
3        A.   Right.
4        Q.   Do you recall anything further?
5        A.   As mentioned, the group's number
6    one focus is to expand the business, so that's
7    number one goal.  I'm sure that we discussed it,
8    but mostly it was with Mike Quigley.  So if I
9    discussed it with Don it would be on a very,
10   very limited context, Because that's not why he
11   was hired for.
12       Q.   I'm sorry?
13       A.   That's not why he was hired for.
14       Q.   What do you mean by that's not why
15   he was hired?
16       A.   As I mentioned, the firm hired him
17   to do the policy work, not really to the
18   business, but if he can develop business, that's
19   fine, that's fine.
20       Q.   Okay.
21       MS. KEARNS:  Mr. Puth, I wonder if
22   we can take a very short break?

65

1      MR. PUTH:  That would be fine.  We
2  can go off the record.
3      THE VIDEOGRAPHER:  Going off the
4  record.  The time is 11:09 a.m.
5      (A brief recess was taken.)
6      THE VIDEOGRAPHER:  Back on the
7  record.  The time is 11:22 a.m.
8  BY MR. PUTH:
9      Q.  Mr. Kim, did you have any
10  discussions with Don Gross about the development
11  of the Russian Practice Group at Akin Gump?
12      A.  I don't recall.
13      Q.  Do you ever recall anybody
14  presenting the idea that perhaps the manner in
15  which the Russia practice of Akin Gump was
16  developed could serve as a template for further
17  development of the Korea practice?
18      A.  I don't recall.  No, I don't.
19      Q.  Okay.  Do you recall Don Gross
20  doing a white paper for business development of
21  the Korea practice?
22      A.  White paper, you mean -- what do

66

1  you mean by white paper?
2      Q.  Like -- it was a document that was
3  referred to as a white paper that was
4  essentially a strategy memorandum for expanding
5  the Korea practice?
6      A.  I do not believe that he has done
7  such a memo.
8      Q.  Okay.
9      A.  He has done a memo that's almost
10  the same as the website to tell the clients what
11  the Korea practice is about, but not a strategy,
12  that would be separate.
13      Q.  Well, you talked about the policy
14  work.  I gather that Mr. Gross did some work in
15  furtherance of your practice on behalf of your
16  clients in the Korea practice?
17      A.  In terms of business development
18  or actual --
19      Q.  No.  I mean in terms of memoranda,
20  policy memoranda?
21      A.  Yes.
22      Q.  Okay.  And how did he do on those?

67

1      A.  On those policy memorandums, he
2  didn't do very well at all.
3      Q.  What specifically were the
4  problems?
5      A.  It needed just revision.
6      Q.  And any further specifics on
7  problems with policy memorandum?
8      A.  It just was not done right.
9  That's all I can tell you.
10      Q.  Do you have any specific reasons
11  why you think it wasn't done right?
12      A.  Oh, as I told you earlier, it's an
13  analysis, which means that you discuss issues,
14  implications and also in a well organized
15  fashion.  And so, basically, when you see a memo
16  it has to have logical connections and just
17  giving advice in a succinct manner.  So
18  basically I would call this sophisticated policy
19  memo.  On those he didn't fare well.
20      Q.  Were there contributions -- was
21  there good contributions that you felt Don Gross
22  made to the Korea practice during his time

68

1  there?
2      A.  Yes.
3      Q.  And what were those?
4      A.  He created a website, Korea
5  website, and for, I don't know the exact time
6  line, but for four or five months or so he tried
7  to organize Korea meetings on a regular basis.
8  And then on a few developments, I guess business
9  prospects, he would write memos.
10      Q.  And did you think those went well?
11      A.  Yes, because these are basically
12  nonlegal areas.  So when it came to those areas
13  I always felt that Don did a decent job.  So in
14  that respect, yes, he made contributions.
15      Q.  Now you -- do you understand that
16  Don Gross had begun with Akin Gump in July 2003?
17      A.  Yes.
18      Q.  Okay.  And left Akin Gump at the
19  end of October 2004?
20      A.  Yes.
21      Q.  During the 2003 time frame, did
22  you maintain regular contact with Don Gross via

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

28 (Pages 109 to 112)

109

1  you meet with Mr. Gale or his associates in
2  relation to Exhibit 56?
3      A.  I met them earlier in New York.
4      Q.  Okay.  Not in September?
5      You mean at an earlier time?
6      A.  I mean, it has to be earlier than
7  September 27th.  Yeah.
8      Q.  Okay.  Does Deposition Exhibit 56
9  refer to a telephone call then, as far as to the
10 extent it refers to discussions?
11     MS. KEARNS:  Can you just show me
12 where you're referring to on the document, where
13 the telephone calls?
14     THE WITNESS:  The second page?
15 BY MR. PUTH:
16     Q.  How about on the very first page,
17 the very top, where your reply says, "I, too,
18 appreciated very much the opportunity to discuss
19 the various issues with you today?"
20     A.  Okay.
21     Q.  Do you think that refers to a
22 telephone call?

110

1      A.  Yes.
2      Q.  Okay.  And does Exhibit 56 also
3  refer to a planned visit by you to Gale's
4  offices in Seoul?
5      A.  Yes.  He talked about me visiting
6  his office in Seoul, but I did not have the time
7  to do that.
8      Q.  Ultimately, you did not do that?
9      A.  I did not do that.
10     Q.  Did anyone from the Korea Practice
11 Group or associated with the Korea Practice
12 Group go to Seoul for this meeting?
13     A.  Just for this meeting?
14     Q.  Yes.
15     A.  I don't think so.
16     Q.  Did Mr. Gale or any of his
17 associates say anything to you in September of
18 2004 that led you to believe that they may not
19 be interested in Akin Gump's services?
20     A.  I don't recall the time line, at
21 all.  I just received a note from him proposing
22 such an amount, which I rejected.

111

1      Q.  Okay.  As far as I can tell that's
2  not a note which we've received, which would be
3  pertinent.  And I would ask you to look for it
4  if it has not been produced.
5      Does that sound fair?
6      MS. KEARNS:  Okay.
7      MR. PUTH:  Thank you.  All right.
8  You can set aside Exhibit 56 and the other
9  exhibits.  Thank you.
10 BY MR. PUTH:
11     Q.  Mr. Kim, you worked with an
12 attorney in the Los Angeles office of Akin Gump
13 named
14     A.  Yes.
15     Q.  And do you recall that Mr.
16 left Akin Gump in 2004?
17     A.  I don't know -- I don't know the
18 date, but he did.  Yes.
19     Q.  Why did Mr.        leave Akin Gump;
20 do you know?
21     A.  Yes.  There were two reasons.
22 First, he was not being productive and, second,

112

1  he took an action that we believe was not
2  proper, appropriate.  So those two reasons.
3      Q.  Okay.  And do I understand
4  correctly he contacted a major client of Akin
5  Gump about the possibility of being represented
6  by him at a different and new law firm?
7      A.  Yes.
8      Q.  Do you understand that        was
9  planning to go to
10     A.  No.
11     Q.  And what discussions did you have
12 with any other partners at Akin Gump regarding
13         and his departure?
14     A.  Basically, Quigley and also once
15 or twice with David Park.
16     Q.  Okay.  What was the substance of
17 those conversations?
18     A.  Basically, we felt that he was not
19 being productive, and also not being loyal.
20     Q.  All right.  Did you discuss his
21 productivity and his loyalty in the same
22 conversation?

REDACTED

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

33 (Pages 129 to 132)

129

1        THE WITNESS:  Clearly.  Yes.
2   BY MR. PUTH:
3        Q.    And if -- is it your observation
4   that Koreans may be apt in social settings to
5   ask a relative stranger what their age is?
6        A.    Yes.
7        Q.    Is that relatively common in Korea
8   from what you've seen?
9        A.    Yes.
10       Q.    And that would be a difference
11  from American culture; correct?
12       A.    In my view.  Yes.
13       Q.    Did you recommend termination of
14  Don Gross?
15       A.    Don's termination?
16       Q.    Yes.
17       A.    No.
18       Q.    No?
19       A.    No.
20       Q.    Did you discuss Don's termination
21  with anyone else at Akin Gump?
22       A.    No.

130

1        Q.    Did you meet with Don Gross about
2   the decision to terminate his employment?
3        A.    When the firm made a decision,
4   yes, I have.
5        Q.    We'll come back to that.
6        A.    Okay.
7        Q.    How about -- if I understand you
8   correctly, you didn't have a discussion with --
9   you're saying you didn't have a discussion with
10  Bruce McLean about Don Gross' termination?
11       A.    When?
12       Q.    Prior to his termination?
13       A.    No.
14       Q.    And did you discuss the
15  possibility of terminating Don Gross with Mike
16  Quigley?
17       A.    No.
18       Q.    And that's prior to the time the
19  decision was made to terminate him?
20       A.    I don't recall the timing, but
21  basically, the reason why I keep saying no is
22  that I was trying to keep him there, trying to

131

1   find a position there and tried to extend it.
2   That would be contrary to termination.
3        So, from one perspective, I don't
4   know how you see it, but as I see it, I was
5   trying to find a place at Akin Gump where there
6   might be a suitable position for Don because Don
7   has certain talents.  So I was looking for that
8   position.
9        And then, second, at the same time
10  I tried to extend his stay as long as I could,
11  so instead of firing, I was trying to keep him
12  there as long as I can at Akin Gump.
13       Q.    Now, I want to get back to a
14  meeting that you had with Don Gross.  Let's say
15  the first meeting that you had with Don Gross in
16  which the subject of his departure from the
17  Korea Practice Group was discussed.
18       Do you have a recollection of
19  that?
20       A.    Without Don?
21       Q.    With Don?
22       A.    Yes.  I do.

132

1        Q.    And?
2        A.    In my office.
3        Q.    Do you know when that was?
4        A.    I would have to guess, but summer.
5        Q.    Don't guess.
6        A.    Don't guess.  Okay.
7        Q.    What's your best estimate?
8        MS. KEARNS:  Best memory.
9        THE WITNESS:  Best memory.  July
10  or August.
11  BY MR. PUTH:
12       Q.    Okay.  Of 2004?
13       A.    Yes.
14       Q.    And what do you recall about that
15  meeting with Don Gross?
16       A.    I told him that McLean said he had
17  to leave.  And he gave me a certain date, but I
18  don't recall, whether it's the 16th or 30th, I'm
19  not sure.  And then I told him that, but since
20  he has no job, I'll try to go back to Bruce and
21  try to extend it as long as I could.  And then
22  I -- in other words, tell you what we discussed.

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

34 (Pages 133 to 136)

133

1      Q.   Yes, absolutely.  This is in your
2    first meeting with Don Gross following -- in
3    which you conveyed that he was being terminated?
4      A.   Right.  Then I expressed my
5    regret, my disappointment, that it didn't work
6    out.  And I told him that he had a certain
7    talent, but I think it was not a good fit for
8    him.  So I told him that I'm sure elsewhere, a
9    think tank or a law firm in Korea, places like
10   that, where they don't engage in sophisticated
11   analytical policy work, I thought that he might
12   do well and so --
13     Q.   Did you state that to him?  That
14   maybe some place where they don't engage in
15   sophisticated analytical policy work?
16     A.   I said different level of work and
17   policy work.  I don't believe I used the word,
18   sophisticated.  I said policy work or different
19   types of work.  And I said that Korea -- in
20   Korea the standard is lower than major U.S. law
21   firms.
22     Q.   You told him that?

134

1      A.   Yes.  I told him I thought that he
2    could do well in Korea.
3      Q.   Okay.  Do you recall what
4    Mr. Gross said in response?
5      A.   He -- it's my recollection, he
6    thanked me for trying to extend it and trying to
7    find a position for him.  And he will work with
8    me in his effort to find a job and, but he was
9    clearly disappointed.
10     Q.   Did you discuss with him the
11   possibility of working somewhere else in Akin
12   Gump?
13     A.   Other than Akin Gump?
14     Q.   Other than the Korea Practice
15   Group?
16     A.   Yes.  I did.
17     Q.   And what areas did you discuss?
18     A.   It's the PLP -- PLP called policy.
19   It's Public --
20     Q.   Is it the Public Law and Policy?
21     A.   Yeah.  Public Law and Policy.  You
22   know better than I do.

135

1      (Laughter.)
2      Q.   Okay.  And what did you -- what
3    did you say to him regarding?
4      A.   To him?
5      Q.   To Don Gross regarding Public
6    Policy?
7      A.   Okay.  I told him that let's try
8    to find a position for you within the firm and
9    given your background, which was Government
10   background, and I thought the PLP might be the
11   best section or the only section.  And so I told
12   him I'll talk to a few people in PLP.
13     Q.   Okay.  Do you know who was heading
14   up the PLP at that time?
15     A.   Joel Jankowsky.
16     Q.   Did you discuss any other
17   possibilities with Don Gross?
18     A.   And -- yes.  I said I will think
19   about a few firms in Korea.  Also, I told him
20   that I will do whatever I can and I'll give some
21   thoughts.  I said, let's discuss, let's stay in
22   touch.  At some point, I mentioned the KEI,

136

1    Korea Economy Institute.  I'm on their Board.  I
2    mentioned that.  I don't know who raised it
3    first, but we talked about Stan Gale also.  So
4    we talked about a lot of options, possible
5    positions for him.
6      Q.   Did you ever discuss with Don
7    Gross whether his chances for staying might be
8    better if Gale were to retain Akin Gump as their
9    attorneys?
10     A.   I don't think so because it's
11   minor, just a minor case.
12     Q.   And do I understand correctly that
13   the position at Gale would be in Korea?
14          Is that what was envisioned?
15     A.   That's my guess.  I think so, in
16   Korea.
17     Q.   Okay.  All right?
18     A.   Or dealing with US/Korea issues.
19     Q.   Did you think that any arrangement
20   that Don Gross might be able to obtain with Stan
21   Gale would replace the work that you would have
22   been doing for Stan Gale?

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

35 (Pages 137 to 140)

137

1      A.   No.  In fact, I recall Don saying
2    that if he were there then he would help us to
3    expand the business with Gale.
4      Q.   Did you think that that would be a
5    good arrangement for Akin Gump?
6      A.   If it works out all right, that
7    would be great.  He has a job and we have more
8    business.  Sure.
9      Q.   Do I understand correctly that
10   American law firms cannot open offices in Korea?
11     A.   Correct.
12     Q.   And that's due to the Korean law?
13     A.   Yes.
14     Q.   And do American law firms
15   sometimes create affiliations with other offices
16   in Korea?
17     A.   Informally.
18     Q.   Informally?
19     A.   Yes.
20     Q.   And how does that work?  How do
21   American law firms generate income?
22     A.   Vis-a-vis Korean law firms.

138

1      Q.   Based on affiliations with Korean
2    law firms?
3      A.   For example, his former law firm
4    Kim & Chung would send cases to a major New York
5    law firm.  And they also refer cases to Kim &
6    Chung if they need counsel in Korea.  So usually
7    that's the arrangement.
8      Q.   So if there's an American forum,
9    for instance, it would require the services of
10   the American law firm to practice law in that
11   forum.
12          Is that the idea?
13     A.   Say that again.  I'm sorry.
14     Q.   If the forum, the court or the
15   body, requires the practice of an American law
16   firm, then the Korean firm could refer that
17   business to an American firm and then vice
18   versa?
19     A.   Sure.  Yeah.  And vice versa.
20     Q.   Okay.  Did you -- do you recall
21   going out to lunch with Don Gross prior to the
22   time that he left?

139

1      A.   Yes.
2      Q.   Did -- were you able to -- strike
3    that.
4          Did you ever discuss -- did Don
5    Gross ever ask you whether it was a matter of
6    economics for the firm that he was being let go?
7      A.   Yes.  He did.
8      Q.   What do you recall him saying to
9    you?
10     A.   At one point he said I know I'm
11   being asked to let go because of the Korea
12   practice's financial situation.  I think that's
13   what he said.
14     Q.   Uh-huh?
15     A.   I said, no, that's clearly not.
16   The practice is doing fine.  So that was the
17   context.
18     Q.   Okay.  And so as far as you knew
19   it wasn't economic issues that Don Gross was
20   being let go for?
21     A.   No.
22     Q.   Is that correct?

140

1      A.   Yes.  That's correct.
2      Q.   Did you ever have a discussion
3    with Don Gross about whether the Korea Practice
4    Group might be able to carry -- dedicate some of
5    his time, a third of his time, to Korea practice
6    matters while he worked the remaining two-thirds
7    of his time for some other practice area for a
8    time?
9      A.   Not at the lunch.  Right?
10     Q.   Not at the lunch.
11     A.   Okay.  Okay.
12     Q.   Was that at an earlier time?
13     A.   Well, yes.  We talked about that
14   several -- a number of times, but I don't know
15   whether I said one-third, but we talked about
16   that.
17     Q.   Okay.  Was that an offer that you
18   made to Don Gross to carry some of his work on
19   the Korea practice books?
20     A.   When you say offer, what -- do you
21   mean formal offer?
22     Q.   Were you trying to help Don Gross

VIDEOTAPED DEPOSITION OF SUKHAN KIM
CONDUCTED ON FRIDAY, SEPTEMBER 7, 2007

36 (Pages 141 to 144)

141

1    out?
2         A.   Well, okay.  Basically, we need to
3    bill our time and I told -- we discussed in the
4    morning, I told Warren Connelly and I make sure
5    that Don bills 2100 or I don't know the exact
6    number, and so I said that whenever you are
7    short on the target then why don't you bill to
8    the retainer.
9         Q.   Okay.  That was early on in Don
10   Gross's employment or are you talking about a
11   transition to another position at Akin Gump?
12        A.   No.  Earlier.
13        Q.   Early on in his employment?
14        A.   Earlier.  Yes.  I want him to
15   succeed, so that's it.
16        Q.   Yes.  I see.  Did you ever have
17   any discussions with -- strike that.
18             I want to get back to lunch,
19   because I brought that up.
20             Was your discussion regarding the
21   decision not being an economic issue, was that
22   at lunch?

142

1         A.   Yes.
2         Q.   And was that shortly before Don
3    left the firm?
4         A.   The lunch, I don't know when.  It
5    was in the summer.  But the issue came up
6    before, not only once, but several times.  I was
7    surprised when Don again raised the issue, so I
8    thought that I really need to correct Don.  So
9    for the first time I came out and I said to Don
10   that's not the reason.
11        Q.   I see.
12        A.   But I told him about it several
13   times in the past.
14        Q.   I see.  Several times between the
15   time he was told he was being terminated and he
16   ultimately left the firm?
17        A.   Really, in terms of time line, I'm
18   not really sure, but the point is that before
19   that lunch, Don knew -- my -- after the firm
20   said he has to leave, I must have told Don why
21   and then at the lunch when he raised the issue
22   again, I know I'm asked to let go because of the

143

1    firm's economics, the economics, I said, no Don,
2    that's not the case.  And that's why it came up.
3         Q.   And when you referred to the
4    reason that you gave to Don for his termination,
5    was that that it was not a good fit?
6         A.   Yes.
7         Q.   Was there anything further that
8    you told Don about the reasons for his
9    termination?
10        A.   I just told him it was not a good
11   fit and someplace else he would do fine.  And I
12   said it's not a matter of really intelligence or
13   how smart, it's a different kind of training,
14   background.  So I said you will be great at
15   someplace else where you can use your talents
16   and so don't feel bad.  I said we're all
17   different, different talents, different fit.
18   That's how I explain.
19        Q.   Aside from your discussion with
20   Don Gross about why he was terminated, what were
21   you told as to the reasons Don Gross was being
22   terminated?

144

1         A.   Well, basically, he could not
2    perform the task that we hired him to do.
3         Q.   And who told you that?
4         A.   Quigley said that.  Also, I said
5    that.  And so basically early on, early on, we
6    felt that he didn't have the requisite skill,
7    with respect to those policy areas, so, so
8    certain people knew, but I did not tell that to
9    many people, because I want him to succeed, but
10   David Park knew, clearly.  Quigley knew and
11   Jaemin Park knew, but I believe that I told them
12   not to really tell other people.
13        Q.   Do you recall any efforts to
14   retain Doran Capital Partners as a client?
15        A.   No.
16        Q.   Do you know who Pietro Doran is?
17        A.   No.
18        Q.   I understand that David Park came
19   to work at the firm in the '90s; is that right?
20        A.   Yes.
21        Q.   Did you work with him from the
22   start of his employment with Akin Gump?

# EXHIBIT 4

VIDEOTAPED DEPOSITION OF MICHAEL QUIGLEY
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

1 (Pages 1 to 4)

---

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF COLUMBIA
3
4   _____
    )
5   DONALD G. GROSS,     )   Case Number:
                         )
6   Plaintiff,           )   07-399(EGS)
                         )
7   vs.                  )
                         )
8   AKIN, GUMP, STRAUSS, HAUER )
    & FELD,              )
9                        )
    Defendant.           )
10  _____)
11
12
13      VIDEOTAPED DEPOSITION OF
14         MICHAEL QUIGLEY
15         Washington, D.C.
16      Wednesday, August 22, 2007
17            10:00 a.m.
18
19
20
21  Job No.: 1-109376
    Pages 1 through 271
22  Reported by:  John L. Harmonson, RPR

---

**Page 2**

1
2
3   Videotaped Deposition of
4      MICHAEL QUIGLEY
5
6
7   Held at the offices of:
8      WEBSTER, FREDRICKSON, HENRICHSEN,
9         CORREIA & PUTH
10        1775 K Street, N.W.
11        Suite 600
12        Washington, D.C.  20006
13        (202)659-8510
14
15
16
17      Taken pursuant to the Federal Rules of Civil
18  Procedure, before John L. Harmonson, Registered
19  Professional Reporter, Notary Public in and for the
20  District of Columbia, who officiated in administering
21  the oath to the witness.
22

---

**Page 3**

1                 APPEARANCES
2
3   ON BEHALF OF PLAINTIFF:
4      JONATHAN C. PUTH, ESQUIRE
       KATARYNA L. BALDWIN, ESQUIRE
5      Webster, Fredrickson, Henrichsen,
       Correia & Puth, PLLC
6      1775 K Street, N.W.
       Suite 600
7      Washington, D.C.  20006
       (202)659-8510
8
9
10  ON BEHALF OF DEFENDANT:
11     KAREN-FAYE McTAVISH, ESQUIRE
       Pillsbury, Winthrop, Shaw, Pittman,
12     LLP
       2300 N Street, N.W.
13     Washington, D.C.  20037
       (202)663-8000
14
       JULIE STUMPE DRESSING, ESQUIRE
15     Akin, Gump, Strauss, Hauer & Feld, LLP
       1333 New Hampshire Avenue, N.W.
16     Washington, D.C.  20036-1564
       (202)887-4000
17
18
19  ALSO PRESENT:
20     DONALD G. GROSS
21     SCOTT FORMAN, Videographer
22

---

**Page 4**

1            EXAMINATION INDEX
2                  PAGE
3   EXAMINATION BY MR. PUTH          6
4          *  *  *  *  *
5
6            EXHIBIT INDEX
7   (Original exhibits retained by counsel and copies
8         attached to transcript.)
9   EXHIBIT        DESCRIPTION        PAGE
10  39   E-mail from D. Gross to D. Park and     44
11       others; April 23, 2004
12  40   E-mail from M. Quigley to D. Gross;    151
13       December 24, 2003
14  41   E-Mail from D. Gross to S. Kim; April  153
15       16, 2004
16  42   E-mail string                          164
17  43   E-mail from B. McLean to S. Kim and M. 174
18       Quigley; August 11, 2004
19  44   New Business Intake Form               236
20
21
22

---

VIDEOTAPED DEPOSITION OF MICHAEL QUIGLEY
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

8 (Pages 29 to 32)

29

1 but I believe he was in litigation.
2      Q.    And how were business decisions made
3 regarding the development of the Korea practice
4 group prior to the time that Don Gross began
5 in 2003?
6      A.    Before and after he arrived, I would
7 say that they were made in a collaborative way.
8 Certainly Sukhan and I would talk a lot about the
9 direction of the practice. When Jaemin and Jay
10 were there, we would talk a lot with them. So I
11 would say in a collaborative way.
12      Q.    And what were the practice development
13 initiatives that were undertaken generally in the
14 first half of 2003, prior to the time that Don
15 Gross arrived?
16      A.    I don't really recall. When you zero
17 in on that kind of a time frame, I don't recall.
18      Q.    Did you get together in Korea practice
19 group meetings?
20      A.    Sure.
21      Q.    And how was that time logged?
22      A.    I don't recall.

31

1      Q.    And that was one of the reasons that
2 you considered Don Gross for the job, right?
3      A.    That's true.
4      Q.    And in conjunction with the
5 consideration of Don Gross for a job at the Korea
6 practice group, did you consider other candidates
7 at the same time?
8      A.    I did.
9      Q.    And do you recall any of those
10 candidates?
11      A.    I do.
12      Q.    Okay. Who were those candidates?
13      A.    By name?
14      Q.    Or by description if you don't remember
15 the name.
16      A.    Generally lawyers who had a
17 demonstrated interest in international practice
18 and a demonstrated academic and intellectual
19 excellence, and those that I thought might be able
20 to fill this fairly unique and challenging role
21 that we were defining for the Korea practice
22 group.

30

1      Q.    What was the -- Well, strike that.
2      A.    Do I have to do anything as a result of
3 that, your striking that?
4      Q.    I'm striking my comments so that we can
5 start with a new question.
6      A.    Okay.
7      Q.    So I'll strike that.
8         Prior to the time that you considered
9 Don Gross for hire in mid-2003, were you looking
10 actively for somebody to hire?
11      A.    Yes.
12      Q.    And what -- what did you -- what did
13 you do to seek out people for a job?
14      A.    I would say two things. One is we were
15 always looking for good new lawyers to hire into
16 the Korea practice group that would complement the
17 practice group, so we were always keeping our eyes
18 open for talent.
19         As a second matter, we had been
20 specifically looking for someone to help us, you
21 know, with the Korea practice in an organizational
22 and managerial way.

32

1      Q.    And that was in the time frame of
2 around mid-2003, June -- May-June 2003?
3      A.    I can't really pinpoint the time, but I
4 would say more broadly 2002, 2003, in that time
5 frame, maybe even stretching back to 2001.
6      Q.    What was the role you were -- What were
7 the duties you were hoping would be undertaken by
8 the person who took the job that Don Gross
9 ultimately got?
10      A.    It depended on the person that we
11 actually hired and what their skills and talents
12 were. But generally my hope was that they could
13 help us with managing the practice, managing the
14 existing workload that we already had, perform
15 analytical and legal advisory services,
16 particularly in respect of one large project that
17 we had.
18      Q.    And that was with respect to work for
19 Samsung?
20      A.    I know you have a protective order in
21 place and --
22      Q.    We do.

VIDEOTAPED DEPOSITION OF MICHAEL QUIGLEY
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

16 (Pages 61 to 64)

61

1     candidate or a particular type of person and with
2     a particular type of background, and he thought
3     Don might be appropriate. He knew Don; I'm not
4     sure how. And so he mentioned Don's name and
5     background to me in that way.
6         Q.   What section does Dan Spiegel work in,
7     or did he in 2003?
8         A.   At the time, I believe Dan was in the
9     international section.
10        Q.   And he was a partner at Akin Gump?
11        A.   He was.
12        Q.   An equity partner?
13        A.   He was.
14        Q.   And --
15        A.   Actually, I may have misspoken there.
16    Dan was either in the policy section, PLP section,
17    or the international section. He had roles in
18    both. So I should amend that answer. I'm not
19    sure which section he was in. He was in one of
20    them.
21        Q.   Okay. "PLP" stands for public law and
22    policy?

62

1         A.   It does.
2         Q.   Now, what do you recall about -- Did
3     Dan Siegel forward to you anything, or did you
4     have a discussion with him?
5         A.   I don't really have a very distinct
6     recollection, but I think he raised it with me
7     orally in a conversation, and then later I came to
8     get Don's résumé, and thereafter I met Don.
9         Q.   How was the decision made to bring Don
10    in for an interview?
11        A.   I'm not sure what the decision-making
12    process was. I don't think it was anything more
13    formal than myself hearing what Dan said, looking
14    at the résumé, perhaps talking to Sukhan about it
15    and saying, "Let's talk to this guy."
16        Q.   Do you remember talking to Sukhan about
17    Don Gross prior to the time he came in for an
18    interview?
19        A.   Not specifically. I'm certain that I
20    did, but I don't specifically remember it.
21        Q.   But generally you remember that the
22    decision was made -- you made the decision in

63

1     conjunction with others that it would be a good
2     idea to bring Don Gross in for an interview?
3         A.   I remember thinking when I saw his
4     résumé it would be an interesting candidate, I'd
5     like to meet the guy.
6         Q.   What about his candidacy interested
7     you?
8         A.   Two things, an impressive academic
9     background and a longstanding interest and a
10    commitment to the Republic of Korea.
11        Q.   And you then interviewed Don Gross?
12        A.   I did. I met with him.
13        Q.   And who else was present?
14        A.   I don't really recall. I recall
15    meeting him in Sukhan Kim's office with Sukhan,
16    and then I recall meeting him separately. But I
17    don't remember the sequence of it, which came
18    first.
19        Q.   And so after meeting with him
20    initially, did you have a discussion with Sukhan
21    Kim about the interview?
22        A.   I did.

64

1         Q.   And what was the substance of that
2     discussion?
3         A.   The substance was I thought that Don's
4     academic background and his interest in Korea as
5     demonstrated in his background were of great
6     interest.
7             My concerns were that he had not spent
8     significant time in a major, at least U.S., law
9     firm, and I was wondering whether or not the
10    absence of that would be a barrier to succeeding
11    at Akin Gump.
12        Q.   Do you recall what Sukhan Kim's
13    response to that was?
14        A.   I do.
15        Q.   And what was that?
16        A.   He shared that concern.
17        Q.   Do you recall any of the words he used
18    or what he said?
19        A.   I couldn't quote him, but I recall him
20    agreeing with that observation. Actually, all of
21    the observations, the academic background, the
22    interest in Korea, particularly State Department

VIDEOTAPED DEPOSITION OF MICHAEL QUIGLEY
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

19 (Pages 73 to 76)

73

1  Jaemin Park regarding Don Gross?
2      A.   As I sit here today, I do not.
3      Q.   Okay.  Do you remember whether Jaemin
4  Park had a positive or a negative impression of
5  Don Gross as a potential person for the Korea
6  practice group?
7      A.   I have a recollection that she deferred
8  to my judgment and Sukhan's judgment, that she was
9  not opposed to bringing Don in or mildly in favor.
10  But why I remember that I can't really say.  If
11  she had a strong feeling one way or the other I
12  would have recalled it more vividly and she would
13  have had reasons for it.  And I don't recall that
14  happening.
15      Q.   You don't recall her having strong
16  feelings about Don Gross becoming a senior counsel
17  at Akin Gump?
18      A.   And joining the Korea practice?
19      Q.   Right.
20      A.   That's true.
21      Q.   That's Jaemin Park?
22      A.   That's true.

74

1      Q.   So you don't recall any discussions
2  with Dennis Race about Don Gross' candidacy?
3      A.   I'm glad that you raised his name.  I
4  do recall -- I do recall discussion with Dennis
5  Race.  I'm not sure if it was on the phone or if
6  it was face to face.  But I could not issue an
7  offer letter.
8          Dennis or Bruce was the hiring partner.
9  Dennis was the hiring partner; Bruce was the
10  chairman of the firm.  So someone other than
11  myself, one of those two men, had to issue the
12  offer letter.  And I surely would have spoken to
13  Dennis about that, or possibly Bruce.
14      Q.   All right.  Because one of those two
15  people had authority to extend an offer?
16      A.   Right.  I'm thinking it was Dennis,
17  because it was a senior counsel position, and the
18  level of compensation, I'm thinking, was such that
19  it was within Dennis' authority to do.  If it was
20  bringing a partner level person in, I know I would
21  have met with and discussed it with Bruce.
22      Q.   But that wasn't the case here?

75

1      A.   That's true.
2      Q.   And otherwise, you don't recall the
3  substance of any conversation aside from just
4  asking one of those individuals to go ahead and
5  extend an offer?
6      A.   In reviewing a draft of the acceptance
7  letter -- or not the acceptance letter but the
8  offer letter, I recall discussing -- I'm sure it
9  was with Dennis -- the -- putting in a provision
10  for a review of Don.  I recall discussing that.
11  It had to be with Dennis.
12      Q.   Okay.  What did you discuss?
13      A.   I can't recall if it was my suggestion
14  or Dennis' suggestion as a result of observations
15  that I made, but I recall that as a result of our
16  conversation, either my recommendation or his
17  thought in response to my observations, that a
18  provision was put in the letter that was not a
19  customary provision in offer letters there
20  would be a review of Don at the end of one year.
21  And I believe that that was in his letter.
22      Q.   Okay.  And you're saying that the

76

1  impetus or the suggestion to put that in Don
2  Gross' letter was -- either came from you or from
3  Dennis Race, the hiring partner?
4      A.   I believe that's right.
5      Q.   Do you remember having any discussions
6  with David Park about Don Gross' candidacy?
7      A.   I don't.  It's possible that I had a
8  discussion with David about it, but I don't recall
9  it.
10      Q.   I want to get back to Sukhan Kim,
11  because I don't think we've really exhausted that
12  subject.  Do you recall anything else about your
13  discussions with Sukhan Kim about the decision to
14  hire Don Gross?
15      A.   Other than the basic key points of the
16  academic background, the experience with Korea,
17  the absence of U.S. law firm experience, I -- We
18  may have discussed the fact that in Don's career
19  he had not developed a specialty area or expertise
20  within the practice of law.
21          He has very extensive background in
22  Republic of Korea and State Department matters

VIDEOTAPED DEPOSITION OF MICHAEL QUIGLEY
CONDUCTED ON WEDNESDAY, AUGUST 22, 2007

43 (Pages 169 to 172)

169

1 project were not as strong as David's, but that
2 Don's reportorial writing skills were. And I mean
3 reporting in terms of faithfully describing
4 something that was down in a text and reducing it
5 to a more summary form were good.
6      And so I was confronted with a short
7 deadline, a complex project, and a need to get out
8 a high quality work product in a short period of
9 time. So I was trying to manage those various
10 requirements and use the team that I had to do
11 that. And Don was a member of that team.
12      Q.   Why was Don Gross terminated?
13      A.   The decision to --
14      MS. McTAVISH: I'm just going to object
15 to that to the extent you're asking him his
16 knowledge of why Mr. Gross was terminated.
17      MR. PUTH: I am.
18      THE WITNESS: The decision to let Don
19 go from the firm was made by Bruce McLean, my
20 chairman, my firm's chairman. And he informed me
21 of that decision in a meeting that I had with him.
22 So the reason is Bruce decided that Don should be

170

1 let go from the firm.
2 BY MR. PUTH:
3      Q.   And what reasons were given to you?
4      A.   Bruce made the decision, but he did not
5 supply me with reasons. He made the decision in
6 connection with or at one of my fairly regular
7 meetings with Bruce about the management of the
8 Korea practice. That particular meeting wasn't
9 one that was centered on Don or personnel matters,
10 but as I think I mentioned this morning, when I
11 would meet with Bruce periodically, as the
12 chairman of the firm and ultimately the person
13 responsible for all the practice sections of the
14 firm, I would be briefing him on the Korea
15 practice.
16      And I gave him a briefing, and we
17 turned to personnel matters, and he made the
18 decision that Don should be let go from the firm.
19      Q.   Was it your understanding that Sukhan
20 Kim was in favor of letting Don Gross go from the
21 firm?
22      MS. McTAVISH: Can I object to that.

171

1      To the extent that you know, you can
2 answer.
3      THE WITNESS: I wouldn't characterize
4 it that way, but I know that Sukhan was aware of
5 the evaluation of Don and had formed his own
6 evaluation of Don. He was aware of my evaluation
7 of Don's role in the Korea practice.
8      And when I reported to Sukhan Bruce
9 McLean's decision to let Don go from the firm, he
10 carried out that instruction. He, Sukhan, carried
11 out that instruction.
12 BY MR. PUTH:
13      Q.   What did you do to prepare for the
14 deposition?
15      A.   I met with Julie and Karen and
16 Christine Kearns yesterday for about two and a
17 half, three hours yesterday afternoon.
18      Q.   Did you review documents?
19      A.   They showed me documents, e-mails and
20 other documents. Other than the documents that
21 they showed me, I reviewed nothing.
22      Q.   Do you recall what documents you

172

1 reviewed?
2      A.   Not particularly. It was a group of
3 e-mails, basically. And I think that was it. I'm
4 not actually sure if it was any of the e-mails
5 that you showed me here. I think it was not.
6      Q.   Okay. Aside from e-mails, what did you
7 review?
8      A.   I think that's it. Unless I'm omitting
9 some document that -- I only reviewed the
10 documents that they shared with me yesterday.
11      Q.   I'm just trying to get a handle
12 specifically on what specifically you reviewed.
13      What do you recall about what you
14 reviewed?
15      A.   It was mostly e-mails, I think, or
16 printed-out copies of e-mails.
17      Q.   Do you recall specific e-mails that you
18 reviewed yesterday?
19      A.   I recall one in particular.
20      Q.   What was that?
21      A.   It was an e-mail that I authored which
22 had fairly detailed substantive legal advice in it

# EXHIBIT 5

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

1 (Pages 1 to 4)

---

**1**

```
 1          UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3    ------------------------------x
 4    DONALD G. GROSS,          :
 5              Plaintiff,  :
 6       v.          :   Civil Action No.
 7    AKIN GUMP STRAUSS HAUER & FELD  :   07-399(EGS)
 8    LLP,            :
 9              Defendant.  :
10    ------------------------------x
11
12       Videotape Deposition of J. DAVID PARK
13             Washington, D.C.
14          Friday, August 17, 2007
15               10:09 a.m.
16
17
18
19
20    Job No: 1-109374
21    Pages 1 - 214
22    Reported by: Jacquelyn C. Jarboe
```

---

**2**

```
 1       Videotape deposition of J. DAVID PARK, held
 2    at the offices of:
 3
 4       Webster, Fredrickson, Henrichsen,
 5          Correia & Puth, PLLC
 6       1775 K Street, Northwest
 7       Suite 600
 8       Washington, D.C. 20006
 9       (202) 659-8510
10
11
12       Pursuant to agreement, before Jacquelyn C.
13    Jarboe, Notary Public in and for the District of
14    Columbia.
15
16
17
18
19
20
21
22
```

---

**3**

```
 1          A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFF:
 4       JONATHAN C. PUTH, ESQUIRE
 5       KATARYNA LYSON BALDWIN, ESQUIRE
 6       Webster, Fredrickson, Henrichsen,
 7          Correia & Puth, PLLC
 8       1775 K Street, Northwest
 9       Suite 600
10       Washington, D.C. 20006
11       (202) 659-8510
12
13
14    ON BEHALF OF THE DEFENDANT:
15       KAREN-FAYE MCTAVISH, ESQUIRE
16       Pillsbury Winthrop Shaw Pittman LLP
17       2300 N Street, Northwest
18       Washington, D.C. 20037
19       (202) 663-8000
20
21
22
```

---

**4**

```
 1       A P P E A R A N C E S (Continued)
 2
 3    ALSO PRESENT:
 4       JULIE STUMPE DRESSING, Esquire, Akin Gump
 5       SCOTT FORMAN, Videographer
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

7 (Pages 25 to 28)

**Page 25**

1    Q    But in terms of day-to-day, the people that
2  you mentioned are really the core group in the
3  2003-2004 time frame?
4    A    That's correct.
5    Q    Now, do you recall that in June 2003 Don
6  Gross was being considered for hire at Akin Gump?
7    A    Yes.
8    Q    And you had some discussions with others in
9  the Korea practice group about the potential for Don
10  Gross's hire; isn't that right?
11    A    I was -- I first heard about it when they
12  were arranging -- I believe it was the second meeting
13  back, that's when I heard that he was coming to
14  interview with us.
15    Q    So your understanding was Don Gross had come
16  for an interview, and you heard after the fact that he
17  was under consideration?
18    A    Yes.  I don't know if it was actually an
19  interview.  I heard that he had discussions with other
20  people within our firm.  I think it was Dan Spiegel.
21  And then there was someone else that Mike Kaye had
22  arranged for, a separate meeting, with Don coming back

**Page 26**

1  and meeting people from the international trade
2  section.
3    Q    And did you take part in that second
4  interview?
5    A    Yes, I did.
6    Q    And who else in the international trade
7  section took part?
8    A    I believe it was Mike Kaye, Warren Connelly,
9  Spencer Griffith, and myself.
10    Q    Now, do I understand correctly that Warren
11  Connelly was not a member of the Korea practice group?
12    A    That's correct.
13    Q    And is that the same for Mike Kaye?
14    A    Yes.
15    Q    And Spencer Griffith, was he a member of the
16  Korea practice group?
17    A    No, he was not.
18    Q    Did any of these three individuals regularly
19  work with the Korea practice group in terms of
20  contributing to the Korea practice?
21    A    They worked -- I believe all of them have
22  worked on Korean cases.  But again, throughout the

**Page 27**

1  firm there are many Korean cases.  I wouldn't consider
2  them the Korea practice group.
3    Q    And did you have discussions with either
4  Mike Quigley or Sukhan Kim prior to your interview of
5  Don Gross about the potential for hiring Don Gross?
6    A    I don't remember a conversation prior to,
7  other than -- the indication that I'd gotten was from
8  Mike Kaye, that he was coming in.  I believe we had a
9  discussion after, but not prior to the interview.  I'm
10  not -- I don't specifically remember, but my
11  recollection is that -- I don't -- we spoke prior to
12  that.
13    Q    What's your understanding of why Don Gross
14  was being considered for hire in the Korea practice
15  group?
16    A    We -- the general discussion that we had had
17  prior to Don Gross's name coming up was the need to
18  bring in somebody that could help us with substantive
19  writing, as well as to help build up the Korea
20  practice group.
21    Q    And when you say "we," who are you talking
22  about?

**Page 28**

1    A    That was with the core members.  There
2  wasn't any formal meeting, but there was regular
3  discussion of the need to get someone, to try to find
4  somebody.  It was more in the abstract, because we
5  didn't have anybody in mind.
6    Q    Why do you think there was a need for
7  substantive writing?
8    A    Writing is what we do.  It's something that
9  is -- that Sukhan Kim and everyone in the group
10  stresses, and it's something that we felt, that we
11  needed somebody who could really devote substantive
12  time and that substantive knowledge of issues to be
13  able to write well.
14    Q    And you -- you obviously did your own
15  writing on trade cases, dumping cases, that sort of
16  thing, right?
17    A    That's correct.
18    Q    Okay.  And other litigation folks may have
19  done writing in litigation, or in bankruptcy, or
20  whatever their practice area was, right?
21    A    That's correct.
22    Q    What was the writing that was needed from

29

1  Don Gross?
2      A   It would be -- it would actually run the
3  full gamut.  It could be anything that any of our
4  Korea practice group cases involved, or it could be
5  specific issues that we had with respect to
6  that we were working on.  But it wasn't a particular
7  area, it was more someone who could contribute well,
8  regardless of the area.
9      Q   When you say cases, what cases do you recall
10  Don Gross being brought in to write on?
11      A   We worked on a project called
12      Q   Okay, that's the            work that you just
13  referred to, right?
14      A   That's correct.
15      Q   Okay.  What do you mean by cases?
16      A   In what -- oh, my earlier reference to cases
17  is the cases that we were doing for the other
18  sections.  In other words, I'm not sure which -- which
19  reference you had, but --
20      Q   Well, let me be more specific.  I think you
21  said that the writing that you needed was on cases, on
22  specific issues, and on matters for clients such as

30

1            and I wanted to sort of highlight and get
2  your explanation of what you meant by cases and ask
3  you, what cases did -- was Don Gross asked to work on?
4      A   Sure.  My cases, my reference to cases was a
5  general reference to, again, work that we did in our
6  various sections beyond -- for example, if -- we have
7  trade cases, so that's a general reference.  And we
8  had a general relationship with the            in
9  particular, where they would give us issues.
10      Q   All right.  So I understand that there was
11  client work that had to be done, right?
12      A   That's correct.
13      Q   Okay, and that's for            you mentioned,
14  right?
15      A   Yes.
16      Q   As well as            was another key
17  client, right?
18      A   Yes.
19      Q   And that was work that was envisioned for
20  Don Gross to work on in particular, right?
21      A   Yes.
22      Q   From the outset, right?

31

1      A   I can't -- it was general work.  The
2            work was probably a possibility at that point,
3  but we didn't specifically discuss he would be doing
4  this, this, and this.
5      Q             was a key concern, right?
6      A             vas a concern, yes.
7      Q   That's a huge client, and the Korea practice
8  group really needed to service well that particular
9  client, right?
10      A   Sure.
11      Q   And Don Gross was envisioned as somebody who
12  could come in and help work on            concerns,
13  right?
14      A   Yes.
15      Q   Okay.  Was there any particular aspect of
16  Don Gross's experience that you felt would be helpful
17  to the work on            ?
18      A   We -- there was actually concern going the
19  other way, that -- initially, that he didn't have a
20  lot of law firm experience.
21      Q   Right.
22      A   And so we thought that generally his prior

32

1  experience, I guess, at the White House or the State
2  Department could be helpful, but there was actually a
3  bit of concern that he didn't have enough law firm
4  experience.
5      Q   So why was he hired, do you think?
6      A   Good question.  There was some objections.
7  My understanding was, I thought that -- I think Sukhan
8  Kim thought that he would still be a good
9  contribution.
10      Q   Okay, and I'm trying to get to what work.
11  You mentioned trade cases.  Was he ever called in to
12  work on trade cases as far as you know?
13      A   Not specific issues.  There was -- again,
14  there might have been issues for a client that was
15  general that we would try to give to him that was a
16  trade client.  The            was -- we were
17  advising them on trade, so in that context.
18      Q   Okay, so that would be policy, and
19  regulatory, and -- type of work, international type of
20  work, right?
21      A   For the most part.
22      Q   And it was your understanding that Don Gross

REDACTED

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

9 (Pages 33 to 36)

33

1  had that type of experience?
2     A   Not specifically, but that was --
3     Q   I understand he didn't do trade cases,
4  right?
5     A   Yes.
6     Q   Okay.  But he wasn't called upon to do trade
7  cases when he came to Akin Gump, right?
8     A   Yes, not anti-dumping.  But he was called
9  upon -- again, we were envisioning      as well as
10  the          but -- and it's trade related.  So
11  I just want to clarify, I don't mean to mince words,
12  but the work that we were doing for the
13  was trade, it involved trade policy, but there was a
14  general concern that he didn't maybe -- he didn't have
15  the substance, which was expressed by a few people.
16     Q   By who?
17     A   By Mike Kaye and myself.
18     Q   Okay.  And what did you say in particular?
19     A   It was a discussion with Mike Kaye that --
20  exactly that, which we didn't -- we knew the type of
21  substantive writer that we were looking for, and we
22  also knew that an issue that has consistently come up

34

1  is analytical skills with legal training.  And one of
2  the aspects that -- there were two aspects, one was it
3  appeared his lack of experience in a U.S. law firm or
4  training, and the second was we were a bit surprised
5  that he knew very little about us.
6        Again, I didn't know the background going
7  in, his background, really, going into the interview,
8  other than his resumé.  I didn't know whether he had
9  approached us or we had approached him.  But there was
10  a bit of surprise expressed that he didn't know very
11  much about us.  And that was expressed with Mike Kaye.
12     Q   So that goes to the lack of law firm
13  experience, is that what you're saying?
14     A   The first one is lack of law firm
15  experience, just in terms of being able to write
16  substantively, you know, I mean, analytically, was the
17  very first issue.  The second was -- again, it maybe
18  could have been a misunderstanding on our part, we
19  thought that he had maybe sought us out, and when we'd
20  interviewed him he knew very little about us, what we
21  did, or Sukhan Kim.  He didn't know anything about
22  that aspect, and it was a bit surprising.

35

1     Q   Let's talk about the writing.  You didn't
2  ask him for any writing samples, did you?
3     A   No, we didn't.
4     Q   You didn't review any writing samples of his
5  prior to his hire, did you?
6     A   No.
7     Q   So you're saying even though that was a
8  concern, as far as you know nobody asked him for
9  writing samples, right?
10     A   We expressed our concern, and as far as I
11  know that he wasn't asked and he was hired.
12     Q   When you talked about -- well, strike that.
13        What about work developing the Korea
14  practice group, was that one of the reasons Don was
15  hired?
16     A   We hoped that that would be, yes.
17     Q   What was the state of the Korea practice
18  group as of June 2003 as far as an organization?
19     A   It was very -- it was informal, we did not
20  have regular meetings, although we would meet -- in
21  other words, we didn't schedule meetings, but we would
22  talk regularly, talk informally.

36

1     Q   Well, did you understand that there was a
2  desire to obtain some greater formality over the Korea
3  practice?
4     A   Yes.  We weren't really looking to make
5  ourselves a formal section, but we wanted to expand,
6  really, the Korea practice, and we thought in order to
7  expand the Korea practice we needed more structure.
8     Q   And that was one of the reasons Don was
9  hired, correct?
10     A   To help expand the practice, yes.
11     Q   Did you have a discussion with Sukhan Kim
12  prior to Don Gross's hire about the potential for
13  hiring him?
14     A   Prior to hiring, but -- prior to actually
15  hiring him?
16     Q   Prior to the decision to hire him.
17     A   And I don't recall the exact timing.  I do
18  remember a conversation in which I had reiterated to
19  him about Mike Kaye's concern, but it wasn't a -- I
20  didn't meet with Sukhan Kim about Don Gross.  His name
21  had come up during the discussion, but it was a
22  limited discussion.

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

37

1    Q    What did you relate to Sukhan Kim about Mike
2    Kaye's concern?
3    A    Well, generally speaking, we first said -- I
4    first said that he seemed to be a very nice person,
5    but had concerns about his ability to contribute
6    substantively to the writing.
7    Q    What did you do to prepare for the
8    deposition?
9    A    I'm sorry?
10   Q    What did you do to prepare for this
11   deposition?
12   A    I met with our attorneys and reviewed the
13   documents that have been produced in this case.
14   Q    How long did you meet with the attorney?
15   A    I would say probably about two or three
16   hours.
17   Q    Was that over the course of days?
18   A    No, just one day.
19   Q    Yesterday?
20   A    Yes.
21   Q    And what documents did you review?
22   A    The documents, we reviewed the documents

38

1    that were produced in this case, the e-mails, and
2    various other documents.
3    Q    Did you ever review a position statement
4    submitted to the EEOC?
5    A    No, I did not.
6    Q    Did you review some of the litigation
7    documents filings made by Akin Gump in the case?
8    A    No.
9    Q    Did you have a discussion with Mike Quigley
10   about any concerns regarding the hiring of Don Gross?
11   A    I don't believe Mike Quigley was in the
12   room. I didn't specifically have a separate meeting
13   with Mike Quigley about Don Gross.
14   Q    You had one meeting with Sukhan Kim?
15   A    With Sukhan Kim.
16   Q    And that was a face-to-face meeting?
17   A    Yes.
18   Q    In June of 2003?
19   A    I would say so.
20   Q    Did you take part in any other group
21   discussions regarding Don Gross's candidacy for a job
22   at Akin Gump?

39

1    A    Not that I'm aware of. Not before he was
2    hired.
3    Q    So did Don Gross after he was hired help
4    bring structure to the Korea practice group?
5    A    Initially. I guess we had formal meetings
6    for a while in the initial period.
7    Q    Okay. And he was also writing during that
8    time?
9    A    Yes, he was.
10   Q    And what were, that you recall, some of the
11   primary writing assignments that he had?
12   A    During the entire time that he was there, or
13   initially?
14   Q    Let's talk about the second half of 2003.
15   A    Second half of 2003. His primary writing
16   assignment was working on          We also had
17   other various memos that we were doing for
18   that were either directly or indirectly related to
19          In the fall I tried to bring him in to do
20   some more          work.
21   Q    What work was done for the          in
22   the fall 2003 that Don Gross was involved in?

40

1         MS. McTAVISH: I'm going to object to that
2    to the extent that it's asking for you to explain
3    anything that would be a client-privileged
4    communication.
5         THE WITNESS: Sure.
6         MS. McTAVISH: But to the extent you can
7    answer without relaying that sort of information.
8         THE WITNESS: Absolutely.
9    A    We would periodically get requests from the
10        about trade-related issues. Generally
11   speaking, they were either policy or IP related. And
12   I believe in the fall of 2003 we probably had at least
13   one, I believe, maybe even two projects where Don was
14   involved in.
15   BY MR. PUTH:
16   Q    And what were those projects called? Did
17   they have a name?
18   A    The projects, I'm sorry, they were just
19   assignments, usually memos that we would write for our
20   client.
21   Q    And what type of memos were those?
22   A    They would usually ask for our advice about

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

11 (Pages 41 to 44)

---

**41**

1  a particular issue involving trade, and we would give
2  them our analysis and just general opinions about what
3  was happening and how that would affect Korea or Korea
4  trade policy.
5      Q   These were proposed changes by Korea in
6  their trade policies?
7      A   I wouldn't -- I wouldn't say they were
8  proposed changes.  They were issues that were coming
9  up that -- international issues that they thought
10  could affect them.  So they weren't proposals that
11  they were coming up with, there were issues that were
12  coming up in the international trade arena that they
13  were asking our input as to how it would -- could
14  impact them.
15     Q   And how did you think Don did on those?
16     A   We had an issue.  He did not do well.
17     Q   So explain what case that involved, and what
18  he was asked to do, and why he didn't do well.
19     A   There were -- I can't remember if it was one
20  or two.  There was an IP, international IP-related
21  memo.  And again, the goal was to try to bring him in
22  and do other non-          work.  And also, again, just

**42**

1  to try to get him more involved with the trade
2  section.  And so he was asked to put together a memo
3  for the          And --
4      Q   On what subject?
5      A   It was the IP-related issue.
6          And the concern, ultimately the memo had --
7  he had -- it had taken too long, and there were too
8  many people that he had used.  We have a very limited
9  budget with the                      and so the number of
10  timekeepers is very important.  And so an issue had
11  come up in which the partner, at that time Mike Kaye,
12  saw the memo and was fairly upset.
13     Q   Well, was Don Gross assigned that work?
14     A   Yes, he was.
15     Q   Wasn't the work initially assigned to other
16  attorneys at Akin Gump, right?
17     A   No, he was asked to -- he was asked to put
18  together the memo, and he, Don Gross, had brought on
19  other people.
20     Q   I see.  So you're talking about the time
21  that Mike Kaye criticized the process that involved
22  other attorneys, right?

**43**

1      A   That was -- that's one of them, yes.
2      Q   Okay.  And this was involving an attorney in
3  London, is that right, as well, a senior associate?
4      A   There was a senior associate from Brussels.
5      Q   Brussels.  What is that person's name?
6      A   Thaddeus Burns.
7      Q   Thaddeus Burns, okay.
8          And so did you express any concerns about
9  that to anybody else aside from Mike Kaye?
10     A   Well, we discussed it with Mike Kaye, and
11  Mike Kaye discussed it with Sukhan Kim.
12     Q   When you say we discussed it with Mike Kaye,
13  who do you mean?
14     A   I discussed it, I discussed it with Mike
15  Kaye, and Mike Kaye discussed it with Sukhan Kim.
16     Q   How do you know that?
17     A   He had sent an e-mail to Sukhan Kim and cc'd
18  me on it.
19     Q   All right.  And his concern was regarding
20  the staffing choices and the time that it took?
21     A   Just the overall product.
22     Q   Okay.  Who assigned the work to Don Gross?

**44**

1      A   It was -- I believe it was myself and Mike
2  Kaye.
3      Q   And what was your assignment to Don Gross in
4  that instance?
5      A   Was to help respond to the request of the
6  embassy.
7      Q   And what was your understanding of what Don
8  Gross's responsibility in terms of the turnaround was?
9      A   It was -- we explained that it was -- our
10  turnarounds are always very quick.
11     Q   Okay.
12     A   And so we -- I believe we asked him to
13  consult with Thaddeus and then try to put together a
14  memo that responded to them.
15     Q   And really Mike Kaye's concern was regarding
16  the staffing dedicated to it, right?
17     A   No, it wasn't limited to the staffing.
18     Q   It was the time that it took as well?
19     A   As well as the overall work product, yes.
20     Q   Where was Mike Kaye at that time physically?
21     A   I don't recall if he was in Chile, or if he
22  was traveling elsewhere, or if he was in Washington.

---

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

20 (Pages 77 to 80)

77

1  grammar, they were just not happy with the content.
2      Q    And you had taken part in the initial
3  drafting of that        nemo; is that correct?
4      A    Yes. A number of us had.
5      Q    Don Gross had as well, correct?
6      A    Yes.
7      Q    Mike Quigley, also?
8      A    Yes. Much more limited, but yes.
9      Q    And Sukhan Kim also had input into that,
10 correct?
11     A    Yes.
12     Q    And substantial say over the final product,
13 correct?
14     A    He had revisions towards the end, but yes, I
15 mean, he had -- he ultimately had say in what went
16 out.
17     Q    And was that        trategic -- strike
18 that.
19          Was that strategic '    _    nemo that was
20 delivered in 2003 transmitted by you to        ?
21     A    I had specifically asked Don to transmit
22 that.

78

1      Q    Okay. And why did you ask Don to transmit
2  it?
3      A    I was -- again, I was trying to help Don.
4  Up to that point most of the communications with
5          were done by me, and it was trying to
6  encourage Don to step up and have more direct contact
7  with the client.
8          I also had scheduled business trips in the
9  fall for, I want to say, between five and seven weeks,
10 and I wanted, again, Don to try to step up and do
11 that. And this is, again, in the context where the
12          memo came up as well, where we were
13 trying to get him to have other billable work.
14     Q    Well, the work he did on        was
15 billable work, correct?
16     A    It was, but I'm talking about the latter
17 half of 2003. In other words, because that was
18 quieting down, we wanted to try to continue to get him
19 to bill.
20     Q    So Don was doing work billable to the
21          policy number that he was working on,
22 in the fall of 2003, correct?

79

1      A    I believe that would be the case, yes.
2      Q    And otherwise, during that time, as far as
3  you knew, Don would have been billing his work on the
4  Korea practice group white paper to        retainer,
5  correct?
6      A    I just don't remember exactly when he did
7  the white paper, but if it was in the latter half of
8  2003, yes, that would be correct.
9      Q    Do you recall any specific concerns
10 regarding Don's contribution to the strategic
11 nemo that was delivered in September 2003 being
12 voiced?
13     A    There were a few concerns, yes.
14     Q    From whom?
15     A    From Sukhan Kim and Mike Quigley.
16     Q    And what were those concerns?
17     A    Again, we were hoping that he would be able
18 to provide us with strategic input into the memo, and
19 that being able to write strategically, where we're
20 giving advice, and we were coming to the realization
21 that that was not the case at that time.
22     Q    Well, what was the context of your

80

1  discussions? Where were you?
2      A    It was in the overall product that we were
3  delivering. And it was, again, the hope, we had the
4  hope that he would -- that Don would be able to come
5  in and really be able to contribute in that way, to be
6  one of the primary people on        since we were
7  all in different sections doing other work. And the
8  conclusion was that that was likely not going to work
9  out.
10     Q    When was that conversation?
11     A    The original conversation, I believe, was
12 right around the time that we had delivered that memo.
13 And we had a separate conversation later on as well.
14     Q    Okay. Around the time that you delivered
15 the memo, who did you meet with?
16     A    I want to say I met specifically with Sukhan
17 Kim.
18     Q    Did you meet specifically with Sukhan Kim?
19     A    Yes, I just -- I can't say if -- I don't
20 remember if Mike Quigley was at that meeting or not,
21 that's why. I did meet with Sukhan Kim.
22     Q    What did Sukhan Kim say to you?


81

1    A   He thought that it had to do with training.
2    Q   I'm sorry, what did he say to you?
3    A   He said that basically he thought that it
4 was ultimately because Don didn't have the proper
5 training in a law firm.
6    Q   What? You say "it."
7    A   Being able to write analytically and
8 substantively.
9    Q   What did -- start from the beginning. What
10 did Sukhan Kim say to you?
11    A   Sukhan Kim overall was not happy with the
12 final product that went out to the client, but we had
13 a deadline and we had to meet it. And so he met with
14 me, and again, I don't remember if Mike Quigley was at
15 the meeting, to just voice concerns overall about the
16 product. And in the context of that discussion, we
17 discussed Don Gross.
18    And, again, this is within the context of we
19 had hired him thinking that he would be someone that
20 we could give primary responsibility to
21 And his ultimate conclusion was that he didn't think
22 that that was going to work out in that sense.

82

1    Q   What did he say?
2    A   That's what he said, his training --
3 ultimately, it didn't seem that he had been trained in
4 a law firm, and so when it came to analytical writing
5 he just didn't think -- it's a difference between
6 being able to polish and make a nice sentence, which
7 is not what we're looking for, versus being able to
8 provide actual advice and coming up with that. And
9 that's what his concern was.
10    Q   And he told you that in September 2003?
11    A   In September 2003, and then we had another
12 discussion after I got back from my various trips.
13    Q   Was that also in 2003?
14    A   I believe that was right after New Year's,
15 in January 2004.
16    Q   You say you were out of the country in late
17 2003?
18    A   I was traveling on and off between, I want
19 to say, mid October through mid December.
20    Q   Of 2003?
21    A   Of 2003.
22    Q   And you say when you returned in

83

1 January 2004, you had another meeting with Sukhan Kim?
2    A   I returned in December 2003, but in
3 January 2004, when we thought we had another
4 opportunity with          I met with Sukhan Kim
5 again.
6    Q   Okay. And what was the substance of that?
7    A   At that point we did not know whether or not
8          would want us to -- would give us another
9 opportunity to revise this memo. But they
10 had contacted us, I want to say, right then in the
11 beginning of January about a possible meeting in New
12 York where we would have an initial discussion of how
13 we could revise the memo. And that's when we
14 discussed Don Gross again.
15    Q   What was the substance of your discussion
16 regarding Don Gross in January of 2004?
17    A   At that time it was he obviously -- Sukhan
18 wanted Don to continue to bill, we wanted him to try
19 to succeed, but -- because if we had another
20 opportunity, he wanted me to -- he wanted the memos to
21 go through me. He did not want to have to revise
22 Don's work. He had asked that I review it first and

84

1 revise it before it got to him.
2    Q   What else do you remember from that
3 conversation?
4    A   We were scheduled to meet with          in
5 New York on          in New York, and -- in early
6 February, and Sukhan decided not to take Don.
7    Q   There had been discussion about taking Don
8 to New York?
9    A   Yes. It was a team meeting. And at that
10 point Sukhan wanted to keep it small, but also he knew
11 that if there was -- we weren't exactly sure what they
12 were going to ask us, but we -- the indication that we
13 had gotten in December that they would give us another
14 opportunity. We talked about actually bringing in
15 Mike Quigley to take the lead on the memo, but in
16 terms of writing responsibility have Don involved, but
17 have me edit the work.
18    Q   You're saying that they let you know in
19 December?
20    A   December was the first time -- and I can't
21 remember what the impetus was, but we had -- a meeting
22 was called for          which we hadn't had in a

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

27 (Pages 105 to 108)

105

1    Q    And what was the intent of the outline?
2    A    It was to give them an idea of what we were
3    thinking before we actually embarked on the actual
4    drafting of the memo.
5    Q    And did they approve the outline?
6    A    They had -- it was a very general outline,
7    from what I recall, and they had -- they had specific
8    requests for revisions to the outline.  But we
9    ultimately thought at that point that the direction
10    was --        _ thought that that was exactly the
11    direction that they wanted to go in, but they wanted
12    more input first.
13    Q    Do you recall exactly when the outline was
14    delivered?
15    A    I don't recall.  I want to say March or
16    April.
17    Q    So who began the drafting process of the
18    _      `memo?
19    A    The memo itself?
20    Q    Right.
21    A    At that time it was probably -- we came
22    back, so I want to say that our meeting with

106

1    was probably in May, and so we probably started in
2    June the drafting.  And it was -- Mike Kaye, I
3    believe, was involved in it, Rob Joyce, myself, and
4    Anne Cusick were involved, and then we would meet with
5    the bigger team to get -- at that point we really
6    didn't -- we had the outline, but we wanted to
7    solidify the direction that we wanted to go in.  But I
8    believe the primary drafters at that point was myself,
9    and Mike Kaye, and -- Mike Kaye was supervising, and
10    Rob and Anne and I were probably the primary drafters.
11    And then Don came in subsequently.
12    Q    This is when, in the May time frame 2003?
13    A    I would say probably closer to June.  I want
14    to say that our meeting, the outline probably went out
15    about March or April, and I thought our meeting was in
16    May.  And so when we were -- either May or early June.
17    And so when we came back it was probably June, I would
18    say.
19    Q    So you and Mike Kaye were the primary
20    drafters initially?
21    A    Mike Kaye was supervising.  I don't recall
22    if he was physically in Washington at that time, but

107

1    it was Rob Joyce and Anne Cusick and I that started
2    the draft.  At that time we were primarily --
3    throughout June, actually, we were doing more of the
4    research at that time.
5    Q    How far along were you in the draft by July
6    of 2003?
7    A    I don't know the specific answer.  I
8    thought -- I think that we were still at a very
9    primary stage.  I don't -- I know that we had, we
10    probably had very rough drafts of maybe a couple of
11    sections, but we were really doing more of the
12    research.  And we were also waiting, I believe, for
13    some of the polling data that we needed.
14    Q    Don Gross began working around July 7th,
15    2003?
16    A    I believe so.  I don't know the exact date,
17    but that sounds correct.
18    Q    I gather there was a settling-in period.
19    A    I think the standard is for him to have
20    trained for a few days, but I believe we probably
21    brought him in right away.
22    Q    Did you meet with him early on?

108

1    A    Yes.  He sat next to me, his office was next
2    to mine.
3    Q    So you met with Don regularly?
4    A    Fairly regularly.  I wasn't -- I believe I
5    was traveling when he first got there, so I met with
6    him after I got back from traveling.  I don't know if
7    it was a few days later, I don't remember the exact
8    time, but I do remember that I wasn't there when he
9    actually arrived.  I don't know the exact timing.  But
10    then, since I got there, yes, I did meet with him
11    pretty regularly.
12    Q    Do you recall being asked to provide some
13    memos to Don Gross?
14    A    Yes.
15    Q    That was soon after he began working there?
16    A    I think it was probably after, very soon
17    after we met.
18    Q    Did you get an e-mail from Ms. Yoo asking
19    that you provide some memos to Don Gross as examples?
20    A    I don't remember -- I thought I had met with
21    Don and he had asked for them.  I don't remember
22    getting a memo from Ms. Yoo about them.

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

28 (Pages 109 to 112)

109

1    We had a discussion about writing, and that
2    was -- either I told him that I would give it to
3    him or he had asked. I thought he had asked me
4    directly.
5    Q    I guess we have five minutes on the
6    videotape.
7    What was your understanding of the purpose
8    of providing Don Gross memos?
9    A    It was to explain to him how important
10   writing substantively was. That was the discussion
11   that we had with Don -- that I had with Don, I'm
12   sorry, it was just the two of us. And I emphasized
13   that -- again, that it was about substantive writing
14   and that was going to be the key for him. And I also
15   mentioned that, you know, there was -- I don't know
16   how it came up, I thought it was in the context of
17   Sukhan Kim, where he had -- Sukhan Kim very regularly
18   sends very nice e-mails to people, and I had the
19   discussion that he needs to essentially ignore those
20   e-mails and really -- there's a style that Sukhan
21   likes, and he's looking for substance.
22   And that's when I thought that Don had asked

110

1    me for examples of memos that Sukhan liked. He wanted
2    to -- he knew that that was important, that was our
3    discussion.
4    Q    So it was kind of an appropriate thing for
5    anybody starting out to be diligent about, trying to
6    find out how things work, right?
7    A    Oh, absolutely. I mean, I told him that was
8    probably the most important thing for him, was being
9    able to write substantively. So I think immediately
10   that's -- I don't have the dates, but I thought
11   immediately -- I don't remember Ju-Hyun Yoo asking me
12   for them, but I thought that almost immediately I had
13   asked him.
14   Q    Do you recall that you had forwarded to Don
15   sometime around July of 2003 a series of memoranda
16   that you felt that Sukhan -- that you felt were well
17   received by Sukhan?
18   A    Yes, that's correct.
19   Q    Did you ever provide any memoranda to him
20   thereafter that you recall as good examples?
21   A    I don't recall -- not in the initial period.
22   There may have been later on, if any should come up.

111

1    Occasionally we would have an issue related to another
2    issue we may have done for another client, and I would
3    have done that.
4    Q    So you mean providing a model, we've done
5    this before for this client, here's what we did, so
6    here's a model for the work?
7    A    Yes, and there's -- there's one memo that
8    I'm thinking of in particular that had to do with a
9    Washington presence that Sukhan very much liked, and I
10   thought when that issue came up again I forwarded that
11   to him or someone else that was working on that.
12   Q    What do you mean Washington presence?
13   A    Well, it has to do with just the logistics
14   of opening up -- the strategic implications behind
15   opening up a Washington office for a company.
16   Q    I see. So you're saying that there had been
17   a memorandum done by you on the strategic implications
18   of opening a Washington office?
19   A    It was originally done by Mike Kaye,
20   originally. So I don't remember if that was one of
21   the memos that I had forwarded at that point, but I
22   do -- if it wasn't, then it was at a later point,

112

1    because I thought that issue had come up again. But
2    there was a memo that Sukhan had liked that dealt with
3    that issue that Mike Kaye had written.
4    Q    That Mike Kaye had done that you understood
5    that Sukhan Kim had liked?
6    A    That's correct.
7    Q    Okay. And that the substantive issue of a
8    company opening a Washington office came up again, and
9    you provided that to Don as an example, a good model
10   for what he might do in a new case?
11   A    That's my recollection, yes.
12   MR. PUTH: Well, I understand we're about
13   out of time on the videotape, and it's 12:17. So
14   maybe it's not a bad time to take a lunch break.
15   THE VIDEOGRAPHER: This marks the end of
16   tape 1 of the deposition of Mr. Park. We're going off
17   the record at 12:16 p.m.)
18   (A luncheon recess was taken.)
19   (Ms. Dressing does not return to the
20   deposition following the luncheon recess.)
21   THE VIDEOGRAPHER: This marks the beginning
22   of tape 2 in the deposition of Mr. Park. We're back

**121**

1    Q    And so Don Gross took on the primary
2    drafting at that point, at some time prior to December
3    of 2003?
4    A    I would say he took on substantial portions.
5    I just don't remember the timing vis-a-vis when he
6    came versus that. But at a certain point in time he
7    did take over, I would say, a pretty -- a significant
8    role.
9    Q    Would you say that when Don Gross took on
10   that role for _____ sometime, say, around August
11   of 2003, would you say that he took on the
12   coordinating role for the memo?
13       MS. McTAVISH: I just want to object to that
14   to the extent that I don't think that Mr. Park
15   testified that it was August of 2003. But --
16   BY MR. PUTH:
17   Q    We can back up. Do you think it was around
18   August 2003 that he started on _____ in earnest?
19   A    It could have been July. I don't know
20   the -- I don't remember the exact dates. It's
21   probably either July or August, either one of those
22   two dates, two months.

**122**

1       I'm sorry, but could you repeat your --
2    Q    So around July or August 2003 when Don Gross
3    took on the _____ memorandum in earnest, was he
4    taking a coordinating role on the memo?
5    A    We wanted him to. That was the ultimate
6    objective, to have him --
7    Q    He was the person who was primarily
8    responsible for circulating the memo and getting
9    feedback, correct?
10   A    I would say we were building -- he had just
11   joined the firm, so that was -- we were trying to
12   build up to that point. But eventually I thought that
13   he was probably at that point, yes.
14   Q    He had just walked in the door.
15   A    Yes.
16   Q    And so at that point, when he began
17   coordinating, was he the primary contact with Sukhan
18   Kim on the _____ memo?
19   A    I don't know if he was the primary contact.
20   I think -- I would say probably both of us were. We
21   were probably speaking with Sukhan pretty regularly.
22   But in terms of the client communications, I believe

**123**

1    it was probably more me, because they knew me.
2    Q    Client communications?
3    A    Client communication. And then when Sukhan
4    came, I believe it was probably both of us.
5    Q    Okay. Now, you said that you and Mike Kaye
6    had expressed concerns after the interview about Don's
7    writing ability?
8    A    We were concerned that he would -- yes,
9    about what his -- whether he would be able to meet the
10   expectations that we had, yes.
11   Q    Was it your understanding that was one of
12   Mike Kaye's principal concerns?
13   A    Yes.
14   Q    That Don Gross wouldn't have the writing
15   abilities for the work that was expected --
16   A    Yes.
17   Q    -- of the Korea practice group?
18   A    Yes.
19   Q    You alluded earlier to meeting with Don
20   Gross soon after he began. I gather maybe when he
21   began you were out of the country; is that right?
22   A    I believe so, yes.

**124**

1    Q    And then you came back into the country, and
2    the two of you sat down to talk about working in the
3    Korea practice group, right?
4    A    Yes. We spoke fairly regularly, actually,
5    since I -- after I got back.
6    Q    I think you related that you had spoken to
7    him about the writing standards of Sukhan Kim, right?
8    A    Yes. I believe so, yes.
9    Q    And you mentioned something about Sukhan
10   Kim's writing reactions to memos, writing e-mails,
11   that sort of thing.
12   A    Yes, what I was --
13   Q    What did you say to Don Gross about that?
14   A    I said that Sukhan typically sends e-mails
15   that are very friendly, and thank you very much for
16   the memos, but that he should be careful, that's not
17   really his sentiments, and that he should make sure
18   that the writing is -- the writing is the most
19   important thing, and that he should focus on being a
20   good writer and not take the compliments at face
21   value.
22   Q    You told that to Don Gross in July 2003?

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED
32 (Pages 125 to 128)

125

1    A    Yes, I believe so.

2    Q    And so was that -- that was something that

3    you felt was something of an idiosyncrasy of Sukhan

4    Kim's, I guess?

5    A    Not an -- I would say it was more for Don's

6    sake. The discussion was about writing and how he

7    could do well at Akin Gump. And so I didn't want him

8    to be -- think that he was -- that a good e-mail meant

9    that he was doing well. And that's the context of the

10    writing samples when that came up.

11    Q    Was it your experience that some other

12    partners at Akin Gump might give a more unvarnished

13    opinion than Sukhan Kim about a writing piece?

14    A    I would think so. My general comment was

15    just more to the notion that Sukhan Kim generally

16    sends --

17    Q    Nice e-mails.

18    A    Regardless of whether a memo was edited once

19    or three times, he will send the same e-mail at the

20    end, saying great job.

21    Q    Right.

22    A    But what I said was he has a particular

126

1    writing style that he liked, and that's when we talked

2    about Mike Kaye's samples.

3    Q    And my question to you was whether other

4    partners at Akin Gump might tend to give a more

5    unvarnished opinion about -- in reaction to a piece

6    that they might think was not good.

7    A    Oh, absolutely. Different partners would

8    react differently, yes.

9    Q    What do you think Mike Quigley's approach

10    was?

11    A    I would say Mike Quigley was probably also

12    fairly friendly. He's generally someone who took --

13    in other words, I would say that he would -- very

14    similar to Sukhan Kim.

15    Q    What about Mike Kaye?

16    A    Mike Kaye, it depends on the circumstances,

17    but I think if it's a group e-mail he would be nice,

18    and in an individual e-mail he would be much more

19    honest. If he was sending an e-mail to the team he

20    would say great job, but he can send a separate e-mail

21    that would be much more critical.

22    Q    Mike Kaye has a critical streak to him,

127

1    would you say?

2    A    Yes.

3    Q    Sometimes a little tough to please?

4    A    I think Mike is actually to the point in

5    terms of he knows what's needed. And I don't think

6    he's overly critical, I actually think he's probably

7    more truthful than most people are. And actually, I

8    think he's probably right in many instances.

9    Q    If this has been asked before, I apologize.

10    When Don Gross began working in earnest on

11    the          memo in July or August of 2003, was it

12    primarily you and him that were working together on

13    it?

14    A    On the          ?

15    Q    Yes.

16    A    At that time it was probably -- I want to

17    say Rob and -- Rob Joyce and Anne Cusick and myself

18    were the primary people along with Don at that point

19    in terms of the drafting. And then we had our

20    consultants, actually, as well.

21    Q    Did the consultants remain a part of the

22    team in 2004?

128

1    A    Yes, they did, but it was more -- the second

2    redraft that happened in 2004 primarily fell to us

3    first, and we would, again, ask them for advice. But

4    it wasn't as in-depth as it was in 2003.

5    Q    And you had already gotten the benefit of

6    much better research that they had done for you, I

7    guess.

8    A    That's correct.

9    Q    Was it

10    A

11    Q          How is that spelled?

12    A

13    Q    Last name          ?

14    A

15    Q    And where was          from?

16    A    I don't remember the name of his consulting

17    firm. He was at a consulting firm. I thought it

18    was -- maybe it was          I don't

19    remember the name offhand, but he was with a

20    consulting firm.

21    Q    So I guess there came a time in 2004 when

22    the reporting relationship on          .ssentially

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

36 (Pages 141 to 144)

<table>
<tr><td>

**141**

1    Q    Is that the same subject, same memo that was
2    referred to in the previous page, 980?
3    A    There was a revision to the memo, and I
4    think this is probably referring to the revised memo.
5    Q    Were you involved in the revision of the
6    memo?
7    A    I did review the revised memo.
8    Q    Did you take part in drafting it?
9    A    I believe it was primarily Don, the initial
10   draft.
11   Q    Do you believe that Don was primarily
12   responsible for drafting the
13        memo as revised and referred to in the
14   February 19th, 2004, e-mail from Sukhan Kim?
15   A    I would assume so, yes.
16   Q    Do you think that's more likely than not?
17   A    Yes.
18   Q    Let's take a look at Deposition Exhibit 36,
19   page AK001420, which refers -- that's an e-mail from
20   Donald Gross to the Korea practice group, correct?
21   A    Yes.
22   Q    Is that the core group that you had referred

</td><td>

**143**

1    Q    Sukhan Kim had proposed that the meetings be
2    smaller, correct?
3    A    It started before then, actually. Don had
4    set up a regular system of meetings, I believe, in the
5    fall of 2003, and he had -- we had, I guess, decided
6    originally to do a core group meeting and then a
7    larger meeting. And then eventually Sukhan Kim was
8    getting frustrated that we weren't making progress
9    between meetings, and so, I guess, I think, through
10   communications through me and Jaemin, asked us to push
11   off, delay meetings.
12   Q    Okay. So your understanding was that in
13   early 2004 in particular it was Jaemin Park who
14   suggested that you hold off on meetings?
15   A    I'm sorry, say that one more time?
16   Q    Wasn't it in early 2004 that Jaemin Park had
17   asked that Korea practice group meetings be held off
18   for a time?
19   A    Jaemin and I both did that for Don's sake.
20   Sukhan Kim was not happy with the progress of
21   meetings.
22   Q    Did he tell you, did he talk to Don about

</td></tr>
<tr><td>

**142**

1    to earlier?
2    A    No, this is -- unfortunately, this is to an
3    expanded group of people which we -- I believe we had
4    later reduced. This particular designation is to a
5    larger group.
6    Q    Okay.
7    A    I don't think he intended to send it to the
8    larger group.
9    Q    Oh, okay. Do you know what "FW KG" stands
10   for?
11   A    Yes, it's forward Korea group.
12   Q    I'm sorry?
13   A    Forward, FW means forward, and KG is
14   referring to Korea group. When we had originally set
15   up this, Don had included a number of people from
16   other sections. But later we started to reduce the
17   number of Korea practice group meetings that we had
18   and who we included in our e-mails.
19   Q    Why were the Korea practice group meetings
20   reduced?
21   A    Because we had -- Sukhan Kim was not very
22   pleased with the progress on the meetings.

</td><td>

**144**

1    that?
2    A    Talk to Don about --
3    Q    About -- you said that Sukhan Kim was
4    dissatisfied with the progress of the meetings.
5    A    Yes.
6    Q    What did you say to Don?
7    A    Jaemin and I both met with him on a number
8    of occasions.
9        Don was very good at setting up regular
10   meetings, but I think Don didn't realize that in a law
11   firm you have to -- you can't just have meetings every
12   two weeks for the sake of having meetings. And he
13   would spend a lot of time putting together these
14   minutes, but we would have agenda items that we were
15   supposed to -- that Don was primarily in charge of
16   trying to take care of.
17       And we would have another meeting, and
18   Sukhan Kim would ask if they were done, and Don would
19   say no, and Sukhan in some of the meetings at that
20   time got visibly upset. And he approached Jaemin and
21   I and said he would prefer that we work with Don or
22   push off the meetings. So Jaemin and I told Don that

</td></tr>
</table>

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

57 (Pages 145 to 148)

145

1 we had to make progress, otherwise we can't have
2 meetings.
3     We eventually, because we were concerned for
4 Don, decided to have internal informal meetings
5 without Sukhan and would only report to him if Don
6 found that we had progress to report.
7     Q    So that was to take care of action items?
8     A    Yes, because the whole point of the Korea
9 practice meetings was to act on actions, and that was
10 one of the issues that Sukhan had expressed about Don.
11    Q    So your understanding was that -- it sounds
12 as if the fall off in Korea practice group meetings in
13 2004 as compared to 2003 was really at Sukhan Kim's
14 initiation?
15    A    Yes, that's correct.
16    Q    And both you and Jaemin Park, a partner at
17 Akin Gump, asked Don to hold off on further meetings
18 for a while?
19    A    Yes.
20    Q    And some of the broader meetings that you
21 had discussed involved some of the outreach efforts
22 that Don Gross had undertaken the first few months of

146

1 his employment to other parts of Akin Gump, correct?
2     A    Yes. And we had discontinued all those
3 altogether.
4     Q    So that was part of a strategy to reach out,
5 for instance, to -- the funds group was one, right?
6     A    Yes, that's correct.
7     Q    Prakash Mehta had been invited to present to
8 the group, take part in the group, right?
9     A    That's correct.
10    Q    Okay. And other parts of the firm had been
11 invited to other meetings as part of this outreach
12 effort of the Korea practice group to involve them in
13 Korea practice group work and business development,
14 right?
15    A    They were -- again, it was just to include
16 them and get their ideas, but it -- again, I don't
17 know if it was a specific outreach, but it was this
18 idea that we would have a larger meeting where we
19 could include people at different times, yes.
20    Q    And the fact was that the meetings were
21 taking too much time, right?
22    A    There just wasn't much progress in the meetings,

147

1 was the issue.
2     Q    So getting back to page AK001420 of
3 Deposition Exhibit 36, this is a draft of marketing
4 material that Don Gross had drafted for the Akin Gump
5 website, correct?
6     A    Yes.
7     Q    And I gather Don Gross was the primary
8 drafter along with some of the PR people and marketing
9 people for Akin Gump, correct?
10    A    Yes.
11    Q    And as far as you know, was the material
12 that went up on the website regarding the Korea
13 practice group sound and good?
14    A    I don't think -- to be quite honest, I don't
15 think a lot of us paid that much attention, but I
16 think it was fine.
17    Q    Was this getting something up on the Akin
18 Gump website regarding the Korea practice group part
19 of the business development strategy of the Korea
20 practice group?
21    A    I think so, yes.
22    Q    And that was part of what Don Gross was

148

1 hired to do, correct?
2     A    Yes.
3     Q    Looking at page AK001497 of Deposition
4 Exhibit 36, do you see that?
5     A    Yes.
6     Q    This is transmittal of a memo from Don Gross
7 to you and Rob Joyce on
8                                    :orrect?
9     A    Yes.
10    Q    This was a memo for                    :orrect?
11    A    I believe it was, yes.
12    Q    And Don Gross was the primary drafter of the
13 memo on countering potential public image problems,
14 correct?
15    A    Yes, I believe so.
16    Q    And as is typical, Don Gross shared this
17 with you and Rob Joyce in order to get feedback on the
18 memo, correct?
19    A    Yes, he did share it with us.
20    Q    And did you feel it was appropriate for Don
21 Gross to share that memo and get feedback from you on
22 that particular subject?

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

23 (Pages 89 to 92)

89

1     MS. McTAVISH:  To the extent that he can
2  answer, if Mr. Park feels that he can answer that
3  question without revealing client-privileged
4  information, he can answer your question.  To the
5  extent that he feels that that would be
6  client-privileged information, I would instruct you
7  not to answer.
8  BY MR. PUTH:
9     Q   I am asking specifically for factual
10  information that has nothing to do with client
11  confidences or client communications.  Was one of the
12  issues involving an                              memo?
13     A   That wasn't specifically related to
14  That actually came from another              entity.
15  But that was one of the assignments he worked on, yes.
16     Q   That was for
17     A                                   was where that
18  assignment came from.
19     Q   Was another issue a memo
20                                   ?
21     A   Yes.
22     Q   And that was related to            That was

90

1  for
2     A   That was for
3     Q   And those are documents that both you and
4  Don took part in writing and editing, correct?
5     A   Yes, that's correct.
6     Q   And other people took part in writing and
7  editing those documents?
8     A   Yes.
9     Q   Okay.  Those are documents that Don took a
10  lead on, correct?
11     A   Yes.
12     Q   Were there any other memoranda in early 2004
13  that you recall that were associated with
14     A   That were associated with              for
15
16     Q   Yes.
17     A   Other than those two, I'm not quite sure
18  that -- the latter memo that you had mentioned, and I
19  just don't recollect, I know there was one memo that
20  we worked on that was never sent to the client, but I
21  don't remember if it was that latter memo.  I can't --
22     Q   There was a memo that was not sent to the

91

**REDACTED**

1  client?
2     A   Yes.
3     Q   And you don't recall whether it was one of
4  the two memos that I just mentioned?
5     A   If it was any one of them, it would have
6  been the latter one.  The
7                  memo did go out.  That was a separate
8  entity.  But -- and again, I just don't recall.  There
9  was one other memo, and it related to a similar issue,
10  so I'm not sure if it's that second issue or not.  But
11  I'm not sure if that ultimately went out to the
12  client, I just don't remember.
13     Q   There was also a memo regarding the
14                  worked on in early 2004,
15  correct?
16     A   Yes.
17     Q   And that was for
18     A   I believe it was.
19     Q   There were a number of op-eds that were
20  worked on by you and by Don Gross, correct?
21     A   Yes.
22     Q   Don Gross wrote some op-eds, right?

92

1     A   Yes, yes.
2     Q   And were those for Sukhan Kim's signature,
3  under his name?
4     A   Yes.  We thought that it would be good to
5  promote the Korea practice through Sukhan Kim.
6     Q   There were other op-eds that were written by
7  you; is that right?
8     A   I didn't write any op -- well, originally
9  drafted, you mean?
10     Q   Yes.
11     A   Yes.  I don't recall specific ones at that
12  time, but yes, I have drafted.
13     Q   Don Gross went in for some surgery in March
14  of 2004, correct?
15     A   That's correct.
16     Q   And after he came back he produced a draft
17  for the new version of the        memo, correct?
18     A   That's correct.
19     Q   So Don Gross was asked to take an initial
20  cut at that?
21     A   Yes, I believe he volunteered, but we -- I
22  don't remember if we specifically asked or he

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

24 (Pages 93 to 96)

---

93

1  volunteered, but yes, he took the initial draft of
2  that.
3      Q    And so that was produced in early May of
4  2004, right?
5      A    I believe so.
6      Q    And then after that time you substantially
7  took over the _____ matter; is that correct?
8      A    No. I'm sorry, the time --
9      Q    After Don Gross submitted his draft.
10     A    So the original plan was to have him do the
11  draft and I would do the editing of that. So I did
12  take over the editing of that.
13     Q    Okay.
14     A    Mike Quigley took lead of the project at
15  that time.
16     Q    Mike Quigley directed the work of you and --
17     A    He directed --
18     Q    -- others on the _____ memo, right?
19     A    Yes, Mike -- prior to that time, during the
20  earlier _____ memo, Mike Quigley would just
21  contribute -- just contributed his thoughts. But
22  given the concern that we had with _____ and the

---

94

1  importance of this additional chance to revise this
2  memo, Sukhan Kim asked Mike Quigley to take charge of
3  the project. And so Mike Quigley was directly
4  involved in not only coordinating, but editing the
5  document.
6      Q    And Sukhan Kim was involved in editing the
7  document as well, correct?
8      A    Later on. But it was primarily Mike Quigley
9  in the beginning.
10     Q    And several of you worked on _____
11  correct?
12     A    That's correct.
13     Q    Also, Rob Joyce, right?
14     A    Yes. I don't remember if he worked on the
15  second version, or the first version, or both, but he
16  was involved at various points.
17     Q    Don Gross?
18     A    Yes.
19     Q    Lisa Ross?
20     A    Yes.
21     Q    Ju-Hyun Yoo?
22     A    Ju-Hyun was one of our legal assistants, and

---

95

1  she helped with research.
2      Q    Ju-Hyun?
3      A    Ju-Hyun.            REDACTED
4      Q    Ju-Hyun?
5      A    Yes.
6      Q    And Mike Quigley was also involved?
7      A    That's correct.
8      Q    Was anybody else involved in the development
9  of the _____ memo in early 2005?
10     A    2004.
11     Q    Strike that. 2004.
12     A    I know that Anne Cusick was involved at an
13  earlier point. I don't know if we brought her back in
14  for the second version. But other than that, I -- we
15  did involve Jaemin and Jay Cohen a little bit more,
16  but they weren't directly drafting.
17     Q    You sought feedback from various members of
18  Akin Gump on the _____ memo, right?
19     A    Yes, yes.
20     Q    It was a huge project, right?
21     A    Yes.
22     Q    It was a large billable project for Akin

---

96

1  Gump, right?
2      A    Within our retainer, yes.
3      Q    Well, this was billed beyond the retainer,
4  wasn't it?
5      A    My understanding was it was not billed
6  beyond the retainer.
7      Q    Do you have a number for Korean policy, a
8  billing number for -- excuse me, _____ policy?
9      A    Sure, that's also retainer. I'm sorry, just
10  to clarify that, we had a set retainer amount. We had
11  two separate retainers and set retainer amounts. I
12  was -- I thought you had indicated whether -- if we
13  exceeded the monthly retainer amount whether we would
14  bill _____ or that, and I don't believe that's the
15  case.
16     Q    So what's your understanding of the billing
17  of _____ retainer? You had a billing number for
18  _____ retainer, correct?
19     A    Yes, that's right.
20     Q    And there was also a billing number for
21  _____ policy, correct?
22     A    Yes.

---

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

42 (Pages 165 to 168)

165

1    A    Yes.
2    Q    Who was the primary drafter of the
3              Op-Ed?
4    A    I think it was Don.
5    Q    And following your transmittal of the
6    document, turned the document around, got it back to
7    you in about 13 minutes, right?
8    A    Yes.
9    Q    Let's look at AK03116 of Deposition Exhibit
10    37.  Do you see that?
11    A    Yes.
12    Q    This is a memo from you to Mike Quigley,
13    cc'ing Donald Gross, extending your apologies for not
14    being able to send the revised memo before he left for
15    Seoul, correct?
16    A    Yes.
17    Q    And at this point did you have primary
18    custody of the document?
19    A    I don't know exactly what you mean by
20    primary custody.
21    Q    Well, my question was were you the one at
22    this point, in mid May of 2004, who kept the document

166

1    and received edits and input from other individuals
2    such as Don Gross, Mike Quigley, and Lisa Ross?
3    A    It wasn't in that context.  Don did the
4    primary draft and I was revising the draft.  So I
5    had -- I was in the process of revising.  So I was
6    telling Mike Quigley in this instance that I wasn't
7    finished with my revisions to the document.
8    Q    Okay.
9    A    The difference with these memos versus some
10    of the others was the size of the document.  It made
11    more sense to make the edits directly.
12    Q    You were making the edits directly?
13    A    Yes.
14    Q    Okay, by mid May, by -- at least by
15    May 17th, 2004, correct?
16    MS. McTAVISH:  I just want to clarify, when
17    you say the edits, are you talking about Mr. Park's
18    edits?
19    BY MR. PUTH:
20    Q    You were making the edits directly on the
21    documents as of May 17th?
22    MS. McTAVISH:  His edits.

167

1    A    I would always make my own edits circled on
2    the document.  I never gave Don handwritten edits.  I
3    would always make my documents -- I'm just saying at
4    this point in time, with the size of the document, I
5    was still in the process of editing the document.  I
6    would always make my own edits.
7    Q    I understand.
8        Were you transmitting as of May 17th, 2004,
9    the document back to Don Gross?
10    A    I'm sorry?
11    Q    Following your edits, were you transmitting
12    the document back to Don Gross?
13    A    I wasn't completed yet, so I would -- we
14    were working as a team, and I was telling Mike that we
15    were really working on it.
16    Q    Right.
17    A    It hadn't been completed yet.
18    Q    Once you completed your edits, were you
19    transmitting the document back to Don Gross?
20    A    Ultimately, yes, Don was getting copies of
21    all the drafts.  The only problem was that it needed a
22    lot of editing.  That was the issue.

168

1    Q    Right, and you were heavily involved in that
2    in May?
3    A    Revising the memo, yes.
4    Q    Looking at the following page, AK003121, top
5    e-mail is from Mike to you, suggesting the process is
6    taking too long, correct?
7    A    That's correct.
8    Q    And in your prior e-mail on May 17th, you
9    let Mike know and Don Gross know that you met with
10    Sukhan and that he said that it would be best to get
11    it out next week rather than this week, the week of
12    May 17th, correct?
13    A    Yes.
14    Q    And looking at the earlier e-mail there --
15    strike that.
16        All right, Mike Quigley was asking that you
17    don't keep editing while he's reviewing, because he
18    wants to be sure to be reviewing an up-to-date
19    document, correct?
20    MS. McTAVISH:  I'm sorry, which e-mail are
21    you referring to?
22    BY MR. PUTH:

VIDEOTAPED DEPOSITION OF J. DAVID PARK
CONDUCTED ON FRIDAY, AUGUST 17, 2007

REDACTED

43 (Pages 169 to 172)

169

1    Q    In the e-mail from Mike Quigley to you.
2    A    Yes.
3    Q    Looking at the last e-mail from you to Mike
4  Quigley cc'ing Don Gross at 11:10 a.m. on May 17th --
5    A    I'm sorry.
6        MS. McTAVISH:  It would be the first e-mail
7  in that string.
8        THE WITNESS:  Okay.
9  BY MR. PUTH:
10    Q    Right, and following over to page AK003122.
11    A    Yes.
12    Q    That you let Mike Quigley know that your
13  plan was to continue editing and for you to
14  incorporate the comments of Mike Quigley and Don Gross
15  into your edit?
16    A    That's true.
17    Q    Let's look at AK003129 of Deposition Exhibit
18  37.  Do you see that?
19    A    Yes.
20    Q    In the e-mail at the top, Mike Quigley is
21  asking you whether Don should join in on the
22  discussion regarding           orrect?

170

1    A    Yes.
2    Q    And that's dated May 19th, 2004, correct?
3    A    Yes.
4    Q    And Mike is asking you whether Don should
5  join in, because he doesn't know whether -- what you
6  and Sukhan Kim have discussed regarding Don's role,
7  right?
8    A    Yes.
9    Q    What had you and Sukhan Kim discussed
10  regarding Don's role?
11    A    It was that his original draft was unusable.
12  And they were upset about that, so they didn't --
13    Q    When did you discuss that?
14    A    When we first got Don's draft.
15    Q    Did you have any e-mail discussions
16  regarding that?
17    A    I don't think so.  I think we met and
18  discussed this.
19    Q    Who met?
20    A    With Sukhan Kim.
21    Q    You and Sukhan Kim, just the two of you?
22    A    I believe so.  This was when we were talking

171

1  about the deadline, because we told them we couldn't
2  meet the deadline.  I think you had a reference to it
3  earlier.
4    Q    Okay.  And what did Sukhan Kim tell you?
5    A    Again, this is a discussion that started
6  back in, I want to say, December 2003.
7    Q    I really -- what I want to ask you about is
8  this particular discussion, about what Sukhan Kim told
9  you in the discussion referenced by Mike Quigley on
10  May 19th, 2004.
11    A    It's -- well, it's the same discussion,
12  which is that he wanted me to edit it.  And at this
13  point, that this memo was too important to not get it
14  right.  So he wanted me to edit it and make sure that
15  we got it right, and that we could delay it by, I
16  think he said, a week, as long as we got a better
17  product out.
18    Q    Okay.  And you had been involved at that
19  point for some time in the           memo, right, for
20  at least a couple of weeks, right?
21    A    I'm sorry, which -- at what point are you
22  talking about?

172

1    Q    At the point that you discussed the matter
2  with Sukhan Kim.
3    A    I don't have the specific -- in terms of the
4  editing of the memo, or in terms of           overall?
5    Q    When did you discuss it with Sukhan Kim?
6    A    I thought it was fairly soon after we
7  received the original draft from Don.
8    Q    In early May?
9    A    Yes.
10    Q    Okay.  And, in fact, Don did get invited to
11  this meeting and did continue to have a role, correct?
12    A    Yes, that's correct.
13    Q    But at this point in mid May of 2004, Don
14  Gross was no longer a central player in the
15  memo?
16    A    No, that's not true.  He was still a central
17  player.
18    Q    Okay.  Was he still making good
19  contributions?
20    A    Yes.  He was actually still working on the
21  memo itself, too.
22    Q    And he was making good contributions?

# EXHIBIT 6

Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------:
DONALD G. GROSS,                    :
                                    :
            Plaintiff,              :
                                    :
      vs.                           : Case No.:
                                    : 1:07CV00399
AKIN GUMP STRAUSS HAUER & FELD,     : (ES)
L.L.P.,                             :
                                    :
            Defendant.              :
-----------------------------------:
```

Washington, D.C.

Thursday, July 12, 2007

Deposition of:

DONALD GROSS

called for oral examination by counsel for

Defendant, pursuant to notice, at Pillsbury

Winthrop Shaw Pittman, L.L.P., 2300 N Street,

Northwest, Washington, D.C., before Shari R.

Broussard, of Capital Reporting Company, a Notary

Public in and for the District of Columbia,

beginning at 10:02 a.m., when were present on behalf

of the respective parties:

Capital Reporting Company

Page 10

1    I also, while I was in the government, I
2  pursued a program for executives in international
3  business at the McDonough School of Business at
4  Georgetown University. I also finished and
5  completed that program.
6    Q    Did you receive a certificate of some
7  kind?
8    A    Yes, I did.
9    Q    And did an employer pay for your
10  attendance at the Harvard University program for
11  executives or did you pay for that?
12    A    It was paid for by the government.
13    Q    Okay. And what about your coursework and
14  certificate that you earned at Georgetown
15  University?
16    A    That was also paid for by the government
17  as part of management training.
18    Q    Anything in terms of formal education
19  since you attended Georgetown University?
20    A    Not that I can think of, no. No.
21    Q    Okay. Why don't we just go ahead and
22  mark as an exhibit, we'll call it Gross Exhibit 1,

Page 11

1  a June 25th, 2003 memorandum.
2      (Gross Exhibit Number 1 was
3      marked for identification.)
4  BY MS. KEARNS:
5    Q    Mr. Gross, the court reporter has put in
6  front of you a June 25, 2003 memorandum with an
7  attachment, which is your, what appears to be your
8  resume, four pages. Do you see that?
9    A    Yes, I do.
10    Q    Okay. I understand that the cover memo
11  is not addressed to you or prepared by you, but I
12  wanted to use the attachment, if it is a document
13  with which you're familiar.
14    A    It looks familiar. I haven't read it
15  over. It looks like a resume that I used at that
16  time.
17    Q    Well, take your time and look it over
18  because I don't want to assume anything, and if
19  there's any doubt in your mind whether it's a
20  resume you provided to Akin Gump, I'd like you to
21  let me know.
22    A    Yes, this looks like the resume I sent at

Page 12

1  that time.
2    Q    And when you say "at that time," this is
3  a resume that you prepared sometime around June of
4  2003?
5    A    Prior to that, yes, that's the case.
6    Q    And do you believe this is the resume
7  that you gave to Akin Gump when you applied for a
8  position there?
9    A    It appears to be.
10    Q    Okay. I wanted to use it as an exhibit
11  mainly to assist in going through your professional
12  background. So you can read as much of it as you
13  want or rely on it as much as you want, but I
14  thought it just gave a nice chronology --
15    A    Sure. Sure.
16    Q    -- and make it a littler easier to review
17  your professional history.
18    A    Sure.
19    Q    Okay. I should have asked you this
20  earlier, what is your date of birth?
21    A    November 29, 1952.
22    Q    So on June 25th, 2003 you were 50, you

Page 13

1  had not yet turned 51?
2    A    Actually, I'm trying to -- in November,
3  in November 2002 I was 50, so yes, I would have
4  been 50 at this time.
5    Q    And at this time meaning June of 2003?
6    A    Yes.
7    Q    Okay. Now, going to what is the second
8  to last page of your resume, I wanted to focus on
9  your professional history working in chronological
10  order, so it would be backwards on your resume.
11    A    Sure.
12    Q    The first entry with respect to your
13  professional background chronologically is attorney
14  at Schwartz, Klink & Schrieber?
15    A    That's right.
16    Q    Was that your first job in a law firm?
17    A    Yes, it was.
18    Q    Can you tell me which month in 1990 -- I
19  beg your pardon -- which month in 1980 you started?
20    A    I believe it was -- I don't recall
21  precisely. I remember probably September or
22  October.

4 (Pages 10 to 13)

Page 26

1    Q   Okay.  And did you work at the Kim &
2  Chang law firm in Korea until the time you returned
3  to the United States in mid December 2002?
4    A   No, I actually was in the hospital for
5  several weeks prior to coming back to the United
6  States, so I worked at Kim & Chang I believe until
7  close to the end of November.  I got quite ill and
8  was in the hospital between -- I was in the
9  hospital for five weeks, so it would have -- you
10  can kick it up.  If I came back in the middle of
11  December, I think it was around November 20th or
12  so, of my last day at the law firm.
13    Q   Somewhere in mid November of 2002?
14    A   Yes.
15    Q   And was your medical condition the reason
16  you returned to the United States?
17    A   Yes, it was.
18    Q   And I believe that it's undisputed in
19  this case that you commenced employment at Akin
20  Gump in July of 2003, precisely July 7th, 2003.  Is
21  that consistent with your memory?
22    A   Yes.

Page 27

1    Q   Between November of 2002 and July of 2003
2  did you have any other employers?
3    A   No, I did not.
4    Q   And are you currently a member of any
5  State Bars?
6    A   I'm a member of the District of Columbia
7  Bar.
8    Q   And you passed or you became a member of
9  the New York Bar at some point?
10    A   Yes, I was a member of the New York Bar,
11  member of the Illinois Bar, and I waived into D.C.
12  as a member of the D.C. Bar.  I took Bar
13  examinations in both New York and Illinois.
14    Q   And you've let those lapse because you
15  don't reside there?
16    A   That's -- that's right.
17    Q   And your D.C. Bar is in good standing?
18    A   Yes.
19    Q   Have you in your legal education taken
20  any classes or course -- done any coursework
21  related to the attorney/client privilege?
22    A   I believe that recently when I -- most

Page 28

1  recently, about a year and-a-half ago or -- when I
2  had to either register again for the D.C. Bar, I
3  was required to take a Continuing Education Course
4  either for a day or part of a day that I remember
5  attending and I believe that might have been one of
6  the issues under discussion.  Of course, you're
7  asking as a continuing education course
8  specifically, right?
9    Q   No, I'm asking about any education.
10    A   Of course, in law school I studied legal
11  ethics and part of legal ethics is the
12  attorney/client privilege and, of course, also as
13  part of the bar review course, there was a unit on
14  ethics and attorney/client privilege.
15    Q   And you think it's possible within the
16  last year and-a-half you've had continuing legal
17  education that included that topic?
18    A   Yeah, there was a requirement for
19  continuing education.  That may have come up.  I
20  don't remember specifically.
21    Q   Now, at some point in time you, for lack
22  of a better word, connected with Akin Gump on a

Page 29

1  professional level?
2    A   Right.
3    Q   How did you first know there might be an
4  opportunity for you at Akin Gump?
5    A   Actually I didn't.  I -- I -- I
6  identified -- I researched and identified law firms
7  that might be interested in someone with my
8  background and expertise, and it happened -- and
9  then I tried to connect with those law firms, if
10  possible, through a personal connection or friend.
11       In the case of Akin Gump, I knew Dan
12  Spiegel from the campaign and government, and he
13  was my initial contact at Akin Gump.
14    Q   And at the time you were researching the
15  law firms you were living in New York; is that
16  right?
17    A   That's right.
18    Q   And which of your campaigns did you know
19  Mr. Spiegel from?
20    A   In the most recent campaign, in the 1992
21  campaign.  He was part of the foreign policy team.
22    Q   Do you know when you reached out to

8 (Pages 26 to 29)

Page 30

1  Mr. Spiegel?
2      A    It was in the Spring of 2003.
3      Q    At that time did you consider Mr. Spiegel
4  a friend?
5      A    I considered him a friend.  Not a close
6  friend, but a friend.
7      Q    Had you had any kind of reporting
8  relationship to him in the campaign?
9      A    No, not at all.  I -- the only other --
10  he was part of the team.  He had separate
11  responsibilities.
12      Q    And what happened after you contacted
13  Mr. Spiegel as it related to you exploring the
14  opportunity at Akin Gump?
15      A    What happened to me?
16      Q    Yeah.  What happened next?
17      A    With the employment situation?
18      Q    Uh-huh.
19      A    We -- we had a meeting.  He wasn't sure
20  what the opportunities would be.  He said he would
21  get back in touch with me.
22      Q    You met with him in person in Washington?

Page 31

1      A    Yes.
2      Q    And did he get back in touch with you?
3      A    Yes.  I may have followed up and sent him
4  an e-mail and he responded, but yes, he initially
5  responded and -- that's correct.
6      Q    And then eventually you had some
7  interviews at Akin Gump?
8      A    Yes, that's correct.
9      Q    At the time you received the offer from
10  Akin Gump did you have any other offers of
11  employment?
12      A    I don't recall precisely.  I was in
13  contact with other employers.  This was -- this was
14  the offer of greatest interest to me at that time.
15  I don't -- I don't recall any other offers.
16      Q    And until July of 2003, until that point
17  in time in your professional career, is it correct
18  that in any year you had annual compensation that
19  was less than $250,000?
20      A    My last salary as a lawyer with Kim &
21  Chang was $165,000, plus they covered housing in
22  Korea.  The package came probably to $210,000.  So

Page 32

1  I would say it was a little bit more than $200,000.
2      Q    And in your professional --
3      A    In the government it was less.
4      Q    So is it correct that, putting Akin Gump
5  aside, your highest compensation as a professional
6  was at the Kim & Chang law firm?
7      A    Yes, as I say, the package was about
8  $210,000.
9      Q    Okay.
10      A    That's right.
11      MS. KEARNS:  Okay.  I'd like to mark the
12  next exhibit, please.
13      (Gross Exhibit Number 2 was
14      marked for identification.)
15  BY MS. KEARNS:
16      Q    Mr. Gross, the court reporter has marked
17  as Exhibit 2 a complaint that was filed in the
18  United States District Court on your behalf on
19  February 26th, 2007 in a lawsuit against Akin Gump.
20      A    Right.
21      Q    Did you see this document before it was
22  filed?

Page 33

1      A    Yes, I did.
2      Q    And I understand you've now filed a
3  motion to amend your complaint to add additional
4  claims against Akin Gump, but since the court
5  hasn't addressed that yet I'm going to work off of
6  what's actually on record as the complaint, if
7  that's okay.
8      A    Sure.
9      Q    I understand, Mr. Gross, that it's your
10  contention that during an interview meeting
11  sometime in 2003 Sukhan Kim made comments that you
12  thought were age related.
13      A    Yes, he asked me my age in the interview.
14      Q    And that was sometime in June 2003,
15  right?
16      A    Yeah, mid June 2003.  Obviously before I
17  received the offer letter.
18      Q    And after that meeting you received your
19  offer and you came to work for Akin Gump?
20      A    There was a call-back interview, where I
21  came back and I met with about four attorneys, but
22  that's correct, I -- I -- after the interview

9 (Pages 30 to 33)

Page 34

1  process I received the letter and accepted the
2  offer and came to work for Akin Gump. As you said,
3  my starting date was I think July 7th.
4      Q   And I'm going to go back and go through
5  your interviews in more detail, but what I'm trying
6  to understand is the chronology --
7      A   Sure.
8      Q   -- of what you're contending are the
9  incidents that support your claim of age
10 discrimination.
11     A   Sure.
12     Q   So I believe, and feel free to refer to
13 your complaint, but is it correct, Mr. Gross, that
14 after your interview in June of 2003, the next time
15 anyone discussed your age with you was in April of
16 2004 in a conversation with David Park following
17 your heart surgery?
18     A   Other than at the interview that you're
19 speaking of in June, and the question about my age
20 in particular?  I couldn't say that.  Age was an
21 issue that we discussed from time to time in
22 relation to dealing with clients.

Page 35

1      Q   Okay.  Well, then I want to hear about
2  each of those incidents because I'm just using your
3  complaint, and feel free to refer to it or not, but
4  in your complaint the next incident where your age
5  was discussed was April of '04.
6          Is it your testimony sometime between
7  your interview and April of '04 someone talked
8  about your age with you?
9      A   The way I would say it is that we --
10 in -- age came up.  I don't remember specific days
11 and times, but I do remember that in talking about,
12 for example, Mike Quigley's relationship with
13 Samsung Corporation, he said age was an issue for
14 him.  He also referred to David Park's age, and I
15 believe he would have referred to my age in that
16 context.  So in that sense age came up from time to
17 time in how we dealt with clients.
18     Q   Okay.  And in that conversation with Mike
19 Quigley did he say something you felt was
20 derogatory about your age?
21     A   The discussion was simply on how Korean
22 clients view American lawyers if you're too --

Page 36

1  there was nothing he said that was specifically
2  derogatory about my age.
3      Q   In your complaint you refer to an April
4  of 2004 conversation with David Park --
5      A   That's correct.
6      Q   -- in your office?
7      A   That's correct.
8      Q   Between your interview and the April of
9  2004 conversation with Mr. Park, do you recall any
10 other conversations related to your age?
11     A   I would answer in this way, to say we had
12 discussions about age in relation to Korean
13 clients.  My age and the age of other attorneys
14 came up during that conversation.  The conversation
15 did not focus specifically on my age.  So if your
16 question is was there a conversation specifically
17 referring to my age alone, no.
18     Q   And you've identified a conversation with
19 Mr. Quigley about his age and Mr. Park's age and
20 you say, presumably, it would have included your
21 age.
22         Are you thinking of any other

Page 37

1  conversation other than that one?
2      A   As I say, the age issue came up from time
3  to time.  It wasn't a question of one conversation.
4  So from -- there would have been several occasions
5  during the time that I was at Akin Gump between the
6  times you've talked about when age came up as a
7  subject of discussion.
8      Q   And tell me what those times were.
9      A   I don't recall specific times when those
10 conversations occurred, but the content of it is
11 what I've described to you.
12     Q   And who did you have those conversations
13 with?
14     A   The only specific conversation that I
15 recall with a specific person was with Mike
16 Quigley, so I would say that.
17     Q   In your complaint you allege that after
18 you returned from your heart surgery you had a
19 conversation sometime in April 2004 with Mr. Kim
20 where he inquired about your plans for retirement.
21 Do you remember that conversation?
22     A   Are you speaking of the conversation

10 (Pages 34 to 37)

Page 46

1       Is that the interview that's described in
2    your complaint?
3       A   Yes, it is.
4       Q   Do you know the date of that interview?
5       A   I'd have to go back and -- I don't know
6    the answer. I don't recall the exact date.
7       Q   Okay.
8       A   It was in June of 2003.
9       Q   And who attended that interview with you?
10      A   My memory of it is hazy. Obviously
11   Mr. Kim was there. I believe Mr. Quigley was
12   there.
13      Q   Was Mr. Quigley there for the entire
14   interview?
15      A   I don't remember. I don't recall.
16      Q   And how long did the exploratory
17   interview last?
18      A   Probably about 45 minutes.
19      Q   Did you take any notes during the
20   interview?
21      A   I don't recall taking any notes.
22      Q   Did you make any notes from memory, as

Page 47

1    you described a few minutes ago, after the
2    interview about what happened at the interview?
3       A   I don't believe so.
4       Q   During that interview what, if anything,
5    did Mr. Kim tell you about the position he was
6    interested in filling?
7       A   He didn't tell me that much. He --
8    because the bulk of the interview was discussing my
9    background and qualifications. He told me that
10   there was a major client that he was unhappy the
11   way the law firm was currently serving.
12          He told me, I believe, that they
13   needed -- he did tell me that he thought that my
14   background in policy and regulatory, work in
15   government would be appropriate and very helpful
16   for the kind of work that he had in mind.
17      Q   And tell me, to the best of your memory,
18   what he said to you about your age during the
19   interview.
20      A   We -- actually, we were talking about my
21   qualifications for working at Akin Gump and he --
22   he asked me my age. I was surprised about that. I

Page 48

1    told him my age.
2       Q   Do you know whether you had submitted a
3    resume in advance of that interview?
4       A   I believe I would have. I don't recall
5    specifically sending it, but I believe I would
6    have.
7       Q   Okay.
8       A   And after -- after he asked me my age,
9    he -- he commented that he thought it was -- that I
10   was very old to be starting out in a major law
11   firm. And as you know from the, I believe I've
12   described it in greater length in the complaint, I
13   tried to make light of it in order not to
14   jeopardize the interview.
15      Q   And did he provide any explanation for
16   why he questioned your age in connection with
17   working in a major law firm?
18      A   He just said what he said and did not
19   provide an explanation.
20      Q   Did you get an impression one way or the
21   other whether he was impressed with your
22   credentials?

Page 49

1       A   I thought the interview went well. He --
2    there was nothing negative he said during the
3    interview and he commented positively on my
4    background. He ended up the interview in an upbeat
5    way, that he thought that my qualifications were
6    good. I waited to hear what the judgment was
7    after -- after that.
8       Q   At what point in the 45 minutes did the
9    issue about your age come up?
10      A   Quite early on in the interview. Not at
11   the very beginning, but after perhaps talking 10,
12   10 or 15 minutes.
13      Q   And what, if anything, did Mr. Quigley
14   say during the interview?
15      A   I believe he said, if I recall correctly,
16   that he was there -- I remember the conversation
17   being almost -- being entirely with Mr. Kim. I,
18   other than being introduced to another lawyer who
19   was sitting there, I don't remember any specific
20   conversation with that other lawyer I believe. So
21   the answer to that is I don't think he said
22   anything other than pleasantries and formalities.

13 (Pages 46 to 49)

Page 66

1  offer based on the letter.
2      Q   And --
3      A   I mean you're asking me other than what
4  I've just told you.
5      Q   Yes.
6      A   In the, perhaps the second interview that
7  I had with him where he gave me perhaps a range, I
8  don't recall specific numbers, but other than that,
9  there was no discussion of salary before I accepted
10  the offer.
11      Q   And what discussion was there, if any,
12  about potential bonuses before you accepted the
13  offer?
14      A   I don't recall having a separate
15  discussion about bonuses.
16      Q   After you received this letter on
17  June 20th, did you contact Mr. Race or anyone else
18  about potential bonuses before you accepted the
19  offer?
20      A   I don't recall doing that.
21      Q   Before you accepted the offer what
22  questions did you ask about billable hour

Page 67

1  requirements at Akin Gump?
2      A   I don't think that I asked that question.
3      Q   Did you ask any questions about
4  responsibility for client generation before you
5  accepted the offer?
6      A   I don't recall any discussions like that.
7  As I said, the sequence was I received the letter,
8  I accepted the offer. There were no intervening
9  discussions --
10      Q   The second --
11      A   -- on any subjects.
12      Q   Okay. The second line of the second
13  paragraph says, "Like other employees of the firm,
14  you'll be considered an employee at will;"?
15      A   Uh-huh.
16      Q   And of course you're free to read the
17  rest of the sentence, I'm not trying to cut it off.
18  But did you understand at that time, meaning
19  June 20th, 2003, what an employee at will was?
20      A   My reading of that particular phrase was
21  that I was going to be treated like all other
22  employees in the firm, and I thought that was equal

Page 68

1  and fair since I wasn't asking for special
2  treatment.
3      Q   Okay. You --
4      A   But I did not -- I -- the answer is I did
5  not know the legal -- I did not have any legal
6  discussions about any legal significance of the
7  words "at will." I interpreted it in a commonsense
8  way.
9      Q   And I'm not asking about discussions
10  actually at the moment. I'm asking whether as of
11  June 20th, 2003, did you, as a lawyer, have an
12  understanding of the legal concept, employed at
13  will, or was that something new to you?
14      A   I've heard the term before. I wasn't an
15  employment lawyer. I didn't attach any special
16  significance of it. As I said, to the extent that
17  I attached meaning to it, it was that I would be
18  treated like other employees of the firm.
19      Q   And you did not ask anyone any questions
20  about what "employee at will" meant at that time?
21      A   I didn't bring this letter to a lawyer
22  and seek a consultation, no.

Page 69

1      Q   Well, did you ask anyone at Akin Gump?
2      A   As I said, there were no intervening
3  discussions. I was just given the offer based on I
4  had two prior meetings with Akin Gump. I was happy
5  with -- with the people I met, they were happy with
6  me it appeared, and I accepted the offer. So I did
7  not have any, as I said, I did not have any
8  discussions about the language of the letter or
9  the -- beyond what I've told you.
10      Q   And that sentence goes on to say,
11  "However, it is our intention to review your
12  employment situation at your one-year anniversary
13  and reassess our needs and the terms of your
14  employment."
15      A   Right.
16      Q   And I take it you read that sentence
17  before you accepted the offer?
18      A   Yes.
19      Q   And like every other aspect of this
20  letter, you did not discuss it with anyone at Akin
21  Gump before you accepted the offer?
22      A   No, that's right. That's correct.

18 (Pages 66 to 69)

Page 78

```
 1        Q   Okay.  That's helpful.  Thank you.
 2        The meeting on July 7th, 2003 was with
 3    Sukhan Kim; is that right?
 4        A   Yes.
 5        Q   That was the first day of your employment
 6    at Akin Gump?
 7        A   That's right.
 8        Q   And were you alone with Mr. Kim in this
 9    meeting?
10        A   I recall that I was alone.
11        Q   If you look then at the third page of the
12    exhibit where it says "Sukhan Kim" at the top --
13        A   Yeah.
14        Q   -- could you just read me what your notes
15    say, those first four lines?
16        A   "Someone who can take control over some
17    cases for K" -- may have been -- and then
18    semicolon, "some, very important, so busy and,"
19    looks like "important deadlines and fail to
20    follow-up."
21        Q   Okay.  Just at the moment, I just wanted
22    you to interpret your notes for me in terms of what
```

Page 79

```
 1    they said.
 2        A   Okay.
 3        Q   But is this you writing down things
 4    Mr. Kim is saying to you?
 5        A   Yes.
 6        Q   Is that basically what these notes
 7    consist of?
 8        A   I'd have to read through them all, but --
 9        Q   Sure.  Just look at the first three pages
10    because I just --
11        A   Okay.
12        Q   Again, you can look at anything you want,
13    but I'm asking you questions about your notes from
14    July 7th.
15        A   Okay.
16        Q   Okay.  So my question is, are these notes
17    of comments that Mr. Kim was making to you during
18    the course of a meeting on July 7th?
19        A   Yes, that's right.
20        Q   Is it correct that at that meeting he
21    told you he wants you to be the focal person for
22    the Korea projects generally?
```

Page 80

```
 1        A   Where are you reading from?
 2        Q   I'm at the bottom of DG 0827.  I may have
 3    misspoken.  "He wants me to be" --
 4        A   Yes, that's correct, that's correct.
 5        Q   Let's not talk over each other.
 6        It's correct he said "He wants me,"
 7    meaning you, "to be the point person for the Korea
 8    projects generally"; is that correct?
 9        A   Yes.
10        Q   And he also told you he wants you to be
11    the focal point of the Korea practice?  I'm looking
12    at notes on the very first page of the exhibit in
13    the top left corner.
14        A   Yes.
15        Q   During that meeting he also told you that
16    he wants to make sure you bill 2,100 hours per
17    year; isn't that correct?
18        A   That's what he said, yes.
19        Q   The copy that we received from the
20    production from your counsel was cut off, as that
21    sometimes happens.
22        Could you do your best to tell me what
```

Page 81

```
 1    the note at the bottom of the first page of the
 2    exhibit says beginning with the word "also"?
 3        A   Excuse me.  Which page?
 4        Q   I'm on page DG 00825.
 5        A   Yeah.
 6        Q   Should be the first page of the exhibit
 7    starting with the word "also."
 8        A   This was -- has said 185 per month,
 9    billable per month with something.
10        Q   Actually, Mr. Gross, I can point for you.
11    I would like you to read me your notes starting
12    with the word "also."
13        A   Yeah.  "Also encouraged me to work outside
14    the Korea Group if I have extra" -- I didn't write
15    down the word "time," but that's what it would have
16    been -- "if I have extra time."
17        Q   What else does it say under the word
18    "extra"?
19        A   "Wants to make sure I bill 2100 and
20    possibly have 3 to 400 in nonbillable time.  Said
21    185/billable per," you know, "month would" -- I
22    cannot read the last word.
```

21 (Pages 78 to 81)

Capital Reporting Company                    REDACTED

Page 82

1    Q   Okay. Was this your first discussion
2  with anyone at Akin Gump about billable hour
3  requirements?
4    A   I believe so.
5    Q   What, if anything, did you say in
6  response to Mr. Kim's comments about billable hour
7  requirements?
8    A   I was writing down what he was telling
9  me. I wouldn't -- I don't recall saying anything
10 in particular about billable hour requirements.
11   Q   Did you ask any questions?
12   A   My notes reflect further comments that he
13 made about billable hours, so there was obviously a
14 discussion. I don't recall specific questions I
15 had.
16   Q   Can you read your notes for me about
17 those further comments about billable hours?
18   A   Yes. He -- he -- "Bill as much as
19 possible," I think that is P-O -- I'm reading from
20 the left-hand corner. "If not reaching" -- I
21 believe that this would have been 2100 -- "then
22 could bill time to      policy."

Page 83

1        That referred to the fact that I was --
2  he was instructing me to mainly bill my time to two
3  matter numbers. One was called        retainer
4  and the other one was called        policy.
5        And then it looks like it's "Admin to
6  office unbillable." I think that what that means
7  is that if I have admin time, time spent on admin,
8  I should have billed it to the office.
9    Q   Okay.
10   A   Unbillable.
11   Q   Do you know how long your meeting lasted
12 with Mr. Kim on the 7th?
13   A   I don't know.
14   Q   After you arrived at Akin Gump, which
15 attorneys gave you billable assignments?
16   A   Most of my -- all of my assignments at
17 the outset came from Mr. Kim.
18   Q   You said "at the outset." At some point
19 did that change?
20   A   I received in the course of the year that
21 I was there some other assignments. One I remember
22 from Dan Spiegel, one from Ed Rubinoff on a matter

Page 84

1  that I developed -- Ed Rubinoff, a partner in the
2  Export Control Group. The work assignments came
3  otherwise from Mr. Kim.
4        I'm trying to think if Quigley --
5  Quigley -- to the extent that Quigley gave me
6  assignments, it was most -- as I recall,
7  implementing what -- the projects that Mr. Kim had
8  given me.
9    Q   And did you take steps to maintain an
10 annual billable rate of 2100 hours?
11   A   When you say "steps," what do you mean by
12 "steps"?
13   Q   Did you consider that a requirement?
14   A   Did I consider it a requirement? He told
15 me -- I knew that, based on what he told me, there
16 was a requirement for senior counsel to normally
17 bill 2100 hours.
18        In the initial discussion on this day
19 he -- he was telling me to bill all my time,
20 including time that I spent on the Korea practice,
21 either to one of the two        accounts.
22        So it says here charge all time to

Page 85

1         policy. My job -- so I would have charged
2  all of my time on        to the        retainer
3  and I would have -- at that point he instructed me
4  to charge all my time as billable time, that I
5  spent on developing the Korea practice, to
6            /policy.
7    Q   That wasn't my question.
8    A   I'm trying to --
9    Q   My question was did you understand you
10 had a billable hour requirement as an attorney at
11 Akin Gump?
12   A   Other than this conversation, there was
13 never any specific discussion about the
14 requirement, no.
15   Q   Did you have an understanding of whether
16 you had a required billable hour target as an
17 attorney at Akin Gump?
18   A   The answer is that other than this
19 conversation where he tells me I should strive to
20 bill at least 2100 hours, I had -- I never had any
21 other conversation, so I knew from him that I
22 should strive to bill 2100 hours. Does that -- I

22  (Pages 82 to 85)

**Page 94**

1    Sometimes I would write -- type notes from memory.

2        Q    And these notes say, "Val will be the new

3    head of the section," and you testified earlier

4    that Val Slater became the head of the

5    International section, which was your section?

6        A    Yes.

7        Q    And did you have any sort of reporting

8    relationship to her?

9        A    Not formally.  The only relationship that

10   I had was that I occasionally attended meetings.  I

11   tried to attend as many meetings as possible of the

12   International section.  But I didn't -- I didn't

13   have any formal reporting relationship.

14       Q    And who are Mark Medish and Dan Lucich?

15       A    They are two other attorneys who worked

16   on what you might call international policy matters

17   pretty closely with Dan Spiegel.

18           Medish is -- was a partner at Akin Gump.

19   I don't know where Dan Lucich is now.  I believe he

20   had a senior counsel or senior advisor or senior

21   international advisor title.  But Mark Medish was a

22   partner at that time.

**Page 95**

1        Q    And do you know where he is now?

2        A    I think Mark Medish went to a research

3    institute in Washington.  I'm not sure.

4        Q    Did you stay in touch with him after he

5    left?

6        A    No, I didn't.

7        Q    How much interaction did you have with

8    Mr. Medish while he was at Akin Gump?

9        A    Very little.

10       Q    Do you consider yourself to have had a

11   good relationship with him?

12       A    Actually I -- I -- I think I only had one

13   full meeting with him at this time and then we may

14   have exchanged e-mails or had a phone conversation

15   the remaining year that I was at Akin Gump, but we

16   didn't have a -- I mean he knew who I was, I knew

17   who he was.  We didn't work together and so -- so

18   when you say "relationship," no, I didn't really

19   have a relationship with him other than the meeting

20   that we had.

21       Q    You did contact him after he left to have

22   him assist you, if possible, in finding another

**Page 96**

1    job?

2        A    I'm not surprised if I did that.  I don't

3    recall specifically, but I may well have done that.

4    I contacted everybody I knew.

5        Q    Could you turn to the next page?

6        A    Sure.

7        Q    Who is Mike Emery?

8        A    At that time Mike Emery was the senior

9    administrator of the law firm of the Washington

10   office -- in the Washington office.  I don't -- he

11   was the senior administrative officer.

12       Q    And why did you meet with him?

13       A    As you'll see, all of these meetings took

14   place -- that you probably -- that I've looked at

15   are meetings that took place as part of my

16   orientation when I joined Akin Gump.

17           I thought it was very valuable to meet

18   with Mike Emery as the senior administrator at the

19   law firm to give me his take.

20           He was not a lawyer, but he certainly

21   understood how the law firm worked, and I wanted to

22   benefit from his, you know, understanding and

**Page 97**

1    insights.

2        Q    Okay.  Could you turn the next two pages

3    to "Meeting with David Park"?

4        A    Yeah.

5        Q    And you met with David Park on July 17th,

6    2003?

7        A    Yes, that's what I've written down.

8        Q    At the top of the next page during your

9    meeting with David Park --

10       A    Yeah.

11       Q    -- "Said that 2100 hours is the normal

12   expectation for counsel, senior counsel and senior

13   advisors.  2000 is the normal quota for

14   associates."

15           He told you that during the meeting?

16       A    He would have.  That's why I would have

17   written it down.

18       Q    And did you ask him any questions about

19   that expectation?

20       A    I certainly -- I don't recall any

21   discussion about that.

22       Q    Down four paragraphs into your memo --

25 (Pages 94 to 97)

Capital Reporting Company

Page 134

1     A    Yes.
2     Q    And you cannot, just based on the
3  content, date them within any particular month; is
4  that right?
5     A    That's right.
6     Q    And --
7        MR. PUTH:  And if it will help at all, if
8  your interest is in the date, we would be glad to
9  review the original and report to you by letter and
10  otherwise to let you know exactly what we can
11  discern and, of course, you're welcome to take a
12  look at the original.
13       MS. KEARNS:  That's fine.  That would be
14  helpful.
15  BY MS. KEARNS:
16     Q    Can you tell, Mr. Gross, by the content
17  who you were meeting with when you made these
18  notes?
19     A    Well, these were meetings -- notes from a
20  meeting with Mr. Kim.
21     Q    And do you know whether anyone else was
22  present?

Page 135

1     A    I don't recall.
2     Q    Could you turn to the next page, please?
3  And these notes are dated 1/19/04?
4     A    Yes.
5     Q    And these are in your handwriting?
6     A    Yes.
7     Q    And the notes from 1/19/04 appear to go
8  on for two full pages and the top of the third?
9     A    Yes.
10     Q    And do you know who you were meeting with
11  at the time you took these notes?
12     A    Let me just take a minute --
13     Q    Sure.
14     A    -- but I think I know the answer.
15     Q    Okay.
16     A    Okay.  Yeah, these were notes that I
17  wrote to myself at that time.
18     Q    So you were alone when you wrote these
19  notes, these are not notes of a meeting you were
20  having with someone else?
21     A    These are notes I wrote to myself.
22  Normally I would write those kind of notes when I

Page 136

1  was alone.
2     Q    Normally you would?
3     A    Yes.
4     Q    And what was your purpose in preparing
5  these notes?
6     A    Thinking through how I wanted to develop
7  my own work in relation to the Korea practice over
8  the -- over the few -- next couple of months.
9     Q    And I noticed down about two-thirds of
10  the way down the first page of the January 19th,
11  '04 notes you've written to yourself, "I have to
12  increase billable hours as much as possible"?
13     A    Uh-huh.
14     Q    Was that your point of view as of
15  1/19/04?
16     A    It must have been.
17     Q    And could you turn to the next page,
18  please, of the notes?
19     A    Uh-huh.
20     Q    There are two lines at the bottom and the
21  word "if" appears to be the first word under the
22  first top line.

Page 137

1     A    Yeah.
2     Q    Could you just read me what that says?
3     A    "If I put myself in the front edge of all
4  actual marketing activity and try by whatever means
5  to increase my billable hours, it should be okay."
6     Q    Did you have some concern as of 1/19/04
7  that your career at Akin Gump was not going okay?
8     A    No, I didn't.
9     Q    And what was the "it" that should be
10  okay?
11     A    I think I was just talking about the
12  process that -- I was just saying, you know, if I
13  do this, that's the way to do it kind of thing.  In
14  other words, that to deal with whatever issue -- I
15  was -- I was -- I was reaffirming to myself that
16  my -- my strategy of putting myself on the front
17  edge of marketing activity was a good strategy.
18  That's what I mean.
19     Q    I'm sorry, but your strategy of putting
20  yourself on the front edge of actual marketing --
21     A    Well, actual marketing activity.
22     Q    -- and try by whatever means to --

35  (Pages 134 to 137)

Page 138

1    A    Right.
2    Q    -- increase your billable hours was your
3    strategy?
4    A    Right.
5    Q    Did you have some --
6    A    The -- the first relates to the second.
7    I mean that was a means of increasing billable
8    hours.
9        In other words, if we -- if the marketing
10   activity went well, that would be a means of
11   increasing billable hours.
12       I -- I can't -- beyond that I can't read
13   into what I was thinking at the time because I
14   don't know.  But I think together they were part of
15   the strategy.
16   Q    And part of your strategy was, as stated
17   on the first page, was to increase your billable
18   hours as much as possible, right?
19   A    Wait a second.  First page?  Yeah, I
20   stated that as one of the overall aims that I had.
21   Q    Okay.  And during your first year at Akin
22   Gump how did you do in your view with respect to

Page 139

1    that particular aim that you've identified in your
2    notes on January 19th?
3    A    I think --
4        MR. PUTH:  Object to the form of the
5    question.
6        THE WITNESS:  Does that mean I shouldn't
7    answer or --
8        MR. PUTH:  You may answer.
9        THE WITNESS:  I think I did quite well.
10   I came -- I believe -- I remember at the end I -- I
11   had billed at least 1300 hours to          , by my
12   calculation I had made the firm over $500,000.
13   Then beyond the 1300 I had billed something like a
14   similar -- a similar quantity of nonbillable time,
15   which, the way things shook out, reflected the time
16   that I spent on organizing and helping to develop
17   the Korea practice.  So I -- not only did -- did
18   Akin Gump make money on me, but I spent half my,
19   looks like roughly, from my recollection, about
20   half of my time on pure practice development to
21   bring the Korea Practice Group up to snuff along
22   the lines that the law firm was hoping and

Page 140

1    expecting.
2    BY MS. KEARNS:
3    Q    It sounds like you had a chance to review
4    the figures that would support your view that you
5    had billed 1350 hours in a year.
6    A    I didn't remember -- I remember it was at
7    least 1300.
8    Q    Okay.
9    A    I did see and I -- I have seen the
10   compilation of the number of billable hours.  I --
11   I thought it had been turned over, or I've shown my
12   attorneys.
13   Q    And you said you made the firm $500,000.
14   How did you come up with that number?
15   A    Multiplying the -- the, by my
16   calculation, multiplying the number of hours by my
17   billable rate.
18   Q    Well, have you taken any finance courses,
19   Mr. Gross?
20   A    Actually I have.
21   Q    Were there any expenses associated with
22   that $500,000 such as your salary?

Page 141

1    A    No, I'm not -- I'm talking about the
2    amount that they could bill the client, that --
3    that they -- that they had -- yes, I mean obviously
4    500 -- they were paying me $250,000.
5    Q    Right.
6    A    They -- they had made more than $500,000,
7    if that's what you mean.
8    Q    You mean after they deduct for your
9    compensation?
10   A    My salary, right.
11   Q    So the way you got to $500,000 is the
12   number of hours you billed --
13   A    Right.
14   Q    -- times your hourly rate minus expenses
15   associated --
16   A    No, I didn't -- I didn't --
17   Q    -- with you?
18   A    Oh, excuse me.  Please continue.
19   Q    Is that how you got it?
20   A    The only thing that I did was request
21   from the accounting department my annual billable
22   hours as -- I think we did it from the beginning of

36  (Pages 138 to 141)

Capital Reporting Company

Page 142

1  August 2003 through the end of July 2004, so it
2  would have not included all the time that I spent
3  on the export control matter that I worked on with
4  Ed Rubinoff and it may not have included time for
5  Time Warner. But I wanted to get -- and I think
6  this, if I recall correctly, was part an overall
7  effort to get time for all the attorneys in the
8  group, as I said to -- I asked -- I got a yearly
9  compilation of that time, and that's -- that's all
10 I meant; that my billable time for the law firm
11 came to over $500,000.
12     Q    Okay.
13     A    And on top, as I said earlier, on top of
14 that I spent roughly half of my time for the
15 benefit of the law firm on -- on organizing,
16 managing, and developing the Korea practice.
17     Q    I have not taken finance courses, so I
18 would like you to just walk me through your
19 calculation that gets you to that $500,000.
20     A    I think you asked --
21        MR. PUTH: Objection. Asked and
22 answered.

Page 143

1        THE WITNESS: I -- I multiplied the
2  number of billable hours by my billable rate and I
3  came up with that number.
4  BY MS. KEARNS:
5     Q    Okay. In March of 2004 you took some
6  time off for medical leave; isn't that correct?
7     A    That's correct.
8     Q    Between the end of December 2003 and
9  March of 2004 how often did you have substantive
10 meetings with Mr. Kim?
11     A    I tried to see him and I believe we had
12 meetings on a -- on a regular basis of
13 approximately once a week. We had a lot of
14 informal contacts by e-mail and phone as well.
15     Q    You mentioned before lunch that once a
16 week or so you would walk down and sit on his couch
17 and talk to him in his office?
18     A    I would go down to his office and talk to
19 him. It didn't always result in a meeting on his
20 couch, but I -- I would have -- I would at least
21 talk to him, express interest in talking with him
22 when he had time.

Page 144

1     Q    And those were the weekly meetings that
2  you were talking about?
3     A    That's correct. That's correct.
4     Q    And that practice on your part of going
5  down and talking to him or trying to talk to him
6  continued until you went out on your medical leave;
7  isn't that right?
8     A    That's correct.
9     Q    Okay.
10     A    As I said, supplemented by phone calls
11 and e-mails.
12     Q    Okay. You went out on medical leave on
13 March 23rd, 2004; isn't that right?
14     A    If that's a Monday, that would be
15 correct. I don't have -- I don't remember the --
16     Q    Well, why don't we just mark this as an
17 exhibit so there's no question.
18        (Gross Exhibit Number 9 was
19        marked for identification.)
20 BY MS. KEARNS:
21     Q    If you could look at Exhibit 9. Is this
22 an e-mail you prepared and sent to Mr. Kim and

Page 145

1  Mr. Quigley on March 4th, 2004?
2     A    Yes.
3     Q    And was this the first notice that you
4  gave them that you'd be taking time off for medical
5  purposes?
6     A    I believe so.
7     Q    You had not discussed it with them at any
8  prior time?
9     A    No.
10     Q    And Mr. Quigley wrote back to you, "No
11 problem. Please take care of yourself and good
12 luck with your operation"?
13     A    Yes.
14     Q    Now, it says here that the doctor is
15 recommending you get the necessary operation in
16 late March, on March 23rd. What day did you go
17 out? Do you know?
18     A    Well, I need a calendar. That's what I'm
19 saying.
20     Q    Okay.
21     A    I went into the hospital on Monday
22 morning of that week. I don't remember if the 23rd

37 (Pages 142 to 145)

Page 146

1   was a Monday or Tuesday, but it was -- if the 23rd
2   was a Tuesday, then I went in on the 22nd, a
3   Monday. But I -- I did enter on Monday -- very
4   early on Monday morning.
5       Q    And did you receive any response from
6   Mr. Kim to this particular e-mail?
7       A    I don't recall.
8       Q    Between March 4th and when you went out
9   on your surgery did you talk with Mr. Kim at all
10  about the fact you were going to be having your
11  surgery?
12      A    I don't recall.
13      Q    Do you remember talking with him about
14  anything at all in that time frame?
15      A    I believe we had a Korea Practice Group
16  meeting in early March, I don't remember the exact
17  date, and I would have talked with him and all the
18  other members of the Korea Practice Group at that
19  time.
20      Q    And is your memory of that meeting based
21  on the practice of having such a meeting once a
22  month or do you have a specific memory of an early

Page 147

1   March meeting?
2       A    My memory is based on reviewing the notes
3   of my meetings. I recall that I had a meeting in
4   March based on my review of the date on those
5   notes. So that's what it's based on.
6       Q    Okay. Are those notes that you turned
7   over?
8       A    Sure. I mean I believe so.
9       Q    Okay.
10      MS. KEARNS:  Let's just mark the next
11  exhibit.
12      THE WITNESS:  By the way, are we still
13  working on this one or are we done?
14      MS. KEARNS:  I'll be coming back to it
15  later.
16      THE WITNESS:  All right.
17      (Gross Exhibit Number 10 was
18      marked for identification.)
19  BY MS. KEARNS:
20      Q    If you could just look at Exhibit 10. It
21  starts with an e-mail from you. I'm not sure
22  who -- it says "To: FW KG." What does that mean?

Page 148

1       A    That was a group e-mail. It means Korea
2   Group. We -- early on when I was there I set up,
3   with the help of the computer people at Akin Gump,
4   designated groups.
5           We had a -- we had a Korea Core Group,
6   that was KG; we had an expanded group that included
7   other attorneys. So if we -- if we needed to send
8   information about the Korea Practice Group to a
9   group of attorneys, we didn't have to write the
10  names down, we just hit, you know, KG or --
11      Q    You created some mailing list on your
12  computer?
13      A    Yes.
14      Q    So this went to the core Korea Group,
15  this thank you note?
16      A    It seems to have gone there.
17      Q    And then Mr. Quigley wrote back to you?
18      A    Yeah.
19      Q    It says that you're looking forward to
20  returning to the office on Monday, April 5th.
21          Did you, in fact, return that day?
22      A    Yes, I believe I did. In fact, I thought

Page 149

1   I -- I was just trying to refresh my own memory. I
2   believe I only took two weeks off and came back,
3   you know, I was out two weeks basically and I came
4   back on that day, so --
5       Q    Did you come back before you were ready
6   to?
7       A    No.
8       Q    Okay.
9       A    They encouraged me to work. I didn't
10  work full-time. I worked part-time for a week or
11  two in the sense that I might leave in the
12  afternoon, take a nap, as part of the convalescent
13  and rehabilitation process.
14      Q    When you say "they encouraged you to
15  work," is that your doctors?
16      A    Yeah.
17      Q    So you came back to work. And, by the
18  way, I don't want to inquire into your medical
19  condition unless you want to talk about it, but was
20  there any aspect of your medical condition that
21  affected your ability to perform to your own
22  satisfaction during the period you were at Akin

38  (Pages 146 to 149)

Capital Reporting Company

Page 150

1    Gump?
2        A    No.
3            MS. KEARNS:  Could I mark the next
4    exhibit?
5            (Gross Exhibit Number 11 was
6            marked for identification.)
7    BY MS. KEARNS:
8        Q    And, Mr. Gross, if you could just look at
9    this.  I believe it's the same e-mail to the Core
10   Korea Group that you just identified, but this is
11   Mr. Kim's response to you?
12       A    Yes, that's right.
13       Q    In your complaint, Mr. Gross, at
14   paragraph 12, and that's Exhibit 2 if you need to
15   look at it.
16       A    Just let me get it.  Yeah.  Which
17   paragraph?
18       Q    Paragraph 12, please.
19       A    Right.
20       Q    In that paragraph you allege that in or
21   around March 2004 plaintiff took a three-week
22   absence for minimally invasive heart valve surgery.

Page 151

1            Now, Mr. Gross, that's the surgery we've
2    been discussing for the last few minutes, right?
3        A    That's correct.
4        Q    You go on to allege that "Beginning with
5    his return in or around April 2004, Mr. Kim's
6    demeanor, interaction, and work assignments in
7    relation to plaintiff changed considerably."
8        A    That's right.
9        Q    "For instance, Mr. Kim avoided meeting
10   with plaintiff or contacting him by telephone and
11   e-mail, as he had done during plaintiff's previous
12   nine months with the firm."  And it goes on, and
13   feel free to read it, but that's the part I want to
14   focus on.
15       A    Sure.
16       Q    So a couple questions about that.  The
17   change in demeanor that you're alleging in
18   paragraph 12, did that occur at some point after
19   Mr. Kim sent you the March 29th, 2004 e-mail or was
20   that e-mail part of the change in demeanor?
21       A    No, I'm speaking of when I returned to
22   the firm in early April, I was still on leave when

Page 152

1    I received this note from Mr. -- when I sent the
2    note and then when I received the note from
3    Mr. Kim.
4        Q    Okay.
5        A    So this is basically after my operation
6    and I was thanking him for the flowers.
7        Q    So is it correct that you did not sense
8    any change in his demeanor while you were on your
9    medical leave?
10       A    That's correct.
11       Q    Up and through at least March 29, 2004
12   there was no change in his demeanor?
13       A    I only noticed it after I came back to
14   the law firm in early April.
15       Q    And there's no doubt in your mind that he
16   knew why you had been out when he wrote you the
17   note on March 29th, right?
18       A    Right.
19           MS. KEARNS:  So let's mark the next
20   exhibit.
21           (Gross Exhibit Number 12 was
22           marked for identification.)

Page 153

1    BY MS. KEARNS:
2        Q    Now, this Exhibit 12 is an e-mail from
3    you to Mr. Kim on Friday, April 16th, 2004.
4        A    Uh-huh.
5        Q    And do you remember writing this e-mail?
6        A    Please let me read it.
7        Q    Sure.
8        A    (Perusing document).  Yes, I read it.
9        Q    Do you remember sending this e-mail on
10   Friday, April 16th, 2004?
11       A    I don't remember -- do I remember sending
12   it?
13       Q    Uh-huh.
14       A    I -- I, after having read it, I remember
15   it generally.  I don't remember it specifically on
16   that day, but I -- I take it that, yeah, this was
17   my e-mail.
18       Q    So shortly after you returned from your
19   surgery you wrote Mr. Kim an e-mail advising him
20   you had stopped by but he was out of town?
21       A    Yes.
22       Q    And updating him on the different kinds

39  (Pages 150 to 153)

Page 242

1    notes, he offered to talk with Dan Spiegel about
2    the Public Law and Policy section. That's --
3    that's the only -- in this meeting I think that was
4    the only think he offered to help -- be helpful on.
5        Q   So did you form an impression as of July
6    13th whether Mr. Kim wanted you to leave the firm?
7        A   I formed an impression that he wanted me
8    to, for the most part, leave the Korea practice,
9    that he was happy to have me stay at the firm if I
10   could find a niche, the word he used, and that he
11   could -- he was happy to keep me working with him
12   about one-third of my time, so the -- that's --
13   that's what I understood.
14       Q   And that he would offer to talk to the
15   Public Law and Policy Group --
16       A   Right.
17       Q   -- if you wanted him to?
18       A   Right, to Mr. Spiegel, who was in it,
19   yeah.
20       Q   Did you tell anybody at the firm about
21   your conversation with Mr. Kim that took place on
22   July 13th, 2004?

Page 243

1        A   I had conversations with both Dan Spiegel
2    and with Mike Quigley about it.
3        Q   When did you speak to Mr. Spiegel?
4        A   Sometime, you know, shortly after this
5    meeting. Sometime in, you know, mid July I
6    suppose.
7        Q   Did you tell Mr. Spiegel about the
8    comments that you've attributed to Mr. Kim related
9    to age?
10       A   I did not specifically refer to the
11   comments about age, no.
12       Q   Did you generally refer to comments about
13   age?
14       A   No, I didn't.
15       Q   A few days later you met with Mike
16   Quigley; isn't that right?
17       A   That's right.
18       Q   And you have notes of that, July 16th,
19   2004?
20       A   Right.
21       Q   And when did you prepare these notes?
22       A   Shortly after my meeting with Mike.

Page 244

1        Q   When you say "shortly after," the same
2    day?
3        A   Most likely the -- yes, it would have
4    most likely been the same day. As I sit here, I
5    don't remember precisely, but my practice was
6    always to go back and write up notes if I thought
7    they were important.
8        Q   And Mr. Quigley's comments to you are, as
9    close as you can remember, as of the 16th of July
10   written in this note?
11           Maybe that wasn't very artfully stated.
12   Are these the words Mr. Quigley used to the best of
13   your memory?
14       A   Yes.
15       Q   And certainly it was the best of your
16   memory on July 16th, 2004?
17       A   Yes.
18       Q   And it says, "Mr. Quigley would like to
19   make it work at the law firm" --
20       A   Right.
21       Q   -- "but doesn't know if that's possible"?
22       A   That's right.

Page 245

1        Q   On the third line it said, "He agrees
2    completely with SK's critique that I am too old to
3    be doing junior level work."
4        A   Uh-huh.
5        Q   Now, I'm just trying to understand. Did
6    he say to you "I agree completely with Sukhan Kim's
7    critique that you're too old to be doing junior
8    level work" or did he use some other words that
9    made you believe that he agreed completely?
10       A   Actually neither of the two per se. I
11   began the meeting, as I recall, recounting what
12   Sukhan Kim had told me, and he told me that he
13   agreed with Sukhan's decision and specifically
14   mentioned my age as the fact -- the disparity
15   between my age and the work that I was doing, which
16   he thought was junior level work.
17       Q   And did you understand what he meant by
18   junior level work?
19       A   I guess it's similar to the other point I
20   made. I -- I -- the meaning that I attached to it
21   at the time was that the work that I had been doing
22   for the Korea Practice Group, in his mind he was

62 (Pages 242 to 245)

Capital Reporting Company

Page 270

1    you had to leave the firm?
2        A    As it's mentioned here, only that I would
3    not -- not -- there was no place in Public Law and
4    Policy for me.
5        Q    And did Mr. Kim express any sentiments
6    about this development to you?
7        A    What do you mean sentiments?
8        Q    Was he sad?  Was he neutral?
9        A    He was very matter of fact.
10       Q    But he did tell you he had not spoken to
11   Mr. McLean directly about --
12       A    Yes.
13       Q    I'm sorry.  Let me finish -- about your
14   employment at the firm?
15       A    That's correct.
16       Q    It says, "He asked me if he should talk
17   to Val about me or if I wanted to do that."
18           That's Val Slater we talked about this
19   morning?
20       A    Right.
21       Q    Why would either of you talk to Val
22   Slater?

Page 271

1        A    Another option for staying at Akin Gump
2    was working on a more full-time basis on trade
3    policy issues for the International section and so
4    the question -- so I was looking at both PLP and
5    potentially at the International section at that
6    point as niches within Akin Gump where I could
7    work.
8        Q    And then did he use the expression that
9    you were like the left foot trying to wear the
10   right shoe?
11       A    Yes.
12       Q    And he used the expression there's not a
13   good fit between you and the firm?
14       A    Yes.
15       Q    Did you tell anybody about the content of
16   this meeting with Sukhan Kim while you were still
17   at Akin Gump?
18       A    Yes, I did.
19       Q    Okay.  Who did you talk to?
20       A    Among -- after this meeting I think the
21   first meeting I had with another partner or another
22   lawyer at Akin Gump was with Rick Burdick the

Page 272

1    beginning of September.
2        Q    And what did Mr. Burdick say?
3        A    About what?  About --
4        Q    In that meeting what did Mr. Burdick say?
5        A    I -- I told Mr. Burdick what I had heard
6    from Mr. Kim and Mr. Burdick said he didn't know
7    anything about it.  He was complimentary of the
8    work I had done and he told me that he would check
9    with Bruce McLean and Mike Quigley about my request
10   specifically to look for a position elsewhere in
11   PLP -- elsewhere in the firm, specifically in PLP.
12           I was -- I told him in that meeting that
13   Kim indicated, you know, in the way you see here,
14   that according to McLean there was -- it wasn't
15   possible for me to look for a niche in PLP and
16   that's -- it was on the basis -- and when I told
17   that to Burdick, he said he would check and get
18   back to me.
19       Q    Did you tell Mr. Burdick in that meeting
20   in early September about any of the alleged ageist
21   comments that Mr. Kim had made to you?
22       A    No, I didn't.

Page 273

1        Q    And did Mr. Burdick get back to you?
2        A    Yes, I believe he did.  Yes, he did.
3        Q    And he told you you could try to look for
4    other positions within the firm?
5        A    That's right.
6        Q    Could you turn to your next note?  It
7    says, "Meeting with SK, August 11, 2004."
8        A    Uh-huh.
9        Q    And this is a meeting with you and Sukhan
10   on the 11th of August?
11       A    Yeah.
12       Q    "SK said I should plan to leave the firm
13   by October 1st."
14       A    Uh-huh.
15       Q    Did he tell you who had set that date?
16       A    I don't recall.
17       Q    He said to you he could possibly seek a
18   short extension based on the fact he had not talked
19   directly to McLean about you?
20       A    Yeah.
21       Q    I mean I don't want to put words into his
22   mouth, but was he saying I could talk to him to get

69  (Pages 270 to 273)

Capital Reporting Company

---

Page 278

```
1      Q    And your July 16th meeting with Mr.
2   Quigley?
3      A    Uh-huh.
4      Q    And is it correct that Mr. Kim was
5   letting you know about an opportunity at the Korean
6   Economic Institute?
7      A    That's what he was doing.
8      Q    But as of July 26th, you're saying your
9   main focus is either finding an additional niche at
10  Akin Gump or doing something other than the Korean
11  Economic Institute?
12     A    Or doing something other than staying at
13  Akin Gump.
14     Q    Right.  Were you going to consider the
15  position at the Korean Economic Institute?
16     A    No, I didn't and I couldn't.  It was not
17  an appropriate position for me both in terms of
18  level of responsibility and in salary.
19     Q    What do you mean "level of
20  responsibility"?
21     A    It was as a research director, a
22  relatively junior position in a think tank in
```

Page 279

```
1   Washington probably paying about $80,000 a year.
2   So it was -- it was a more junior level position
3   than I -- than I -- I was far more -- I was much
4   more qualified for a senior position than that.
5      Q    And then the next paragraph says,
6   "Frankly, our recent discussion came as a big
7   surprise to me, so I am still sorting through my
8   options."
9      A    Yeah.
10     Q    And are you referring to the discussion
11  on July 13th?
12     A    That's right.
13     Q    "I have a great deal of respect for you"
14  you say.  Was that true on July 26th?
15     A    I have a great deal of respect for his
16  achievements and accomplishments, and still do, as
17  a -- as a lawyer.
18          I -- I would have to say that I was very,
19  very upset about the way he had -- about what he
20  told me, but that -- so I separate that.
21     Q    And you say on July 26th, "And I know
22  what you have told me is best for both Akin Gump
```

Page 280

```
1   and for the development of my own career."
2          Could you just tell me, sir, what aspect
3   of what Mr. Kim told you did you believe was best
4   for both Akin Gump and for the development of your
5   own career?
6      A    I -- I think that I was, of course,
7   trying to make -- find a silver lining and what
8   I -- what -- I'm trying to maintain a -- trying to
9   maintain a good relationship with Mr. Kim, and I
10  took his point that I believed at that time that if
11  I could diversify my practice within Akin Gump
12  either within the International Group or within
13  Public Law and Policy, while still keeping a hand
14  in the Korea practice, that that would be better
15  for me than to be so narrowly focused on Korea
16  practice matters.
17     Q    And you believed that what --
18     A    And so in that sense it was better for
19  the development of my legal career to become a more
20  diversified and versatile attorney at Akin Gump who
21  could handle a variety of international or public
22  policy matters and not simply be seen or, in fact,
```

Page 281

```
1   be in the role of working on Korea matters
2   full-time.
3      Q    And you end with "I sincerely appreciate
4   your support."
5          Did you believe as of July 26th you had
6   his support?
7      A    Yes, I did.  I believed that his main
8   goal was to help -- to -- basically to have me work
9   two-thirds of my time in another part of the law
10  firm or, failing that, to leave the firm.  But I --
11  I appreciated -- I was expressing appreciation for
12  his support in helping me to find another position
13  at Akin Gump.  That's what I appreciated.
14     Q    Okay.
15     A    Or his -- his statement of support.
16     Q    Did you tell --
17     A    Excuse me.  Can I get another cup of
18  coffee?
19     Q    Sure.
20          (Pause)
21          MS. KEARNS:  Can I mark my next exhibit,
22  please?
```

71 (Pages 278 to 281)

Page 286

1    this critical time?
2        A   Uh-huh.
3        Q   And you meant that, didn't you?
4        A   Uh-huh, yes.
5        Q   Okay.
6        A   I'd also add that I -- I added at the end
7    "I would deeply appreciate all your support and
8    goodwill at this critical time for me and my
9    family," reflecting the crisis that I had been
10   plunged into.
11       Q   You mean if you had to leave the firm, as
12   Bruce McLean said, in 60 days, you would face some
13   financial difficulty?  Is that the crisis you're
14   referring to?
15       A   Specifically the third paragraph, "Since
16   I have been moving ahead as expeditiously as
17   possible, it was frankly quite upsetting to hear
18   from you yesterday that Bruce McLean suggests I
19   leave the law firm in 60 days.  If I do that, and
20   have not obtained a new position, it will cause a
21   financial disaster for my family, something I very
22   much want to avoid."  So it was more than a little

Page 287

1    bit of difficulty.
2        Q   Right.  No, I understand that.  I'm
3    certainly not trying to diminish it.  I'm just
4    trying to understand the impending crisis was the
5    time constraints that Mr. McLean had put you under
6    for ending your employment?
7        A   Not just that, the fact that they were
8    firing me.
9        Q   That --
10       A   But giving me -- that they -- that they
11   had fired me in the first place, that's what I was
12   referring to, and the 60 days as the time which I
13   had to get out.
14       Q   But as of the 6th, people at the firm
15   were helping you look within the firm for another
16   role; isn't that right?
17       A   I wouldn't say that.
18       Q   Oh, okay.  They weren't helping you?
19       A   I would say -- I would put it a different
20   way.  I would say that Sukhan Kim sent me an e-mail
21   about a position, and that was the extent to which
22   they were "helping me."

Page 288

1        Q   What position?
2        A   The e-mail you referred to earlier, KEI.
3    He sent me that e-mail about the possible position
4    at KEI.  He was trying to be helpful -- to help,
5    suggesting that I could find a position at KEI.
6        Q   Okay.  Maybe I misstated what I was
7    trying to say.
8            As of August 6th, there were people at
9    Akin Gump helping you look for positions within
10   Akin Gump; isn't that right?
11       A   Yes, that's correct, Dan Spiegel and Mike
12   Quigley, yeah.
13       Q   Okay.  Now, at some point in August of
14   2004 you wrote to your friend Pietro Doran --
15       A   Uh-huh.
16       Q   -- and told him that if The Gale Company
17   thinks it needs Washington representation, it
18   should stick with its current law firm, which had
19   recently merged with a top D.C. firm; isn't that
20   right?
21       A   That's correct.
22       Q   And you knew as of that time that

Page 289

1    Mr. Doran was, I believe you said, the financial
2    manager for The Gale --
3        A   He was managing partner for Gale
4    International and the senior financial advisor to
5    New Songdo City, which was the main project that
6    The Gale Company was and has been constructing in
7    Korea.
8        Q   And did you tell anyone at Akin Gump that
9    you were going to tell Mr. Doran that The Gale
10   Company should not retain Akin Gump?
11       A   I did not tell anybody that in advance.
12       Q   And isn't it correct that you told
13   Mr. Doran that Mr. Kim could not be trusted to
14   serve as an honest broker for The Gale Company?
15       A   That's what I wrote to Mr. Doran toward
16   the end of August.
17       Q   And you told him that Mr. Kim planned to
18   retire soon and that you couldn't imagine he'd want
19   to spend any of his time helping The Gale Company?
20       A   Is that a -- is that a direct quote?
21       Q   Something to that effect.  Didn't you say
22   something to that effect in writing?

73 (Pages 286 to 289)

Page 290

1    A    Something to that effect, yes.
2    Q    And you told Mr. Doran that Jaemin Park
3  overstated her influence in Korea; isn't that
4  right?
5    A    That's correct.
6    Q    And that her help to the Gale companies
7  was, your word, was questionable?
8    A    I -- I said, if I remember correctly,
9  that because she was a bankruptcy lawyer, she
10  didn't have the -- she wasn't the kind of lawyer
11  that would be helpful to them, in addition to what
12  you've also said.
13    Q    And you told Mr. Doran -- I keep saying
14  that incorrectly -- Doran that if Mr. Gale wants to
15  be in touch with Korean businesses, there are other
16  ways to do it rather than using Akin Gump?
17    A    That's what I wrote.
18    Q    And I believe it was on August 11th that
19  you took a note down that Mr. Kim was very
20  interested in being retained by the Gale companies.
21  Do you remember that?
22    A    Yes.

Page 291

1    Q    Between August 11th and August 24th had
2  Mr. Kim told you that he was no longer interested
3  in being retained by the Gale companies?
4    A    I don't believe we discussed it.
5    Q    Okay.  And did you tell Mr. Kim that you
6  were going to advise this executive in the Gale
7  companies that he could not be trusted to serve as
8  an honest broker?
9    A    I didn't tell him that, no.
10    Q    And did you tell him or anyone else at
11  Akin Gump that you were going to tell the Gale
12  companies that Sukhan was planning to retire soon
13  and that you couldn't imagine he would want to
14  spend his own time helping the Gale companies?
15    MR. PUTH:  I object to the form of the
16  question.
17    THE WITNESS:  I -- I didn't tell them
18  because it wasn't something I was planning --
19  planning to say.
20  BY MS. KEARNS:
21    Q    To who?
22    A    I wasn't planning -- I didn't have a

Page 292

1  preconceived plan to make the comments that you
2  described at that time.
3    Q    I'm not sure I follow you.  You did make
4  the comments, didn't you?
5    A    Yes, I did on -- at the end of August.
6    Q    Right.  And did you --
7    A    But I'm explaining why I -- I didn't tell
8  anybody, but I had no reason to tell them because I
9  wasn't planning to make those comments at that
10  point.
11    Q    After you made the comments in writing --
12    A    Oh, after I made the comments, no, I
13  didn't tell them.
14    Q    And before you made them you didn't tell
15  anyone you were going to make them?
16    A    I -- I had no plan to make those until
17  the end of August, so there would have been no
18  reason to tell them about it.
19    Q    And after you did it, you didn't tell
20  anyone either?
21    A    Again, I may have discussed the situation
22  with Jay Cohen after -- after what had happened --

Page 293

1  after sending the e-mails to Mr. Doran, but I
2  didn't discuss it with Mr. Kim.
3    Q    Did you tell Mr. Cohen that you had said
4  that Jaemin Park exaggerates her influence?
5    A    I don't remember what I told him.  I
6  would have discussed the situation in general.
7  I -- I can't say.  I may have said that.  I don't
8  remember.
9    Q    And when was this meeting with Mr. Cohen?
10    A    I don't recall a specific meeting.  I'd
11  simply say that after the problem arose with Doran
12  and Gale at that time, I was in touch with
13  Mr. Cohen and he -- he was -- I likely made him
14  aware of the problems that we encountered.
15    Q    When you say "the problem with Doran and
16  Gale," is the problem with Doran the problem with
17  the Funds Group in New York?
18    A    No, I was speaking of the problem that
19  arose -- that led to the e-mail that you're talking
20  about.
21    Q    What was that problem?
22    A    The problem was that Jaemin Park had a

Capital Reporting Company    REDACTED

Page 294

1  meeting with Gale in early August. She went into
2  the office, as conveyed to me by Doran, she went
3  into the office to meet with Gale, who was visiting
4  Korea at that time. She totally ignored Doran, met
5  with Gale, brought with her several executives from
6  the Samsung group, and then -- and then left.
7       I then -- the problem -- I became aware
8  of the problem when Doran wrote me that he was
9  furious that Jaemin Park had totally ignored him,
10  had met separately with Gale, had brought with him
11  (sic) people that he called the hole in the --
12  Samsung hole-in-the wall gang, people who he said
13  in capital letters, excuse my language, had screwed
14  him in the past, and he pointed out in his e-mail
15  to me that he had a major influence over any
16  decisions to retain outside counsel, something that
17  we were then seeking from the Gale Corporation.
18       Q    And your response to that was stick with
19  your current law firm in Washington, don't go with
20  Akin Gump?
21       A    My response was -- I needed to regain his
22  trust. The only way I knew how to do that was to

Page 295

1  be as honest with him as possible.
2       Sukhan Kim had always told me, and I
3  admired him for the fact that he gave his clients
4  the unvarnished truth. I felt I had a duty of
5  candor to the client in order to -- to keep his
6  trust. He had trusted me deeply. And in the -- in
7  the face of his incredible anger at the -- and the
8  fact that Jaemin Park had -- had blundered and
9  essentially sabotaged the relationship with Gale
10  and Doran further going forward, I had to do
11  something to regain Doran's trust, which is what
12  led to that e-mail. It occurred in that context.
13       Q    And at or around the same time you were
14  interested in potentially getting a job at The Gale
15  Company; isn't that right?
16       A    I had discussed with Sukhan Kim a couple
17  of alternatives. He told me in early August that
18  if Akin Gump was retained by Gale, then I could
19  possibly stay at Akin Gump and work on the Gale
20  matter.
21       He also told me that -- I told him I was
22  also, in the alternative, interested in working as

Page 296

1  an in-house counsel for the Gale companies in
2  Korea, and he -- and he told me he would help me,
3  give me his support in getting that position.
4       So it was both. Consistent -- I was
5  seeking either, you know, I -- I -- my priority
6  goal was remaining at Akin Gump, continuing to work
7  there. Failing that, it was finding an interesting
8  and decent paying position outside Akin Gump either
9  as in-house counsel to a corporation like Gale
10  or -- or elsewhere. So I had a dual-track
11  strategy.
12       Q    Just so I'm clear, you testified that you
13  were concerned about Mr. Doran's anger and you felt
14  you needed to regain his trust in you?
15       A    And the firm.
16       Q    And your way of regaining his trust in
17  the firm was writing him and saying they should
18  stick with their current law firm rather than work
19  with Akin Gump?
20       A    The answer is I had -- I felt I had a
21  fiduciary duty to Mr. Doran. He was relying on me
22  a hundred percent for my assessment.

Page 297

1       I knew, for example, that Jaemin Park had
2  told me and regarded Mr. Doran as a gangster, she
3  told me that she thought he was a wheeler-dealer,
4  she didn't trust him. She told me that she thought
5  Stan Gale was even worse.
6       I felt at that time, when I thought about
7  it more deeply, that Akin Gump, and -- and
8  specifically Sukhan Kim, had a huge conflict of
9  interest. There was no way that he could represent
10  both Gale and                    being his most
11  important client. I felt I had a duty to point
12  that out to Mr. Doran.
13       I had a -- I felt that both -- that Park
14  in particular, but both -- and Kim as well were
15  overreaching in terms of any potential political
16  influence they could bring to bear because I knew
17  how limited it was, and I felt that I had to,
18  consistent with my fiduciary duty, I had to give my
19  frank and honest opinion to Mr. Doran.
20       Everything I said in that e-mail is the
21  God's honest truth, and that's what I told
22  Mr. Doran. I felt that if there was any way to

Capital Reporting Company

Page 330

1    Q    Okay.  You can put it to the side now.
2    A    Okay.
3    Q    Could you tell me about any conversations
4    you had with anyone at Akin Gump while you were
5    there about your prospects for partnership
6    consideration?
7    A    I don't remember specific conversations,
8    but I remember conversations with other lawyers at
9    Akin Gump about the process whereby a senior
10   counsel can become a partner at the firm.
11   Q    Who did you have those conversations
12   with?
13   A    I -- I -- I probably had a conversation
14   with Jay Cohen about it, who's the lawyer in the
15   practice group who I trusted the most.  But I don't
16   remember specifically the day or --
17   Q    Do you remember the content of the
18   conversation?
19   A    The content would have been --
20   Q    No.  I want to know whether you remember
21   it --
22   A    I don't --

Page 331

1    Q    -- not what it would have been.
2    A    I only remember having a general
3    conversation with lawyers at Akin Gump about the
4    process whereby a senior counsel, someone who had
5    come on in that capacity, could move over to a
6    partnership track.  I may have also talked with
7    Lars Hjelm, who had done just that.
8    Q    And what did you learn about that
9    process?
10   A    Mainly I -- I learned as an affirmation
11   that it was possible to do that and that other --
12   other partners had previously been senior counsel,
13   so I realized that was a viable partnership track
14   in the first instance.  I learned that -- I had the
15   impression it would be helpful if I had a major
16   client.  I learned that, you know, it took some
17   time for that to happen.  Those are the only things
18   that I recall.  It didn't -- didn't happen
19   overnight.
20   Q    Did you have a conversation with Val
21   Slater, the head of your practice group, about your
22   prospects for partnership consideration?

Page 332

1    A    I don't recall anything like that.
2    Q    Did you have a conversation with Sukhan
3    Kim about your prospects for partnership
4    consideration?
5    A    I -- no.
6    Q    Did you have a conversation with Dan
7    Spiegel about your prospects for partnership
8    consideration?
9    A    Not that I recall.
10   Q    Did you mention it to Dennis Race when
11   you brought up your annual evaluation?
12   A    No, I only discussed the procedure for
13   getting an annual evaluation with him.
14   Q    Who is Bob Boorstin?
15   A    Bob Boorstin is a -- where -- where
16   should -- what is he --
17   Q    Who is he to you?
18   A    He's a friend.
19   Q    Okay.
20   A    Someone that I worked with in the Clinton
21   campaign and who I worked with in the White House.
22   Q    And is he someone who you believe has

Page 333

1    discriminatory animus towards you?
2    A    Discriminatory animus?  I mean in what
3    sense?
4    Q    Does he have negative feelings about you
5    because of your age?
6    A    He's the same age as me.  He actually is
7    a little younger, but I -- I don't -- he's never --
8    I don't think he holds my age against me, no.
9    Q    Who is Paul Stares?
10   A    Paul Stares is the Director of Research
11   at the U.S. Institute of Peace.
12   Q    And how long have you known him?
13   A    Let me see.  I -- I met him probably in
14   September of -- around the Fall of 2003, so I guess
15   a little less than four years.
16   Q    I'm sorry, is he a professional
17   acquaintance or --
18   A    Professional, yes.
19   Q    And do you believe he holds your age
20   against you?
21   A    No, I don't.
22   Q    You had lunch with Mr. Kim on

84  (Pages 330 to 333)

Page 334

1    October 27th, 2004.  Where did you have lunch?
2        A    We had lunch across Connecticut Avenue at
3    a restaurant called Otello.  It's an Italian
4    restaurant.
5        Q    And how did that lunch come about?
6        A    Well, as best I recall, Mr. Kim suggested
7    that we have lunch together in my last week at the
8    firm.
9        Q    And you agreed?
10       A    Yes, obviously.
11       Q    Well, when you say "obviously," do you
12   mean obviously because you did it or obviously --
13   what do you mean obviously?
14       A    Unless I had agreed, I wouldn't have
15   attended, so I mean I -- I accepted the invitation.
16       Q    Right.  You're saying by the fact that
17   you attended, I should have inferred you agreed.
18   Okay.
19       A    I attended.  I accepted his invitation.
20       Q    And what did you discuss at that lunch?
21       A    We talked -- probably we had some social
22   conversation.  We -- I -- most likely we talked

Page 335

1    about my recent trip to Korea.  The things that I
2    most remember we discussed, once again, the reasons
3    that he wanted me to leave the firm.
4        Q    What did he say about wanting you to
5    leave the firm?
6        A    He felt that I was too old to do the kind
7    of work I was doing, what he called research or
8    junior level work.  He told me that if I was -- if
9    I was an associate, I don't know, fourth- or
10   fifth-year associate, that he'd be able to pick up
11   the phone and help me, but because I was too senior
12   in terms of age he wouldn't be able to help me in
13   that way.
14       Q    But he had helped you; he had suggested a
15   couple different jobs to you already, hadn't he?
16       A    Well, he had -- that's -- he had sent
17   me -- he sent me two job announcements for jobs
18   that were not appropriate.  But, yes, he -- he had,
19   in that sense, thought about it.
20       Q    And he had --
21       A    He had sent me two job descriptions, and
22   I appreciated that, although they were not

Page 336

1    appropriate.
2        Q    And they were not appropriate because you
3    were too experienced for the positions they were
4    hiring for?
5        A    They were inappropriate for several
6    different reasons.  One -- one criterion was the
7    money.  It was I believe 25 percent -- or maybe
8    30 percent of what I was currently making at Akin
9    Gump.  Secondly, they were -- they were too junior.
10   I guess that's -- those are the two criteria; they
11   were too junior and they were too low paying.
12       Q    When you say "too junior," because the
13   responsibilities were not suitable for someone with
14   your level of experience?
15       A    What I mean is that I -- I came out of
16   the government a senior advisor to an
17   undersecretary, I had been Director of Legislative
18   Affairs at the National Security Council in the
19   White House, I had been counselor of a major agency
20   of foreign policy apparatus of the U.S. Government,
21   I had considerable experience working overseas in
22   Korea.

Page 337

1        They -- both of those positions were
2    junior level positions and were not appropriate for
3    someone with my background and expertise.
4        Q    And this lunch with Mr. Kim, you said it
5    was a lunch that you enjoyed very much; isn't that
6    right?
7        A    You mean the food or the conversation?
8        Q    I don't know.  Didn't you tell him
9    afterwards you enjoyed it very much?
10       A    I -- if I -- if I did, I likely sent him
11   a thank you note.  I mean he paid for the lunch.
12   I -- I -- I was trying to be cordial and -- I guess
13   I enjoyed aspects of it.
14       Q    In fact, as of that time you were still
15   trying to get him to assist you by speaking to
16   Vernon Jordan on your behalf; isn't that true?
17       A    At that time I was struggling with how to
18   prevent my life from falling apart and how to get
19   help from whomever, including Mr. Kim, in finding
20   other positions.
21       I had -- ever since I was told that I
22   needed to find another position at Akin Gump or

85  (Pages 334 to 337)

Capital Reporting Company

Page 338

1    leave Akin Gump, I worked diligently to find
2    another position. And one of the -- one of the
3    options that I thought about was perhaps also
4    working with Mr. Jordon, who was -- who I knew was
5    a friend of Mr. Kim's, and so I -- I may well
6    have -- I think I did mention that to him.
7        Q   You asked him to help you?
8        A   Yeah.
9        Q   Okay.
10           MS. KEARNS:  Could you just mark this
11   exhibit, please?
12   BY MS. KEARNS:
13       Q   And he said he would, right?
14       A   I think he said he would make his best
15   efforts.  I don't -- I don't know whether he ever
16   talked to Mr. Jordan or not, or he would try.
17           (Gross Exhibit Number 32 was
18            marked for identification.)
19   BY MS. KEARNS:
20       Q   My question, Mr. Gross, will be do you
21   recall sending and/or receiving this string of
22   e-mails?

Page 339

1        A   Yes, I do.
2        Q   Did you tell anyone at Akin Gump about
3    the comments that Mr. Kim made at this lunch about
4    your age?
5        A   At Akin Gump?
6        Q   Yeah.
7        A   No, I didn't.
8        Q   So when you wrote after the lunch "I very
9    much enjoyed our lunch today," was that true?
10       A   Well, as I said, I was trying to be
11   cordial.  There were aspects of the lunch I
12   enjoyed.  I tried to -- throughout this experience
13   I tried to maintain a good relationship with
14   Mr. Kim despite the way -- despite his actions, and
15   thought that, as I've said earlier, that even if I
16   went to Korea, I could maintain a good relationship
17   with Akin Gump from a business standpoint.  So in
18   that sense I was trying to maintain a good
19   relationship with Mr. Kim at this time and that's
20   why I wrote it the way I did.
21       Q   I'm just trying to -- so you didn't
22   really mean it, you just wanted to keep things

Page 340

1    cordial?
2            MR. PUTH:  Objection.
3            THE WITNESS:  Well, I enjoyed -- I said
4    "I very much enjoyed our lunch today."  It's
5    something that I would have written to be cordial,
6    as a way of thanking him.  He bought me lunch.  I
7    appreciated that.  He made a gesture, he took me
8    out to lunch the last week I was at the firm.  I
9    also hoped that he would be able to be helpful to
10   me with Mr. Jordan.
11   BY MS. KEARNS:
12       Q   Did you have a sense one way or another
13   whether he liked you?
14       A   I believe he liked me.  I believe he
15   liked me.
16       Q   Some time after you left the firm you
17   asked Mr. Kim to sign a letter of recommendation on
18   your behalf; isn't that right?
19       A   No, I asked him to write a letter of
20   recommendation on my behalf.
21       Q   And he said I will do it if you'll write
22   it for me?

Page 341

1        A   That's correct.
2        Q   And so you wrote it for him and sent it
3    to him and he signed it for you and sent it back to
4    you?
5        A   Essentially that's correct.
6        Q   Have you used Mr. Kim's letter in your
7    job search?
8        A   I don't recall specifically.  It -- it
9    was something that was very helpful to me at the
10   time I thought.
11           I don't -- I don't remember specific
12   instances, but having the letter of recommendation
13   from Mr. Kim and the letter of recommendation from
14   Mr. Rubinoff was helpful to me going forward in
15   seeking, especially seeking positions with law
16   firms in Washington.
17       Q   So I'm clear, you have no specific memory
18   of providing the recommendation letter from Mr. Kim
19   to any law firm?
20       A   That's correct.
21       Q   Okay.
22       A   That's correct.

86 (Pages 338 to 341)

# AKIN GUMP
# STRAUSS HAUER & FELDLLP

▬▬▬▬▬▬ Attorneys at Law

**Dennis M. Race**
202.887.4028/fax: 202.887.4288
drace@akingump.com

June 20, 2003

Mr. Donald G. Gross
2 the Circle
Great Neck, NY 11020

Dear Donald:

I am writing to confirm our offer of employment as an attorney with Akin Gump's international section. All of us are extremely impressed with your background and demonstrated abilities.

Your offer is to join the firm as a Senior Counsel. Your salary will be $250,000 per annum. Like other employees of the firm, you will be considered an employee at will; however, it is our intention to review your employment situation at your one year anniversary and reassess our needs and the terms of your employment.

I have enclosed materials which describe our benefits package. Please feel free to contact our Legal Recruitment Manager, Erin Springer (202) 887-4184, if you have any questions.

Having said all that, let me reemphasize that we would be delighted to have you join the firm and believe you clearly have the ability and drive to make a significant contribution to our international practice. If I can assist you in making your decision, please do not hesitate to call me directly.

Sincerely,

*Dennis M. Race*

Dennis M. Race
Chairman, Hiring Committee

Enclosures

cc:    Michael Quigley
       Warren Connelly



Robert S. Strauss Building / 1333 New Hampshire Avenue, N.W. / Washington, D.C. 20036-1564 / 202.887.4000 / fax: 202.887.4288 / www.akingump.com

DG 00207

GROSS 6
7/12/07  88

REDACTED

(Wants me to be the focal point of the Korea practice

can do other work I mention K respts.)

Understanding US. point of view better; not only "seeing it through K eyes".

Educating officials w/o lecturing — with a particular emphasis on staff & working level exec. branch that write papers. (briefings, trips). to K.

Lawyers effective — not just in reading legal departments; but in building a case; more effective than lobbyists

able to [?] stay about rate

Emphasis on fact that we could help coord. a media strat. / Trip

change all time to samsung / Potin    All time

Media is big part of problem: blew up anti-Americanism issue.

Include media in educ. efforts.

Tell M.Q. to change

330  national / regional
300

3 hr. a week as if not reading; than could bill time to [?] policy; non-billable to office or billable

Drawing heavily on business interests in US. / companies that operate in Korea that buy/sell buy from or sell to K. companies · communities where K. companies have have plants.

Also encouraged me to do work outside the Korea group if I have extra

wants to make sure I bill 2100 + poss. have billed 3-400 in non-billable time. So 185/mo wd

DG 00825

<u>Sukhan Kim</u>                    7/7/03

Someone who can take control
over some cases for K..; some,
very inept, so bury + miss
deadline + fail to follow-up.


J Lee – Really want to take control
+ focus on it 100%, bec. have
not been able to do it.; daily basis
<u>worried</u> about it.

More I can learn from
David Park.

Tom Joyce    Mike Kang.
             Mike Quigley

Tu
Kang
8:30 am

John
Wahlberg.

Mark
Vandeysson

analog
live?

So many requests; not done well.
To do list · + follow up
request  missed

J. Lee here tom @ 2 pm. / Meet him –
Draft Q&A            Now I'm with
Draft Spe                    him .

Wants me to Be point person for Korean projects
                                                generally
Back on 14ᵗʰ / See him on 15ᵗʰ

DG 00827

<u>Meeting with David Park</u>                    REDACTED

July 17, 2003

MQ is sometimes arrogant, feels very competitive with Mike Kaye. Doesn't play the role of coordinating the policy memos. Feels he's too senior to write memos. Sukhan wanted someone to help with the work projects in addition to Mike Q.

MQ could be very helpful in helping me staff out contributions to memos and I could discuss that with him.

Point is the MQ might inadvertently or unconsciously try to undercut me. I should be aware of that. Also sometimes he orders people by email to come down to his office. David's point is that I should not assume from Mike Q's actions that is really second in command of the Korea practice. I should not become, in his view, subservient to Mike Q, but be responsive to Sukhan, though Mike Q may try to make me his subordinate.

Sukhan would like someone to write or at least revise the memos needed by the client. Most of the requests come to Sukhan and he will pass them on to me. Sukhan will view me as a godsend if I am someone he can turn to to write a memo, based on input from others, rather than someone who simply revises what others have written.

Thought it's fine to bill all my time right now to the          ; retainer on Project    If after 3 months, I'm not getting enough work, he thinks at that point, I should raise it with Sukhan or others.

Thinks that        J has many components and will spin off a lot of work.   himself is very demanding.

Sukhan did a lot to build up in the firm both Mike Q and Mike Kaye. Annoyed that Mike Kaye is developing more of his own practice, unrelated to Korea. Annoyed that Mike Q often presents himself as being in charge of the Korea practice.

Sukhan really wants someone to be responsive to him and not Mike Quigley. That's why they put me on the 11th floor.

Sukhan had a big falling out with Mike Kaye at one point and now they have a love-hate relationship.

Sukhan really likes it when we send a member proactively to the client identifying the significance of a newspaper article.

David offered to be very helpful to me.

Liked the idea of me putting out a piece of paper each week with the status of current matters.

People in PLP are good at supplying information, arranging high-level meetings, etc., but are not good writers. So Sukhan can't rely on them for memos.

DG 00848

REDACTED

Said that 2100 hours is the normal expectation for Counsel, Senior Counsel and Senior Advisers. 2000 is the normal quota for associates.

Sukhan likes memos to be easily understandable from a foreigner's perspective in terms of language.

David has done a number of memos on Korea-related issues in the recent past, though he has a full load of trade cases. He has been at the law firm for 7 years.

Started out by saying that Mike Q might fear that I would somehow usurp his role in the future; could be paranoid because his role as billing attorney for Korean cases has built him up tremendously in the firm, and he may think I want to take that away from him.

Sometimes the meetings on ⁻          have turned into bull sessions where the senior people talk to hear themselves talk and don't do any of the work. It's left to the junior people to write the memos without much help from the seniors.

Up to now, a lot of the work of the Korea practice has been uncoordinated; Sukhan will usually turn to Mike Q to get a piece of work done, but he is often very busy.

Thinks that Ju-Hyun can be very helpful in gathering information about any topic that I give her. She is a great researcher. I should turn to her for that kind of help. Sukhan was annoyed that Mike Q more or less made her into his personal assistant.

Pat Williford is really and can be very helpful to me, but Mike Q often keeps her in the dark about what he is doing.

If I am on Cielo's good side, she can be very helpful in forging a good working relationship with Sukhan.

Most of the time, David communicates with Mike Q by email. He is not very close to Mike Q.

David follows the principle that if there are a lot of meetings going on, and he may be in demand, he will inform his secretary that he is going out of the office.

Good to do work for the ⁻          .    If there's something they ask us to do that's substantial, we'll request it be billed as a separate matter, not against the retainer.

— Have Cielo coordinate the meetings w/ the other secretaries. ~~This~~ setting up meetings is a secretarial task, the other ~~secs~~ secretaries know their boss's availability this will involve secretaries more, + she can call a meeting <u>whenever he likes</u>.

(Plan on 2-week, adjustable schedule).
(more flexible)

— David & I (or I) meet w/ others separately in advance of group meeting to get their initial views on an issue. Purpose of meeting ~~is~~ is to get consensus on areas of agreement.

- Discuss accounting issue + reaching out to law f. clients w/ Gretchen (or Jamie) (After ID'ing active clients)

Meeting agenda should have financial reports + admin, business development + one other item at most. (W/ keep focus better + keep meetings to 1 hour)

Maybe target a finite number of companies/individuals (50-100) in several categories for regular mailings. Ja-Hyun can monitor publications of relevance - Categorize by area of interest (Create a low-cost, low-effort "system" (filtered by lawyers; e.g. me + David) in end ) // Also include U.S. companies/clients

[left margin notes:]
Cross 8
7/3/07
BB
PENGAD 800-631-6989

* from co's in Korea category to identify clients.

weekly or ? Bus. Devel. in Korea Select US clients (?) co. Reports we do (celebrate many US co. news/etc.) giving us limits)

DG 00836

Re: Trade

Tell SK that it would be best ~~the~~ if DP took the lead on memos to the _____ , re: trade issues. The key people in trade section would (strongly) prefer that since David has worked on that account for a long time + They (Val, Lars, Mike K. + Warren) know him well I can make a lot of contacts (build contacts) and support him.

Overall

Goal has to be to market myself and firm to prospective clients. / I have to be engaged in a constant writing effort.

→ Not just to K companies, but to US. companies operating in K / China / Japan, etc + to partners at firm that rep. co's active in Asia

Thus, expanding the practice from the point of view of the firm.

→ I ~~q~~ should try to be active on Korea, Japan + China, not just Korea.

→ I have to increase billable hours as much as possible.

→ Make others (MQ, JP, JC + DP) feel that I am helping them to achieve their goals. Not just looking at .. through an Sk/Korea lens. [poss. report on US global bus news for K./Asian clients]

DG 00837

Ask members which clients that want to target;
who then what support do they need from
the firm; do help them develop + implement
plans for approaching those clients.

- I should keep running list of possible
  clients in diff. sectors; do bi-weekly
  meeting w/ Julyun on this to go over
  reports, but don't have to produce a
  new report of my own on the issues.

Overall point: Limited amount that can be
accomplished in a group meeting without
prior prep. by meeting in smaller groups
w/ participants. (Not just a matter of
circulating papers beforehand — this is a
government model).

- Maybe meet w/ sectares as a group; or ask Lelo
  if she thinks this would be a good idea, for
  purpose of helping coordination.

_____

If I put myself on the front-edge of all an actual
marketing activity + try, by whatever means, to
increase my billable hours, it should be okay

Getting in front of a lot of people on a regular basis - in US + Korea
China + Japan. Marketing the law firm's capabilities building relationships

DG 00838

## Notes on Meeting with SK

### July 13, 2004

Thinks that they're not utilizing my talents and capabilities well. I'm doing associate-level work, and at my age that's not comfortable for him.

Thought I would do well in a leadership position, where I would have a lot of people working for me.

Thought I have to find the right niche either outside the firm – think-tank, PR firm, etcetera – or within the firm. Thought that PLP would be a good place for me, although he heard they may be down-sizing.

Stressed that a person's skills might be under-utilized in one area but could be more fully utilized when he finds the right position, inside or outside of the firm.

Right now, there's not a good fit between me and the firm. Because there's not a good fit, he hasn't reached the point of giving me an overall evaluation.

Emphasized age issue: SK is 55 and I am 52. I'm five years older than MQ and still doing research-type work (although he thinks I've graciously accepted it). That makes him very uncomfortable.

I said I would think about it and come back with a proposal on staying within the firm and also a proposal on getting a position outside the firm – I said in a couple of weeks.

Thinks I would make a great ambassador; everybody he talked to in Korea regards me highly, mentions my White House experience.

Tom Hubbard will be joining the firm in 2005, for the purpose of generating business. SK talked about it with Bob Strauss today.

First offered to talk with Spiegel about possibility of my joining PLP. I said I would be talking with Spiegel and so SK said he wouldn't talk with him in that case.

Consistently pointed out the age issue and stressed the difficulty that caused him.

Said that if asked, he would say that the Korea section could use me one-third of time; and he would give me projects when something came up that was appropriate.

<u>Notes on Meeting with Sukhan</u>          **REDACTED**

August 5, 2004

Quigley talked to McLean before he left for India and my situation came up in their
discussion.  McLean wants to put in place a 60-day "exit strategy" for me.  I should finish
up my current projects and not accept any new work.  McLean said there would not be a
place in PLP for me.

SK asked me whether I had talked to Spiegel.  I said I had and we're going to sit down
and talk in more detail when Dan gets back from his trip.

SK says he hasn't talked with McLean directly but received all the information about me
from MQ.  He asked me if he should talk to Val about me or if I wanted to do that.

Said that Val wants to bring a well-known trade lawyer like                         to the
firm who bring in their own team.  Doesn't have in mind a person like me.

Said that I am like the left foot trying to wear a right shoe.  There's not a good fit
between me and the firm.

## Meeting with SK

### August 11, 2004

SK said I should plan to leave the law firm by October 1. Could possibly seek a short extension based on fact that SK has not talked directly to McLean about me.

Said Gale approached Hubbard about working together when Hubbard was in Korea.

After Gale comes back from Korea next week, he will let SK know about retaining the firm. SK likes the idea of putting Gale on a retainer. He spent three hours with Gale in New York. SK thinks I could possibly stay to work on Gale matter, if we get the retainer.

Said people at the firm who could help me to find a new position include Langdon, Spiegel, Foley, others.

Jaemin told Gale that Korean officials are unhappy with the pace of the project. (Gale said it was the first time he heard about this).

SK does not want me to mention Jaemin's meeting with Gale to Pietro.

He thinks neither Val nor Dan have enough work to keep me busy.

Told Gale that Doran asked us for help in raising funds.

DG 00846

From: Kim, Sukhan
Sent: 3/29/2004 9:58:09 AM (Eastern Time)
To: Gross, Donald
Subject: RE: Many Thanks

I am very relived and glad to learn that everything went smoothly. As
mentioned, don't worry about the firm and take as much time as you need. My
best to yours.

    -----Original Message-----
From:  Gross, Donald
Sent: Sunday, March 28, 2004 6:35 PM
To: FW KG
Subject: Many Thanks

I greatly appreciate your flowers and kind thoughts for me.  I am now out of
the hospital and the surgery was very successful.  I'm happy to say that I'll
be able to return to the office on Monday, April 5 and look forward to seeing
you then.

Many thanks and all my best wishes,

Don

*GROSS 11*

*PENGAD 800-631-6989*

*-1/12/07   85*

CONFIDENTIAL

AK001723

From: Kim, Sukhan
Sent: 4/19/2004 1:11:00 PM (Eastern Time)          REDACTED
To: Gross, Donald
Subject: RE: To Sukhan

I am so glad that you are recuperating nicely. Your wife and your family must
be relieved and thankful. As mentioned, your health comes first. So, pls take
as much time as you need. I am available this Thursday. Hope all is well.

    -----Original Message-----
From:  Gross, Donald
Sent: Friday, April 16, 2004 4:35 PM
To: Kim, Sukhan
Subject: To Sukhan


Sukhan,

I stopped by your office, but Cielo mentioned that you are out of town today.
So I'll look forward to talking with you on Monday.

I met with David and Mike this week on our revised          memo and am
pushing ahead with that.  I also met for an hour or so with Jaemin and Jay
today and we mainly discussed practice development issues.  I mentioned to
Jaemin and Jay that I hoped to visit Korea in May to meet with several
friends/potential clients
                                      and to attend the Asia
Society's corporate conference.  Since Jaemin and Jay will be in Korea at that
time, Jaemin thought it would be good if she, Jay and I could meet these
potential clients together over lunch or dinner.

I wanted to check with you as well concerning your availability for a Korea
practice group meeting next Thursday.  If you are available, I'll work with
Cielo on arranging it.

Finally, my doctors told me yesterday that my recuperation from the operation
has been excellent and I can resume normal activities so long as I avoid
getting unduly tired.  I greatly appreciate your friendship and support during
the last few weeks, which were difficult for me and my family.  Have a
wonderful weekend.  Thanks so much,

Best,

Don



CONFIDENTIAL                                                      AK001765

From: Marsha Lewis
Sent: 4/7/2004 2:43:14 PM (Eastern Time)
To: Gross, Donald
CC: jwit@starpower.net
Attachments: Marsha Lewis.vcf
Subject: Message from Joel

Don* I have had a chance to look at your paper. I think at this point in the
process, I have an obligation to USIP to make sure these papers are the best
they can be. Honestly, I still think yours falls  short of the mark.

My main problem is that you will remember that in the last round of comments,
in addition to Pauls remarks, I gave you as a general guideline cut back the
materail on the interests of other countries by 50% and expand the parts that
cover the internal political/legal work that would need to be done in North
Korea the day after by 50 %. I really do not see that in this draft. It takes
12 pages on the other countries--almost half the paper-- before we get to
anything resembling the internal part.

The contrast with your discussion of internal issues is even more striking
because that is still short and in much need of significant development.
Moreover, your discussion on this part covers issues in other papers--security,
humanitarian, economic--just as much as the ones you are suppose to cover.

We really need an in-depth discussion on political-legal issues in facilitating
a transition to reunification. For example, you do not take into account Norm
Levins comment that you seem to take for granted the relative ease in extending
ROK ministries to the North. You need to develop this much further based on his
discussion.

Your discussion on transition administration needs a great deal more work. once
again, here you talk a great deal about economics, humanitarian issues and have
one short paragraph on political issues. It falls far short of what is needed.
What about the examples of Germany and, maybe to a lesser degree Iraq and
others. You do not address, for example, the whole issue of national elections
that Norm mentions. How do you create a unified state politically from two such
politically differente populations. Its even more hard than in Germany as you
know given the system of North Korea. what were the political (not economic)
problems in Germany that continue to plague them today

Finally, if you read your conclusion, there is nothing said about these
internal issues. We need a good set of strong recommendations that can provide
a roadmap for both US, ROK and maybe even Japanese decision-makers. The
conclusions have to have specific steps.

You can think about them in terms of what internal planning should be done that
isnt already done or needs to be updated, is there anything we should be doing
bilaterally with the Koreans and Japanese and what about multilaterally,
reconoizing that this is a very sensitive subject.

It might be possible to do these things bilaterally or multilaterally without
specifically saying they are for collapse but they might come in handy. The
most obvious is institutionalization of something from the Six Party Talks to
handle regional security contingencies.

Gross 17

7/12/07  BS

PENGAD 800-631-6989

CONFIDENTIAL                                                                                  AK001746

Don, I am sort of under the gun on these papers. I hope you can think about these comments quickly and act on them ASAP. We can certainly sit down when I get back. I am not an expert on this stuff but I can provide you with as much help as you need, including research assistance. But we really need to turn this around quickly.

If you want to talk, you can call me in Japan at 81-03-3224-6963. Joel

Don, I hope this is not because we were too vague in our last comments. If so then I apologize. But this still needs alot of work.

Maybe the best way to proceed is for you, me and Paul to sit down after I return on April 16.


Marsha Lee Lewis
Research Assistant
International Security Program
Center for Strategic and International Studies
1800 K Street, NW
Washington, DC  20006
Tel:(202) 457-8716
Fax:(202) 775-3199
mlewis@csis.org

CONFIDENTIAL

Message

## Gross, Donald

| | |
|---|---|
| **From:** | Gross, Donald |
| **Sent:** | Monday, July 26, 2004 10:53 AM |
| **To:** | Kim, Sukhan |
| **Subject:** | RE: KEI |

Dear Sukhan,

Thanks for letting me know about the opportunity at KEI. I would certainly like to have a closer relationship with KEI, but I think it would be better if I could assist KEI on a volunteer, professional basis in the future. At this point, my main focus is on finding either an additional niche at Akin Gump, or, if that is not possible, obtaining a position at a U.S. investment bank dealing with Korea and East Asia.

Frankly, our recent discussion came as a big surprise to me so I am still sorting through my options. I have a great deal of respect for you and I know that what you have told me is best both for Akin Gump and for the development of my own career.

I sincerely appreciate your support. Thanks and best wishes,

Don



DG 00300

From: Gross, Donald
Sent: 8/24/2004 10:27:37 AM (Eastern Time)
To: ⌐‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾¬
Subject: RE: Private Equity Highlights



I agree with you and you are right to feel the way you do.  They have also
ignored me and treated me very badly, though they know I am your friend and
have strived to advance your interests.  If the ⌐‾‾‾¬company thinks it needs
Washington representation, it should stick with its current law firm which has
recently merged with a top D.C. firm.

I wonder if you know your schedule for next week.  I am not in Washington right
now but can be reached any time by cell phone at 202-365-1997. I am not sure if
you still have the same U.S. cell phone number that you had previously.  Thanks
and talk to you soon.

Best,

Don
-----Original Message-----
From: ⌐‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾¬
Sent: Tuesday, August 24, 2004 2:54 AM
To: Gross, Donald
Subject: RE: Private Equity Highlights


Don;

Can I be a bit frank with you regarding this sudden interest by Akin Gump in
⌐‾‾‾‾‾‾¬  Basically, in my humble opinion, a key principal in the project, its
Managing Partner, Managing Director and Chief Investment Officer, along with
senior executive on the ground, was basically dumped and dismissed by Akin Gump
on earlier issue  as you are aware.

I personally think that certain members of AK who know the history have been
amazingly callous and, almost admirably, unabashed to not only ignore me on
this approach to Songdo, which I will have a major influence on any outsourcing
decisions, but to expect me to completely forget that shoddy treatment I was
given.

Amazing how one can be totally irrelevant on one platform and so very
interesting on another.

Trouble is Don, I don t thing that way.

FYI


-----Original Message-----
From: Gross, Donald [mailto:dgross@akingump.com]
Sent: Saturday, August 21, 2004 4:44 AM
To: ⌐‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾¬

CONFIDENTIAL

Gross 23
7/12/07    80

AK002123

Subject: Private Equity Highlights

FYI.   Hope you have a good weekend, and [          ] a smooth trip back to the U.S.
I'm looking forward to seeing you.

Best,

Don

The information contained in this e-mail message is intended only for the
personal and confidential use of the recipient(s) named above. This message may
be an attorney-client communication and/or work product and as such is
privileged and confidential. If the reader of this message is not the intended
recipient or an agent responsible for delivering it to the intended recipient,
you are hereby notified that you have received this document in error and that
any review, dissemination, distribution, or copying of this message is strictly
prohibited. If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.

CONFIDENTIAL

From: Gross, Donald
Sent: 8/25/2004 10:50:33 AM (Eastern Time)
To: [_____]
Subject: RE: Private Equity Highlights



I had a couple of further thoughts on this, that I want to tell you in
confidence.  The little I know is that Sukhan Kim met Stan Gale for the first
time in late July at a lunch in honor of Songdo in New York.  I heard that Stan
later requested a meeting with Sukhan for the purpose of discussing [_____]
Sukhan said he thought Stan might explore retaining Akin Gump to help make a
deal with [_____]

This didn't make sense to me at the time, and still doesn't, because Sukhan is
so close to [_____] and a couple of other Korean business groups that Stan
could not possibly trust him to serve as an "honest broker."  Sukhan has never
represented an American company doing business in Korea, so far as I know, and
is a highly-specialized trade lawyer whose practice consists of representing
Korean companies in the United States.  Moreover, Sukhan plans to retire soon
so I can't imagine he wants to spend his own time helping the Gale Company.

I didn't know Jaemin was involved in this, until you mentioned she had a
meeting with Stan in Seoul.  Her help is even more questionable since she is a
bankruptcy lawyer whose practice consists of representing Korean companies on
corporate restructuring issues.  She claims to have Blue House connections, but
except for knowing Hun-jai Lee through her family,
she exaggerates her influence.

If Stan wants to get in touch with some Korean business groups, there are other
ways to do it.

I hope you are enjoying your visit so far, though I imagine things are hectic.
Talk to you soon,

Best,

Don
-----Original Message-----
From: [_____]
Sent: Tuesday, August 24, 2004 2:54 AM
To: Gross, Donald
Subject: RE: Private Equity Highlights

*Gross 24*
*7/12/07*

Don;

Can I be a bit frank with you regarding this sudden interest by Akin Gump in
[_____]  Basically, in my humble opinion, a key principal in the project, its
Managing Partner, Managing Director and Chief Investment Officer, along with
senior executive on the ground, was basically dumped and dismissed by Akin Gump
on earlier issue   as you are aware.

I personally think that certain members of AK who know the history have been
amazingly callous and, almost admirably, unabashed to not only ignore me on

AK002425

this approach to [░░░░░] which I will have a major influence on any outsourcing decisions, but to expect me to completely forget that shoddy treatment I was given.

Amazing how one can be totally irrelevant on one platform and so very interesting on another.

Trouble is Don, I don t thing that way.

FYI

[░░░░]

-----Original Message-----
From: Gross, Donald [mailto:dgross@akingump.com]
Sent: Saturday, August 21, 2004 4:44 AM
To: [░░░░░░░░░░░░░░░░░░]
Subject: Private Equity Highlights

FYI.  Hope you have a good weekend, and [░░░░░] a smooth trip back to the U.S. I'm looking forward to seeing you.

Best,

Don

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

```
>
>  Don
>  The information contained in this e-mail message is
> intended
> only for the personal and confidential use of the
> recipient(s) named
> above. This message may be an attorney-client
> communication and/or work
> product and as such is privileged and confidential.
> If the reader of
> this message is not the intended recipient or an
> agent responsible for
> delivering it to the intended recipient, you are
> hereby notified that
> you have received this document in error and that
> any review,
> dissemination, distribution, or copying of this
> message is strictly
> prohibited. If you have received this communication
> in error, please
> notify us immediately by e-mail, and delete the
> original message.
>
>
>
> The information contained in this e-mail message is
> intended only for the personal and confidential use
> of the recipient(s) named above. This message may be
> an attorney-client communication and/or work product
> and as such is privileged and confidential. If the
> reader of this message is not the intended recipient
> or an agent responsible for delivering it to the
> intended recipient, you are hereby notified that you
> have received this document in error and that any
> review, dissemination, distribution, or copying of
> this message is strictly prohibited. If you have
> received this communication in error, please notify
> us immediately by e-mail, and delete the original
> message.
>
>
```

CONFIDENTIAL

AK002120

From: Gross, Donald
Sent: 10/20/2004 2:23:46 PM (Eastern Time)
To: 'Berger, Samuel R.'
Subject: RE: To Sandy

Sandy,

Thanks very much for your help.  All the best,

Don

-----Original Message-----
From: Berger, Samuel R. [mailto:SBerger@stonebridge-international.com]
Sent: Wednesday, October 20, 2004 3:12 PM
To: Gross, Donald
Subject: RE: To Sandy


Don:  Sorry to hear the news.  I will begin to ask around for firms that may be
looking.  Sandy

---------

From: Gross, Donald [mailto:dgross@akingump.com]
Sent: Wednesday, October 20, 2004 2:54 PM
To: Berger, Samuel R.
Subject: To Sandy

*Gross 27*
*7/10/07 JS*

Dear Sandy,

I hope everything is going very well with you.  I was very glad to see the
report of your recent speech at the Johns Hopkins forum and hope it is an
indication that things are getting back to normal.

I wanted to let you know that I will soon be leaving Akin Gump and am currently
seeking a new position with a Washington firm.  Over the summer, Akin Gump's
management put considerable pressure on the Korea practice group here to reduce
its costs due to insufficient profitability.  As a consequence, I and a partner
in the practice group from our L.A. office were asked to leave the firm.
Though this decision seems very unfair and short-sighted because I have only
been at Akin Gump about one year (and have done quite well), it is the reality
I am facing.

I am now in the process of contacting various Washington law and business
consulting firms, emphasizing the value of my public and private sector
experience in the area of international policy.  I believe I would be
especially helpful to firms that team international policy professionals with
lawyers who are negotiating foreign investment transactions or advising clients
on international dispute resolution.

I am attaching my current resume for your reference (as well as a copy of an
op-ed Jim Goodby and I recently published on the six party talks).  Please feel
free to recommend me to any colleagues or friends who could benefit

CONFIDENTIAL

AK002244

considerably from someone with my background and experience.

Many thanks and all best wishes,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct


The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

CONFIDENTIAL

From: Gross, Donald
Sent: 10/20/2004 2:31:51 PM (Eastern Time)
To: Medish, Mark C.
Attachments: Resume of Donald G. Gross 10-20-04.doc, IHT Op-Ed.doc
Subject: To Mark

Dear Mark,

I hope everything is going very well with you.

I wanted to let you know that I will soon be leaving Akin Gump and am currently
seeking a new position with a Washington firm.  Over the summer, Akin Gump's
management put considerable pressure on the Korea practice group here to reduce
its costs due to insufficient profitability.  As a consequence, I and a partner
in the practice group from our L.A. office were asked to leave the firm.
Though this decision seems unfair and short-sighted because I have only been at
Akin Gump about one year (and have done quite well), it is the reality I am
facing.

I am now in the process of contacting various Washington law and business
consulting firms, emphasizing the value of my public and private sector
experience in the area of international policy.  I believe I would be
especially helpful to firms that team international policy professionals with
lawyers who are negotiating foreign investment transactions or advising clients
on international dispute resolution.

I am attaching my current resume for your reference (as well as a copy of an
op-ed Jim Goodby and I recently published on the six party talks).  Please feel
free to recommend me to any colleagues or friends at other firms who could
benefit considerably from someone with my background and experience.

Many thanks and all best wishes,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct

CONFIDENTIAL

AK002246

```
From: Gross, Donald
Sent: 10/20/2004 2:35:04 PM (Eastern Time)
To: Gati, Toby
Attachments: Resume of Donald G. Gross 10-20-04.doc, IHT Op-Ed.doc
Subject: To Toby
```

Dear Toby,

I hope everything is going very well with you.

I wanted to let you know that I will soon be leaving Akin Gump and am currently seeking a new position with a Washington firm.  Over the summer, Akin Gump's management put considerable pressure on the Korea practice group here to reduce its costs due to insufficient profitability.  As a consequence, I and a partner in the practice group from our L.A. office were asked to leave the firm. Though this decision seems unfair and short-sighted because I have only been at Akin Gump about one year (and have done quite well), it is the reality I am facing.

I am now in the process of contacting various Washington law and business consulting firms, emphasizing the value of my public and private sector experience in the area of international policy.  I believe I would be especially helpful to firms that team international policy professionals with lawyers who are negotiating foreign investment transactions or advising clients on international dispute resolution.

I am attaching my current resume for your reference (as well as a copy of an op-ed Jim Goodby and I recently published on the six party talks).  Please feel free to recommend me to any colleagues or friends at other firms who could benefit considerably from someone with my background, skills and experience.

Many thanks and all best wishes,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct

CONFIDENTIAL

AK002251

From: Gross, Donald
Sent: 10/20/2004 5:39:36 PM (Eastern Time)
To: 'mbrillia@uschamber.com'
Attachments: Resume of Donald G. Gross 10-20-04.doc, IHT Op-Ed.doc
Subject: To Myron Brilliant

Dear Myron,

I hope everything is going very well with you.

I wanted to let you know that I will soon be leaving Akin Gump and am currently
seeking a new position with a Washington firm.  Over the summer, Akin Gump's
management directed the Korea practice group here to reduce its costs due to
insufficient profitability.  As a consequence, I and a partner in the practice
group from our L.A. office were asked to leave the firm.  Though this decision
seems unfair and short-sighted because I have only been at Akin Gump about one
year (and have done quite well), it is the reality I am facing.

I am now in the process of contacting various Washington law and international
business consulting firms, emphasizing the value of my public and private
sector experience in the area of international policy.  I believe I would be
especially helpful to firms that team international policy professionals with
lawyers who are negotiating foreign investment transactions or advising clients
on international dispute resolution.  My Asia and Korea experience should prove
particularly valuable to firms whose clients have business operations in East
Asia.

I am attaching my current resume for your reference (as well as a copy of an
op-ed Jim Goodby and I recently published on the six party talks).  Please feel
free to recommend me to any Washington firms that could benefit considerably
from someone with my background, skills and experience.

Many thanks and all best wishes,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct

From: Gross, Donald
Sent: 10/20/2004 5:14:55 PM (Eastern Time)
To: 'jabw@keia.org'
Attachments: Resume of Donald G. Gross 10-20-04.doc, IHT Op-Ed.doc
Subject: To Joe Winder

Dear Joe ,

I hope everything is going very well with you.

I wanted to let you know that I will soon be leaving Akin Gump and am currently
seeking a new position with a Washington firm.  Over the summer, Akin Gump's
management directed the Korea practice group here to reduce its costs due to
insufficient profitability.  As a consequence, I and a partner in the practice
group from our L.A. office were asked to leave the firm.  Though this decision
seems unfair and short-sighted because I have only been at Akin Gump about one
year (and have done quite well), it is the reality I am facing.

I am now in the process of contacting various Washington law and international
business consulting firms, emphasizing the value of my public and private
sector experience in the area of international policy.  I believe I would be
especially helpful to firms that team international policy professionals with
lawyers who are negotiating foreign investment transactions or advising clients
on international dispute resolution.  My Asia and Korea experience should prove
particularly valuable to firms whose clients have business operations in East
Asia.

I am attaching my current resume for your reference (as well as a copy of an
op-ed Jim Goodby and I recently published on the six party talks).  Please feel
free to recommend me to any Washington firms that could benefit considerably
from someone with my background, skills and experience.

Many thanks and all best wishes,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct

CONFIDENTIAL

From: Gross, Donald
Sent: 10/27/2004 2:03:19 PM (Eastern Time)
To: Kim, Sukhan
Attachments: Resume of Donald G. Gross 10-22-04.doc
Subject: Re: Lazard

Sukhan,

I very much enjoyed our lunch today.  As I mentioned, I would very much
appreciate it if you would recommend me to Vernon Jordan for a position at
Lazard.  I believe my experience in government and private practice would allow
me to help him considerably in developing and implementing international
business strategies for the bank.  I would appreciate an opportunity to talk
with him about the various ways I could best assist him and Lazard.

I am attaching my resume and you should feel free to forward it to Mr. Jordan.
Many thanks,

Don

Gross 32

7/12/07   88

CONFIDENTIAL

AK002404

From: [redacted]
Sent: 7/29/2004 7:47:46 PM (Eastern Time)
To: [redacted]  [redacted]
Subject: RE: Conference Call, Etc.

Dear Don,

I cannot begin to tell you how impressed I was by your approach to this
situation.  Few would be so supportive, even fewer so candid.  Your letter
highlights exactly the reasons why [redacted] continues to hold you in such high
personal regard.  Very special, indeed.

We will dial in, as you have arranged and thank you for that.

I appreciate your remarks about CSFB, we will certainly keep an open mind.
Given my prior experiences with this group, they tend to have more questions
than answers or advice, at least initially.  We would like to reverse this
approach during the call.  They are likely to request additional details
including financial models, etc.  We are not likely to supply any additional
details at this time, but let s see what they say.

Please know, but keep confidential, that we are in discussions with DTZ about
joining us in some way with the Fund.  They too can likely assist in completing
some of the things you mentioned while also providing excellent research and
property level services that we do not provide.   Just keep this in mind, but
no one should know this, as things may not work out with them.

All the best and many thanks,

[redacted]

---

From: Gross, Donald [mailto:dgross@akingump.com]
Sent: 30 July 2004 06:21
To: [redacted]
Subject: RE: Conference Call, Etc.

[redacted]

Gross 31

7/10/07 85

My secretary has made the arrangements for our conference call on Monday at
8:30 am New York time (9:30 pm Seoul time) with Doug Weill, Managing Director
and Group Co-Head of CSFB's Real Estate Private Fund Group.  To join in the
conference, please call 954-797-0718 at the start time on Monday and use
participant code 996664.

As I mentioned earlier, I've been trying to reach several of Akin Gump's funds
group lawyers, some of whom are still traveling, to assess their level of
commitment in contacting potential investors. I've distributed the flip book to
a substantial group of lawyers throughout our offices whom I believe will be
helpful.  Everyone tells me they want to be supportive and they should start
reporting client feedback soon. But I'm not satisfied with the out-reach
efforts of the funds group so far, though there's no question the law firm
would do an excellent job on the legal work. For the moment, I think you should
delay signing the engagement letter. The law firm will be unhappy with this

CONFIDENTIAL

AK002065

recommendation, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words.

Concerning our Monday conference call, as both of you suggest, CSFB may be interested in offering [XXX] its placement services, but the potential benefits are greater than that. CSFB's Real Estate Private Fund Group can also prepare the offering memorandum, partnership agreement and accompanying documents, significantly lowering your legal costs.  CSFB may be interested in co-investing with [XXX].  Establishing a partnership with CSFB where CSFB in effect receives a "success fee" for helping to establish the fund is in line with your original concept.  And I believe that any fees CSFB obtains are normally paid out over a three or four year period, matched with the incoming management fees.

Anyway, I agree with both of you that it's good to keep an open mind about the discussion on Monday with Doug Weill, so the call can conclude with an agreement to conduct further discussions and perhaps a meeting in Seoul or New York.  Doug Weill told me he is looking forward to the call, he is "definitely interested" in Asia-only funds and he wants to "dig deeper" into your plans.

I look forward to talking with you Monday and have a good weekend.  Thanks,

Best,

Don

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

AK002066

**Donald Gross**

| | |
|---|---|
| **From:** | "Bob Boorstin" <rboorstin@americanprogress.org> |
| **To:** | "Donald Gross" <Dongross617@hotmail.com> |
| **Sent:** | Tuesday, December 21, 2004 1:11 AM |
| **Subject:** | RE: To Bob |

Hi Don,

Sorry I've taken so long to get back to you.  My wife has had health problems and, although she's doing fine, it's been very time consuming.

We have nothing at the Center at the moment which would work, I'm afraid. We are in the midst of a search for a new analyst but I'm looking for someone with about 3-5 years experience, much younger, with an extraordinarily low salary (even for DC).  You're about ten grades above the position we're hiring for now, although I will gladly keep you on the list of "wish I had money for" people who would make terrific fellows and have a lot to add.

In the meantime, I hope that while you search – and even after you land something – you'll think about doing a couple of projects with us.  I am commissioning papers these days from our "adjunct scholars" and would be very happy if there's a project you would like to undertake.

Trust that you and yours will enjoy the holidays, and look forward to being in touch in the New Year.

Yrs.

Bob

**From:** Donald Gross [mailto:Dongross617@hotmail.com]
**Sent:** Tuesday, December 14, 2004 10:22 AM
**To:** Bob Boorstin
**Cc:** Brooke Lierman
**Subject:** To Bob

Dear Bob,

I hope everything is going well with you.  It was very nice seeing you recently at the Center's excellent event on advancing a progressive foreign policy agenda.

I wanted to let you know I am currently looking for a new position with a policy institute in Washington and would sincerely appreciate your consideration.

I am especially interested in joining the Center's national security team where I could focus on East Asia, conflict resolution and nonproliferation issues.  I would certainly be open to working on any other issues the Center believes are important as well as assist in organizing conferences and meetings.  I would also be happy to spend a chunk of my time on fundraising and other aspects of institutional development.

I have the highest respect for you and John and very much appreciate your consideration.  I am attaching a current resume for your reference.

Many thanks and all my best wishes,

Don

Gross 33
7/12/07

5/13/2005
DG 00368

## Donald Gross

**From:**      "Paul Stares" <pstares@usip.org>
**To:**         "Donald Gross" <Dongross617@hotmail.com>
**Sent:**      Tuesday, December 14, 2004 3:18 PM
**Subject:**   Re: Application for Program Officer (Northeast Asia)

Hi Don, many thanks for your note. My initial reaction is that you are too senior for this position. I also thought you were pretty ensconced at Akin and Gump? Anyway, do you mind if I run this by Dick Solomon? Best Paul

On Dec 14, 2004, at 10:11 AM, Donald Gross wrote:

> Dear Paul,
>
> I hope everything is going very well with you.  When I talked with Joel Wit last week, he mentioned that USIP is still seeking someone to serve as a Program Officer with a specialization in Northeast Asia.  I am very interested in being considered for this position and today sent the cover letter below and the attached resume to the designated USIP e-mail address.
>
> I look forward to seeing you soon.  Many thanks and all best wishes,
>
> Don

* * * * *

December 14, 2004

USIP Vacancy No. 200410

U.S. Institute of Peace

1200 17th Street NW, Suite 200

Washington, DC  20036

Dear Sir or Madam,

GRoss 34

7/10/07

I am quite interested in applying for the position of Program Officer with a specialization in Northeast Asia at the U.S. Institute of Peace and sincerely appreciate your consideration.

4/28/2005
DG 00359

By way of background, I am an international lawyer who served in senior policy roles at the National Security Council, Arms Control & Disarmament Agency and State Department from 1993 to 2000. While serving at ACDA and State, I focused heavily on conflict prevention with both China and North Korea in the fields of arms control and nonproliferation.

Since leaving the State Department in June 2000, I have devoted considerable time to research and writing on security policy issues concerning Northeast Asia. While practicing law in Seoul with the leading Korean law firm through 2002, I served as an adjunct professor of international relations at Yonsei University's Graduate School of International Studies. In this capacity, I began writing regular quarterly reports on U.S.-Korea relations for a journal published by Pacific Forum of the Center for Strategic and International Studies. I also became an Op-Ed contributor to the International Herald Tribune and Newsweek Korea on Northeast Asia security issues.

Since returning to Washington, where I have practiced law at the international firm of Akin Gump Strauss Hauer & Feld, I had the great pleasure of participating in a project co-sponsored by the U.S. Institute of Peace and CSIS regarding the prospective consequences of the collapse of North Korea. My paper for the project covered the political and legal dimensions of this issue and drew on the current literature concerning post-conflict disarmament, transitional administration and reconstruction.

Especially when I served in the Executive branch, I obtained considerable experience in organizing workshops and conferences, as well as representing the U.S. government at international meetings. In 1996, I organized the first U.S.-Israel conference on arms control and nonproliferation. Over a two-week period, U.S. officials trained and instructed Israeli officials in the substance and techniques of arms control negotiations.

In 2000, I was instrumental in forming the U.S.-Japan Commission on Arms Control, Nonproliferation and Verification. A key component of the Commission was establishing an expanded Track II dialogue between U.S. and Japanese NGOs for the purpose of fact-finding, exchange of views, and providing guidance to government officials.

My representational work for the U.S. government began in 1995 when I served as senior adviser to the head of the U.S. delegation which successfully negotiated the indefinite extension of the Nuclear Nonproliferation Treaty. From then on, I developed and implemented strategies for multilateral arms negotiations and frequently met with foreign diplomats for this purpose. When I moved from ACDA to the State Department, I became the principal coordinator for the U.S.-China nonproliferation dialogue as well as a member of the delegation negotiating limits on North Korea's missile program. In carrying out these responsibilities, I gained broad experience in conflict management and resolution.

4/28/2005

DG 00360

I have a strong interest in researching and developing study projects relating to the prevention, management and resolution of conflict in Northeast Asia. I have spent considerable time examining the six party talks and would like to design a roadmap for developing this negotiating venue into a new regional security forum for Northeast Asia. It would be quite worthwhile studying how the experience of the Organization for Security and Cooperation in Europe would be applicable to this new multilateral security forum.

More broadly, I would like to examine the evolution of U.S. alliances and critical diplomatic relationships in Asia. I have done considerable work to date on issues affecting the evolution of the US-South Korea alliance, and would like to expand this research to include Japan, and the regional dynamics among the U.S., South Korea and Japan. The success of China's economic diplomacy in Asia over the last three years, in forging a number of free trade agreements and market-opening measures, has stirred renewed concern among some U.S. officials and scholars about a future "China threat." I would like to examine how a more cooperative approach by the U.S. could instigate greater democracy and rule of law in China, while mitigating the potential threat to U.S. interests.

Finally, I should mention that I am fluent in Korean language. I began studying Korean when I worked at the State Department and have continued my studies since that time, both in Seoul and Washington.

I am attaching a current resume as well as a recent salary history and will look forward to hearing from you. Thanks very much for your consideration.

All my best wishes,

Donald G. Gross

Tel: 202-365-1997 (cell)

E-mail: Dongross617@hotmail.com
<Resume of Donald G. Gross - December 2004.doc>

**********************

Dr Paul B. Stares
Director, Research and Studies Program
United States Institute of Peace
1200 17th Street, N.W.
Washington D.C. 20036-3011
Tel: 202-429-3891 Fax: 202-429-6063
web: www.usip.org

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD G. GROSS ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-399 (EGS) |
| ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF D. MICHAEL KAYE

I, D. Michael Kaye declare the following based upon my first-hand knowledge:

1.      Akin Gump Strauss Hauer & Feld LLP ("the Firm") hired me as a mid-level associate in 1992. The Firm promoted me to partner in 1996, and I remained a partner at the Firm until April 2005. I am now a legal consultant to the Firm. My areas of concentration are international trade and international commercial law.

2.      My current residence is in Santiago, Chile.

3.      In June 2003, I interviewed Donald Gross as a candidate for a position with the Firm. I understood the Firm was looking for a lawyer with 5-6 years experience to support Sukhan Kim's practice advising Korean clients on international policy issues. I had been an active member of the Firm's hiring and recruiting committee for several years, and interviewed many candidates at all levels of experience. I was also actively involved in the Firm's international trade and Korea practices.

4.      I interviewed Mr. Gross in my office for approximately forty (40) minutes. He was personable, but he seemed confused about how large law firms work and appeared to have

done little background work to learn about the Firm, in particular. I believed that substantial large law firm experience was important for the type of position the Firm wanted to fill, because it provides training for dealing with sophisticated clients and in preparation of legal memos. I was surprised by Mr. Gross's lack of knowledge about law firms, because his resume included some law firm experience. I also had the impression that Mr. Gross was not a "roll up your sleeves" type of attorney. Because Mr. Kim was very much this way, I believed the lack of that quality might create problems in their potential working relationship.

5.    I prepared an e-mail on June 13, 2003, describing my experience in the interview, in response to an inquiry from Mr. Kim. I sent it to Mr. Kim, Michael Quigley (another partner) and David Park (a Counsel). A copy of that e-mail is attached hereto as Exhibit A.

6.    I was not involved in any follow-up conversations about hiring Mr. Gross, but did learn shortly thereafter that the Firm had made an offer to hire him and he had accepted.

7.    During Mr. Gross's tenure with the Firm, I had the opportunity to review his work product and performance on at least four occasions. First, in the Fall 2003, Mr. Kim had given Mr. Gross an assignment to write a relatively short Op-Ed piece for a Korean periodical. Mr. Kim is a good writer and expects written work product for non-English speaking clients to be particularly clear and precise. He was unhappy with Mr. Gross's draft and brought it to me to edit. In essence, I rewrote it.

8.    Second, a couple months after his arrival I worked on critical sections of a memo that Mr. Gross had been working on relating to an assignment that we called Project J. In my view, his work was poorly done. I recommended that he rewrite several sections more than once. Mr. Gross seemed somewhat panicked by the experience, but anxious to please.

2

9.    Third, in November 2003, I learned that Mr. Gross was working on a memo for one of the clients that I supervised, the Korean Embassy. It is very important to me that all projects involve the "Three C's:" communication, cooperation and coordination. Mr. Gross' handling of this assignment lacked all three. On November 11, 2003, I wrote an e-mail to Mr. Kim raising my concerns about the handling and quality of the assignment. A copy of the November 11, 2003 e-mail is attached as Exhibit B. On November 14, 2003, I wrote an e-mail to Mr. Gross and a junior associate with whom he was working instructing them to "pull the plug" on the assignment. A copy of my November 14, 2003 e-mail is attached as Exhibit C. I also wrote to Mr. Gross again that day providing constructive suggestions on future staffing and efficiency. A copy of my November 14, 2003 e-mail is attached as Exhibit D.

10.    Finally, in the Spring of 2004, Mr. Kim asked me to work on a project with Mr. Gross to assist him in improving his written work product. I gave him a precise research assignment and asked him to provide me with a short memo later that day. In that the purpose of the exercise was to help Mr. Gross learn how we expected these kinds of memos to be written and presented to clients, I was dismayed when his reaction was, "Who can I get to work with me on this?" I explained to him that he should be able to handle the entire assignment on his own. He did not provide me with a draft that day, but did so three or four days later. It was poorly researched and written. I asked him to rewrite the assignment.

11.    I have worked with and for Mr. Kim for over 15 years. In that time, I have never heard him use an ageist comment or demonstrate any ageist animus. To the contrary, I have

3

witnessed him work with many attorneys senior to him who, in fact, report to him on major projects.  Age in the Korean culture is an attribute and to be respected.

I declare under penalty of perjury that the foregoing is true and correct.

D. Michael Kaye

Date: _September 4, 2007_

4



From: Kaye, Michael
Sent: 6/13/2003 9:22:13 AM (Eastern Time)
To: Kim, Sukhan; Park, David
CC: Quigley, Mike
Subject: RE:

Personally, I liked him.  He seemed like a really nice guy.  However:
 (1) He struck me as being somewhat naïve about what law firms are all about
(notwithstanding his two years working at Kim & Chang).  For instance, I'm not
sure he has an appreciation for the intensity of big U.S. law firms.
 (2)  I was taken aback a few times by "knowledge gaps."  For instance, for a
guy as involved in Korea, law firms in Korea and Washington/international
affairs, I would have assumed he would have known more about Akin Gump (or at
least done a little more homework) -- especially given that he had previously
met you, Mike Q and Dan Spiegel.  There were some other knowledge gap examples.
 (3)  He seemed much more interested in trying to "generate business" from his
Korea contacts than he was in rolling up his sleeves to help us in the Korea
practice.  I think this may be a function of advice he received from Dan
Spiegel about the fact that to succeed at a law firm you need to be a "finder"
and not a "minder" or "grinder."  Truthfully, I don't think he has a finder
personality, and honestly we don't need someone to bring in more business, we
need someone to service what we already have.  This might be a function of him
telling us what he thought he wanted us to hear, but I hope it is not misplaced
expectations.

 -----Original Message-----
From: Kim, Sukhan
Sent: Thursday, June 12, 2003 4:19 PM
To: Kaye, Michael; Park, David
Cc: Quigley, Mike
Subject:

What did you think of gross? Can you let me know asap?  Who else met with him?
tks

CONFIDENTIAL

AK002632

**B**

From: Kaye, Michael
Sent: 11/11/2003 2:04:46 PM (Eastern Time)
To: Kim, Sukhan
Subject: RE: Request from [redacted]

I spoke to Don already, and I think he understands the need to coordinate.  No
further action necessary.  I just wanted to double-check with you and make sure
you had not told him to take this ball and run with it.

Problem is that he was getting a little too engaged in areas where he had no
idea about: (1) legal subject matter (or even who in the firm handles it); (2)
history of our involvement in the issue or the background on issue; and (3)
client sensitivities.  As long as everyone coordinates, we will be O.K.  The
objective should always be getting the client the best advice/product -- if we
are not coordinating well we risk getting them something they did not want, or
ask for, or that is not a good product, and then we will be in trouble.

-----Original Message-----
From: Kim, Sukhan
Sent: Tuesday, November 11, 2003 1:51 PM
To: Kaye, Michael
Subject: RE: Request from [redacted]


This comes to me as a surprise. I had no idea that he was involved in doing the
memos you mentioned. I thought that you were handling this on behalf of [redacted]
[redacted], unless you asked don to get involved. How do you want to proceed?

-----Original Message-----
From: Kaye, Michael
Sent: Tuesday, November 11, 2003 12:30 PM
To: Kim, Sukhan
Subject: FW: Request from [redacted]


Sukhan:

I had a little talk with Don Gross this morning, because this was the second
time in two days he was rushing into and asking people to work on a project
without properly coordinating.  Don is an O.K. writer, but has no substantive
background on international trade (or other legal matters), and I do not want
us to start shooting from the hip and/or giving clients uninformed memos.
Specifically:

 Yesterday I had to stop a memo from going to [redacted] on the Special
301 OCR, that Don had a first year associate working on.  My first concern was
that we provided no analysis, but only a summary of submissions [redacted] has
already had for over a week.  My second concern was that he had a first year
with no experience working on intellectual property issues doing a memo in a
very complex area.  This project needed to be coordinated with Thaddeus Burns,
David Park or I who have been working on it for the last 3 years.

 This morning, Don assigned a project to Thaddeus and Rob Joyce involving the
WTO Appellate Body decision on steel 201 (see e-mail below).  I told Don that he
should have checked with the [redacted] points of contact (either David Park,

CONFIDENTIAL                                                                AK002794

Warren or I), and that we always need to check on who has the appropriate
subject matter expertise.  Rob and Thaddeus have no background on steel or 201,
and are in no position to get the answers [_____] is looking for.  Indeed,
Warren and I had already figured out who we were going to call at White House,
USTR and Capitol Hill when Don took this over and started Rob working on it.

We need to get Don to coordinate a little more, and step back and think (or
ask) about things before pulling the trigger.  Don implied you wanted him to
run all of the Korea matters, and was puzzled that he should have to coordinate
with Warren or I or others that had subject matter experience.  If you want me
to step back and let him run these things on his own, I will do so.

Mike

-----Original Message-----
From: Gross, Donald
Sent: Tuesday, November 11, 2003 6:59 AM
To: Kendler, Thea; Kaye, Michael; Connelly, Warren; Park, David
Cc: Joyce, Rob; Burns, Thaddeus
Subject: RE: Request from [_____]


I'll work on this beginning today with the assistance of Rob Joyce and Thaddeus
Burns.  Thanks, Don

-----Original Message-----
From: Kendler, Thea
To: Kaye, Michael; Connelly, Warren; Gross, Donald; Park, David
Sent: 2003-11-10      5:10
Subject: Request from [_____]

[_____] has a request for us, due COB Thursday:

He has asked what the Administration will do regarding Steel Section 201 in
light of today's WTO decision.  He believes that since the ITC report was
issued in September, the Administration has been pondering this question.
There is now a rumor that the Administration may lift the measure.  As such,
[_____] has been asked to file a report on Friday describing the prospects
for lifting the steel Section 201 measure.

[_____] is not looking for a legal memo or a description of the WTO process.
He simply wants information regarding the word around town (or
something like that).


Thea D. R. Kendler
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
tel. 202.887.4083
fax 202.955.7651
tkendler@akingump.com


CONFIDENTIAL                                                    AK002795

From: Kaye, Michael
Sent: 11/14/2003 4:59:35 AM (Eastern Time)
To: Park, Jason A.; Gross, Donald
Subject: RE: Comments to [ X ] re Korea Special 301 OCR

Don/Jason:

Let's pull the plug on this one. We picked up the 301 OCR comments on November
3 (11 days ago), and even at that time they had already been on file for a
week. We're way too late to do a routine follow-up memo now. If the [ X ]
[ X ] pr [ X ] want any specific advice, they will let us know.

Mike


-----Original Message-----
From: Park, Jason A.
To: Kaye, Michael; Gross, Donald
Cc: Burns, Thaddeus
Sent: 11/13/2003 5:25 PM
Subject: RE: Comments to [ X ] re Korea Special 301 OCR

Mike,
I hope you are doing well.

I've contacted both Don and Thaddeus and am waiting to receive their
comments. Don is still waiting to hear from one of his contacts at [ X ]
and said he will probably have something to contribute soon (as early as
Fri. morning). I will draft something as soon as I hear from them and
will work with them before sending you a draft. But I will keep you
posted on our progress.-Jason


> -----Original Message-----
>From: Kaye, Michael
>Sent: Thursday, November 13, 2003 4:12 PM
>To: Park, Jason A.; Gross, Donald
>Subject: RE: Comments to [ X ] re Korea Special 301 OCR
>
>Just wanted to check on where we stand on the revised memo.
>
>   -----Original Message-----
> From: Park, Jason A.
> Sent: Monday, November 10, 2003 3:59 PM
> To: Kaye, Michael
> Subject: RE: Comments to [ X ] re Korea Special 301 OCR
>
> Mike: I am working with both Thaddeus and Don on this. Thanks
>for your comments; I will correct the memo and send you a revised
>draft.
>
>   -----Original Message-----
> From: Kaye, Michael
> Sent: Monday, November 10, 2003 3:56 PM
> To: Park, Jason A.
> Subject: RE: Comments to [ X ] re Korea Special


CONFIDENTIAL

AK000711

>301 OCR                                          REDACTED
>
>  Jason:
>
>  Please review with David Park, Thaddeus Burns and/or Don
>Gross.  However, we cannot send this to the client in its present form.
>It is simply a summary of the public submissions that were filed.  The
>          could have done that on their own (and likely did it already
>days ago).  We need to provide them with something value added.  My
>idea would have been to summarize the 2 submissions, dedicating no more
>than 4-5 sentences to each, and then: (a) provide an analysis of the
>submissions (highlighting the weaknesses or strengths); or (b) provide
>them with intelligence from          as to initial reactions from USG
>officials; or (c) recommendations on some next steps Korea should take.
>
>
>  Mike
>
>    -----Original Message-----
>  From:  Park, Jason A.
>  Sent: Monday, November 10, 2003 3:23 PM
>  To: Kaye, Michael
>  Subject: FW: Comments to          re Korea
>Special 301 OCR
>
>  Hello Mike,
>  Here is a draft of the Special 301 OCR comments
>summary for your review.  Please submit any analytical comments and
>recommendations for the          you may have.  Please feel free to make
>any editorial changes you feel are necessary.  I will incorporate them
>into the memo and send you a revised copy.  Thank you and have a nice
>day.-Jason
>
>    << File:
>EAST-#7084832-v4-ROK          Special_301_OCR_Comment_Summary.DOC >>
>
>    -----Original Message-----
>  From:  Kendler, Thea
>  Sent: Monday, November 10, 2003 8:10 AM
>  To: Park, Jason A.
>  Cc: Gross, Donald
>  Subject: FW: Comments to          re Korea
>Special 301 OCR
>  Importance: High
>
>  Jason -- Per Mike's e-mail, can you prepare a
>quick summary of the comments today?  I will not be in my office most
>likely, but preparing the giant lumber filing on the Terrace Level.
>
>  Don -- Please forward any additional comments
>received from Thaddeus to Jason -- I will not reliably be in a position
>to do that myself.
>
>  Thank you!
>

CONFIDENTIAL

AK000712

>   -----Original Message-----
> From:  Kaye, Michael
> Sent: Monday, November 10, 2003 12:21 AM
> To: Kendler, Thea
> Cc: Park, David; Burns, Thaddeus; Gross,
>Donald
> Subject: RE: Comments to ⬚ re Korea
>Special 301 OCR
> Importance: High
>
> Don:
>
> I have been traveling the better part of the
>last 10 days.
>
> Not sure I responded to the e-mail below, but
>where do we stand?  I assume we are going to send a short summary to
>the ⬚, along with any insights we may have.  Thaddeus, do
>you have any thoughts on information or very brief thoughts we should
>share with them.  (I would add that we heard last week from AUSTR Jim
>Mendenhall, a former Akin Gump associate, that PhRMA has been pushing
>hard, as has IIPA.)
>
> Mike
>
>   -----Original Message-----
> From:  Rozman, Thea
> Sent: Monday, November 03, 2003 12:43 PM
> To: Kaye, Michael; Burns, Thaddeus; Gross,
>Donald
> Cc: Park, David
> Subject: Comments to ⬚ re Korea
>Special 301 OCR
>
> We picked up the Korea Special 301 OCR comments
>this morning.  Only three were filed:
>
> (1) Nintendo of America, Inc.
>
> (2) International Intellectual Property Alliance
>(this is an organization that include the Business Software Alliance,
>of which Microsoft is a member)
>
> (3) PhRMA
>
> All are quite short, and I have attached them to
>this e-mail in PDF form, if you are interested in reviewing them.
>Although PhRMA also submitted requests to initiate Special 301 OCR's
>for Croatia and Turkey, I have not included those somewhat lengthy
>pages.
>
> Mike -- How do you suggest we proceed from here?
>Should we prepare a summary memo for the ⬚ or simply review them
>internally and be prepared to respond to any questions?
>

CONFIDENTIAL

AK000713

```
>
>     << File: nintendo.pdf >>  << File: IIPA.pdf >>
><< File: PhRMA.pdf >>
>
>
>   Thea D. R. Kendler
>   Akin Gump Strauss Hauer & Feld LLP
>   1333 New Hampshire Ave., NW
>   Washington, DC 20036
>   tel. 202.887.4083
>   fax 202.955.7651
>   trozman@akingump.com
>
```

CONFIDENTIAL

From: Kaye, Michael
Sent: 11/14/2003 5:49:08 AM (Eastern Time)
To: Gross, Donald
Subject: FW: Comments to ⊠ re Korea Special 301 OCR

Don:


See attached.  Aside from the fact that we are very late and the memo would be
of zero value now (my reson for pulling the plug), the e-mail from Thaddeus
raises two other important points --

    (1)  Looking at the e-mail traffic below, I am at a loss (as was Thaddeus)
as to how we ended up with 4 attorneys (yourself, Jason, Thea and Thaddeus)
working on what should have been a 1-2 page memo involving 1 billable hour.
Moreover, we have cc:'s and messages to 3 other people during the process
(David Park, Rob Joyce and myself).

    (2)  On any given project we have to find the right person to work on the
memo and get it done.  It does not pay to have a slew of first or second year
associates or PLP types "interview" and pester a senior lawyer like Thaddeus.

We spoke about both of these issue earlier this week.  We have to do better
next time.

Mike

-----Original Message-----
From: Burns, Thaddeus
To: Kaye, Michael
Sent: 11/14/2003 4:05 AM
Subject: FW: Comments to ⊠ re Korea Special 301 OCR
Sensitivity: Confidential

Mike,
In my view, this is an unusual and not particularly collegial way of
proceeding.  I am happy to draft something if necessary but the idea of
being interviewed so that someone who knows little about the history or
substance of US Korea bilateral relations on TRIPS can draft something
second hand seems to me to be a waste of my time and of the client's
money.  BTW, I will be in Washington on Monday through Wednesday and am
hoping to have lunch with Val Slater while I am town.  We missed each
other when she was in Brussels.


How is it that preparing a technical but otherwise simple memorandum for
the ⊠ has become such a complicated process involving so
many individuals?

Thaddeus

-----Original Message-----
From: Park, Jason A.
Sent: Thursday, November 13, 2003 7:38 PM
To: Burns, Thaddeus
Cc: Gross, Donald
Subject: RE: Comments to ⊠ re Korea Special 301 OCR


CONFIDENTIAL

AK000715

Thank you Thaddeus for your message.
You said it would be most helpful for you to redline a draft of a memo,
but I was hoping I could get some comments/analysis so I could write the
draft in the first place. Could I speak with you on Friday to get some
of your thoughts? I will then incorporate them into a memo and then
have you add comments. Thank you.


-----Original Message-----
From: Burns, Thaddeus
Sent: Wednesday, November 12, 2003 1:15 AM
To: Park, Jason A.
Subject: Re: Comments to ⨯ re Korea Special 301 OCR


Jason, am in geneva until thu am can revert to you first thing thu
-----------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Park, Jason A. <japark@akingump.com>
To: Burns, Thaddeus <TBurns@AKINGUMP.com>
Sent: Tue Nov 11 17:24:45 2003
Subject: FW: Comments to ⨯ re Korea Special 301 OCR

Hello Thaddeus,
I am working with Thea and Don Gross on this memo for the Korean
Embassy.

Because of your historical knowledge and experience on this subject, I
would appreciate any insights and comments you could make on PhRMA
and/or IIPA's comments or the progress of the Special 301 OCR in
general. Specifically, if you have any insights on: 1) current U.S.
Government views on the Special 301 OCR and 2) why the US Government has
selected now to pursue the OCR, that would be very helpful.

In order to be most helpful to the ⨯ we are trying to have this
memorandum completed soon. Thank you in advance for your assistance and
insight.-Jason Park

-----Original Message-----
From: Gross, Donald
Sent: Monday, November 10, 2003 4:25 PM
To: Park, Jason A.; Kendler, Thea
Cc: Joyce, Rob; Burns, Thaddeus
Subject: RE: Comments to ⨯ re Korea Special 301 OCR

I'll talk to USTR at the office director level to get USTR's initial
assessment of the industry comments, and where they plan to go from
here. Rob Joyce is checking on Hill interest/pressure re: the Korea-IPR
issue. Thaddeus Burns should also be able to provide us with a valuable
perspective tomorrow morning, based on his experience in dealing with

CONFIDENTIAL                                                    AK000716

this issue. Thanks,

Don

  -----Original Message-----
From:   Park, Jason A.
Sent: Monday, November 10, 2003 4:02 PM
To: Gross, Donald
Subject: FW: Comments to [✗] re Korea Special 301 OCR

Don,
Here are Mike's comments. I agree with his comments/assessments
and will shorten the summaries. I have a 4:00 meeting, but could I come
speak with you later to discuss how to find and incorporate the other
information? Thanks.

  -----Original Message-----
From:   Kaye, Michael
Sent: Monday, November 10, 2003 3:56 PM
To: Park, Jason A.
Subject: RE: Comments to [✗] re Korea Special 301 OCR

Jason:

Please review with David Park, Thaddeus Burns and/or Don Gross.
However, we cannot send this to the client in its present form. It is
simply a summary of the public submissions that were filed. The Embassy
could have done that on their own (and likely did it already days ago).
We need to provide them with something value added. My idea would have
been to summarize the 2 submissions, dedicating no more than 4-5
sentences to each, and then: (a) provide an analysis of the submissions
(highlighting the weaknesses or strengths); or (b) provide them with
intelligence from USTR as to initial reactions from USG officials; or
(c) recommendations on some next steps Korea should take.

Mike

  -----Original Message-----
From:   Park, Jason A.
Sent: Monday, November 10, 2003 3:23 PM
To: Kaye, Michael
Subject: FW: Comments to [✗] re Korea Special
301 OCR

Hello Mike,
Here is a draft of the Special 301 OCR comments summary
for your review. Please submit any analytical comments and
recommendations for the [✗] you may have. Please feel free to make
any editorial changes you feel are necessary. I will incorporate them
into the memo and send you a revised copy. Thank you and have a nice
day.-Jason

  << File:
EAST-#7084832-v4 [✗] Special_301_OCR_Comment_Summary.DOC >>

CONFIDENTIAL

AK000717

-----Original Message-----
From:  Kendler, Thea
Sent: Monday, November 10, 2003 8:10 AM
To: Park, Jason A.
Cc: Gross, Donald
Subject: FW: Comments to [X] re Korea
Special 301 OCR
Importance: High

Jason -- Per Mike's e-mail, can you prepare a
quick summary of the comments today?  I will not be in my office most
likely, but preparing the giant lumber filing on the Terrace Level.

Don -- Please forward any additional comments
received from Thaddeus to Jason -- I will not reliably be in a position
to do that myself.

Thank you!

-----Original Message-----
From:  Kaye, Michael
Sent: Monday, November 10, 2003 12:21 AM
To: Kendler, Thea
Cc: Park, David; Burns, Thaddeus; Gross,
Donald
Subject: RE: Comments to [X] re Korea
Special 301 OCR
Importance: High

Don:

I have been traveling the better part of the
last 10 days.

Not sure I responded to the e-mail below, but
where do we stand?  I assume we are going to send a short summary to the
[            ] along with any insights we may have.  Thaddeus, do you
have any thoughts on information or very brief thoughts we should share
with them.  (I would add that we heard last week from AUSTR Jim
Mendenhall, a former Akin Gump associate, that PhRMA has been pushing
hard, as has IIPA.)

Mike

-----Original Message-----
From:  Rozman, Thea
Sent: Monday, November 03, 2003 12:43
PM
To: Kaye, Michael; Burns, Thaddeus;
Gross, Donald
Cc: Park, David
Subject: Comments to [X] re
Korea Special 301 OCR

We picked up the Korea Special 301 OCR

CONFIDENTIAL

AK000718

comments this morning.  Only three were filed:

(1) Nintendo of America, Inc.

(2) International Intellectual Property
Alliance (this is an organization that include the Business Software
Alliance, of which Microsoft is a member)

(3) PhRMA

All are quite short, and I have attached
them to this e-mail in PDF form, if you are interested in reviewing
them.  Although PhRMA also submitted requests to initiate Special 301
OCR's for Croatia and Turkey, I have not included those somewhat lengthy
pages.

Mike -- How do you suggest we proceed
from here?  Should we prepare a summary memo for the [ ] or simply
review them internally and be prepared to respond to any questions?

<< File: nintendo.pdf >>  << File:
IIPA.pdf >>  << File: PhRMA.pdf >>

Thea D. R. Kendler
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
tel. 202.887.4083
fax 202.955.7651
trozman@akingump.com

CONFIDENTIAL

AK000719

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DONALD G. GROSS, | ) |
| Plaintiff, | ) |
| v. | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) Case No. 1:07CV00399 (EGS) |
| Defendant. | ) |

## DECLARATION OF LISA ROSS

I, Lisa Ross, a member in good standing of the bar of the District of Columbia, state as follows:

1. I am an attorney employed by Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), the Defendant in this matter. I make this Declaration based on my personal knowledge.

2. I joined the firm as an associate in Fall 2003, following my graduation from law school.

3. I worked on a project with Donald Gross and others in the Spring/Summer of 2004.

4. The project that I worked on with Mr. Gross was a major client memorandum that Mr. Gross had been assigned to write by Sukhan Kim, a partner at Akin Gump.

5. In May 2004, David Park, then Counsel at Akin Gump, asked me to assist him, Mr. Gross, and Michael Quigley, then partner at Akin Gump, in redrafting the draft memo-

randum prepared by Mr. Gross. I reviewed Mr. Gross's memorandum and thought that it

was severely lacking in both substance and clarity. The writing in the memorandum was re-

dundant, wordy and poorly structured. Moreover, the memorandum was simply not written

as if it were written by an attorney providing advice and recommendations to a client.

6. I recall that I was surprised by the poor quality of the work, and somewhat con-

cerned, given my junior status, about expressing my true opinions of Mr. Gross's work.

7. I did end up, shortly thereafter, discussing the quality of Mr. Gross's draft with

Mr. Park. Mr. Park also expressed dissatisfaction with Mr. Gross's writing in the memoran-

dum, and informed me that the writing in the memorandum "was not unusual" for Mr. Gross.

8. I attempted to assist Mr. Park with the rewriting and restructuring of the memo-

randum. This was a particularly difficult assignment because Mr. Gross's writing was too

wordy and redundant and these problems was pervasive throughout the document. In addi-

tion, the structure of the memorandum was so disjointed that it was difficult to rework. As I

explained to Mr. Park in an email on May 22, 2004:

> I think it may have been totally impossible to get rid of that "type of writ-
> ing" that we discussed last night—but I tried to make progress. As I said
> before, it was too wordy and redundant. . . . Again, literally full sentences
> and ideas were repeated in the paragraph below them, making the message
> get lost in the words. So, I added entire paragraphs and deleted entire
> paragraphs and switched the order of sections, so I really hope Don won't
> be offended. I also reworked the tech policy section and tried to make it
> more concise and convey why we are recommending this--. . . .

May 22, 2004 email from L. Ross to D. Park, attached hereto as Exhibit A (AK003138).

9. Mr. Quigley also expressed his frustration with the poor quality of Mr. Gross's

work on the memorandum to me. I recall being in a conference room with Mr. Quigley, who

was visibly frustrated while vigorously reviewing and editing the memorandum.  I recall that Mr. Quigley told me, in effect, "Lisa, you could have done a better job writing this memo."

10. Mr. Park ended up having to substantially re-write and restructure the memorandum.  As mentioned below, this process was arduous given the poor quality of Mr. Gross's draft.  Mr. Park and Mr. Quigley did assign me and Mr. Gross smaller portions of the restructuring and rewriting responsibilities.

11. The need for the extensive rewriting and restructure of this memorandum was particularly problematic because it caused us to miss several client deadlines on this project.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2007.

Lisa Ross

From: Ross, Lisa
Sent: 5/22/2004 3:32:59 PM (Eastern Time)
To: Park, David
Attachments: EAST-#7205068-v2·  __Sections_3_and_4_revisions.DOC
Subject:

Please review the attached document.                          REDACTED


Dave-- a few comments-

Some words that I think are used to much, but you will know better when you put
it all together: success, growth, positive, strengthen, engage, enhance,
benefit/beneficial, valuable.


I added the part in the                                  ·- I thought we
needed a concrete example to get the point across of what we are trying to say.
 I also have some notes to you in the text that are in brackets and bold.


I think it may have been totally impossible to get rid of that "type of
writing" that we discussed last night-- but I tried to make progress. As I said
before, it was too wordy and redundant.  I changed a lot of phraseology like
"Doing X will help to improve          j" - to "Doing X will improve his
standing" --or "to participate in meetings with" to simply "to meet with."   I
tried to make it sound like we are more confident in our positions without
being too impositional.


Again, literally full sentences and ideas were repeated in the paragraph below
them, making the message get lost in the words. So, I added entire paragraphs
and deleted entire paragraphs and switched the order of sections, so I really
hope Don won't be offended. I also reworked the tech policy section and tried
to make it more concise and convey why we are recommending this-- I added a
part about how investors will also like the fact that he is taking an active
role in policy decisions because it shows he is committed to their investments,
etc.
I sincerely hope this is helpful to you.  Please let me know if you want me to
make further edits and revisions in certain areas.  I'll be in the office for
about another hour before I have to go to the event tonight.

Thanks.


CONFIDENTIAL                                            AK003138

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07CV00399 (EGS) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) (ELECTRONICALLY FILED) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>ORDER</u>**

UPON CONSIDERATION of the Defendant's Motion for Summary Judgment and Statement of

Undisputed Facts, Plaintiff's opposition thereto, and the entire record in this case, it is this __

day of _____, 200_, by the United States District Court for the District of Columbia,

ORDERED, that Defendant's Motion is granted, and the Amended Complaint dismissed

in its entirety.

_____
The Honorable Emmet G. Sullivan

Copies to:

Christine N. Kearns, Esq.
Karen-Faye McTavish, Esq.
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037


Jonathan C. Puth, Esq.
Kataryna L. Baldwin, Esq.
WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006