## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07CV00399 (EGS) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### OPPOSITION OF AKIN GUMP STRAUSS HAUER & FELD LLP
### TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), through counsel,

respectfully submits this memorandum in opposition to Plaintiff Donald G. Gross's Motion for

Summary Judgment. Mr. Gross has moved for summary judgment on Akin Gump's

counterclaims for tortious interference with economic advantage and breach of loyalty, as well as

on Akin Gump's affirmative defense of "after acquired evidence." Mr. Gross's motion is based

exclusively on his own self-serving testimony, hearsay statements purporting to portray the

views of potential Akin Gump clients and inaccurate characterizations of the record – all of

which is directly refuted by admissible evidence in the actual record. The counterclaims and the

affirmative defense present classic issues of witness credibility that must be presented to the jury.

## I.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY.[1]

Mr. Gross was hired by Akin Gump as an attorney in July 2003. See Akin Gump's

November 2, 2007 Statement of Undisputed Material Facts ("Akin Gump Statement") at ¶¶ 1-

---

[1] Pursuant to Local Rule 56.1, Akin Gump has also filed a Statement of Material Facts in Dispute ("Facts in Dispute") in connection with this Opposition Brief and expressly incorporates the facts listed therein.

21.[2] Mr. Gross was 51 years old at that time. Id. at ¶ 8. His offer letter expressly stated, "it is our intention to review your employment situation at your one-year anniversary and reassess our needs and the terms of your employment." Id. at ¶ 20. After approximately one year, Bruce McLean, Chairman of Akin Gump, who is older that Mr. Gross, considered Mr. Gross's lack of contribution, including his low billable hours, and decided that Mr. Gross's employment should be terminated at the conclusion of one year. Id. at ¶¶ 28-38; 41-54. Mr. Gross left the firm in October 2004. Mr. Gross was 52 years old at that time. Id. at ¶ 8.

On April 29, 2005, Mr. Gross filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), where, for the first time, he raised alleged age discrimination under the Age Discrimination in Employment Act ("ADEA") and the District of Columbia Human Rights Act ("DCHRA"). On February 26, 2007, Mr. Gross filed a Complaint in which he repeated the allegations in the EEOC Charge. Akin Gump filed its Answer denying the allegations, and discovery commenced.

In response to Mr. Gross's document requests in this case, Akin Gump discovered emails Mr. Gross had secretly sent to discourage two prospective clients, the "Prospective Client" and "Company X," from retaining the services of Akin Gump, including negative statements about the motivation, experience and level of influence of Akin Gump partners, including Sukhan Kim. Mr. Gross did so while Mr. Kim and others at Akin Gump were assisting (at Mr. Gross's request) in his search for another position both inside and outside of the firm. See Akin Gump Statement at ¶¶ 68, 75. Mr. Gross admits to making the damaging statements. Id. at ¶ 76.

On June 25, 2007, approximately <u>two (2) years</u> after Akin Gump first learned about Mr. Gross's claims of age discrimination, Akin Gump filed a motion to amend its Answer to add

---

[2] On November 2, 2007, Akin Gump moved for summary judgment on Mr. Gross's claims of age discrimination and retaliation and filed the Akin Gump Statement with exhibits at that time. To avoid unnecessary duplication, Akin Gump will rely on the Akin Gump Statement where appropriate.

an affirmative defense of "after-acquired evidence" based upon these emails.  It also included in

the Amended Answer counterclaims for breach of duty of loyalty and tortious interference with

economic relations based upon the same newly discovered evidence.  On September 10, 2007,

this Court granted Akin Gump's motion to amend.

    The counterclaims have substantial merit.  With respect to the Prospective Client,

Mr. Gross had actively worked from Spring 2003 to July 2004 to persuade the Prospective Client

to hire Akin Gump in connection with the establishment of a new private equity fund.  See

Plaintiff and Counterclaim Defendant Gross' Statement of Material Facts Not in Dispute ("Gross

Statement") at ¶ 2.  In addition to assisting in "the preparation of marketing documents, term

sheet, partnership agreement, negotiation, et cetera," Akin Gump partner Prakash Mehta testified

that the firm was prepared to

> try to identify a few investors with whom contact might be made,
> but we could not promise anything in terms of timing. . . .  I don't
> know that we could promise anything in terms of delivery, but we
> would certainly be happy to share what we think might be likely
> candidates within our constellation of contacts and clients,
> information about this particular fund to gauge their level of
> interest in this sector.

Defendant's Statement of Material Facts in Dispute ("Facts in Dispute") at ¶ 15.  As of June

2004, Akin Gump, through Mr. Gross, had received written confirmation that the Prospective

Client agreed to a retainer in the amount of $15,000.  See Exhibit A to Facts in Dispute at

Exhibit 1.  On July 2, 2004, Mr. Mehta noted that he would send materials regarding the

Prospective Client's funds to two Akin Gump clients and would "consider others as well."  See

Facts in Dispute at ¶ 15.

    Then, on July 13, 2004, Mr. Kim informed Mr. Gross that the firm had decided to

terminate his employment.  Akin Gump's Statement at ¶ 61.  Shortly thereafter, after a year of

pursuing the business of the Prospective Client, on July 25, 2004, Mr. Gross, for the first time

abruptly changed his tune and sent an email to the Prospective Client stating "[b]efore you commit yourself to a partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind your project." See Exhibit 12 to Mr. Gross's Motion for Summary Judgment. Then, on July 30, 2004, Mr. Gross sent another email to the Prospective Client in which he stated "[f]or the moment, I think you should delay signing the engagement letter. *The law firm will be unhappy with this recommendation*, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words." (emphasis added). See Akin Gump Statement at ¶¶ 75-76. See also Exhibit 13 to Mr. Gross's Motion for Summary Judgment. Mr. Gross does not recall discussing his plans to tell the client not to sign the engagement letter with the partners at Akin Gump. Akin Gump Statement at ¶ 76. There is no evidence on the record of any such discussions. Id. The Prospective Client did not sign the engagement letter with Akin Gump. See Exhibit 8 to Mr. Gross's Motion for Summary Judgment, at 267:21-268:3.

    With respect to Company X, the Chief Executive Officer ("CEO") of Company X contacted Mr. Kim in late July 2004 about Mr. Kim's possible representation of Company X in connection with a massive development project in Korea, as well as a large development project in Manhattan. See Facts in Dispute at ¶ 33. On July 29, 2004, Mr. Kim informed Mr. Gross, via email, that he had been approached by the CEO of Company X and asked Mr. Gross what type of work Akin Gump might expect from Company X. See Facts in Dispute at ¶ 36. Mr. Gross wrote back "I think we can assist him in several areas. . . . Perhaps, most importantly, he could benefit from a wise general advisor like you who knows the Korean business landscape so well." Id. Mr. Gross did not mention any concerns regarding any conflict of interest with respect to Akin Gump or Mr. Kim representing Company X. See id. Next, on August 3, 2004, in an email memorandum to Mr. Kim advising him further on potential work with respect to Company X,

Mr. Gross discussed a variety of ways that Akin Gump's services would prove valuable to

Company X. See Exhibit 15 to Mr. Gross's Motion for Summary Judgment. Mr. Gross told

Mr. Kim that:

> If [CEO of Company X] wants to explore a deal with [Company Y], he would obviously appreciate your willingness to help him contact and build relations with senior [Company Y] executives for this purpose. From his standpoint, your assistance on this alone would give tremendous "added value." Overall, I believe [CEO of Company X] will be open to hearing the various ways that you and Akin Gump can assist him with [a major Korean Development] project [(the "Korean Project")].

Id.[3] Mr. Gross wrote his August 3, 2004 email memorandum during the period of time "in which

he "tr[ied] his damndest to stay at Akin Gump and find a section where I could work." See Facts

in Dispute at ¶ 37.[4]

On August 11, 2004 Mr. Kim informed Mr. Gross that Mr. McLean had decided that

Mr. Gross needed to leave Akin Gump by October 1, 2004. Akin Gump Statement at ¶ 66.

Shortly after being informed of his termination date, on August 24, 2004, Mr. Gross admittedly

sent an email to the Prospective Client, a managing partner and financial advisor to Company X,

advising him that Company X should not retain Akin Gump. Id. at ¶¶ 75-76; Gross Statement at

¶ 32. Specifically, Mr. Gross stated that "If [Company X] thinks it needs Washington

representation, it should stick with its current law firm which has recently merged with a top

D.C. firm." Id. at ¶¶ 75-76. There was no reference in this email to any potential conflict, or

---

[3] Company Y was one of Mr. Kim's clients. While Mr. Gross did mention in his August 3, 2004 email memorandum that the CEO of Company X might "want to know whether your position as outside counsel to [Company Y] would prevent you from assisting [Company X] in a subsequent negotiation with [Company Y]," Mr. Gross in no way indicates that he is concerned about any conflict.

[4] After his July 13, 2004 conversation with Mr. Kim, during which Mr. Kim told Mr. Gross about Mr. McLean's decision that Mr. Gross would have to leave to firm, Mr. Gross still believed that their was a possibility of finding an alternative role in another section. See id.

deficiency with respect to Akin Gump's, Mr. Kim's or any other Akin Gump partner's qualifications. Id. Instead, Mr. Gross discussed what he perceived to be the poor treatment that he had received from Akin Gump, stating that Akin Gump had "ignored [him] and treated [him] very badly." Id. Of course, Mr. Gross never mentioned alleged age discrimination.

The next day, Mr. Gross sent a follow-up email, in which he explained that "I had a couple of further thoughts on this, *that I want to tell you in confidence*." Akin Gump Statement at ¶¶ 75-76 (emphasis added). These "further thoughts" included the following damaging statements about Akin Gump and its partners:

- "Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.] This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X] could not possibly trust him to serve as an 'honest broker.' Sukhan has never represented an American company doing business in Korea, so far as I know, and is a highly specialized trade lawyer whose practice consists of representing Korean companies in the United States."

- "Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X]."

- "I didn't know Jaemin [Park] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul. Her help is even more questionable. . . . She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence."

- "If [the CEO of Company X] wants to get in touch with some Korean business groups, there are other ways to do it."

Id.

Mr. Gross did not discuss these "thoughts," or his intention of sharing these "thoughts" with the Prospective Client, with anyone at Akin Gump prior to sending the email. See Facts in Dispute at ¶ 41. In response to Mr. Gross's August 25, 2004 email, the Prospective Client responded "Excellent thoughts Don. Great detail and intelligence. *I'll use it very carefully.*" Id. (emphasis added). The next day, August 26, 2004, Mr. Gross replied to the Prospective Client

- 6 -

that he was "very interested in discussing further the opportunity to work with you to build [a corporation]." Id. Later that same day, Mr. Gross sent an email to the CEO of Company X, attaching his resume and explaining that he was very interested in a position at Company X. See id. Mr. Gross specifically mentions his "good friend" the Prospective Client. Id.[5]

After the Prospective Client received Mr. Gross's August 24-25, 2004 emails, Company X did not retain Akin Gump for the significant work on the Korean development project that Mr. Kim had discussed performing with the CEO of Company X in August 2004 (prior to Mr. Gross's August 24-25 emails). See Facts in Dispute at ¶¶ 44-47. In September 2004, the CEO of Company X offered a modest $50,000 retainer to Mr. Kim for some legal work. Id. This signaled to Mr. Kim a "change of heart" from the CEO's original discussions. Id. At the time, without knowledge of Mr. Gross's August 24-25, 2004, emails to a managing partner and senior financial advisor to Company X, Mr. Kim did not understand Company X's "change in heart" given their prior discussions.[6] Id.

Mr. McLean has given undisputed sworn testimony that he would have "terminated [Mr. Gross] immediately" had he known about Mr. Gross's "disparaging comments about the firm or its attorneys to a client." Akin Gump Statement at ¶ 78.

---

[5] Mr. Gross had good reason to suspect that his "intelligence" about Akin Gump would be well received by the Prospective Client who had praised him for his June 30, 2004 email advising against retaining the services of Akin Gump. See id. Specifically, the Prospective Client had responded to Mr. Gross's July 30, 2004 email by stating:

> I cannot begin to tell you how impressed I was by your approach to this situation. Few would be so supportive, even fewer so candid. Your letter highlights exactly the reasons why [Prospective Client] continues to hold you in such high personal regard. Very special, indeed. Id.

[6] Company X later retained the advisory services of Thomas Hubbard (former U.S. Ambassador to Korea), a non-lawyer advisor working for Akin Gump. This work, however, was not the work contemplated in previous discussion between Mr. Kim and Company X. See Facts in Dispute at ¶ 47.

## II.    ARGUMENT.

### A.    Mr. Gross Interfered With Akin Gump's Economic Advantage.

Contrary to Mr. Gross' assertion, there is ample evidence on the record in this case for a reasonable jury to conclude that Mr. Gross intentionally interfered with Akin Gump's prospective client relationships.  Under District of Columbia law, the elements of tortious interference with prospective economic advantage are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damages.  Brown v. Carr, 503 A.2d 1241, 1247 (D.C. 1986).  See also Gross Motion for Summary Judgment at 11.  In addition, the interference must be "improper."  Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 239 (D.D.C. 1996).  To demonstrate liability, Akin Gump must make "a strong showing of intent to disrupt ongoing business relations."[7]  Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995) (internal citation and quotations omitted).  There is no dispute that Akin Gump had business expectancies with both Prospective Client and Company X and that Mr. Gross had knowledge of these expectancies.[8]

---

[7] A showing of malice is not required (as Mr. Gross suggests) to establish tortious interference with prospective business relationships under District of Columbia law.  In support of his assertion that Akin Gump must prove that he acted with "malice," Mr. Gross cites Paul v. Howard Univ., 754 A.2d 297 (D.C. 2000).  In Howard, however, the court decided a tortious interference case, where the plaintiff employee alleged that a supervisor had tortiously interfered with a contract between the employee and the University.  The court explained that, under D.C. law, a supervisory employee may lawfully interfere with a contract between their employer and a third person, but only for a "proper purpose[ ]." Id. at 309 (internal citation and quotations omitted).  Therefore, the court further explained, "in order to recover for interference with contractual relations by a supervisor. . . a plaintiff [employee] must present evidence that the supervisor acted with malice." Id. (citations omitted).  These are not the circumstances here.

[8] In fact, Mr. Gross himself was Akin Gump's primary client contact with the Prospective Client, and was the individual responsible for negotiating the engagement relating to the private equity fund, which was in its final stages in July 2004.  Gross Statement at ¶ 2.  Mr. Gross was also expressly notified by Mr. Kim of the CEO of Company X's interest in retaining Akin Gump.  See Facts in Dispute at ¶ 36.

1.    **Mr. Gross's Acts Were Improper and Intentional.**

Mr. Gross argues that Akin Gump cannot prove as a matter of law that his actions in

sending damaging statements to the Prospective Client and Company X were improper.  He is

wrong.  As an employee of Akin Gump, Mr. Gross owed a duty of loyalty to Akin Gump.  As

this Court has found:

> Multiple recent cases in this jurisdiction have applied the common
> law principles and limitations of agency law into the field of
> corporate employment.  Under this application, it has been
> established that employees – especially managers, corporate
> officers, and directors – "owe 'an undivided and unselfish loyalty
> to the corporation' such that 'there shall be no conflict between
> duty and self interest.'". . . .  An agent has "a duty to act solely for
> the benefit of his employer and to avoid conflicts of interest
> between his duty to his employer and his own self-interest."

PM Servs. Co. v. Odoi Assocs., No. 03-1810 (CKK), 2006 U.S. Dist. LEXIS 655, at **84-85

(D.D.C. Jan. 4, 2006) (citations omitted).  Mr. Gross does not dispute that he owed Akin Gump

this duty.[9]

Mr. Gross admits that he sent emails to the Prospective Client, while he was still an

employee of Akin Gump, and still on its payroll, discouraging the Prospective Client from

retaining the firm.  In addition, Mr. Gross admits that on August 24-25, 2004, while he was still

an employee of Akin Gump, and still on its payroll, he made a number a damaging statements

about Akin Gump, and its partners, including Mr. Kim, to the Prospective Client, a managing

---

Continued from previous page

For example, on August 3, 2004, Mr. Gross wrote a memorandum to Mr. Kim outlining different
prospective areas of that representation.  See Facts in Dispute at ¶ 41.

[9] Mr. Gross does make the unsupported assertion that "presumably" the duty owed by Mr. Gross
to Akin Gump is "less" than any duty owed by a manager, corporate officer, or director.  See Gross
Memorandum in Support of Motion for Summary Judgment at 21, n.11.  Mr. Gross cites PM Services
and Mercer Management in support of this assertion.  Neither case states that the duty owed by an
employee is any less that the duty owed by a manager or officer, but rather, state that "employees –
especially managers, corporate officers and directors – owe an undivided and unselfish loyalty to the
corporation."

partner and senior financial advisor to Company X, after the CEO of Company X had approached Mr. Kim about retaining his services.

This Court has repeatedly held that violations of an employee's duty of loyalty can constitute "egregious conduct" sufficient to establish a tortious interference claim. In PM Services, a case cited by Mr. Gross, the court <u>denied</u> a motion for summary judgment on a tortious interference with economic advantage claim. The Court found that:

> [T]wo alleged actions might be sufficient – if proven – to meet the requirement of "egregious conduct" sufficient to establish intentional interference. First, as noted previously by the Court, a genuine issue of material fact remains as to whether Defendant O'Shea misappropriated PM Services' confidential and/or proprietary information, or breached his duty of loyalty to PM Services in other ways by knowingly and intentionally using his position and relationship to Taylor and others within the GSA to divert business opportunities away from his employer at the time to his prospective new venture with OAI.

<u>Id.</u> at *113.

Similarly, in <u>Furash & Co. v. McClave</u>, 130 F. Supp. 2d 48 (D.D.C. 2001), this Court denied the defendant's motion for summary judgment on a tortious interference claim, and found that "the facts as to whether [the defendant] improperly solicited clients for her personal benefit in order to interfere with [the plaintiff's] business relationships are largely in dispute." <u>Id.</u> at 56. The court held that "[a] reasonable jury might find that [the defendant's] alleged breach of fiduciary duty destroyed [the plaintiff's] client relationships." <u>Id.</u> Here, there is ample evidence in the record that would enable a reasonable jury to find that Mr. Gross's breach of his duty of loyalty by interfering with Akin Gump's relationships with the Prospective Client and Company X was improper.[10]

---

[10] Mr. Gross's reliance on the Restatement (Second) of Torts § 767, comment (j) in support of his argument that his actions were not improper is both incomplete, and misapplied. The Restatement states that: "Recognized standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not "sanctioned

- 10 -

Just as important, there is evidence on the record to establish that Mr. Gross's interference was intentional. Mr. Gross admittedly sent the secret emails containing the damaging statements to the Prospective Client and Company X (through Prospective Client, a managing partner and senior financial advisor to Company X). The content of the emails reveals the intent to interfere. In addition, the timing of the emails is strong evidence of his improper intent to interfere with Akin Gump's business. It is undisputed that in 2003 and up until late July 2004, Mr. Gross was actively encouraging the Prospective Client to retain the services of Akin Gump. Only after Mr. Gross received the news on July 13, 2004, that he would be terminated from Akin Gump did Mr. Gross, on July 25 and 30, 2004, send the Prospective Client emails in which he encouraged the Prospective Client not to retain Akin Gump. At no point prior to being notified of Mr. McLean's decision did Mr. Gross express any reservations to the client regarding Akin Gump's services. A reasonable jury could easily conclude that Mr. Gross's advice to the Prospective Client was not, as Mr. Gross asserts, borne out of a newly developed concern about the firm's commitment to setting up investor meetings, but rather, was a deliberate attempt to interfere with Akin Gump's relationship with the Prospective Client in retaliation for his impending termination.

Significantly, Mr. Gross's purported "concerns" to justify his actions are wholly unsupported by admissible evidence on the record, absent Mr. Gross's self serving statements. In contrast, there is evidence in the record in this case that refutes that Mr. Gross even held such concerns. Although a concern was initially raised by Mr. Mehta that the Prospective Client was

---

Continued from previous page

by the 'rules of the game.'" See id. Akin Gump welcomes a jury to consider the factual question of whether Mr. Gross's behavior of sending emails to prospective clients of the firm "in confidence" advising them not to retain the firm and making negative statements about the firm and its partners, all while collecting a paycheck from Akin Gump as its employee, is generally sanctioned by business customs and standards. A jury would quickly conclude the conduct is not sanctioned.

400686367v1

incorrectly expecting that Akin Gump could guarantee investor meetings and investor participation, on July 5, 2004 (approximately a week before Mr. Gross was notified that he was going to be asked to leave Akin Gump), Mr. Gross reported that there was no problem, stating "[Prospective Client is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest." Second Declaration of Julie Dressing ("Dressing Decl.) attached as Exhibit A at ¶ 2. Mr. Mehta has provided sworn, and undisputed, testimony on the record that Akin Gump was prepared and poised to do just that. Id. Moreover, on July 2, 2004, Mr. Mehta himself informed the Prospective Client that he would send materials regarding the Prospective Client's funds to two Akin Gump clients and would "consider others as well." There simply is no evidence to the contrary (except Mr. Gross's post hoc rationalizations).

Likewise, the timing of Mr. Gross's statements to the Prospective Client pertaining to Company X is significant evidence of his intent to interfere with Akin Gump's prospective business relationship with Company X. On August 11, 2004, Mr. Kim informed Mr. Gross that Mr. McLean had decided that he needed to leave Akin Gump by October 1, 2004, ending Mr. Gross's hopes (held during the period between his July 13, 2004 conversation with Mr. Kim during which Mr. Kim first relayed Mr. McLean's decision to terminate Mr. Gross's employment, and the August 11, 2004 meeting) that he might be able to continue employment at Akin Gump in another section. Shortly thereafter Mr. Gross sent the damaging emails on August 24 and 25, 2004. This time, Mr. Gross maintains that his August 24 and 25, 2004 emails were not motivated by the recent news that Mr. McLean had set a date certain for his termination from Akin Gump, but rather, from a concern regarding a potential conflict with Mr. Kim's representation of Company X. Again, however, there is evidence in the record in this case that

- 12 -

refutes Mr. Gross's testimony that he held such concerns. Despite repeated opportunities to voice his alleged concerns about a conflict internally, Mr. Gross never did so. Instead, Mr. Gross wrote to Mr. Kim "I think we can assist [CEO of Company X] in several areas. . . . Perhaps, most importantly, he could benefit from a wise general advisor like you who knows the Korean business landscape so well." Second Dressing Decl. at ¶ 3.

Finally, there is evidence from which a reasonable jury could conclude that Mr. Gross intended to interfere with Akin Gump's relationships with the Prospective Client and Company X, in an attempt to curry favor with the Prospective Client. Mr. Gross was actively seeking employment with the Prospective Client and Company X. Facts in Dispute at ¶ 41. Jurors could reasonably find that Mr. Gross was seeking to prove his loyalty to the Prospective Client by providing "intelligence" (Facts in Dispute at ¶ 41) that would lead to a job offer. These facts present a classic dispute about credibility.[11]

None of the cases cited by Mr. Gross support his argument that there is insufficient evidence on the record in this case for Akin Gump's intentional interference to survive summary judgment. For example, Mr. Gross relies on Sheppard v. Dickstein, Shapiro Morin & Oshinsky, 59 F. Supp. 2d 27 (D.D.C. 1999), which provides a useful contrast to the facts presented in this case. In Sheppard, the court granted a motion to dismiss a tortious interference claim, because the plaintiff had failed to identify any business relation or "expectancies" with which the defendants interfered. Id. at 35. This is obviously not true here. Moreover, the Sheppard court stated that even if the plaintiff in that case had evidence of a future expectancy, the tortious

---

[11] Mr. Gross's curious contention that his statement to the Prospective Client that "I think you should delay signing the engagement letter" and his statement "If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm," were actually attempts to secure these clients for Akin Gump in the future, simply makes no sense and is supported only by his own opportune testimony. Facts in Dispute at ¶ 41. In any event, at best, Mr. Gross's explanation for his actions presents a genuine issue of material fact as to why Mr. Gross sent the emails at issue. In short, there is ample evidence on the record for a reasonable jury to conclude that Mr. Gross's actions were both intentional and improper.

interference claim should be dismissed because the "plaintiff's complaint [wa]s silent as to defendants' intent to interfere with plaintiff's future business relations." Id. at 34. Here, there is ample evidence as to Mr. Gross' intent to interfere with Akin Gump's business expectancy with the Prospective Client and Company X.

In addition, Mr. Gross cites Sullivan v. Heritage Found., 399 A.2d 856 (D.C. 1979), which involved a tortious interference claim based on an allegation that the President of a defendant Foundation (the plaintiff's former employer), failed to pay a court reporter for copies of a transcript ordered by the plaintiff (allegedly in connection with his duties as an employee of the Foundation). Id. at 861. The court noted that the record showed that the invoice was not presented by the plaintiff for payment until after he left the Foundation, that the President of the Foundation had indicated (in writing) his willingness to pay when the plaintiff demonstrated that the expense was incurred on behalf of the Foundation, and that the plaintiff had never responded to the President's request for information. Id. Considering these facts, the Sullivan court held that "[t]here being an absence of facts to show malicious or intentional injury to appellants reputation" the court concluded that summary judgment had been properly granted. Id. at 861. Here, unlike in Sullivan, there is evidence on the record of Mr. Gross' intent to interfere with Akin Gump's relationships with the Prospective Client and Company X. Finally, Mr. Gross' reliance on Mercer Management is misplaced. In Mercer, the court granted summary judgment with respect to the plaintiff's tortious interference claim because although defendants actions of soliciting and rendering services to former clients of the plaintiff were improper, the fact that the defendants did not believe they were under any restrictive covenants at the time of the improper solicitations precluded a finding of tortious interference. Id. at 239-40. The facts here are quite different. Mr. Gross told the Prospective Client that "[t]he law firm will be unhappy with this recommendation." Facts in Dispute at ¶ 2. He also told the Prospective Client that he was

- 14 -

making his negative comments about Akin Gump and its partners, which interfered with the firm's retention by Company X, "in confidence." Akin Gump Statement at ¶¶ 75, 76. Mr. Gross also cannot recall speaking to anyone at Akin Gump regarding his recommendations not to retain the services of Akin Gump.[12]

### 2.   Mr. Gross's Wrongdoing Caused Akin Gump Damage.

Akin Gump has ample evidence of causation and damage to succeed on its tortious interference claim, even more to survive summary judgment. As explained above, it is undisputed that Mr. Gross was negotiating an engagement letter with the Prospective Client on behalf of Akin Gump in 2003 through July 2004. It is also undisputed that on July 25 and July 30, 2004, Mr. Gross secretly sent Prospective Client emails advising the Prospective Client not to sign the engagement letter, noting, in one of these emails that "*[t]he law firm will be unhappy with this recommendation.*" Facts in Dispute at ¶ 2. It is further undisputed that the Prospective Client did not sign the engagement letter after receiving Mr. Gross' warning. There is no evidence that the Prospective Client had even an inclination not do so before those emails.

A reasonable jury could readily conclude that Mr. Gross's act of discouraging the Prospective Client from signing the engagement letter resulted in the Prospective Client's not signing the letter. Mr. Gross's proffered "theory" that the Prospective Client may not have decided to retain Akin Gump's services because Akin Gump was not willing to try to line up investor meetings, is not supported by any admissible evidence on the record in this case. Moreover, as described above, there is undisputed evidence in the record that Akin Gump was

---

[12] Finally, Mr. Gross' reliance on <u>Vinas v. Chubb Corp.</u>, 499 F. Supp. 2d 427 (S.D.N.Y. 2007), a case decided under New York law, is misplaced. In <u>Vinas</u>, the court dismissed a tortious interference with prospective economic advantage claim because the "economic pressure" alleged to have been used by the defendants to interfere with the plaintiffs' relationships was not extreme enough to constitute "improper means." <u>Id.</u> at 435. Here, there is no allegation that Mr. Gross interfered with its economic advantage by using "economic pressure."

willing, and planning, to try to line up such meetings. See e.g., Facts in Dispute at ¶¶ 8, 12. As a result, whether Mr. Gross's advice to the Prospective Client not to sign the engagement letter with Akin Gump actually caused the Prospective Client not to sign the letter is an issue of disputed material fact that must be decided by a jury. See PM Servs., 2006 U.S. Dist. LEXIS 655, at **114-15 (denying motion for summary judgment on tortious interference claim, and explaining that it could not "conclusively determine – assuming the truth of Plaintiff's contentions in light of the evidence adduced – that Defendants did not induce or cause a termination of PM Services' expectancy in the 2003 Cohen & Switzer contract").

In addition, with respect to Company X, it is undisputed that the CEO of Company X approached Mr. Kim in late July 2004 about the possibility of Akin Gump, and specifically Mr. Kim, doing significant work on, among other projects, a major development project in Korea. It is also undisputed that on August 24 and 25, 2004, Mr. Gross secretly sent emails to a managing partner and senior financial advisor of Company X stating "If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm," and making damaging statements about Akin Gump's partners. Thereafter, the undisputed record reflects that in September 2004, despite previous discussions of significant work, the CEO of Company X sent Mr. Kim an email in which he suggested a small retainer, indicating to Mr. Kim that the CEO had had a "change of heart" regarding the representation. See Exhibit B hereto. Mr. Gross speculates (again with no evidence) that the CEO could have made a low retainer offer to Akin Gump because he "had a poor night's sleep" or for some other reason. Gross Memorandum at 20. If Mr. Gross actually has evidence, these issues are for a jury to decide.

Once again, the cases cited by Mr. Gross do not help him. Mr. Gross first relies on Connors, Fiscina, Swartz & Zimmerly v. Rees, 599 A.2d 47 (D.C. 1991). In Connors, however,

the court affirmed the judgment of the trial court that a law firm had failed to establish tortious interference because it had failed to establish proximate cause that the attorney's misconduct (making misrepresentations about the law firm) caused client to leave based on "<u>unequivocal testimony</u>" of the clients that they would have followed the attorney anywhere. <u>Id.</u> at 51 (emphasis added). There is no such client testimony here. Mr. Gross attempts to distort the <u>Connors</u> holding by contending that in the absence of "unequivocal [client] testimony" that the Prospective Client would have retained Akin Gump following Mr. Gross's termination, summary judgment is appropriate here. <u>See</u> Gross Memorandum at 19, n.9. This argument is meritless. This is a summary judgment motion. There need not be "unequivocal" evidence in support of Akin Gump's claims on the record to bring them to trial. As explained above, there is ample evidence for a jury to conclude that Mr. Gross's statements to the Prospective Client and Company X led to those entities' "change in heart" with respect to retaining Akin Gump.

Additionally, Mr. Gross's reliance on <u>R.M. Newell Co. v. Rice</u>, 236 A.D.2d 843 (N.Y. App. Div. 1997), a case decided under New York law, is equally misplaced. In <u>R.M. Newell Co.</u>, the court held that damages sustained by plaintiff were not proximately caused by wrongful conduct on the part of defendants, as a matter of law, because the

> record establishe[d] that Fisher had determined to end its relationship with Richard Newell whether or not Rice and Newell could agree on the transfer of Newell's interest in plaintiff. Thus, even if Rice had not left plaintiff's employ and started his own corporation, Fisher would have terminated its contract with plaintiff, which it had every right to do. Under the circumstances, plaintiff's damages, if any, were proximately caused by Fisher's nonrenewal of the contract with plaintiff, and were not attributable to Rice's alleged breach of fiduciary duty or Fisher's and Process' unlawful inducement of such breach.

<u>Id.</u> at 844-45 (citations omitted).

In this record, there is no admissible evidence that the Prospective Client or Company X decided not to retain Akin Gump prior to Mr. Gross's damaging statements, nor is there any admissible evidence on the record that they decided not to retain Akin Gump's services for some other reason.[13]

There is also evidence on the record that Akin Gump suffered injury directly resulting from Mr. Gross's wrongful actions. First, with respect to the Prospective Client, there is evidence that Mr. Gross's interference cost Akin Gump, at the very least, the $15,000 retainer that Mr. Gross had previously negotiated. Second, prior to Mr. Gross's negative emails regarding Akin Gump, Mr. Kim and Ms. Park, Company X had approached Mr. Kim and discussed significant work on two major development projects. Mr. Kim had expected a substantially higher retainer amount than the $50,000 eventually offered to him by Company X, given the amount and type of work he had discussed with Company X. Akin Gump did not get any of these assignments[14]

Once again, the cases cited by Mr. Gross do not help him. In Mercer Management, the Court did not even discuss damages in connection with a tortious interference or breach of fiduciary duty claim. In Curtis v. Radio Representatives, Inc., 696 F. Supp. 729, 734 (D.D.C. 1988), the court dismissed a client's counterclaim to disgorge legal fees owed to his attorney, because the client had not alleged that it had been damaged by the alleged acts or even billed for the alleged services. Here, Akin Gump has specifically evidence of damages in connection with

---

[13] Likewise in Altimont v. Chatelain, Samperton & Nolan, 374 A.2d 284 (D.C. 1977), the court dismissed a tortious interference claim, deciding that the letters written by a defendant architect were not the basis for any refusals of bonds for the plaintiff because of evidence in the record that the plaintiff had a history of an inability to obtain bonding before publication of the letters and that most of the decisions not to bound the plaintiff were made before the letters were written and were based on past history and financial background

[14] The fact that Company X later retained Mr. Hubbard for non-legal advice does not effect the value of the substantial lost work originally contemplated/discussed between Mr. Kim and the CEO of Company X prior to Mr. Gross's August 24-25, 2004 emails.

400686367v1

its tortious interference claim—the business profit it lost with respect to lost representations of the Prospective Client and Company X.[15]  Finally, to the extent that Mr. Gross argues that in order for Akin Gump's tortious interference claim to survive there must be specific evidence on the record of the amount of Akin Gump's damages, he is wrong.  See Watson v. Tele-Commc'ns, Inc., No. 95-0869 (TFH), 2000 U.S. Dist. LEXIS 1055, at *14 (D.D.C. Jan. 24, 2000) (finding that "[t]he law requires Plaintiff to prove only the fact of damages with reasonable certainty, not the amount of damages with reasonable certainty").  There is evidence on the record that Akin Gump lost at least $15,000 of business from the Prospective Client and at least $50,000 worth of business from Company X.  As noted herein, this is in addition to the forfeited salary and other compensation that Akin Gump is owed as a result of Mr. Gross's breach of his duty of loyalty to Akin Gump.  This is sufficient evidence of damages to allow Akin Gump's claims to proceed.

---

[15] Mr. Gross's other cases are similarly beside the point.  In Day v. Avery, 548 F.2d 1018 (D.C. Cir. 1976), the court affirmed the judgment of the trial court on a misrepresentation claim for lack of compensable harm where the only damage plaintiff alleged were his "outraged sensibilities," which resulted from an action that would have occurred regardless of the alleged misrepresentations.  Id. at 1028.  Again, Akin Gump has evidence of specific damages that a reasonable jury could certainly attribute to the wrongful and intentional actions of Mr. Gross.  In Financial General Bankshares, Inc. v. Metzger, 680 F.2d 768 (D.C. Cir. 1982), the court stated in dicta that it had discovered no District of Columbia cases which awarded a monetary remedy to a client for an attorney's breach of fiduciary duty in the absence of proven pecuniary loss to the client or proven financial gain to the attorney, but noting that District of Columbia courts have not foreclosed the possibility that disgorgement of fees might be an appropriate remedy.  First, this case does not involve a disgorgement of fees.  Second, there is evidence of actual economic loss to Akin Gump on the record.  Finally, Mr. Gross's reliance on Romer v. District of Columbia, 449 A.2d 1097 (D.C. 1982), a case involving a back injury, where the Court refused to award damages for unspecified future medical treatment, where the plaintiff had refused to follow earlier recommendations of his physician, has no relevant application to this matter.  Here, there is evidence on the record that Akin Gump has been damaged to the extent of its lost profits with respect to lost business that it had a very reasonable expectation of getting from the Prospective Client and Company X prior to Mr. Gross's improper interference

- 19 -

**B.    Mr. Gross's Actions Were Disloyal.**

As an employee of Akin Gump, Mr. Gross owed Akin Gump a duty of loyalty.  This Court has repeatedly denied summary judgment motions on breach of duty of loyalty claims where, as is the case here, a genuine issue of material fact exists as to whether a defendant breached that duty.  See PM Services, 2006 U.S. Dist. LEXIS 655, at *89 (denying motion for summary judgment on breach of loyalty claim, and finding that a genuine issue of material facts existed concerning whether the defendant "stepped over the line" and breached his duty of loyalty) (citations omitted); Furash & Co., 130 F. Supp. 2d at 54 (denying motion for summary judgment on breach of loyalty claim because the material facts of the plaintiff's claim for breach of fiduciary duty were largely in dispute, and noting that plaintiff had set forth evidence of the defendant's actions in searching for a buyer of the plaintiff and soliciting work from clients that "might lead a reasonable jury to find that these activities constitute a breach of fiduciary duty"); Riggs Inv. Mgmt., Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250 (D.D.C. 1997) (finding that the defendant employee had breached his duty of loyalty to his employer).  Here, evidence in the record, including, but not limited to, Mr. Gross's admitted statements in his emails to the Prospective Client and Company X, the timing of those secret emails in relation to Mr. Gross's notice of his termination and evidence of Mr. Gross's desire to work for the Prospective Client and/or Company X, "might lead a reasonable jury to find that [Mr. Gross's] activities constitute a breach of fiduciary duty." Furash, 130 F. Supp. 2d at 54.

Mr. Gross argues that Akin Gump cannot establish "disloyalty" because Mr. Gross's secret damaging statements to the Prospective Client and Company X were borne out of concerns regarding Akin Gump's ability to set up investor meetings (with respect to the Prospective Client), and a potential conflict (with respect to Company X).  Even assuming that Mr. Gross's actions were actually based on a belief that he had a fiduciary duty to tell the

- 20 -

Prospective Client that he did not believe that Akin Gump could meet its expectations or that

Akin Gump had a conflict with respect to representation of Company X, (neither of which Akin

Gump in any way concedes), this does not end the inquiry with respect to whether Mr. Gross's

actions were disloyal. First, there is no intent element required to prove a case of breach of duty

of loyalty. That is to say, Mr. Gross need not have intended to breach his duty of loyalty to Akin

Gump to have breached it. Second, it is undisputed that Mr. Gross does not recall discussing his

plans to advise the Prospective Client and Company X not to retain the services of Akin Gump

with anyone at Akin Gump and expressly voiced his damaging statements regarding Akin Gump

and its partners to the Prospective Client "in confidence." Mr. Gross's failure to discuss his

alleged concerns and proposed advice with Akin Gump prior to raising them directly with the

Prospective Client and Company X could be determined to be a breach of his duty of loyalty to

Akin Gump, regardless of his motivation. Moreover, even if there was an intent requirement, as

pointed out above, Mr. Gross's sole evidence of his supposed "concerns is his own convenient

testimony, which is sharply refuted by evidence in the record. The question of whether

Mr. Gross's conduct "stepped-over the line," is a disputed factual issue that should go to a jury.

PM Servs., 2006 U.S. Dist. LEXIS 655, at * 89.

Finally, Mr. Gross argues that Akin Gump's breach of duty of loyalty claim should be

dismissed because there is no evidence on the record of causation or damages. As explained

above with respect to Akin Gump's tortious interference claim, there is evidence of actual

damages caused by Mr. Gross's improper breaches of his duty of loyalty in the form of lost

business from the Prospective Client and Company X. What is more, Akin Gump does not need

to establish causation of lost business in order for its breach of duty of loyalty claim to survive.

As this Court held in Riggs, "no compensation is owed an employee who has breached his duty

of loyalty to his employer." Id. at 1266 (holding that the defendant had violated his duty of

400686367v1

loyalty to the plaintiff, and ordering the defendant to return to the plaintiff all compensation that he was paid after his breach).  See also Radio TV Reports, Inc. v. Ingersoll, 742 F. Supp. 19, 23 (D.D.C. 1990).  Accordingly, if a jury determines that Mr. Gross breached its duty of loyalty to Akin Gump by sending his July 25 and 30, 2004, and/or August 24-25, 2004 emails, Akin Gump will be entitled to the return of all compensation it paid to Mr. Gross from the date of the breach through the termination of his employment on October 31, 2004.  See id.[16]  This is the case regardless of whether Mr. Gross's actions caused Akin Gump to lose business from the Prospective Client and/or Company X.  Therefore, Mr. Gross motion to dismiss Akin Gump's breach of duty of loyalty claim as a matter of law should be denied.

### C.    Akin Gump's Affirmative Defense of After Acquired Evidence Survives Summary Judgment.

In June 2007 Akin Gump amended its Answer to add the affirmative defense of "after acquired evidence."  The defense is based upon the damaging emails described above that Mr. Gross secretly sent to prospective firm clients.  In McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352 (1995), the Supreme Court held that a plaintiff's entitlement to back pay and reinstatement would be barred if after termination the employer discovered "wrongdoing [that] was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of [the conduct] at the time of the discharge."  Id. at 362-63.

Mr. Gross argues that he is entitled to summary judgment on the affirmative defense, because "Defendant cannot point to any similarly situated individual who has been fired solely

---

[16]    At his annual salary of $250,000 (See Exhibit 6 to Akin Gump Statement at 140:21-141:4), assuming a breach is found on July 25, 2004, Mr. Gross will owe Akin Gump over $60,000 in forfeited salary plus the value of benefit contributions.  If, for some reason, a jury decides that Mr. Gross did not breach his duty of loyalty until August 24-25, 2004, he will owe in excess of $40,000 in forfeited salary plus the value of benefit contributions.

- 22 -

for a breach of duty of loyalty or tortious interference with economic advantage." Gross

Memorandum at 26. Mr. Gross is wrong.

Mr. McLean, Akin Gump's Chairman, has given sworn testimony that he would have

"terminated [Mr. Gross] immediately" had he known about Mr. Gross's "disparaging comments

about the firm or its attorneys to a client." See Akin Gump Statement at ¶78. Mr. Gross has no

evidence that Akin Gump would have acted any differently. In Ekandem v. District of

Columbia, No. 91-1060-LFO, 1997 U.S. Dist. LEXIS 8906 (D.D.C. June 23, 1997), this Court

held that the after-acquired evidence defense barred reinstatement and front pay in an

employment discrimination case, based solely on an affidavit submitted by a manager of the

District of Columbia Office of Personnel stating that if it was discovered that any part of a

candidate's application contained false information, that candidate was automatically

disqualified from consideration. Id. at **18-19. The court reasoned that by way of his position,

the manager was competent to offer such testimony. Id. Likewise, Mr. McLean, as the

Chairman of Akin Gump, is competent to testify to Akin Gump's policies. See also Frazier

Indus. Co. v. NLRB, 213 F.3d 750, 761 (D.C. Cir. 2000) (noting that it would not make sense to

"suggest that the company would have to demonstrate that other employees had been discharged

on [the same] ground, as there will always be a first case," in order for the after-acquired

evidence defense to apply); Jackson v. ABC Nissan, Inc., No. CV-03-0563-PHX-SMM, 2006

U.S. Dist. LEXIS 59347, at **52-53 (D. Ariz. Aug. 4, 2006) (finding that where the defendant

had proffered the sworn affidavit of an official who averred that the Plaintiff would have been

terminated if the Defendant had known of his misrepresentations on his application, and where

the application stated that any misrepresentations would result in termination or disqualification,

the after-acquired evidence doctrine applied, and holding that "[c]ontrary to Plaintiff's assertion,

400686367v1

this Court 'could hardly require employers in these cases to come forward with proof that they

discharged other employees for the precise misconduct at issue") (citation omitted).

The only case that Mr. Gross cites in support of his incorrect assertion that Akin Gump

cannot establish an after-acquired evidence defense based on Mr. McLean's undisputed

testimony, is <u>Sheehan v. Donlen Corp.</u>, 173 F.3d 1039 (7th Cir. 1999). <u>Sheehan</u>, however,

expressly relies on <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 79 F.3d 756 (9th Cir. 1996), a

case that affirmed the lower court's grant of summary judgment for the employer on an

employee's ADEA claim. In <u>O'Day</u>, the court specifically held that sworn testimony that an

employee's misconduct would have resulted in termination, when combined with another factor,

such as common sense, is sufficient evidence to carry the after-acquired evidence defense

burden. As the <u>O'Day</u> Court explained:

> As evidence that O'Day's misconduct would have resulted in his
> immediate discharge, McDonnell Douglas introduced the sworn
> affidavit of Olinda Willis, a "Human Resources Representative"
> for the division in which O'Day worked. Willis testified that "had
> [McDonnell Douglas] been aware of Mr. O'Day's conduct before
> his layoff, he would have been terminated immediately. . . ."

> O'Day contends that this affidavit does not carry McDonnell
> Douglas' burden because it is "self-serving" and "speculative." He
> has a point: Working from hindsight, and given the opportunity to
> limit the backpay and other remedies it might otherwise have to
> provide, an employer has a strong incentive not only to discover
> previously undisclosed wrongdoing on the part of the plaintiff, but
> also to conclude that that conduct would in fact have resulted in the
> plaintiff's immediate discharge. But the fact that Willis' testimony
> might be thoroughly impeached does not render it incompetent,
> and McDonnell Douglas is entitled to rely on sworn affidavits from
> its employees in proving that it would have discharged O'Day for
> the alleged misconduct. . . . *We could hardly require employers in*
> *these cases to come forward with proof that they discharged other*
> *employees for the precise misconduct at issue* (though such
> evidence would no doubt be helpful to their case), as often the only
> proof an employer will have is that adduced in this case - a
> company policy forbidding the conduct and the testimony of a

400686367v1

company official that the conduct would have resulted in immediate discharge. . . .

> This does not mean that employers can prevail based only on bald assertions that an employee would have been discharged for the later-discovered misconduct. In this regard, we find it significant that Willis' testimony is corroborated both by the company policy, which plausibly could be read to require discharge for the conduct at issue here, and by common sense. There is nothing inherently incredible about McDonnell Douglas asserting that it would discharge an employee, even an employee with a spotless record, for sneaking into his supervisor's office, stealing sensitive documents pertaining to employment matters, and showing them to one of the very people affected by the documents.

Id. at 761-62 (emphasis added) (citations omitted).

Here, "[t]here is nothing inherently incredible" about Akin Gump's policy and assertion that it would have discharged Mr. Gross immediately had it known at the time that he was making negative comments about the firm and its attorneys to prospective clients and actively discouraging them from retaining the services of the firm. O'Day, 79 F.3d at 762. As the O'Day Court recognized, Mr. McLean's undisputed sworn testimony under oath under such circumstances is corroborated by "common sense." Id.

## III.    CONCLUSION.

For these reasons, Akin Gump respectfully requests that this Court deny Mr. Gross's Motion for Summary Judgment in its entirety.

DATED: December 11, 2007                 Respectfully submitted,

                                  _____/s/_____
                                  Christine N. Kearns  (Bar # 416339)
                                  Karen-Faye McTavish (Bar # 477588)
                                  PILLSBURY WINTHROP SHAW PITTMAN LLP
                                  2300 N Street, N.W.
                                  Washington, D.C.  20037-1128
                                  (202) 663-8000

                                  *Counsel for Defendant*

- 25 -

400686367v1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of December 2007, a copy of the foregoing

Opposition to Motion for Summary Judgment and Statement of Material Facts in Dispute were

delivered, by hand, to the following counsel of record:

Jonathan C. Puth, Esq.
Webster, Fredrickson & Brackshaw
1775 K Street, N.W., Suite 600
Washington, DC  20006

_____
Christine N. Kearns

400686367v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DONALD G. GROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07CV00399 (EGS) |
| | ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Pursuant to Local Rule 56.1, Defendant/Counterclaim Plaintiff Akin Gump Strauss Hauer & Feld LLP, through counsel, submits that the following asserted "material facts as to which there is no genuine issue" by Plaintiff/Counterclaim Defendant Donald G. Gross, are either disputed, unsupported by admissible evidence in this case, immaterial, or some combination thereof.[1]

**2.**     Mr. Gross's statement that "[i]n 2003 and 2004, during his tenure at Akin Gump, Mr. Gross 'worked to persuade a particular prospective client ('Prospective Client') to hire Akin Gump and to sign a proposed engagement letter which Mr. Gross had drafted and negotiated with input from others,'" is contradicted by admissible evidence in the record.  It is true that Mr. Gross worked to persuade Prospective Client to hire Akin Gump and sign a proposed engagement letter, which Mr. Gross drafted and negotiated with input from others in 2003 and in

---

[1] For ease of reference, Akin Gump refers to Plaintiff Donald G. Gross's asserted "material facts" by paragraph number.  Akin Gump does not contest the accuracy of those "material facts" not addressed here, but does not concede that all are material to the determination of Mr. Gross's Motion for Summary Judgment.

2004 <u>until</u> July 25, 2004.  On July 13, 2004, however, Sukhan Kim, a Partner at Akin Gump, informed Mr. Gross that the firm had decided to terminate his employment.  <u>See</u> Akin Gump's November 2, 2007 Statement of Undisputed Material Facts ("Akin Gump Statement") at ¶ 61.[2] Shortly thereafter, on July 25, 2004, Mr. Gross sent an email to the Prospective Client stating "[b]efore you commit yourself to a partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind your project."  <u>See</u> Exhibit 12 to Mr. Gross's Motion for Summary Judgment.  Then, on July 30, 2004, Mr. Gross sent another email to the Prospective Client in which he stated "[f]or the moment, I think you should delay signing the engagement letter.  The law firm will be unhappy with this recommendation, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words."  <u>See</u> Akin Gump Statement at ¶¶ 75-76.  <u>See also</u> Exhibit 13 to Mr. Gross's Motion for Summary Judgment. Finally, the pleading to which Mr. Gross cites in support of the timeframe for the alleged undisputed fact does not support it.

3.       The alleged undisputed fact about the Prospective Client's business goals and communications with Mr. Gross is supported solely by the hearsay statement of Mr. Gross and should be stricken as purported evidence.

4.       Mr. Gross's claim that "Prospective Client sought Akin Gump's representation to obtain Akin Gump's help 'in screening and setting up appointments with potential investors,' believing that Akin Gump's experience in the field would enable it to effectively launch the private equity fund," is not supported by admissible evidence on the record.  It is supported only by the hearsay testimony of Mr. Gross and should be stricken.  There is no admissible evidence

---

[2] Akin Gump filed a Motion for Summary Judgment and the Akin Gump Statement on November 2, 2007.  To avoid duplication, Akin Gump will cite to the Akin Gump Statement and exhibits where appropriate.

in the record regarding why the Prospective Client sought Akin Gump's representation, nor what the Prospective Client believed Akin Gump's capabilities to be. In addition, Mr. Gross's deposition testimony conflicts with his prior statements in a July 5, 2004 email to Prakash Mehta, partner at Akin Gump specializing in Private Equity transactions, and others, in which Mr. Gross states: "[Prospective Client is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest." <u>See</u> Second Declaration of Julie Dressing, ("Dressing Decl."), attached hereto as Exhibit A, at ¶ 2. Moreover, there is admissible evidence on the record that there were a number of legal services that are normally performed in connection with the launch of a private equity fund. As Mr. Mehta testified under oath, "any time one forms a fund, one is typically asked to assist in the preparation of marketing documents, term sheet, partnership agreement, negotiation, et cetera. I was assuming that it was this type of work in which we would engage." <u>See</u> Deposition Transcript of Prakash Mehta ("Mehta Dep."), attached as Exhibit 4 to Mr. Gross's Motion for Summary Judgment, at 23:18-24:3.

5.      Mr. Mehta's statement that "the client was looking to us in part to help them get the fund raising process started, and to make contacts," is inadmissible hearsay with respect to the client's wishes and should be stricken. In addition, it is incomplete and is a mischaracterization of Mr. Mehta's testimony. When asked what work was envisioned to be done by Akin Gump for the Prospective Client, Mr. Mehta testified under oath that: "Again, any time one forms a fund, one is typically asked to assist in the preparation of marketing documents, term sheet, partnership agreement, negotiation, et cetera. I was assuming that it was this type of work in which we would engage." <u>Id.</u>

3

6.      To the extent this alleged undisputed fact purports to be evidence of the "client's expectation" it is based upon inadmissible hearsay.  In addition, the fact that there are differences between drafts of an engagement letter prepared by Mr. Gross (neither of which Mr. Gross alleges were sent to the Prospective Client) is not a material fact.  Mr. Gross's statement regarding various versions of retainer letters is also a mischaracterization of the record. Mr. Gross himself undisputedly drafted various versions of an engagement letter, with input from others, with respect to the Prospective Client.  See Mr. Gross's November 2, 2007 Statement of Material Facts Not in Dispute ("Gross Statement") at ¶ 2.  Finally, there is no admissible evidence in the record to support Mr. Gross' assertion that "[E]arly drafts of a prospective retainer letter between Prospective Client and Akin Gump reflected the client's expectation."

7.      Mr. Gross's statement that the Prospective Client "hoped that Akin Gump could schedule meetings with potential investors to his private equity fund beginning in mid to late June 2004" is not based on any admissible evidence in the record in this case.  Mr. Gross bases this statement entirely on his own statements in a May 20, 2004 email, in which he relays to others at Akin Gump the supposed "hope[s]" of Prospective Client.  See Exhibit 3 to Mr. Gross' Motion for Summary Judgment.  This evidence should be stricken as hearsay.

8.      Mr. Gross's statement "[c]ontrary to Prospective Client's expectations, the Funds Group expected only to do the legal work for Prospective Client, and not to take part in investor fundraising" is based upon inadmissible hearsay and is contradicted by admissible evidence on the record to which Mr. Gross cites (albeit incorrectly).  Mr. Mehta did not testify, as stated by Mr. Gross, that Akin Gump did not intend to take part in investor fundraising.  To the contrary, Mr. Mehta testified that:

4

> we would try to identify a few investors with whom contact might
> be made, but we could not promise anything in terms of timing. . . .
> I don't know that we could promise anything in terms of delivery,
> but we would certainly be happy to share what we think might be
> likely candidates within our constellation of contacts and clients,
> information about this particular fund to gage their level of interest
> in this sector.

Mehta Dep. at 30:15-31:11.  In addition, Mr. Mehta explained that:

> That is not to say that to the extent that we are representing a fund,
> that to the extent if we have clients, other clients, or contacts in the
> industry that might find the fund of interest, we would certainly
> offer to tell them about it.  But we would not really push, and
> typically, we would not push, we would just sort of let our Client
> X or Contact X know, "Look, we're assisting this particular fund,
> it's a North Asian real estate fund," or "It's an Indian private
> equity fund, " or whatever it is, "do you have any interest in
> learning more?

Id. at 25:1-18.  Moreover, in an email dated July 2, 2004 (attached as Exhibit 9 to Mr. Gross's

Motion for Summary Judgment), Mr. Mehta noted that he would send materials regarding the

Prospective Client's funds to two Akin Gump clients and would "consider others as well."

Specifically, Mr. Mehta stated:

> *Thanks, I will send the one pager to [Client of Akin Gump] and*
> *[Another Client of Akin Gump] tomorrow and follow with the*
> *booklet.  We will consider others as well.*
>
> Seeing the general email traffic, I don't want to get anyone's hopes
> up yet.  *We need to gauge general interest in Asia real estate first.*
> Also, we have been seeing reluctance on the part of many in the PE
> community to "first time funds" especially of late.  *Of course I*
> *know that you are keenly aware of both these facts already.*

Id. (emphasis indicates portions of Mr. Mehta's email omitted from Gross Statement).

Additionally, Mr. Gross cites no admissible evidence in the record supporting his statement

regarding the Prospective Client's "expectations."

5

9.    Mr. Gross does not even try to cite to evidence for his statement that "Despite Prospective Client's hopes, no investor meetings were held in 2004."

10.    Mr. Gross provides no admissible evidence in support of these assertions of the "expressed desire" of the Prospective Client.  First, the June 12, 2004 through June 14, 2004 email string he cites is not admissible evidence of any "desire" on the part of the Prospective Client, and certainly is not evidence in support of the Prospective Client's "desires" in late June and July 2004.  See Exhibit 7 to Mr. Gross's Motion for Summary Judgment.  Second, there is nothing in this email string that states or indicates that the Prospective Client expressly desired Akin Gump to "lead an effort to raise funds for its private equity fund."  See id.  In addition, Mr. Gross's deposition testimony conflicts with his prior statements in a July 5, 2004 email to Mr. Mehta and others in which Mr. Gross states:  "[Prospective Client is not asking us to guarantee him meetings with potential investors.  He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest."  See Second Dressing Decl. at ¶ 2.

11.    Mr. Gross provides no admissible evidence in the record in this case to support this statement.  The June 12, 2004 through June 14, 2004 email string is not admissible evidence of any "key aim" on the part of the Prospective Client or the "central basis" upon which the Prospective Client intended to retain Akin Gump.  See Exhibit 7 to Mr. Gross's Motion for Summary Judgment.  In addition, to the extent that Mr. Gross is attempting to rely on statements in these emails to prove the intent of the Prospective Client, the statements in Exhibit 7 are inadmissible hearsay.

12.    Mr. Gross's statement regarding Prospective Client's "expectations" is not based on any admissible evidence in this record in this case.  In addition, this statement conflicts with

Mr. Gross's prior statements in a July 5, 2004 email to Mr. Mehta and others in which Mr. Gross

states: "[Prospective Client is not asking us to guarantee him meetings with potential investors.

He only is asking us to make a determined and systematic effort to inform our clients and

business contacts about the [] fund in order to gauge their interest." See Second Dressing Decl.

at ¶ 2. Moreover, Mr. Gross's statement that "raising money from specific investors was not

typically a role Akin Gump took on" is contradicted by other evidence in the record. While it is

true that Mr. Mehta viewed Akin Gump's primary role in established private equity funds to be

"structuring, negotiating, documenting, and closing the fund transaction":

> [t]hat is not to say that to the extent that we are representing a
> fund, that to the extent if we have clients, other clients, or contacts
> in the industry that might find the fund of interest, we would
> certainly offer to tell them about it. But we would not really push,
> and typically, we would not push, we would just sort of let our
> Client X or Contact X know, "Look, we're assisting this particular
> fund, it's a North Asian real estate fund," or "It's an Indian private
> equity fund, " or whatever it is, "do you have any interest in
> learning more?"

Mehta Dep. at 25:1-18. In addition, Mr. Mehta testified, under oath, that:

> we would try to identify a few investors with whom contact might
> be made, but we could not promise anything in terms of timing. . . .
> I don't know that we could promise anything in terms of delivery,
> but we would certainly be happy to share what we think might be
> likely candidates within our constellation of contacts and clients,
> information about this particular fund to gage their level of interest
> in this sector.

Mehta Dep. at 30:15-31:11.

13.    Mr. Gross's statement regarding Prospective Client's "expectations" for Akin

Gump to "establish investor meetings" is not based on any admissible evidence in this record in

this case. In addition, this statement conflicts with Mr. Gross's prior statements in a July 5, 2004

400686324v1

email to Mr. Mehta and others in which Mr. Gross states: "[Prospective Client is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest." <u>See</u> Second Dressing Decl. at ¶ 2. Additionally, Mr. Gross's statement that "Akin Gump cancelled any hoped-for investor meetings that had been scheduled for July 2004" conflicts with Mr. Gross's statement to the Prospective Client in an email dated July 2, 2004, in which Mr. Gross explains to the Prospective Client that it made sense to postpone any such meetings.

> I had a more detailed discussion with the Funds Group today about the process for setting up meetings with potential investors. There is concern we are not allowing you (and us) enough time to build up investor interest in the [] fund, by locking ourselves into near-term dates for meetings.
>
> The way we see it, if we send out the Flip Book sometime next week, it will take another week or ten days until we get reactions and make the necessary follow-up efforts. Only at that point will we be able to start scheduling meetings for you with the people who are interested. And of course, some of the people you'll want to meet will already be on vacation since it's late July or out of town for business reasons.
>
> We're thinking that it would be better to give you (and us) enough time to finalize the Flip Book, distribute the first set by the end of next week to potential investors, and over the next few weeks do follow-up efforts and further distribution. We will keep you abreast of all comments we receive and the level of investor interest, but we won't push people to meet you during the week of July 20.
>
> Once we collect investor reactions, you'll be in a good position to decide when you want to come to New York. And we'll be able to schedule meetings more easily with the people you want to see. The overall process may take more than one trip and may run into September, if you find that not enough people are around in late July and August to justify your trip. If the investor is important enough, you may decide you want to take a special trip just to see that investor.

> By not trying to force this process into a specific scheduling
> straightjacket, we think you'll do much better in engendering
> investor interest in the fund, which, after all is the whole purpose
> of this effort.

See Exhibit 9 to Mr. Gross's Motion for Summary Judgment.

**14.**    There is no evidence at all of "Akin Gump's previous position that it would

establish investors meetings," and Mr. Gross's statement that Mr. Gross was left to inform the

Prospective Client that planned meetings with investors "could not take place" is a

mischaracterization of the record.   Mr. Gross cites an email that he sent to the Prospective Client

on July 2, 2004 in support of this statement.  In this email, Mr. Gross did not state that meetings

with investors could not take place.  See Exhibit 9 to Mr. Gross' Motion for Summary Judgment.

Instead, he said:

> I had a more detailed discussion with the Funds Group today about
> the process for setting up meetings with potential investors.  There
> is concern we are not allowing you (and us) enough time to build
> up investor interest in the [] fund, by locking ourselves into near-
> term dates for meetings.
>
> The way we see it, if we send out the Flip Book sometime next
> week, it will take another week or ten days until we get reactions
> and make the necessary follow-up efforts.  Only at that point will
> we be able to start scheduling meetings for you with the people
> who are interested.  And of course, some of the people you'll want
> to meet will already be on vacation since it's late July or out of
> town for business reasons.
>
> We're thinking that it would be better to give you (and us) enough
> time to finalize the Flip Book, distribute the first set by the end of
> next week to potential investors, and over the next few weeks do
> follow-up efforts and further distribution.  We will keep you
> abreast of all comments we receive and the level of investor
> interest, but we won't push people to meet you during the week of
> July 20.
>
> Once we collect investor reactions, you'll be in a good position to
> decide when you want to come to New York.  And we'll be able to
> schedule meetings more easily with the people you want to see.

The overall process may take more than one trip and may run into September, if you find that not enough people are around in late July and August to justify your trip. If the investor is important enough, you may decide you want to take a special trip just to see that investor.

By not trying to force this process into a specific scheduling straightjacket, we think you'll do much better in engendering investor interest in the fund, which, after all is the whole purpose of this effort.

Id.

15.    Mr. Gross' statements that the Prospective Client "found the news 'rather disappointing,'" and his description of the Prospective Client's "keen interest," and that the Prospective Client's "expressed frustration" are not supported by any admissible evidence in the record in this case, but are inadmissible hearsay. See Exhibit 9 to Mr. Gross's Motion for Summary Judgment.

16.    Mr. Gross' selective quotation of Mr. Mehta's July 2, 2004 email to the Prospective Client is misleading. See Exhibit 9 to Mr. Gross' Motion for Summary Judgment. In his email, Mr. Mehta noted that he had already sent materials regarding the Prospective Client's funds to two Akin Gump clients and would "consider others as well." Specifically, Mr. Mehta stated:

> *Thanks, I will send the one pager to [Client of Akin Gump] and [Another Client of Akin Gump] tomorrow and follow with the booklet. We will consider others as well.*
>
> Seeing the general email traffic, I don't want to get anyone's hopes up yet. *We need to gauge general interest in Asia real estate first.* Also, we have been seeing reluctance on the part of many in the PE community to "first time funds" especially of late. *Of course I know that you are keenly aware of both these facts already.*

Id. (emphasis indicates portions of Mr. Mehta's email omitted from Gross Statement).

Mr. Gross's statement that "[t]he point was apparently not lost on Prospective Client" is

10

unsupported by admissible evidence in this case, and is hearsay. In addition, Mr. Gross's statement that the portion of the Prospective Client's email that he quotes was the Prospective Client's "full" response to Mr. Mehta's July 2, 2004 email is false. Id. The Prospective Client also thanked Mr. Mehta in his response email. Id.

17.    Mr. Gross' statement about what was of "critical importance" to the Prospective Client is unsupported by any admissible evidence in the record in this case. It is hearsay. In addition, this statement conflicts with Mr. Gross's prior statements in a July 5, 2004 email to Mr. Mehta and others in which Mr. Gross states: "[Prospective Client] is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest." See Second Dressing Decl. at ¶ 2.

18.    Mr. Gross' statement regarding the fact that the Prospective Client wrote one email message (among numerous email messages exchanged between the Prospective Client and Akin Gump attorneys) in which the Prospective Client discussed one topic is not a material fact in this case. In addition, in support of this material "undisputed" fact, Mr. Gross relies on an email message in which Jay Cohen, a partner at Akin Gump, implies that he has cut and pasted an email message from the Prospective Client—this is not admissible evidence in the record in this case. Instead, this is double hearsay. See Exhibit 10 to Mr. Gross' Motion for Summary Judgment.

19.    Mr. Gross' statement that the "Prospective Client asserted that the representation could go forward" based upon certain criteria is unsupported by admissible evidence in the record. See Exhibit 10 to Mr. Gross' Motion for Summary Judgment. In support of this "fact," Mr. Gross relies on an email message in which Jay Cohen, a partner at Akin Gump, implies that

400686324v1

he has cut and pasted an email message from the Prospective Client—this is not admissible evidence in the record in this case. Instead, this is double hearsay.

20.    In support of this "fact," Mr. Gross relies on an email message in which Jay Cohen, a partner at Akin Gump, implies that he has cut and pasted an email message from the Prospective Client—this is not admissible evidence in the record in this case. Instead, this is double hearsay. <u>See</u> Exhibit 10 to Mr. Gross' Motion for Summary Judgment.

21.    Mr. Gross's statements that the Prospective Client "emphasized that it was not convinced that Akin Gump was the right choice to lead the representation" and "that it was not interested in losing $15,000 if it was not confident that the fundraising would be performed" are not supported by admissible evidence in the record in this case. <u>See</u> Exhibit 10 attached to Mr. Gross' Motion for Summary Judgment. First, Mr. Gross is relying on an email message in which Jay Cohen, a partner at Akin Gump, implies that he has cut and pasted an email message from the Prospective Client. This is double-hearsay. Second, the purported message <u>does not include</u> the statements Mr. Gross attributes to the Prospective Client. <u>See id.</u>

23.    Mr. Gross's statement that "Akin Gump 'could not promise anything in terms of timing' or 'in terms of delivery' to Prospective Client" is an incomplete mischaracterization of the record. It is true that Mr. Mehta testified that Akin Gump could not promise anything in terms of timing or delivery with respect to setting up investor meetings. <u>See</u> Exhibit 9 to Mr. Gross's Motion for Summary Judgment. This fact, however, is immaterial given Mr. Gross's statement in a July 5, 2004 email to Mr. Mehta and others that: "[Prospective Client is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest." <u>See</u> Second Dressing Decl. at ¶ 2.

12

25.     Mr. Gross's statement that "[a]t the time of Prospective Client's concerns about Akin Gump's unwillingness to attract investors, Prospective Client had spoken to a firm with an extensive Asian practice, and communicated its interest in this prospective competitor to Akin Gump," is not supported by admissible evidence on the record in this case. Mr. Gross is relying on an email message in which Jay Cohen, a partner at Akin Gump, implies that he has cut and pasted an email message from the Prospective Client. See Exhibit 10 to Mr. Gross' Motion for Summary Judgment. This is double-hearsay.

26.     Mr. Gross's statement that he was "expected to communicate Akin Gump's unwillingness to attract investors" is contradicted by evidence in the record. Akin Gump was not "unwilling" to attract investors. To the contrary, Mr. Mehta testified that

> we would try to identify a few investors with whom contact might be made, but we could not promise anything in terms of timing. . . . I don't know that we could promise anything in terms of delivery, but we would certainly be happy to share what we think might be likely candidates within our constellation of contacts and clients, information about this particular fund to gage their level of interest in this sector.

Mehta Dep. at 30:15-31:11. In addition, Mr. Mehta explained that

> That is not to say that to the extent that we are representing a fund, that to the extent if we have clients, other clients, or contacts in the industry that might find the fund of interest, we would certainly offer to tell them about it. But we would not really push, and typically, we would not push, we would just sort of let our Client X or Contact X know, "Look, we're assisting this particular fund, it's a North Asian real estate fund," or "It's an Indian private equity fund, " or whatever it is, "do you have any interest in learning more?

Mehta Dep. at 25:1-18.

400686324v1

27.     There is no evidence in the record to support Mr. Gross' current statement that he discussed advising the Prospective Client to delay signing the engagement letter with Jay Cohen, prior to advising the Prospective Client not to do so.  Mr. Gross testified that "[he] *may* have discussed it with Jay Cohen.  He's the only person that I likely would have talked to about it. See Exhibit 8 to Mr. Gross's Motion for Summary Judgment at 262:22-263:6 (emphasis added).  When asked what he recalls saying to Mr. Cohen, Mr. Gross testified "We *may* have discussed basically telling [Prospective Client] to hold off, which is what we did – which is what I did." Id. at 263:7-18 (emphasis added).

30.     Mr. Gross' statement that he "reinforced" certain statements is not supported by admissible evidence in the record in this case.  Rather he relies on his own emails and those of the client, both of which are hearsay.  See Exhibit 13 to Mr. Gross's Motion for Summary Judgment.

31.     As a preliminary matter, Mr. Gross's statement that the reason that the Prospective Client wanted to enter into an engagement with Akin Gump was to set up investor meetings is not supported by admissible evidence in the record in this case.  Mr. Gross cites only to his own deposition testimony in support of this "fact."  Mr. Gross presents no admissible testimony as to the Prospective Client's motivations.  In addition, this "fact" conflicts with Mr. Gross's prior statements in a July 5, 2004 email to Mr. Mehta and others in which Mr. Gross states:  "[Prospective Client is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [] fund in order to gauge their interest."  See Second Dressing Decl. at ¶ 2. Additionally, Mr. Gross' self-serving testimony as to his own motivation for sending emails to the Prospective Client discouraging the Prospective Client from retaining Akin Gump

14

and its partners, Mr. Kim and Ms. Park, is disputed by ample evidence in the record in this case.

First, as explained above, there is undisputed evidence in the record that Akin Gump was willing

to "inform [its] clients and business contacts about the [] fund in order to gauge their interest,"

and had started this process. See Mehta Dep. at 25:1-18; 30:15-31:11. Second, Mr. Gross' own

actions, and the timing of those action refute his self-serving testimony. On July 13, 2004,

Mr. Kim informed Mr. Gross of Mr. McLean's decision to terminate Mr. Gross's employment at

Akin Gump. Akin Gump Statement at ¶ 61. Shortly thereafter, on July 25, 2007, Mr. Gross, for

the first time cautioned the Prospective Client that "[b]efore you commit yourself to a

partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind

your project." See Exhibit 12 to Mr. Gross' Motion for Summary Judgment. Next, on July 30,

2004, Mr. Gross sent another email to the Prospective Client in which he stated "[f]or the

moment, I think you should delay signing the engagement letter. The law firm will be unhappy

with this recommendation, but I can't in good conscience ask you to rely exclusively on Akin

Gump until I see actions matching words." See Akin Gump Statement at ¶¶ 75-76. See also

Exhibit 13 to Mr. Gross's Motion for Summary Judgment and Akin Gump's response to

Mr. Gross's alleged undisputed fact No. 36 below.

     **33.**     This statement is an incomplete mischaracterization of the record in this case.

Company X discussed retaining the services of Akin Gump (more specifically Mr. Kim's

services) in performing work in connection with a "massive" development projects in Korea, as

well as a separate development project in Manhattan. Deposition Transcript of Sukhan Kim

("Kim Dep."), attached hereto as Exhibit B, at 177:19-179:12. Company X had discussed

potentially partnering with a number of companies with Mr. Kim. See id. One of those

companies was Company Y. Id.

400686324v1

34.    Mr. Gross' statement that "Akin Gump's client Company Y had been putting pressure on Akin Gump's potential client Company X regarding a Korean real estate development" is unsupported by admissible evidence in this case. As record support for this "undisputed fact," Mr. Gross relies entirely on a memorandum that he wrote in which he makes this unsupported statement. See Exhibit 15 to Mr. Gross's Motion for Summary Judgment. This is not admissible evidence regarding the truth of this fact.

35.    There is no support in the record for the statement that Mr. Kim is the "head of the Korea Practice Group." Also, there is no admissible evidence in the record to support the statement that Company Y was Mr. Kim's "largest" and "most important" client. Although Mr. Gross cites to Mr. Kim's deposition for support of these facts, Mr. Kim never testified that Company Y was his largest or most important client. Moreover, while Mr. Gross testified that Company Y was Mr. Kim's most important client, Mr. Gross's opinion about the importance of a client to Mr. Kim is not admissible evidence in this case as to the truth of this statement. Finally, this is not a material fact in this case.

36.    Mr. Gross' assertion that there was a conflict of interest between Mr. Kim's client and Company X is completely unsupported by admissible evidence in the record in this case. Mr. Gross' self-serving, conclusory statement that he believes there was a conflict is not supporting admissible evidence of an actual conflict in this case. Moreover, there is evidence in the record that contradicts Mr. Gross's deposition testimony that he was concerned about a perceived conflict between Company X and Company Y. Despite ample opportunity to do so, there is no evidence in the record that Mr. Gross ever communicated to Mr. Kim, or anyone at Akin Gump, any concern on his part of a conflict in connection with Akin Gump's representation Company X. When Mr. Kim first informed Mr. Gross on July 29, 2004, that he had been

16

approached by the CEO of Company X and asked Mr. Gross what type of work Akin Gump

might expect from Company X, Mr. Gross wrote back "I think we can assist him in several areas.

. . . Perhaps, most importantly, he could benefit from a wise general advisor like you who knows

the Korean business landscape so well." See Second Dressing Decl. at ¶ 3.  Mr. Gross does not

mention any concerns regarding any conflict.  See id.  Next, on August 3, 2004, in an email

memorandum to Mr. Kim advising him further on potential work with respect to Company X,

Mr. Gross discusses a variety of ways that Akin Gump's services would prove valuable to

Company X, most of which do not involve Company Y.  See Exhibit 15 to Mr. Gross' Motion

for Summary Judgment.  In addition, while Mr. Gross does mention in this email memorandum

that the CEO of Company X might "want to know whether your position as outside counsel to

[Company Y] would prevent you from assisting [Company X] in a subsequent negotiation with

[Company Y]," Mr. Gross in no way indicates that he is concerned about a conflict.  See id.  In

addition, Mr. Gross told Mr. Kim that:

> If [CEO of Company X] wants to explore a deal with [Company
> Y], he would obviously appreciate your willingness to help him
> contact and build relations with senior [Company Y] executives for
> this purpose.  From his standpoint, your assistance on this alone
> would give tremendous "added value."  Overall, I believe [CEO of
> Company X] will be open to hearing the various ways that you and
> Akin Gump can assist him with [a major Korean Development]
> project [(the "Korean Project")].

Id.

37.     Mr. Gross's statement misstates the record in this case.  It is true that Mr. Gross

wrote a memorandum to Mr. Kim providing advice as to how to secure Company X as a client

after receiving the initial news (on July 13, 2004) that Mr. McLean had decided that Mr. Gross

needed to leave the firm.  See Exhibit 15 to Mr. Gross's Motion to Dismiss.  However, it is

undisputed that after receiving this news, Mr. Gross believed that there was a possibility that he

17

might be able to stay at Akin Gump, working for another section.  See Deposition Transcript of

Donald Gross ("Gross Dep."), attached hereto as Exhibit C at 241:6-242:13.  Mr. Gross wrote his

August 3, 2004 email memorandum during the period in which he "tr[ied] his damndest to stay

at Akin Gump and find a section where I could work" – this period ran from July 13, 2004

through August 11, 2004, when Mr. Kim informed Mr. Gross that Mr. McLean was requiring

Mr. Gross to leave the firm by October 1, 2004.  Id.  See also Akin Gump Statement at ¶ 66.

Moreover, Mr. Gross made the following statements in his August 3, 2004 email to Mr. Kim

providing him with advice as to how to secure Company X as a client:

> If [CEO of Company X] wants to explore a deal with [Company
> Y], he would obviously appreciate your willingness to help him
> contact and build relations with senior [Company Y] executives for
> this purpose.  From his standpoint, your assistance on this alone
> would give tremendous "added value."  Overall, I believe [CEO of
> Company X] will be open to hearing the various ways that you and
> Akin Gump can assist him with [a major Korean Development]
> project [(the "Korean Project")].

Id., attached as Exhibit 15 to Mr. Gross' Motion for Summary Judgment.

38.    Mr. Gross's statement that Akin Gump did not prepare an engagement letter or

retainer agreement with Company X during its 2004 discussions with Company X is not

supported by the record in this case.  Mr. Gross relies on Mr. Kim's testimony to support this

statement.  Mr. Kim testified, however, that he did not recall one way or the other whether Akin

Gump had a draft retainer agreement with Company X.  See Kim Dep. at 102:11-15, attached as

Exhibit 16 to Mr. Gross's Motion for Summary Judgment.  Additionally, whether Akin Gump

prepared an engagement letter or retainer agreement with Company X is immaterial.  Akin

Gump has alleged that Mr. Gross interfered with its prospective business with Company X.  It is

18

immaterial whether or not Akin Gump had actually prepared a retainer agreement or engagement letter with Company X in 2004.

39.     Mr. Gross's statements about Mr. Kim's instructions to start work for Company X before the firm internally assigned a client/matter number to a project for Company X is immaterial to this case.

40.     Mr. Gross's statements about the lack of evidence in the record of a retainer agreement is immaterial. Akin Gump has alleged that Mr. Gross interfered with its prospective business with Company X. It is immaterial whether or not Akin Gump had actually entered into a retainer agreement with Company X in 2004.

41.     Mr. Gross's self-serving testimony regarding his motivation for making negative statements to prospective clients about Akin Gump, and a number of its partners, while still an Akin Gump employee, and while still on Akin Gump's payroll, is otherwise unsupported in the record and is sharply refuted by the evidence in this case. First, in addition to the content of these secret emails (See Akin Gump Statement at ¶¶ 75-76), the timing of these statements contradicts Mr. Gross's purported motivation. On July 13, 2004, Mr. Kim informed Mr. Gross of Mr. McLean's decision to terminate Mr. Gross's employment at Akin Gump. Akin Gump Statement at ¶ 61. At that time, Mr. Gross believed that it still might be possible for him to stay employed at Akin Gump if he found a different role for himself within the firm (possibly working 1/3 of the time for the Korea Practice Group). Gross Dep. at 241:6-242:13. Mr. Gross was doing everything he could at that time to stay at Akin Gump. Id. Next, on August 3, 2004, in an email memorandum to Mr. Kim advising him further on potential work with respect to Company X, Mr. Gross discusses a variety of ways that Akin Gump's services would prove valuable to Company X, most of which do not involve Company Y. See Exhibit 15 to

19

Mr. Gross' Motion for Summary Judgment.    Shortly thereafter, on August 11, Mr. Kim

informed Mr. Gross that Mr. McLean had decided that he needed to leave Akin Gump by

October 1, 2004.  See Akin Gump Statement at ¶ 66.  On August 24-25, 2004, only after being

told that Mr. McLean had decided that Mr. Gross would need to leave Akin Gump by a certain

date, did Mr. Gross send the email with the negative statements about Akin Gump and its

partners to Prospective Client, a managing partner and senior financial advisor to Company X.

Id. at ¶¶ 75-76; Gross Statement at ¶ 32.  He told the Prospective Client that he was providing his

thoughts "in confidence."  Id.  In addition, Mr. Gross did not discuss with anyone at Akin Gump

his intention to tell the Prospective Client that Company X should not retain the services of Akin

Gump prior to sending the email.  See Exhibit 6 to Akin Gump Statement at 289:8-11.  In

response to Mr. Gross's August 25, 2004 email, the Prospective Client responded "Excellent

thoughts Don.  Great detail and intelligence. *I'll use it very carefully.*"  See Gross Dep. Ex. 25

(emphasis added).  The next day, August 26, 2004, Mr. Gross replied to the Prospective Client

that he was "very interested in discussing further the opportunity to work with you to build [a

corporation]."  Id.  Later that same day, Mr. Gross sent an email to the CEO of Company X,

attaching his resume and explaining that he was very interested in a position at Company X.  See

Gross Dep. Ex. 26.  Mr. Gross specifically mentions his "good friend" the Prospective Client.

See id.  Mr. Gross had good reason to suspect that his "intelligence" about Akin Gump would be

well received by the Prospective Client who had praised him for his June 30, 2004 email

advising against retaining the services of Akin Gump.  Specifically, the Prospective Client

responded to Mr. Gross's July 30, 2004 email by stating:

> I cannot begin to tell you how impressed I was by your approach to
> this situation.  Few would be so supportive, even fewer so candid.
> Your letter highlights exactly the reasons why [Prospective Client]

continues to hold you in such high personal regard.  Very special, indeed.

See Exhibit 13 to Mr. Gross's Motion for Summary Judgment.

42.    Mr. Gross's self-serving testimony in which he stated that by writing the August 25, 2004 negative email "he was trying to 'salvage the relationship with [Company X] going forward," 'uphold [] [his] ethical duty of – of being honest," and protect[] the fiduciary duty and . . . interest of the client," is sharply contradicted both by common sense and by the facts in the record in the case as described in the preceding paragraph.  Nor does it explain why he took his actions secretly.

43.    Mr. Gross' statement that he never directly communicated his "hesitations" to the CEO of Company X is immaterial.  Mr. Gross undisputedly made the statements outlined in Paragraph 75 of Akin Gump's Statement to the Prospective Client, who undisputedly "was also a managing partner and financial partner to" Company X.  See Akin Gump's Statement at ¶¶ 75-76.  See also Gross Statement at ¶ 32.

44.    Mr. Gross's statement is a mischaracterization of the record in this case.  Mr. Kim did not, as Mr. Gross implies simply, "testif[y] that Akin Gump rejected the representation of Company X."  Rather, Mr. Kim testified that he recalled discussing a retainer amount with the CEO of Company X.  Kim Dep. at 174:16-175:10.  He testified that an extremely low retainer suggested by Company X in September 2004 (after Mr. Gross had warned Company X not to retain Akin Gump's services) signaled to him that Company X, in essence was saying that it did not want to retain him.  Id. at 191: 7-19.  Basically, Mr. Kim explained that by cutting the retainer so low, Company X was "basically [] say[ing] no."  Id.  Mr. Kim further testified that he could not recall whether or not he ever sent a retainer agreement to Company X, but that if he did

21

not, it was because he viewed its low retainer suggestion as a rejection of his representation. Id.
at 187:5-191:19. Although at the time Mr. Kim realized that Company X had had a "change of
heart" about him and Jaemin Park, he had no knowledge of the harmful comments made by
Mr. Gross, and therefore did not connect the dots at that time. Specifically, Mr. Kim testified
that:

> During our conversation I was clearly under the impression that it
> was not worth going forward, because I sensed that there is a
> change of heart, okay. And now in view of hindsight, now that I'm
> aware of what Don Gross did in terms of contacting those people,
> at that time I had no idea. So at that time I felt that maybe he did
> some due diligence and had some concerns about us or about me or
> Jaemin, but I had no idea at the time, but I knew he had a change
> of heart. And, therefore, after this I – if we didn't sent it, that
> means that I believed that it would not really be worth going
> forward, so that's my recollection.

Id.

45.    For the reasons explained in the preceding paragraph, Mr. Gross's statement is an
incomplete mischaracterization of the record in this case. In addition, the fact that Thomas
Hubbard, a Senior Advisor to the Korea Practice Group who was older than Mr. Gross and hired
around the same time that Mr. Gross's employment at Akin Gump was terminated, later was
hired by Akin Gump in an advisory role to Company X, and not to perform the far more
substantial work Company X had originally discussed with Mr. Kim, is not material to this
matter. See Kim Dep. at 190:9-192:17.

46.    This statement mischaracterizes the record in this case. There is no admissible
evidence in the record that Akin Gump hired Mr. Hubbard specifically to "assist Akin Gump in
securing representation of Company X."

22

47.    As explained above, the fact that Mr. Hubbard was retained by Company X in an advisory role, and not to perform the far more substantial work Company X had originally discussed with Mr. Kim, is not material to this matter.  See Kim Dep. at 190:9-192:17.

48    Akin Gump stated in its Response to Plaintiff's Third Set of Interrogatories, Interrogatory No. 4, attached as Exhibit 22 to Mr. Gross' Motion for Summary Judgment, that Akin Gump "is not aware of any of its employees or former employees, other than Mr. Gross, actively encouraging prospective clients not to retain the services of Akin Gump by making negative and/or disparaging statements about the firm and its partners while employed by the firm." This point is immaterial as a matter of law.

DATED:  December 11, 2007                    Respectfully submitted,


                                                        _____/s/_____
                                                        Christine N. Kearns  (Bar No. 416339)
                                                        Karen-Faye McTavish (Bar No. 477588)
                                                        PILLSBURY WINTHROP SHAW PITTMAN LLP
                                                        2300 N Street, N.W.
                                                        Washington, D.C.  20037-1128
                                                        (202) 663-8000

                                                        Counsel for Defendant

# A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DONALD G. GROSS,                           )
                                           )
                Plaintiff,                 )
                                           )
        v.                                 )
                                           )  Case No. 1:07CV00399 (EGS)
AKIN GUMP STRAUSS HAUER & FELD             )
LLP,                                       )
                                           )
                Defendant.                 )
                                           )
                                           )
─────────────────────────────────────     )

## SECOND DECLARATION OF JULIE STUMPE DRESSING

I, Julie Stumpe Dressing, a member in good standing of the bar of the District of Columbia, state as follows:

1. I am the Chief Human Resources Officer and Human Resources Counsel for Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), the Defendant in this matter. I make this Declaration based on my personal knowledge and my review of Akin Gump's business records kept in the ordinary course of business.

2. The document that is attached hereto as Exhibit 1 (Bates labeled AK002017), is a hard copy of two electronic messages that were produced in this case from Akin Gump's computer systems.

3. The document that is attached hereto as Exhibit 2 (Bates labeled AK002062-63), is a hard copy of three electronic messages that were produced in this case from Akin Gump's computer systems.

4. The document that is attached hereto as Exhibit 3 (Bates labeled AK001929-31), is a hard copy of four electronic messages that were produced in this case from Akin Gump's computer systems.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2007.

Julie Stumpe Dressing

- 2 -

400682707v1

1

From: Gross, Donald
Sent: 7/5/2004 7:46:28 PM (Eastern Time)
To: Mehta, Prakash H.; Cohen, Jay G.; Vine, Stephen
CC: Park, Jaemin
Subject: RE: [ _____ ] and Korean Private Equity Practice

To help clarify matters, I would like to give you my best sense of what [ _____ ] is looking to us for. [ _____ ] wants us to "take the lead" in helping launch his fund because he thinks we have the experience, expertise and business relationships to tell him what is necessary to make it successful.  He also believes that being represented by Akin Gump will give [ __ ] greater credibility in the investment community.

[ _____ ] is not asking us to guarantee him meetings with potential investors. He only is asking us to make a determined and systematic effort to inform our clients and business contacts about the [ __ ] fund in order to gauge their interest.  So the real question is whether we are prepared to make this effort. The Korea group believes doing so would have a high payoff because [ _____ ] and his real estate projects have a high profile in Korea and Korea is a very promising place to expand our private equity fund business in the future, as Jay noted. [ _____ ] has already been approached by Coudert who said they would exert their best efforts to tell their clients and contacts about the [ __ ] fund.

I suggest we do an internal conference call on this issue at 9:30 am on Thursday morning, after Jay and Jaemin have arrived in Korea.  By then, we should have received the final draft of the Flip Book, which will help us in making an assessment.  Thanks so much for all your efforts and interest in this matter.

Best,

Don

-----Original Message-----
From: Mehta, Prakash H.
Sent: Monday, July 05, 2004 6:10 PM
To: Cohen, Jay G.; Vine, Stephen
Cc: Park, Jaemin; Gross, Donald
Subject: Re: [ _____ ] and Korean Private Equity Practice


Thanks, Jay.  Perhaps we all should do an internal call tomorrow.  As I told [ _____ ] I am sending feelers out to [ __ ] and [ _____ ] We should consider others as well.  But as Don and I discussed for [ ___ ] to think we  can attract interest  is in my judgment overly optimistic.  If he is hiring us on this basis at the end of the day I personally am afraid he may be disappointed.  Of course we will try but I can't even guarantee him one investor meeting at this point.  So when he says Akin is taking the lead  if he's referring to investors and meetings it worries me.  I appreciate this needs to be handled correctly. Let's discuss.

CONFIDENTIAL

**2**

From: Gross, Donald
Sent: 7/29/2004 3:23:36 PM (Eastern Time)
To: Kim, Sukhan
CC: Quigley, Mike
Subject: RE: Luncheon Thank You and Question

I think we can assist him in several areas.  His company has an on-going need
to main good relations with the Korean government and resolve problems with
various ministries relating to the construction of [_____]  His company's
regular outside counsel, Hale & Dorr, has no capabilities in that area.  I
believe he would like to obtain support and investment from Korean business
groups, in addition to [_____] for the [_____] project.  If we can help
facilitate that investment, we could handle all the transactional work that
goes with it.  Hale & Dorr has few, if any, contacts in the Korean business
community and it cannot help him in this area.  Third, although Morgan Stanley
is already involved in the financing of [_____]  I believe he would welcome
investment from some of the other investment banks and investment funds that
Akin Gump represents.  If we could help him in this area, we would also be able
to handle all the accompanying legal work.  Those are three areas I can think
of off the top of my head.  Perhaps, most importantly, he could benefit from a
wise general adviser like you who knows the Korean business landscape so well.
Thanks,

Best,

Don

-----Original Message-----
From: Kim, Sukhan
Sent: Thursday, July 29, 2004 3:59 PM
To: Gross, Donald
Cc: Quigley, Mike
Subject: FW: Luncheon Thank You and Question


don, what kind of work do you think we can get from him? currently, i think he
is using a boston firm for the [_____] project. tks
-----Original Message-----
From: [_____]
Sent: Thursday, July 29, 2004 3:38 PM
To: Kim, Sukhan
Subject: Luncheon Thank You and Question


Dear Mr. Kim,

Thank you very much for attending the luncheon for Ambassador Christopher Hill
at the [____] International Offices on July 19.  It was a memorable event.

I would like to discuss something of interest with you related to [_____]
Please contact me at your convenience.


Regards,
[_____]



CONFIDENTIAL

AK002063

**3**

From: Gross, Donald
Sent: 6/8/2004 4:51:52 PM (Eastern Time)
To: [ ]
CC: [ ]
Subject: RE: Letter of Engagement

Dear [ ]

I'm glad that you and [ ] will be getting together with Jay and Jaemin while they're in Seoul.  I hope you have some fun in addition to discussing business.

I'll reflect [ ] new title in all our documents from now on. Concerning Tim's point on the name of the company, our Funds group lawyers (either Prakash or Steve) will know what's best from the standpoint of interesting U.S. or other international investors in the [ ] Fund and I'd like to check with them.

The exclusive right for AG to represent the [ ] fund outside Korea is something that [ ] mentioned since the outset of our discussions.  Creating a long-term partnership with [ ], based on our exclusive international representation, is the reason why senior lawyers here agreed to take the unprecedented step of accepting payment of all legal fees and expenses at closing for a first-time fund as well as accepting a reduced retainer.  If we eliminate it, the law firm will treat [ ] like a regular client and expect full payment of our bills on a monthly basis along with a significantly larger retainer. Lastly, from a personal standpoint, [ ] interest in working with me on a long-term basis (and my interest in working with him) has been a prime motivation for both of us all along.

I'll talk with the rest of our team about the best schedule for your July visit and get back to you on that soon.  Thanks and all best wishes,

Don


-----Original Message-----
From: [ ]
Sent: Tuesday, June 08, 2004 3:55 AM
To: Gross, Donald
Subject: RE: Letter of Engagement


Hello, again.

I read the letter and have the following comments, but I have not spoken to [ ] and I likely will not before tomorrow but then I shall get right back to you.

[ ] is now  Chairman

Though we use the [ ] name, I am told by Tim Trinka that we might wish to use [ ] I should sort that out with [ ] by tomorrow.

There should be no question that we want to work with A&G as much as possible,

CONFIDENTIAL                                                    AK001929

but I am not so sure we should endorse you by providing the broad exclusivity right mentioned in Para. 2, Section 1, Scope of Engagement.  How important is it to you that this be stated here?

Those are my comments.  As you see, I have copied Pietro on this e-mail.

Look forward to getting going.

John

---

From: Gross, Donald [mailto:dgross@akingump.com]
Sent: 08 June 2004 07:01
To: [redacted]
Cc: [redacted] Cohen, Jay G.; Park, Jaemin
Subject: RE: Letter of Engagement

John,

Thanks for your and [redacted] positive decision on the retainer.  I submitted the revised engagement letter this afternoon to our business acceptance committee for formal approval and do not expect any problems.  I'll let you know the result as soon as I hear it.  (As you requested, I am attaching a copy of the engagement letter).

Jay mentioned that he and Jaemin plan to meet you and [redacted] before they leave Seoul.  I hope you'll all have a chance to get together.

As soon as Jay and Jaemin return to DC, we'll talk with Prakash, Steve et al, to develop our comments and suggestions on revising the flip-book for your and [redacted] presentations to investors in July (taking into account the need to minimize legal costs early on).  When you decide on your preferred dates of travel in July, please let me know.  I would suggest being here during the week of July 19.

We very much look forward to working with [redacted] you and the rest of the [redacted] team in the coming months.  Thanks again to both of you,

Best,

Don

Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct
Fax:  202-887-4288
dgross@akingump.com
www.akingump.com

CONFIDENTIAL

AK001930

-----Original Message-----
From: [_____]
Sent: Sunday, June 06, 2004 8:38 PM
To: Gross, Donald
Subject: Letter of Engagement

Dear Don,

Good news . [><] will put up $15,000 (USDRS), as you requested.

Please also make the change from 31 Dec. 04 to 31 Jan. 05, as we discussed.   If
you could re-do the letter and send along, I think that should do it.

It goes, without saying much more, that we must monitor the billings very
closely and seek to minimize them during the early stages.

Best regards,



The information contained in this e-mail message is intended only for the
personal and confidential use of the recipient(s) named above. This message may
be an attorney-client communication and/or work product and as such is
privileged and confidential. If the reader of this message is not the intended
recipient or an agent responsible for delivering it to the intended recipient,
you are hereby notified that you have received this document in error and that
any review, dissemination, distribution, or copying of this message is strictly
prohibited. If you have received this communication in error, please notify us
immediately by e-mail, and delete the original message.

**CONFIDENTIAL**                                                    AK001931

**B**

169

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3                                        COPY

4   DONALD G. GROSS,

5        Plaintiff,              Civil No.

6   vs.                         07-399 (EGS)

7   AKIN GUMP STRAUSS HAUER & FELD LLP,

8        Defendant.

9            -    -    -    -    -

10       CONTINUING DEPOSITION OF SUKHAN KIM

11                    Washington, D.C.

12                    October 16, 2007

13  The continuing deposition of Sukhan Kim was

14  convened on Tuesday, October 16, 2007,

15  commencing at 9:45:07 a.m., at the offices of

16  Webster Fredrickson Henrichsen Correia & Puth,

17  1775 K Street, N.W., Suite 600, Washington,

18  D.C., before Paula G. Satkin, Registered

19  Professional Reporter and Notary Public.

20  Job No. 1-13698

21  Pages 169 - 214, Volume II

22            -    -    -    -    -


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

174

1    BY MR. PUTH:

2        Q.    Mr. Kim, I'll ask you to review

3    Exhibit 64, please?

4        A.    The whole thing?

5        Q.    Yes.

6        A.    Yes, I read it.

7        Q.    All right.  Mr. Kim, I would like

8    to draw your attention to the first substantive

9    e-mail, which is on AK 003465 D.  That's the

10   fourth page in?

11       A.    All right.

12       Q.    Actually, your response to

13   Mr. Gale of September 20th, 2004 at 3:37 p.m.

14   do you see that?

15       A.    Yes.

16       Q.    I think you had testified

17   previously that you had worked for Mr. Gale for

18   some time, prior to raising the issue of a

19   retainer?

20       A.    Right.

21       Q.    And were you raising the issue of

22   a retainer in this e-mail, on the third page of

175

1    Deposition Exhibit 64?

2           A.     On this September 20th e-mail?

3           Q.     Yes.

4           A.     Yes.  The issue, yes.

5           Q.     Okay.  And do I gather, prior to

6    this time you hadn't had a discussion regarding

7    the retainer with Mr. Gale?

8           A.     I don't really recall.  We talked

9    about it orally, about fee issues, but I don't

10   really recall.

11          Q.     Was that in -- with respect to any

12   specific retainer amount, previously?

13          MS. McTAVISH:  Is that previously

14   to this e-mail?

15   BY MR. PUTH:

16          Q.     Previously to this e-mail?

17          A.     I mean, yes.  I began getting

18   involved sometime in July.  I'm not really sure

19   on the date, but July.

20          It has been ongoing for a couple

21   months, and then during the process he and we

22   briefly talked about fees.  And basically he

177

1      A.    Yeah.   You're talking about

2   3465 C?

3      Q.    Yes.   And D.

4      A.    And -- okay.   Yes, I read it.

5      Q.    And what did you understand

6   Mr. Gale's response to your suggestion of a

7   monthly retainer?

8      A.    Basically, he asked me to come up

9   with a number.

10      Q.    Okay.   And you did that in your

11   reply e-mail to him?

12      A.    Yes.   I believe I mentioned

13   $50,000.

14      Q.    And, in fact, later on that same

15   day you suggested a $50,000 retainer agreement

16   beginning September?

17      A.    I don't know when, but I -- yes, I

18   proposed a $50,000 retainer.

19      Q.    Okay.   And what work did you

20   envision to be doing for Mr. Gale on that

21   $50,000 retainer?   What type of work?

22      A.    Basically it would involve a

178

```
 1    really massive project called Songdo City
 2    Project.  So I assume they are building hotels,
 3    schools, infrastructure, bridges.  And in that
 4    connection they had to deal with the Korean
 5    government and also they had to deal with their
 6    partners in Korea and future investors.  So in
 7    that regard they wanted someone to help
 8    Mr. Gale.
 9             Q.    Okay.
10             A.    And so that's one thing.  And the
11    other, Stan Gale wanted some sort of massive
12    project in the West side of Manhattan, and he
13    thought that either REDACTED or REDACTED might be
14    suitable, I guess partner for Stan Gale.  And I
15    knew both the president of        REDACTED
16    and    REDACTED            so in that regard he
17    asked whether I can set up these meetings.  So
18    another second really type of work would be for
19    me to help them launch the Manhattan project.
20             Q.    And that would be to serve as a
21    point of contact and provide introductions to
22    the relationships that you enjoy with
```

179

1   individuals from REDACTED and   REDACTED

2          A.    Not only that.  He said that any

3   legal work that would be required, he said he

4   would turn to Akin Gump.  So we were talking

5   about a major project.

6          Q.    Okay.

7          A.    Besides the retainer.

8          Q.    Okay.

9          A.    So there would be the retainer,

10  and that was for my advice.  And then once these

11  take off then it requires a lot of legal work,

12  and he said he would turn to us.

13         Q.    All right.  And let's look at

14  Mr. Gale's reply to you on the second page of

15  Exhibit 64?

16         A.    Yes.

17         Q.    And what was your understanding of

18  Mr. Gale's reply to your suggestion of the

19  $50,000 retainer?

20         A.    On this one, basically he had a

21  change of heart with respect to Jaemin Park.

22                MS. McTAVISH:  I'm sorry.  I'm

Case 1:07-cv-00399-EGS    Document 23-3    Filed 12/11/2007    Page 20 of 34
DEPOSITION OF SUSAN KANE, VOLUME 1
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

187

```
 1   the day before.  That's why I can't recollect,

 2   but we spoke a lot, and that would be a good

 3   guess, but I shouldn't be guessing.  That's

 4   right.

 5           Q.    Okay.  Now, in Mr. Gale's message

 6   to you of September 24th, he states, "please

 7   forward the necessary invoice for your $50,000

 8   retainer, as discussed"?

 9           A.    Right.

10           Q.    Do you know whether an invoice was

11   submitted to him?

12           A.    I don't recall.  I mean I can

13   guess, but I don't recall.

14           Q.    Well, do you believe that it's

15   likely that a $50,000 retainer agreement was

16   submitted to Mr. Gale following his e-mail

17   inviting you to do so?

18           MS. McTAVISH:  I'm going to object

19   to that question as speculative.  You shouldn't

20   guess, but if you know an answer you should

21   answer.

22   BY MR. PUTH:
```

188

1          Q.    I'm not asking you to guess.  I'm

2   asking you whether it is more likely than not?

3          A.    More likely than not?

4          MS. McTAVISH:  Again, I have the

5   same objection, but you can answer if you know.

6          THE WITNESS:  Okay.  Then,

7   probably not.

8   BY MR. PUTH:

9          Q.    Probably not?

10         A.    Not.  Right.

11         Q.    Why not?

12         MS. McTAVISH:  Again, I'm going to

13   object as speculation.  He hasn't answered that

14   it didn't happen.  He said that if you're asking

15   him to guess --

16         MR. PUTH:  I'm not asking him to

17   guess.

18         MS. McTAVISH:  -- whether it was

19   likely or not likely.

20         MR. PUTH:  Okay.  I'm going to ask

21   you to please state your objection succinctly,

22   without explanation, so you don't run afoul of

189

1    Rule 30(D)(1) of the Rules of Civil Procedure.

2    And we can just get the testimony out.  Your

3    objections will be preserved for the record.

4              THE WITNESS:  We spoke a lot and I

5    only read a few e-mails here.  During our

6    conversation I was clearly under the impression

7    that it was not worth going forward, because I

8    sensed that there is a change of heart, okay.

9    And now in view of hindsight, now that I'm aware

10   of what Don Gross did in terms of contacting

11   those people, at that time I had no idea.

12             So at that time I felt that maybe

13   he did some due diligence and had some concerns

14   about us or about me or Jaemin, but I had no

15   idea at the time, but I knew that he had a

16   change of heart.  And, therefore, after this

17   I -- if we didn't send it, that means that I

18   believed that it would not really be worth going

19   forward, so that's my recollection.

20   BY MR. PUTH:

21             Q.   Okay.  You don't have any

22   knowledge of Don Gross contacting Stan Gale?

190

1      A.    I learned it afterwards, during

2  this whole case.

3      Q.    Right, but you didn't learn of him

4  contacting Stan Gale; did you?

5      A.    I don't recall.  I don't think so.

6      Q.    Okay.

7      A.    He may have told me, but I don't

8  remember that.

9      Q.    All right.  And as far as you know

10  the Gale Company did engage Akin Gump for work

11  on New Songdo City; is that correct?

12      A.    Yes and no.

13      Q.    What do you mean by that?

14      A.    Basically, they didn't engage me,

15  **REDACTED**

16      Q.    Right.

17      A.    But they turned to Tom Hubbard.

18      Q.    Okay.

19      A.    Originally they were talking to

20  me, only me, and they had Jaemin Park in mind,

21  but after that something happened and then Gale

22  decided to turn to Tom Hubbard --

191

1      Q.    Okay.

2      A.    -- for his advice.  So, yes, it

3   was Akin Gump on retainer, but they really

4   didn't hire me, they hired Tom Hubbard.

5      Q.    Right.

6      A.    That's why I said, yes and no.

7      Q.    Okay.  And did you have a

8   discussion with Tom Hubbard at one point

9   suggesting that you split the work for Gale?

10      A.    No, no.  I would not do that.  I

11   mean, Gale had a change of heart and he really

12   told me from July that he will really pay us,

13   handsomely.  And we set up the meeting with

14   Korea's President and the Deputy Prime Minister,

15   top level people.  And then he had a change of

16   heart and he wanted to cut the retainer so low,

17   basically to say no.  So I didn't want to deal

18   with such a person.  So I let Tom Hubbard run it

19   and I didn't get involved at all.

20      Q.    All right.  You didn't ask Tom

21   Hubbard to give some of the work to you?

22      A.    Oh, no.  But if Tom were to call,

DEPOSITION OF SUKHAN KIM, VOLUME II
CONDUCTED ON TUESDAY, OCTOBER 16, 2007

192

1    turn to me for my advice, then because he is my

2    colleague, of course, I will do what I can to

3    help Tom, but I did want to deal with Stan Gale

4    directly, anymore.

5          Q.    And just to be clear, you didn't

6    ask Tom Hubbard to split credit for the retainer

7    between you and Tom Hubbard?

8          A.    No.  I mean, they were turning to

9    Tom, exclusively, not me, so I couldn't claim

10   any credit.

11         Q.    Okay.  And you did not; is that

12   what your testimony is?

13         A.    Of course not.  Yes, I did not.

14   Of course, it was a minor project, so there is

15   no reason to claim.  It was about $25,000 a

16   month or $30,000.  For Akin Gump that is not a

17   big retainer.

18         Q.    Okay.  Let me hand you Exhibit 52.

19               You can hand back Exhibit 64.

20         A.    Yes.

21         Q.    All right.  You don't need to go

22   over your prior testimony with respect to

C

**Capital Reporting Company**

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

2

    ----------------------------------:
3   DONALD G. GROSS,                   :
                                       :
4              Plaintiff,              :
                                       :
5          vs.                         : Case No.:
                                       : 1:07CV00399
6   AKIN GUMP STRAUSS HAUER & FELD,    : (ES)
    L.L.P.,                            :
7                                      :
               Defendant.              :
8   ----------------------------------:

9                           Washington, D.C.

10                      Thursday, July 12, 2007

11  Deposition of:

12                  DONALD GROSS

13  called for oral examination by counsel for

14  Defendant, pursuant to notice, at Pillsbury

15  Winthrop Shaw Pittman, L.L.P., 2300 N Street,

16  Northwest, Washington, D.C., before Shari R.

17  Broussard, of Capital Reporting Company, a Notary

18  Public in and for the District of Columbia,

19  beginning at 10:02 a.m., when were present on behalf

20  of the respective parties:

21

22

## Capital Reporting Company

Page 238

1    A    I would say that the work that new -- new
2    and young associates who are assigned has that
3    character. I don't -- I don't quite understand
4    beyond that. But, you know -- at -- at the extreme
5    I'm speaking.
6    Q    Did he actually say to you that he
7    thought you would do well in a leadership position
8    where you would have lots of people working for
9    you?
10    A    Yeah, I distinctly remember him saying
11    that.
12    Q    Now, the next point of your notes talks
13    about "Thought I'd have to find the right niche
14    either outside of the firm," and then some
15    examples, "or within the firm"?
16    A    That's right.
17    Q    What did he say to you on July 13th about
18    your future at Akin Gump?
19    A    Everything that he said to me is
20    reflected in these notes. He said that because of
21    the fact that they're not utilizing my talents and
22    capabilities well, I -- and because I was doing

Page 239

1    associate level work at my age, that I needed to --
2    either to move outside the firm or to find another
3    niche within the firm, that the status quo -- that
4    that's -- that is what he said.
5    Q    And did he say that he would try to use
6    you one-third of the time if you found another
7    position within the firm?
8    A    Yes, he said that.
9    Q    And it says "Emphasize the age issue. SK
10    is 55 and I am 52."
11    A    Uh-huh.
12    Q    Did he talk about your specific age at
13    this meeting?
14    A    Yes, I remember he asked me how old I was
15    and then he -- he talked about the closeness in age
16    between me and him and, as reflected here, my age
17    in relation to Mike Quigley.
18    Q    Did he say you were 52 because you
19    weren't 52?
20    A    I -- I wrote down these notes from memory
21    after I -- after I had the meeting.
22    Q    How long after the meeting?

Page 240

1    A    Probably just right afterwards or within
2    a couple of hours.
3    Q    So you didn't know how old you were that
4    day?
5    A    I would have reflected what he said.
6    Obviously he -- he must have made a mistake because
7    I was 51 and I told him that I was 51.
8    Q    At that meeting?
9    A    Yeah. I mean he -- in response to his
10    question about how old I was.
11    Q    Did you know whether he was 55 that day?
12    A    I'm writing down -- I -- I don't know --
13    I only wrote down what he said. I assume that he
14    was telling me the truth.
15    Q    Okay. Well, you knew he was wrong about
16    your age?
17    A    At the time I -- I -- in the situation I
18    was in I came back to my office, wrote down what he
19    said, I just wrote down what he said of course, and
20    I -- you know, that's what he said.
21    Q    And then you said "I would think about
22    what he had to say and come back with a proposal on

Page 241

1    staying within the firm"?
2    A    Right.
3    Q    "And also a proposal on getting a
4    position outside of the firm"?
5    A    Right.
6    Q    So as of July 13th, what did you believe
7    your prospects were for staying at Akin Gump?
8    A    Actually I -- I -- I wasn't sure. I
9    adopted consciously a two-track strategy trying --
10    my first priority was staying at Akin Gump and I
11    decided to try my damndest to stay at Akin Gump and
12    find a section where I could work with. Failing
13    that, I decided I -- I had to consider where else I
14    would work outside of the firm.
15    Q    And as of that meeting, what did you
16    understand Mr. Kim's position to be about you
17    staying at Akin Gump?
18    A    My understanding was that he was leaving
19    either option open at that point.
20    Q    Okay. Did he offer to assist you in any
21    way in finding other positions at the firm?
22    A    Yeah, he -- he -- as I say here in the

61 (Pages 238 to 241)

# Capital Reporting Company

Page 242

1 notes, he offered to talk with Dan Spiegel about
2 the Public Law and Policy section. That's --
3 that's the only -- in this meeting I think that was
4 the only think he offered to help -- be helpful on.
5     Q   So did you form an impression as of July
6 13th whether Mr. Kim wanted you to leave the firm?
7     A   I formed an impression that he wanted me
8 to, for the most part, leave the Korea practice,
9 that he was happy to have me stay at the firm if I
10 could find a niche, the word he used, and that he
11 could -- he was happy to keep me working with him
12 about one-third of my time, so the -- that's --
13 that's what I understood.
14     Q   And that he would offer to talk to the
15 Public Law and Policy Group --
16     A   Right.
17     Q   -- if you wanted him to?
18     A   Right, to Mr. Spiegel, who was in it,
19 yeah.
20     Q   Did you tell anybody at the firm about
21 your conversation with Mr. Kim that took place on
22 July 13th, 2004?

Page 243

1     A   I had conversations with both Dan Spiegel
2 and with Mike Quigley about it.
3     Q   When did you speak to Mr. Spiegel?
4     A   Sometime, you know, shortly after this
5 meeting. Sometime in, you know, mid July I
6 suppose.
7     Q   Did you tell Mr. Spiegel about the
8 comments that you've attributed to Mr. Kim related
9 to age?
10     A   I did not specifically refer to the
11 comments about age, no.
12     Q   Did you generally refer to comments about
13 age?
14     A   No, I didn't.
15     Q   A few days later you met with Mike
16 Quigley; isn't that right?
17     A   That's right.
18     Q   And you have notes of that, July 16th,
19 2004?
20     A   Right.
21     Q   And when did you prepare these notes?
22     A   Shortly after my meeting with Mike.

Page 244

1     Q   When you say "shortly after," the same
2 day?
3     A   Most likely the -- yes, it would have
4 most likely been the same day. As I sit here, I
5 don't remember precisely, but my practice was
6 always to go back and write up notes if I thought
7 they were important.
8     Q   And Mr. Quigley's comments to you are, as
9 close as you can remember, as of the 16th of July
10 written in this note?
11         Maybe that wasn't very artfully stated.
12 Are these the words Mr. Quigley used to the best of
13 your memory?
14     A   Yes.
15     Q   And certainly it was the best of your
16 memory on July 16th, 2004?
17     A   Yes.
18     Q   And it says, "Mr. Quigley would like to
19 make it work at the law firm" --
20     A   Right.
21     Q   -- "but doesn't know if that's possible"?
22     A   That's right.

Page 245

1     Q   On the third line it said, "He agrees
2 completely with SK's critique that I am too old to
3 be doing junior level work."
4     A   Uh-huh.
5     Q   Now, I'm just trying to understand. Did
6 he say to you "I agree completely with Sukhan Kim's
7 critique that you're too old to be doing junior
8 level work" or did he use some other words that
9 made you believe that he agreed completely?
10     A   Actually neither of the two per se. I
11 began the meeting, as I recall, recounting what
12 Sukhan Kim told me, and he told me that he
13 agreed with Sukhan's decision and specifically
14 mentioned my age as the fact -- the disparity
15 between my age and the work that I was doing, which
16 he thought was junior level work.
17     Q   And did you understand what he meant by
18 junior level work?
19     A   I guess it's similar to the other point I
20 made. I -- I -- the meaning that I attached to it
21 at the time was that the work that I had been doing
22 for the Korea Practice Group, in his mind he was

62 (Pages 242 to 245)

From: Gross, Donald
Sent: 8/26/2004 10:14:42 AM (Eastern Time)
To:
Subject: RE: Private Equity Highlights

I'm very interested in discussing further the opportunity to work with you to
build          It would be fine to get together on Friday, September 3, in New
York.  Maybe Su, I and our daughter, Lisa, can join you, Yunie and your
daughter for lunch.  Then we can talk afterwards by ourselves about          If
this works for you, please let me know the approximate area where you'll be in
New York and I'll go ahead and make a reservation.  Thanks,

All the best,

Don

-----Original Message-----
From:
Sent: Wednesday, August 25, 2004 1:09 PM
To: Gross, Donald
Subject: RE: Private Equity Highlights

Excellent thoughts Don.  Great detail and
intelligence.

I'll use it very carefully.

As for your thoughts on          Don, we're all
entrepreneurs on this one.  I have a real "come one
come all and help build it attitude" about it all.
While I take care of          housing at this time, he
time is his investment.  I'd love to build a core of
extremely intelligent, deep Korea experience partners
with a common reference point and philosophy.  The
Australia partner, the Hong Kong partner all come to
the table on the belief we can build something
extraordinary.  I fund the entire thing out of pocket
for now but hope things will soon be going into orbit.

I've put a group of extraordinary people together by
selling a vision of doing something way beyond what
anyone of us can do on our own (which would be, in
itself, impressive by most measures) through
channeling our energies.

That's what          is all about.  I'm not interested in
folks who aren't willing to jump from the high tower
that need to measure the distanc down.

I'm in the US through the 3rd, in fact, I'll be in NY
on the 3rd so perhaps we might get together.

GROSS 25

7/12/07  BB

PENGAD 800-631-6989

Best,

[redacted]

--- "Gross, Donald" <dgross@akingump.com> wrote:

> [redacted]
>
> I had a couple of further thoughts on this, that I
> want to tell you in
> confidence.  The little I know is that Sukhan Kim
> met [redacted] for the
> first time in late July at a lunch in honor of
> [redacted] in New York.  I
> heard that Stan later requested a meeting with
> Sukhan for the purpose of
> discussing [redacted].  Sukhan said he thought [redacted]
> might explore retaining
> Akin Gump to help make a deal with [redacted]
>
> This didn't make sense to me at the time, and still
> doesn't, because
> Sukhan is so close to [redacted] and a couple of other
> Korean business
> groups that [redacted] could not possibly trust him to
> serve as an "honest
> broker."  Sukhan has never represented an American
> company doing
> business in Korea, so far as I know, and is a highly-specialized trade
> lawyer whose practice consists of representing
> Korean companies in the
> United States.  Moreover, Sukhan plans to retire
> soon so I can't imagine
> he wants to spend his own time helping the [redacted]
> Company.
>
> I didn't know Jaemin was involved in this, until you mentioned she had
> a meeting with [redacted] in Seoul.  Her help is even more
> questionable since
> she is a bankruptcy lawyer whose practice consists
> of representing
> Korean companies on corporate restructuring issues.
> She claims to have
> Blue House connections, but except for knowing
> Hun-jai Lee through her
> family,
> she exaggerates her influence.
>
> If [redacted] wants to get in touch with some Korean
> business groups, there
> are other ways to do it.
>
> I hope you are enjoying your visit so far, though I
> imagine things are
> hectic.  Talk to you soon,
>

CONFIDENTIAL                                    AK002428

```
> Best,
>
> Don
>  -----Original Message-----
>  From: [                                                    ]
>  Sent: Tuesday, August 24, 2004 2:54 AM
>  To: Gross, Donald
>  Subject: RE: Private Equity Highlights
>
>
>  Don;
>
>  Can I be a bit frank with you regarding this sudden
> interest by
> Akin Gump in [    ><    ]    Basically, in my humble
> opinion, a key principal
> in the project, its Managing Partner, Managing
> Director and Chief
> Investment Officer, along with senior executive on
> the ground, was
> basically dumped and dismissed by Akin Gump on
> earlier issue - as you
> are aware.
>
>  I personally think that certain members of AK who
> know the
> history have been amazingly callous and, almost
> admirably, unabashed to
> not only ignore me on this approach to [    ><    ] which
> I will have a major
> influence on any outsourcing decisions, but to
> expect me to completely
> forget that shoddy treatment I was given.
>
>  Amazing how one can be totally irrelevant on one
> platform and so
> very interesting on another.
>
>  Trouble is Don, I don't thing that way.
>
>  FYI
>
>  [    ><    ]
>
>  -----Original Message-----
>  From: Gross, Donald [mailto:dgross@akingump.com]
>  Sent: Saturday, August 21, 2004 4:44 AM
>  To: [                                              ]
>  Subject: Private Equity Highlights
>
>  FYI.  Hope you have a good weekend, and [    ><    ] a
> smooth trip
> back to the U.S.  I'm looking forward to seeing you.
>
>  Best,
```

CONFIDENTIAL    AK002129

```
>
>  Don
>  The information contained in this e-mail message is
>  intended
>  only for the personal and confidential use of the
>  recipient(s) named
>  above. This message may be an attorney-client
>  communication and/or work
>  product and as such is privileged and confidential.
>  If the reader of
>  this message is not the intended recipient or an
>  agent responsible for
>  delivering it to the intended recipient, you are
>  hereby notified that
>  you have received this document in error and that
>  any review,
>  dissemination, distribution, or copying of this
>  message is strictly
>  prohibited. If you have received this communication
>  in error, please
>  notify us immediately by e-mail, and delete the
>  original message.
>
>
>
>  The information contained in this e-mail message is
>  intended only for the personal and confidential use
>  of the recipient(s) named above. This message may be
>  an attorney-client communication and/or work product
>  and as such is privileged and confidential. If the
>  reader of this message is not the intended recipient
>  or an agent responsible for delivering it to the
>  intended recipient, you are hereby notified that you
>  have received this document in error and that any
>  review, dissemination, distribution, or copying of
>  this message is strictly prohibited. If you have
>  received this communication in error, please notify
>  us immediately by e-mail, and delete the original
>  message.
>
>
```

From: Gross, Donald
Sent: 10/26/2004 5:55:04 PM (Eastern Time)
To: 'sgale@thegalecompany.com'
Attachments: Cover Letter - The Gale Company.doc, Resume of Donald G. Gross
10-22-04.doc
Subject: To Stan Gale

Dear Mr. Gale,

I hope everything is going very well with you.  You may remember that my good
friend, Pietro Doran, introduced us in August 2002 when I attended a
presentation for the New Songdo City project in Incheon.  At the time, I was
serving as an international advisor to the leading Korean law firm.  I returned
to the U.S. not long after that and joined the law firm of Akin Gump Strauss
Hauer & Feld in Washington, where I have managed the Korea practice group.

I am now very interested in joining a U.S. real estate development, engineering
or infrastructure company as international counsel and have an especially
strong interest in your outstanding firm.  I believe I would make a strong
contribution to advancing The Gale Company's international business strategy.
I am attaching a cover letter and resume for your reference and would
appreciate the opportunity to discuss with you the possibility of joining The
Gale Company as international counsel.

Thanks very much for your consideration of this matter.  Many thanks and all
best wishes,

Don Gross


Donald G. Gross
Senior Counsel
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Tel: 202-887-4435 direct
dgross@akingump.com



CONFIDENTIAL                                                  AK002376