# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **DONALD G. GROSS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-399 (EGS)** |
| | ) | |
| **AKIN GUMP STRAUSS HAUER & FELD LLP** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

-----------------------------------------------------------------------------

## PLAINTIFF DONALD G. GROSS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

-----------------------------------------------------------------------------

**WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.**

**Jonathan C. Puth, #439241**
**Kataryna L. Baldwin, #494439**
**1775 K St., N.W.**
**Suite 600**
**Washington, DC 20006**
**Tel: (202) 659-8510**
**Fax: (202) 659-4082**

**Counsel for Plaintiff Gross**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

THE SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    THE RECORD CONTAINS ABUNDANT EVIDENCE
      TO PROVE AGE DISCRIMINATION. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    Direct Evidence Is Sufficient To Take This Case To a Jury... . . . . . . . . . . . . 11

      B.    Defendant Offers Pretextual Reasons For the Termination. . . . . . . . . . . . . 16

            1.    Plaintiff Gross Makes Out a *Prima Facie* Case of Discrimination... . 16

            2.    Defendant's Non-Discriminatory Reasons For the Termination
                  Are Pretexts For Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                  a.    Akin Gump Changed Its Reasons For the Termination.. . . . . . 20

                  b.    Defendant's Assertion that McLean Alone Made the
                        Decision To Terminate Plaintiff Is Evidence of Pretext.. . . . . 23

                  c.    Overt Discriminatory Comments Show Pretext... . . . . . . . . . . 27

      C.    Akin Gump Is Not Entitled To Any Inference Against Age
            Discrimination at This Stage.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

II.   PLAINTIFF CAN PROVE RETALIATION BEFORE A JURY.. . . . . . . . . . . . . . 31

      A.    Defendant's Filing of Counterclaims Constitutes an Adverse Action.. . . . . . 32

      B.    A Jury Could Find Defendant's Counterclaims Causally
            Related To Plaintiff's Complaint and Defendant's
            Reasons For the Counterclaims Pretextual.. . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**Cases**                                                                                          **page**

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) . . . . . . . . . . . . . . . 7, 21, 27, 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28

*Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 35

*Beltran v. Brentwook N. Healthcare Ctr LLC.,* 426 F. Supp.2d 827 (N.D. Ill. 2006) . . . . . . . . 34

*Burlington Northern & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405 (2006). *passim*

*Cook v. Babbitt,* 819 F.Supp. 1 (D.D.C. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Danzer v. Norden Systems, Inc.*, 151 F3d 50 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Domiguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . 22

*Dunaway v. International Broth. of Teamsters*, 310 F.3d 758 (D.C.Cir. 2002) . . . . . . . . 7, 18, 28

*E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . 21, 22, 23

*Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627 (7th Cir. 1996) . . . . . . . . . . . . 22, 28

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fisher v. Pharmacia & Upjohn*, 225 F.3d 915 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Futrell v. J. I. Case*, 38 F.3d 342 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16, 17

*Gregory v. Daly*, 243 F.3d 687 (2nd Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gustave-Schmidt v. Chao*, 360 F.Supp.2d 105 (D.D.C. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hall v. Giant Food, Inc.*, 175 F.3d 1074 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hunt v. Cromartie*, 526 U.S. 541 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*International Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). . . . . . . . . . . . . . . . . . . . 17

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 29

*Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . 31

*Lucas v. Paige*, 435 F. Supp. 2d 165 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . 7

*Mazloum v. District of Columbia Metropolitan Police Dept.*, No. 06-0002
(JDB), 2007 WL 3257010 (D.D.C., November 5, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 17, 20

*McQueeny v. Wilmington Trust Co.*, 779 F.2d 916 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 27

*Nesselrotte v. Allegheny Entergy, Inc.*, No. 06-01390, 2007 WL 3147038
(W.D. Pa. Oct. 25, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*PNC Financial Services Group, Inc. v. Commissioner of Internal Revenue Service*,
503 F.3d 119 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Oncale v. Sundowner*, 523 U.S. 75 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*\*Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Saunders v. George Washington University*, 768 F.Supp. 854 (D.D.C. 1991). . . . . . . . . . . . . . . 17

*Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Stampfel v. City of New York*, 2005 WL 3543696 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . 29

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). . . . . . . . . . . . . . . . . . 15, 17

*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir. 1996).. . . . . . . . . . . . . . . . . . . . 22

*Timmerman v. U.S. Bank, N.A.*, 2006 WL 894894 (D. Colo. March 31, 2006),
*aff'd on other grounds*,  483 F.3d 1106 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) . . . . . . . . . . . . . 17

*Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vickers v. Powell*, 493 F.3d 186 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ware v. Howard Univ.*, 816 F.Supp. 737 (D.D.C. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 18, 19

**Statutes**

29 U.S.C. § 621. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

D.C. Code § 2-1401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Rules**

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**UNITED STATES  DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
DONALD G. GROSS                               )
                                              )
                    Plaintiff,                )
                                              )
          v.                                  )          Civil Action No. 07-399 (EGS)
                                              )
AKIN GUMP STRAUSS HAUER & FELD LLP            )
                                              )
                    Defendant.                )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Akin Gump has sought summary judgment on Plaintiff Donald G. Gross' claims of

age discrimination under the Age Discrimination in Employment Act and the District of Columbia

Human Rights Act for the termination of his employment.  However, because Mr. Gross has provided

sworn testimony that Akin Gump told him he was being terminated because he was "too old," summary

judgment must be denied.  Moreover, Akin Gump has offered a variety of alternative explanations for

its actions, but the Defendant's explanations are not consistent with what it told Mr. Gross at the time,

nor with the justifications provided to the Equal Employment Opportunity Commission ("EEOC") in

the firm's official position statement.  Therefore, summary judgment must be denied for these reasons

as well.

In addition, Akin Gump seeks summary judgment on Plaintiff's retaliation claims.  In an obvious

litigation ploy and in an unprecedented manner, Akin Gump sued Mr. Gross for breach of fiduciary duty,

among other things, after Mr. Gross filed his age discrimination complaint.  Because this employer

action is just the type of conduct that might dissuade any reasonable employee to forego prosecution of

his civil rights, Akin Gump's conduct constitutes actionable retaliation under the Supreme Court's most

recent pronouncement regarding retaliation claims. Thus, summary judgment must be denied on this count as well.

## STATEMENT OF FACTS

On July 13, 2004, Sukhan Kim told Donald Gross that he was being let go from his job with the Korea Practices Group at Akin Gump because he was "too old." (Ex. 1, Deposition of Donald G. Gross at 238-39; Verified Complaint at ¶20.) Akin Gump partners Sukhan Kim, Michael Quigley, and Bruce McLean all participated in the termination decision and fired Mr. Gross. (Ex. 6, Defendant's Response to the Equal Employment Opportunity Commission, August 11, 2005, at 2, 10, 11; Ex. 5, Deposition of Michael Quigley at 27.) Kim's discomfort with Mr. Gross' age was a recurring theme: Kim said he was concerned about Mr. Gross' age at their very first meeting and interview in 2003; Kim's concerns grew and became even more apparent following Mr. Gross' hospitalization for heart surgery in March 2004; and Kim reiterated once again at their final meeting before Mr. Gross' departure from the firm that he was fired because of his age. (*See* Ex. 1, Gross Dep. at 182, 185-88, 191-92, 194-95; Verified Complaint at ¶¶10, 18, 20, 22, 23, 29.) Kim's partner Michael Quigley and Counsel David Park verified that the motivation was Mr. Gross' age. (*See* Ex. 1, Gross Dep. at 185-88, 191-92; 244-45; Verified Complaint at ¶¶13, 14, 22, 23.) Indeed, his superiors gave Mr. Gross no other reason for the termination but his age and told him that his job performance had been very good. (Verified Complaint at ¶21, 22, 29, 30.)

Mr. Gross first interviewed with Kim for a Senior Counsel job in June 2003, along with Michael Quigley, another partner in the Korea Practice Group. (Ex. 1, Gross Dep. at 64-65; Ex. 5, Quigley Dep. at 20, 27-8.) Kim was impressed with Mr. Gross' experience at the White House and State Department, and his work at a prestigious law firm in Korea, and Kim was particularly impressed that Mr. Gross

spoke Korean, which is "very rare." (Ex. 2, Deposition of Sukhan Kim at 22-23, 26.)

During the interview, however, Kim told Mr. Gross that he was "concerned about [his] age" and that Mr. Gross seemed "very old to be starting out in a major law firm." (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10.) Ultimately, however, Kim recommended that Mr. Gross be hired, but reservations regarding the hire were reflected in a clause in Mr. Gross' June 20, 2003 offer letter that indicated an intention to review his employment after a year. (Ex. 2, Kim Dep. at 21; Ex. 7, Akin Gump's Offer Letter to Donald G. Gross, June 20, 2003.)[1]

After hiring partner Dennis Race approved the hire, Plaintiff started at Akin Gump as Senior Counsel on July 7, 2003. (Ex. 7; Ex. 5, Quigley Dep. at 74; Ex. 1, Gross Dep. at 26.) Mr. Gross was hired to manage and add structure to the firm's Korea Practice Group, which until then had been "considered an extremely informal group," and to work on a special project for a major client. (Ex. 6 at 1-2, 4; Ex. 1, Gross Dep. at 124-26; Ex. 5, Quigley Dep. at 30-32.)

Mr. Gross had worked hard for Akin Gump and generated a great deal of good will with the firm. (Ex. 1, Gross Dep. at 124, 285; *see also* Ex. 5, Quigley Dep. at 211.) He received regular praise from Mr. Kim, Mr. Quigley, and others, some of which was captured in writing:

- "[Y]ou are adding a critical new dimension to our Korea practice. I am particularly appreciative of your work as much of what you do is beyond my capacity . . ." (Ex. 9, 12/24/03 email from M. Quigley to D. Gross at AK000936).

- "I just read the memos to [] re inter adv. Board. They are just excellent!! And you covered everything so superbly." (Ex. 10, 2/19/04 email from S. Kim to D. Gross at AK001417);

---

[1] Notably, Akin Gump included a similar clause in its offer to Thomas Hubbard, who was 61 when he was hired to the Korea Practice Group. (Ex. 2, Kim Dep. at 72-73; Ex. 8, 10/13/04 email from M. Quigley to B. McLean and D. Race.) Mr. Hubbard, a former ambassador to Korea, was not a lawyer and was not hired as replacement for Mr. Gross. (Ex. 2, Kim Dep. at 99.)

- "I read the proposals . . . . Both are excellent. It reads nicely and also thoughtfully discusses the issues of interest to the clients." (Ex. 11, 1/20/04 email from S. Kim to D. Gross at AK001004);

- "Mike Quigley speaks of you highly." (Ex. 12, 10/7/03 email from M. Emery to D. Gross at AK000417);

- "Don, your presentation at the Partners luncheon meeting today regarding the Korean Practice was well done and well received." (Ex. 13, 11/18/03 email from M. Emery to D. Gross at AK00749);

- "You are doing a great job on the kpg [Korea Practice Group]" (Ex. 14, 11/1/03 email from R. Burdick to D. Gross at AK000568).

In March 2004, Plaintiff underwent heart surgery, requiring a lengthy hospital stay and two days in intensive care. (Ex. 1, Gross Dep. at 144-46; Attachment A, Affidavit of Donald G. Gross at ¶3; *see also* Ex. 15, 3/25/04 email from C. Pineda at AK003073.) Mr. Gross had first informed Kim and Quigley of his need for surgery earlier that month. (Ex. 16, 3/4/04 email from D. Gross to S. Kim and M. Quigley at AK001563; Gross Aff at ¶3.)

After the surgery, however, Kim's demeanor and level of interaction with Mr. Gross changed "radical[ly]." (Ex. 1, Gross Dep. at 182, 185.) Before that time, Mr. Gross had met regularly with Kim at least once a week and enjoyed regular contact by telephone and e-mail. (*Id*. at 143-144.) After the surgery, however, Kim avoided meeting with Plaintiff or contacting him by telephone and e-mail, as he had done during Mr. Gross' previous nine months with the firm. (*Id*. at 182, 185.) Rather than communicate directly with Mr. Gross about projects that Mr. Gross had been directing, Kim began providing direction through David Park, a significantly younger attorney in the Korea Practice Group. (*Id*. at 179-80; Verified Complaint at ¶12.)

After Mr. Gross brought his concerns to David Park, Park explained that Korean employers like Kim prefer a clear superior-subordinate relationship, and that Kim felt that Plaintiff was too old in

-4-

relation to Kim to work in a position subordinate to him and Mr. Quigley.  (Ex. 1, Gross Dep. at 181-82,

185-88, 191-92.)[2]  Park said that Mr. Gross' age was a "big problem" for Kim and that Plaintiff's recent

heart surgery had deepened Kim's concerns about Plaintiff's age and created a question in Kim's mind

whether Mr. Gross could adequately perform his work.  (Ex. 1, Gross Dep. at 185-86.)  Park also said

that Kim had directed him to take charge of the projects previously headed up by Mr. Gross, including

a second phase of the special project memorandum that had been initially assigned to Mr. Gross, even

though Park was not a strong writer.  (Ex. 4, Deposition of J. David Park at 92; Ex. 1, Gross Dep. at 168-

69, 176, 186-87.)

When Kim by chance encountered Mr. Gross in the hallway, their very first meeting following

Plaintiff's surgery, Kim stated  "we're both getting older."  (Ex. 1, Gross Dep. at 165-66, 194.)  Kim

then asked Plaintiff when he expected to retire.  (*Id*. at 194-95.)  When Mr. Gross responded that he had

no plans to retire for at least another 15 years, Kim expressed surprise and told Mr. Gross that he (Kim)

hoped to retire soon.  (*Id.*; Verified Complaint at ¶18.)

In July 2004, Mr. Gross on his own initiative sought a meeting with Kim to obtain an annual

performance review.  (Ex. 1, Gross Dep. at 223-24, 226.)  At the July 13, 2004 meeting, however, Kim

informed Plaintiff that he was "very uncomfortable" with Mr. Gross' age, and that Mr. Gross was being

let go from the Korea Practice Group because he was "too old" for the kind of work he was doing.  (*Id*.

at 238-39; Verified Complaint at ¶20.)  Kim provided no reason for his decision aside from age.

---

[2] Akin Gump's Korea Practice Group operated in an environment where there was significant sensitivity to age and age differences, based on the importance attached to age in Korea's Confucian culture.  (Ex. 17, Plaintiff's Answers to Defendant's First Set of Interrogatories, June 12, 2007, at Answer to Interrogatory No. 9, p. 28.)  Indeed, when asked about cultural differences between the United States and Korea, Mr. Kim, a native of Korea, first mentioned age, as well as the more hierarchical nature of Korean society when compared to the U.S.  (Ex. 2, Kim Dep. at 14-16, 118-19.)

(Verified Complaint at ¶21.)  Kim suggested, however, that Mr. Gross could investigate other employment opportunities in the firm.  (Ex. 1, Gross Dep. at 241-42.)

A few days later, partner Michael Quigley said he agreed completely with Kim that Mr. Gross was "not a good fit" with the Korea Practice Group because he was "too old to be doing junior-level work."  (*Id.* at 244-45; Verified Complaint at ¶22.)  Quigley also said that both he and Kim viewed the quality of Mr. Gross' work as very good.  (Verified Complaint at ¶22.)  Quigley stated that Mr. Gross' age and experience made him "perfect" for a job as an in-house corporate counsel or other position, but reiterated that Mr. Gross was too old to be working for Mr. Kim, Mr. Park, and him in the Korea Practice Group.  (*Id.* at ¶23.)

Kim, Quigley, and Bruce McLean took part in the termination decision.  (Ex. 6 at 5, 10.)  During the last week of Mr. Gross' employment, Kim told Mr. Gross that he was being terminated, not because of any defects in his performance, but because he was "too senior" because of his age and, therefore, "not a good fit."  (Verified Complaint at ¶29.)  Kim also said that said he would have been able to pick up the phone and find Mr. Gross a position at another law firm if Mr. Gross were a fifth-year associate, but that this would not be possible in Mr. Gross' case because he was too old.  (*Id.* at ¶29.)

## THE SUMMARY JUDGMENT STANDARD

To establish a basis for summary judgment, the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Dunaway v. International Broth. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' ruling on a motion for summary judgment." *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255).

In discrimination cases, when an employee proffers evidence from which a jury can find that the employer's reasons were pretextual or "unworthy of credence," summary judgment is inappropriate and the claims should be decided instead by the jury. *George*, 407 F.3d at 413; *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1294 (D.C. Cir. 1998)(*en banc*). Whether a defendant's statements are worthy of credibility are genuine issues of material fact properly assigned to a jury. *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006). In ruling on a motion for summary judgment, a trial court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

## SUMMARY OF ARGUMENT

Plaintiff Donald Gross brings this action charging Defendant Akin Gump with discrimination and retaliation on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA") and the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et. seq*. ("DCHRA"). Those claims are grounded in Defendant's admissions that Plaintiff was terminated because of his age, and on evidence that Defendant has offered pretextual reasons for the firing. The retaliation claim concerns Defendant's unwarranted filing of counterclaims against Mr. Gross shortly after Plaintiff filed this lawsuit.

In its motion for summary judgment, Akin Gump has woven a story that it believes (with several inferences drawn in its favor) could win over a jury. The Plaintiff offers another side, which a jury could reasonably credit, and thus, a jury could rule for Plaintiff at trial. This case cannot be resolved on summary judgment.

First, Akin Gump told Mr. Gross he was being fired because he was "too old." He was told so a number of times by his two superiors who were both Akin Gump partners. Defendant currently claims both partners had nothing to do with the decision, but there is a factual dispute on that point. In any case, those statements are more than enough for a jury to rule in Plaintiff's favor, since if the jury credits that testimony, it can find Mr. Gross was fired from his job because he was "too old" as he was told. That is age discrimination at its essence.

Defendant also claims the termination decision was made by its Chairman alone based on a supposed concern with billable hours, but those facts are disputed as well. Prior to this lawsuit, Akin Gump made its case before the EEOC without ever mentioning billable hours or any independent decision by its Chairman. Neither fact was mentioned in its sworn interrogatory responses when it was

asked to set forth all reasons for the termination.  Those differences present another way that a jury could rule for Plaintiff, in that the jury could find that Akin Gump is now being untruthful about its reasons for firing Mr. Gross.

Under these circumstances, a jury could reasonably question why an employer would keep its supposed billable hours concern secret from its employee, particularly a large law firm whose billable hours are its lifeblood.  A jury could look askance at an employer who failed to mention its new reasons during an investigation by the United States government and again in sworn discovery.  That jury could reasonably conclude that Akin Gump is now making up those reasons to fit some available facts, and rule in Plaintiff's favor.  *See Reeves*, 530 U.S. at 147.

Defendant's Motion on Plaintiff's retaliation claim fares no better.  A jury could find that Defendant's counterclaims for money damages asserting professional wrongdoing by Plaintiff are the types of adverse action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," the standard for retaliation under the law.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2415 (2006).  A jury could also conclude there is a sharp nexus between the counterclaims and Plaintiff's complaint, particularly where in all its history Defendant has never before charged a single employee with breach of fiduciary duty or breach of prospective business advantage, as it does here, and it brought its claims against Mr. Gross in the context of this very lawsuit.

Summary judgment must be denied.

## ARGUMENT

### I.    THE RECORD CONTAINS ABUNDANT EVIDENCE OF AGE DISCRIMINATION.

Plaintiff Gross offers ample evidence of discrimination in this case, which is more than enough to raise an inference of discrimination and defeat summary judgment. Where an Akin Gump decisionmaker told Plaintiff that he was being terminated because he was "too old," a jury could on that basis alone reasonably return a verdict for Mr. Gross. As well, Plaintiff also offers ample indirect evidence to take this case to a jury. Summary judgment must be denied.

First, because his boss, Sukhan Kim, along with Michael Quigley told Mr. Gross he was being let go because of his age, a jury would have sufficient evidence to determine that the statements were true and render a verdict in Plaintiff's favor. Defendant contends that the statements cannot constitute direct evidence of discrimination and as "irrelevant" solely because, it misguidedly claims, Bruce McLean alone decided to terminate Plaintiff based on a his billable hours. (*See*, *e.g.*, Def. Mem. at 1, 2, 7, 12, 16, 17, 18.) Defendant's factual contentions, however, are disputed and in conflict with Defendant's earlier representations.

Contrary to its current claim, Defendant took the position before the EEOC that Sukhan Kim, Michael Quigley, and Bruce McLean all participated in the decision to terminate Mr. Gross. (Ex. 6 at 5, 10, 11.) Akin Gump also told the EEOC that Plaintiff was terminated for certain performance issues and never mentioned billable hours, which Defendant now claims was the very reason underlying McLean's "independent" basis for the firing. (*See id.*; Def. Mem. at 16.) Even more significantly, when asked in written discovery to set forth all reasons for the termination, Defendant claimed that it was due to Sukhan Kim's supposed dissatisfaction with Mr. Gross' writing and other reasons, but never cited any shortcomings in billable hours or any independent review by McLean. (Ex. 18, Defendant's Objections

and Responses to Plaintiff's First Set of Interrogatories, May 14, 2007, at Response to Interrogatory No. 1.) With Defendant's own admissions proving Kim and Quigley's role in Plaintiff's termination, the discriminatory statements are not "irrelevant," as Defendant urges, but instead are more than enough for a jury to find discrimination. (*See* Section I(B)(2), *infra*.)

In addition to this direct evidence, Defendant's reasons for the termination have evolved over time to attempt to evade liability, making this case particularly well-suited to analysis under the familiar *McDonnell-Douglas* burden shifting model. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Not only is there a factual dispute regarding the lynchpin of Defendant's Motion (a supposed "independent" decision by McLean based on billable hours), but Defendant's conflicting factual representations present ample evidence from which a jury could reasonably conclude that Akin Gump has concocted a ruse to mask a discriminatory firing decision. *Reeves*, 530 U.S. at 147.

### A.    Direct Evidence Is Sufficient To Take This Case To a Jury.

The direct evidence in this case alone can support a jury verdict in Plaintiff's favor. "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. . . . [including] any statement or written document showing a discriminatory motive on its face." *Mazloum v. District of Columbia Metropolitan Police Dept.*, No. 06-0002 (JDB), 2007 WL 3257010, *14 (D.D.C., November 5, 2007)(defendant's utterance of "Al-Qaeda" when beating plaintiff establishes unlawful racial motivation under D.C. Human Rights Act)(citation, internal quotes, and emphasis omitted). "The existence of [direct] evidence in itself defeats the motion for summary judgment and takes the case to the jury." *Lucas v. Paige*, 435 F. Supp. 2d 165, 169 (D.D.C. 2006)(citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985))(additional citations omitted).

-11-

In *Lucas*, Judge Facciola found that an overt reference to age (calling plaintiff "old timer" in the interview), even though capable of differing interpretations, could by itself "be deemed proof of discriminatory intent." *Lucas*, 435 F. Supp. 2d at 171.  The court noted further:

> Construing it as I must, in a light most favorable to plaintiff, the explicit reference to his age by a decision maker at the very moment of his interview for the position he sought easily meets the standard of sufficiency articulated in the cases involving references to the plaintiff's age, race, or protected behavior.

> *  *  *

> If the jury believes plaintiff's claims that Fairley made such a comment and that it was reflective of his intent to hire a younger individual for the position, then the jury might well conclude that defendant violated the ADEA.

*Id*. at 171-172.

As in *Lucas*, the record in this case reveals that decisionmakers Kim and Quigley each made explicit references to Plaintiff's age in the context of Mr. Gross' termination.  Indeed, age was offered by both witnesses as the very reason for the firing.  Any of the following comments, alone or in conjunction with one another, are enough to put this matter into the hands of a jury:

- On July 13, 2004, Kim told Plaintiff that he was "very uncomfortable" with Mr. Gross' age, and that he was letting him go from the Korea Practice Group because he was "too old" for the kind of work he was doing.  (Ex. 1, Gross Dep. at 238-39; Verified Complaint at ¶20.)

- A few days later, Michael Quigley said he agreed completely with Kim that Mr. Gross was "not a good fit" because he was "too old to be doing junior-level work."  (Ex. 1, Gross Dep. at 244-45; Verified Complaint at ¶22.)

- Quigley told Mr. Gross his age and experience made him "perfect" for a job as an in-house corporate counsel, but reiterated that Plaintiff was too old to be working for Mr. Kim, Mr. Park and him in the Korea Practice Group.  (Verified Complaint at ¶23.)

- During the last week of Mr. Gross' employment, Kim told Mr. Gross that he was being terminated, not because of any defects in his performance, but because he was "too senior" because of his age and, therefore, "not a good fit."  (*Id*. at ¶29.)

●     During that same meeting, Kim said that he would have been able to pick up the phone and find Mr. Gross a position at another law firm if Mr. Gross were a fifth-year associate, but that this would not be possible in Mr. Gross' case because he was too old. (*Id.* at ¶31.)

This is not a close case. "'Evidence which in and of itself suggests' that someone with managerial authority was 'animated by an illegal employment criterion'" provides direct evidence of discrimination sufficient to support a jury verdict. *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir. 1999)(statement to plaintiff at time of termination that "that she would be happier at home with her children" is direct evidence of pregnancy discrimination)(quoting *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997)). Here, the comments were all uttered by a decisionmaker, with managerial authority, in the context of the termination. Because age was asserted as the very rationale for the termination, it is safe to say that there is clear evidence the firing was "animated by an illegal employment criterion." *Sheehan*, 173 F.3d at 1039.

The only legal arguments advanced by Defendant concerning this evidence are grounded completely in its new claims that Akin Gump Chairman Bruce McLean alone made the decision to terminate Mr. Gross based on billable hours, without even consulting his partners Kim and Quigley prior to making the decision (*see* Def. Mem. at 8-12; *see also id.* at 1, 2, 7, 12, 16, 17, 18), but those are facts in dispute. Consequently, every one of the cases relied on in Section (IV)(A)(1) of Defendant's brief are inapposite, since they presume Mr. McLean alone made the decision without input from others (*see id.* at 8-12), facts that run contrary to Defendant's prior representations in this case.

In *Hall v. Giant Food, Inc.*, for instance, which Defendant claims controls this case, there were no facts to dispute that the plaintiff had been terminated by a single individual, unlike the record in this case. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079 (D.C. Cir. 1999). Moreover, and unlike here,

-13-

the plaintiff in *Hall* did not even dispute the defendant's stated reasons for the termination, and (unlike here), the single alleged discriminatory remark was made a full eight months after the termination, which "obscures any conceivable nexus" between the remark and the termination. *Id.* at 1080. Defendant's reliance on *Vickers v. Powell*, 493 F.3d 186 (D.C. Cir. 2007) is also unavailing. (*See* Def. Mem. at 8-9.) In that case and unlike here, the plaintiff offered no evidence that the person who exposed him to a hostile environment was in any way involved in the decision to terminate him, nor did the plaintiff offer evidence that showed that the decisionmaker's reasons for the termination were pretextual. *Vickers*, 493 F.3d at 195-96. This case is also nothing like *Gustave-Schmidt v. Chao*, 360 F.Supp.2d 105 (D.D.C. 2004), also relied upon by Defendant (*see* Def. Mem. at 12), where a higher official in the Department of Labor reviewed the plaintiff's work product and concluded that the employee plagiarized an article that was "100% identical" to another article, and plaintiff offered no evidence that the reason was pretextual. *Gustave-Schmidt*, 360 F.Supp.2d at 119.

Unlike all the cases relied upon by Defendant, there is abundant evidence in this record that Mr. McLean and his partners are not being truthful about the nature of his involvement in Defendant's termination decision. (*See* Section I(B)(2), *infra*.) In any event, where Defendant has admitted the participation of Kim and Quigley in Plaintiff's termination, and where there is significant other evidence of pretext, Defendant's reliance on several "sole decisionmaker" cases simply have no bearing on this case.

In addition to the statements above, the record contains the following evidence outside the immediate context of the termination, which, whether considered direct or indirect evidence, is sufficient to raise an inference of discrimination and defeat summary judgment:

● At his very first interview with Mr. Gross, Kim stated that he was "concerned about

-14-

[Plaintiff's] age" and that Mr. Gross seemed "very old to be starting out in a major law firm." (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10.)

●    Explaining why Kim had completely altered his level of interaction with Mr. Gross following heart surgery, Akin Gump counsel David Park explained that Kim, like many Korean employers, prefers a clear superior-subordinate relationship, and that Kim felt that Plaintiff was too old to work as subordinate to Kim and Quigley. (Ex. 1, Gross Dep. at 182, 185-88, 191-92.)[3]

●    Park explained to Mr. Gross that Mr. Gross' age was a "big problem" for Kim and that Plaintiff's recent heart surgery had deepened Kim's concerns about Plaintiff's age and created a question in Kim's mind whether Mr. Gross would be able to adequately perform his work. (*Id*. at 185-86.)

●    At his very first (chance) meeting with Mr. Gross following the surgery, Kim stated "we're both getting older." (*Id*. at 194.)

●    During that same chance meeting, Kim asked Plaintiff when he expected to retire. (*Id*. at 194-95.) When Mr. Gross responded that had no immediate plans to retire, Kim expressed surprise. (*Id*.; Verified Complaint at ¶18.)

Each of these comments fills out the picture of the actual motivations for Plaintiff's firing, and provides a uniquely powerful window into what in most other cases is the "elusive factual question of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981). Presented with this testimony, a reasonable jury might well determine that Mr. Gross was indeed fired because of his age, as he was told.

**B.    Defendant Offers Pretextual Reasons For the Termination.**

Plaintiff's direct evidence, if believed by a jury, is more than sufficient to support a verdict, and Plaintiff Gross has no duty to present an indirect case under the familiar *McDonnell Douglas* burden shifting scheme or to demonstrate pretext. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121-22

---

[3] Mr. Park's and Mr. Kim's statements related to a matter within the scope of their employment and during their employment, and are admissible as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(D). *Cook v. Babbitt,* 819 F.Supp. 1, 26 & n.25 (D.D.C. 1993)(citations omitted).

(1985).  Nonetheless, this case is readily amenable to proof under the pretext model as well, given the substantial evidence of pretext in the record.

### 1.    Plaintiff Gross Makes Out a *Prima Facie* Case of Discrimination.

Plaintiff Donald Gross easily makes out a *prima facie* case of age discrimination.  Plaintiff may make out a *prima facie* case of age discrimination by demonstrating that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  *George*, 407 F.3d at 412.

Defendant apparently concedes that Plaintiff makes out the first two elements, and challenges only the third.  (*See* Def. Mem. at 13.)  Defendant mistakenly contends, however, that Plaintiff cannot make out the third element of the *prima facie* case because he cannot demonstrate that he was treated differently than similarly situated employees, suggesting (wrongly) that this is the only way a plaintiff can present a *prima facie* case.  (*See id*. at 13-15.)  In fact, "[t]his is not a correct statement of the law."  *George v. Leavitt*, 407 F3d 405, 412 (D.C. Cir. 2005)(abuse of discretion to require a plaintiff to offer comparisons to similarly situated employees).  "One method by which a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly situated employees who are not in the protected class. . . .  But this is not the only way."  *Id*.   In *George* and again more recently in *Czekalski v. Peters*, the D.C. Circuit reversed grants of summary judgment where the district court had adopted the position urged by Defendant here.  *See George*, 407 F.3d at 412; *Czekalski v. Peters*, 475 F.3d 360, 356-67 (D.C. Cir. 2007); (*see* Def. Mem. at 13-16.).

Defendant also wrongly claims that a plaintiff cannot make out a *prima facie* case as a matter of law where an employer claims that the employee was performing below the employer's expectations (*see* Def. Mem. at 15-17), (although Defendant's claims of performance issues are disputed).  Moreover, and

-16-

contrary to Defendant's position, the third prong of the plaintiff's *prima facie* showing requires only that

he demonstrate that the circumstances give rise to an inference of discrimination, and that showing is

not limited to any particular form of evidence. *See George*, 407 F3d at 412.  In fact, the *McDonnell*

*Douglas* burden-shifting "was never intended to be rigid, mechanistic, or ritualistic." *Furnco Constr.*

*Corp. v. Waters*, 438 U.S. 567, 577 (1978); *Ware v. Howard Univ.*, 816 F.Supp. 737, 750 (D.D.C. 1993).

"[T]he elements of the prima facie case must be adapted to the context of the particular employment

decision at issue." *Saunders v. George Washington University*, 768 F.Supp. 854, 866 (D.D.C. 1991);

*International Bhd. of Teamsters v. United States*, 431 U.S. 324,  358 (1977).  The burden of meeting a

*prima facie* case is "not onerous." *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253

(1981).

Indeed, in this Circuit, once an employer sets forth its alleged reasons for a termination decision

(as Defendant has done here), the district court "need not address the [employer's] contentions that [the

plaintiff] failed to make out a prima facie case.  Instead, we proceed to 'the ultimate question of

discrimination *vel non*.'"  *George*, 407 F.3d at 411-412 (citing *United States Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 714 (1983)); *see also Czekalski v. Peters*, 475 F.3d 360, 364 (D.C.

Cir. 2007)(same).  Contrary to the defendant's position, in this circumstance the court should "[begin]

with the assumption that [plaintiff] presented a *prima facie* case," and avoid "unnecessarily evad[ing]

the ultimate question of discrimination *vel non*." *Dunaway*, 310 F.3d at 762(citations omitted).

Here, there is ample evidence from which a jury could infer discrimination.  For instance, Kim,

a manager involved in Mr. Gross' termination, on numerous occasions made remarks indicative of age

bias, and even informed Mr. Gross he was being let go because he was "too old."  (Ex. 6 at 10; Ex. 1,

Gross Dep. at 238-39; Verified Complaint at ¶20.)  Even where (unlike here) such remarks are uttered

outside the context of a termination, they easily raise an inference of discrimination. *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922-23, *reh'g & reh'g en banc denied*, (8th Cir. 2000)(ageist remarks made by management outside the decisionmaking process sufficient to raise an inference of discrimination); *Gregory v. Daly*, 243 F.3d 687, 697 (2nd Cir. 2001)(gender biased "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus may give rise to an inference of discriminatory motive.")(internal quotes and citations omitted); *Futrell v. J. I. Case*, 38 F.3d 342, 347 (7th Cir. 1994).

Moreover, Defendant's claim that Plaintiff was unqualified due to supposedly poor writing is disputed. Plaintiff received regular praise for his work, and he was told he was not being terminated for any performance reasons, but instead that his work product was "very good." (*See infra* at 3-4; Verified Complaint at ¶22.) As well, based on his strong writing abilities and contributions to a special project memorandum in 2003, Defendant assigned Plaintiff the task of writing a major revision in 2004. (Ex. 4, Park Dep. at 92-93; Ex. 19, 9/30/03 email from M. Kaye to D. Gross at AK000350.) Only after Kim's discomfort with Plaintiff's age grew following Plaintiff's surgery was that assignment shifted to David Park. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003)(en banc)("one can infer that he would not have been given significant responsibility . . . if his performance had been unacceptable.")(citation omitted).

As well, Defendant simply overstates the evidence, which is inappropriate in this posture. For instance, Defendant relies heavily on observations by its partner Michael Kaye, but Kaye left to work in Chile shortly after Mr. Gross' arrival, and never worked closely with Mr. Gross on either phase of the special project or on an op-ed, as Defendant now claims. (*See* Def. Mem. at 7; Def. Statement of Mat'l Facts at ¶29, 30, 34, 46; Ex. 1, Gross Dep. at 170-71, 204, 206-07.) Although Kaye may have

contributed to the original special project memo in 2003, Kaye's only reaction to Mr. Gross'
contributions to that memo was to inform Mr. Gross that it was a "great job." (Ex. 19, 9/30/03 email
from M. Kaye to D. Gross at AK000350.)[4]

Similarly, Defendant relies on an e-mail from Joel Wit at the Center for Strategic and
International Studies ("CSIS") as evidence of supposed poor writing (*see* Def. Mem. at 7), but that e-
mail is pure hearsay and Defendant is not entitled to the inference that it represented anything more than
constructive criticism. In fact, Mr. Wit was pleased with the final product, and Mr. Gross, a professional
writer, has written 13 articles published by CSIS since the e-mail Defendant relies upon as "proof" of
supposed bad writing. (Gross Aff. at ¶6.)

Defendant cannot seriously contend in this posture that Plaintiff was a poor performer as a matter
of law. *See Wexler*, 317 F.3d at 568, 575 (rejecting suggestion that 48% drop in sales by store manager
and 30% drop in store sales overall was poor performance as a matter of law where plaintiff disputed
reasons for the changes.) Whether Mr. Gross performed well, as he was informed, or poorly as
Defendant now contends, is a matter for the jury. Plaintiff makes out a *prima facie* case here.

## 2.    Defendant's Non-Discriminatory Reasons For the Termination Are Pretexts For Discrimination.

Under the *McDonnell-Douglas* framework, once a plaintiff demonstrates a *prima facie* case and
defendant articulates some legitimate, non-discriminatory explanation for its decision, summary
judgment should be denied if the plaintiff offers evidence sufficient to demonstrate that the defendant's
proffered reasons are a pretext for discrimination. *Reeves*, 530 U.S. at 143. Plaintiff offers abundant

---

[4] The only contemporaneous record of criticism by Mr. Kaye did not concern Plaintiff's
writing; indeed, Mr. Gross did not even write what Defendant terms an "unusable memorandum"
(*see* Def. Mem. at 7), and Mr. Kaye's criticisms of Mr. Gross' work are disputed. (Ex. 1, Gross Dep.
at 208, 212-13.)

evidence of pretext here.

### a.    Akin Gump Changed Its Reasons For the Termination.

Defendant claims that Akin Gump chairman Bruce McLean terminated Plaintiff because of his billable hours, (Def. Mem. at 2, 6-7, 8, 12, 16-17, 18), but since Defendant never before raised the issue with the EEOC or in sworn interrogatories, a jury could conclude Defendant is not telling the truth. That finding would be enough for the jury to find that Defendant actually terminated Plaintiff because of discrimination. *Reeves,* 530 U.S. at 143.

Before the EEOC, Defendant alleged that:

Akin Gump terminated Mr. Gross's employment because he was unable to perform the job that was required, namely to manage the Korea practice and to draft polished, high-level written analyses for the special project that did not require substantial revision.

(Ex. 6 at 7.) Although Defendant's long letter in defense of Plaintiff's legal complaint before the EEOC went into detail regarding its reasons, the summary sentence above captures the essence. Most notably, however, in all eleven single-spaced pages to the EEOC, Akin Gump never mentioned or alluded to any issue with Mr. Gross' billable hours. (*See id*.)

Even more significantly, when asked to "[s]tate with particularity and in detail each and every reason for the termination of Donald Gross's employment with Akin Gum and identify all documents related thereto," Defendant failed once again to mention billable hours at all in its sworn response. (*See* Ex. 18 at Answer to No. 1.) Where billable hours is now asserted as the very basis for McLean's supposed "independent" reason for the termination (*see, e.g.*, Def. Mem. at 16), Defendant's failure to raise this issue until this late stage is telling.

Presented with evidence of an employer that omits its "real" reason for the termination decision before the United States government agency investigating claims of discrimination, and then omits the

reason once again in its sworn discovery responses, a jury could reasonably conclude that the employer

is instead making up its reasons.  Since a jury could conclude that Defendant's arguments are unworthy

of belief, this serves as evidence of culpability on the central question of age discrimination:

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."

*Reeves,* 530 U.S. at 147(citing *Wright v. West*, 505 U.S. 277, 296 (1992)).

Under the law, pretext may be shown through proof "that the employer's explanation was

fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's

decision." *Aka*, 156 F.3d at 1295.  The fact that a defendant offers different justifications at different

times for its employment decision is, in and of itself, probative of pretext. *E.E.O.C. v. Sears Roebuck

and Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001)("A factfinder could infer from the late appearance of

Sears's current justification that it is a post-hoc rationale, not a legitimate explanation of Sears's decision

not to hire" plaintiff.). *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)("An

employer's changing rationale for making an adverse employment decision can be evidence of pretext.");

*Domiguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)(same).

This is particularly true where a defendant fails to muster its current reason when given every

opportunity to do so in response to interrogatories.  In similar circumstances one court noted:

> Answers to interrogatories are evidence.  In this instance [where defendant's current justification was missing from its response], they were admissions by a party opponent.  The interrogatory and Coca-Cola's response were presented to the jury. . . . The jury apparently concluded from the total absence earlier of the justification Coca-Cola would later offer at trial that the justification had been concocted in preparation for trial to fit the available facts.  In other words that it was pretextual.

-21-

*Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634-35 (7th Cir. 1996).

Not only did Akin Gump fail to offer this explanation to the EEOC or its answers to interrogatories, but the firm failed to tell Mr. Gross at any point in his employment that his job was in jeopardy due to any deficiency with billable hours.  (Ex. 1, Gross Dep. at 124-25.)   To the contrary, Akin Gump made it quite explicit to Mr. Gross that he was hired to manage and develop the Korean practice, knowing full well that Mr. Gross' efforts to do so would not entail billable time.  (*Id*. at 83, 87, 91, 124-26; Deposition of J. David Park, at 45-50; Ex. 2, Kim Dep. at 45.)[5]  Akin Gump Chairman Bruce McLean was aware as far back as the time of Mr. Gross' hire of the firm's intention to have Plaintiff dedicate time to non-billable "administrative" work, and he was aware of the firm's objective to "broaden the work we were doing for our Korean clients" and "expand the range of services we provide to our Korean clients."  (Ex. 3, Deposition of Bruce McLean, at 19-20.)  Indeed, the firm's desire was to "create greater management organization and focus of the Korea Practice Group," a task that was Mr. Gross' "major designated responsibility," and as a result, Mr. Gross was instructed to dedicate at least half his time to Korea Practice Group development.  (Ex. 1, Gross Dep. at 87-88, 124-25, 139.)  Mr. Gross had been led to understand the firm would fully credit his work.  (*Id*. at 87-88, 129-30; Ex. 4, Park Dep. at 49-50.)

A jury might expect that a rational employer that was truly concerned with the lack of billable hours, would explain to an employee who was not billing sufficient hours that the problem had to be corrected.  That Akin Gump failed to even mention such a problem to Mr. Gross while he could correct it speaks volumes–and demonstrates the reason is nothing more than pretext. A jury could conclude that

---

[5] Kim encouraged Mr. Gross to use each of the full days before and after Korea Practice Group meetings to work on practice group development.  (Ex. 20, 8/17/03 notes at DG00855.)

no such problem existed or that Akin Gump was not particularly concerned about Mr. Gross' billable hours in a year in which revenues for the Korean practice group were up by more than 30% over the prior year. (*See* Ex. 24, 8/11/04 email from B. McLean to S. Kim and M. Quigley, at AK003251; Ex. 3, McLean Dep. at 53-54.) In sum, given Akin Gump's failure to raise this issue with Mr. Gross at the time, when the EEOC considered Plaintiff's discrimination charge, or in response to Plaintiff's interrogatories, "a trier of fact would certainly be entitled to infer that this explanation is nothing more that a post hoc rationale, invented for the purpose of the litigation." *Sears Roebuck*, 243 F.3d at 853.

> **b.     Defendant's Assertion that McLean Alone Made the Decision To Terminate Plaintiff Is Evidence of Pretext.**

Although Defendant previously asserted the involvement of Sukhan Kim and Michael Quigley in its termination decision, Defendant now contends that Bruce McLean alone made the decision, without any involvement by Kim or Quigley whatsoever. (Def. Mem. at 1, 2, 7, 12, 16-18.) Particularly where there is evidence that Kim and Quigley made a series of overtly discriminatory remarks, and even told Plaintiff that he was being terminated because of his age, a jury could reasonably infer that Defendant's new and conflicting assertions regarding the manner in which Mr. Gross was terminated amount to an intentional effort to cover up a discriminatory firing decision.

Indeed, while Defendant claims now that "Mr. Kim had no involvement at all" (*see* Def. Mem. at 2), Defendant earlier credited Kim as directly participating in the firing. (Ex. 6 at 10 ("Mr. Kim, Mr. Quigley, and Mr. McLean all participated in . . . the decision to terminate Mr. Gross.").) That position was reinforced throughout Defendant's submission to the EEOC. (*See, e.g., id.* at 10 ("it is simply inconceivable **that these three individuals** . . . were motivated by Mr. Gross's age in **their decision to terminate him**."); *id.* at 11 ("**the same individuals decided to** hire and **fire Mr. Gross**. . . ." "[Mr.

Kim, Mr. Quigley, Mr. Race, and Mr. McLean] **would not have terminated** Mr. Gross simply because he, like they, was over 40.")(emphasis added).

Additionally, during that same submission to the EEOC, Akin Gump set forth legal and factual arguments regarding the sufficiency of Mr. Gross' direct evidence. (*See id*. at 7-8.) Defendant denied that Mr. Kim had uttered anything more than innocuous age-based comments and, based on that supposition and a cramped reading of the case law, claimed that the evidence was insufficient to demonstrate discrimination. (*See id*.) In other words, when presented with the opportunity and every incentive to reveal (had it actually been the case) that Mr. Kim was not even involved in the decision as it now claims, Defendant simply offered legal arguments that instead assumed Kim's (and Quigley's) direct participation.

Moreover, Defendant refers eight times in its brief to McLean's alleged "independent assessment," "individual assessment," or "independent review" of Mr. Gross' performance (*see* Def. Mem. at 1, 2, 6, 8, 9, 12, 13), yet Defendant never even alluded to such an independent assessment in its legal and factual justification for the termination submitted to the EEOC. (*See* Ex. 6.)[6] Such reasoning is also completely absent from Defendant's sworn interrogatory response providing its supposed reasons for the termination. (*See* Ex. 18 at Answer to No. 1.) As well, and as noted above, Defendant's new-found claim that Mr. McLean terminated Mr. Gross because of a supposed deficiency in billable hours is missing entirely from both the EEOC submission and Defendant's sworn

---

[6]Although Defendant now claims "Mr. McLean conducted an independent review of Mr. Gross's performance" (*Id*. at 12), in its Initial Disclosures it set forth the discoverable information possessed by various witnesses, and Defendant did not claim that Mr. McLean possessed any knowledge whatsoever regarding Mr. Gross' performance. (Ex. 25, Defendant's Federal Rule of Civil Procedure 26(a)1 Initial Disclosure Statement, April 26, 2007, at 2; *compare id*. at 1-2 (identifying four other witnesses as each having knowledge of Mr. Gross' performance).)

interrogatory responses, where it claimed that the termination was actually due to Sukhan Kim's alleged

dissatisfaction with Plaintiff's work product. (*Id.*)

In similar circumstances, courts have found that a significant change in an employer's factual

representations to a government equal employment opportunity agency presents "persuasive . . . evidence

of pretext, and entitles [plaintiff] to a trial on the issues of the reason for his termination." *Stalter v.*

*Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999). Given Defendant's prior justifications for the

firing decision, a jury could reasonably question Defendant's current claim that McLean alone made the

termination decision based on an independent assessment of Mr. Gross' performance and billable hours.

Other evidence undermines Defendant's new-found claim of a supposed "independent" review

by McLean to terminate Mr. Gross. For instance, a jury might find it unlikely that Akin Gump's

Chairman, who had never even met Mr. Gross, would terminate Mr. Gross without ever consulting with

his partner Sukhan Kim, who headed the Korea Practice Group.[7] (*See* Def. Mem. at 2, 7, 12; Ex. 1,

Gross Dep. at 70.)

Against this backdrop, the following assertions in particular are also disputed:

○ that "Mr. Gross has failed to provide any evidence that Mr. McLean (or Ms. Slater or Mr. Burdick) had any discriminatory animus towards him." (Def. Mem. at 9.);

○ that there "is absolutely no evidence of a discriminatory motive on the part of Mr. McLean." (*id*. at 13); and

○ that because of McLean's "sworn testimony" "[t]here is absolutely no evidence in the record to suggest that [McLean] did not honestly believe" that he alone

---

[7]Apparently to avoid this unlikely suggestion, Defendant has altered his presentation regarding leadership of the Korea Practice Group. (*Compare* Def. Stmt. Mat'l Facts at ¶4 ("Michael Quigley [was] head of the Korea Practice Group") *with* Ex. 6 at 1 ("The Korea Practice Group is headed by Sukhan Kim . . .") *and* Ex. 5, Quigley Dep. at 27 ("Sukhan Kim [was] really the founder of the practice and essentially the head of the practice group.").)

terminated Mr. Gross prompted by the supposed fact that "Ms. Slater, Mr. McLean's and Mr. Burdick were not satisfied with [Plaintiff's] low billable hours." (*id*. at 18.)[8]

First, Plaintiff notes that in this posture, a district court "must disregard all evidence favorable to the moving party that the jury is not required to believe" *Reeves*, 530 U.S. at 151, and a jury would not be required to believe any of the assertions or inferences urged by Defendant in the quoted sections above. More importantly, as outlined herein, there is abundant record evidence from which a jury could reasonably conclude that Mr. McLean's sworn testimony is not true and that it is instead a coverup for discrimination, including the total absence of such a rationale from Akin Gump's EEOC submission and its sworn interrogatory responses. Quigley's and Kim's denials of involvement stand in a similar posture. (*See* Def. Stmt. of Mat'l Facts at ¶¶56, 57.)

The D.C. Circuit recognizes that such proof may serve as particularly strong evidence of discriminatory animus:

> If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. As *Hicks* said, "[t]he factfinder's disbelief of the reasons put forward by the defendant (*particularly if disbelief is accompanied by a suspicion of mendacity*) may, together with the elements of the prima facie case, suffice to show intentional discrimination."

*Aka*, 156 F.3d at 1293 (original emphasis and brackets)(quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)). As observed by another court:

> It has always been understood–the inference indeed is one of the simplest in human experience–that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's

---

[8]Contrary to Defendant's arguments, Defendant never identified Slater or Burdick when asked to identify all persons with knowledge of the reasons for Mr. Gross' termination. (Ex. 18 at Answer to No. 2; *see also* Ex. 6.)

lack of truth and merit.

*McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 921-22 (3d. Cir. 1985)(emphasis omitted)(citing 2

Wigmore § 278(2) (Chadbourne Rev. 1979)).

Under these circumstances, a jury could reasonably conclude that Defendant's reasons for the

termination are untrue and are instead a pretext for discrimination.

### c.     Overt Discriminatory Comments Show Pretext.

Of course in this case Mr. Gross was repeatedly told that he was being terminated because he was

"too old" for the position, including by Mr. Kim and Mr. Quigley who both took part in the decision to

terminate Mr. Gross.  (Ex. 1, Gross Dep. at 238-39; Verified Complaint at ¶20; Ex.6 at 5, 10, 11.)  Such

evidence readily suffices to demonstrate pretext under an indirect model of proof.  As explained by the

D.C. Circuit, once an employer has set forth its reasons for its employment decision,

> the focus of proceedings at trial (and at summary judgment) will be whether the jury
> could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2)
> any evidence the plaintiff presents to attach the employer's proffered explanation for its
> actions; and (3) any further evidence of discrimination that may be available to the
> plaintiff (*such as independent evidence of discriminatory statements or attitudes on the
> part of the employer*) or any contrary evidence that may be available to the employer
> (such as evidence of a strong track record in equal opportunity employment).

*Aka*, 156 F.3d at 1289 (emphasis added).

In this Circuit, such remarks are sufficient to demonstrate pretext.  *Id.* (Where a plaintiff presents

evidence of overtly discriminatory remarks in connection with his termination, "a reasonable jury could

find that the purported explanations for [plaintiff's] termination were pretextual"); *Dunaway v.

International Bhd. of Teamsters*, 310 F.3d 758, 765-66 (D.C. Cir. 2002)(same); *see also Emmel*, 95 F.3d

at 635 ("The strongest evidence that Coca-Cola's proffered reason for its [decisions] was pretextual was

the same evidence at the heart of Emmel's direct evidence case – the contemporaneous explanation by

[her supervisor] that she had not been promoted because 'they wanted men in these positions.'")

### C.    Akin Gump Is Not Entitled To Any Inference Against Age Discrimination at This Stage.

Oddly in the posture, Defendant claims entitlement to several additional inferences that, it claims wrongly, entitle it to judgment as a matter of law. (*See* Def. Mem. at 20-22.) To the contrary, as movant Defendant is entitled to no inferences in its favor; rather, all reasonable inferences from the evidence must be taken in favor of the non-movant. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255.

First, Defendant claims that it is entitled to a "strong inference" that no discrimination took place because the decisionmakers in this case were all over 40. (Def. Mem. at 20.) Not only does Rule 56 preclude the granting of such an inference in Defendant's favor, but courts have consistently ruled that employers are not entitled to such an inference as a matter of law. *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 55 (2d Cir. 1998)("the proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable."); *Stampfel v. City of New York*, 2005 WL 3543696 at *5 (S.D.N.Y. 2005 ("there is no exemption permitting senior citizens to discriminate.") As enunciated by the Supreme Court, in rejecting the mandatory presumption urged by Defendant here:

> Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.

*Oncale v. Sundowner*, 523 U.S. 75, 78 (1998)(quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977).

Similarly, in the age discrimination context, Judge Posner observed that

> it is altogether common and natural for older people, first, to exempt themselves from what they believe to be the characteristic decline of energy and ability with age; second, to want to surround themselves with younger people; third to want to protect their own jobs by making sure the workforce is not too old, which might, if 'ageist' prejudice is rampant, lead to RIFs of which they themselves might be the victims; and fourth, to be oblivious to the prejudices they hold, especially perhaps prejudices against the group to

> which they belong. We emphatically rejected the 'same-actor inference' in the race-discrimination setting in *Johnson v. Zema Systems Corp.,* 170 F.3d 734, 745 (7th Cir.1999), and our conclusion there applies with equal force to proof of age discrimination.

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001).

Also contrary to the dictates of Rule 56, Defendant seeks an inference against discrimination where "the same individual hired and terminated an employee" and where he was terminated over a year after he was hired. (Def. Mem. at 21-22.) In this case, Mr. Gross was hired after a series of interviews with Sukhan Kim, with the decision formalized by Dennis Race, and then allegedly terminated by Kim, Quigley, and McLean. (Ex. 1, Gross Dep. at 65; Ex. 7; Ex. 6 at 10, 11.) Second, on these facts, there is ample evidence for a jury to find that age discrimination was the true reason for the decision, particularly where Kim expressed reservations about Mr. Gross' age at their first meeting, and Kim's discomfort with Mr. Gross' age became more pronounced after Mr. Gross' surgery in spring 2004.

Until the time he went out on leave for heart surgery in March 2004, Mr. Gross met regularly with Kim at least once a week, and also had regular contact by telephone and e-mail. (Ex. 1, Gross Dep. at 143-144.) Following his surgery, however, Kim's demeanor and interactions with Mr. Gross changed considerably: there was a "rather dramatic difference. . . no contact, no e-mails, . . . no phone calls;" "a radical difference." (*Id*. at 182, 185.)

Akin Gump counsel David Park told Mr. Gross that his recent heart surgery had deepened Kim's discomfort with Plaintiff's age, and that age was a "big problem" for Kim, particularly given the cultural differences of Korean employers. (Verified Complaint at ¶¶13-14; *see also* Ex. 1, Gross Dep. at 185-87, 191-92.) Indeed, in Plaintiff's very next contact with Kim during a chance hallway encounter, unprompted Kim remarked, "we're both getting older." (Ex. 1, Gross Dep. at 193-94; Verified

Complaint at ¶16.)  Although Defendant may wish to argue for its inferences to a jury, there is record evidence from which a jury could reasonably reject Defendant's arguments and instead find that Kim's discomfort with Plaintiff's age became intolerable following Mr. Gross' surgery.

Still arguing as it might to a jury, Akin Gump counters that "[i]t is undisputed. . . that Mr. Kim was aware of Mr. Gross's upcoming heart surgery when he recommended that the firm hire him." (Def. Mem. at 6, n. 4, Statement of Material Facts at ¶15; *see also* Ex. 6 at 10.)  In fact, Mr. Gross himself knew nothing about any impending heart surgery and, therefore, never discussed it with anyone at Akin Gump until March 2004, eight months after he was hired.  (*See* Ex. 16; Ex. 1, Gross Dep. at 144-45; Gross Aff. at ¶1.)  In other words, Mr. Kim provided an elaborate story about Mr. Gross' having informed him at the interview that he would need surgery in six to eight months, even suggesting that was one of the reasons Mr. Gross was hired.  (Ex. 2, Kim Dep. at 21-22.)  Kim also testified in great detail regarding the interview about the cost of the operation and that Mr. Gross did not have health insurance, which was untrue.  (*Id*. at 22; Gross Aff. at ¶1.)  Under the circumstances, a jury could infer that Kim made up this story to cover up his discriminatory intent.    Defendant's arguments concerning the fact that Plaintiff did not complain of age discrimination while an employee of Akin Gump also fail to assist Defendant at this stage.  (*See* Def. Mem. at 2, 5.)  First, this is not a hostile environment case, thus whether or not Plaintiff complained is of no legal significance, as it might be in harassment cases. *Cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 804 (1998).  While Defendant may wish to argue to a jury that Plaintiff's actions somehow undermine his case, Defendant is entitled to no such inference in this posture.  To the contrary, a jury might reasonably conclude that Mr. Gross refrained from antagonizing his employer with a discrimination complaint at a time he was dependent upon Akin Gump and Sukhan Kim in particular to assist him in his efforts to obtain alternate employment either within

-30-

or outside the firm and to avoid a "financial disaster for [his] family."  (Ex. 21, 8/6/04 email from D.

Gross to S. Kim at DG0011.)  *See Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (summary judgment

"inappropriate when the evidence is susceptible to different interpretations").

## II.    PLAINTIFF CAN PROVE RETALIATION BEFORE A JURY.

Defendant already advanced the exact arguments it offers here regarding the sufficiency of

Plaintiff's retaliation claim, and this Court rejected those arguments.  (*See* Defendant's Opposition to

Plaintiff's Motion for Leave to Amend and Supplement Complaint, July 20, 2007, at 6-11 (Docket Entry

No. 17) ("Def. Opp. Amend"); Order Granting Plaintiff's Motion for Leave to Amend and Supplement

Complaint, Sept. 10, 2007 (Docket Entry No. 23) ("Order").)  In its present Motion, Defendant has

simply cut and pasted its same arguments, citing dozens of the same inapposite cases.

This Court's ruling rejecting Defendant's same arguments is law of the case.  *Laffey v. Northwest*

*Airlines, Inc.*, 740 F.2d 1071, 1082-83 (D.C. Cir. 1984).  As noted by the D.C. Circuit, "[t]he *same* issue

presented a second time in the *same case* in the *same court* should lead to the *same result*." *PNC*

*Financial Services Group, Inc. v. Commissioner of Internal Revenue Service*, 503 F.3d 119,126 (D.C.

Cir. 2007)(emphasis in original)(internal citations and quotations omitted).  "Law-of-the-case doctrine

encompasses issues decided both explicitly and by necessary implication."  *Id*.  Under that doctrine,

Defendant cannot reopen issues that this Court already decided and use its Summary Judgment Motion

as an "auxiliary vehicle for the repetition of arguments previously advanced, without success."  *Laffey*,

640 F.2d at 1083.

Because this Court's ruling is law of the case, and because Defendant has simply advanced the

very same arguments already decided again in its Motion, Plaintiff will not re-advance in detail all of

his counter-arguments or again distinguish all of the cases cited by Defendant.  Plaintiff has done already

so in his Reply in Support of his Motion for Leave to Amend and Supplement Complaint, July 30,

2007(Docket Entry No. 20)("Reply"), which Plaintiff incorporates by reference herein.

### A.    Defendant's Filing of Counterclaims Constitutes an Adverse Action.

A jury could reasonably find that Akin Gump's decision to file counterclaims against Mr. Gross

for money damages constitutes an "adverse action" for retaliation purposes.  The standard for whether

any retaliatory act constitutes an adverse action was set forth by the Supreme Court in June 2006.  *See*

*Burlington Northern & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2415 (2006).  By that

standard, a plaintiff demonstrates an adverse action by showing

> that a reasonable employee would have found the challenged action materially adverse,
> which in this context means it might well have dissuaded a reasonable worker from
> making or supporting a charge of discrimination.

*Burlington Northern*, 126 S. Ct. at 2405 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir.

2006)(internal quotes and cite omitted)).  A jury could readily find that Plaintiff meets that standard in

this case.

For instance, with its counterclaims, Defendant has accused Mr. Gross of professional

wrongdoing and sought money damages against him.  A jury could reasonably find that the threat to Mr.

Gross of financial loss and damage to his professional reputation "might well have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 126

S. Ct. at 2405.  Consequently, Mr. Gross has made out the adverse action element of his retaliation case.

In arguing for a rule that counterclaims cannot be an adverse action as a matter of law (*see* Def.

Mem. at 22-25), Defendant merely cites the same pre-*Burlington Northern* cases from other jurisdictions

that operated under different legal standards and thus were abrogated by the Supreme Court in

*Burlington Northern*.  (*See* Reply at 7-10.)  Notwithstanding the major change in law, Defendant

-32-

continues to argue through reference to two pre-*Burlington Northern* cases that a plaintiff cannot be deterred from complaining after the plaintiff has filed a complaint. (*See* Def. Mem. at 24-25 (citing *Timmerman v. U.S. Bank, N.A.*, 2006 WL 894894 (D. Colo. March 31, 2006), *aff'd on other grounds*, 483 F.3d 1106 (10th Cir. 2007) and *Beltran v. Brentwook N. Healthcare Ctr LLC.,* 426 F. Supp.2d 827, 834 (N.D. Ill. 2006).)[9] Such a doctrine cannot possible hold water, since every retaliation case *requires* that a complaint has been lodged in order to be viable. *See, e.g., Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006). In *Rochon*, for instance, after the plaintiff filed and later settled his Title VII case, the D.C. Circuit found sufficient evidence that the FBI had taken an adverse action and retaliated against him by refusing to investigate death threats made against him. *Id*. at 1213-14, 1219-20. There is no logic to a rule that strips individuals of protection against retaliation once they file a complaint in court.

As noted in Plaintiff's Reply, several courts both before and after the *Burlington Northern* decision have found counterclaims the appropriate subject of a retaliation suit. (*See* Reply at 9-10; *see also Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2007 WL 3147038 *12 (W.D. Pa. Oct. 25, 2007)(rejecting in light of *Burlington Northern* assertion that counterclaims cannot be retaliatory.). Particularly given the expansive interpretation accorded the anti-retaliation provisions of anti-discrimination laws, counterclaims cannot constitute a safe haven for an employment defendant's retaliatory acts. *See Burlington Northern*, 126 S. Ct. at 2412 (counseling against limiting anti-retaliation provisions given that the law is meant to "deter the many forms that effective retaliation can take" in light of "the anti-retaliation provision's 'primary purpose,' namely, '[m]aintaining unfettered access to statutory remedial mechanisms.'")(quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).) In any

---

[9]The *Beltran* decision also relies on a fiction that plaintiffs faced with a counterclaim would not have to expend legal fees in defense of the action (*see* Def. Mem. at 24), which is not the case here.

event, where in this case Plaintiff faces monetary and reputational harm from Defendant's counterclaims, a jury could reasonably find that he has suffered an adverse action under the *Burlington Northern* standard.

**B.    A Jury Could Find Defendant's Counterclaims Causally Related To Plaintiff's Complaint and Defendant's Reasons For the Counterclaims Pretextual.**

Plaintiff Gross presents sufficient evidence for a jury to conclude that Defendant's counterclaims are causally related to Plaintiff's legally protected complaint in this case. The same evidence serves to demonstrate that Defendant's supposed legitimate reasons for the counterclaims are instead pretextual.

First, as it admits, Defendant moved to file counterclaims and seek damages against Plaintiff as soon as it could find some grounds to do so. (*See* Def. Mem. at 25; *see also* Defendant's Motion to Amend Answer and File Counterclaims, June 25, 2007 at 6, ¶21.) Second, the causal connection between the complaint and the counterclaims is apparent on its face, as Defendant brings its counterclaims within the very same lawsuit. Third, in all its history Defendant has never charged a single employee with breach of fiduciary duty or breach of prospective business advantage, undermining any suggestion that Defendant would have brought its claims against Mr. Gross in the absence of Plaintiff's discrimination lawsuit. (Ex. 22, Defendant's Objections and Responses to Plaintiff's Third Set of Interrogatories, August 16, 2007, at 4.) Finally, Defendant admits in its Motion that "Akin Gump derives no benefit from the Counterclaims," and that the counterclaims do not "provide a strategic advantage." (Def. Mem. at 27.) Where Defendant disclaims a benefit or advantage to its filing against Plaintiff, a jury could reasonably determine that its reasons are illegitimate; *i.e.*, a pretext for retaliation.

Defendant's claims based on non-controlling authority that a plaintiff must demonstrate that a defendant's retaliatory acts are baseless should also be rejected. (*See* Def. Mem. at 27-28.) First,

Defendant's counterclaims are baseless, and as a result Plaintiff has asked that they be dismissed. (*See* Plaintiff's Motion for Partial Summary Judgment, Nov. 2, 2007 (Docket Entry No. 30).) As well, and contrary to Defendant's contention, a plaintiff need only demonstrate evidence sufficient to suggest to a reasonably jury that the defendant's asserted reasons for its acts are pretextual. *See Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006). Moreover, the same arguments advanced by Defendant here have been rejected explicitly by the District of Columbia Court of Appeals in consideration of the DCHRA, under which Plaintiff Gross has also charged retaliation. In particular, the court holds that the post-litigation filing of a legal action can constitute unlawful retaliation, regardless of the legitimacy of the employer's case. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 367 (D.C. 1993). As stated by that court, whose interpretation of District of Columbia law controls here, "the statute contains no safe harbor for otherwise lawful acts done for an improper retaliatory purpose." *Id*.

Otherwise, in its Motion, Defendant has merely re-stated the very same arguments on causation that it advanced in opposing Plaintiff's Motion to Amend his Complaint, along with a long list of inapposite authority, arguments this Court has already rejected. (*See* Def. Opp. Amend at 11; Order.) Notably, as set forth above, Plaintiff does not rely on temporal proximity alone to demonstrate causation or pretext, and thus, the cases that seek to prove causation solely through that manner are inapposite. Here, where Defendant has brought his counterclaims immediately upon finding some basis to do so, in this very lawsuit, where Defendant has never before charged any employee with the claims it asserts against Plaintiff, and where Defendant disclaims any benefit to itself for filing the counterclaims, there is sufficient evidence of causation and pretext for a jury to rule in Plaintiff's favor.

**CONCLUSION**

For the foregoing reasons, Plaintiff Gross respectfully requests that this Honorable Court deny

Defendant's Motion for Summary Judgment in its entirety.


Respectfully Submitted,

WEBSTER,   FREDRICKSON,   HENRICHSEN,
CORREIA & PUTH, P.L.L.C.


_____/s/_____
Jonathan C. Puth  #439241
Kataryna L. Baldwin  #494439
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
Attorneys for Plaintiff Gross

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this *11th* day of December, 2007, a copy of the forgoing Opposition to Defendant's Motion for Summary Judgment and proposed order were transmitted electronically to:

Christine Nicolaides Kearns
Karen Faye McTavish
Pillsbury Winthrop Shaw Pittman, LLP
2300 N St., N.W.
Washington, DC  20037

Counsel for Defendant


_____/s/_____

Kataryna L. Baldwin
Webster, Fredrickson, Henrichson,
Correia & Puth, PLLC
1775 K Street, N.W.
Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DONALD G. GROSS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-399 (EGS) |
| | ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Upon consideration of Defendant's Motion for Summary Judgment, the Plaintiff's Opposition thereto, and the entire record herein, it is this ____ day of _____, 2008,

ORDERED that the Defendant's motion shall be, and the same hereby is, DENIED in its entirety.

Dated: _____        _____

                                         Judge Emmet G. Sullivan
                                         United States District Court for the District of Columbia

**UNITED STATES  DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD G. GROSS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-399 (EGS) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AT ISSUE**

Plaintiff Donald G. Gross, by and through counsel, sets forth the following Statement of Material Facts At Issue, pursuant to Rule 56.1 of the U.S. District Court for the District of Columbia.

**I.    Facts Supported by the Record**

The following facts are supported by the record in each instance, and therefore, Defendant must are either concede that they are true or acknowledge with citation to the record that they are disputed facts at issue, pursuant to Rule 56.1:

1.    During the initial interview for a Senior Counsel position at Akin Gump, Akin Gump partner and Korea Practice head Sukhan Kim told Plaintiff Gross that he was "concerned about [his] age" and that Mr. Gross seemed "very old to be starting out in a major law firm."  (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10.)

2.    Kim recommended that Mr. Gross be hired, but his reservations regarding the hire were reflected in a clause in Mr. Gross' June 20, 2003 offer letter that indicated an intention to review his employment after a year.  (Ex. 2, Kim Dep. at 21; Ex. 7.)

1

3.      Akin Gump included a similar clause in its offer to Thomas Hubbard, who was 61 when he was hired to the Korea Practice Group.  (Ex. 2, Kim Dep. at 72-73; Ex.  8, 10/13/04 email from M. Quigley to B. McLean and D. Race.)

4.      During Mr. Gross' tenure at the firm, there were several occasions when age came up as a subject of discussion.  (Ex. 1, Gross Dep. at 36-37.)

5.       Akin Gump's Korea Practice Group operated in an environment where there was significant sensitivity to age and age differences, based on the importance attached to age in Korea's Confucian culture.  (Ex. 17, Plaintiff's Answer to Defendant's Interrogatory No. 9, June 12, 2007, at 28.)

6.      Kim, a native of Korea, observed that age, as well as the more hierarchical nature of Korean society, are the main cultural differences between the United States and Korea.  (Ex. 2, Kim Dep. at 14-16, 118-19.)

7.      In March 2004, Plaintiff underwent heart surgery, requiring a lengthy hospital stay and two days in intensive care.  (Ex. 1, Gross Dep. at 144-46; Attachment A, Affidavit of Donald G. Gross at ¶; *see also* Ex. 15, 3/25/04 email from C. Pineda.)  Mr. Gross had first informed Kim and Quigley of his need for surgery in early March 2004.  (Ex. 16, 3/4/04 email from D. Gross to S. Kim and M. Quigley at AK001563.)

8.      After Plaintiff's heart surgery, Kim's demeanor and level of interaction with Mr. Gross changed "radical[ly]."  (Ex. 1, Gross Dep. at 182, 185.)  Before that time, Mr. Gross had met regularly with Kim at least once a week, enjoyed regular contact by telephone and e-mail, and, at Kim's direction, Mr. Gross took the lead on numerous memoranda, letters, and other projects.  (Ex. 4, Park Dep. at 90, 147-48, 152-155; Ex. 1, Gross Dep. at 143-144.)

9.    After the surgery, Kim avoided meeting with Plaintiff or contacting him by telephone and e-mail, as he had done during Mr. Gross' previous nine months with the firm. (Ex. 1, Gross Dep. at 182, 185.) Rather than communicate directly with Mr. Gross about projects that Mr. Gross had been directing, Kim began providing direction through Counsel David Park, a significantly younger attorney in the Korea Practice Group. (*Id.* at 179-80; Verified Complaint at ¶12.)

10.    Mr. Park explained to Mr. Gross that Korean employers like Kim prefer a clear superior-subordinate relationship and that Kim felt that Plaintiff was too old in relation to Kim to work in a position subordinate to him and partner Michael Quigley. (Ex. 1, Gross Dep. at 181-82, 185-88, 191-92.)

11.    Park said that Mr. Gross' age was a "big problem" for Kim and that Plaintiff's recent heart surgery had deepened Kim's concerns about Plaintiff's age and created a question in Kim's mind whether Mr. Gross could adequately perform his work. (Ex. 1, Gross Dep. at 185-86.)

12.    Park also said that Kim had directed him to take charge of the projects previously headed up by Mr. Gross, including a second phase of the special project memorandum that had been initially assigned to Mr. Gross, even though Park was not a strong writer. (Ex. 4, Park Dep. at 92; Ex. 1, Gross Dep. at 168-69, 176, 186-87.)

13.    When Kim by chance encountered Mr. Gross in the hallway, their very first meeting following Plaintiff's surgery, Kim stated "we're both getting older." (Ex. 1, Gross Dep. at 165-66, 194.) Kim then asked Plaintiff when he expected to retire. (*Id.* at 194-95.) When Mr. Gross responded that he had no plans to retire for at least another 15 years, Kim expressed surprise and told Mr. Gross that he (Kim) hoped to retire soon. (*Id.*; Verified

3

Complaint at ¶18.)

14.     In July 2004, Mr. Gross on his own initiative sought a meeting with Kim to obtain an annual

performance review. (Ex. 1, Gross Dep. at 223-24, 226.) At the July 13, 2004 meeting, Kim

informed Plaintiff that he was "very uncomfortable" with Mr. Gross' age, and that Mr. Gross

was being let go from the Korea Practice Group because he was "too old" for the kind of

work he was doing. (*Id*. at 238-39; Verified Complaint at ¶20.) Kim provided no reason for

his decision aside from age. (Verified Complaint at ¶21.)

15.     A few days later, Mr. Quigley said he agreed completely with Kim that Mr. Gross was "not

a good fit" with the Korea Practice Group because he was "too old to be doing junior-level

work." (Ex. 1, Gross Dep. at 244-45; Verified Complaint at ¶22.) Quigley also said that

both he and Kim viewed the quality of Mr. Gross' work as very good. (Verified Complaint

at ¶22.)

16.     Quigley stated that Mr. Gross' age and experience made him "perfect" for a job as an in-

house corporate counsel or other position, but reiterated that Mr. Gross was too old to be

working for Mr. Kim, Mr. Park, and him in the Korea Practice Group. (Verified Complaint

at ¶23.)

17.     During the last week of Mr. Gross' employment, Kim told Mr. Gross that he was being

terminated, not because of any defects in his performance, but because he was "too senior"

because of his age and, therefore, "not a good fit." (Verified Complaint at ¶29.)

18.     Kim also said that said he would have been able to pick up the phone and find Mr. Gross a

position at another law firm if Mr. Gross were a fifth-year associate, but that this would not

be possible in Mr. Gross' case because he was too old. (Verified Complaint at ¶31.)

4

19.    Kim, along with Quigley and Akin Gump chairman Bruce McLean, made the decision to terminate Mr. Gross. (Ex. 6 at 2, 10; Ex. 5, Quigley Dep. at 27.)

20.    Kim and Quigley gave Mr. Gross no other reason for the termination but his age and told him that his job performance had been very good.  (Verified Complaint at ¶21, 22, 29, 30.)

21.    Mr. Gross was hired to manage and add structure to the firm's Korea Practice Group, which until then had been "considered an extremely informal group," and to work on a special project for a major client.  (Ex. 6 at 1-2, 4; Ex. 1, Gross Dep. at 124; Ex. 5, Quigley Dep. at 30-32.)

22.    Virtually all of Mr. Gross' assignments came from Sukhan Kim and the Korea Practice Group, while a few originated from the Export Control Group and the Private Equity Funds Group.  (Ex. 1, Gross Dep. at 83-84, 92-93, 231.)

23.    Although Akin Gump had "parked" Mr. Gross in the International Trade Section, Mr. Gross (unlike counsel David Park) had no formal reporting relationship to the section head, Val Slater, and only occasionally attended section meetings.  (Ex. 23, 2/25/04 email from V. Slater to B. McLean at AK02608; Ex. 1, Gross Dep. at 94.)

24.    Mr. Gross first interviewed at the firm in June 2003 with Kim and Quigley.  (Ex. 1, Gross Dep. at 64-65; Ex. 5, Quigley Dep. at 20, 27-8.)

25.    Kim was impressed with Mr. Gross' experience at the White House and State Department, and his work at a prestigious law firm in Korea, and Kim was particularly impressed that Mr. Gross spoke Korean, which is "very rare."  (Ex. 2, Kim Dep. at 22-23, 26.)

26.    After hiring partner Dennis Race approved the hire, Plaintiff started at Akin Gump as Senior Counsel on July 7, 2003.  (Ex. 7; Ex. 5, Quigley Dep. at 74; Ex. 1, Gross Dep. at 26.)

27. Mr. Gross dedicated at least half his time to developing and managing the Korea Practice Group, work that was otherwise unbillable, logging at least 2600 hours, half of it to development of the Korea Practice Group and the other half to client work. (Ex. 1, Gross Dep. at 139-40.)

28. As part of that work, Kim requested that Plaintiff undertake all organizational duties, from setting up practice group meeting and having minutes prepared, to setting the agenda and business aims of the practice. (Ex. 2, Kim Dep. at 56.)

29. Because Mr. Gross was hired to organize the Korea practice (work that would otherwise be non-billable), and because it benefitted the firm, Kim specifically instructed Mr. Gross to bill all such practice development time to a retainer for a large client of the firm. (Ex. 1, Gross Dep. at 83, 87, 91, 125-26; Ex. 4, Park Dep. at 45-50; Ex. 2, Kim Dep. at 45.)

30. Mr. Gross did as he was told, with the understanding that he would be given full credit for his work developing the Korea Practice – the very reason the firm hired him. (Ex. 1, Gross Dep. at 87, 129-30.)

31. At a later point, Akin Gump disallowed the practice of billing practice development time to client retainers, rendering the non-billable time that had initially been envisioned as billable work creditable to Mr. Gross. (Ex. 4, Park Dep. at 45-46; *see also* Ex. 24, 8/11/2004 email from B. McLean to S. Kim and M. Quigley at AK003250.)

32. Bruce McLean was aware at the time of Plaintiff's hire that Mr. Gross was to dedicate time to non-billable tasks in order to "expand the range of services [Akin Gump] provided to [its] Korean clients." (Ex. 3, McLean Dep. at 19-20.) Prior to Mr. Gross' hire, the Korea Practice Group was "considered an extremely informal group." (Ex. 6 at 4.)

6

33.    Mr. Gross had worked hard for Akin Gump and generated a great deal of good will with the

firm.  (Ex. 1, Gross Dep. at 124, 285; *see also* Ex. 5, Quigley Dep. at 211.) He received

regular praise from Mr. Kim, Mr. Quigley, and others for his work, some of which was

captured in writing:

> "[Y]ou are adding a critical new dimension to our Korea practice. I am particularly appreciative of your work as much of what you do is beyond my capacity . . ."  (Ex. 9, 12/24/03 email from M. Quigley to D. Gross at AK000936);

> "I just read the memos to [] re inter adv. Board. They are just excellent!! And you covered everything so superbly."  (Ex. 10, 2/19/04 email from S. Kim to D. Gross at AK001417);

> "I read the proposals . . . . Both are excellent.  It reads nicely and also thoughtfully discusses the issues of interest to the clients."  (Ex. 11, 1/20/04 email from S. Kim to D. Gross at AK001004);

> "Mike Quigley speaks of you highly."  (Ex. 12, 10/7/03 email from M. Emery to D. Gross at AK000417);

> "Don, your presentation at the Partners luncheon meeting today regarding the Korean Practice was well done and well received."  (Ex. 13, 11/18/03 email from M. Emery to D. Gross at AK00749);

> "You are doing a great job on the kpg."  (Ex. 14, 11/1/03 email from R. Burdick to D. Gross at AK000568)..

34.    Toward the end of Mr. Gross' tenure, Akin Gump had collected from its Korean clients an

amount that was projected to represent a 30% increase in revenue for the Korea Practice

Group over the prior year's totals.  (Ex. 24, 8/11/04 email from B. McLean to S. Kim and M.

Quigley at AK003251; Ex. 3, McLean Dep. at 53-54.)

35.    Based on his strong writing abilities and contributions to a special project memorandum in

2003, Defendant assigned Plaintiff the task of writing a major revision in 2004.  (Ex. 4, Park

Dep. at 92-93; Ex. 19, 9/30/03 email from M. Kaye to D. Gross at AK000350.)

7

36.    Mr. Gross was never told by Akin Gump he was being terminated because of his writing. (Verified Complaint at ¶21, 22, 29, 30.)

37.    Kim never requested to see any of Mr. Gross' writing samples prior to hiring Mr. Gross into the Korea Practice Group.  (Ex. 2, Kim Dep. at 114-15.)

38.    Mr. Gross was never told by Akin Gump that he was being terminated because of his billable hours. (Verified Complaint at ¶21, 22, 29, 30.)

39.    Mr. Gross was never counseled by Akin Gump about any deficiencies in his billable hours. (Ex. 1, Gross Dep. at 123.)

40.    Akin Gump submitted its supposed reasons for Plaintiff's termination to the EEOC, but never mentioned billable hours as a reason.  (*See* Ex. 6.)

41.    When asked in written discovery to set forth all reasons for the termination, Defendant claimed that it was due to Sukhan Kim's supposed dissatisfaction with Mr. Gross' writing and other reasons, but never mentioned any shortcomings in billable hours or any independent review by McLean.  (Ex. 18, Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, May 14, 2007, at Response to Interrogatory No. 1.)

42.    Mr. Gross, a professional writer, has written 13 articles published by the Center for Strategic and International Studies ("CSIS") since 2004.  (Gross Aff. at ¶6.)  CSIS and Joel Wit were pleased with Mr. Gross' 2004 paper on the diplomatic and security consequences of the collapse of North Korea's regime.  (*Id.*)

## II.    Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts

As shown below, in several paragraphs of its statement of supposedly undisputed facts ("Def. Stat."), contrary to Rule 56.1, Defendant's claims are based on disputed facts:

43.　　Whether Michael Quigley is the head of the Korea Practice Group, (Def. Stat. at ¶4), or rather, whether Sukhan Kim is the head of the Korea Practice Group.  (Ex. 6 at 1; Ex. 5, Quigley Dep. at 20, 27.)

44.　　 Whether Mr. Quigley's testimony accurately reflects what Akin Gump actually wanted in an attorney for the Korean Practice Group, (Def. Stat. at ¶5), or rather whether the testimony of this biased and interested witness is an inaccurate characterization of the reasons Akin Gump hired Plaintiff: first, to bring organization and structure to the Korea Practice Group by managing its activities, and second, to work on a special project for a major client. (Verified Complaint at ¶8; Ex. 1, Gross Dep. at 50; Ex. 2, Kim Dep. at 56; Ex. 5, Quigley Dep. at 30-32.)

45.　　Whether Mr. Park's testimony accurately reflects what Akin Gump actually wanted in an attorney for the Korea Practice Group, (Def. Stat. at ¶6), or rather whether the testimony of this biased and interested witness is an inaccurate characterization of the reasons Akin Gump hired Plaintiff: first, to bring organization and structure to the Korea Practice Group by managing its activities, and second, to work on a special project for a major client.  (Verified Complaint at ¶8; Ex. 1, Gross Dep. at 50; Ex. 2, Kim Dep. at 56; Ex. 5, Quigley Dep. at 30-32.)

46.　　Whether in Def. Stat. at ¶9, Defendant takes the "nothing negative" quote out of context, particularly where Mr. Kim said that he was "concerned about [Plaintiff's] age," and that Mr. Gross seemed "very old to be starting out in a major law firm."  (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10.)

47.　　Whether Mr. Quigley and Mr. Park were actually concerned about Plaintiff's lack of major

law firm training, lack of an area of specialty, or writing abilities after interviewing Plaintiff, (Def. Stat. at ¶¶10-11), or rather whether the testimony of these biased and interested witnesses are post-hoc pretextual explanations for discrimination, particularly where Mr. Gross was hired by Akin Gump, had seven years of experience at law firms, including the prestigious law firm of Kim & Chang, the largest firm in Korea, had the rare skill of being able to speak Korean, had an area of expertise in public policy and international affairs, and had management experience through his work at the U.S. government, all which made him highly qualified for the position Akin Gump sought to fill, and where Akin Gump never requested a writing sample from Mr. Gross prior to his hire. (Ex. 1, Gross Dep. at 22-25, 47; Ex. 2, Kim Dep. at 23, 26, 114-15.)

48.    Whether Mr. Quigley considered Mr. Gross' experience with the Republic of Korea more than what was required for the position, (Def. Stat. at ¶10), or rather whether Mr. Quigley was interested in hiring Mr. Gross because of Mr. Gross' "impressive academic background" and "longstanding interest and a commitment to the Republic of Korea." (Ex. 5, Quigley Dep. at 63.)

49.    Whether Michael Kaye had misgivings about Plaintiff's abilities and qualifications for the position, (Def. Stat. at ¶12), or whether these statements by a biased and interested witness are post-hoc explanations and a pretext for discrimination, and whether despite Mr. Kaye's June 13, 2003 email, Akin Gump was impressed with Mr. Gross' qualifications and did hire Plaintiff. (Ex. 2, Kim Dep. at 22-23, 26; Ex. 5, Quigley Dep. at 63.)

50.    Whether Mr. Kim had reservations about the firm hiring Mr. Gross because he did not have training at a major law firm and whether he made the quoted comments to Mr. Quigley, (Def.

Stat. at ¶13), or rather whether the testimony of this biased and interested witness is a pretext for discrimination, particularly where, at the time of the hiring, Mr. Kim stated in Quigley's presence he had reservations because Plaintiff was "very old," where Mr. Kim actually hired Plaintiff, and where the firm hired others without law firm experience. (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10; Ex. 2, Kim Dep. at 21; Ex. 5, Quigley Dep. at 230-35.)

51.     Whether Mr. Kim had a concern that Plaintiff was "too senior," referring to Mr. Gross' years out of law school, and discussed this with Mr. Gross during Plaintiff's interview, (Def. Stat. at ¶14), or rather whether Mr. Kim was "concerned about [Plaintiff's] age" and said Mr. Gross seemed "very old to be starting out in a major law firm." (Verified Complaint at ¶10; Ex. 1, Gross Dep. at 48.)

52.     Whether Mr. Gross' response "I hope you don't use my age and my experience against me" was responsive to Mr. Kim's question was about his fit for the job given his seniority, (Def. Stat. at ¶14), or rather whether it was responsive to Mr. Kim stating "I am concerned about your age" and "You seem very old to be starting out in a major law firm." (Verified Complaint at ¶¶10-11.)

53.     Whether Mr. Kim recommended that the firm hire Mr. Gross in part because he liked Plaintiff and Plaintiff "had been candid during his interview that he needed to have major surgery, did not have health insurance and would have to pay for the $70,000-$80,000 surgery out of his own pocket," (Def. Stat. at ¶15), or rather whether Mr. Kim made up this story, given that Mr. Gross never discussed a need for heart surgery or his medical insurance status at any job interviews with the firm, particularly since he had health insurance in June 2003, and did not learn of an impending need for heart surgery until several months later in

November 2003.  (Gross Aff. at ¶¶1,2.)

54.    Whether Mr. Connelly told Mr. Kim that Mr. Gross could only be placed in the International

Section if he met the firm's 2100 hour billing requirement, (Def. Stat. at ¶16 and citations

therein), or rather whether the cited record evidence does not support such an assertion;

whether Mr. Connelly made clear that Mr. Gross could only be placed in the section if he met

his billing requirement, (Def. Stat. at ¶16 and citations therein), or rather whether Defendant

mischaracterizes the testimony, particularly where Plaintiff was not informed of the 2100

hour billing requirement until after he began at the firm, understood that he would be given

full credit for his work developing the Korea Practice, even if the firm technically considered

it unbillable time, and was instructed to bill his time managing and organizing the Korea

Practice Group to a major client retainer.  (Ex. 1, Gross Dep. at 80-83, 125-26, 129-30; Ex.

4, Park Dep. at 45-47; Ex. 2, Kim Dep. at 45.)

55.    Whether Mr. Park's observation, expressed in a June 16, 2003 email that "Don will have a

very hard team *(sic)* billing anywhere close to 2100 hours" was due to Mr. Park's concern

about Plaintiff's lack of substantive legal experience, (Def. Stat. at ¶17), or rather whether

Mr. Park wrote the email to Mr. Kim and Mr. Kaye to highlight firm's expectation that Mr.

Gross would be dedicating at least half his time on the non-billable responsibilities of

developing and organizing the Korea practice.  (Ex. 1, Gross Dep. at 139-140; *see also* Ex.

3, McLean Dep. at 19-20 (recognizing that at the time of his hire, Mr. Gross was expected

to take on non-billable "administrative" work and that the firm's aim was to "expand the

range of services that we provided to Korean clients").)

56.    Whether Defendant's assertions in paragraph 18 are true, or rather whether Defendant

mischaracterizes the testimony for the assertion that Mr. Kim recommended Mr. Gross to Mr. Quigley or that Mr. Quigley obtained approval from Bruce McLean, (*see* Def. Stat. at ¶18 and citations therein), particularly where Mr. Kim was head of the Korea Practice Group, Mr. Kim hired Mr. Gross, and it was more likely that Dennis Race rather than McLean approved the hire. (Ex. 6 at 2, 10; Ex. 5, Quigley Dep. at 27, 74-75.)

57.     Whether Mr. McLean approved the hiring of Mr. Gross, (Def. Stat. at ¶19), or rather whether it was more likely approved by hiring partner Dennis Race, and whether the testimony of the biased and interested witness regarding his expectations for Mr. Gross was inaccurate and is instead part of an effort to cover up a discriminatory termination decision, particularly where Mr. Gross was hired by Akin Gump in large part to dedicate substantial time to managing and developing the Korea Practice Group, time that was otherwise non-billable. (Ex. 5, Quigley Dep. at 74-75; Ex. 1, Gross Dep. at 139-140, 124; Ex. 3, McLean Dep. at 19-20.)

58.     Whether Quigley requested of Race that Defendant add a provision to Plaintiff's offer letter stating "[l]ike other employees of the firm, you will be considered an employee at will; however it is our intention to review your employment situation at your one year anniversary and reassess our needs and the terms of your employment," (Def. Stat. at ¶20), or rather whether the testimony of this biased and interested witness is inaccurate and this provision reflects Defendant's reservations about Plaintiff's age. (Ex. 1, Gross Dep. at 48; Verified Complaint at ¶10.)

59.     Whether the review and reassessment provision contained in Akin Gump's offer letter to Donald Gross was not customary and was peculiar to Mr. Gross, (Def. Stat. at ¶20), or rather

whether this provision was include due to Mr. Gross' age, particularly in light of the inclusion of a similar provision in the offer made to Thomas Hubbard, who was 61 at the time of the offer.  (Ex. 8, 10/13/04 email from M. Quigley to B. McLean and D. Race at AK003407.)

60.    Whether Plaintiff cannot specifically recall ageist remarks between his first interview at Akin Gump and April 2004, (Def. Stat. at ¶21), or rather whether Defendant mischaracterizes the testimony, particularly where age "came up from time to time," and there were "several occasions during the time that I was at Akin Gump between [the first interview and April 2004] when age came up as a subject of discussion."  (Ex. 1, Gross Dep. at 36-37.)

61.    Whether Mr. Kim told Mr. Gross to only do non-billable Korea Practice Group management work "if he did not have enough real billable work," (Def. Stat. at ¶23), or rather whether the cited record does not support such an assertion, where Plaintiff was expected to dedicate at least half his time to managing and developing the Korea practice, and where any such time was to be credited as billable time recognized by the firm, particularly where Mr. Kim for a time instructed Mr. Gross to bill his time to two major Korean client matter numbers.  (Ex. 1, Gross Dep. at 84-85, 89-91, 124-26, 139-40; Ex. 4, Park Dep. at 45-50; Ex. 3, McLean Dep. at 19-20.)

62.    Whether Mr. Kim "tried to help Mr. Gross meet his 2,100 hour billing requirement by, for a period of time, permitting Mr. Gross to bill time worked on non-billable Korea Practice matters to a particular billable retainer when Mr. Gross was short of his target," (Def. Stat. at ¶27), or rather whether Mr. Kim expected Mr. Gross to dedicate at least half his time to developing and managing the Korea Practice Group and instructed Plaintiff to bill his time

on a special project to the major client retainer, and where the firm anticipated that Mr. Gross would do significant work that was otherwise non-billable developing, organizing and managing the Korea practice.   (Ex. 1, Gross Dep. at 84-85, 89-91, 124-26, 139-40; Ex. 4, Park Dep. at 45-50; Ex. 3, McLean Dep. at 19-20.)

63.     Whether the representations in ¶28 of Def. Stat. are accurate, or rather whether the testimony of this interested and biased witness is part of a post-hoc rationale intended to cover up a discriminatory termination decision, particularly where Akin Gump had never requested writing samples from Mr. Gross, Mr. Gross received regular praise for his work, and where Akin Gump assigned Mr. Gross to write the reformulated major client memorandum in 2004 based on his contributions in the first phase.  (Ex. 2, Kim Dep. at 114-15; Ex. 4, Park Dep. at 77, 92-93; *see also* ¶33, *infra*.)

64.     Whether Defendant's paragraph 29 is accurate, or rather whether the testimony of this interested and biased witness is inaccurate, particularly where Mr. Kaye did not work closely with Mr. Gross, Mr. Kaye left to work in Chile shortly after Mr. Gross' arrival, Plaintiff never worked with Mr. Kaye on the special project while Mr. Gross was employed at Akin Gump, and where Mr. Kaye reviewed the final memorandum after it was transmitted to the client and praised Mr. Gross for the quality of his work.  (Gross Aff. at ¶4; Ex. 1, Gross Dep. at 170-71, 204, 206-7; Ex. 19, 9/30/03 email from M. Kaye to D. Gross at AK000350.)

65.     Whether Mr. Kim was "unhappy" with Mr. Gross' draft of an op-ed piece and whether Mr. Kaye "rewrote" it, (Def. Stat. at ¶30), or rather whether the testimony of this interested and biased witness is inaccurate, Mr. Gross never worked with Mr. Kaye on an op-ed, and whether Mr. Kim praised Mr. Gross for his work on what he viewed as an "excellent article."

(Ex. 26, 9/22/03 email from S. Kim to D. Gross at AK000311.)

66.     Whether the assertions regarding Mr. Gross's written work in ¶¶31, 32, and 33 of Def. Stat.

alleging that Mr. Gross only did a "decent job," that Kim did not really mean his praise or

praised even when work was poor, that Mr. Gross "didn't fare well," that Akin Gump "had

an issue" with Mr. Gross' writing, and that Mr. Gross did not have the requisite skill, are

accurate, or rather whether the testimony of these biased and interested witnesses are an

attempt to create post-hoc rationalizations for a discriminatory termination decision,

particularly where Mr. Gross received regular praise from different partners for his work, Mr.

Gross was assigned to write a major revision to the special project memorandum in 2004,

Mr. Gross is a professional writer, and Mr. Gross was told at the time of his termination that

he was not being terminated for performance reasons and his work product was "very good."

(Gross Aff. at ¶6; Ex. 4, Park Dep. at 77, 92-93; Verified Complaint at ¶22; *see also* ¶33,

*infra*.)

67.     Whether the characterizations of paragraph 34 are accurate, or rather whether Kaye's

criticisms were misdirected where Mr. Gross did not even write the memorandum at issue,

Kaye was mistaken about the nature of Mr. Gross' involvement, and Kaye merely needed to

blame someone and he misdirected his anger toward Mr. Gross.  (Ex. 1, Gross Dep. at 208,

212-13.)

68.     Whether Mr. Kim and Mr. Park viewed the Korea Practice Group meetings organized by

Plaintiff as unproductive and whether the completion of other attorneys' agenda items was

Plaintiff's responsibility, and whether Mr. Kim was upset with Plaintiff's work, (Def. Stat.

at ¶35), or rather whether Kim testified that Mr. Gross was not hired to generate business,

16

and Defendant is placing blame on Mr. Gross for other attorneys' failure to carry out their action items as a pretext for discrimination.  (Ex. 2, Kim Dep. at 64)

69.   Whether Mr. Gross' initial draft of the special project for a major client was "poor," and whether Mr. Kim wanted Plaintiff to "succeed" and "continue to bill," and, as a result, directed Mr. Park to revise Mr. Gross' work during the second phase of the memorandum, (Def. Stat. at ¶¶36, 37), or rather whether Mr. Kim felt that Plaintiff was too old to work in a position subordinate to him and Mr. Quigley and whether Plaintiff's recent heart surgery had deepened Kim's concerns about Plaintiff's age.  (Ex. 1, Gross Dep. at 185-88, 191-92.)

70.   Whether Mr. Kim told certain Korea Practice Group attorneys not to tell others about Plaintiff's "deficiencies," (Def. Stat. at ¶37), or rather whether these are self-serving statements and post-hoc justifications by Mr. Kim, an interested and biased witness who told Plaintiff he was being fired because he was too old.  (Ex. 1, Gross Dep. at 238-39; Verified Complaint at ¶20.)

71.   Whether Mr. Kim, Mr. Quigley and Mr. Park found Mr. Gross' draft of the special project memorandum "unusable," and whether Mr. Kim asked Mr. Park to edit Mr. Gross' "unusable" draft, (Def. Stat. at ¶42), or rather whether the special project draft included sections drafted by several attorneys besides Plaintiff, whether Mr. Park thought that Mr. Gross "was making good contributions" to the memorandum and where Mr. Gross was initially assigned the second phase of the special project given his skills and contributions, but Kim then directed Mr. Park to take charge of the project because of Kim's growing discomfort with Plaintiff's age following Plaintiff's heart surgery. (Ex. 4, Park Dep. at 92, 172-73; Ex. 1, Gross Dep. at 185-86.)

72.    Defendant's paragraphs 43 and 44 are not material, as Lisa Ross was not listed as a witness in Defendant's initial disclosures or as a witness with knowledge of the reasons for Plaintiff's termination; however, it is disputed whether Ms. Ross' opinion of the quality of Plaintiff's work is accurate, (Def. Stat. at ¶¶43, 44), or rather whether Ms. Ross, then a junior associate, had sufficient knowledge or expertise to judge Mr. Gross' writing, and whether the declaration of Ms. Ross, a biased and interested witness, is simply another attempt by Defendant to mask its discriminatory termination of Plaintiff. (Ex. 1, Gross Dep. at 174; Ex. 25, Defendant's Initial Disclosure Statement, April 26, 2007 at 1-3; Ex. 18, Defendant's Answers to Interrogatories at Answer to No. 2.)

73.    Whether in the spring of 2004, Mr. Kim asked Mr. Kaye to work on a project with Mr. Gross "to assist him in improving his written work product," and whether Mr. Gross provided a "poorly researched and written" draft memo of this project three to four days later, (Def. Stat. at ¶46), or rather whether Mr. Gross never worked on any such project and there is no evidence of Plaintiff working on a project with Mr. Kaye in the spring of 2004, and Mr. Kaye was not in a position to judge the quality of Mr. Gross' work. (Affidavit of Donald G. Gross at ¶5; Ex. 1, Gross Dep. at 170-71, 206-07.)

74.    Paragraph 47 to Defendant's Statement of Material Facts is not material and is hearsay. Whether the Senior Advisor to the Center for Strategic and International Studies (CSIS) commented negatively on Mr. Gross' draft of an article based on Mr. Gross' writing skills, (Def. Stat. at ¶ 47), or rather whether it represented nothing more than constructive criticism, where CSIS was very pleased with Mr. Gross' paper, Mr. Gross is a professional writer who regularly publishes articles for CSIS and other publications, and where has since that time

written 13 quarterly articles published by CSIS.  (Gross Aff. at ¶6.)

75.    Whether Mr. Gross failed to meet any 2100 hour annual billing requirement, (Def. Stat. at ¶¶48, 49, 50), or rather whether Mr. McLean knew at the time of the hire that Mr. Gross was to dedicate time to non-billable work, Mr. Gross understood that he would be given full billable hour credit for his work developing the Korea Practice, and where any concerns about Mr. Gross' lack of billable hours were never communicated to him and are instead a pretext for discrimination, in particular where Mr. Gross was hired to organize the Korea practice (work that would otherwise be non-billable).  (Ex. 1, Gross Dep. at 87, 89-91, 124-26, 129-30; Ex. 4, Park Dep. at 49-50; Ex. 3, McLean Dep. at 19-20.)

76.    Whether McLean approached Mr. Quigley about Mr. Gross' billable hours as a result of Ms. Slater's concerns and Quigley explained that Mr. Gross had not worked out, (Def. Stat. at ¶51), or rather whether the firm hired Mr. Gross to dedicate half his time on non-billable work organizing and managing the Korea Practice Group to help expand the practice, the practice group revenues rose 30% during that time, no one ever counseled Mr. Gross about any supposed deficiency in billable hours, Mr. Gross was told at the time of his termination there were no deficiencies in his performance and that his work was "very good," and Defendant failed to mention any deficiencies in Mr. Gross' billable hours, either before the EEOC or in its sworn interrogatory response when asked to state all reasons for the termination of Mr. Gross.  (Ex. 1, Gross Dep. at 123, 139-40; Verified Complaint at ¶22; *see* Ex. 6; Ex. 18, Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, May 14, 2007, at Response to Interrogatory No. 1; Ex. 24, 8/11/04 email from B. McLean to S. Kim and M. Quigley at AK003251; Ex. 3, McLean Dep. at 53-54.)

77.    Whether Mr. McLean decided to terminate Mr. Gross' employment because of serious

performance issues or lack of productivity, (Def. Stat. at ¶52), or rather whether Mr. Kim and

Mr. Quigley took part in the termination decision and Akin Gump terminated Mr. Gross

because he was "too old," where the firm hired Mr. Gross to dedicate half his time on non-

billable work organizing and managing the Korea Practice Group to help expand the practice,

the practice group revenues rose 30% during that time, no one ever counseled Mr. Gross

about any supposed deficiency in billable hours, Mr. Gross was told at the time of his

termination there were no deficiencies in his performance and that his work was "very good,"

and Defendant failed to mention any deficiencies in Mr. Gross' billable hours, either before

the EEOC or in its sworn interrogatory response when asked to state all reasons for the

termination of Mr. Gross.  (Ex. 1, Gross Dep. at 123, 139-40; Verified Complaint at ¶22; *see*

Ex. 6; *see also* Ex. 18, Defendant's Objections and Responses to Plaintiff's First Set of

Interrogatories, May 14, 2007, at Response to Interrogatory No. 1; Ex. 24, 8/11/04 email

from B. McLean to S. Kim and M. Quigley, at AK003251; Ex. 3, McLean Dep. at 53-54.)

78.    Whether Mr. McLean was actually aware of Mr. Gross' initial one year term of employment

and that should be communicated to Mr. Gross immediately, (Def. Stat. at ¶53), or rather

whether the testimony of this biased and interested witness is inaccurate, the one year term

reflected Sukhan Kim's discomfort with Mr. Gross' age, a similar term was applied to the

hire of 61 year old Thomas Hubbard, Mr. Gross sought a meeting with Mr. Kim on his own

initiative (not at McLean's urging) at the time of his one year anniversary, at which time Mr.

Kim informed Mr. Gross that he was being terminated because of his age, a sentiment

reinforced by Mr. Quigley, thus the explanation is a pretextual explanation for a

discriminatory termination decision.  (Ex. 2, Kim Dep. at 72-73; Ex. 7; Ex. 8, 10/13/04 email

from M. Quigley to B. McLean and D. Race; Ex. 1, Gross Dep. at 238-39, 244-45; Verified

Complaint at ¶¶20, 21, 22.)

79.    Paragraph 55 in Defendant's statement is true, that "Mr. Kim did recommend that Akin

Gump terminate Mr. Gross's employment," the cited testimony is disputed, and Kim

participated in the decision to terminate Mr. Gross and fired Mr. Gross.  (Ex. 6 at 5, 10, 11.)

80.    Whether Mr. McLean did not discuss Mr. Gross' termination with Mr. Kim, (Def. Stat. at

¶56), or rather whether Mr. Kim participated in the decision to terminate Mr. Gross and fired

Mr. Gross.  (Ex. 6 at 5, 10, 11.)

81.    Whether Mr. McLean did not discuss the termination of Mr. Gross' employment with Mr.

Quigley, (Def. Stat. at ¶57), or rather whether Mr. Quigley participated in the  decision to

terminate Mr. Gross and fired Mr. Gross.  (Ex. 6 at 5, 10, 11.)

82.    Paragraph 58 is immaterial to the extent that Akin Gump may have fired another attorney.

Whether Akin Gump terminated Mr. Gross' employment based on low productivity, (Def.

Stat. at ¶58), or rather whether Akin Gump terminated Mr. Gross' employment because he

was "too old," particularly where he was told that there were no performance deficiencies

and that his work was "very good."  (Ex. 1, Gross Dep. at 238-39; Verified Complaint at

¶¶20, 21, 22, 29, 30.)

83.    Whether McLean alone made a decision regarding Mr. Gross' termination, (Def. Stat. at

¶59), or rather whether Kim and Quigley also made the decision and fired Mr. Gross, and

communicated to Mr. Gross a full month earlier that he was being let go because he was "too

old" and that there were otherwise no deficiencies in his work.  (Ex. 6 at 5, 10, 11; Ex. 1,

Gross Dep. at 238-39; Verified Complaint at ¶¶20, 21, 22, 29, 30.)

84.     Paragraph 60 is immaterial in that Mr. Hubbard was not a lawyer and was not hired as a replacement for Mr. Gross.  (Ex. 2, Kim Dep. at 99.)

85.     Whether McLean made the decision to terminate Mr. Gross' employment and whether Kim delivered the news, (Def. Stat. at ¶61), or rather whether Mr. Gross sought a meeting with Mr. Kim at his own initiative in order to obtain a review, Kim participated in the decision to terminate Mr. Gross, Kim told Mr. Gross he was being terminated because he was "too old," Kim "emphasized the age issue" and told Mr. Gross that he was very uncomfortable with his age and particularly in relation to his own age and Mr. Quigley's age (concerns that were reflected in Mr. Gross' notes quoted only in part by Defendant).   (Ex. 6 at 5, 10, 11; Ex. 1, Gross Dep. at 223-226, 238-39, 245; Verified Complaint at ¶¶20, 21; *see* Gross Dep. Ex. 8 at DG 0004, attached to Def. Mot. Ex. 6.)

86.     Plaintiff wrote the email quoted in part in ¶62 of Def. Stat.; however, Defendant is entitled to no inference in its favor, particularly where Plaintiff testified that he had a "great deal of respect for [Kim's] achievements and accomplishments, and still do, as a -- as a lawyer" but was "very upset" about what Mr. Kim told him about why he was being terminated.  (Ex. 1, Gross Dep. at 279.)

87.     Whether Mr. McLean alone made the decision to terminate Mr. Gross and whether Kim was actually still hopeful that Mr. Gross could stay at the firm in some capacity, (Def. Stat. at ¶63), or rather whether Kim participated in the decision to terminate Mr. Gross and fired Mr. Gross, and Kim was only expressing a concern about Mr. Gross out of his deep appreciation for the contributions Mr. Gross made to the Korea Practice Group and its clients,

notwithstanding the fact that Kim decided to terminate Mr. Gross from the Korea Practice Group because he was "too old." (Ex. 6 at 5, 10, 11; Ex. 1, Gross Dep. at 238-39; 245; Verified Complaint at ¶¶20, 21, 31.)

88.    Paragraph 65 is not material, and it is disputed whether Kim actually tried to extend Mr. Gross' stay as long as he could, (Def. Stat. at ¶65), or rather whether the testimony of this biased and interested witness was intended to cover up the fact that he terminated Mr. Gross because he was "too old," and where Mr. Burdick conveyed to Mr. Gross that he could stay an extra month. (Ex. 6 at 5, 10, 11; Ex. 1, Gross Dep. at 238-39; 275; Verified Complaint at ¶¶20, 21, 31.)[1]

89.    Paragraph 67 is not material and it is disputed whether Mr. Kim actually asked Mr. McLean to extend Mr. Gross' original termination date and McLean granted that request, (Def. Stat. at ¶67), or rather whether Mr. Kim and Mr. McLean, who both participated in the decision to terminate Mr. Gross, made these statements to cover up the fact that Mr. Gross was terminated because he was "too old." (Ex. 6 at 5, 10, 11; Ex. 1, Gross Dep. at 238-39; Verified Complaint at ¶¶20, 21, 31.)

90.    Defendant's paragraph 68 is not material, and it is disputed whether "Mr. Kim suggested the Korea Economy Institute (KEI) and Stan Gale as potential employers" to Plaintiff and forwarded "job opportunity notices at KEI" to Plaintiff, (Def. Stat. at ¶68), or rather whether Mr. Kim sent Mr. Gross a single announcement for an inappropriate position at KEI, and whether Mr. Gross himself asked Mr. Kim to help him obtain a position with the Gale

---

[1]Even if Defendant's assertions in this paragraph were true, a jury might also reasonably infer that any efforts made by Mr. Kim on behalf of Mr. Gross were due to the significant contributions that Mr. Gross made to the Korea Practice Group and its clients.

Company. (Ex. 1, Gross Dep. at 287-88, 295-96, 336.)

91.   Paragraph 69 is not material and it is disputed whether Mr. Gross meant by "too junior" that

the jobs were not appropriate for someone which Mr. Gross' background and expertise, (Def.

Stat. at ¶69), or rather whether Mr. Gross was also referring to the low level of pay offered

and meant that he had been a senior advisor to an undersecretary, Director of Legislative

Affairs at the National Security Council in the White House, and had been counselor of a

major agency of foreign policy apparatus of the United States Government with considerable

experience working overseas in Korea, and the position was primarily inappropriate because

the salary was approximately 25 to 30 percent of Plaintiff's salary at Akin Gump.  (Ex. 1,

Gross Dep. at 336.)

92.   Whether ¶70 of Def. Stat. fully describes the October 27, 2004 lunch meeting, or rather

whether during the lunch meeting, Mr. Kim told Mr. Gross that he was being terminated, not

because of any defects in his performance, but because he was "too senior" because of his

age and, therefore, "not a good fit," and stated further that said he would have been able to

pick up the phone and find Mr. Gross a position at another law firm if Mr. Gross were a fifth-

year associate, but that this would not be possible in Mr. Gross' case because he was too old.

(Verified Complaint at ¶¶29, 31.)  Whether in the email quoted in ¶70 of Def. Stat., Plaintiff

is solicitous to Mr. Kim in the interest of obtaining work.  (Ex. 1, Gross Dep. at 337-40.)

93.   Paragraph 71 of Def. Stat. is not material, and Defendant is not entitled to any inferences in

its favor.

94.   Akin Gump does not assert it as undisputed fact, but its heading that "Mr. Gross Admits that

his Employment at Akin Gump was Terminated Because of his Lack of Productivity," as

24

with other headings (Def. Stat. at p. 19) is utterly unsupported by record evidence, the following paragraph 72 is not material, and any inference or suggestion in paragraph 72 is disputed, particularly where Akin Gump admitted that Mr. Gross was not let go based on economic considerations and the Korea Practice Group enjoyed a 30% increase in projected income during his year with the firm, and Mr. Gross drafted the October 20, 2004 emails because he "couldn't bring [him]self to tell [the individuals] what had happened at Akin Gump" and that he "had been discriminated against and basically left for dead on the side of the road." (*See* Defendant's Answer, March 19, 2007, at ¶30 (Docket Entry No. 3); Ex. 24, 8/11/04 email from B. McLean to S. Kim and M. Quigley, at AK003251; Ex. 3, McLean Dep. at 53-54; Ex. 1, Gross Dep. at 310-13.)

95.    Paragraph 73, Defendant's purported harassment policy, is not material because Plaintiff does not make a claim for discrimination based on a hostile environment theory. (*See* Verified Complaint, February 6, 2007 (Docket Entry No. 1).)

96.    Plaintiff authored the emails that are quoted in part in ¶75 of Def. Stat., without any emphasis, but Mr. Gross wrote the emails to communicate Akin Gump's unwillingness to set up investor meetings, "which was the reason . . . that [Prospective Client] wanted to enter into the engagement in the first place," and because he felt that "Akin Gump, and -- and specifically Sukhan Kim, had a huge conflict of interest. There was no way that [Kim] could represent both [Company X] and [Company Y], [Company Y] being his most important client. I felt I had a duty to point that out to [Prospective Client]." (Ex. 1, Gross Dep. at 256, 297.)

97.    Whether Mr. Gross did not advise anyone else of his comments, (Def. Stat at ¶75), or rather

whether he discussed the matters with Akin Gump partner Jay Cohen.  (Ex. 1, Gross Dep. at 263-64, 292-93.)

98.  Whether Akin Gump filed its counterclaims because Mr. Gross disparaged or "criticized the performance of Akin Gump attorneys," (Def. Stat. at ¶77), or rather whether Akin Gump filed its counterclaims in retaliation for Mr. Gross' protected complaint of discrimination in this case, particularly where it did so at its first opportunity, Akin Gump had never in its history charged any attorney with a breach of fiduciary duty or breach of prospective business advantage, Akin Gump admits that it "derives no benefit from the Counterclaims," and that the counterclaims do not "provide a strategic advantage," and Mr. Gross advised Prospective Client to delay signing an engagement letter because Akin Gump had made clear that it could not deliver the services that Prospective Client hoped to attain, and whether, believing that Mr. Kim could not ethically represent Company X and Company Y, Mr. Gross communicated this conflict of interest to Prospective Client because he felt he had "had a fiduciary duty" and "a duty of candor" to Prospective Client.  (Ex. __, Gross Dep. at 263-64, 295-96; Ex. 22, Defendant's Objections and Responses to Plaintiff's Third Set of Interrogatories, August 16, 2007, at 4; Def. Mem. at 27.)

99.  Whether Mr. McLean would have immediately terminated Plaintiff for his alleged misconduct, (Def. Stat. at ¶78), or rather whether such a self serving statement fails as proof that Akin Gump would have actually terminated Mr. Gross for advising prospective clients that Akin Gump would not do the work the client wanted to have done and of conflicts of interest, where Defendant has never charged a single employee with breach of fiduciary duty or breach of prospective business advantage, and where Akin Gump admits that it "derives

no benefit from the Counterclaims," and that the counterclaims do not "provide a strategic

advantage," and thus the counterclaims were brought to retaliate against Mr. Gross for his

legally protected complaints.  (Ex. 22 at 4; Gross Dep. at 263-64, 295-96; Def. Mem. at 27.)

Respectfully Submitted,

WEBSTER,   FREDRICKSON,   HENRICHSEN,
CORREIA & PUTH, P.L.L.C.


_____/s/_____
Jonathan C. Puth  #439241
Kataryna L. Baldwin  #494439
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
Attorneys for Plaintiff Gross

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD G. GROSS )
)
                Plaintiff, )
)      Civil Action No. 07-399 (EGS/JMF)
         v. )
)
AKIN GUMP STRAUSS HAUER & FELD LLP )
)
             Defendant. )
)

**AFFIDAVIT OF DONALD G. GROSS**

I, Donald G. Gross, state as follows:

1.    I had no plans to have heart surgery in June 2003 and I did not discuss any such topic at any interview with Sukhan Kim in or around that time. As well, I had health insurance in June 2003.

2.    In November 2003, I was advised by a doctor of a need for heart surgery. In late January 2004, another doctor confirmed the diagnosis and also recommended surgery.

3.    I advised Sukhan Kim and Michael Quigley of my need for heart surgery for the first time via email on March 4, 2003. Following the surgery on March 23, 2004, I remained in the intensive care unit for two days, and in the hospital for another three days.

4.    I did not work with Michael Kaye on the special project for a major client in 2003.

5.    I did not work with Michael Kaye on a written project in spring 2004.

6.    I am a professional writer and regularly publish articles for various international journals, including a journal sponsored by the Center for Strategic and International Studies (CSIS). Joel Wit, a Senior Advisor at CSIS, was very pleased with my 2004 paper on the diplomatic

and security consequences of the collapse of North Korea's regime, which was written for

a project sponsored by the United States Institute of Peace.  Since writing the 2004 paper, I

have written 13 quarterly articles published by CSIS.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Donald G. Gross

Subscribed and sworn to before me this ___/___ day of December, 2007.

_____
Notary Public

GAIL M. SPENCE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires May 14, 2010

My Commission expires:  _____

2