**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DONALD G. GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07CV00399 (EGS) |
| | ) |
| AKIN GUMP STRAUSS HAUER & FELD LLP, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), through counsel, submits this reply in support of its motion for summary judgment.  Plaintiff Donald G. Gross has unsuccessfully complicated a straightforward set of undisputed facts to create the appearance of disputes.  He does not, however, provide any admissible evidence, as he must, to refute the following material facts:

- Mr. Gross's date of birth is November 29, 1952.  Statement at ¶ 8.[1]  He was 50 when he was hired by Akin Gump and 51 when his employment was terminated.  Id. at ¶¶ 8, 21.

- Bruce McLean is the Chairman of Akin Gump.  Statement at ¶ 2.  Mr. McLean's date of birth is November 15, 1946.  Id.  He is older than Mr. Gross.

- Sukhan Kim, Akin Gump partner, is the most senior lawyer in the Korea Practice Group.  Statement at ¶ 4.  Mr. Kim's date of birth is November 20, 1949.  Id.  He is older than Mr. Gross.

- In the first half of 2003 Akin Gump was looking to hire an attorney for its Korea Practice Group who "could help us with managing the practice, managing existing workload that we already had, perform analytical and legal advisory services, particularly in respect of one large project that we had."  Akin Gump wanted "to bring in somebody that could help us with substantive writing," "who could really devote substantive time and had substantive knowledge of issues to be able to write well."  Statement at ¶¶ 5-6.

- Dan Spiegel (date of birth September 5, 1945), an Akin Gump partner, recommended that the firm consider hiring Mr. Gross for the position.  Statement at ¶ 7.  He is older than Mr. Gross.

- In June 2003 Mr. Gross interviewed with a number of Akin Gump attorneys, including Mr. Kim.  Mr. Gross thought that his interview with Mr. Kim "went well."  Statement at ¶ 9.

- Michael Quigley (date of birth September 11, 1957), a former Akin Gump partner, also interviewed Mr. Gross.  Statement at ¶ 4, 10.  Mr. Quigley was concerned that Mr. Gross "had not spent significant time in a major, at least U.S., law firm, and I was wondering whether or not the absence of that would be a barrier to succeeding at Akin Gump."  Id. at ¶ 10.  In addition, Mr. Quigley was concerned that Mr. Gross's "experience and the length of his experience, which was considerable with the Republic of Korea, was more than what was required or appropriate for the job we were looking to fill."  Id.  Finally, Mr. Quigley was also concerned about that fact that Mr. Gross "had not developed a specialty area or expertise within the practice of law."  Id.

- David Park (date of birth November 28, 1971), then Counsel at Akin Gump, also interviewed Mr. Gross.  Statement at ¶ 6, 11.  Mr. Park was concerned because Mr. Gross

---

[1] See Defendant's Statement of Undisputed Material Facts ("Statement").

"wasn't coming in with a specific area of expertise, and in a law firm you need that specific area of expertise to continue to bill." <u>Id.</u> at ¶ 11.  In addition, Mr. Park was concerned, because he "knew the type of substantive writer that we were looking for, and we also knew that an issue that has consistently come up is analytical skills with legal training," and Mr. Gross lacked "experience in a U.S. law firm or training." <u>Id.</u>

- Michael Kaye (date of birth January 8, 1960), former Akin Gump partner, also interviewed Mr. Gross.  Mr. Kaye prepared and sent an email on June 13, 2003 to Mr. Kim, Mr. Quigley and Mr. Park, describing his thoughts regarding Mr. Gross:

> Personally, I liked him.  He seemed like a really nice guy.  However:  (1) **He struck me as being somewhat na[i]ve about what law firms are all about. . . .  For instance, I'm not sure he has an appreciation for the intensity of big U.S. law firms. . . .  He seemed much more interested in trying to "generate business" from his Korea contacts than he was in rolling up his sleeves to help us in the Korea practice. . . . Truthfully, I don't think he has a finder personality, and honestly we don't need somebody to bring in more business, we need someone to service what we already have.**  Statement at ¶ 12.

- Prior to recommending to the firm that it hire Mr. Gross, Mr. Kim consulted with Warren Connelly (date of birth November 18, 1946), then Head of the International Trade Practice Group at Akin Gump.  Statement at ¶ 16.  Mr. Connolly is older than Mr. Gross. As Mr. Kim explained in a June 16, 2003 email to Mr. Connelly, and others:

> i spoke to warren about don gross.  Warren was more than willing to accommodate us and has agreed to invite don to his international section. I think this is just great.  I have assured warren though that he would bill no less than 2,100 hours, as required of all counsels.  Dan, can you pls tell don about this billing requirement and get his reaction, as I must honor my commitment to warren?  Warren, thanks so much for your support and cooperation.  I really appreciate it. <u>Id.</u>

- Mr. Kim recommended to Mr. Quigley that Akin Gump hire Mr. Gross.  Mr. Quigley took Mr. Kim's recommendation to Mr. McLean, Chairman of Akin Gump, and Dennis Race (date of birth March 13, 1947), hiring partner at Akin Gump.  Statement at ¶ 18. Mr. Race is older than Mr. Gross.

- **Mr. McLean approved the hiring of Mr. Gross on the basis "that Mr. Gross would be a fully productive practicing lawyer at a senior counsel level given the amount of the salary."**  Statement at ¶ 19.

- As a result of the reservations expressed about hiring Mr. Gross, however, Mr. Quigley asked Mr. Race to add a provision to Mr. Gross's offer letter stating **"[l]ike other employees of the firm, you will be considered an employee at will; however, it is our intention to review your employment situation at your one year anniversary and**

**reassess our needs and the terms of your employment."** Statement at ¶ 20.  He did so. Id.  Such language is not a customary part of Akin Gump's offer letters.  Id. at ¶ 20.[2]

- **According to Mr. Gross's handwritten notes, in July 2003, Mr. Kim told him that he was required to bill 2,100 hours of billable client work annually.** Statement at ¶ 22. **During a separate July 2003 meeting, Mr. Park also conveyed the 2,100 billable requirement.** Id. at ¶ 25.

- Mr. Gross did a "decent job" on some of the non-legal writing projects that he was assigned.  Mr. Gross, along with other attorneys received emails praising his work on non-billable projects from Mr. Kim and others.  Statement at ¶ 31.

- As early as late September 2003, however, Mr. Kim and Mr. Park discussed Mr. Gross's poor contribution on a major client memorandum.  Statement at ¶ 28.  They had hoped that Mr. Gross "would be able to provide us with strategic input into the memo, and [] be[] able to write strategically, where we're giving advice, and we were coming to the realization that that was not the case at that time."  Id.  Mr. Kim and Mr. Park discussed their "hope" that Mr. Gross would be able to "come in and really be able to contribute in that way, to be one of the primary people on [the project], since we were all in different sections doing other work.  Id.  And the conclusion was that that was likely not going to work out."  Id.

- On November 11, 2003, Mr. Kaye wrote an email to Mr. Kim raising his concerns about the handling and quality of an assignment by Mr. Gross.  Statement at ¶ 34.  On November 14, 2003, Mr. Kaye wrote an email instructing Mr. Gross and another attorney to "pull the plug" on the assignment.  Id.  That same day Mr. Kaye also sent an email to Mr. Gross providing corrective suggestions on future staffing and efficiency.  Id.

- In April 2004, the Center for Strategic and International Studies criticized a paper Mr. Gross submitted for publication:  "Don[] I have had a chance to look at your paper.  **I have an obligation to USIP to make sure these papers are the best they can be. Honestly, I still think yours falls short of the mark."** Statement at ¶ 47.

- On February 25, 2004, Val Slater (date of birth October 13, 1952), who had replaced Mr. Connelly as Head of Akin Gump's International Trade Practice Group, sent an email to Mr. McLean in which she raised concerns about Mr. Gross's billable hours.  Statement at ¶ 38.  Ms. Slater is older than Mr. Gross.  Specifically, Ms. Slater told Mr. McLean:

> Bruce:  Sorry to bother you with this, but one topic I meant to mention to you yesterday, (but forgot!) is the status of Korea practice development personnel.  **I am carrying on my section "books" Don Gross, who is working full time at Korea practice development and who is billing only about 20-30 hours a month.  We originally parked him in our section on the express understanding (which Warren correctly**

---

[2] Mr. Gross attempts to dispute Mr. Quigley's sworn deposition testimony that this provision was not customary with an email discussing the employment of Thomas Hubbard (a non-lawyer).  See Mr. Gross's Statement of Disputed Facts ("Gross Statement") at ¶ 59. Significantly, Mr. Gross does not mention any of the forty-six (46) offer letters to Senior Counsel that Akin Gump produced in this matter that do not contain that statement.

> insisted upon) that he would be kept fully billable, which he was for a
> while.  Since last fall, however, he is down to next to nothing . . . .  I
> know Rick [Burdick] mentioned this to you last week, and that you would
> be looking at the situation this week, so I just wanted to mention what the
> current state of affairs means for our group.  Id.

- Rick Burdick is the Partner in Charge of Akin Gump's Washington D.C. office.
  Statement at ¶ 38.

- Mr. McLean testified that **"Mr. Gross, like all of our senior counsel, was expected to
  perform at a level where they would have, you know, roughly 2,100 chargeable
  client hours and that that was one of the factors that – that was addressed when
  Mr. Gross was hired, and my recollection was that Ms. Slater – Ms. Slater had –
  after she became the practice manager, had indicated to me that the performance
  was substantially below that."**  Statement at ¶ 50.

- As a result of Ms. Slater's expressed concerns, **Mr. McLean approached Mr. Quigley**
  and asked him "why Mr. Gross's performance was so far below what we had expected."
  Mr. Quigley explained: "He hasn't worked out."  Statement at ¶ 51.

- In January 2004 Mr. Gross noted to himself in writing that **"I have to increase billable
  hours as much as possible."**  He further noted that **"[i]f I put myself in the front edge
  of all actual marketing activity and try by whatever means to increase my billable
  hours, it should be okay."**  Statement at ¶ 48.

- In March 2004, Mr. Gross went out on leave (less than two weeks), for what he referred
  to as "non-invasive heart surgery."  Statement at ¶ 39.  When he returned from medical
  leave, Mr. Gross was assigned to work on a new version of the memorandum.  Id. at ¶ 41.

- Mr. Park asked Lisa Ross (date of birth September 1, 1977), an associate with Akin
  Gump, to assist him, Mr. Quigley and Mr. Gross revise the draft memorandum prepared
  by Mr. Gross.  Statement at ¶ 43.  Ms. Ross assisted Mr. Park with the rewriting and
  restructuring of the memo.  Id. at 44.  She found this to be particularly difficult.  Id.  Ms.
  Ross explained to Mr. Park in an email on May 22, 2004:

  > I think it may have been totally impossible to get rid of that "type of
  > writing" that we discussed last night – but I tried we make progress. . . .
  > Again, literally full sentences and ideas were repeated in the paragraph
  > below them, making the message get lost in the words.  So, I added entire
  > paragraphs and deleted entire paragraphs and switched the order of
  > sections, so I really hope Don won't be offended.  I also reworked the tech
  > policy section and tried to make it more concise and convey why we are
  > recommending this --. . . .  Id.

- **Mr. Gross failed to meet his 2,100 hour annual billing requirement—billing only
  approximately 1,300 to client billable work during his first year of employment with
  Akin Gump.**  Statement at ¶ 49.

- **Mr. McLean decided to terminate Mr. Gross's employment "because there were
  serious performance issues," "[f]irst of all, there was a very substantial lack of
  productivity.  Secondly, even with respect to the tasks that he was asked to**

**accomplish there were performance issues with respect to – to his ability to carry out those tasks."**  Statement at ¶ 52.  Mr. McLean was "aware at the time that Mr. Gross was working under a one-year contract and my decision was we were not going to extend that, that we needed to communicate to Mr. Gross that we were not going to extend the relationship beyond the one year that was in his agreement and that – and that that ought to be communicated to Mr. Gross immediately."  Id. at ¶ 53.

- On July 9, 2004, Mr. Burdick wrote to Mr. McLean and again addressed the need to **"deal with some of the idle resources, like don gross."**  Statement at ¶ 52.

- **Mr. Kim did not recommend that Akin Gump terminate Mr. Gross's employment.**  Statement at ¶ 55.[3]

- **Mr. McLean did not discuss Mr. Gross's termination with Mr. Kim before making the decision to terminate Mr. Gross.**  Statement at ¶ 56.

- **Mr. Kim did not discuss Mr. Gross's termination with Mr. Quigley prior to Mr. McLean making the termination decision.**  Statement at ¶ 57.

- During the summer 2004, Mr. McLean also decided to require the withdrawal from the partnership of an income partner (date of birth October 31, 1963) (the "Income Partner (under 40)") in the Korea Practice Group.  The decision to terminate the Income Partner (under 40), like the decision to terminate Mr. Gross's employment, was based, in part on low productivity.  Statement at ¶ 58.

- On or about July 13, 2004, Mr. Kim delivered news of Mr. McLean's decision to Mr. Gross.  Statement at ¶ 61.  According to Mr. Gross's notes, Mr. Kim also "offered to talk with Spiegel about possibility of my joining PLP," and "[s]aid that if asked, he would say that the Korea section could use me one-third of time; and he would give me projects when something came up that was appropriate.  Id.

- On July 26, 2004, Mr. Gross wrote Mr. Kim an email in which he stated:

  > Frankly, our recent discussion came as a big surprise to me so I am still sorting through my options.  I have a great deal of respect for you and **I know that what you have told me is best both for Akin Gump and for the development of my own career.  I sincerely appreciate your support.  Thanks and best wishes, Don.**  Statement at ¶ 62.

- On August 5, 2004, according to Mr. Gross's notes, Mr. Kim told Mr. Gross that **"McLean wants to put in place a 60-day "exit strategy" for me," and "SK says he hasn't talked with McLean directly but received all the information about me from MQ."**  Statement ¶ 66.  On August 11, 2004, according to Mr. Gross's notes, "SK said I should plan to leave the law firm by October 1.  Could possibly seek a short extension based on fact that **SK has not talked directly to McLean about me."**  Id.

- Mr. Kim **"tried to extend [Mr. Gross's] stay as long as [he] could" and "was trying to**

---

[3]  Akin Gump's inadvertent omission of the word "not" from Statement ¶ 55 was corrected in its December 19, 2007 Errata, consistent with the sworn record testimony originally cited in Statement ¶ 55.

keep him there as long as [he could] at Akin Gump." Statement at ¶ 65. **Mr. Kim asked Mr. McLean to extend Mr. Gross's original termination date** in order to provide more time for Mr. Gross to find suitable employment. Id. at ¶ 67. As a result, **Mr. Gross's termination date was extended to October 31, 2004**. Id.

- On August 11, 2004, Mr. McLean sent an email to Mr. Kim and Mr. Quigley summarizing Mr. McLean's previous decision regarding "at least two personnel actions that need to be addressed immediately. Gross ought to be resolved by October 31 and [Income Partner (under 40)] by year end." Statement at ¶ 59

- **In the Fall 2004, Mr. Gross explained the circumstances of the termination of his employment** at Akin Gump to at least five (5) individuals inside and outside of Akin Gump as follows:

    Over the summer, **Akin Gump's management put considerable pressure on the Korea practice group here to reduce its costs due to insufficient profitability. As a consequence, I and a partner in the practice group from our L.A. office were asked to leave the firm.** Though this decision seems very unfair and short-sighted because I have only been at Akin Gump about one year (and have done quite well), it is the reality I am facing. Statement at ¶ 72.

- Mr. Gross never complained about any alleged comments made by Mr. Kim to Mr. Kim or to anyone else at Akin Gump. Statement at ¶ 74.

Mr. Gross's lack of admissible evidence to dispute these material facts is fatal to his case.

See Lytes v. D.C. Water & Sewer Auth., No. 05-402 (RMC), 2007 U.S. Dist. LEXIS 91154, at

*17 (D.D.C. Dec. 13, 2007) (granting summary judgment, holding that: "By pointing to the

absence of evidence proffered by the nonmoving party, a moving party may succeed on

summary judgment. . . . the nonmoving party may not rely solely on allegations or conclusory

statements") (citations omitted).

In the face of this overwhelming and undisputed evidence, Mr. Gross makes three

unpersuasive arguments. First, Mr. Gross alleges that summary judgment must be denied

because of Mr. Kim's alleged ageist remarks. Even assuming that Mr. Kim made the alleged

comments, they are of no consequence to this motion. There is no evidence to dispute the fact

that Mr. McLean, Chairman of Akin Gump, decided to terminate Mr. Gross's employment after

hearing from Ms. Slater, then Head of the Group to which Mr. Gross was undisputedly assigned,

and Mr. Burdick, the Partner in Charge of the Washington D.C. office, that they had concerns about Mr. Gross's low productivity. Mr. McLean then learned from Mr. Quigley that Mr. Gross "had not worked out." Mr. Kim's statements are entirely irrelevant because there is no evidence whatsoever that Mr. Kim recommended that Mr. Gross be terminated, that Mr. McLean discussed Mr. Gross's termination with Mr. Kim prior to making the decision to terminate Mr. Gross, or that Mr. Kim discussed Mr. Gross's termination with Mr. Quigley prior to Mr. McLean's termination decision. In fact, Mr. Gross's own notes confirm that as of August 5, 2004, Mr. Kim had not talked to Mr. McLean about Mr. Gross at all. Statement at ¶ 66. Most significantly, Mr. Gross does not cite to any admissible evidence in support of any discriminatory animus on the part of Mr. McLean, Ms. Slater, or Mr. Burdick (all of whom are older than Mr. Gross).[4]

Second, in the absence of any evidence that disputes the fact that Mr. McLean made the decision to terminate Mr. Gross's employment without consulting Mr. Kim, Mr. Gross resorts to arguing about so-called inconsistencies in statements regarding why Akin Gump terminated Mr. Gross's employment and who made the termination decision, made in a letter to the Equal Employment Opportunity Commission ("EEOC"), in an interrogatory response, and Akin

---

[4] Moreover, although the Court need not examine the statements allegedly made by Mr. Kim, a cursory review of the record shows that Mr. Gross has repeatedly mischaracterized his own sworn statements in this matter regarding what exactly he alleges Mr. Kim stated to him. For example, Mr. Gross states, for the first time, in his Opposition that "on July 13, 2004, Sukhan Kim told [him] that he was being let go from his job with the Korea Practices Group at Akin Gump because he was 'too old.'" Opposition at 2. Mr. Gross cites to his deposition testimony as well as his Complaint in support of this statement. Neither support it. In his Complaint, Mr. Gross alleges that Mr. Kim told him that he believed "that [Mr. Gross] was 'too old to do the kind of work you're doing.'" He does not state that Mr. Kim in any way said that he was being terminated because he was too old. In fact, Mr. Gross's reported contemporaneous notes of his July 13, 2004 meeting with Mr. Kim (which, was a meeting initiated by Mr. Gross, not Mr. Kim), reflect that Mr. Kim still thought it was possible for him to find "the right niche . . . within the firm," and that he suggested that Mr. Gross consider another practice group within Akin Gump where he felt Mr. Gross's skills could be utilized.

Gump's motion.  He is wrong.  Akin Gump has consistently maintained that Mr. Gross's termination was based on his inadequate performance—this includes, among other things, his low billable hours.  See EEOC letter, attached as Exhibit 6 to Opposition ("Mr. Gross. . . was asked to leave [Akin Gump] for one reason:  he was hired with the express written understanding that Akin Gump's need for him would be reassessed after one year; his performance during that year was not satisfactory; thus, his services were not needed."); Interrogatory Response, attached as Exhibit 18 to Opposition ("Mr. Gross was hired with the express understanding that the firm's need for him would be reassessed in one year.  Accordingly, the firm assessed its need for Mr. Gross, and his employment was terminated for his inadequate performance and contributions.").  Mr. Gross concedes that performance and billable hours are interrelated when he characterizes Akin Gump as "a large law firm whose billable hours are its lifeblood."  Opposition at 9.

Additionally, Mr. Gross argues that in the legal analysis section of EEOC letter, when discussing the inference against discrimination that exists in ADEA cases when all alleged decisionmakers are over 40, Akin Gump states that Mr. Kim "participated in . . . the decision to terminate Mr. Gross."  It is, however, undisputed, that after Mr. McLean decided, without consulting Mr. Kim, that Mr. Gross's employment should be terminated, Mr. Kim did participate in Mr. Gross's termination decision, both by relating on several occasions the decision to Mr. Gross, and successfully lobbying Mr. McLean to extend Mr. Gross's employment at the firm.  There is nothing inconsistent between the EEOC letter, Akin Gump's interrogatory response and the evidence in the record.

Third, Mr. Gross alleges that there is a factual dispute as to whether his performance at Akin Gump was actually poor.  This misses the point entirely.  The relevant issue is whether Mr. McLean believed that Mr. Gross's performance was acceptable.  It is undisputed that he did not.

Finally, Mr. Gross does not seriously attempt to defend his retaliation claims. He admits making a number of damaging negative statements about Akin Gump and its partners to its prospective clients—including recommendations that they not retain the firm's services—while he was on the Akin Gump payroll. He has no evidence to dispute the sworn evidence that Mr. McLean made the decision to file Counterclaims based on the discovery of these statements during the discovery process in this case, or that he would have fired Mr. Gross immediately had he known about the emails. Mr. Gross's self serving statements about his motivation for making these statements do not create a dispute. There is absolutely no legal or factual support for Mr. Gross's theory that the filing of these Counterclaims was retaliatory.

## I.    ARGUMENT

### A.    Alleged Comments By Non-Decisionmakers Are Irrelevant.

Mr. Gross does not dispute the ample authority cited by Akin Gump (See Motion at 8-13) granting summary judgment to the employer where, as here, there is no evidence of ageist animus by the actual decisionmaker. Accordingly, the cases Mr. Gross cites are inapposite because they all involve discriminatory statements made by the decisionmakers, or involve stray remarks by non-decisiomakers combined with other evidence of discriminatory animus.[5] There

---

[5] See Lucas v. Paige, 435 F. Supp. 2d 165, 171 (D.D.C. 2006) (noting that the alleged ageist "statement was uttered by the decision maker"); Mazloum v. D.C. Metro. Police Dep't, No. 06-0002 (JDB), 2007 U.S. Dist. LEXIS 81793 (D.D.C. Nov. 6, 2007) (finding that summary judgment of a plaintiff's race discrimination claim against a police officer was inappropriate where he allegedly yelled racist statements while beating the plaintiff); Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999) (noting that the individual alleged to have made the discriminatory statement was a decisionmaker); Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 922 (8th Cir. 2000) (finding that evidence of ageist remarks allegedly made by non-decisionmakers "standing alone, may not give rise to an inference of discrimination"); Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001) (finding that gender based "remarks made by decisionmakers. . . may give rise to an inference of a discriminatory motive") (internal citations and quotations omitted); Futrell v. J.I. Case, 38 F.3d 342 (7th Cir. 1994) (reversing award of judgment as a matter of law for the

is no such evidence about Mr. McLean. Because Mr. Gross has no evidence to dispute the fact

that Mr. McLean made the decision to terminate his employment without consulting with Mr.

Kim, the remarks Mr. Gross attributes to Mr. Kim are immaterial to this motion.[6]

In addition, in Bennett v. Saint-Gobain Corp., 507 F.3d 23 (1st Cir. 2007), (decided the

same day Akin Gump filed its motion), the Court affirmed summary judgment for employers on

discrimination claims with facts similar to Mr. Gross's claims. In Bennett, the Court affirmed

summary judgment with respect to an attorney's age discrimination claims where plaintiff

alleged that he had adduced significantly probative evidence of pretext—an executive had made

statements to the effect that he wanted to get rid of older employees. Id. at 26. The Bennett

Court rejected this argument, noting that the alleged statements were not made by the individual

who made the decision to terminate his employment, and held that "[a]ctionable discrimination

cannot exist in a vacuum. Rather, the discriminatory intent of which a plaintiff complains must

be traceable to the person or persons who made the decision to fire him." Id. at 31. The Court

held:

> When assessing a claim of pretext in an employment discrimination case, an
> inquiring court must focus on the motivations and perceptions of the actual
> decisionmaker. Statements made by those who are not involved in the decisional
> process "normally are insufficient, standing alone, to establish either pretext or
> the requisite discriminatory animus." In the absence of some other proof that the
> decisionmaker harbored a discriminatory animus, it is not enough that his
> perception may have been incorrect. Rather, the plaintiff must show that the
> decisionmaker did not believe in the accuracy of the reason given. The plaintiff's
> argument runs afoul of these tenets. His evidentiary proffer centers on a
> discriminatory animus that he attributes to Feagans. That proffer does not take
> the plaintiff very far; what is conspicuously missing is evidence either that
> Feagans had something to do with the discharge decision or that Mesher – the

defendant, and noting that the record provided evidence that the individual who ultimately
terminated the plaintiff consulted with the individual who allegedly made ageist comments
before firing the plaintiff).

[6] We will address the so-called inconsistencies in Section B below.

> actual decisionmaker – shared Feagans's sentiments. For aught that appears,
> Mesher made the decision to fire the plaintiff based on Wilk's investigation and
> without ever consulting Feagans.

Id. at 31 (emphasis added) (internal citations omitted). Here, the proper focus is "on the

motivations and perceptions of the actual decisionmaker"—Mr. McLean. There is no evidence

that Mr. McLean harbored discriminatory animus with respect to Mr. Gross, nor is there any

evidence that he did not believe that Mr. Gross's performance was unsatisfactory when he

decided to terminate him. Similarly, the discriminatory animus that Mr. Gross attributes to Mr.

Kim "does not take [Mr. Gross] very far" given the lack of any evidence that Mr. McLean shared

Mr. Kim's alleged sentiments or that Mr. Kim had anything to do with Mr. McLean's

termination decision other than talking to Mr. Gross about it on several occasions (Statement at

¶¶ 61, 66) and then lobbying to extend the termination date. Statement at ¶ 67. Mr. Gross also

"speculates" that Mr. McLean consulted with Mr. Kim prior to making his termination decision

(See Opposition at 25 "a jury might find it unlikely that Akin Gump's Chairman, who had never

met Mr. Gross, would terminate Mr. Gross without ever consulting with his partner Sukhan

Kim"). Mr. Gross's "conjecture cannot take the place of proof in the summary judgment

calculus." Bennett, 507 F.3d at 31. See also Dorsey v. Morgan Stanley, 507 F.3d 624 (7th Cir.

2007) (affirming summary judgment where plaintiff had only circumstantial evidence that the

alleged discriminator participated in the demotion decision).

Finally, Mr. Gross does not successfully distinguish the authority cited in the motion

which holds that even if Mr. Kim or Mr. Quigley had recommended to Mr. McLean that Mr.

Gross be terminated, Mr. Gross's claims are defeated because of Mr. McLean's own independent

evaluation of Mr. Gross's poor performance. See Motion at 8-13. In addition, as the Seventh

Circuit recently held in Brewer v. Bd. of Trs., 479 F.3d 908, 918 (7th Cir.), cert. denied, 128 S.

Ct. 357 (2007):

> [W]here a decision-maker is not wholly dependant on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision-maker. It does not matter that in a particular situation much of the information has come from a single, potentially biased source, so long as the decision-maker does not artificially or by virtue of her role in the company limit her investigation to information from that source.

Id. (citations omitted). See also Jenks v. City of Greensboro, 495 F. Supp. 2d 524 (M.D.N.C. 2007) (granting summary judgment on discrimination claim and, citing Brewer, finding that where the decisionmaker did not rely on one allegedly biased report, but instead made the adverse decision after reviewing numerous reports, the decision making process did not disclose evidence of animus required for a successful discrimination claim).

This is not a case where Mr. McLean "rubber-stamped" a termination decision made by Mr. Kim and/or Mr. Quigley. In fact, there is no evidence that either Mr. Kim or Mr. Quigley recommended that Mr. Gross be terminated. Rather, Mr. Gross's termination was set into motion by Mr. McLean's discovery, through information undisputedly provided by Ms. Slater and Mr. Burdick that Mr. Gross's productivity was low. Mr. McLean then approached Mr. Quigley and inquired about why Mr. Gross's performance was not where it needed to be. Mr. Burdick then again reminded Mr. McLean that he should "deal with some of the idle resources, like don gross." Statement at ¶ 54. Mr. McLean was not a "cat's paw," he initiated the termination. See Statement at ¶¶ 51-59. Accordingly, any alleged discriminatory animus on the part of Mr. Kim (or Mr. Quigley) is irrelevant. See Roberts v. Randstad N. Am., Inc., 231 Fed. Appx. 890 (11th Cir. 2007) (affirming summary judgment and holding that where decisionmaker had relied on information from an allegedly bias supervisor in making a termination decision, but also relied on other information, he had conducted an independent investigation and had not been a "cat's paw"); Ameen v. Merck & Co., 226 Fed. Appx. 363 (5th Cir. 2007) (affirming summary judgment and rejecting "cat's paw" theory of causation where even assuming the alleged

discriminator recommended termination to the decisionmaker, the decisionmaker conducted an

independent investigation of the alleged offense); <u>Mehta v. HCA Health Servs. of Fla., Inc.</u>, No.

8:06-CV-1284-T-24-MSS, 2007 U.S. Dist. LEXIS 60858, at *15 (M.D. Fla. Aug. 20, 2007)

(granting summary judgment on discrimination claim, and explaining that in a "cat's paw"

scenario, "the causal ink [sic] between the animus of a subordinate and the decisionmaker's

decision is severed if instead of merely tacitly approving or otherwise 'rubber stamping'

another's adverse recommendation . . . , the decision maker conducts an independent

investigation into the allegations against the plaintiff") (internal citation omitted).

**B.     There is No Evidence of Pretext Based Upon Alleged Inconsistencies.**

Faced with incontrovertible authority and substantial undisputed evidence that Mr.

McLean decided to terminate his employment without even consulting Mr. Kim, Mr. Gross

limply argues that Akin Gump's reasons for the termination are pretextual.  He is wrong again.

**1.     Mr. Gross Was Terminated For Poor Performance.**

Akin Gump has consistently maintained, to the EEOC, and in this litigation, that Mr.

Gross was terminated because of his poor performance.  In the EEOC letter, it explained that

"Mr. Gross. . . was asked to leave [Akin Gump] for one reason:  he was hired with the express

written understanding that Akin Gump's need for him would be reassessed after one year; his

performance during that year was not satisfactory; thus, his services were not needed."  <u>See</u>

Exhibit 6 to Opposition at 1.  Similarly, in response to Mr. Gross's Interrogatory requesting the

reason for Mr. Gross's termination, Akin Gump responded:  "Mr. Gross was hired with the

express understanding that the firm's need for him would be reassessed in one year.

Accordingly, the firm assessed its need for Mr. Gross, and his employment was terminated for

his inadequate performance and contributions."  <u>See</u> Opposition Exhibit 18.  Mr. McLean also

testified, under oath, that he decided to terminate Mr. Gross's employment "because there were

serious performance issues," "[f]irst of all, there was a very substantial lack of productivity. Secondly, even with respect to the tasks that he was asked to accomplish there were performance issues with respect to – to his ability to carry out those tasks."  Statement at ¶ 52.

As a preliminary matter, Mr. Gross's unsupported claims that he was given a different explanation for his termination at the time of the termination is extinguished by the fact that he does not dispute that at that time he wrote to numerous individuals stating: "Akin Gump's management put considerable pressure on the Korea practice group here to reduce its costs due to insufficient profitability.  As a consequence, I and a partner in the practice group from our L.A. office were asked to leave the firm."  Statement at ¶ 72.[7]

In addition, the fact that Akin Gump did not specifically identify Mr. Gross's dismal billable hours as part of his performance deficiencies in its EEOC letter or in its interrogatory response is not evidence of pretext.  Courts have consistently held that giving complementary explanations for a termination decision, or as in this case, complementary concrete examples of the same explanation—poor performance, is not a basis for denying summary judgment.  In Warren v. N. Shore Univ. Hosp. at Forest Hills, No. CV-03-0019 (DGT) (RML), 2006 U.S. Dist. LEXIS 73302 (E.D.N.Y. Sept. 29, 2006), the Court found that where different witnesses had testified to different reasons as to why the plaintiff had not been hired:

> [t]he multiple reasons defendant raised for not hiring plaintiff are not conflicting, but complementary. . . .  In giving multiple reasons, the Hospital is painting a complete and accurate picture of its decision, not obfuscating a discriminatory reason.

---

[7] Mr. Gross claims that he lied because he could not face telling people the truth.  Gross Statement at ¶ 94.  It is positively uncanny, however, how Mr. Gross's "fictitious" account of his termination comports exactly with the contemporaneous evidence in this case that Akin Gump management (Mr. McLean) decided to terminate Mr. Gross's employment, and that of an under 40 partner, because of, in part, low productivity.

Id. at \*\*29-30 (granting summary judgment for employer).  See also Hayes v. City of Newnan, No. 3:05-CV-102-JOF, 2007 U.S. Dist. LEXIS 69821 (N.D. Ga. Sept. 20, 2007) (granting summary judgment, holding that Defendants had not offered shifting reasons for the plaintiff's termination where in response to the EEOC investigation the defendant had stated that plaintiff was terminated after she declined a severance agreement and because it was in the best interest of the city to change the department head for Human Resources, as this explanation was not inconsistent with the defendant's later elaboration that the plaintiff's management style was causing complaints); Wisdom v. M.A. Hanna Co., 978 F. Supp. 1471, 1480 (N.D. Ga. 1997) (granting summary judgment, holding that the fact that one supervisor stated to the EEOC that performance was not the reason for the plaintiff's termination, but rather, that the plaintiff was terminated because the Company was going in a new direction with the computer department and the plaintiff did not possess the required skill set, and a different supervisor later testified that Plaintiff's performance, not the Company's decision to take its computer division in a new direction, was the major issue resulting in the termination, was not sufficient evidence to create a jury issue because "[b]oth reasons [were] supported by strong factual bases and the reasons are not mutually exclusive"), aff'd without op., 141 F.3d 1190 (11th Cir. 1998).[8]  Here, there is nothing inconsistent about the explanation of "poor performance," "lack of contribution" and "low billable hours."  Mr. Gross himself described Akin Gump as "a large law firm whose

---

[8] See also Peters v. Lincoln Elec. Co., 285 F.3d 456 (6th Cir. 2002) (affirming summary judgment for employer, and holding that the fact that various members of management cited different areas of deficiency that they felt led to the plaintiff's termination did not amount to evidence from which a fact-finder could infer falsity of the employer's proffered non-discriminatory reason); McDowell v. T-Mobile USA, Inc., No. CV-04-2909 (DGT), 2007 U.S. LEXIS 71591, at \*56 (E.D.N.Y. Sept. 26, 2007) (holding that "[a]lthough defendant's statements to the EEOC do not align perfectly with defendant's preferred reasons or with all of the evidence in the record, these discrepancies and defendant's conflicting explanations about its MVR policy are, in light of the other evidence in this case . . . insufficient to show pretext").

billable hours are its lifeblood."  Opposition at 9.

The cases cited by Mr. Gross provide an instructive contrast to the situation presented here.  For example, Mr. Gross relies on <u>Stalter v. Wal-Mart Stores, Inc.</u>, 195 F.3d 285 (7th Cir. 1999), where the court found that a jury could believe that an extraordinarily flimsy reason offered for an employee's termination—the taking of Doritos from an open bag in a lunch-room (where communal food was often left for employees) was pretextual.  The Court found that the firing did not pass the "straight-face" test.  Akin Gump fired Mr. Gross because he billed only slightly more than half of what he was required to bill and his analytical skills "missed the mark" (in the words of a third party (Statement at ¶ 47)), not because he took a handful of corn chips.[9]

Likewise, in <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424 (1st Cir. 2000), (Opposition at 21) the court reversed summary judgment because the employer had first stated that the plaintiff's termination was <u>not</u> an issue of performance, but was instead the result of a business restructuring plan, and then later said that the termination was indeed based on the plaintiff's job performance, and because the key decisionmaker had repeatedly referred to the plaintiff as an "old fart."  In <u>Emmel v. Coca-Cola Bottling Co.</u>, 95 F.3d 627 (7th Cir. 1996), (Opposition at 21-22) the court affirmed a jury finding of discrimination where, in response to an interrogatory asking why the plaintiff was not given a promotion, the employer responded "because plaintiff did not seek promotion" and later in litigation changed its rationale entirely

---

[9] The Court focused on multiple facts that are simply not present here; including; the severity of the punishment in relation to the alleged offense; other non-minority employees had not been terminated for seemingly more egregious violations of the company's misconduct policy; the employer had initially told the EEOC that the employee who's Doritos were "stolen" had complained to the company regarding the incident, and that later, after it was discovered that the employee had not complained and had, in fact, told the company that the incident was "no big deal," the company changed its story and said that the firing was mandatory under company policy (where the policy on its face was permissive).  <u>Id.</u>

and argued that she was not qualified for the promotion.  Finally, in <u>EEOC v. Sears Roebuck & Co.</u>, 243 F.3d 846, 852-53 (4th Cir. 2001), (Opposition at 21) the Court found that "looking at the totality of the circumstances," which included differing explanations for failure to hire the plaintiff ranging from the selection of another candidate, a lack of available hours and the belief that the plaintiff had been investigated for sexual harassment in the past, combined with the fact—not present here—that the evidence in the record did not support the employer's most recently proffered reason, a jury could find that the employers legitimate reason for the plaintiff's termination was pretextual.[10]

### 2.    Mr. Kim "Participated" In Mr. Gross's Termination.

There is nothing in the EEOC letter that contradicts the evidence that Mr. McLean made the decision to terminate Mr. Gross's employment after an independent assessment of Mr. Gross's performance that was prompted by concerns raised by Ms. Slater and Mr. Burdick about Mr. Gross's low billable hours, and included a conversation with Mr. Quigley.[11]  Akin Gump did not even describe its decision making process with respect to Mr. Gross's termination in the EEOC letter.  <u>See</u> Opposition Exhibit 6.  Mr. Gross is correct that in the legal analysis section of the EEOC letter, when discussing the inference against discrimination that exists in ADEA cases, Akin Gump stated that Mr. Kim "participated" in the decision to terminate Mr. Gross's

---

[10] Even under the circumstances present in <u>Sears Roebuck & Co.</u>, Judge Niemeyer noted in his dissent the importance of not allowing a plaintiff's claim based on "personal suspicions" and an employer's "clumsiness in giving its reasons for not hiring plaintiff" to survive summary judgment where there is no indication that discrimination played a part in the questioned employment decision.  <u>Id.</u> at 857-58 <u>citing</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-48 (2000).

[11] Contrary to Mr. Gross's assertion that Akin Gump now denies that Mr. Quigley participated in the decision to terminate Mr. Gross, Akin Gump maintains that, prompted by Ms. Slater and Mr. Burdick's expressed concerns about Mr. Gross's low productivity, Mr. McLean approached Mr. Quigley and asked him "why Mr. Gross's performance was so far below what we had expected."  Mr. Quigley explained:  "He hasn't worked out."

employment.  He did so.  After Mr. Kim learned of Mr. McLean's decision to terminate Mr. Gross, Mr. Kim delivered news of Mr. McLean's decision to Mr. Gross on two occasions and pushed Mr. McLean to give Mr. Gross more time before the final termination date.  Mr. Kim's subsequent participation does not, however, in any way refute the fact that Mr. McLean decided that Mr. Gross's employment should be terminated.

Significantly, there is also nothing in the EEOC letter (or any other evidence in the record) that contradicts Mr. McLean's sworn testimony that he did not consult Mr. Kim prior to deciding to terminate Mr. Gross's employment at Akin Gump.  Moreover, as Mr. Gross's own contemporaneous notes reflect, as of August 5, 2004, Mr. Kim had <u>not</u> discussed Mr. McLean's decision to terminate Mr. Gross's employment with Mr. McLean.  Specifically, Mr. Gross wrote "SK says he hasn't talked with McLean directly but received all the information about me from MQ."  Moreover, as of August 11, 2004, again, according to Mr. Gross's own notes "SK said I should plan to leave the law firm by October 1.  Could possibly seek a short extension based on fact that *SK has <u>not</u> talked directly to McLean about me*."  Akin Gump has offered one, and only one, description of the firms's termination decision—Mr. McLean, prompted by Ms. Slater's and Mr. Burdick's concerns regarding Mr. Gross's "idle[ness]," consulted with Mr. Quigley about Mr. Gross's performance.  Mr. Quigley told Mr. McLean that Mr. Gross was not working out.  Based on Mr. Gross's poor performance Mr. McLean decided to terminate Mr. Gross's employment—without consulting Mr. Kim.  Thereafter, Mr. Kim participated in the decision as described above.  There is nothing different or inconsistent in the EEOC letter.

Additionally, even assuming that the alleged inconsistencies did exist, in light of the other evidence in this case, they would be insufficient to establish pretext.  Mr. Gross relies on <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000).  In <u>Reeves</u>, however, the Court

held that pretext may be shown under certain circumstances not present here:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . . Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter or law.

Id. at 148-49.[12]  Here, even if the inconsistencies described by Mr. Gross existed, such weak

evidence that Akin Gump's reason for terminating his employment was not true, combined with

the abundant evidence in the record supporting the fact that Mr. McLean terminated Mr. Gross

for poor performance, is insufficient to establish an inference of pretext.   In Council v. Tri-Star

Constr. Co., No. 01 Civ. 11788 (BSJ), 2004 U.S. Dist. LEXIS 1921, at *11 (S.D.N.Y. Feb. 10,

2004), for example, the Court found that "inconsistencies between Defendant's answer to

Plaintiff's EEOC complaint and deposition testimony, when viewed in connection with

Plaintiff's weak prima facie case, would be insufficient to persuade a trier of fact that Defendant

---

[12] Mr. Gross also relies on Aka v. Washington Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998).  In Aka, however, the Court held that "in some instances . . . the fact that there are material questions as to whether the employer has given the real explanation will not sufficient to support an inference of discrimination," and explained that one such instance is where "the plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue and there is abundant independent evidence in the record that no discrimination has occurred."  Id. at 1291.  In Aka, the Court reversed summary judgment for the employer in a discrimination in hiring case because "there [was] sufficient evidence in the record so that a reasonable jury could conclude that Aka was markedly more qualified than Valenzuela was, thus throwing into doubt the reason given for his rejection," where the employer had stated that a candidate had been hired over the plaintiff because he was more qualified, the plaintiff was a 19-year employee with a good record who had earned two degrees while on the job and the candidate hired by the employer had worked for the employer for less than a year as a laundry-folder.  Id. at 1299.

intentionally discriminated against Plaintiff," explaining that:

> Plaintiff also points to various inconsistencies in responses given in the
> Defendant's EEOC position statement and deposition testimony, suggesting that
> Defendant's proffered reason for her discharge is not credible.  Specifically,
> Plaintiff notes that when responding to her charge of discrimination filed with the
> EEOC, Defendants said that Plaintiff was fired for poor work performance.
> Defendant essentially admits that this statement was untrue and explains that the
> statement was prepared by counsel and not sworn to or verified by any employee
> of Tri-Star.  However, aside from this inconsistency, Defendant's reasons for
> terminating Plaintiff's employment have remained unchanged.  Although proof
> that a defendant's non-discriminatory explanation for a plaintiff's termination is
> false, combined with a plaintiff's prima facie showing of discrimination, *may* be
> sufficient to preclude summary judgment, . . . such a showing will not always be
> sufficient to survive summary judgment.

Id. at **8-9, n.4 (emphasis added) (citations omitted).

Schuster v. Lucent Techs., Inc., 327 F.3d 569 (7th Cir. 2003), is directly on point.  In
affirming summary judgment, the Court found that a change in story with respect to who
participated in a termination was insufficient to raise an inference of pretext, where (as here) the
plaintiff had no facts that calls the employer's legitimate reason for his termination into question:

> The allegedly changing story as to who actually participated in the decision to
> include Schuster in the second RIF is also insufficient to raise a question as to
> whether the restructuring reasons given are merely pretextual.  What Schuster's
> purported inconsistencies demonstrate is that Lucent was committed to an
> aggressive defense of its actions, perhaps leading it to occasionally over-defend
> itself.  But Schuster has failed to raise a genuine issue as to the legitimacy of
> Lucent's proffered reason for terminating him. . . .  Given this legitimate,
> nondiscriminatory reason, and Schuster's inability to point to any specific facts
> which would call into question its veracity, we cannot say that Schuster "would
> not have been fired but for the employer's motive to discriminate on the basis of
> age.

Id. at 579 (internal citation and quotations omitted).  Here, Mr. Gross can point to no specific
facts that call Akin Gump's legitimate reason for his termination into question.

First, it is undisputed that Mr. Burdick and Ms. Slater raised Mr. Gross's low billable
hours with Mr. McLean.  Mr. Gross also does not dispute the fact that he only billed

approximately 1,300 to clients during his first year at Akin Gump.  He alleges that a jury could infer that his termination for poor performance was pretextual because he was not subject to a 2,100 client billable requirement.  (Opposition at 22).  He has, however, no admissible evidence disputing Mr. McLean's sworn testimony that he approved Mr. Gross's hiring with the understanding that at his level of salary ($250,000), Mr. Gross "was expected to perform at a level where [he] would have . . .  roughly 2,100 chargeable client hours."  Mr. Gross also does not dispute that prior to him even starting work at Akin Gump, Mr. Kim sent an email making it clear that Mr. Gross could join the International Trade Practice Group on the condition that he "would bill no less than 2,100 hours."  Statement at ¶ 16.  In addition, it is undisputed that according to Mr. Gross's own notes, when he began work at Akin Gump, Mr. Kim informed him that he was required to bill 2,100 hours to clients annually, and that during a separate July 2003 meeting, Mr. Park stated the same thing.  In January 2004, Mr. Gross noted to himself that "I have to increase billable hours as much as possible."  He further noted that "[i]f I put myself in the front edge of all actual marketing activity and try by whatever means to increase my billable hours, it should be okay."[13]  In addition, there are contemporaneous emails supporting the sworn testimony of Ms. Ross[14] and Mr. Kaye[15] that they found Mr. Gross's performance to be

---

[13] Mr. Gross concedes that these statements were contained in his notes, but argues without any evidence that there is a dispute as to whether "Mr. McLean knew at the time of the hire that Mr. Gross was to dedicate time to non-billable work."  The evidence confirms that Mr. McLean and many others had a clear expectation at the time the firm hired Mr. Gross.

[14] Mr. Gross's assertion that Ms. Ross's testimony is not material makes no sense.  Mr. Gross himself listed Ms. Ross in his Initial Disclosures as someone who "should have knowledge regarding job duties and job performance of Plaintiff Gross. . . ."  See Plaintiff's Initial Disclosures, attached hereto as Exhibit A.

[15] Mr. Gross inexplicably states that there is a question as to whether Mr. Kaye's statements--undisputedly made before Mr. Gross was even hired-- are "post-hoc explanations and a pretext for discrimination."  See Gross Statement at ¶ 49.  Mr. Gross also does not dispute Mr. Kaye "pulled the plug" on a memorandum, or that he was dissatisfied with Mr. Gross with respect to an assignment.  Rather he defensively claims, without any evidence, that Mr. Kaye's

substantially lacking.  Additionally, Mr. Gross does not dispute that his writing was described as "fall[ing] short of the mark" by CSIS.  Instead, Mr. Gross offers his opinion that CSIC "was very pleased with [his] paper" (citing to his own affidavit).  Finally, Mr. Gross himself admitted in contemporaneous writings that he and an under 40 partner were terminated due to low productivity.  Thus, even if the alleged inconsistencies existed, viewed in connection with Mr. Gross's feeble case, they would be insufficient to persuade a jury that Akin Gump discriminated against him based on his age.

### C.    Whether Mr. Gross's Performance Was Objectively Poor Is Irrelevant.

Mr. Gross also argues that "[w]hether Mr. Gross performed well. . . or poorly . . is a matter for the jury."  As the <u>Bennett</u> Court held, this is "largely beside the point":

> The plaintiff has a second string to his bow.  He attempts to persuade us that he did not compose the poems.  That issue is largely beside the point:  what counts is whether the decisionmaker – Mesher – believed the plaintiff to be the author and, if so, whether he acted on that belief in deciding to send the plaintiff packing. Here, the plaintiff offered no evidence to show that Mesher believed that the poems were written by someone else.

<u>Bennett</u>, 507 F.3d at 31-32 (internal citations omitted).  <u>See also</u> Motion at 17-20.  Mr. Gross has no evidence to dispute the material fact that Mr. McLean based his decision on his sincere belief that Mr. Gross's performance was unacceptable.  Whether Mr. Mr. Lean's decision was correct is not at all material.  <u>See</u> <u>Evans v. Davis Mem'l Goodwill Indus.</u>, 133 F. Supp. 2d 24, 29 (D.D.C. 2000), <u>aff'd</u>, 1 Fed. Appx. 3 (D.C. Cir. 2001) (holding that once an employer has asserted a non-discriminatory reason for an adverse job action, "the issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers'").

---

anger was "misdirected."  Mr. Gross's belief as to whether Mr. Kaye's dissatisfaction with him (which he is no way attributes to discriminatory animus) was justified is irrelevant.

Likewise, the fact that Mr. Gross received a few complimentary emails indicating that he performed some tasks (or portions thereof) well, in no way refutes evidence in this case that Mr. McLean, after conducting an investigation, found Mr. Gross's overall contribution to be unsatisfactory.  See Royall v. Nat'l Ass'n of Letter Carriers, No. 05-1711 (RBW), 2007 U.S. Dist. LEXIS 63655, at *108 (D.D.C. Aug. 29, 2007) ("The plaintiff cannot create a genuine issue of material fact as to whether the NALC 'honestly believes in the reasons it offers' or his termination simply by contesting some portion of the defendant's account of his performance or citing certain instances in which he correctly performed the duties of his job.  It is nonsensical to suppose that a plaintiff should be able to demonstrate that an employer's stated reason for its adverse action is pretextual merely because the employer cannot prove that the plaintiff was deficient in *every* aspect of his job performance.")[16] (internal citations omitted).

### D.    It Is "Eminently Reasonable" To Doubt Age Discrimination Occurred.

Mr. Gross does not cite <u>any</u> authority from this jurisdiction to counter the District of Columbia authority cited by Akin Gump holding that the fact that Mr. McLean is older than Mr. Gross, and decided to hire and fire him within a short one year period, weighs heavily against a finding of age discrimination in this case.  See Motion at 20-21.  There is none.  This inference should be even stronger in this case where almost everyone involved--Mr. McLean, Mr. Kim, Mr. Burdick and Ms. Slater are all older than Mr. Gross.  Instead, Mr. Gross mistakenly cites to

---

[16] Also, Mr. Gross states without any evidence that "Akin Gump assigned Mr. Gross to write the reformulated major client memorandum in 2004 based on his contributions in the first phase."  Gross Statement at ¶ 63.  Mr. Park, testified that Mr. Gross was asked to write that draft, but that based on Mr. Gross's poor performance on the first draft, Mr. Kim told Mr. Park that he wanted Mr. Park to review Mr. Gross's work product.  See Statement at ¶¶ 36, 41.  In addition, while not necessary for this motion, the fact that Mr. Kim asked Mr. Gross to revise a major client memorandum in 2004 when he returned from having surgery refutes Mr. Gross's baseless speculation that Mr. Kim developed a deeper bias against him based on his age because of his two week absence.

Kadas v. MCI Systemhouse Corp., 255 F.3d 359 (7th Cir. 2001) to argue that these facts are

irrelevant.  In Kadas, however, the Court noted that it disagreed with a "number of cases

suggest[ing] that this is a factor that should weigh heavily against a finding of age

discrimination."  Id. at 361.  In addition, the Kadas Court affirmed summary judgment on the

plaintiff's age discrimination claim, explaining that:

> [I]t is eminently reasonable to doubt that, as in this case, a worker hired at an age
> well beyond that at which the protections of the age discrimination law click in
> and terminated *within months*, that is, before he is appreciably older, was a victim
> of age discrimination.  A company that didn't want 54-year-olds on its payroll
> would be unlikely to hire one rather than to hire one and promptly fire him, thus
> inviting a lawsuit since terminated workers are much more likely to sue than ones
> who have merely not been hired, owing to the much greater difficulty of proving
> damages in the latter case.

Id. at 361-62.  Here too, "it is eminently reasonable to doubt that" Mr. Gross who was hired by

Akin Gump at age 50, was a victim of age discrimination when he was terminated at age 51.

### E.    Mr. Gross Has No Evidence Of Retaliation.

Mr. Gross has no admissible evidence to dispute the sworn evidence that Mr. McLean

made the decision to file Counterclaims; that he based this decision on the discovery of emails

during the discovery process in this case; and that he would have fired Mr. Gross immediately

had he known about the emails.  There is absolutely no evidence of retaliation.  As a result, Mr.

Gross offers four equally unpersuasive and unsupported arguments to save his retaliation claims.

First, Mr. Gross nonsensically argues that Akin Gump's legitimate reason for filing its

compulsory counterclaims is pretextual because Akin Gump moved to file Counterclaims as

soon as it uncovered Mr. Gross's improper emails.  The timing of the filing of Akin Gump's

Counterclaims supports the fact that it was motivated by the discovery of this information and

not by retaliatory animus based on discrimination claims it knew about for approximately two

years.  Second, Mr. Gross argues that "the causal connection between the complaint and the

counterclaims is apparent on its face, as Defendant brings its counterclaims within the very same lawsuit." Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Akin Gump had no other choice but to bring its Counterclaims in this lawsuit or forfeit them. Third, Mr. Gross asserts that the fact that Defendant "has never charged a single employee with breach of fiduciary duty or breach of prospective business advantage" is evidence of pretext. Mr. Gross, however, ignores the undisputed evidence that Akin Gump "is not aware of any of its employees or former employees, other than Mr. Gross, actively encouraging prospective clients not to retain the services of Akin Gump by making negative and/or disparaging statements about the firm and its partners while employed by the firm." See Exhibit 22 to Mr. Gross's Motion for Summary Judgment. Finally, Mr. Gross argues that Akin Gump admits that it "derives no benefits from the Counterclaims." Akin Gump stated: "Finally, there is no logic to a theory of causation here. Akin Gump derives no benefit from the Counterclaims – they do not stop the lawsuit or otherwise provide a strategic advantage." See Motion at 27. This statement simply exposes the lack of logic in Mr. Gross's theory because Akin Gump's filing of Counterclaims is in no way "chilling." There is nothing in this statement to suggest pretext.

## II.   CONCLUSION

For the reasons set forth above and in Defendant's Motion for Summary Judgment, Defendant respectfully requests that the Court grant summary judgment on Mr. Gross's claims.


DATED: January 22, 2008                    Respectfully submitted,

                                           _____/s/_____
                                           Christine N. Kearns (Bar #416339)
                                           Karen-Faye McTavish (Bar # 477588)
                                           PILLSBURY WINTHROP SHAW PITTMAN LLP
                                           2300 N Street, N.W.
                                           Washington, D.C. 20037-1128
                                           (202) 663-8000
                                           Counsel for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DONALD G. GROSS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-399 (EGS/JMF) |
| v. | ) | |
| | ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S REQUIRED INITIAL DISCLOSURES

Plaintiff Donald G. Gross, by counsel, and in accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure and Local Civil Rules of Civil Procedure 26.2(a), hereby submits his required initial disclosures.

### Disclosures under Rule 26(a)(1)(A)

Donald G. Gross
c/o Webster, Fredrickson & Brackshaw
1775 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 659-8510

Plaintiff Gross has knowledge regarding his employment, skills, and experience, his job duties and performance as Senior Counsel at Akin Gump, the allegations in his Complaint, the circumstances of his termination, and his damages.

Sukhan Kim
Akin Gump

Mr. Kim should have knowledge regarding the circumstances of the hiring and termination of Plaintiff Gross, the job duties and job performance of Plaintiff Gross, the allegations in the Complaint, and Plaintiff's damages.

Rick L. Burdick
Akin Gump

     Mr. Burdick should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

Warren E. Connelly
Akin Gump

     Mr. Connelly should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's hiring, and Plaintiff's damages.

Bruce S. Mendelsohn
Akin Gump

     Mr. Mendelsohn should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

Dennis M. Race
Akin Gump

     Mr. Race should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's hiring and termination, and Plaintiff's damages.

Lisa W. Ross
Akin Gump

     Ms. Ross should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

J. David Park
Akin Grump

     Mr. Park should have knowledge regarding the circumstances of the hiring and termination of Plaintiff Gross, the job duties and job performance of Plaintiff Gross, the allegations in the

Complaint, and Plaintiff's damages.

Edward L. Rubinoff
Akin Gump

      Mr. Rubinoff should have knowledge regarding job duties and job performance of Plaintiff

Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

R. Bruce McLean
Akin Gump

      Mr. McLean should have knowledge regarding job duties and job performance of Plaintiff

Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

Michael Quigley
White & Case
701 Thirteenth Street, NW
Washington, DC 20005
Tel: 202-626-3600

      Mr. Quigley should have knowledge regarding the circumstances of the hiring and

termination of Plaintiff, the job duties and job performance of Plaintiff Gross, the allegations in the

Complaint, and Plaintiff's damages.

Jay G. Cohen
Duane Morris LLP
111 South Calvert Street, Suite 2000
Baltimore, MD 21202
Tel: 410-949-2900

      Mr. Cohen should have knowledge regarding job duties and job performance of Plaintiff

Gross, the circumstances concerning Plaintiff's hiring and termination, the allegations in the

Complaint, and Plaintiff's damages.

Jaemin Park
DLA Piper
1200 Nineteenth Street, NW
Washington, DC 200036

Tel: 202-861-3900

Ms. Park should have knowledge regarding the circumstances of the hiring and termination of Plaintiff Gross, the job duties and job performance of Plaintiff Gross, the allegations in the Complaint, and Plaintiff's damages.

Janis L. Nordstrom
former Director of Practice Development
Akin Gump

Ms. Nordstrom should have knowledge regarding job duties and job performance of Plaintiff Gross, the circumstances concerning Plaintiff's termination, and Plaintiff's damages.

Julie M. Fry
former Public Relations Specialist
Akin Gump

Ms. Fry should have knowledge regarding job duties and job performance of Plaintiff Gross.

Erin Springer
Akin Gump

Ms. Springer should have knowledge regarding the circumstances of the hiring of Plaintiff Gross.

Cielo Pineda
Akin Gump

Ms. Pineda should have knowledge regarding the circumstances of the hiring and termination of Plaintiff, the job duties and job performance of Plaintiff Gross, the allegations in the Complaint, and Plaintiff's damages.

Su Gross
1519 33rd Street, NW
Washington, DC 20007
Tel: 202-365-8027

Ms. Gross, Plaintiff's wife, should have knowledge regarding the circumstances of the hiring and termination of Plaintiff, the allegations in the Complaint, and Plaintiff's damages.

Dr. Showkat Bashir
George Washington University
Medical Faculty Associates
2150 Pennsylvania Avenue, NW, Suite 3
Washington, DC 20037
Tel: (202) 741-3333

Dr. Bashir should have knowledge and opinions regarding Plaintiff's damages associated with his treatment of Plaintiff for gastroesophageal reflux disease.

**Disclosures under Rule 26(a)(1)(B)**

See documents to be produced upon entry of an appropriate protective order.

**Disclosures under Rule 26(a)(1)(C)**

Plaintiff seeks any and all appropriate relief necessary to be made whole. The basic facts supporting Plaintiff's claims for relief are set forth in his Complaint and include the following:

(1) Lost earnings, bonuses, and benefits. Plaintiff's lost earnings through the present include the value of all pay, bonuses, and benefits he would have earned had he continued at Akin Gump (information in Defendant's possession and control that is currently sought by Plaintiff in discovery), minus the following income earned to date:

2005: $17,202.50 from Samuels International Assoc., Inc.

$8,000.00 from Stonebridge International, LLC

2006: $120,781.25 from Stonebridge International, LLC

$30,000.00 from The Atlantic Council of the United States

2007: $24,093.75 from Stonebridge International, LLC

5

$10,000.00 from The Atlantic Council of the United States

(2)     Medical insurance payments under COBRA and other insurance plans. Plaintiff has requested related documentation and will supplement this response with calculations and supporting documentation accordingly.

(3)     Fees and expenses for moving. Due to the discrimination and resulting loss of income, Plaintiff was compelled to move out of his home to less expensive living quarters. As a result, Plaintiff incurred the following expenses that he claims as damages:

Moving expenses, including $750.00 for April 1, 2006 move by Cho Yang Transport, Inc. Additional documentation for moving expenses is being sought, and documents and further calculations shall be produced accordingly.

$744.00 management fee

$3,300.00 broker rental fee

$135.00 rental advertising costs

$50.00 application fee

(4)     Reinstatement into an appropriate position at Akin Gump.

(5)     Front pay for the difference between Plaintiff's earnings following his termination and the salary, bonuses, and benefits he would have received had he continued at Akin Gump.

(6)     Compensatory damages in an amount to be determined by a jury.

(7)     Reasonable attorneys' fees and costs.

(8)     Prejudgment interest.

(9)     Post-judgment interest.

(10)    Liquidated damages.

6

(11)   Punitive damages in an amount to be determined by a jury.

(12)   All other relief that is just and proper.

## Disclosures under Rule 26(a)(1)(D)

Plaintiff Gross does not have any insurance agreements applicable to the required disclosure under Rule 26(a)(1)(D).

Respectfully Submitted,
WEBSTER, FREDRICKSON & BRACKSHAW

Jonathan C. Puth  #439241
1775 K Street, N.W.
Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2007, a copy of the foregoing Plaintiff's Required Initial Disclosures with additional documents was delivered by facsimile and by first-class mail to the following:

Christine Nicolaides Kearns, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N St., N.W.
Washington, DC 20037
Fax: (202) 663-8007


Jonathan C. Puth, #439241
Webster, Fredrickson & Brackshaw
1775 K Street, N.W., Suite 600
Washington, D.C. 20006
(202) 659-8510

Counsel for Plaintiff