## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| DONALD G. GROSS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-399 (EGS/JMF) |
| v. | ) | |
| | ) | |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFF AND COUNTERCLAIM DEFENDANT DONALD GROSS' REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### I.    Akim Gump Cannot Demonstrate Causation or Damages.

Akin Gump's claims regarding causation or damages from any supposedly lost business from Company X must fail as a matter of law and summary judgment should be entered with respect to that claim.  The undisputed evidence reveals that Kim "decide[d] not to represent [Company X]" in October 2004.  (Ex. 16, Kim Dep. at 81, 83-85, 104-05; Ex. B to Defendant's Statement of Material Facts ("Def. Statement"), Kim Dep. 10/16/07 at 183.) That rejection is fatal to Defendant's case.

Defendant admits that in September 2004, Company X offered Akin Gump a retainer in the amount of $50,000 for work to be done by Sukhan Kim.  (Opp. at 7, 18.)  Contrary to Defendant's suggestion (*id*. at 18), the offer by Company X matched precisely Sukhan Kim's proposed retainer in the amount of $50,000.  (*See* Def. Statement Ex. B, Kim Dep. at 177.)   Defendant misguidedly claims that the $50,000 retainer offer by Company X was somehow "modest" and "extremely low" when compared to Kim's expectation (Opp. at 7; Def. Statement at ¶44), but offers no evidence that any larger retainer amount was ever proposed or discussed.  (*See* Opp.)  Rounding out the factual

context provided by Defendant, the timeline is as follows:[1]

- On September 20, 2004, Kim for the first time raised the issue of a retainer with Company X; Kim proposed a retainer in the amount of $50,000.  (Def. Statement Ex. B, Kim Dep. at 174-75, 177; Exhibit 23, Kim Dep. at 176.)

- Disappointed with the reaction of Company X to his retainer proposal, Kim wrote to the CEO of Company X on September 23, 2004 and suggested that it "might be best for us not to go forward with this representation."  (Ex. 23, Kim Dep. at 181-83.)

- The following day, after discussing the matter further with Kim, the CEO of Company X agreed to the retainer and requested that Kim "forward the necessary invoice for your $50,000 retainer, as discussed."  (Def. Statement Ex. B, Kim Dep. at 186-87.)[2]

- Kim did not forward the $50,000 retainer agreement as requested by Company X.  (*Id*. at 187-88.)[3]

When asked why he did not forward a $50,000 retainer agreement as requested by Company X, Kim failed to provide a clear explanation as to why the offer was somehow inadequate when compared to his retainer offer in the precise same amount.  (*See id*. at 188-89.)  Instead, Kim claims that he formed an "impression that it was not worth going forward," because Kim "sensed that there is a change of heart."  (*Id*. at 188-89.)

Despite this evidence, Akin Gump claims that "Mr. Kim had expected a substantially higher

---

[1]Mr. Gross has attached at Exhibit 23 pages 176 and 180-86 from the resumed deposition of Sukhan Kim, passages that have not been designated as confidential by Defendant.

[2]The retainer offer by Company X is admissible as an admission under Fed. R. Civ. P. 801(d)(2)(A) and 801(d)(2)(B), as well as for the non-hearsay purposes of demonstrating the effect on the hearer: in this case Kim, who rejected the offer.  (*See* Opp. at 7; Def. Statement Ex. B, Kim Dep. at 187-89.)

[3]Kim at first claimed difficulty recalling whether an agreement was sent, but ultimately admitted that it was more likely than not that no such retainer agreement was ever transmitted to Company X.  (*Id*.)

retainer amount than the $50,000 eventually offered to him by Company X." (*See* Opp. at 18) Defendant's contention is belied by the record and the admission pursuant to Fed. R. Civ. P. 801(d)(2)(A) that Kim's retainer offer of four days earlier was also in the amount of $50,000. (Def. Statement Ex. B, Kim Dep. at 174-75, 177 ("Yes, I proposed a $50,000 retainer"); Ex. 23, Kim Dep. at 176.) Defendant's premise for this vague "change of heart" is not supported by the evidence.

In this setting, Defendant's claim that it can meet its burden to prove causation with respect to Company X must be rejected. By his own admission, Kim, and not Company X, rejected any retainer agreement for work to be performed by Kim. No competent evidence supports a supposed "change of heart" other than Kim's apparently unwarranted (and inadmissible) impressions and speculation. Even if there was competent evidence of a "change of heart" beyond Kim's opinion (which there is not), this vague assertion could not possibly serve to meet Defendant's burden of proving the "substantial and direct causal link" required to make out this element of a tortious interference claim under District of Columbia law. *Connors, Fiscina, Swartz & Zimmerly v. Rees*, 599 A.2d 24, 47, 51 (D.C. 1991)(citing *Dalo v. Kivitz*, 596 A.2d 35, 42 (D.C. 1991)). Because Defendant cannot meet its burden to prove the causation element, summary judgment should be entered on this claim.

Moreover, even if the causal link were not completely broken by Kim's rejection of the $50,000 retainer offer from Company X (which it is), Akin Gump shows no quantifiable damages. In response to Plaintiff's motion, Akin Gump claims vaguely that "Mr. Kim had expected a substantially higher retainer amount than the $50,000 eventually offered to him by Company X" (Opp. at 16), which is demonstrably false, and that Akin Gump lost "at least $50,000 worth of business from Company X" (*id*. at 19), which is misleading at best where Kim himself rejected the

$50,000 retainer offer from Company X.

Defendant's claim that it can meet the damages element of its tortious interference claim is also undermined completely by the fact that even after Kim's rejection of the offer, Akin Gump actually secured a $50,000 per month retainer from Company X for work coordinated by Thomas Hubbard. (Ex. 20; *see also* Def. Statement Ex. B, Kim Dep. at 191(Kim "didn't want to deal with [the CEO of Company X]" and instead "let Tom Hubbard run it. . . .").) Defendant claims, inaccurately, that the retainer secured by Akin Gump was for "non legal advice" and only "an advisory role" (Opp. at 7 n. 6, 18 n. 14), but those allegations of "fact" are utterly unsupported by the record.

In fact, there is no competent evidence to demonstrate that Akin Gump lost any business beyond the representation actually secured by Akin Gump from Company X. Although Akin Gump claims that certain work was "contemplated/discussed between Mr. Kim and the CEO of Company X" (Opp. at  18 n. 14), Defendant presents no record evidence to show that Company X "contemplated" any such thing or that such an additional engagement was imminent. As well, Defendant provides no record support for its claim that "Akin Gump did not get any of these assignments" (*id*. at 18), when in fact the record reveals that Akin Gump secured a $50,000 per month retainer with Company X and Kim "let Tom Hubbard run" the representation for Akin Gump. (Ex. 20; Def. Statement Ex. B, Kim Dep. at 191.)

Consequently, even if there were causation or damages (which there are not), Defendant has identified no evidence of a quantifiable harm. If there were damages due to Kim's rejection of the $50,000 retainer offer, any calculation of damages would be left to sheer guesswork or speculation. *See Garcia v. Llerena*, 599 A.2d 1138, 1142 (D.C. 1991)(affirming a directed verdict in breach of

option matter where plaintiff failed to "present evidence of damages upon which the jury could have based an award without resorting to guesswork."); *Zoerb v. Barton Protective Servs.*, 851 A.2d 465, 471 (D.C. 2004)(affirming directed verdict in personal injury matter where causation and damages were speculative). Aside from unsupported and conclusory allegations, Akin Gump has simply provided no reasonable basis upon which to estimate damages. *See Garcia*, 599 A.2d at 1142 (citing cases). Consequently, summary judgment on this counterclaim is also warranted for Defendant's failure to meet its burden to demonstrate the damages element of this claim.

Akin Gump's claim regarding Prospective Client fares no better. Defendant relies principally on evidentiary objections to claim that Mr. Gross has no "admissible evidence" to underpin summary judgment with respect to this claim (*see* Opp. at 11), but those objections are unavailing. (*See* Part III, *infra*.) As outlined in his Motion, Mr. Gross provides substantial admissible evidence to demonstrate an absence of causation or disloyalty with respect to Prospective Client. (*See* Motion at 17-19.)[4] Contrary to Defendant's claims, the stated representation aims of Prospective Client are admissible, as are Akin Gump's admissions through Mr. Mehta, demonstrating both an absence of causation and disloyalty. (*See* Part III, *infra*.; Motion at 18.) Consequently, Defendant's counterclaims with respect to Prospective client also must fail.

At the same time, Defendant's theory that Mr. Gross was seeking to curry favor with Prospective Client is far fetched and itself unsupported by admissible evidence. (*See* Opp. at 13.)[5] To be sure, Mr. Gross had a long standing relationship with Prospective Client, but that relationship

---

[4]Plaintiff concedes that Akin Gump has pointed to case law allowing for recovery on a breach of duty of loyalty claim in the absence of a showing of damages.

[5]For instance, the statements attributed to Prospective Client in Paragraph 41 of Defendant's Statement of Material Facts are hearsay and subject to no exception.

does not undermine the duty of candor and honesty that Mr. Gross owed to Prospective Client, as set forth more fully below.

## II.    Akin Gump Cannot Demonstrate the Requisite Intent.

Contrary to its claims, Akin Gump's counterclaims for intentional interference and breach of duty of loyalty both fail due to an absence of wrongful intent.  Summary judgment should be entered on these counterclaims.

For instance, Akin Gump simply misreads the law when it suggests that a showing of malice is not required for a claim of tortious interference with a prospective contract.  (*See* Opp. at 8, n. 7.) To the contrary, a showing of malicious intent is required under District of Columbia law in order to maintain an action for tortious interference with prospective business advantage where, as here, the defendant is an agent for a party to the contract.  In *Paul v. Howard University*, 754 A.2d 297 (D.C. 2000), the District of Columbia Court of Appeals recognized the bedrock principle that an agent for a party cannot tortiously interfere with the party's own contract.  *Paul*, 754 A. 2d at 309 (citing  *Sorrells v. Garfinckel's, Brooks Bothers, Miller & Rhoads, Inc.*, 565 A.2d 285, 291 (D.C. 1989); *Press v. Howard University*, 540 A.2d 733 (D.C. 1988)).  An agent who is an officer cannot be held liable, however where the agent is not an officer, "a plaintiff must present evidence that the supervisor acted with malice."  *Paul*, 754 A.2d at 309 (citing *Sorrells*, 565 A.2d at 291-92).[6]

Akin Gump makes no claim that Mr. Gross acted with malice in this case and offers no proof of malice  (*See* Opp.; *see also* Amended Answer and Counterclaims, September 21, 2007)  As held

---

[6]Akin Gump's suggests that the *Paul* decision hinged on the defendant's status as "supervisors" (*see* Opp. n. 7), however the reference to supervisors refers to the particular facts of that case (as in *Sorrells*).  The operative concern of the court was that an agent for the party to the contract was "not an officer" of the party and thus was not entitled to an unqualified privilege; rather, the plaintiff would have to show that the agent acted with malice.  *Paul*, 754 A.2d at 309.

by the Court of Appeals, "when a plaintiff has presented no evidence of malice, as in this case, summary judgment for the defendant is warranted. . . ." *Paul*, 754 A.2d at 309 n. 24; *cf Temps & Co., Inc. v. Finova Mezzanine Capital, Inc.*, No. 00-1349, 2001 WL 503249 *2 (D.D.C. May 9, 2001)(defense of legal justification due to financial interest may only be overcome by showing of malice). *See also Sullivan v. Heritage Foundation,* 399 A.2d 856, 861 (D.C. 1979)(rejecting intentional interference claim for failure to demonstrate malice); *Weiss v. Lehman*, 713 F. Supp. 489, 503 (D.D.C. 1989)(same).

Similarly, Mr. Gross' conveyance of truthful information to the potential clients also provides a defense to Akin Gump's claims (*see* Mot. at 8-9, 13, 14, 15), and Defendant does not present any evidence to challenge Mr. Gross' assertions that his communications were truthful. (*See* Opp.) As noted in the Restatement, an individual cannot improperly interfere with a prospective contractual relation by providing "truthful information." Restatement (Second) of Torts § 772(a). According to the comment to Section 772(a):

> There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another. It is also true whether or not the information is requested.

*Id*. at § 772 cmt. b. *See also Int'l City Mgmt. Ass'n Retirement Corp. v. Watkins*, 726 F. Supp. 1, 6 (D.D.C. 1989); *Weiss*, 713 F. Supp. at 503.

Similarly, Akin Gump provides no countervailing facts to Mr. Gross' argument that he provided honest advice in connection with his communications. (*See* Mot. at 8-9, 13-14, 14-15, 18.) Under the Restatement, even an individual who intentionally interferes with a prospective contract

"does not interfere improperly" by giving "honest advice within the scope of a request for the advice." Restatement (Second) of Torts § 772(b); *Kaempfer v. Brown*, 109 B.R. 527. 532 n. 7 (D.D.C. 1990). In this case, the parties agree that Prospective Client sought advice concerning representation by Akin Gump, with Mr. Gross as his primary source of contact. (*See* Opp. at 8 n. 8.)

Mr. Gross' conveyance of truthful and honest advice to Prospective Client stands in a similar light with respect to Defendant's breach of duty of loyalty claims. Mr. Gross agrees that he owed a duty of loyalty to his employer, but Akin Gump leaves largely unchallenged Mr. Gross' concomitant duty to his clients and potential clients. (*See* Motion at 14.) *See also, e.g., Comm'r of Internal Revenue v. Banks*, 543 U.S. 426, 436 (2005)("The attorney is an agent who is duty bound to act solely in the interests of the principal. . . .").[7]

Defendant's citation to case law is of little help in meeting its burden. Each of the cases relied upon by Akin Gump involves an employee who actively solicited the employer's clients or contracts in order for the employee to claim the business for himself. (*See* Opp. at 20-22, citing *PM Services v. Odoi Assocs., Inc.*, 03-1810, 2006 WL 20382 (D.D.C. Jan. 4, 2006); *Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC*, 966 F.Supp 1250, 1264-65 (D.D.C. 1997); *Furash & Company, Inc. v. McClave, et al.*, 130 F.Supp. 2d 48, 53-54 (D.D.C. 2001); *Radio TV Reports, Inc. v. Paul Ingersoll*, 742 F.Supp. 19, 21-22 (D.D.C. 1990). There is no such evidence here, and Defendant's claims that Mr. Gross acted out of some self interest are far too attenuated to create a material issue of fact. Unlike the cases relied upon, in which evidence of actual benefit was set forth by the

---

[7]Contrary to Defendant's claim (Opp. at 21), Mr. Gross did not "keep secret" his concerns regarding a potential conflict of interest between Company X and Company Y, rather he informed Sukhan Kim of the conflict. (Ex. 15 at AK002080.)

plaintiff, the record is devoid of such evidence with respect to Mr. Gross, undermining any claim of wrongful intent.  Summary judgment should be granted..

### III.     Defendant's Evidentiary Objections are Unavailing.

Akin Gump misguidedly argues that Mr. Gross lacks "admissible evidence" to support the factual bases that justify a grant of summary judgment on Defendant's counterclaims.  (*See* Opp. at 11, 15, 18.)  Akin Gump's blanket claims of inadmissibility do not hold water and must be rejected.

First, and notably, the e-mails and other documents that Akin Gump now claims are hearsay were maintained by Akin Gump among its business records, some of which were relied upon throughout its opposition to summary judgment, as well as its own motion for summary judgment. (*See* Opp.; *see also* Exhibits A, 1, 2, 3, and C attached to Opp.; Defendant's Motion for Summary Judgment, November 2, 2007, Statement of Undisputed Material Facts, and exhibits attached thereto.)  The e-mails and other documents relied upon by Mr. Gross were produced by Akin Gump in this litigation and may qualify as admissible business records pursuant to Rule 803(6) of the Federal Rules of Evidence.[8]  Plaintiff submits at Attachment A an affidavit of Mr. Gross providing a foundation for the admission of the documents as business records.  *See Copabianco v. City of New York*, 442 F.3d 47, 55 (2d Cir. 2005)(approving of submission of affidavit after challenge in order to cure any need for foundation); *Strauss v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007)(same, citing cases).

In this case, Plaintiff's exhibits constituting e-mails and draft retainer agreements were made and maintained in the regular course of business and thus are admissible business records pursuant

---

[8]The exhibits are authenticated by the fact that they were produced by Akin Gump from its files.  *See* Fed. R. Evid. 901(a); *Burgess v. Premiere Corp.*, 727 F.2d 826, 835 (9th Cir. 1984); *Snyder v. Wittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988).

to Fed. R. Evid. 803(6).  (*See* Att. A.)  Therefore, Defendant's objections set forth in ¶¶ 3, 6, 7, 8, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 25, and 34 are without merit.

As well, Akin Gump has affirmatively relied on Exhibits 9 and 15.  (*See* Def. Statement at ¶¶ 8, 13, 14,  16, 36, 37, and 41.)  By citing to these exhibits for its own purposes, Akin Gump has waived objection to their admissibility.  *Copabianco*, 442 F.3d at 55 (citing 10A Charles Alan Wright, *et al.*, Federal Practice & Procedure § 2722, at 384-85 (3d ed. 1998); Fed. R. Civ. P. 801(d)(2)(B)).

Additionally, several of the records contain admissions of a party opponent and are thus non-hearsay pursuant to Rule 801(d)(2) of the Federal Rules of Evidence.  Consequently, Defendant's objections to its admissions contained in ¶¶5, 8, 18, 19, 20, 21, 25 of its Statement of Material Facts must be rejected.  Notably, admissions include not only statements of a party opponent, but also statements of which the opposing "party has manifested an adoption or belief in its truth." Fed. R. Civ. P. 801(d)(2)(b).  "There is no requirement that a party admission be based on personal knowledge." *Blackburn v. United Parcel Services, Inc.*, 179 F.3d 81, 96 (3d Cir. 1999).  Mr. Gross' Exhibit 10, for instance,  consists of an email circulated by Akin Gump partner Jay Cohen in which Mr. Cohen indicates that he cut and pasted a message from the Prospective Client containing a statement about which Mr. Cohen adopted a belief in its truth.  As a result, Defendant's arguments in paragraphs 17, 18, 19, 21, and 25 are without merit and the exhibit should be admitted as non-hearsay evidence pursuant to Rule 801(d)(2)(B).

Finally, Mr. Gross has offered exhibits for the non-hearsay purpose of demonstrating the effect the communications had upon him, which is relevant to intent, motive, and causation.  *See* Fed. R. Civ. P. 801(c); *Royall v. National Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93,

98 n. 10 (D.D.C. 2007)(third party statements admissible for non hearsay purpose of demonstrating defendant's reasons for acting and absence of unlawful intent)(citing cases)).  Accordingly, Exhibits 3, 7, 9,10,11, 14, 15, and 18 are admissible for the effect of the statements on the hearer, and Defendant's evidentiary arguments in ¶¶3, 4, 7, 10, 11, 13, 14, 15, 17, 18, 19, 20, 21, 25, 30, 31, and 34 are without merit.

**IV.    Akin Gump's After-Acquired Evidence Defense Must be Dismissed.**

Akin Gump claims that it has evidence that it would have terminated Mr. Gross for the honest and truthful advice he provided, yet it can point only to the self-serving assertion by Bruce McLean that he would have terminated Mr. Gross for the conduct.  (*See* Opp. at 22-25.)  In its opposition to summary judgment, Akin Gump offers no further evidence of any terminations for similar conduct, which is fatal to its claims.  *See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047-48 (7th Cir. 1999).

Akin Gump relies on *Ekandem v. District of Columbia*, 91-1060-LFO, 1997 WL 361187 (D.D.C. June 23, 1997), a case in which Judge Oberdorfer held that prospective relief must be denied where the plaintiff falsely represented that he was a United States citizen on his application for a job with the District of Columbia government (*see* Opp. at 23) but, unlike here, there is no indication that the plaintiff in *Ekandem* offered any evidence to undermine the claim.  *See Ekandem*, 1997 WL 1187 *6.  As well, there is no evidence, as there is here, that the employer did not have a practice of discharging employees for similar reasons or that the plaintiff offered the argument advanced by Mr. Gross.  (*See id.*)  The *Ekandem* case is of no benefit to Defendant.

As well, two non-controlling cases from within the Ninth Circuit, *Jackson v. ABC Nissan, Inc.*, No. CV-03-0563-PHX-SMM, 2006 WL 2256908 (D. Ariz. Aug. 4, 2006) and *O'Day v.*

*McDonnel Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996), on which Defendant relies to suggest that an employer cannot be expected to have evidence of the "precise misconduct at issue" (*see* Opp. at 23-25), are of little help to Akin Gump.  In this case, Akin Gump presented no evidence of even a single termination it made for any type breach of fiduciary duty or tortious interference with economic advantage, let alone the "precise misconduct at issue."  (*See* Ex. 22, Defendant's Objections and Responses to Plaintiff's Third Set of Interrogatories,  August 16, 2007, at 4.)  This, despite the competition of attorneys moving with clients among law firms.

Despite the "precise misconduct" reasoning in the Ninth Circuit, the District of Columbia Circuit and the Seventh Circuit adhere to a more generalized inquiry.  The D.C. Circuit has found that an employer's absence of proof of "similar" misconduct is sufficient to defeat an employer's assertion of an after-acquired evidence affirmative defense in the context of proceedings under the National Labor Relations Act.  *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 760 (D.C. Cir. 2000). Applying the Supreme Court's decision in *McKennon v. v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), which also guides this matter, the Court in *Frazier* found that the company's policy justifying termination for falsification of an employment application was insufficient to prove it would have actually terminated the employee.  *Frazier*, 213 F.3d at 760-61.  Akin Gump ignores this holding and instead attempts to rely on the Court's observation that "there will always be a first case." (Opp. at 23.) That dicta, however, cannot undermine the D.C. Circuit's holding that the employer could not meet its burden because "the company has provided no evidence that it has routinely dismissed employees for similar omissions." *Frazier*, 213 F.3d at 761.

**CONCLUSION**

For the foregoing reasons, Plaintiff and Counterclaim defendant Gross respectfully requests that this Honorable Court grant his Motion for Summary Judgment in its entirety.

Respectfully Submitted,

WEBSTER,   FREDRICKSON,   HENRICHSEN, CORREIA & PUTH, P.L.L.C.

_____*/s/  Jonathan C. Puth*_____
Jonathan C. Puth  #439241
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorney for Plaintiff

-13-

## CERTIFICATE OF SERVICE

I hereby certify that on this **22nd** day of January, 2008, a copy of the forgoing Plaintiff and Counterclaim Defendant Donald Gross' Reply In Support of His Motion for Summary Judgment was transmitted electronically to:

Christine Nicolaides Kearns, Esq.
Karen Faye McTavish, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N St., N.W.
Washington, DC  20037

Counsel for Defendant


    **/s/  Jonathan C. Puth**
Jonathan C. Puth
Webster, Fredrickson & Brackshaw
1775 K Street, N.W.
Suite 600
Washington, D.C.  20006
(202) 659-8510

Attorney for Plaintiff

-14-

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD G. GROSS )
)
)
Plaintiff, )
)
v. )
)
AKIN GUMP STRAUSS HAUER & FELD LLP )
)
Defendant. )

Civil Action No. 07-399 (EGS/JMF)

## AFFIDAVIT OF DONALD G. GROSS

I, Donald G. Gross, state as follows:

1.    I was employed as Senior Counsel at Akin Gump Strauss Hauer & Feld LLP ("Akin Gump" or "the firm") from July 2003 through October 2004.

2.    In my job as Senior Counsel, I regularly used the firm's e-mail system to communicate with clients and potential clients, and with other attorneys and employees at Akin Gump. I also used the firm's computer network and word processing software to draft memos and other documents, including draft retainer agreements for prospective clients. Through my work as Senior Counsel, I have knowledge of Akin Gump's use and retention of e-mails and documents created electronically.

3.    I have reviewed the e-mails and draft retainer agreements attached to Counterclaim Defendant Donald Gross' Motion for Summary Judgment Dismissing Counterclaims, and Plaintiff's Motion for Partial Summary Judgment Dismissing After-Acquired Evidence Defense, all of which were produced by Akin Gump during discovery in this matter. With the exception of the e-mails attached as Exhibits 17, 19, and 20, I have personal

knowledge that each of the e-mails and draft retainer agreements records acts, events, conditions, and opinions made at or near the time of the acts or events, by or from information transmitted by one with personal knowledge of the events or acts.  As well, the records were kept in the course of Akin Gump's regularly conducted business activity, and it was the regular practice of Akin Gump to keep the records.

I declare under penalty of perjury that the foregoing is true and correct.

_Donald G. Gross_

Donald G. Gross

Subscribed and sworn to before me this _12nd_ day of January 2008.

_Gail B. Spence_

Notary Public

GAIL M. SPENCE
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires May 14, 2010

My Commission expires:

169

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3                                    ORIGINAL

4    DONALD G. GROSS,

5         Plaintiff,               Civil No.

6    vs.                          07-399 (EGS)

7    AKIN GUMP STRAUSS HAUER & FELD LLP,

8         Defendant.

9              -    -    -    -    -

10         CONTINUING DEPOSITION OF SUKHAN KIM

11                   Washington, D.C.

12                   October 16, 2007

13   The continuing deposition of Sukhan Kim was

14   convened on Tuesday, October 16, 2007,

15   commencing at 9:45:07 a.m., at the offices of

16   Webster Fredrickson Henrichsen Correia & Puth,

17   1775 K Street, N.W., Suite 600, Washington,

18   D.C., before Paula G. Satkin, Registered

19   Professional Reporter and Notary Public.

20   Job No. 1-13698

21   Pages 169 - 214, Volume II

22              -    -    -    -    -


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

173

```
 1              P R O C E E D I N G S

 2

 3     Whereupon--

 4                      SUKHAN KIM

 5     a witness, called for examination, having

 6     previously been duly sworn, was examined and

 7     testified further as follows:

 8

 9               EXAMINATION BY COUNSEL FOR

10                 PLAINTIFF -- RESUMED

11

12     BY MR. PUTH:

13          Q.    Mr. Kim, we're continuing your

14     deposition today, so that you remain under oath.

15     Do you understand that?

16          A.    Yes.

17          Q.    Okay.  Mr. Kim, I wanted to focus

18     on some documents that we didn't have a chance

19     to get around to last time, and have this marked

20     as Exhibit 64, please.

21               (KIM Exhibit Number 64 was marked

22     for identification.)
```

176

1  said, "don't worry, we'll pay you, we'll pay you

2  handsomely." So along that general, really,

3  line, we talked about it, but I don't remember

4  specific detailed discussions prior to this

5  e-mail.

6          Q.    Okay. And you wanted to raise the

7  issue more pointedly on September 20th, 2004?

8          A.    Yes, on a formal basis.

9          Q.    Okay. And then what did you

10  understand from Mr. Gale's reply to you later

11  that day?

12          A.    Which one?

13          Q.    The e-mail beginning on the second

14  page -- third page of Exhibit 64?

15          A.    The bottom?

16          Q.    Yes.

17          Ms. McTAVISH: I'm sorry. Your

18  question was what did he understand?

19  BY MR. PUTH:

20          Q.    What did you understand to be

21  Mr. Gale's reply to you, concerns regarding a

22  retainer?

180

1    sorry.  The question was what did he understand

2    with respect to the retainer, his $50,000

3    retainer.

4                 THE WITNESS:  There is nothing

5    really on the retainer.

6    BY MR. PUTH:

7         Q.    What did you understand Mr. Gale's

8    reaction to your suggestion of the retainer?

9         A.    My understanding?

10        Q.    Yeah.

11        A.    Somehow he didn't want Jaemin to

12   be involved in the project.  Then with regard to

13   the West Side Project, he wanted to discuss

14   separate, I guess, retainer.

15        Q.    For the West Side Project?

16        A.    Yes, that was my understanding.

17        Q.    His focus was on that, as opposed

18   to the New Songdo City Project?

19        A.    I didn't really -- I didn't

20   recall, but as I read it now, that's my

21   reaction.

22        Q.    Okay.  You had indicated that you

181

1    were disappointed with Mr. Gale's reaction to

2    your suggestion of a $50,000 retainer?

3         A.    Yes.

4         Q.    You had testified to that

5    previously; right?

6         A.    Right.

7         Q.    And was this the reaction that you

8    were thinking of?

9         A.    No.

10        Q.    Okay.  What was that reaction?

11   What was that in reaction to?

12        A.    I don't really recall, but

13   either -- I mean I don't want to guess, but

14   somehow I was informed that he doesn't want to

15   go with $50,000 retainer.  I don't know how I

16   find that out but, yes, sir.

17        Q.    Okay.  All right.  Well, in your

18   reply to Mr. Gale on September 23rd, you

19   actually suggest that maybe it's not best --

20   maybe it's best for us not to go forward with

21   this representation?

22        A.    September 23rd?

182

1        Q.   Yes.  That's the -- starting on

2   the first page of Exhibit 64 and continuing on

3   to the second page?

4        A.   Yes, I read it.

5        Q.   Okay.  And in that e-mail you

6   suggest to Mr. Gale that it might be best for us

7   not to go forward with this representation;

8   correct?

9        A.   Correct.

10       Q.   And you state, "frankly, I'm

11  surprised about your reaction to my fee

12  proposal."

13       A.   Right.

14       Q.   Right.  And -- what did you mean

15  by that?

16       A.   It's my recollection, we must have

17  had a telephone conversation about this, you

18  know, besides the e-mails that you have.

19       Q.   Okay.

20       A.   Right.

21       Q.   And what was your reaction?

22       A.   My recollection was that he came

183

1    up with a very low figure, and I don't remember,

2    and the number was low enough to lead me to

3    believe that he didn't really want to go forward

4    with the project.

5            Q.    Okay.

6            A.    So, basically, I said, no.

7            Q.    Okay.  And you also say, in the

8    second sentence of your September 23rd e-mail on

9    the first page of Exhibit 64, "actually, I was

10   focusing more on the Songdo City Project where I

11   thought we could be most helpful to you and your

12   company"?

13           A.    Yes.

14           Q.    What did you mean by that?

15           A.    Well, basically, when we -- when I

16   met Stan Gale in July, we only focused on Songdo

17   City, nothing else.  And then sometime later he

18   mentioned this Manhattan project, and so that

19   was something that was entirely different from

20   our original conversation.

21           Q.    Right.

22           A.    And as to our possible engagement.

184

1   That's why I said I was focused on Songdo City.

2          Q.    Right.  And is it true that Songdo

3   City was a very, very large project?

4          A.    Yes.  Maybe largest in the world.

5          Q.    What did it entail?

6          A.    Entire city.  They were building a

7   new city, in new area, hotels, schools,

8   convention centers.  Maybe biggest in the world,

9   yes.

10         Q.    Okay.  All right.  And so did you

11  understand when Mr. Gale replied to you on

12  September 21st he was suggesting that maybe the

13  limited role for you might be just working on --

14  in Manhattan?

15              MS. McTAVISH:  I'm sorry.  I'm

16  going to object that you're asking him what

17  Mr. Gale meant?

18              MR. PUTH:  I'm asking him about

19  his understanding.

20              MS. McTAVISH:  I going to object

21  as speculative.

22              MR. PUTH:  Let me withdraw the

185

1    question and ask another question.

2    BY MR. PUTH:

3        Q.    Did you understand from Mr. Gale

4    that the scope of your work suggested to you was

5    to work instead on the Manhattan work?

6        A.    No.  No, no.  In addition to

7    Songdo City Project.

8        Q.    Okay.  All right.  Then let's look

9    at Mr. Gale's response to you, September 24th,

10   on the first page of Exhibit 64, in the middle?

11       A.    Right.

12       Q.    Do you see that?

13       A.    Right.

14       Q.    And it appears that Mr. Gale's

15   referring in the first sentence to a

16   conversation between you and him, of the day

17   before?

18       A.    Yes.

19       Q.    Okay.  Do you think that was a

20   telephone conversation?

21       A.    I really don't recall.

22       Q.    Okay.  Do you think you got

186

```
 1    together face to face?

 2             A.    No, no.  Not over this, no.

 3             Q.    Okay.

 4             A.    That's why I said my recollection

 5    is that we spoke.

 6             Q.    Okay.

 7             A.    That's my recollection, but it

 8    goes back several years, so.

 9             Q.    All right.  But you don't have any

10    doubt that you had a conversation with Mr. Gale,

11    subsequent to your e-mail of September 23rd

12    regarding the representation?

13                  MS. McTAVISH:  I think that

14    mischaracterizes his testimony.  I think that he

15    says he doesn't specifically recall it.

16    BY MR. PUTH:

17             Q.    Right, but do you have any doubt

18    as to whether you had a conversation with

19    Mr. Gale after you suggested that perhaps the

20    representation was not a good idea?

21             A.    We spoke quite a bit.  That's why

22    I don't know whether we talked about this fee
```

214

```
 1              CERTIFICATE OF NOTARY PUBLIC.

 2      I, Paula G. Satkin, the officer before whom the

 3  foregoing proceedings were taken, do hereby

 4  certify that the witness whose testimony appears

 5  in the foregoing proceeding was duly sworn by

 6  me; that the testimony of said witness was taken

 7  by me in stenotype and thereafter reduced to

 8  typewriting under my direction; that said

 9  proceedings is a true record of the testimony

10  given by said witness; that I am neither counsel

11  for, related to, nor employed by any of the

12  parties to the action in which these proceedings

13  were taken; and, further, that I am not a

14  relative or employee of any attorney or counsel

15  employed by the parties hereto, nor financially

16  or otherwise interested in the outcome of the

17  action.

18  My commission expires October 31, 2010.

19

20                    Paula G. Satkin

21                    PAULA G. SATKIN

                   Notary Public in and for the

22                    District of Columbia
```