**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
DONALD G. GROSS,               )
                               )
              Plaintiff,       )
                               )        Civ. No. 07-399(EGS)
        v.                     )
                               )
AKIN, GUMP, STRAUSS, HAUER, &  )
FELD LLP,                      )
                               )
              Defendant        )
                               )
                               )
_____)
```

**MEMORANDUM OPINION**

Donald G. Gross ("Gross" or "plaintiff") filed suit against his former employer, Akin, Gump, Strauss, Hauer, & Feld, LLP ("Akin Gump" or "defendants"), alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.* Gross claims that his termination was based on Akin Gump's discrimination against him because of his age. Akin Gump denies the charges, and after finding evidence of alleged wrong-doing by Gross during discovery, Akin Gump filed counterclaims against him for breach of fiduciary duty of loyalty and tortious interference with economic advantage. Gross counterclaimed for retaliation under

1

ADEA and DCHRA and moved for partial summary judgment on Akin
Gump's counterclaims.  Akin Gump moved for summary judgment on
Gross's age discrimination and retaliation claims.  After careful
consideration of the parties' filings and applicable case law,
this Court **GRANTS** Akin Gump's motion for summary judgment for all
claims and **DENIES** Gross's cross-motion for partial summary
judgment.

**I.     BACKGROUND**

    **A.     Age Discrimination Claims**

This Court recites the facts in the light most favorable to
the non-moving party.  *Hatch v. District of Columbia*, 184 F.3d
846, 848 (D.C. Cir. 1999).  As this case involves both a motion
and a cross-motion for summary judgment, the non-moving parties
differ for the separate motions.

In June 2003, Gross was hired as Senior Counsel in the
Washington, D.C. office of Akin Gump, a law firm.  Compl. at  8.
Though several Akin Gump attorneys raised concerns about Gross's
qualifications before he was hired, Sukhan Kim, the head of the
Korea Practice Group, recommended that Akin Gump hire Gross.  As
a result of the misgivings within the firm about Gross's
qualifications, Akin Gump made an atypical decision to put a
clause in Gross's offer letter which specifically stated that the
firm would review his employment situation after one year and

2

reassess the needs of the firm and the terms of his employment. First Amended Answer and Counterclaims ("CC") at 5.

Gross was fifty years old at the time he was hired.  He was assigned to work in the International Trade Practice Group and with Akin Gump's Korea Practice Group helping to organize and administer the group.[1]  As Senior Counsel, he was told numerous times by his superiors at the firm that he was expected to bill 2,100 hours a year.  *See* Def. Statement of Undisputed Material Facts ("Statement") at 22.

Gross alleges that during his interview, Kim indicated that he was uncomfortable hiring a fifty year-old attorney.  Compl. at 9-10.  Gross also alleges that Kim stated, "I am concerned about your age," and "you seem very old to be starting out in a major law firm."  *Id.*  Gross claims that Michael Quigley, the second-highest ranking partner in the Korea Group, was present for these comments and did not interject, thereby condoning these ageist remarks.  In response, Gross alleges that he told Kim that he hoped that Defendants would not take his age and experience against him.  *Id.* at 11.

In March 2004, Gross took a three-week absence for minimally-invasive heart-valve surgery.  *Id.* at 12.  Gross alleges that upon his return from surgery, Kim's demeanor towards

---

[1] The Korea Practice Group is an informal group of attorneys who are all assigned to various formal practice groups, but who work on Korea matters.

plaintiff changed and that his work assignments changed considerably.  Gross claims that Kim avoided meeting with him or contacting him by phone or e-mail.  Gross alleges that Kim began communicating with him only through David Park, a significantly younger attorney in the Korea Practice Group.  *Id.*

Gross claims that in or around April 2004, he asked Park why Kim refused to communicate with him directly.  Gross alleges that Park explained that for cultural reasons, "Korean employers like Kim prefer a clear superior-subordinate relationship, and that Mr. Kim felt that Plaintiff [fifty-one] was too old to work in a relationship in which he was subordinate to Mr. Kim [fifty-four] as well as Mr. Quigley, who was approximately [forty-six] years old."  *Id.* at  13.  Gross claims that Park told him that his age was a "big problem" for Kim and that Gross's recent heart surgery deepened Kim's concerns about Gross's age.  *Id.*  Gross alleges that Park told him that Kim had directed Park, who is in his thirties, to take charge of the projects headed by Gross.  *Id.* at 14.

Gross also claims that shortly after he returned from his surgery, Kim said to him, "we're both getting older."  *Id.* at 16. Gross alleges that Kim asked him when he planned to retire, "suggesting that it was appropriate for him to be moving in that direction."  *Id.* at 18.  Gross also claims that in July 2004, Kim and Quigley made negative comments about Gross's age and

4

suggested that he should not be working for Akin Gump. *Id.* at 19. Specifically, on July 13, 2004, Gross alleges that Kim told him that he was "too old to do the kind of work [he was] doing." *Id.* at 20. Gross claims that Kim asked him his age again, and when he said that he was fifty-one, Kim stated that he was "'very uncomfortable' that [Gross] was 'still doing writing and research' at his age." *Id.*

Gross alleges that Kim suggested to him that he should explore other opportunities within the firm, particularly working with the firm's public law and policy practice group. *Id.* at 21. Gross claims that the only reason Kim provided for seeking his removal from the Korea Practice Group was that Kim was uncomfortable with Gross's age. *Id.* A few days after that, Gross alleges that Quigley, who said that he completely agreed with Kim, said that Gross was "not a good fit" with the Korea Practice Group because he was "too old to be doing junior-level work." *Id.* at 22.

Over the year Gross was employed at Akin Gump, a number of different attorneys with whom Gross worked complained about the quality of his work and his productivity. *See* Def. Mot. for Summ. J. at 2. For example, Val Slater, the head of the International Trade Practice Group, brought her concerns about Gross's low billable hours to the attention of R. Bruce McLean, Akin Gump's Chairman. McLean initiated an independent assessment

5

of Gross's productivity and performance.  McLean spoke with
Quigley about Gross's failure to meet his billable hours
requirement.  *Id.*  Quigley told McLean that Gross was not a "good
fit" for the Korea Group.  Former Akin Gump partner Michael Kaye
and associates David Park and Lisa Ross complained about Gross's
poor writing skills and his unsatisfactory work product.  *Id.* at
7.  A senior advisor at the Center for Strategic and
International Studies also commented that Gross's work was of a
poor quality.  *See id.*

After conducting his independent assessment, McLean made the
decision to terminate Gross.  McLean noted the two main problems
with Gross:  "First of all, there was a very substantial lack of
productivity.  Secondly, even with respect to the tasks that he
was asked to accomplish there were performance issues with
respect to . . . his ability to carry out those tasks."
Statement at 52.  McLean testified that he made this decision
without any input from Kim.  According to Akin Gump, the extent
to which Kim was involved in the decision to terminate Gross
included relaying the termination decision to him.  *See id.* at
52-55.

On July 13, 2004, Kim informed Gross that Akin Gump was
terminating his employment effective October 1, 2004.  *Id.* at 61.
On August 6, 2004, Gross wrote an e-mail to Kim expressing how
upset he was that he was being asked to leave the firm.  CC at

15.  Gross solicited Kim's support for a position somewhere else in the firm, and Gross asked Kim if he would recommend him to one of Kim's contacts outside of the firm.  *Id.* at 17.  Kim told Gross that he would do his best.

On September 1, 2004, Gross met with Rick Burdick, the partner who heads the Washington, D.C. office.  Burdick told Gross that he had not heard about his termination.  Burdick said that he would speak to McLean and Quigley about Gross's termination.  *Id.* at 25.  Later, Burdick informed Gross that he could explore opportunities in the public law and policy group, but he would have to leave the firm if he could not find work with another group.  Gross was unable to find a position in the public law and policy group.  *Id.* at 26-27.  Kim, however, negotiated a one-month extension for Gross.  On or about October 27, 2004, Gross alleges that Kim reiterated that Gross was being terminated because he was "too senior" and "not a good fit."  *Id.* at 28.  Akin Gump terminated Gross's employment on October 31, 2004.

In his deposition, Gross admitted that he never complained to anyone at Akin Gump about any alleged age discrimination at Akin Gump.  *See id.* at 74.  There is nothing on the record that indicates that he complained to anyone outside of Akin Gump either.  He waited six months after his termination to file a charge with the Equal Employment Opportunity Commission ("EEOC")

7

in April 2005.

**B.   Breach of Fiduciary Duty and Tortious Interference Claims**

During the discovery phase of this litigation, Akin Gump uncovered evidence of an alleged breach of fiduciary duty and tortious interference with economic advantage by Gross.  *See* CC at 24-25.  The bases for Akin Gump's allegations were only uncovered in response to discovery requests from Gross in May and June 2007.  *Id.* at 25.  Prior to leaving the firm, Gross had been working to help persuade a prospective client ("Prospective Client") to retain Akin Gump and sign a proposed engagement letter which Gross had drafted and negotiated with the help of others at the firm.  *Id.* at 10.  Gross and others at the firm had done significant work in anticipation of certain exclusive rights to perform services for Prospective Client.  *Id.*

On July 25, 2004, Gross conveyed reservations to Prospective Client about retaining Akin Gump.  Gross wrote:  "Before you commit yourself to a partnership with Akin Gump, I want to make sure that the law firm is a hundred percent behind your project."  *Id.* at 11.  On July 29, 2004, Gross encouraged Prospective Client not to sign a retainer with Akin Gump.  Specifically, Gross wrote:  "For the moment, I think you should delay signing the engagement letter.  The law firm will be unhappy with this recommendation, but I can't in good conscience ask you to rely exclusively on Akin Gump until I see actions matching words."

8

*Id.* at 12.  The Prospective Client did not sign an engagement letter with Akin Gump.

Gross also made numerous disparaging comments about Akin Gump to Prospective Client, who was an advisor to a company ("Company X") that Akin Gump had been working with to retain business.  He sent the following messages in separate e-mails to Prospective Client and Company X:

> If [Company X] thinks it needs Washington representation, it should stick with its current law firm which has recently merged with a top D.C. firm.
>
> Sukhan [Kim] said he thought [CEO of Company X] might explore retaining Akin Gump to help make a deal with [Company Y.]  This didn't make sense to me at the time, and still doesn't, because Sukhan is so close to [Company Y] and a couple of other Korean business groups that [CEO of Company X] could not possibly trust him to serve as an "honest broker."  Sukhan has never represented an American company doing business in Korea, so far as I know, and is a highly specialized trade lawyer whose practice consists of representing Korean companies in the United States.
>
> Moreover, Sukhan plans to retire soon so I can't imagine he wants to spend his own time helping [Company X].
>
> I didn't know Jaemin [Park] was involved in this, until you mentioned she had a meeting with [CEO of Company X] in Seoul.  Her help is even more questionable. . . .  She claims to have Blue House connections, but except for knowing Hun-jai Lee through her family, she exaggerates her influence.
>
> If [the CEO of Company X] wants to get in touch with some Korean business groups, there

9

are other ways to do it.

Def. Mot. at 26.  Gross admits that he sent the e-mails quoted
above.  *See* Pl. Answer to Def. Counterclaims  11, 12, and 17.

### C.    Procedural History

Gross filed a charge of discrimination with the EEOC on
April 29, 2005, alleging age discrimination under the ADEA and
the DCHRA.  On February 26, 2007, Gross filed his Complaint in
this Court repeating the allegations in the EEOC charge.  Akin
Gump filed an Answer denying the allegations, and the parties
commenced discovery.  On June 25, 2007, Akin Gump filed a motion
to amend its Answer to add an affirmative defense of "after
acquired evidence" based on e-mails it discovered in responding
to Gross's document request.  Akin Gump then added counterclaims
for breach of fiduciary duty and tortious interference with
economic relations based on the newly discovered evidence.  In
response, Gross amended his Complaint to add a retaliation claim
based on Akin Gump's counterclaims.

This Court granted both Motions to Amend on September 10,
2007.  Akin Gump filed a Motion for Summary Judgment on all
claims on November 2, 2007.  Gross filed an opposition to Akin
Gump's Motion for Summary Judgment on December 11, 2007, and a
Motion for Summary Judgment on Akin Gump's counterclaims on
January 22, 2008.

## II.   Standard of Review

Summary judgment is appropriate when the pleadings on file, together with any affidavits, depositions, interrogatories, and admissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).  A dispute of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Facts are material if they "'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment bears the initial burden of demonstrating an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  "When a motion for summary judgment is properly made and supported, [however,] an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324.  "'[A] mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment.'"  *Ginger v. District of Columbia*,

11

527 F.3d 1340, 1347 (D.C. Cir. 2008) (quoting *Harding v. Gray*, 9
F.3d 150, 154 (D.C. Cir. 1993)) (alterations in original).
"Accepting . . . conclusory allegations as true . . . would
defeat the central purpose of the summary judgment device, which
is to weed out those cases insufficiently meritorious to warrant
the expense of a jury trial." *Greene v. Dalton*, 164 F.3d 671,
675 (D.C. Cir. 1999).

When considering a motion for summary judgment, the Court
draws all reasonable inferences in favor of the non-moving party.
*See Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir.
2004). "'As employers rarely maintain records directly
evidencing discrimination, an added measure of rigor or caution
is appropriate in applying this standard to motions for summary
judgment in employment discrimination cases.'" *Brownfield v.
Bair*, 541 F. Supp. 2d 35, 41 (D.D.C. 2008) (quoting *Woodruff v.
Peters*, 482 F.3d 521, 526 (D.C. Cir. 2007)).


## III. DISCUSSION

### A.   Gross's Age Discrimination Claims

Gross alleges that he was terminated by Akin Gump because of
his age in violation of the ADEA and the DCHRA. *McDonnell
Douglas Corp. v. Green*, 411 U.S. 792 (1973), outlines the correct
analytical approach through which this Court must review
plaintiff's claims. Employee allegations of discrimination

trigger this familiar *McDonnell Douglass* burden-shifting framework in federal courts. *See Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002). In the absence of direct evidence of discrimination, the courts use this framework to determine whether an employee-plaintiff has a colorable claim against his or her employer. Claims under the DCHRA are also analyzed under the *McDonnell Douglass* framework. *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361-62 (D.C. 1993); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1367 (D.C. Cir. 2000). Given this congruence, any DCHRA claim necessarily fails if a plaintiff's federal claims cannot survive. A separate analysis under D.C. law, therefore, is unnecessary.

According to the *McDonnell Douglass* framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802; *Stella*, 284 F.3d at 144. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Stella*, 284 F.3d at 144 (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer articulates a non-discriminatory reason for the adverse employment action, the burden then shifts back to the plaintiff, who must demonstrate that the employer's stated reason was merely pretext and that the true reason was discriminatory. *Id.* (citing

13

*McDonnell Douglas*, 411 U.S. at 802).  If the plaintiff cannot demonstrate pretext, the employee's claims necessarily fail.

To make out a *prima facie* case of age discrimination, Gross must demonstrate that he (1) "is a member of a protected class;" (2) "suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) (citations omitted), *cert. denied*, 127 S. Ct. 1140 (2007).

The parties agree that Gross is a member of a protected class and that he suffered an adverse employment action.  Akin Gump disputes whether or not the unfavorable action gives rise to an inference of discrimination.  Accepting the pleadings as true, however, as the Court is required to do here, defendant's alleged comments that Gross was "too old" do indeed give rise to an inference of discrimination.  "'[T]he burden of establishing a prima facie case . . . is not onerous.'" *Wiley v. Glassman*, 511 F.3d 151, 155-56 (D.C. Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)) (second alterationa in original).  Gross's allegations satisfy the requirements for a *prima facie* case of age discrimination.  The burden then shifts to Akin Gump to demonstrate a legitimate, non-discriminatory reason for terminating Gross.  *See McDonnell Douglas*, 411 U.S. at 802.

Akin Gump submitted evidence in the record which

overwhelmingly demonstrates that Gross was terminated because he failed to meet the terms of his contract.  Numerous lawyers and partners at Akin Gump complained about Gross's poor work product. Further, Gross was not able to bill the hours he was expected to bill as Senior Counsel; he sent himself e-mails acknowledging this shortcoming.  *See* Statement at 48.  Simply put, Gross was not able to adequately perform the essential functions for which he was hired.  The evidence in the record demonstrates that Akin Gump had a legitimate, non-discriminatory reason for terminating him.  Gross's offer letter provided clear notice that he was hired on a probationary period and that if he did not adequately perform his duties, he would be terminated.

Furthermore, the D.C. Circuit has repeatedly upheld grants of summary judgment in discrimination cases where the decision-maker completed an independent assessment of the relevant facts and made an independent decision to terminate an employee.  *See Vickers v. Powell*, 493 F.3d 186, 195-96 (D.C. Cir. 2007); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079 (D.C. Cir. 1999); *see also Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 870 (D.C. 1997).  Gross makes no allegations of ageism against McLean.  *See Thompson v. Coca-Cola Co.*, 522 F.3d 168, 178 (1st Cir. 2008) ("'Actionable discrimination cannot exist in a vacuum. Rather the discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision

to fire him.'" (quoting *Bennett v. Saint-Gobain Corp.*, 507 F.3d
23, 31 (1st Cir. 2007))).  "Statements made by those who are not
involved in the decisional process 'normally are insufficient,
standing alone, to establish either pretext or the requisite
discriminatory animus.'"  *Bennett*, 507 F.3d at 31 (quoting
*Velázquez-Fernández v. NCE Foods, Inc.*, 476 F.3d 6, 11-12 (1st
Cir. 2007)).  There is no evidence in the record that contradicts
McLean's insistence that he conducted an independent assessment
of Gross and that the decision to terminate Gross's employment
was made without input from Kim.  McLean testified that he
decided to terminate Gross "because there were serious
performance issues." Def. Mot. at 18.  The record supports this
determination.

     There is also no evidence that Kim recommended to Quigley
that Gross's employment be terminated.  If anything, it is clear
that Kim went out of his way to attempt to assist Gross after the
decision was made to terminate him.  Kim encouraged him to look
for work in another group at the firm, told Gross that he would
see what he could do about finding Gross employment with Akin
Gump clients, and secured an additional month of employment for
Gross at the firm.  All the while, Gross sent e-mails to Kim
thanking him for assistance.

     Since Akin Gump has provided a legitimate non-discriminatory
reason for terminating Gross's employment, the burden shifts back

to Gross to demonstrate a pretext for his termination. *See McDonnell Douglas*, 411 U.S. at 802. When evaluating allegations of pretext, D.C. Circuit case law is clear:  this Court may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)) (first alteration added). The evidence on the record suggests that McLean in fact believed that Gross was not performing as expected. There is an abundance of evidence, furthermore, demonstrating that Gross was not meeting the expectations that were set for him when he was hired by defendants. Gross has not been able to demonstrate that his termination was based on pretext, and he "cannot establish pretext simply based on [his] own subjective assessment of [his] own performance, for 'plaintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant." *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Smith v. Chamber of Commerce of*

*the U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986)) (original alterations omitted and alterations added).  Gross's claims fail, and Defendant's Motion for Summary Judgment on the age discrimination claims is **GRANTED**.

      **B.    Akin Gump's Counterclaims Alleging Breach of Fiduciary Duty and Tortious Interference**

Akin Gump argues that Gross's e-mails to Prospective Client and Company X breached his fiduciary duty with the firm and tortiously interfered with economic advantage.  Gross argues that Akin Gump fails to demonstrate the requisite intent necessary to make out a claim for tortious interference.  The Court is not persuaded by Gross's argument.

      **a.    Breach of Fiduciary Duty**

As an employee, Gross owed "'an undivided and unselfish loyalty'" to Akin Gump "such that 'there shall be no conflict between duty and self interest.'"  *PM Servs. Co. v. Odoi Assoc.*, 2006 WL 20382, at *27 (D.D.C. Jan. 4, 2006) (quoting *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp 219, 233 (D.D.C. 1996)).  Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters concerned with his agency.  *See id.* (quoting Restatement (Second) of Agency § 387).  Since Gross does not dispute that he sent e-mails to Prospective Client and Company X which depicted Akin Gump in a negative light, a reasonable jury could find that he

breached the fiduciary duty he owed to Akin Gump while under their employ.  Gross's Motion for Summary Judgment is therefore **DENIED**.

### b.   Tortious Interference

To make out a claim of tortious interference with prospective economic advantage, a party must prove "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach [or] termination of the relationship or expectancy, and (4) resultant damage."  *Bennett Entm't, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) (citation omitted).  The evidence in the record clearly demonstrates that Akin Gump meets the threshold showings for a claim of tortious interference with prospective economic advantage.

By Gross's own admission, he had been working on securing a contract with Prospective Client for Akin Gump.  It is fair to say, then, that Akin Gump had a valid expectancy of a business relationship with Prospective Client.  Gross clearly knew of the expectancy, as he was intimately involved in the relationship with and courting of Prospective Client.  Gross admits that he sent e-mails to Prospective Client and Company X relating to Akin Gump's possible representation.  The e-mails he sent were harmful to Akin Gump, as they specifically discouraged Prospective Client

19

from retaining Akin Gump.  Indeed, Gross specifically advised
Prospective Client not to sign a retainer with Akin Gump, and he
acknowledged in the same e-mail that Akin Gump would not be happy
with his recommendation.  The resulting damage is that
Prospective Client did not sign a retainer with Akin Gump.  Gross
admits all of these allegations.  His attempts at explaining why
he sent the e-mails he sent are unavailing.  He claims, for
example, that he felt that Kim could not ethically represent both
Company X and Company Y.  *See* Pl. Opp. to Mot. Sum J. at 9.
Gross did not, however, express any misgivings he may have had to
anyone at Akin Gump.  Gross claimed that he had a duty to
Prospective Client.  In fact, his duty was to Akin Gump.  *See PM
Servs. Co.,* 2006 WL 20382, at *27.  A reasonable jury could find
that he tortiously interfered with Akin Gump's and Prospective
Client's relationship.  *See Furash & Co. v. McClave*, 130 F. Supp.
2d 48, 56 (D.D.C. 2001) ("A reasonable jury might find that [the
defendant's] alleged breach of fiduciary duty destroyed [the
plaintiff's] client relationships.")  Summary judgment for Gross
is improper and the motion is **DENIED.**


### C.    Gross's Retaliation Claims

Gross asserts that Akin Gump's breach of fiduciary duty and
tortious interference claims were filed in retaliation for his
age discrimination claims.  Akin Gump argues that their

counterclaims were filed only after the firm discovered that
Gross sent e-mails to their prospective clients disparaging the
firm.  Akin Gump contends that it only discovered these e-mails
in a response to a discovery request made by Gross as part of
this litigation.  Furthermore, Akin Gump argues that they could
not have retaliated against Gross because he was no longer
employed by defendants when they filed their counterclaims.  This
Court agrees with Akin Gump.

To make out a *prima facie* case for retaliation under the
ADEA or the DCHRA, a plaintiff must demonstrate that:  (1) s/he
engaged in protected activity; (2) s/he suffered adverse
employment action; and (3) there is a causal link between the
protected activity and the adverse action.  *Taylor v. Small*, 350
F.3d 1286, 1292 (D.C. Cir. 2003).

The protected activity Gross alleges that he engaged in was
the filing of his complaint against Akin Gump.  Defendants do not
contest this, and it is clear that the filing of a complaint is a
protected activity.  *See Fabiano v. Hopkins*, 352 F.3d 447, 453
(1st Cir. 2003) ("As an initial matter, every citizen has the
right 'to petition the Government for a redress of grievances.'
U.S. Const. amend. I.  The right of access to the courts is an
established aspect of this right." (citing *Bill Johnson's
Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983))).  Gross,
therefore, satisfies the first prong of the *prima facie* test.

21

The second prong, however, requires more in-depth analysis. Gross argues that the counterclaim Akin Gump filed in this case is an adverse employment action. Gross relies on *Burlington Northern & Santa Fe Railway. Co. v. White*, 548 U.S. 53 (2006), but that case undermines Gross's argument for two reasons. In *Burlington*, the Supreme Court agreed with the D.C. Circuit and held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

As a threshold matter, Gross is no longer an employee of Akin Gump, and he was not an employee when Akin Gump filed its counterclaims. Akin Gump only filed its counterclaims after Gross's discovery request revealed evidence of his alleged wrong-doing. Gross was terminated in October 2004; Akin Gump filed its counterclaims in September 2007, nearly three years later. For this reason alone, Gross does not fit within the group of people *Burlington* seeks to protect. Furthermore, *Burlington*'s reasoning for protecting employees was to prevent employers from dissuading employees from filing discrimination charges. *Id*. Given that Akin Gump's counterclaim was filed after Gross filed suit for age discrimination, there is no way

Akin Gump's counterclaim could dissuade Gross from filing his claim.

The D.C. Circuit has never found that the filing of a counterclaim constitutes an adverse employment action.  Moreover, other federal courts have specifically held that counterclaims cannot, as a matter of law, constitute an adverse employment action.  *See Earl v. Electro-Coatings of Iowa, Inc.*, 2002 WL 32172298, at *2 (N.D. Iowa Oct. 29, 2002) (unpublished) ("Although many different post-termination actions may constitute retaliation, this court holds that, ordinarily, a counterclaim may not.  Initially, the court notes that a counterclaim is not to be considered an employment-related action.  Only in the rare case will conduct that occurs within the scope of litigation amount to retaliation." (citing *Steffes v. Stepan* Co., 144 F.3d 1070, 1075 (7th Cir. 1998))); *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 833-34 (N.D. Ill. 2006) ("[I]f the mere filing of a counterclaim were sufficient to give rise to a retaliation claim, then every defendant in an FLSA, Title VII or ADA lawsuit who asserts a counterclaim would be subject to a retaliation claim.").  Filing a counterclaim is different from initiating a lawsuit against a complaining employee, as "filing a counterclaim will not chill plaintiffs from exercising and enforcing their statutory rights because by the time the employer files its counterclaim, plaintiffs have already made their

charges and initiated a lawsuit." *Beltran*, 426 F. Supp. 2d at 834 (citing *EEOC v. K&J Mgmt. Inc.*, 2000 WL 34248366, at *4 (N.D. Ill. 2000) (unpublished)).

Furthermore, as a matter of law, Akin Gump was required to file its counterclaim.  Rule 13 of the Federal Rules of Civil Procedure requires parties to file counterclaims that "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(1)(A).  Akin Gump's counterclaims were compulsory under the federal rules, and it would have waived those claims had it failed to allege them.

It is clear that Akin Gump filed its counterclaim because it was compulsory, not in retaliation for Gross's suit.  Gross has failed to satisfy the second prong of the *prima facie* test, and the Court need go no further in the analysis.  Akin Gump's Motion for Summary Judgment on this claim is **GRANTED.**


**IV.   CONCLUSION**

Accordingly, defendant's Motion for Summary Judgment is **GRANTED**; plaintiff's cross-motion for Summary Judgment is **DENIED.** An appropriate Order accompanies this Memorandum Opinion.

        **SO ORDERED.**

Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **March 3, 2009**